# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)[1] |

## DISCLOSURE STATEMENT FOR THE AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL*.

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944

*Attorneys for the Financial Oversight and Management Board for Puerto Rico as Representative for the Debtors in their Title III Cases*

Dated:  February 28, 2020

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID:  3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).  The Oversight Board submits this Disclosure Statement in Cases No. 17 BK-1283-LTS (Commonwealth), 17 BK-3566-LTS (ERS), and 17 BK-5523-LTS (PBA).

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN OF ADJUSTMENT.  VOTES MAY NOT BE SOLICITED UNTIL THE TITLE III COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE TITLE III COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

NO OTHER INFORMATION HAS BEEN JUDICIALLY APPROVED.

THE OVERSIGHT BOARD, AS THE DEBTORS' REPRESENTATIVE IN THESE TITLE III CASES PURSUANT TO PROMESA SECTION 315(b), HAS NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION CONCERNING THE PLAN OR THE DEBTORS, OR THE VALUE OF THE DEBTORS' PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER.[2]  HOLDERS OF CLAIMS SHOULD UNDERSTAND THAT ANY INFORMATION, REPRESENTATIONS, WARRANTIES, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF, OR OBTAIN AN ELECTION TO SETTLE CERTAIN CLAIMS PURSUANT TO, THE PLAN HAVE NOT BEEN APPROVED BY THE TITLE III COURT. FURTHER, HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION DISTRIBUTED VIA SOCIAL MEDIA, INCLUDING, BUT NOT LIMITED TO, FACEBOOK, TWITTER, AND INSTAGRAM.

THE PLAN IS THE PRODUCT OF SUBSTANTIAL NEGOTIATIONS AMONG THE OVERSIGHT BOARD (AS THE SOLE REPRESENTATIVE OF THE DEBTORS IN THEIR RESPECTIVE TITLE III CASES), PARTIES TO THE PLAN SUPPORT AGREEMENTS (COLLECTIVELY, THE "SUPPORTING PARTIES"), AND OTHER PARTIES.  THE OVERSIGHT BOARD AND THE SUPPORTING PARTIES BELIEVE THE PLAN REPRESENTS A FAIR AND REASONABLE OUTCOME FOR ALL CREDITORS OF THE DEBTORS AND, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE OVERSIGHT BOARD AND THE SUPPORTING PARTIES RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

FOR THE AVOIDANCE OF DOUBT, THIS DISCLOSURE STATEMENT WAS DRAFTED BY THE OVERSIGHT BOARD, AND SOME OF THE STATEMENTS HEREIN MAY BE DISPUTED BY CERTAIN CREDITORS OR THE GOVERNMENT, INCLUDING, WITHOUT LIMITATION, STATEMENTS REGARDING THE INTERPRETATION OF PROMESA AND RIGHTS AND REMEDIES OF THE DEBTORS AND CREDITORS.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE VIEWS EXPRESSED IN THIS DISCLOSURE STATEMENT ARE THE VIEWS OF THE OVERSIGHT BOARD AND THE DEBTORS ONLY AND MAY NOT BE ATTRIBUTED TO ANY OF THE SUPPORTING PARTIES OR ANY OTHER PARTY.

---

[2] Capitalized terms used but not defined in this Disclosure Statement have the respective meanings given to them in the Plan.

## IMPORTANT INFORMATION

**OVERSIGHT BOARD AUTHORITY.** THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT ("**PROMESA**") PROVIDES THAT THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO (THE "**OVERSIGHT BOARD**") MAY TAKE ANY ACTION NECESSARY TO PROSECUTE A CASE UNDER TITLE III OF PROMESA OF A DEBTOR, INCLUDING FILING A TITLE III PETITION, SUBMITTING A PLAN OF ADJUSTMENT FOR A DEBTOR, AND OTHERWISE GENERALLY SUBMITTING FILINGS IN RELATION TO THE TITLE III CASE. PROMESA ALSO PROVIDES THAT ONLY THE OVERSIGHT BOARD MAY FILE A PLAN OF ADJUSTMENT OF THE DEBTS OF A DEBTOR. PROMESA REQUIRES THAT THE PLAN OF ADJUSTMENT FOR A TITLE III DEBTOR BE FILED IN ITS TITLE III CASE TOGETHER WITH A DOCUMENT CALLED A DISCLOSURE STATEMENT.

**PURPOSE OF DISCLOSURE STATEMENT.** THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") FOR THE AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.* DESCRIBED HEREIN (THE "**PLAN**"). THE FUNCTION OF A DISCLOSURE STATEMENT IS TO PROVIDE A HYPOTHETICAL INVESTOR TYPICAL OF THE CLAIMHOLDERS IN THE CASE INFORMATION REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND CONDITIONS OF THEIR BOOKS AND RECORDS TO ENABLE THE HYPOTHETICAL INVESTOR TO MAKE AN INFORMED JUDGMENT TO ACCEPT OR TO REJECT THE PLAN.

**LIST OF DEBTORS.** THIS DISCLOSURE STATEMENT ACCOMPANIES A JOINT PLAN OF ADJUSTMENT FOR THE FOLLOWING DEBTORS:

- THE COMMONWEALTH OF PUERTO RICO (THE "**COMMONWEALTH**" OR "**PUERTO RICO**"),

- THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO ("**ERS**"), AND

- THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("**PBA**").

**SOURCE OF DATA.** THIS DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND FILED BY THE OVERSIGHT BOARD ON BEHALF OF THE DEBTORS.

THE UNITED STATES GOVERNMENT CREATED THE OVERSIGHT BOARD ON JUNE 30, 2016. THE PRESIDENT OF THE UNITED STATES (THEN PRESIDENT BARACK OBAMA) APPOINTED THE OVERSIGHT BOARD'S SEVEN

VOTING MEMBERS ON AUGUST 31, 2016.  AT ITS INCEPTION, THE OVERSIGHT BOARD HAD NO INFORMATION OR DATABASE OF ITS OWN, BUT HAD THE LEGAL RIGHT TO PROCURE INFORMATION AND DATA FROM THE COMMONWEALTH.

ORIGIN OF FINANCIAL INFORMATION.  ALL FINANCIAL INFORMATION HEREIN IS BASED ON DATA THE OVERSIGHT BOARD HAS EITHER RECEIVED FROM THE COMMONWEALTH AND ITS INSTRUMENTALITIES, OR THAT IS PUBLICLY AVAILABLE.  AS OF THE DATE OF THIS DISCLOSURE STATEMENT, THE COMMONWEALTH HAD NOT YET PUBLISHED AUDITED FINANCIAL STATEMENTS FOR ITS 2017, 2018, AND 2019 FISCAL YEARS.  IN SOME CASES, SUCH AS FOR PENSION LIABILITIES AND DETERMINATIONS OF AVAILABLE CASH, THE OVERSIGHT BOARD RETAINED EXPERTS TO HELP VERIFY AND UNDERSTAND THE DATA.  ACCORDINGLY, WHILE THE OVERSIGHT BOARD HAS USED ITS BEST EFFORTS TO PROCURE ACCURATE AND COMPLETE INFORMATION, IT IS LIMITED TO USING THE COMMONWEALTH'S SYSTEMS AND DATA AS ITS SOURCES AND CANNOT INDEPENDENTLY VOUCH FOR THE CORRECTNESS OF SUCH DATA.  THIS DISCLOSURE STATEMENT AND THE ECONOMIC AND FINANCIAL INFORMATION PROVIDED HEREIN HAVE NOT BEEN APPROVED BY THE COMMONWEALTH'S FISCAL AGENT, THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY.[3]

COURT REVIEW.  THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO (THE "TITLE III COURT") HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED IT CONTAINS ADEQUATE INFORMATION PURSUANT TO BANKRUPTCY CODE SECTION 1125(b)[4] AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE ON, ELECTION TO SETTLE CERTAIN CLAIMS UNDER, OR ELECTION OF THE FORM OF DISTRIBUTION TO BE RECEIVED UNDER, THE PLAN.  THE COURT HAS NOT, HOWEVER, DETERMINED THE CORRECTNESS OR COMPLETENESS OF ANY INFORMATION HEREIN.

VOTE AFTER CONSIDERING RISK FACTORS.  ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN, OR MAKE AN ELECTION THEREUNDER, ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN OR MAKING AN ELECTION THEREUNDER. SEE SECTION VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

---

[3]   The Government of Puerto Rico, and its agencies and instrumentalities (including AAFAF), have not independently verified or approved the information contained or the statements made in this Disclosure Statement.

[4]   All provisions of Title 11 of the United States Code (the "Bankruptcy Code") referenced herein are made applicable to these Title III cases by PROMESA section 301(a).

**FORWARD LOOKING STATEMENTS.** THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF CERTAIN FEDERAL SECURITIES LAWS. ALL STATEMENTS CONTAINED HEREIN THAT ARE NOT CLEARLY HISTORICAL IN NATURE ARE FORWARD-LOOKING AND THE WORDS "ANTICIPATE," "BELIEVE," "COULD," "SHOULD," "EXPECT," "ESTIMATE," "FORECAST," "INTEND," "POTENTIAL," "PROJECT," "TARGET," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, OTHER THAN STATEMENTS OF HISTORICAL FACT, INCLUDING STATEMENTS ABOUT THE PLAN, STRATEGIES, PROSPECTS, AND EXPECTATIONS REGARDING FUTURE EVENTS AND THE DEBTORS' FINANCIAL PERFORMANCE, ARE FORWARD-LOOKING STATEMENTS THAT INVOLVE CERTAIN RISKS AND UNCERTAINTIES. WHILE THESE STATEMENTS REPRESENT THE DEBTORS' CURRENT JUDGMENT ON WHAT THE FUTURE MAY HOLD, AND THE DEBTORS BELIEVE THESE JUDGMENTS ARE BASED UPON REASONABLE ASSUMPTIONS UNDER THE CIRCUMSTANCES, THESE STATEMENTS ARE NOT GUARANTEES OF ANY EVENTS OR FINANCIAL RESULTS, AND THE DEBTORS' ACTUAL RESULTS MAY DIFFER MATERIALLY. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FORWARD-LOOKING STATEMENTS AND PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF THE PLAN, ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, UNLESS OTHERWISE SPECIFIED. THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE PUBLICLY THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FORWARD-LOOKING STATEMENTS, TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS REQUIRED BY LAW. ALL FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL, WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM ANTICIPATED RESULTS, PERFORMANCE, OR ACHIEVEMENTS. THE DEBTORS CANNOT GUARANTEE THAT PROJECTED RESULTS OR EVENTS WILL BE ACHIEVED. FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM THE DEBTORS' EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED HEREIN UNDER SECTION VIII, "CERTAIN RISK FACTORS TO BE CONSIDERED." THE DEBTORS URGE HOLDERS OF CLAIMS TO CONSIDER THESE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS AND NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS.

**FACTS CAN CHANGE.** THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE SET FORTH ON THE COVER PAGE, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN ARE UNCHANGED

SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON, OR MAKE AN ELECTION WITH RESPECT TO, THE PLAN MUST RELY ON ITS OWN EVALUATION OF THE DEBTORS AND ITS OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT, OR MAKE AN ELECTION PURSUANT TO, THE PLAN.

PLAN SUPPLEMENT. A PLAN SUPPLEMENT CONTAINING DRAFT OR FINAL VERSIONS OF PRIMARY DOCUMENTS REQUIRED TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BE FILED WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE,[5] OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES. THE PLAN SUPPLEMENT SHALL BE DEEMED INCORPORATED INTO AND PART OF THE PLAN AS IF SET FORTH THEREIN IN FULL.

DISCLOSURE STATEMENT IS SOLELY FOR VOTING. THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT, ELECT TO SETTLE CERTAIN CLAIMS PURSUANT TO, OR ELECT THE FORM OF DISTRIBUTION PURSUANT TO, THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN.

JUDICIAL APPROVAL DOES NOT MEAN ALL FACTS ARE CORRECT. THIS DISCLOSURE STATEMENT AND THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DO NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.[6] FURTHER, THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE TITLE III COURT'S DETERMINATION THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AND DOES NOT MEAN THE COURT WILL CONFIRM THE PLAN. THE TITLE III COURT HAS SCHEDULED A HEARING ON [OCTOBER 13-23, 2020] TO CONSIDER CONFIRMATION OF THE PLAN UNDER PROMESA AND

---

[5] The "Voting Deadline" is defined as 5:00 pm (Atlantic Standard Time) on [September 18, 2020], unless such time is extended.

[6] For the avoidance of doubt, the use of the term "clawback" in this Disclosure Statement shall not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver in current or future litigation regarding monies historically conditionally appropriated by the Commonwealth to certain Commonwealth instrumentalities.

THOSE SPECIFIC BANKRUPTCY CODE PROVISIONS MADE APPLICABLE TO THE TITLE III CASES PURSUANT TO PROMESA SECTIONS 301 AND 314.

NO GOVERNMENTAL APPROVAL.  NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY FOREIGN OR STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR OPINED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

UNREGISTERED SECURITIES.  NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN WILL HAVE BEEN REGISTERED WITH THE SECURITIES & EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

CONSEQUENCES OF HOLDING SECURITIES ISSUED PURSUANT TO THE PLAN OF ADJUSTMENT.  THE DEBTORS RECOMMEND POTENTIAL RECIPIENTS OF NEW GO BONDS AND COFINA JUNIOR LIEN BONDS (COLLECTIVELY, "NEW BONDS") TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH SECURITIES, OR ANY OTHER POTENTIAL CONSEQUENCE OF HOLDING SUCH SECURITIES.

TAX CONSIDERATIONS.  THE TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS ARE COMPLEX, AND DEPEND IN PART ON BOTH THE TYPE OF CLAIM HELD AND THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS CONSULT THEIR OWN RESPECTIVE TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, TERRITORIAL (INCLUDING PUERTO RICO), LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN IN THEIR RESPECTIVE INDIVIDUAL CIRCUMSTANCES.

PLAN OF ADJUSTMENT CONTROLS OVER THIS DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION RELATING TO THE DEBTORS.  THE DEBTORS BELIEVE THESE SUMMARIES ARE FAIR AND ACCURATE.  NO OTHER PARTY, INCLUDING ANY PARTY TO A PLAN SUPPORT AGREEMENT, MAKES ANY REPRESENTATION AS TO THE FAIRNESS OR ACCURACY OF THESE SUMMARIES OR THE DESCRIPTIONS OF PARTIES' LEGAL RIGHTS AND REMEDIES CONTAINED HEREIN.  IF THERE IS ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND

THE TERMS AND PROVISIONS OF THE PLAN OR ANY OF THE OTHER DOCUMENTS OR FINANCIAL INFORMATION REFERENCED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN, OR SUCH OTHER DOCUMENT OR FINANCIAL INFORMATION, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

**PLAN OF ADJUSTMENT MAY BE AMENDED.** THE OVERSIGHT BOARD RESERVES THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THE PLAN AT ANY TIME, IN ACCORDANCE WITH THE TERMS OF THE PLAN SUPPORT AGREEMENTS, THE PLAN, AND PROMESA TITLE III.

## Table of Contents

**Page**

I.   Preface .................................................................................................................1

II.  Introduction .......................................................................................................10

    A.   PROMESA Title III Plan of Adjustment: An Overview ...........................13

    B.   Summary of Key Components of the Plan of Adjustment ....................13

    C.   Holders of Claims Entitled to Vote on the Plan of Adjustment............38

    D.   Solicitation and Voting Procedures ....................................................41

    E.   Confirmation Hearing and Deadline for Objections to Confirmation ..................41

III. Overview of the Debtors .....................................................................................42

    A.   General Information .............................................................................42

    B.   Debtors' Financial Obligations as of the Petition Date ........................50

    C.   Puerto Rico's Revenue and Tax Regime ..............................................70

    D.   The Debtors' Cash Management Systems ...........................................97

    E.   Debtors' Cash Accounts ....................................................................104

    F.   Commonwealth's Liquidity and Working Capital Analysis...............114

IV.  Significant Events Leading to Commencement of the Title III Cases...........119

    A.   The Commonwealth's Steady Operational and Financial Decline ....................119

    B.   Legislation Enacted by the Commonwealth to Address the Fiscal and Debt
Crisis ..................................................................................................122

    C.   PROMESA.............................................................................................126

    D.   Adoption of Commonwealth Fiscal Year Budgets and Fiscal Plans .................144

    E.   Negotiations with Creditors ..............................................................164

V.   Overview of the Debtors' Title III Cases ...........................................................166

    A.   Commencement of the Debtors' Title III Cases .................................166

    B.   Hurricanes Irma, Maria, and Dorian, the January 2020 Earthquakes, and
the Oversight Board's Response ........................................................167

    C.   Claims Process and Bar Date ............................................................172

    D.   Rejection or Assumption of Unexpired Leases of Nonresidential Real
Property...............................................................................................176

    E.   Title III Stay Matters...........................................................................178

    F.   Significant Adversary Proceedings and Related Litigation ...............186

    G.   Rule 2004 Motions.............................................................................211

| | | | |
|---|---|---|---|
| | H. | Oversight Board's Investigation of Potential Causes of Action | 213 |
| | I. | The Stay Order and Mediation Team Reports | 248 |
| | J. | Public Corruption Investigations | 255 |
| | K. | Related Debt Restructurings | 256 |
| VI. | | The Title III Plan of Adjustment | 270 |
| | A. | General | 270 |
| | B. | Overview of the Plan of Adjustment | 271 |
| | C. | Compromise and Settlement of Disputes / Restructuring of Entities | 272 |
| | D. | Provisions for Payment of Administrative Expense Claims | 275 |
| | E. | Classification and Treatment of Claims | 277 |
| | F. | Provisions Regarding the New GO Bonds, COFINA Junior Lien Bonds, and Additional Indebtedness | 327 |
| | G. | Treatment of Executory Contracts and Unexpired Leases | 338 |
| | H. | Rights and Powers of Disbursing Agent | 340 |
| | I. | Provisions Governing Distributions | 340 |
| | J. | Avoidance Actions Trust | 345 |
| | K. | Prosecution and Extinguishment of Claims Held by the Debtors | 353 |
| | L. | Acceptance or Rejection of the Plan, Effect of Rejection by One or More Classes of Claims | 353 |
| | M. | Rights and Powers of Disbursing Agent | 353 |
| | N. | Procedures for Treatment of Disputed Claims | 354 |
| | O. | Governance and Provisions Regarding Pension Reserve | 355 |
| | P. | Conditions Precedent to Confirmation of the Plan | 356 |
| | Q. | Conditions Precedent to the Effective Date | 357 |
| | R. | Modification, Revocation, or Withdrawal of the Plan | 362 |
| | S. | Corporate Governance and Management of Reorganized Debtors | 363 |
| | T. | Provisions Regarding Oversight Board and Compliance with PROMESA | 363 |
| | U. | Provisions Regarding Committees | 364 |
| | V. | Miscellaneous Provisions | 366 |
| VII. | | Confirmation of the Plan of Adjustment | 376 |
| | A. | Confirmation Hearing | 376 |
| | B. | Deadlines to Object to Confirmation | 376 |
| | C. | Requirements for Confirmation of the Plan of Adjustment | 378 |

VIII.   Certain Risk Factors to Be Considered ............................................................383

    A.    Risks Related to the Title III Cases.........................................................383

    B.    Risks Related to the Debtors.................................................................385

    C.    Risks Related to the New GO Bonds....................................................386

    D.    Risks Related to the COFINA Junior Lien Bonds................................389

    E.    Risks Related to Projections in Revenues and Expenses in the
    Commonwealth Fiscal Plan ..................................................................391

    F.    Risks Related to the Collection of Revenues Supporting the Payment of
    New GO Bonds .....................................................................................395

    G.    Risk Factors Related to Future Judicial Actions...................................397

    H.    Risk Factors Related to Legislative Action ..........................................398

    I.    Risk Factors Related to Tax Treatment of New GO Bonds and COFINA
    Junior Lien Bonds ................................................................................399

IX.   Certain Material United States Federal Income Tax Considerations...............................401

    A.    General ..................................................................................................401

    B.    U.S. Holders .........................................................................................402

    C.    Puerto Rico Individuals and Puerto Rico Corporations........................416

    D.    Non-U.S. Holders .................................................................................418

X.   Certain Material Puerto Rico Income Tax Considerations .............................................421

    A.    General ..................................................................................................421

    B.    P.R. Holders .........................................................................................421

    C.    Non-P.R. Holders .................................................................................430

XI.   Applicability of Certain Federal and State Securities Laws ...........................................432

    A.    New GO Bonds .....................................................................................432

    B.    COFINA Junior Lien Bonds. ...............................................................433

XI.   Financial Information and Projections............................................................................435

    A.    Historical Financial Reporting..............................................................435

    B.    Commonwealth Fiscal Plan and Projections.........................................440

XII.   Additional Information ..................................................................................................442

XIII.   Conclusion ....................................................................................................................442

## **Table of Exhibits**

**Exhibit A** – Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, *et al.*

**Exhibit B** – Plan Support Agreement (the "PSA"), dated as of February 9, 2020, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, the Puerto Rico Public Buildings Authority, and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico, and certain GO Bondholders and PBA Bondholders

**Exhibit C** – Plan Support Agreement ("Retiree Committee PSA"), dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the Official Committee of Retirees appointed in the Commonwealth's Title III Case

**Exhibit D** – Plan Support Agreement ("AFSCME PSA," and together with the PSA and the Retiree Committee PSA, the "Plan Support Agreements"), dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the American Federation of State, County, and Municipal Employees International Union, AFL-CIO

**Exhibit E** – Certified Commonwealth Fiscal Plan (which includes ERS and PBA)

**Exhibit F** – Certified Commonwealth Budget (which includes ERS and PBA)

**Exhibit G** – Oversight Board Report on Pensions

**Exhibit H** – Summary Chart of the Debtors' Outstanding Bonds

**Exhibit I** – List of Entities that Comprise the Commonwealth Central Government

**Exhibit J** – List of Debtors' Bank Accounts, Balances, and Preliminary Restriction Categorizations as of December 31, 2019

**Exhibit K** – Latest Audited Financial Statements for the Debtors

**Exhibit L** – Best Interests Test Reports[7]

**Exhibit M** – Certified COFINA Fiscal Plan

**Exhibit N** – Certified COFINA Budget

**Exhibit O** – Latest Audited Financial Statement for COFINA

---

[7] The certification of a new Commonwealth fiscal plan is currently expected on April 30, 2020. Letter from Natalie A. Jaresko to Governor Vázquez Garced, President Rivera Schatz, and Speaker Méndez Núñez, Jan. 30, 2020, https://drive.google.com/file/d/1Y81ivGjzA8kqtIyqtRSIW9gkZs-1k_Ew/view. To the extent necessary, the Debtors will submit revised best interests test reports reflecting the new fiscal plan data.

THE FOLLOWING STATEMENTS IN THESE SECTIONS I AND II ARE QUALIFIED
IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION CONTAINED
ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN AND THE
EXHIBITS TO EACH.

## I.    Preface[8]

*The Commonwealth's Economic Decline.*   Over the last several decades, a multitude of
factors contributed to the steep economic downturn of the Commonwealth of Puerto Rico (the
"Commonwealth"), including a contracting economy, population decline, and changes in tax status
and available credits under the U.S. tax code.  From the early 2000s through 2016, Puerto Rico's
public debt rose rapidly, in part from borrowing to cover deficits including to pay debt service,
and the outlook for Puerto Rico's economy continued declining.

By 2016, Puerto Rico was "in the midst of a fiscal crisis."[9]  The Commonwealth was "being
crushed under the weight of a public debt that [was] larger" than its gross national product, "it
ha[d] started to default on its debt obligations," and it had lost access to external financing.[10]  The
Commonwealth had over $120 billion in combined debt and unfunded pension liabilities.  Even
worse, these calamitous financial circumstances threatened a humanitarian crisis for the over
3 million U.S. citizens living on the island of Puerto Rico.  As the United States Secretary of the
Treasury observed, the Commonwealth's ability to provide "basic healthcare, legal, and education
services" was in serious doubt.[11]

*Enactment of PROMESA.*   Consequently, on June 30, 2016, the President signed into law
legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability
Act ("PROMESA"), 48 U.S.C. § 2101 *et seq.*, to work toward a remedy to the ongoing fiscal and
humanitarian crisis in Puerto Rico.  The goal of PROMESA is to meet Puerto Rico's immediate
need to provide its citizens effective services, to formulate a debt restructuring, and to implement
fiscal reform leading to a sustainable economy, fiscal responsibility, and market access.

*Main Components of PROMESA.*   PROMESA establishes two primary mechanisms for
restoring fiscal responsibility.  First, Titles I, II, IV, and V of PROMESA create the Financial
Oversight and Management Board for Puerto Rico (the "Oversight Board") and provide it powers
and duties governing the review and certification of multi-year fiscal plans, annual budgets, and
infrastructure revitalization, and fast-tracking key infrastructure projects.[12]  Second, Titles III and

---

[8]  Capitalized terms used herein not otherwise defined shall have the meaning ascribed to such term in the Plan (as
     defined below).

[9]  *Puerto Rico v. Franklin Cal. Tax–Free Tr.*, 136 S. Ct. 1938, 1942 (2016).

[10]  *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gómez*, 174 F. Supp. 3d 585, 602 (D.P.R. 2016); H.R. Rep. No. 114- 602,
     at 40 (2016).

[11]  Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives (Jan.
     15,   2016),   https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-
     Rico.aspx.

[12]  On July 31, 2019, U.S. House Natural Resources Committee Chairman Raúl Grijalva, D-Ariz., circulated a
     "discussion draft" of possible amendments to PROMESA.  The amendments would allow the Commonwealth to

VI of PROMESA provide for debt restructurings, similar to bankruptcy cases and out-of-court restructurings, respectively, for Puerto Rico and its instrumentalities.[13]  By incorporating many provisions of Title 11 of the United States Code (the "Bankruptcy Code") into Title III of PROMESA, which provides for restructurings similar to restructurings under chapters 9 and 11 of the Bankruptcy Code, the statute also protects the debtors from creditor debt-enforcement actions[14] that otherwise could extract billions of dollars from the Commonwealth and inflict irreparable damage on Puerto Rico's economy.  The statute includes unique attributes, such as an automatic stay triggered once the bill was signed into law.  The Oversight Board is the sole representative of any debtor entity in a Title III case, with the exclusive authority to propose a plan of adjustment. PROMESA Title VI provides an alternate, out-of-court restructuring process conditioned on voting thresholds.

 ***Historic Problems Leading to Oversight Board.***  To overcome decades of severe economic decline, operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing,[15] PROMESA established an independent entity within Puerto Rico's government—the Oversight Board.[16]  The Oversight Board is "an entity within the territorial government," rather than a "department, agency, establishment, or instrumentality of the Federal Government."[17]  The Oversight Board is statutorily charged with restoring to the Commonwealth fiscal responsibility and market access.[18]  To achieve success in carrying out its statutory mission, the Oversight Board is granted authority to oversee the restructuring of the Commonwealth's and its instrumentalities' debt and to require fiscal reforms.  Elements of this authority have been challenged,[19] but have been confirmed by the United States District Court for the District of Puerto Rico (the "Title III Court") and the United States Court of Appeals for the First Circuit (the "First Circuit").[20]

---

discharge unsecured debt once every seven years, create an office of reconstruction coordinator, establish a revitalization coordinator within PREPA, fund the Oversight Board out of the U.S. Treasury, and change several definitions.

[13] 48 U.S.C. § 2161.

[14] 11 U.S.C. § 362(a) (incorporated into the Title III case by 48 U.S.C. § 2161(a)).

[15] PROMESA § 405(m)(1).

[16] 48 U.S.C. § 2121(a)(1).

[17] *Id*. § 2121(c)(2); *see also* 48 U.S.C. § 2194(i)(2) (defining the term "Government of Puerto Rico" to include the Oversight Board for purposes of that section); 48 U.S.C. § 2127(b) (providing that the Oversight Board is funded exclusively by the territorial government of Puerto Rico).

[18] PROMESA § 101(a).

[19] The summaries of court filings in this Disclosure Statement are fully qualified by the corresponding publicly filed documents.

[20] As further described in section IV.C.3, on July 5, 2018, then-Governor Ricardo Rosselló Nevares ("Governor Rosselló") sued the Oversight Board, contending, among other things, that "any matters that constitute recommendations (whether or not styled as recommendations) under the Fiscal Plan that the Government has rejected or may rejected [sic] in the future (whether set forth herein or otherwise) are non-binding on the Government and do not need to be implemented by the Government."  Governor's Complaint against Oversight Board, dated July 5, 2018, Adv. Proc. No. 18-00080-LTS in 17 BK 3283-LTS (D.P.R.), at ¶ 83.  By opinion and

***Oversight Board's Initial Actions to Fulfill PROMESA's Mandate.***  On August 31, 2016, President Obama appointed the seven voting members of the Oversight Board, who under PROMESA serve with no compensation, but are entitled to reimbursement of reasonable and necessary expenses incurred by reason of their service.[21]  When appointed, the Oversight Board had no staff, no office, and no data.  It commenced assembling the facilities and expertise it needed to carry out its statutory functions.  At the time, the Commonwealth had approximately $74 billion of funded debt, estimated pension liabilities of approximately $51.5 billion, and insufficient resources to meet those obligations.  On September 30, 2016, the Oversight Board (i) announced a process for the development, submission, approval, and certification of fiscal plans for the Commonwealth and for covered territorial instrumentalities, (ii) designated an initial group of 63 entities as covered entities under PROMESA,[22] (iii) requested a significant amount of financial and budgetary information from the Governor as a first step to develop improvements to the Government's fiscal governance, accountability, internal controls and financial affairs, and (iv) began the critical projects process authorized under Title V of PROMESA by developing selection criteria and processes for expediting certain critical energy and infrastructure projects.  Furthermore, the Oversight Board commenced meetings with representatives of multiple groups of creditors ranging from retirees to holders of general obligation bonds (the "GO Bonds," and the holders of GO Bonds, the "GO Bondholders"), bond insurers, insured and uninsured bondholders, on-island bondholders, Government Development Bank for Puerto Rico ("GDB") bondholders, Puerto Rico Highways and Transportation Authority ("HTA") bondholders and insurers, Puerto Rico Aqueduct and Sewer Authority ("PRASA") bondholders, Puerto Rico Electric Power Authority ("PREPA") bondholders and insurers, and many others.

***First Commonwealth Certified Fiscal Plan.***  The development of the first certified fiscal plan for the Commonwealth stretched over two administrations. On October 14, 2016, then Governor Alejandro Javier García Padilla submitted his administration's fiscal plan proposal for

---

order dated August 7, 2018, the United States District Court for the District of Puerto Rico (the "Title III Court") ruled against the then-Governor on that issue, explaining: "The power bestowed on the Oversight Board by Section 205(b)(1)(K) of PROMESA allows the Oversight Board to make binding policy choices for the Commonwealth, notwithstanding the Governor's rejection of Section 205 recommendations . . ." *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.*  [Adv. Proc. No. 18-00080-LTS ECF No. 33], at 25.  On appeal brought by then-Governor Rosselló, the United States Court of Appeals for the First Circuit affirmed the District Court decision, confirming there is nothing in PROMESA section 205 "suggesting that, by first seeking the Governor's agreement on a matter, the Board somehow loses whatever ability it otherwise had to act unilaterally on the matter," and the Oversight Board has the power to adopt "a rejected recommendation if it otherwise has the power to adopt the recommended action on its own." *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 5 (1st Cir. 2019).  The Legislative Assembly of Puerto Rico (the "Legislature") also contested the Oversight Board's budget power.  It claimed "the Board's decision to certify its Budget over the Legislative Assembly's was an 'unlawful[] encroach[ment] upon the Legislative Assembly's exclusive legislative power under the Puerto Rico Constitution.'"  *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019).  The Title III Court ruled against the Legislature and the United States Court of Appeals for the First Circuit affirmed, ruling: ". . . Under PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA].'"  *Id.*

[21]  PROMESA § 101(g).

[22] On May 9, 2019, the Oversight Board also designated 78 municipalities as covered entities.

the Commonwealth.  By letter dated November 29, 2016, then Governor García Padilla rejected the Oversight Board's request for certain fiscal plan revisions to be submitted by December 15, 2016, asserting that any efforts to reduce government spending would worsen the economic crisis and should be abandoned.  Then, on January 1, 2017, Governor Rosselló took office and submitted a proposed Commonwealth fiscal plan on February 28, 2017.  The Oversight Board and its advisors had worked with the then Governor and his administration for months on developing fiscal plans for the Commonwealth and certain of its instrumentalities.  On March 13, 2017, the Oversight Board certified a Commonwealth fiscal plan comprised of the Governor's fiscal plan with certain amendments added by the Oversight Board.   The Oversight Board also worked with the Government to develop and eventually certify fiscal plans for other covered instrumentalities, including GDB, HTA, PRASA, and PREPA on April 28, 2017.

*Commencement of Title III Cases.*   When PROMESA was enacted, it imposed a temporary automatic stay protecting the Commonwealth and its instrumentalities from creditor actions to enforce debt against them until May 1, 2017.[23] After the expiration of the PROMESA stay, the Oversight Board commenced Title III cases for the Commonwealth on May 3, 2017, for the Puerto Rico Sales Tax Financing Corporation ("COFINA") on May 5, 2017, for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") and HTA on May 21, 2017, for PREPA on July 2, 2017, and for PBA on September 27, 2019.   The commencement of Title III cases triggered the operation of the automatic stay in Bankruptcy Code section 362, thereby providing those entities continued protection from enforcement actions for the duration of their Title III cases.[24]

*A New Landscape – Hurricanes Irma and Maria.*  In September 2017, the difficulty of improving the financial status of the island worsened as Puerto Rico was devastated by Hurricanes Irma and Maria. The hurricanes destroyed much of the island's infrastructure and upended the daily lives of all Puerto Ricans and the work of the Oversight Board.

Immediately after the hurricanes struck, the Oversight Board provided the Government with the flexibility to reapportion up to $1 billion in budgeted expenditures to cover disaster-related expenses. Through several meetings, letters, Congressional testimony, and other interactions with the federal government and authorities in Puerto Rico, the Oversight Board actively advocated for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity.

*New Fiscal Plans.*  Because the hurricanes created a new reality for Puerto Rico, the Oversight Board initiated a process for rewriting the fiscal plans for the Commonwealth and its covered instrumentalities.  During the nine months following Hurricanes Irma and Maria, the Oversight Board collaborated with the Government to develop new fiscal plans with the overarching goal of fulfilling PROMESA's mandates.  To do so, the fiscal plans would require a

---

[23] PROMESA §§ 5(11), 405(b).  The PROMESA stay was initially set to expire on February 15, 2017 but the Oversight Board extended the stay by 75 days as permitted under PROMESA section 405(d)(1)(B).

[24] PROMESA § 301(a).

series of ambitious structural reforms and fiscal measures to restore growth and opportunity to the people and businesses of Puerto Rico.

While the Oversight Board and the Government eventually reached broad agreement on several aspects of each fiscal plan, including agreed labor and welfare reform, ease of doing business reform, energy reform, and infrastructure reform, among other things, the Government disagreed with some of the reforms, including at-will employment for private sector employees. The Oversight Board eventually reached an accommodation with then Governor Rosselló to change the law of Puerto Rico to make it an employment at-will jurisdiction for private sector employees, the same as in 49 of the 50 states. The Legislature, however, did not pass the necessary legislation, leaving Puerto Rico's labor law as-is.

At the conclusion of this months-long process with the Government, the Oversight Board developed and certified its own fiscal plan for the Commonwealth, which contained many fiscal measures necessary to right-size the Government. The Oversight Board's fiscal plan did not include a comprehensive reform of the private sector labor market because that proposal had failed to garner the necessary legislative support as described above

***Changes in Government and Other Recent Events.*** Progress on the development of revised fiscal plans was further delayed by the resignation of Governor Rosselló and several members of his cabinet. More recently, a series of seismic events (including earthquakes, tremors, and swarms) starting in December 2019 have caused significant damage in the south of the island and led to many school closures, further diverting resources and attention of government officials. The Oversight Board included a $130 million annual appropriation in its certified budgets for fiscal years 2018 and 2019 to build an Emergency Reserve over time, which allowed the Commonwealth to have access to $260 million when the seismic events occurred.

***Oversight Board's Policy Reforms.*** Concurrently with the development of the fiscal plans and budgets, the Oversight Board and the Government worked together to enact significant legal and governance reforms. These legislative actions have resulted in Puerto Rico undertaking significant reform projects, including an operational and structural transformation of the island's electric grid, measures to increase the Government's financial transparency, and budgetary controls.[25] In fiscal year 2019, the Oversight Board implemented a consolidated budget review process for the General Fund,[26] Special Revenue Funds,[27] other funds, and federal funds, along with public agencies without independent fiscal plans, to increase transparency of funding, monitoring of funds, and understanding of operational trends of the Government.

The Oversight Board sought to achieve cost savings by consolidating many of the Commonwealth's over 100 government agencies, while ensuring the delivery of more efficient

---

[25] FOMB, Annual Report, Fiscal Year 2018, at 8-11.5; FOMB, Annual Report, Fiscal Year 2019, at 37-52.

[26] The term "General Fund" is an accounting term used throughout the Disclosure statement to describe the Commonwealth's primary operating fund.

[27] The term "Special Revenue Fund" is an accounting term used throughout this Disclosure Statement, and does not imply that monies in Special Revenue Funds are special revenues. The Debtors reserve all their rights with respect thereto.

government services. Consolidation would also have the effect of making the Government more manageable over time. The policy reforms also reinvest a portion of those savings in areas with the highest needs. The Oversight Board authorized, for instance, a considerable increase in teacher and police salaries.

The Oversight Board also made major strides in promoting financial transparency within the Government by providing the people of Puerto Rico better access to higher quality information on government reforms, government spending, and government administration. The Oversight Board has required financial transparency so that the general public has full access to information about the spending of taxpayer dollars. The public reports now available online include budget-to-actual reporting, cash reporting, bank balances, and attendance reporting. The Oversight Board certified budgets for the Commonwealth and certain of its instrumentalities and public corporations now include more detail about the nature of Government spending. The Oversight Board also mandated oversight over all outside contracting and new debt issuances. Finally, the Oversight Board posts online all progress on implementation plans submitted by Government agencies.

Transparency and accountability of public finances are critical to responsible governance. Where transparency was not possible, the Oversight Board pursued building the database to make it so. The Oversight Board commissioned a report detailing the bank and investment account balances of certain entities and instrumentalities of the Commonwealth. The analysis of the cash is ongoing and is described further in section III.D.1.

In 2017, the Oversight Board hired the law firm Kobre & Kim to provide a complete, independent review of the Government's debt. In August 2018, the Oversight Board received the result of this investigation and presented the Kobre & Kim report. Subsequently, the Oversight Board created a Special Claims Committee which has challenged approximately $6 billion worth of GO Bonds, among other debt, issued by the Commonwealth and its instrumentalities and public corporations.

***The Debtors' Title III Cases***. Throughout the course of the Title III cases, the Oversight Board has led debt restructuring negotiations with the view that consensual negotiations are often better than contested resolutions. To that end, the Oversight Board and the Government made significant progress with COFINA's stakeholders regarding a gating issue over whether certain sales and use taxes ("SUTs") were property of the Commonwealth or COFINA. These negotiations led to a consensual allocation of SUT revenues and ultimately the successful confirmation of a plan of adjustment for COFINA on February 5, 2019, reducing COFINA's debt from approximately $17 billion to $12 billion. With the SUT issue settled, the Commonwealth was one step closer to restructuring its debt in that it knew which SUT revenues it could use. This eliminated uncertainty over billions of dollars claimed by both the Commonwealth and COFINA.

***Reasons for Disagreements***. While the Oversight Board took on the challenges identified by Congress in PROMESA accrued from prior decades, exacerbated by Hurricanes Irma and Maria, various creditors, stakeholders, and, at times, the Government, disagreed with the Oversight Board's reforms and sought to challenge the Oversight Board's exercise of its authority and mandate pursuant to PROMESA to bring the Commonwealth and its covered instrumentalities to

6

economic stability and access to capital markets.  Because PROMESA was a new statute, some of the disputes arose out of differing interpretations of the statute, while other disputes arose because certain stakeholders believed they would ultimately attain better results for themselves if the Oversight Board changed course.  For the most part, reasonable people could differ, and they did differ and brought their disputes to court.

*Litigation Affecting the Debt Restructurings.*  In a Title III case under PROMESA, the plan of adjustment is required to be consistent with the debtor's certified fiscal plan.[28]  In turn the fiscal plan must contain, among other things, a debt sustainability analysis.[29]  Creditors who believed the Commonwealth's certified fiscal plan contained a debt sustainability analysis showing the Commonwealth could issue less new debt to pay creditors' claims than the creditors believed was adequate, sued and sought to enjoin the Oversight Board from proposing any plan of adjustment consistent with the Commonwealth's certified fiscal plan.  Some creditors also asked to nullify the Commonwealth's certified fiscal plan, and to compel turnovers of billions of dollars of revenues critical to the provision of public services and the viability of the Commonwealth, especially in the wake of the hurricanes.  *See* section V.F of this Disclosure Statement for a summary of litigation against the Oversight Board.

PROMESA expressly provides "[t]here shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this chapter."[30]  No creditor procured any injunction against the Oversight Board, and creditors' claims for turnovers of revenues were either dismissed for lack of jurisdiction or denied on the merits.  Specifically, the trial and appellate courts ruled Bankruptcy Code section 922(d) does not require application of pledged special revenues, to special revenue debt during the Title III Cases, and the United States Supreme Court denied two petitions for *certiorari* requesting further review.[31]

*Initial Agreements with Creditor Groups Leading to the Initial Plan of Adjustment.*  In May 2019, the Oversight Board reached agreements with several major creditor groups on the treatments of their claims, pursuant to separate plan support agreements, which treatments were embodied in the proposed plan of adjustment dated September 27, 2019 [ECF No. 8765] (the "Initial Plan").  Those groups included:  (a) the Official Committee of Retirees (the "Retiree Committee"), whose constituency asserts outstanding obligations in excess of $50 billion in connection with pension claims, (b) the American Federation of State, County, and Municipal Employees ("AFSCME"), which represents more than 10,900 current employees of the Commonwealth and its instrumentalities, and (c) bondholder groups owning bonds issued by the Public Buildings Authority ("PBA Bonds," and the holders of PBA Bonds, "PBA Bondholders") and guaranteed by the good faith, credit and taxing power of the Commonwealth, and GO Bonds issued by the Commonwealth.  The Plan Support Agreement, dated as of May 31, 2019 (the "Initial

---

[28] PROMESA § 314(b)(7).

[29] PROMESA § 201(b)(1)(I).

[30] PROMESA § 106(e).

[31] *Assured Guar. Corp. v. Carrion (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121 (1st Cir. 2019), *cert. denied*, No. 19-391, 2020 U.S. LEXIS 237 (Jan. 13, 2020).

PSA"), among the Oversight Board, and certain holders of GO Bonds and PBA Bondholders, included the compromise and settlement of a key dispute between the Commonwealth and PBA as to whether the leases between the two entities were leases for purposes of Bankruptcy Code section 365 or were actually financings, and the optional settlement of certain challenges to GO Bonds, including validity, priority, and secured status.

***Amended Plan of Adjustment with Significant Creditor Support.*** Following the filing of the Initial Plan, the Oversight Board continued to engage stakeholders in negotiations to build greater support for the Plan. Those negotiations, facilitated by the Mediation Team,[32] culminated in an agreement in principle with groups holding a majority of outstanding PBA Bonds and GO Bonds, and providing a framework for the treatment of PBA Bonds and GO Bonds, and the proposed settlement of all challenges to the validity, priority, and secured status of such bonds. This agreement in principle was memorialized in the Plan Support Agreement, dated February 9, 2020 (the "PSA"), among the Oversight Board, as representative of the Commonwealth, ERS, and PBA, certain holders of GO Bonds, and certain holders of PBA Bonds.[33] The PSA was signed by the holders of approximately $8 billion in claims of GO Bonds and PBA bonds. The PSA also allows each holder of GO Bonds or PBA Bonds with a face amount of such bonds in excess of one million dollars to join the PSA. Since its execution, holders of an additional $2 billion in GO Bonds or PBA Bonds have joined the PSA. As further described below, the PSA contemplates, among other things:

    (a) total nominal, principal consideration of $14.478 billion, which consists of

        1. $3.809 billion of cash (all of which will be distributed to holders of GO Bonds and PBA Bonds pursuant to the Plan), and

        2. $10.669 billion of new bonds ($10.142 billion of which will be distributed to holders of GO Bonds and CW Guarantee Claims pursuant to the Plan);[34]

    (b) the issuance of New GO Bonds by the Commonwealth in an aggregate original principal amount of $5,334,295,000 of the above-described new bonds consideration, and the issuance of COFINA Junior Lien Bonds by COFINA in an aggregate original principal amount of $5,334,615,000 of the above-described new bonds consideration;

    (c) payment of a PSA Restriction Fee to the initial parties to the PSA, and certain parties who join the PSA on or before February 28, 2020, up to an aggregate of $350 million and the payment of up to an aggregate of $50 million to classes of retail investors

---

[32] The "Mediation Team" is the mediation team led by Chief Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas (the "Mediation Team Leader") as established by the Title III Court under its *Order Appointing Mediation Team*, dated June 23, 2017 [ECF No. 430].

[33] In connection with the execution of the PSA, the Initial PSA was terminated on February 9, 2020.

[34] The remaining New GO Bonds and COFINA Junior Lien Bonds will be available to classes of unsecured claimholders pursuant to the Plan.

holding GO Bonds or PBA Bonds in aggregate face amount equal to or less than one million dollars ($1,000,000) each if such class accepts the Plan; and

(d) the global settlement of all issues and disputes among all GO/PBA bondholders, holders of PRIFA BANs,[35] the Oversight Board, the Commonwealth, and PBA, including the validity, priority, and secured status of the GO/PBA/PRIFA BANs claims, in exchange for the consideration proposed in the Plan.

If the Plan is confirmed, the Oversight Board believes no further litigation of any dispute regarding the validity, priority, or secured status of the GO/PBA/PRIFA BANs claims is necessary as the Plan will effect a global settlement of any such dispute, binding on all parties in interest in the Title III Cases.  The Mediation Team has recommended that any litigation regarding the validity, priority, and secured status of the GO/PBA/PRIFA BANs claims be stayed pending a decision on confirmation of the Plan.[36]

The Government currently does not support the PSA and the Plan.  The Oversight Board and the Government, however, continue to engage in meaningful discussions with every hope that a resolution will be reached to obtain a consensual outcome.

[*Remainder of Page Left Intentionally Blank*]

---

[35] PRIFA BANs refer to that certain indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated March 1, 2015, between PRIFA and The Bank of New York Mellon, as trustee.

[36] *Amended Report and Recommendation of the Mediation Team* [ECF No. 10756], pp. 9-10.

## II.   Introduction

***Commencement of Title III Cases.***   On May 3, 2017 (the "Commonwealth Petition Date"), the Oversight Board issued a restructuring certification for the Commonwealth pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "Commonwealth Title III Case").

On May 21, 2017 (the "ERS Petition Date"), the Oversight Board issued a restructuring certification for ERS pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for ERS pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "ERS Title III Case").

On September 27, 2019 (the "PBA Petition Date"), the Oversight Board issued a restructuring certification for PBA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PBA pursuant to PROMESA section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "PBA Title III Case," and together with the Commonwealth Title III Case, and the ERS Title III Case, the "Title III Cases").   Pursuant to PROMESA section 315, the Oversight Board is the sole representative of the Debtors[37] in their Title III cases.

***Certification of Proposed Plan of Adjustment.***   On February 28, 2020, pursuant to PROMESA section 104(j), the Oversight Board certified the submission of the amended joint plan of adjustment for the Debtors (the "Plan").   On February 28, 2020, the Debtors filed (a) the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. ____], (b) this disclosure statement [ECF No.____] (the "Disclosure Statement"), and (c) the *Motion for Order (I) Approving Notice of Disclosure Statement Hearing; (II) Approving Disclosure Statement; (III) Fixing Voting Record Date; (IV) Scheduling Plan Confirmation Hearing and Approving Form and Manner of Related Notice and Objection Procedures; (V) Approving Solicitation Packages and Procedures for the Distribution Thereof; (VI) Approving Forms of Ballots and Voting Procedures; (VII) Fixing Voting Deadline; and (VIII) Approving Vote Tabulation Procedures* (the "Disclosure Statement Approval Motion"). [38]

***Disclosure Statement Approval and Confirmation Hearing Date.***[39]   On _____, the Title III Court entered the Disclosure Statement Order approving the Disclosure Statement (the

---

[37] The Oversight Board, in its capacity as representative of the Commonwealth, ERS, and PBA is referred to collectively as the "Debtors" and individually as "Commonwealth Debtor," "ERS Debtor," or "PBA Debtor," as applicable.

[38] References to the docket are to Case No. 17-BK-3283-LTS, unless otherwise specified.

[39] On February 11, 2020, the Debtors filed the *Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline to File Objections to the Disclosure Statement and Replies Thereto, and (IV) Granting Related Relief* [ECF No. 10808].

"Disclosure Statement Order").  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE TITLE III COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.  THE TITLE III COURT WILL CONSIDER CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING SCHEDULED FOR [OCTOBER 13-23, 2020].**

The Confirmation Hearing may be adjourned or continued from time to time.  Therefore, parties in interest should check the online docket at https://cases.primeclerk.com/puertorico to confirm the latest scheduled date and time of the Confirmation Hearing.

[The Title III Court has set the following schedule in connection with the confirmation proceedings:

- **June 3, 2020:** Hearing to consider the adequacy of the information contained in the amended Disclosure Statement;
- **June 30, 2020:** Commencement of confirmation discovery;
- **July 2, 2020:** Deadline to mail approved solicitation package;
- **July to mid-September, 2020:** Deadline to file objections to confirmation of the plan and confirmation discovery;
- **September 16, 2020:** Plan confirmation pretrial hearing;
- **September 18, 2020:** Voting and election deadline; and
- **October 13-23, 2020:** Confirmation hearing.]

The Debtors are furnishing this Disclosure Statement as the proponents of the Plan pursuant to Bankruptcy Code section 1125 and in connection with the solicitation of votes to accept or reject, elections to settle certain claims pursuant to, and elections of the form of distributions pursuant to, the Plan, as it may be amended or supplemented from time to time in accordance PROMESA Title III and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to Title III pursuant to PROMESA section 310.

This Disclosure Statement provides the information required by Bankruptcy Code section 1125 and summarizes the Plan, the Debtors' operations, their financial condition, including financial projections, as well as other related matters, including the treatment of holders of Claims against the Debtors.  This Disclosure Statement also describes certain potential federal and Puerto Rico income tax consequences to holders of Claims, voting and settlement election procedures, and the confirmation process.

***Ballot and Election Forms.***  A ballot for the acceptance or rejection of the Plan (a "Ballot") and/or a notice of election pursuant to the Plan (an "Election Notice") is enclosed with the copy of this Disclosure Statement distributed to the holders of Claims in the Classes entitled to vote to accept or reject the Plan, elect to settle certain claims pursuant to the Plan, and/or elect the form of distributions pursuant to the Plan.  The Ballot includes information regarding the voting deadlines and detailed instructions for voting to accept or reject the Plan.  The Election Notice includes information regarding the election deadline and detailed instructions for making an election to settle certain claims and/or to elect the form of distributions pursuant to the Plan.  Before voting and/or making the applicable election, each holder of a Claim entitled to vote and/or make an

11

election should read this Disclosure Statement (including the exhibits and documents incorporated by reference herein) and the instructions accompanying the Ballot and Election Notice. These documents contain, among other things, important information concerning the classification of Claims for voting and tabulation of votes. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, as it may be amended, the Disclosure Statement Order, and Bankruptcy Code section 1125.

**Exhibits to Disclosure Statement.** This Disclosure Statement includes the following exhibits and supplements:

- **Exhibit A** – Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, *et al.*

- **Exhibit B** – Plan Support Agreement (the "PSA"), dated as of February 9, 2020, by and among the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, the Puerto Rico Public Buildings Authority, and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico, and certain GO Bondholders and PBA Bondholders

- **Exhibit C** – Plan Support Agreement ("Retiree Committee PSA"), dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the Official Committee of Retirees appointed in the Commonwealth's Title III Case

- **Exhibit D** – Plan Support Agreement ("AFSCME PSA"), dated as of June 7, 2019, by and between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and the American Federation of State, County, and Municipal Employees International Union, AFL-CIO

- **Exhibit E** – Certified Commonwealth Fiscal Plan (which includes ERS and PBA)

- **Exhibit F** – Certified Commonwealth Budget (which includes ERS and PBA)

- **Exhibit G** – Oversight Board Report on Pensions

- **Exhibit H** – Summary Chart of the Debtors' Outstanding Bonds

- **Exhibit I** – List of Entities that Comprise the Commonwealth Central Government

- **Exhibit J** – List of Debtors' Bank Accounts, Balances, and Preliminary Restriction Categorizations as of December 31, 2019

- **Exhibit K** – Latest Audited Financial Statements for the Debtors

- **Exhibit L** – Best Interests Test Reports

- **Exhibit M** – Certified COFINA Fiscal Plan

12

- **Exhibit N** – Certified COFINA Budget

- **Exhibit O** – Latest Audited Financial Statement for COFINA

To the extent any inconsistencies exist between this Disclosure Statement, any of the Plan Support Agreements (and any exhibit or term sheet attached thereto), and the Plan, the terms and provisions of the Plan will govern.

## A.    PROMESA Title III Plan of Adjustment: An Overview

Confirmation of a Title III plan of adjustment by the Title III Court binds the debtor, any issuer of securities under the plan of adjustment, any person acquiring property under the plan of adjustment, and any creditor of a debtor.  Except as provided in PROMESA, the plan of adjustment or the confirmation order, confirmation of a plan of adjustment discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the applicable obligations specified in the confirmed plan of adjustment.

The Title III Court will confirm a plan of adjustment if it satisfies both PROMESA section 314(b) and the incorporated subsections of Bankruptcy Code section 1129, which are further discussed in section VII.C. of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment."  Among other things, PROMESA section 314(b) requires that (i) the plan of adjustment comply with the provisions of PROMESA and the applicable provisions of the Bankruptcy Code, (ii) all the required legislative, regulatory, or electoral approvals necessary to carry out any provision of the plan of adjustment shall have been obtained, or such provision is conditioned upon such approval, (iii) the plan of adjustment is feasible and in the best interests of creditors, and (iv) the plan of adjustment is consistent with the applicable fiscal plan certified by the Oversight Board under PROMESA Title II.

While the Debtors believe all classes of Claims should vote to accept the Plan, the Plan may be confirmed without acceptance by all classes.  Bankruptcy Code section 1129(b)(1) provides that, if all the applicable requirements of section 1129(a) (including the requirement that at least one impaired class accepts the plan of adjustment) other than acceptance by all classes (as provided in section 1129(a)(8)) are met with respect to a plan of adjustment, the Title III Court, on request of the proponents, shall confirm the plan of adjustment if it does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired under and has not accepted the plan of adjustment.

## B.    Summary of Key Components of the Plan of Adjustment

Except for Administrative Claims and Professional Claims, which are not classified and do not vote on the Plan, all Claims that existed on the Petition Date are divided into classes under the Plan.  Under the Bankruptcy Code, a plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class.  Under section 301(e) of PROMESA, in determining whether claims are "substantially similar" to one another, the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims. The following table shows the classes of claims against the Debtors and approximates the

13

percentage return or range of percentage returns proposed to be paid to the claims in each class. The amount a creditor may actually recover could vary materially from the estimates below.

| Claim[40] | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| Vintage PBA Bond Claims | Class 1 | $2,257,221,339.10 | 23.0%† | Cash |
| Vintage PBA Bond Claims (Insured) | Class 2 | 404,018,537.96 | 23.0%† | Cash |
| Retail Vintage PBA Bond Claims | Class 3 | [41] | 23.0%† | Cash |
| 2011 PBA Bond Claims | Class 4 | 1,335,422,892.78 | 23.0%‡ | Cash |
| Retail 2011 PBA Bond Claims | Class 5 | [42] | 23.0%‡ | Cash |
| 2012 PBA Bond Claims | Class 6 | 674,308,470.06 | 23.0%* | Cash |
| Retail 2012 PBA Bond Claims | Class 7 | [43] | 23.0%* | Cash |
| PBA/DRA Secured Claim | Class 8 | 66,222,028 | 0% | - |
| PBA General Unsecured Claims | Class 9 | [      ] | 100% | Cash |
| PBA/DRA Unsecured Claim | Class 10 | 134,357,497 | 0% | - |
| Vintage CW Bond Claims | Class 11 | 4,109,703,562.03 | 74.874% | New GO Bonds / COFINA Jr. |

---

[40] **Preliminary and subject to revision.**

† Estimate excludes recovery on account of an Allowed Vintage CW Guarantee Claim against the Commonwealth. Total recovery on account of both (I) (a) an Allowed Vintage PBA Bond Claim, (b) an Allowed Vintage PBA Bond Claim (Insured), or (c) a Retail Vintage PBA Bond Claim, as applicable, and (II) (x) an Allowed Vintage CW Guarantee Bond Claim, (y) an Allowed Vintage CW Guarantee Bond Claim (Insured), or (z) an Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 77.582%.

‡ Estimate excludes recovery on account of an Allowed 2011 CW Guarantee Claim against the Commonwealth. Total recovery on account of both (I) (a) an Allowed 2011 PBA Bond Claim, or (b) a Retail 2011 PBA Bond Claim, as applicable, and (II) (x) an Allowed 2011 CW Guarantee Bond Claim or (y) an Allowed 2011 CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 76.810%.

* Estimate excludes recovery on account of an Allowed 2012 CW Guarantee Claim against the Commonwealth. Total recovery on account of both (I) (a) an Allowed 2012 PBA Bond Claim, or (b) a Retail 2012 PBA Bond Claim, as applicable, and (II) (x) an Allowed 2012 CW Guarantee Claim, or (y) an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 72.217%.

§ Amount depends upon how many holders of Allowed Claims are eligible and elect to be treated under such class.

± Total recovery on account of both (I) (a) an Allowed Vintage PBA Bond Claim, (b) an Allowed Vintage PBA Bond Claim (Insured), or (c) a Retail Vintage PBA Bond Claim, as applicable, and (II) (x) an Allowed Vintage CW Guarantee Bond Claim, (y) an Allowed Vintage CW Guarantee Bond Claim (Insured), or (z) an Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 77.582%.

[41] Included in Vintage PBA Bond Claims Amount.

[42] Included in 2011 PBA Bond Claims Amount.

[43] Included in 2011 PBA Bond Claims Amount.

| Claim[40] | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| | | | | Lien Bonds / Cash |
| Retail Vintage CW Bond Claims | Class 12 | [44] | 74.874% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Vintage CW Bond Claims (Insured) | Class 13 | 1,733,057,755.96 | 74.874% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Vintage CW Bond Claims (Taxable Election) | Class 14 | § | 74.874% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Vintage CW Guarantee Bond Claims | Class 15 | 1,738,699,949.76 | 70.896%± | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Vintage CW Guarantee Bond Claims (Insured) | Class 16 | 311,208,741.24 | 70.896%± | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 17 | § | 70.896%± | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2011 CW Bond Claims | Class 18 | 250,507,930.17 | 70.401% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Retail 2011 CW Bond Claims | Class 19 | [45] | 70.401% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2011 CW Bond Claims (Insured) | Class 20 | 225,917,592.71 | 70.401% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2011 CW Bond Claims (Taxable Election) | Class 21 | § | 70.401% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |

---

[44] Included in Vintage CW Bond Claims Amount.

[45] Included in 2011 CW Bond Claims Amount.

15

| Claim[40] | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| 2011 CW Guarantee Bond Claims | Class 22 | 1,028,653,981.05 | 69.894%[£] | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 23 | [§] | 69.894%[£] | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2011 CW Series D/E/PIB Bond Claims | Class 24 | 634,719,627.45 | 73.800% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2011 CW Series D/E/PIB Bond Claims (Insured) | Class 25 | 10,953,484.03 | 73.800% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 26 | [46] | 73.800% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 27 | [§] | 73.800% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2012 CW Bond Claims | Class 28 | 2,545,325,618.54 | 69.887% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Retail 2012 CW Bond Claims | Class 29 | [47] | 69.887% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2012 CW Bond Claims (Insured) | Class 30 | 393,576,302.36 | 69.887% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2012 CW Bond Claims (Taxable Election) | Class 31 | [§] | 69.887% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |

---

[46] Included in 2011 CW Series D/E/PIB PBA Bond Claims Amount.

[47] Included in 2012 CW Bond Claims Amount.

16

| Claim[40] | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| 2012 CW Guarantee Bond Claims | Class 32 | 519,408,567.83 | 63.931%[48] | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 33 | § | 63.931% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2014 CW Bond Claims | Class 34 | 3,836,611,111.11 | 65.358% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Retail 2014 CW Bond Claims | Class 35 | [49] | 65.358% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2014 CW Bond Claims (Taxable Election) | Class 36 | § | 65.358% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2014 CW Guarantee Bond Claims | Class 37 | 345,380,885.83 | 65.358% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 38 | § | 65.358% | New GO Bonds / COFINA Jr. Lien Bonds / Cash |
| Retiree Claims | Class 39A | [___] | [___] | |
| Active ERS Participant Claims | Class 39B | [___] | [___] | |
| Active JRS Participant Claims | Class 39C | [___] | [___] | |
| Active TRS Participant Claims | Class 39D | [___] | [___] | |
| System 2000 Participant Claims | Class 39E | [___] | [___] | |
| AFSCME Employee Claims | Class 40 | [___] | [___] | |
| CW General Unsecured Claims | Class 41 | [___] | 3.9% | New GO Bonds / Cash |
| CW/HTA Claims | Class 42 | 5,786,167,494 | 3.9% | New GO Bonds / COFINA Jr. Lien Bonds |

[48] Total recovery on account of both (I) (a) an Allowed 2012 PBA Bond Claim, or (b) a Retail 2012 PBA Bond Claim, as applicable, and (II) (x) an Allowed 2012 CW Guarantee Claim, or (y) an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, estimated to be 72.217%.

[49] Included in 2014 CW Bond Claims Amount.

17

| Claim[40] | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| CW/Convention Center Claims | Class 43 | 414,393,096 | 3.9% | New GO Bonds / COFINA Jr. Lien Bonds |
| CW/PRIFA Rum Tax Claims | Class 44 | 1,892,926,265 | 3.9% | New GO Bonds / COFINA Jr. Lien Bonds |
| CW/MBA Claims | Class 45 | 28,903,666[50] | 3.9% | New GO Bonds / COFINA Jr. Lien Bonds |
| CW Appropriations Claims | Class 46 | [___] | 0% | - |
| CW 510(b) Subordinated Claims | Class 47 | [___] | 0% | - |
| ERS Bond Claims | Class 48 | [3,168,698,777] | [___] | Cash |
| Settling ERS Bond Claims | Class 49 | § | 12.7% | Cash |
| ERS General Unsecured Claims | Class 50 | [___] | [___] | New GO Bonds |
| Gracia-Gracia Claims | Class 51 | [___] | 100% | Cash |
| Convenience Claims | Class 52 | [___] | 100% | Cash |

The Debtors believe the Plan's contemplated restructuring is feasible and in the best interests of the Debtors' creditors.  If confirmation of the Plan were to be denied, the Debtors' options would be either for the Oversight Board to propose an alternate Title III plan of adjustment after re-engaging with and re-negotiating with creditors or for the Title III Cases to be dismissed, in which event the automatic stay would be terminated and multi-party, multifaceted litigation would ensue (including litigation commenced by bondholders and other parties against the Commonwealth, its officials and instrumentalities), as holders of claims compete for the limited resources available to pay those claims.

The following overview summarizes certain key components of the Plan.  The overview is qualified in its entirety by the full text of the Plan.

1. **Implementation of Plan Support Agreements in the Plan of Adjustment**

    a) **Plan Support Agreement with Certain Holders of GO Bond Claims and PBA Bond Claims**

On February 9, 2020, the Oversight Board, as representative of the Debtors in their Title III Cases, announced that, following extensive discussions, it had entered into the PSA with certain holders of in excess of $8 billion of GO Bond Claims and PBA Bond Claims on the framework of a plan of adjustment that proposes to resolve the outstanding disputes with the holders of GO Bonds and holders of PBA Bonds, including their validity, priority, and asserted secured status. Through the execution and submission of Joinder Agreement and Annex Agreements, as of February 28, 2020, such level of support exceeds $10 billion.  The PSA reduces the

---

[50] Claim amount reflects principal only.

18

Commonwealth's debt service (including principal and interest from COFINA Senior Lien Bonds) by 56%, to $39.7 billion from $90.4 billion.

The PSA provides for the proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico constitutional debt limit, as set forth in Article VI. section 2 of the Commonwealth Constitution (the "Constitutional Debt Limit")[51] and disputes regarding the priorities of the GO Bonds pursuant to the Constitution of the Commonwealth of Puerto Rico (the "Commonwealth Constitution") relative to other Commonwealth debts.  *See* section III.B.1.a) of this Disclosure Statement for a summary of such disputes and section V.H.7 for a detailed description.

The agreement also provides for the resolution of disputes between the Commonwealth and PBA regarding (i) the characterization of purported leases between PBA and the Commonwealth as disguised financing transactions, (ii) the amount, if any, of administrative rent the Commonwealth may owe PBA for the use and occupancy of PBA facilities following the commencement of the Commonwealth Title III Case, and (iii) the ownership of certain PBA facilities and property as between the Commonwealth and PBA (collectively, the "PBA Litigation").  *See* section III.B.1.c) of this Disclosure Statement for a summary of such disputes.

Finally, the PSA provides for the resolution of disputes regarding the PRIFA BANs.  *See* section V.H.7.e) of this Disclosure Statement for a description of such disputes.

***Settlement of Outstanding Disputes Relating to GO Bonds, PBA Bonds, and PRIFA BANs***.  In exchange for the consideration to be provided in the Plan, the following disputes in connection with the GO Bonds, PBA Bonds, and PRIFA BANs will be compromised and settled pursuant to the confirmation of the Plan, which includes disputes regarding the validity, priority, and asserted secured status of the GO Bonds and PBA Bonds (such disputes are summarized in section III.B.1.a of this Disclosure Statement):

- **Debt Related Objections**:

  - Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [ECF No. 4784],

  - Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [ECF No. 7057],

  - Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against

---

[51] *See* section V.H.7.a)(i) for a detailed description.

19

Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [ECF No. 8141],

o   Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [ECF No. 9730],

o   Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [ECF No. 9735], solely as it relates to the PRIFA BANs,

o   Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [ECF No. 10638], and

o   any other objections or joinders to these or such other objections that may be filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds, the PBA Bonds, and/or the PRIFA BANs.

- **Invalidity Actions:**[52]

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC*, Adv. Proc. No. 19-00281

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec*, Adv. Proc. No. 19-00282

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co.*, Adv. Proc. No. 19-00283

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E*, Adv. Proc. No. 19-00284

  o   *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A*, Adv. Proc. No. 19-00285

---

[52] *See* section V.H.7.b. of this Disclosure Statement for a detailed summary of the Invalidity Actions.

- *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B*, Adv. Proc. No. 19-00286

- *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C*, Adv. Proc. No. 19-00287

- *The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D*, Adv. Proc. No. 19-00288

- **Lien Challenge Actions:**

  - *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd.*, Adv. Proc. No. 19-00291

  - *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro y Credito de Rincon*, Adv. Proc. No. 19-00292

  - *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta*, Adv. Proc. No. 19-00293

  - *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez*, Adv. Proc. No. 19-00294

  - *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso*, Adv. Proc. No. 19-00295

  - *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman*, Adv. Proc. No. 19-00296

  - *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt.*, Adv. Proc. No. 19-00297

- **PBA Litigation**:

  - *The Financial Oversight and Management Board for Puerto Rico v. Puerto Rico Public Buildings Authority,* Adv. Pro. No. 18-AP-149-LTS[53]

---

[53] *See* sections III.A.3 and III.B.1.c. of this Disclosure Statement.

21

- **PRIFA BANs Litigation**:

  o *The Financial Oversight and Management Board for Puerto Rico v. The Bank of New York Mellon et al.,* Adv. Pro. No. 19-AP-269-LTS[54]

The Oversight Board has assessed the litigation risk related to the above actions and has determined that the proposed recoveries reasonably reflect the litigation risk related to the disputes in connection with the GO Bonds, PBA Bonds, and PRIFA BANs.  The Oversight Board submits that the resolution of the challenges to GO Bonds, PBA Bonds, and PRIFA BANs embodied in the Plan is reasonable and fair, and should be approved.

***Framework for Treatment of Commonwealth Bond Claims and Guarantee Claims***.  The principal terms of the treatment of GO Bonds and claims against the Commonwealth on account of the Commonwealth's guarantee of (a) bonds issued by PBA, and (b) the PRIFA BANs incorporated into the Plan include the following:

- **Total Consideration Provided in Plan of Adjustment:** $14.478 billion, of which $13.951 billion will be provided to GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims.

  - $3.809 billion of cash, all of which will be provided to GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims.

  - $10.669 billion in new bonds, of which $10.142 billion will be provided to GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims.

  - In settlement of the PBA Litigation, the Commonwealth will provide $1.073 billion of cash to PBA as an allowed administrative expense claim in the Commonwealth's Title III Case.

- **New Bonds Structure:**

  - Approximately fifty percent (50%) of New Bonds issued will be New GO Bonds ($5,334,295,000 in aggregate original principal amount) issued by the Commonwealth, the payment of which will be backed by the good faith, credit and taxing power of the Commonwealth under the Commonwealth Constitution.

  - Approximately fifty percent (50%) of New Bonds issued will be COFINA Junior Lien Bonds ($5,334,615,000 in aggregate original principal amount)) issued by COFINA and secured by the Conveyed Commonwealth Share, which shall be sold, transferred and assigned by the Commonwealth to COFINA.

---

[54] *See* section V.I.6 of this Disclosure Statement.

- **Deemed Issuance Date of New Bonds:** March 1, 2020 (interest on the New Bonds shall accrue from the earlier to occur of such deemed issuance date and the Effective Date).

- **New Bonds – Tax-Exempt / Taxable Status**:

  - As more particularly described in Sections 57.1-57.3 of the Plan, in the event a determination from the IRS or an opinion from Section 103 Bond Counsel is obtained prior to the Effective Date providing that the ratio of the aggregate amount of all taxable New Bonds to be issued on the Effective Date to the total aggregate amount of New Bonds is less than twelve percent (12%), the taxable New Bonds determined to be tax-exempt will have a lower coupon by 50 basis points and 37.5 basis points for the New GO Bonds and COFINA Junior Lien Bonds, respectively.

  - As more particularly described in Sections 57.1-57.3 of the Plan, if such determination or opinion is obtained subsequent to the Effective Date, the affected taxable bonds will be invited to exchange their bonds for converted bonds reflecting a yield of 25 basis points lower than the yield for such invited bonds of the same type, interest rate, series and maturity.

- **Taxable Bond Waterfall:**

  - Taxable New Bonds will be distributed first to Puerto Rico Investors who elect to receive a taxable bond distribution.

  - Remaining taxable New Bonds after distribution to Puerto Rico Investors will be distributed pro rata to all GO Bond Claims, and CW Guarantee Bond Claims (without duplication).

- **Treatment of Original Issue Discount:**[55]

  - Allocation of plan consideration between classes of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims are made ratably according to the claim amount as of the Commonwealth Petition Date or PBA Petition Date (as applicable), including unmatured interest (i.e., par plus accrued interest).

  - Distribution within a class of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims are made ratably according to the claim amount as of the Commonwealth Petition Date or PBA Petition Date (as

---

[55] Capital appreciation bonds are accreted to the Commonwealth Petition Date or PBA Petition Date (as applicable) in all distributions.

applicable), <u>excluding</u> unmatured interest (i.e., par less unaccreted original issue discount plus accrued interest).

- **Sources of Payments:**  Some holders of GO Bond Claims and CW Guarantee Bond Claims assert their bonds are secured by the 1.03% of the property tax levied pursuant to Act 83-1991 (the "<u>1.03% of Property Tax</u>") and collected by the Municipal Revenues Collection Center ("<u>CRIM</u>") and by monies historically conditionally appropriated to certain instrumentalities but, pursuant to Article VI, section 8 of the Commonwealth Constitution, retained by the Commonwealth when available revenues (including surplus) for a given year are insufficient to meet appropriations.  While the Commonwealth Debtor disagrees that the GO Bonds and guaranties are secured by the 1.03% of Property Tax and/or the historically conditionally appropriated monies, to eliminate these legal disputes, pursuant to the global settlement provided in the PSA, the GO Bond Claims' recovery will be distributed each fiscal year from: (i) first, the 1.03% of Property Tax, (ii) second, and once the 1.03% of Property Tax is exhausted, the monies arising from the operation of Article VI Section of the Commonwealth Constitution, and (iii) third, and once the 1.03% of Property Tax and the monies arising from the operation of Article VI Section of the Commonwealth Constitution are exhausted, the other resources of the Commonwealth.

*Framework for Treatment of PBA Bond Claims*.  The principal terms of the treatment of the PBA Bond Claims incorporated into the Plan includes the following:

- **PBA Settlement:**  In settlement of the PBA Litigation, the Commonwealth will provide $1.073 billion of cash to PBA as an allowed administrative expense claim in the Commonwealth's Title III Case in consideration of unpaid rent since the Commonwealth Petition Date and ownership and valuation of certain property to which the PBA holds title.  Such funds will be distributed by PBA to allowed PBA Bond Claims.

- **Allowance of PBA Bond Claims:**[56]  Holders of PBA Bonds will have an allowed claim against PBA equal to the principal amount outstanding of PBA Bonds, plus accrued and unpaid interest thereon, as of the PBA Petition Date.

  - Solely for purposes of distribution under the Plan, the CW Guarantee Claim against the Commonwealth on account of the Commonwealth's guarantee of PBA Bonds is calculated as such amount <u>less</u> the settlement amount of $1.073 billion.

*Consummation Costs*.  Holders of GO Bonds and PBA Bonds party to the PSA at its execution on February 9, 2020 are entitled to a pro rata share of cash in an amount equal to 1.25%

---

[56] Pursuant to the Plan Classes, the PBA Bond Claims as defined in the Plan Support Agreement also includes the PBA Bond Claims (Insured).

of the aggregate amount of such holders' PBA Bond Claims, GO Bond Claims, and CW Guarantee Bond Claims (without duplication). The Consummation Costs are in consideration for the fees and expenses incurred by such holders in connection with the negotiation and execution of the PSA and the prosecution of the approval of the Disclosure Statement and confirmation of the Plan.

***PSA Restriction Fee***. An aggregate amount of $350 million in cash will be paid to certain parties to the PSA. Such aggregate amount is reduced by the Consummation Costs paid. The PSA Restriction Fee is in consideration for executing the PSA and agreeing to "lock-up" such party's bonds in accordance with the terms of the PSA.

The following parties are eligible to receive the PSA Restriction Fee:

- Holders of GO Bonds and PBA Bonds party to the PSA at its execution on February 9, 2020.

- Any holders of GO Bonds and PBA Bonds who join as parties to the PSA on or before the earlier to occur of: (a) February 28, 2020, and (b) the date and time at which the parties to the PSA entitled to receive the PSA Restriction Fee own seventy percent (70%) of the aggregate amount of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication).

Pursuant to the *Notice of Opportunity to Join Plan Support Agreement* posted on the Oversight Board's website on February 14, 2020, holders of GO Bonds and PBA Bonds were notified of the opportunity to join as a party to the PSA and receive the PSA Restriction Fee.

***Retail Support Fee***. To provide all holders of GO Bonds and PBA Bonds an opportunity to receive a PSA fee, an aggregate amount of fifty million dollars ($50,000,000.00) in cash is made available to Retail Investors holding GO Bonds and PBA Bonds. Retail Investors are such holders who hold GO Bonds or PBA Bonds in the aggregate face amount of equal to or less than one million dollars ($1,000,000.00). The Retail Support Fee will be available to each class of retail investors who vote, as a class, to accept the Plan. If a class of Retail Investors votes to reject the Plan, the share of the Retail Support Fee allocable to such class will be reallocated pro rata to the classes of Retail Investors who have voted to accept the Plan, and parties eligible to receive the PSA Restriction Fee.

b)   <strong>Plan Support Agreement with Retiree Committee</strong>

After significant negotiations, on June 7, 2019, the Oversight Board and the Retiree Committee[57] entered into the Retiree Committee PSA (attached hereto as Exhibit C) providing for the Retiree Committee's support for the terms of the agreed-upon restructuring of the Commonwealth's pension obligations pursuant to the Plan. The Oversight Board has determined the following steps are essential to provide adequate funding for future pension obligations: (a) reducing pension benefits above certain levels to achieve significant savings in pension payments

---

[57] On June 15, 2017, the United States Trustee appointed the Retiree Committee in the Title III Cases. *Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico*, [ECF No. 340].

over the next 40 years while leaving the benefits of lower-income retirees unaffected; and (b) establishing a pension reserve fund to provide a guaranteed source of payment in years when the annual budget falls into deficit.  These measures are incorporated into the Retiree Committee PSA, as described below:

(i)     ***Benefit Reductions***

Pension benefits in ERS, Teachers Retirement System ("TRS"), and Judiciary Retirement System ("JRS") accrued by active and retired employees on or after May 3, 2017, are not subject to any reductions in pension or retirement benefits.  Pension benefits in all three systems accrued by active and retired employees before May 3, 2017, are subject to reduction as follows.[58]

For any individual whose Total Monthly Retirement Benefit (exclusive of the Monthly Medical Insurance Plan Contribution, which will not be reduced at all) is in excess of $1,200 per month (the threshold above which cuts apply), a flat cut percentage equal to the lesser of (A) 8.5% of the Total Monthly Retirement Benefit, or (B) 25% of the difference of the Total Monthly Retirement Benefit *plus* the Monthly Medical Insurance benefit, if any, *minus* either (i) $1,000 for those Participants without access to Social Security when accruing their pension or (ii) $600 per month for those Participants with access to Social Security when accruing their pension will be applied, provided that the Total Monthly Retirement Benefit cannot fall below $1,200 per month. The minimum benefit thresholds will remain at $1,200, $1,000 and $600 as applicable.  Accrued pension amounts and threshold will not be indexed for any reason in the future, except for Pension Benefit Restoration provisions as described below.

The reduction in the Total Monthly Retirement Benefit will be calculated in a four step process:

(1)     any annual Christmas Bonus will be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,200, (ii) the total reduction as calculated above is reached, or (iii) the Christmas Bonus is entirely eliminated, whichever occurs first;

(2)     any Summer Bonus will next be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,200, (ii) the total reduction as calculated above is reached, or (iii) the Summer Bonus is entirely eliminated, whichever occurs first;

(3)     the Monthly Medicine Bonus will next be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,200, (ii) the total reduction as calculated above is reached, or (iii) the Monthly Medicine Bonus is entirely eliminated, whichever occurs first; and

(4)     the Monthly Base Pension will next be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,200, or (ii) the total reduction as calculated above is reached.

Under no circumstances shall this reduction formula reduce an individual Retiree's Total Monthly Retirement Benefit below the $1,200 monthly benefit threshold.  If a Retiree's Total

---

[58] System 2000 Participants (defined below) are not subject to such reduction and their claims are treated as provided for in Class 39E.

Monthly Retirement Benefit starts out below this threshold, the Retiree Total Monthly Retirement Benefit will be unaffected by the Plan.

(ii)     *Benefit Restoration*

All Retirees subject to the Monthly Benefit Reduction described above are also eligible for partial or total restoration of the benefit for any given fiscal year in the event there is sufficient surplus cash generated beyond the surplus projected in the Fiscal Plan for that fiscal year. The restoration of the benefit will occur in any particular post-confirmation fiscal year so long as the Commonwealth Debtor achieves a budget surplus of more than $100 million in excess of the surpluses projected in the Fiscal Plan for that year. If such an excess surplus is achieved, then 10% of the excess surplus shall be distributed on or before October 1 following that fiscal year to Retirees on a pro-rata basis to restore partially or fully the benefit reduction experienced by Retirees in such year. Each Retiree will receive a Monthly Benefit Restoration pro-rated based on the amount of total cuts experienced, and the restoration of benefits will be capped by the reduction experienced by each Retiree. If the excess surplus achieved in any given fiscal year is less than $100 million, no restoration payments will be made for that year. Such benefit restoration payments may be achieved for any post-confirmation fiscal year through and including fiscal year 2033.

The Retiree Committee has established the following website to provide an illustrative calculator of the retirement benefit modifications provided under the Plan and the Retiree Committee PSA:

https://calculadoracor.org/eng.html (English)
https://calculadoracor.org/index.html (Spanish)

(iii)     *Pension Reserve Trust*

On the Effective Date of the Plan, the Commonwealth Debtor will establish a Pension Reserve Trust. The Pension Reserve Trust will be held in trust for the sole benefit of the Retirees, and managed by the three-member Pension Reserve Investment Committee appointed pursuant to the Plan. The funding of the administrative cost of the investment adviser will come from the Pension Reserve Trust.

The Plan provides, commencing as of fiscal year 2020, that the Commonwealth will make annual contributions to the Pension Reserve Trust from the Commonwealth General Fund until fiscal year 2027 in an amount no less than $175 million per year; provided further that for any fiscal year ending after the Plan Effective Date in which the projected Fiscal Plan Surplus is at least $1.750 billion, the Commonwealth shall make a contribution to the Pension Reserve Trust from the Commonwealth General Fund in an amount equal to 25% of the projected Fiscal Plan Surplus that year (such amount, the "Base Contribution").[59] Subsequent to entry into the Retiree Committee PSA, the parties further negotiated and agreed, and the Plan provides at paragraph 65.2,

---

[59] The PSA and the Plan also provide for an initial contribution of $5 million to fund the initial administrative fees, costs, and expenses of the Pension Reserve Trust.

that the Commonwealth's annual contribution shall also include: (a) such additional amount calculated as the lower of the actual primary surplus for such fiscal year or the projected Fiscal Plan primary surplus for such Fiscal Year minus the sum of (i) the Base Contribution for such fiscal year, plus (ii) the Commonwealth debt service obligation pursuant to the plan for such fiscal year, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in all instances, such additional amount cannot be lower than zero dollars ($0.00), and (b) subject to applicable laws, including, without limitation, Titles I and II of PROMESA, such additional amounts as the Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust. The annual contribution must be made by October 1 following the end of each fiscal year.  If the Effective Date occurs after October 1 following fiscal year 2020 or any successive fiscal year through fiscal year 2027, the Base Contributions and any other amounts due and owing pursuant to the provisions described above shall be deposited into the Pension Reserve on the Effective Date.

Any withdrawals from the Pension Reserve Trust shall only be used by the Commonwealth for the payment of current pension obligations under PayGo.

c)     **Plan Support Agreement with AFSCME**

The Oversight Board engaged in negotiations with AFSCME regarding CBAs, the ERS Systems Benefits, and the Upside Fiscal Plan Surplus Sharing Agreement, resulting in an agreement which provides AFSCME's support of the Plan, while providing key benefits to AFSCME's members in exchange for its support.  On June 7, 2019, the Oversight Board and AFSCME, for itself and on behalf of its two local chapters, Servidores Públicos Unidos ("SPU"), AFSCME Council 95 and Capítulo de Retirados de SPU and their fourteen affiliated local unions in Puerto Rico, entered into a PSA providing for AFSCME's support for terms of a new collective bargaining agreement or agreements ("CBAs"), along with the foregoing restructuring of pension obligations, pursuant to the Plan.  The vote passed with 92% of members voting in favor.  The agreement also provides AFSCME's support of the terms set forth in the Plan with respect to treatment of retirement benefit claims, and AFSCME has agreed to support and encourage those terms with their voting membership. AFSCME will also be provided with institutional representation with direct interaction with the Oversight Board to ensure the perspectives of AFSCME are shared in regards to the Commonwealth fiscal plan, budget, and restructuring process.

The Plan provides the existing CBAs between the Commonwealth and AFSCME or its local affiliates are rejected under Bankruptcy Code section 365 and replaced with modified CBAs. The treatment of claims as a result of such modification will be, in part, the implementation of valid, enforceable modified CBAs.  The current CBAs combined with the provisions of the term sheet annexed as Appendix I to the AFSCME PSA (also attached as Exhibit D to this Disclosure Statement) shall constitute the modified CBAs and the modified CBAs shall have a term of five years.   The five year contract term locks in fiscal plan economic savings while providing enforceable CBAs and important contractual protections to AFSCME and its members, including, for example, protection from privatization for the contract period.  The AFSCME-represented employees are assured that for the term of the new CBAs there will be no changes in base pay, other compensation, leaves, holidays, or other benefits without the express consent of AFSCME.

The five-year term also allows for an emergency process to achieve fiscal plan personnel reductions, while providing AFSCME input into cost saving initiatives. The result of the collaborative process maintains the majority of AFSCME's previously negotiated benefits while memorializing said benefits in the modified five-year CBAs.

Claims as a result of such rejection are in Class 40, and the treatment of the rejection damage claims is the proffer of the modified CBAs consistent with the AFSCME PSA, to be executed and effectuated pursuant to the Plan and Confirmation Order. The terms of the CBA cover the following union affiliates:

- Parole Board and Local 3584 / United Public Servants

- Department of Consumer Affairs and Local 3986 / United Public Servants

- Department of Correction and Rehabilitation and Local 3500-Unit B Correctional Officers (ACU) / United Public Servants

- Department of Correction and Rehabilitation / Bureau of Juvenile Institutions and Local 3559 (ACU) / United Public Servants

- Department of Education and Local 3840 covering only employees within AFSCME jurisdiction of PASO

- Department of Natural and Environmental Resources and Local 2082-Unit A / United Public Servants

- Department of Natural and Environmental Resources and Local 3647 (Ranger Corps) / United Public Servants

- Department of Transportation and Public Works and Local 3889 / United Public Servants

- Department of Labor and Human Resources / Vocational Rehabilitation Administration and Local 3251 / United Public Servants

- Department of the Family and Local 3227-Unit A / United Public Servants

- Department of the Family and Local 3234-Unit B (UPETEC) / United Public Servants

- Bureau of Forensic Sciences and Local 2099 / United Public Servants

- Department of Correction and Rehabilitation / Pretrial Services Program and Local 3573 (ACU) / United Public Servants

- Bureau of Transport and Other Public Services and Local 3897 / United Public Servants

The PSA provides for a multitude of benefits negotiated between the Oversight Board and AFSCME in an effort to maintain protection of the union members, including as follows.

*Uniform Healthcare*.  The PSA provides for an enhanced monthly employer contribution of $170.00 per person/per month in comparison to the fiscal plan proposal of $125.00 per person/per month.  The PSA also provides for union representation through a negotiated health care administrator, which will facilitate better coverage, a wider array of choices for coverage, and lower overall costs to union members.

*Upside Participation Bonus*.   The PSA provides a mechanism for union member participants to share in any excess surplus above and beyond the Certified Fiscal Plan in effect as of the date of the Plan for the Commonwealth.  Given the sacrifices already endured by the workers of Puerto Rico and the additional sacrifices required under the Fiscal Plan, the Fiscal Plan Surplus Sharing Agreement provides a mechanism to share any potential upside with those who have endured the current challenges and will be working to stabilize Puerto Rico in future years.

*Support Fee*.  AFSCME will receive a one-time payment of $5 million, in recognition of their efforts as the lead negotiator of and as a signatory to the Agreement.

*Additional Fee*.  AFSCME will receive a one-time payment of $5 million to AFSCME, to be disbursed in the manner AFSCME designates, as a concession by the Oversight Board for the efforts undertaken by AFSCME to fulfill obligations under the agreement.

*Signing Bonus*. Union member participants will receive a one-time signing bonus of $500.

*System 2000*.  Union members will receive full recovery of their contributions under the System 2000 plan, with interest credit through May 3, 2017.  The following terms outline the means in which System 2000 participants are treated:

- segregate full System 2000 contributions from 2000-2013;

- segregate full System 2000 participant Act 3-2013 contributions from 2013-2017; and

- segregate full Act 3-2013 participant (who had not participated in either Act 1 of 1990 or Act 447, or System 2000 from 2000-2013) contributions through 2017.

System 2000 participants who have not yet retired as of July 1, 2019 will receive the amount of their contributions into System 2000 (and Act 3 plans from and after 2013) through June 30, 2017, plus accrued interest thereon through the Petition Date.  This amount will be rolled into  participants' individual defined contribution accounts, which will result in the unimpairment of their contributions to the system and interest accrual under Puerto Rico law, protection of their retirement savings in new defined contribution accounts, and flexibility for participants to invest the dollars according to their personal preference.

 As of the Effective Date, participants with System 2000 contributions will no longer be entitled to future system administered benefits, such as death and disability provisions.

30

*Act 3-2013 Benefits*.  Act 1 of 1990 and Act 447 participants' pensions will include their contributions under Act 3-2013 from July 1, 2013 through the implementation of the Act 106 defined contribution plan in July 2017, including interest accrued through the Petition Date, as annuitized pursuant to Act 3-2013.  The portion of the annuity related to contributions under Act 3-2013 will be exempt from the benefit reduction formula described above in subsection 2(a) for participants who retire after the Effective Date of the Plan.  This will serve to further protect workers' retirement benefits.

*Pension Reserve Trust.*  Establishment and funding of a Pension Reserve Trust protects both current and future union retirees.  The AFSCME PSA provides the Commonwealth shall make annual contributions to the Pension Reserve Trust from the Commonwealth General Fund from fiscal year 2020 until fiscal year 2027 in an amount no less than $175 million per year; provided that for any fiscal year ending after the Plan Effective Date in which the projected Fiscal Plan Surplus is at least $1.750 billion, the Commonwealth  shall make a contribution to the Pension Reserve Trust from the Commonwealth General Fund in an amount equal to 25% of the projected Fiscal Plan Surplus that year.[60]

*Excess Cash Surplus.*  The PSA provides a mechanism for union members to share in any excess surplus above and beyond the Certified Fiscal Plan in effect as of the Effective Date of the Plan.  It provides for a bonus pool for union members to the extent the Commonwealth outperforms the projections included in the Fiscal Plan, via an Excess Cash Surplus formula, whereby 25% of actual surplus in excess of $100 million above the projected Fiscal Plan surplus for any fiscal year will be distributed to all AFSCME-represented participants and all other eligible Commonwealth employees each year.  All recipients of this upside bonus pool will have the choice to allocate any portion of their bonus to their defined contribution account and any remainder will be distributed in cash

*Non-Union Rank-and-File Employees.*  For those rank-and-file employees who are not represented by a union, and therefore are not eligible to sign a plan support agreement for the Plan, the Oversight Board will provide them with certain of the benefits afforded to those employees who are represented by a union that does sign a plan support agreement for the Plan.  For example, such rank-and-file employees will receive the enhanced monthly employer contribution of $170.00 per person/per month in comparison to the fiscal plan proposal of $125.00 per person/per month and are permitted to participate in the upside participation bonus which shares any excess surplus above and beyond the Certified Fiscal Plan in effect as of the date of the Plan for the Commonwealth.

---

[60] The formula here (defined in the Plan as the Base Contribution) is provided for in the AFSCME PSA (Exhibit D); however, the Plan provides for a more beneficial formula (see the Plan at 65.2), consistent with the revisions to the formula negotiated by the Oversight Board and the Retiree Committee as described above. The Plan establishes an initial contribution of $5 million to fund the initial administrative fees, costs, and expenses of the Pension Reserve Trust. Beginning in fiscal year 2020 through fiscal year 2027, the Reorganized Commonwealth will make an annual contribution to the Pension Reserve Trust in an amount equal to (a) the Base Contribution for such fiscal year, plus (b) such additional amount calculated as the lower of the actual primary surplus for such fiscal year or the projected Fiscal Plan primary surplus for such Fiscal Year minus the sum of (i) the Base Contribution for such fiscal year, plus (ii) the Commonwealth debt service obligation pursuant to the plan for the fiscal year, plus (iii) $200 million.

2.  **Implementation of Other Settlements in the Plan**

a)  **Election to Settle ERS Litigation**

The Plan provides holders of ERS Bond Claims an option to settle and compromise the litigation regarding, among other things, that the ERS Bonds are invalid because they were issued *ultra vires*, recovery of principal and interest payments in the event the ERS Bonds are determined to be invalid, whether Bankruptcy Code section 552(a) prevents the ERS bondholders' security interests from attaching to certain employer contributions received by ERS after the ERS Petition Date (but only if the First Circuit grants a rehearing or rehearing *en banc* and the First Circuit's January 30, 2020 decision is overruled, or a petition for certiorari is granted and the Supreme Court reverses the First Circuit's January 30, 2020 decision), constitutional claims against the Commonwealth government and United States government for alleged violations of the Takings Clause and Contracts Clause, and the perfection and scope of the asserted security interests of holders of ERS Bonds (collectively, the "ERS Litigation").  For a summary of such disputes, see sections III.B.1.b)(i) & (iii), and V.H.6 of this Disclosure Statement.

3.  **Holders of Allowed Claims Permitted to Make Elections**

Pursuant to the Disclosure Statement Order and the Plan, certain holders of Claims are entitled to make an election regarding the distribution they will receive under the Plan and the settlement of certain disputes.  Below is an overview of the distribution elections and limitations on voting applicable to certain holders of Claims.

***Taxable Bond Election.***  If you hold an Allowed Claim in any of the following Classes, you may elect to receive your distribution of New GO Bonds and COFINA Junior Lien Bonds pursuant to the Plan in the form of higher interest rate coupons but are treated as taxable bonds for federal income tax purposes:

| Claims Eligible to Make Taxable Election | |
| --- | --- |
| **Claim** | **Class** |
| Vintage CW Bond Claims | Class 11 |
| Retail Vintage CW Bond Claims | Class 12 |
| Vintage CW Guarantee Bond Claims | Class 15 |
| 2011 CW Bond Claims | Class 18 |
| Retail 2011 CW Bond Claims | Class 19 |
| 2011 CW Guarantee Bond Claims | Class 22 |
| 2011 CW Series D/E/PIB Bond Claims | Class 24 |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 26 |
| 2012 CW Bond Claims | Class 28 |
| Retail 2012 CW Bond Claims | Class 29 |
| 2012 CW Guarantee Bond Claims | Class 32 |
| 2014 CW Bond Claims | Class 34 |

| Claims Eligible to Make Taxable Election | |
|---|---|
| **Claim** | **Class** |
| Retail 2014 CW Bond Claims | Class 35 |
| 2014 CW Guarantee Bond Claims | Class 37 |

Since residents of Puerto Rico are generally exempt from payment of federal income taxes, to be eligible to make the taxable bond election, a holder of such Allowed Claim must certify that it is a **Puerto Rico Investor**, *i.e.*, that it is either:

- A natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or

- An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes).

If you make the above-described election, you will be deemed to accept the Plan. If you are determined to be ineligible to make the taxable bond election, your Claim will be treated in accordance with your originally designated Class and you will be deemed to accept the Plan.

AFTER THE ELECTION DEADLINE, ALL SECURITIES THAT HAVE BEEN TENDERED WITH RESPECT TO AN ELECTION WILL BE RESTRICTED FROM FURTHER TRADING OR TRANSFER UNTIL THE EFFECTIVE DATE OF THE PLAN. THIS IS NECESSITATED BY THE DEPOSITORY TRUST COMPANY PROCEDURES TO ASSOCIATE AN ELECTION TO RECEIVE TAXABLE BONDS WITH THE UNDERLYING SECURITY, WHICH CAN ONLY BE ACCOMPLISHED BY TENDERING THE UNDERLYING SECURITY.

**IF YOU MAKE THE TAXABLE BOND ELECTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING OF TAXABLE NEW GO BONDS, TAXABLE COFINA JUNIOR LIEN BONDS, AND CASH APPROXIMATELY EQUAL TO THE FOLLOWING:**

| Claim | Class | Approx. Taxable Bond Election Recovery |
|---|---|---|
| Vintage CW Bond Claims | Class 11 | 74.874% |
| Retail Vintage CW Bond Claims | Class 12 | 74.874% |
| Vintage CW Guarantee Bond Claims | Class 15 | 70.896% |
| 2011 CW Bond Claims | Class 18 | 70.401% |
| Retail 2011 CW Bond Claims | Class 19 | 70.401% |
| 2011 CW Guarantee Bond Claims | Class 22 | 69.894% |
| 2011 CW Series D/E/PIB Bond Claims | Class 24 | 73.800% |

33

| Claim | Class | Approx. Taxable Bond Election Recovery |
|---|---|---|
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 26 | 73.800% |
| 2012 CW Bond Claims | Class 28 | 69.887% |
| Retail 2012 CW Bond Claims | Class 29 | 69.887% |
| 2012 CW Guarantee Bond Claims | Class 32 | 63.931% |
| 2014 CW Bond Claims | Class 34 | 65.358% |
| Retail 2014 CW Bond Claims | Class 35 | 65.358% |
| 2014 CW Guarantee Bond Claims | Class 37 | 65.358% |

**IF YOU <u>DO NOT</u> MAKE THE TAXABLE BOND ELECTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING OF NEW GO BONDS, COFINA JUNIOR LIEN BONDS, AND CASH APPROXIMATELY EQUAL TO THE FOLLOWING:**

| Claim | Class | Approx. Recovery |
|---|---|---|
| Vintage CW Bond Claims | Class 11 | 74.874% |
| Retail Vintage CW Bond Claims | Class 12 | 74.874% |
| Vintage CW Guarantee Bond Claims | Class 15 | 70.896% |
| 2011 CW Bond Claims | Class 18 | 70.401% |
| Retail 2011 CW Bond Claims | Class 19 | 70.401% |
| 2011 CW Guarantee Bond Claims | Class 22 | 69.894% |
| 2011 CW Series D/E/PIB Bond Claims | Class 24 | 73.800% |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 26 | 73.800% |
| 2012 CW Bond Claims | Class 28 | 69.887% |
| Retail 2012 CW Bond Claims | Class 29 | 69.887% |
| 2012 CW Guarantee Bond Claims | Class 32 | 63.931% |
| 2014 CW Bond Claims | Class 34 | 65.358% |
| Retail 2014 CW Bond Claims | Class 35 | 65.358% |
| 2014 CW Guarantee Bond Claims | Class 37 | 65.358% |

Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds distributed to holders making the taxable bond election will have certain repayment terms that differ from those distributed to holders who do not make such election. You are encouraged to review the entire Disclosure Statement, including the tax consequences of making an election discussed in IX, entitled "Material United States Federal Income Tax Considerations" and section X, entitled "Certain Material Puerto Rico Income Tax Considerations" of this Disclosure Statement, before making the taxable bond election. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read section IX of the Disclosure

34

Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. Even if you qualify as a Puerto Rico Investor, you may not be exempt from paying U.S. federal income tax on the Taxable New GO Bonds or Taxable COFINA Junior Lien Bonds. The tax consequences described in this Disclosure Statement are not a substitute for careful tax planning and professional tax advice relating to your individual circumstances and you should seek advice from your own tax advisor.

***ERS Bond Claims Settlement Election***. Each holder of an ERS Bond Claim may elect to have its ERS Bond Claim treated as a Settling ERS Bond Claim in Class 49 and participate in the ERS Bond Settlement. Pursuant to the ERS Bond Settlement, holders of ERS Bond Claims will:

(i)     receive a pro rata share of Cash providing a recovery of approximately 12.79%;[61]

(ii)    provide for the general release of the Commonwealth and the United States of America for any claims and causes of action, including, but not limited to, those asserted, or could be asserted, in the ERS Litigation and the litigation styled *Altair Global Credit Opportunities Fund (A) LLC v. United States*, Case No. 17-970C, pending in the U.S. Court of Federal Claims, regarding the right of holders of ERS Bonds to just compensation pursuant to the Takings Clause of the U.S. Constitution;

(iii)   be released from any potential claims for recovery of principal and interest payments in the event the ERS Bonds are determined to be invalid; and

(iv)    accept the Plan as a holder of a Claim in Class 49 (Settling ERS Bond Claims).

AFTER THE ELECTION DEADLINE, ALL SECURITIES THAT HAVE BEEN TENDERED WITH RESPECT TO AN ELECTION WILL BE RESTRICTED FROM FURTHER TRADING OR TRANSFER UNTIL THE EFFECTIVE DATE OF THE PLAN. THIS IS NECESSITATED BY THE DEPOSITORY TRUST COMPANY PROCEDURES TO ASSOCIATE AN ELECTION WITH THE UNDERLYING SECURITY, WHICH CAN ONLY BE ACCOMPLISHED BY TENDERING THE UNDERLYING SECURITY.

Holders of ERS Bond Claims that do not elect to participate in the ERS Bond Settlement will not be entitled to the distributions and releases above and will continue to be a participant in the ERS Litigation. Such non-settling holder's distribution as a holder of a Claim in Class 48 (ERS Bond Claims) will be placed in the ERS Reserve pending entry of a final, non-appealable order

---

[61] Such distribution is inclusive of payments of adequate protection made to holders of ERS Bond Claims in accordance with that certain (a) *Joint Stipulation and Order*, dated April 11, 2017 [Case No. 17-3566, ECF No. 26, Ex. E], and (b) *Joint Stipulation Regarding (I) Motion of Certain Secured Claimholders of Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Adequate Protection and Stay Relief and Reservation of Rights and (II) Motion of Debtors Pursuant to PROMESA Section 301(a) and Bankruptcy Code Sections 105(a), 362(a), 365 and 922 for Entry of an Order Confirming Application of the Automatic Stay, Stay of Prepetition Lawsuits and Actions and Application of Contract Protections*, dated July 14, 2017 [Case No. 17-3566, ECF No. 170].

resolving or settling the ERS Litigation. **If holders of ERS Bond Claims that do not elect to participate in the ERS Bonds Settlement do not prevail in the ERS Litigation, such holders may receive no recovery on account of their ERS Bond Claims.**

*Convenience Claim Election*. Holders of Allowed CW General Unsecured Claims (Class 41) and Allowed ERS General Unsecured Claims (Class 50) may elect to:

(a) reduce the amount of such holder's Allowed Claim to $10,000.00 and receive payment in full in cash of such reduced claim pursuant to the treatment of Convenience Claims in Class 52; and

(b) accept the Plan as a holder of a Claim in Class 52.

Holders of multiple Allowed CW General Unsecured Claims or multiple Allowed ERS General Unsecured Claims may elect to:

(a) reduce the amount of such multiple claims to an aggregate amount of $20,000.00 and receive payment in full in cash of such reduced aggregate claim pursuant to the treatment of Convenience Claims in Class 52; and

(b) accept the Plan as a holder of a Claim in Class 52.

4. **Overview of New GO Bonds and COFINA Junior Lien Bonds to be Issued on the Effective Date**

a) **New GO Bonds**

On the Effective Date, Reorganized Commonwealth will issue the New GO Bonds as current interest bonds with seven (7) different maturity dates. Subject to certain adjustments permitted under the Plan, the New GO Bonds will be senior debt obligations of Reorganized Commonwealth, secured by a statutory first lien and pledge of the Debt Service Reserve Fund and the Debt Service Fund and a pledge of the Commonwealth's good faith, credit and taxing power of Reorganized Commonwealth pursuant to Article VI, Sections 2 and 8 of the Commonwealth Constitution and applicable laws of the Commonwealth as of the Effective Date, will have an aggregate original principal amount of $5,334,295,000, will have interest rates between 5.625% and 7.125%, and will have stated maturity dates between July 1, 2021 and July 1, 2039. The New GO Bonds will be issued pursuant to the New GO Bonds Indenture and New GO Bonds Legislation. The New GO Bonds will be distributed as set forth in the Plan. Notwithstanding the timing of the Effective Date, interest on the New GO Bonds shall commence to accrue from the earlier to occur of the Effective Date and March 1, 2020, which earlier date shall be designated as the "dated" date of the New GO Bonds.

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New GO Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the New GO Bonds, following consultation with up to two (2) Initial PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group, each of which shall have executed a

36

confidentiality agreement, in form and substance satisfactory to the Oversight Bond and restricting such Initial PSA Creditors from trading New GO Bonds and COFINA Junior Lien Bonds, including based upon the Government Parties' judgment with respect to expected benefits.

The New GO Bonds will not carry any default rate of interest; provided, however, that any interest on the New GO Bonds that is due and unpaid on an interest payment date shall be compounded into the principal amount of the New GO Bonds on such date.

Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such Taxable New GO Bonds shall be distributed to holders of Allowed Claims in the following order of priority:  (1) *first*, to holders of Allowed Taxable Election CW Claims, and (2) *second*, pro rata to all other holders of Allowed Claims and recipients of New GO Bonds, without duplication.

### b)    COFINA Junior Lien Bonds

On the Effective Date, COFINA shall issue the COFINA Junior Lien Bonds, consisting of CIBs, as current interest bonds with seven (7) different maturity dates.  The COFINA Junior Lien Bonds will be securities payable from the Conveyed Commonwealth Share and shall, in all respects, be subject to the First Dollars Funding obligations with respect to the COFINA Senior Lien Bonds.  The COFINA Junior Lien Bonds will have (a) an aggregate original principal amount of $5,334,615,000, (b) interest rates between 4.75% and 6.125%, and (c) stated maturity dates between July 1, 2021 and July 1, 2039.  The COFINA Junior Lien Bonds will be issued pursuant to the New GO Bond COFINA Junior Lien Bonds Indenture.  The COFINA Junior Lien Bonds will be distributed as set forth in the Plan.  Notwithstanding the timing of the Effective Date, interest on the COFINA Junior Lien Bonds shall commence to accrue on March 1, 2020, which date shall be designated as the "dated" date of the COFINA Junior Lien Bonds.

Repayment of the COFINA Junior Lien Bonds (i) shall be secured by a second lien that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Senior Lien Bonds and (ii) shall not be payable from the COFINA Revenues.  The COFINA Junior Lien Bonds are not secured by nor are they payable from the Trust Estate.

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the COFINA Junior Lien Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the COFINA Junior Lien Bonds, including promptly responding in good faith to documentary or other requests, following consultation with up to two (2) Initial PSA Creditors jointly designated by the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group, each of which shall have executed a confidentiality agreement in form and substance satisfactory to the Oversight Board and restricting such Initial PSA Creditors from trading New GO Bonds and COFINA Junior Lien Bonds, including based upon the Government Parties' judgment with respect to expected benefits.

The COFINA Junior Lien Bonds will not carry any default rate of interest.

Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable COFINA Junior Lien Bonds are issued, such Taxable COFINA Junior Lien Bonds shall be distributed to holders of Allowed Claims in the following order of priority: (1) *first*, to holders of Taxable Election CW Claims and (2) *second*, pro rata to all other holders of Allowed Claims and recipients of COFINA Junior Lien Bonds, without duplication.

### C.   Holders of Claims Entitled to Vote on the Plan of Adjustment

Pursuant to PROMESA Title III and the Bankruptcy Code, only holders of Allowed Claims in classes of claims that are impaired and are not deemed to have automatically accepted or rejected a proposed Title III plan of adjustment are entitled to vote to accept or reject a proposed plan of adjustment. Classes of claims in which the holders of claims are unimpaired under the Plan are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes of claims in which the holders of claims will receive no recovery under the plan of adjustment are deemed to have rejected the plan of adjustment and are also not entitled to vote.

Below is a summary of Classes of Claims (a) entitled to vote to accept or reject the Plan, (b) entitled to make a distribution election, and (c) not entitled to vote to accept or reject the Plan:

|  | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| Vintage PBA Bond Claims | Class 1 | X | - | - |
| Vintage PBA Bond Claims (Insured)* | Class 2 | X | - | - |
| Retail Vintage PBA Bond Claims | Class 3 | X | - | - |
| 2011 PBA Bond Claims | Class 4 | X | - | - |
| Retail 2011 PBA Bond Claims | Class 5 | X | - | - |
| 2012 PBA Bond Claims | Class 6 | X | - | - |
| Retail 2012 PBA Bond Claims | Class 7 | X | - | - |
| PBA/DRA Secured Claim | Class 8 | - | - | X |
| PBA General Unsecured Claims | Class 9 | - | - | X |
| PBA/DRA Unsecured Claim | Class 10 | - | - | X |
| Vintage CW Bond Claims | Class 11 | X | X | - |
| Retail Vintage CW Bond Claims | Class 12 | X | X | - |
| Vintage CW Bond Claims (Insured)* | Class 13 | X | - | - |
| Vintage CW Bond Claims (Taxable Election) | Class 14 | - | - | - |
| Vintage CW Guarantee Bond Claims | Class 15 | X | X | - |
| Vintage CW Guarantee Bond Claims (Insured)* | Class 16 | X | - | - |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 17 | - | - | - |
| 2011 CW Bond Claims | Class 18 | X | X | - |
| Retail 2011 CW Bond Claims | Class 19 | X | X | - |
| 2011 CW Bond Claims (Insured)* | Class 20 | X | - | - |

38

| | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| 2011 CW Bond Claims (Taxable Election) | Class 21 | - | - | - |
| 2011 CW Guarantee Bond Claims | Class 22 | X | X | - |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 23 | - | - | - |
| 2011 CW Series D/E/PIB Bond Claims | Class 24 | X | X | - |
| 2011 CW Series D/E/PIB Bond Claims (Insured)* | Class 25 | X | - | - |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 26 | X | X | - |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 27 | - | - | - |
| 2012 CW Bond Claims | Class 28 | X | X | - |
| Retail 2012 CW Bond Claims | Class 29 | X | X | - |
| 2012 CW Bond Claims (Insured)* | Class 30 | X | - | - |
| 2012 CW Bond Claims (Taxable Election) | Class 31 | - | - | - |
| 2012 CW Guarantee Bond Claims | Class 32 | X | X | - |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 33 | - | - | - |
| 2014 CW Bond Claims | Class 34 | X | X | - |
| Retail 2014 CW Bond Claims | Class 35 | X | X | - |
| 2014 CW Bond Claims (Taxable Election) | Class 36 | - | - | - |
| 2014 CW Guarantee Bond Claims | Class 37 | X | X | - |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 38 | - | - | - |
| Retiree Claims | Class 39A | X | - | - |
| Active ERS Participant Claims | Class 39B | X | - | - |
| Active JRS Participant Claims | Class 39C | X | - | - |
| Active TRS Participant Claims | Class 39D | X | - | - |
| System 2000 Participant Claims | Class 39E | X | - | - |
| AFSCME Employee Claims | Class 40 | X | - | - |
| CW General Unsecured Claims | Class 41 | X | X | - |
| CW/HTA Claims | Class 42 | X | - | - |
| CW/Convention Center Claims | Class 43 | X | - | - |
| CW/PRIFA Rum Tax Claims | Class 44 | X | - | - |
| CW/MBA Claims | Class 45 | X | - | - |
| CW Appropriations Claims | Class 46 | - | - | X |
| CW 510(b) Subordinated Claims | Class 47 | - | - | X |
| ERS Bond Claims | Class 48 | X | X | - |
| Settling ERS Bond Claims | Class 49 | - | - | - |
| ERS General Unsecured Claims | Class 50 | X | X | - |

39

|  | Class | Ballot | Eligible for Election | Non-Voting Notice |
|---|---|---|---|---|
| Gracia-Gracia Claims | Class 51 | - | - | X |
| Convenience Claims | Class 52 | - | - | X |

\* The Plan provides that, for voting purposes, the "holder" of an insured Bond Claim shall be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such insured Bond Claims.

Holders of Allowed Claims in Classes 8 (PBA/DRA Secured Claim), 10 (PBA/DRA Unsecured Claim), 46 (CW Appropriations Claims), and 47 (CW 510(b) Subordinated Claims) will not receive a distribution pursuant to the Plan and shall be deemed to have rejected the Plan and are not entitled to vote.

Holders of Allowed Claims in Classes 9 (PBA General Unsecured Claims), 51 (Gracia-Gracia Claims), and 52 (Convenience Claims) are unimpaired pursuant to the Plan and shall be deemed to accept the Plan and are not entitled to vote.

Bankruptcy Code section 1126 defines "acceptance" of a plan of adjustment by a class of claims as acceptance by creditors in that class holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that voted to accept or reject the Plan. Thus, acceptance of the Plan by Claims in each Class entitled to vote on the Plan will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Allowed Claims in such Class that have actually voted their Ballots have voted in favor of the Plan. A vote may be disregarded if the Title III Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of PROMESA or the Bankruptcy Code.

It is important that holders of Claims in the Classes in the chart above that are eligible to vote exercise their right to vote to accept or reject the Plan. **EVEN IF YOU DO NOT VOTE OR DO NOT HAVE THE RIGHT TO VOTE TO ACCEPT THE PLAN, YOU MAY BE BOUND BY THE PLAN IF IT IS CONFIRMED BY THE TITLE III COURT.** The amount and number of votes required for acceptance or rejection of the Plan by a Class are computed on the basis of Claims actually voting to accept or reject the Plan. There are no quorum requirements with respect to the number of Claims in a Class that actually vote.

If at least one impaired class of claims accepts a Title III plan of adjustment (without counting the votes of insiders), Bankruptcy Code section 1129(b), made applicable to Title III of PROMESA pursuant to PROMESA section 301(a), permits the confirmation of the plan of adjustment under certain conditions, notwithstanding the rejection of the plan of adjustment by one or more other impaired classes of claims. Under that section, a plan of adjustment may be confirmed by a court if the plan of adjustment does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. *See* section VII.C of this Disclosure Statement for more information.

The Debtors' determination as to whether to request confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) will be announced prior to or at the Confirmation Hearing.

## D.    Solicitation and Voting Procedures

On February 28, 2020, the Debtors filed the Disclosure Statement Approval Motion, seeking an order from the Title III Court (i) approving the proposed Disclosure Statement, (ii) fixing a Voting Record Date (as defined therein) for voting on the Plan, (iii) approving the Confirmation Hearing Notice (as defined therein), (iv) approving the proposed contents of the Solicitation Package (as defined therein) and procedures for distribution thereof, (v) approving the forms of Ballots and Election Notices, and establishing solicitation, voting, distribution election, and balloting procedures, (vi) approving the form and manner of Notice of Non-Voting Status (as defined therein), (vii) fixing the Voting Deadline (as defined therein) and Election Deadline (as defined therein), and (viii) approving procedures for tabulating creditor votes.  On _____, 2020, the Title III Court entered the Disclosure Statement Order.

For more information regarding the solicitation and voting procedures surrounding the Plan, *see* the Disclosure Statement Order.

## E.    Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to Bankruptcy Code section 1128, the Title III Court has scheduled the Confirmation Hearing on whether the Debtors have satisfied the confirmation requirements of PROMESA section 314 and the incorporated subsections of Bankruptcy Code section 1129 on [_____] (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge designated by Chief Justice John Roberts of the U.S. Supreme Court to preside over the Commonwealth's Title III Case, Clemente Ruiz Nazario U.S. Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined.  The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Title III Court has (i) established a Voting Deadline and Election Deadline of no later than 5:00 p.m. (Atlantic Standard Time) on [September 18, 2020], and (ii) ordered that objections, if any, to confirmation of the Plan be filed and served on or before [_____] (Atlantic Standard Time).

[*Remainder of Page Left Intentionally Blank*]

41

### III.    <u>Overview of the Debtors</u>

**A.    General Information**

1.    **The Commonwealth**

Puerto Rico has an area of approximately 3,500 square miles and a population estimated by the U.S. Census Bureau of approximately 3.2 million as of July 1, 2019.

Puerto Rico came under U.S. sovereignty pursuant to the Treaty of Paris of 1898.  In 1917, pursuant to the Jones-Shafroth Act, Pub. L. 64-368, citizens of Puerto Rico became citizens of the U.S.  In 1950, the U.S. Congress authorized Puerto Rico to approve its own Constitution, which was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the U.S. Congress, and subsequently approved by the President of the U.S. in 1952.  The Commonwealth Constitution provides for the separation of powers between the executive, legislative and judicial branches of government.  The Legislature consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.

Since the enactment of PROMESA, Puerto Rico has had four Governors.  The first, Alejandro García-Padilla, was elected Governor on November 6, 2012, and was sworn into office for a four-year term on January 2, 2013.  The second, Ricardo A. Rosselló Nevares, was elected Governor on November 8, 2016 and was sworn into office for a four-year term on January 2, 2017.  On July 24, 2019, then-Governor Rosselló announced his resignation effective as of August 2, 2019.  Before his resignation became effective, then-Governor Rosselló appointed former resident commissioner Pedro Pierluisi as Secretary of State, which is the first official in the line of succession to Governor under the Commonwealth Constitution.  Despite being confirmed by the Puerto Rico House of Representatives (but not the Senate), Mr. Pierluisi was sworn in as acting Governor on August 2, 2019.  But on August 7, 2019, the Puerto Rico Supreme Court unanimously determined that Mr. Pierluisi was unconstitutionally sworn into office as Governor and Mr. Pierluisi promptly resigned.  Later that same day, the Secretary of Justice of Puerto Rico, Wanda Vázquez, was sworn in as Governor pursuant to the Commonwealth Constitution to complete former Governor Rosselló's term through 2020.  As of the date hereof, Governor Vázquez serves as Governor for the Commonwealth.

While the people of Puerto Rico are citizens of the United States under the U.S. Constitution, the residents of Puerto Rico have no direct representation in the federal government. Puerto Rico has no electors in the Electoral College to vote for president; however, the people can participate in presidential nominating primaries.  Consistent with the treatment for all U.S. territories, under current Congressional rules, Puerto Rico's representation in Congress is limited to a single resident commissioner who does not possess the same parliamentary rights afforded to other members of Congress.  While Puerto Rico's resident commissioner can serve and vote in committees, as well as when the House convenes as a Committee of the Whole, if the resident commissioner's vote is determinative, a revote is taken without the resident commissioner's participation.  The resident commissioner is not permitted to vote on the House floor, is not recorded on the Clerk's roll of Members-elect, and may not vote for Speaker or file or sign

discharge petitions.  In addition, federal taxes, such as individual income taxes, except payroll taxes such as Social Security and Medicare taxes, are generally not levied on Puerto Rico source income.[62]

As a result of the current fiscal crisis that affects the Commonwealth, the United States Congress enacted PROMESA, which established the Oversight Board as an entity within the Commonwealth government with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs and to restructure its debt.

*The Commonwealth's Central Government.*   The central government of the Commonwealth (the "Central Government") provides essential services to the people of Puerto Rico through agencies and other entities.  The list of entities that comprise the Central Government is attached as Exhibit I to this Disclosure Statement.[63]  The Central Government accounts for the costs of these essential services through its General Fund, Special Revenue Funds, and federal funds.

*The Commonwealth's Public Corporations and Instrumentalities.*   In the Commonwealth, many governmental and quasi-governmental functions are performed by legally separate public corporations created by the Legislature with varying degrees of independence from the Commonwealth.  Public corporations may obtain revenues from rates charged for services or products but, as described further below, many receive sizable subsidies from the Commonwealth. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Puerto Rico Senate.  Capital improvements of most of the larger public corporations have been financed historically by bonds issued under trust agreements or bond resolutions or by loan agreements.

Through the years, many public corporations and other instrumentalities have traditionally relied on subsidies, in the form of appropriations from the General Fund of the Commonwealth or appropriations of Commonwealth taxes or other revenues, to fund their operations. Certain of these instrumentalities, including the Puerto Rico Health Insurance Administration ("ASES"), the Puerto Rico Medical Services Administration, the Puerto Rico Integrated Transit Authority ("PRITA"), the Puerto Rico and Island Municipalities Maritime Transport Authority, the Metropolitan Bus Authority ("MBA"), HTA and the University of Puerto Rico ("UPR"), provide services to the residents of the Commonwealth and rely heavily on such subsidies to fund their day-to-day operations.  Other subsidized public corporations provide services to the Central Government and other government entities, which in turn provide services to the Commonwealth residents.

Commonwealth appropriations and/or tax revenues have also been used as a principal source of funding for certain public corporations dedicated to fiscal and advisory functions (*e.g.*, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), infrastructure development (*e.g.*, the Puerto Rico Infrastructure Financing Authority ("PRIFA"), and the Puerto Rico Public Private Partnerships Authority), air and maritime transportation and logistics (*e.g.*, the

---

[62] The information is based on AAFAF's (as defined below) advice as to the contents of the upcoming Commonwealth Financial Statement.

[63] The list is subject to change.

43

Puerto Rico Ports Authority), and economic, tourism and cultural promotion (*e.g.*, the Puerto Rico Tourism Company ("PRTC"), the Puerto Rico Convention Center District Authority ("CCDA"), the Puerto Rico Industrial Development Company ("PRIDCO") (primarily with respect to the Special Fund for Economic Development and the Rums of Puerto Rico Program) and the Institute of Puerto Rican Culture).

Other public corporations, such as COFINA and the Puerto Rico Public Finance Corporation ("PFC"), have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (in the case of COFINA) or appropriations (in the case of PFC) as their sole source of repayment.

Notwithstanding the Commonwealth's substantial grants of support, certain of these public corporations suffer from significant annual operating losses and carry material amounts of accounts payable. If the Commonwealth's financial condition is not improved by the Plan and the reforms the Oversight Board has built into its certified fiscal plans and budgets, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues.

The Commonwealth has approximately $13.4 billion of GO debt and approximately $5 billion of debt guaranteed by its good faith, credit and taxing power. The holders of the GO debt and the Commonwealth guaranteed debt claim they have (i) a first priority right to all "available revenues" of the Commonwealth, and (ii) liens against certain property taxes and the funds historically conditionally appropriated to certain instrumentalities subject to Article VI, section 8 of the Commonwealth Constitution. Under section 8, when "available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." Holders of the GO debt and Commonwealth guaranteed debt assert that until all their accrued interest and matured principal is paid in full, the monies otherwise historically conditionally appropriated to HTA and other entities subject to Article VI, section 8 of the Commonwealth Constitution constitute "available revenues" payable to those holders.

PROMESA section 202 grants the Oversight Board power over the budget. The Oversight Board believes PROMESA section 4 preempts inconsistent Commonwealth laws, which includes laws enacted prior to PROMESA that historically conditionally appropriated certain Commonwealth monies to its instrumentalities. Even if the Commonwealth statutes are not preempted, they allow for these historically conditionally appropriated monies to be used by the Commonwealth to pay GO debt and Commonwealth-guaranteed debt. The Commonwealth has not used such monies to pay GO debt since June 30, 2016, because (a) the enforceability of the priority of GO debt or Commonwealth-guaranteed debt is in Title III has not been decided, and/or (b) the Commonwealth's police power entitles it to use available revenues for the public health, safety, and welfare. Notably, the U.S. Congress found in PROMESA section 405(m)(2) that the Commonwealth was unable to provide its citizens with effective services, which the Oversight Board believes justifies the Commonwealth's use of police power to fund services for its citizens as opposed to debt payments.

44

2.     **ERS**

Prior to the enactment of Act 106-2017 on August 23, 2017 ("Act 106"),[64] ERS administered a cost-sharing, multiple-employer defined benefit and hybrid defined contribution plan.  The benefits provided to participating employees of ERS were established by law.  As a cost-sharing plan, the plan's assets were not legally segregated and may therefore have been used to pay benefits to the retirees of any participating employer.  Prior to the amendments made in 2013 by Act No. 3-2013 ("Act 3-2013"), ERS consisted of different benefit structures.  Members who began to participate before January 1, 2000, participated in a defined benefit program. Members who began to participate prior to April 1, 1990 ("Act 447 Participants"), were entitled to the highest benefits structure, while those who began to participate on or after April 1, 1990 ("Act 1 Participants"), were subject to a longer vesting period and a reduced level of benefits, as provided by Act No. 1 of February 16, 1990 ("Act 1 of 1990").

In 1999, Act 447 was amended to close the defined benefit program for new participants and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000").  Members who began to participate on or after January 1, 2000 ("System 2000 Participants") participated solely in System 2000.  Prior to the amendment made by Act 3-2013 (described below), under the System 2000 benefit structure, a participant was entitled to receive a lump-sum payment, which could be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed in cash by such participant and credited earnings on such cash.  System 2000 Participants cash balance accounts did not benefit from any Employer Contributions.  Employer Contributions made on account of System 2000 Participants were used to reduce the accumulated unfunded pension benefit obligations of ERS.

System 2000 was not established as a separate plan, however, and there are no segregated accounts for System 2000 Participants.  Contributions received from System 2000 Participants and Employer Contributions made on account of System 2000 Participants were pooled and invested by ERS together with the assets corresponding to the defined benefit structure.  Thus, future benefit payments under the defined benefit structure of Act 447 and Act 1 of 1990 and the defined contribution structure of System 2000, as amended by Act 3-2013, were payable, and were paid, from the same pool of assets of ERS.

In April 2013, the Commonwealth enacted Act 3-2013 as a comprehensive reform of ERS to address the growing funding shortfalls that threatened the viability of ERS.  The most important aspects of the changes effected to ERS by Act 3-2013 were the following: (i) in the case of active employees who were Act 447 Participants and Act 1 Participants (meaning, those entitled to the defined benefit plan, hired prior to January 1, 2000), all defined benefits accrued through June 30, 2013 were frozen, and thereafter all future benefits accrue under a defined contribution formula which will be paid at retirement through a lifetime annuity similar to System 2000; (ii) the retirement age for Act 447 Participants gradually increases from age 58 to age 61; (iii) the retirement age for System 2000 Participants gradually increases from age 60 to age 65; (iv) the

---

[64] Prior to the enactment of Act 106, the governance of ERS was vested in a Board of Trustees, which set policies and oversaw the operations consistent with applicable law.  Act 106 dissolved the Board of Trustees and created a new Retirement Board, as discussed below.

retirement age for new employees increased to age 67, except for new state and municipal police officers, firefighters, and custody officers, which will be age 58; (v) the employee contribution increased from 8.275% to 10%; (vi) in the case of System 2000 Participants, the retirement benefits will no longer be paid as a lump sum payment and instead will be paid in the form of a lifetime annuity; (vii) with respect to post-employment benefits, the Christmas bonus payable to current retirees is reduced from $600 to $200 (and is eliminated for future retirees) and the summer bonus ($200) is eliminated; (viii) future retirees will not receive any other post-employment benefits; and (ix) disability and survivor benefits are modified.

As an integral part of the Act 3-2013 reform, the Commonwealth recognized that an additional annual employer contribution was necessary to maintain sufficient system assets to be able to meet benefit payments when due and maintain a minimum asset balance. As such, Act 3-2013 established an Additional Uniform Contribution ("ERS-AUC") for ERS that the Commonwealth and other participating employers would be required to make annually. The ERS-AUC was established at $120 million for fiscal year 2014, and for fiscal year 2015 through 2033 was to be the amount certified by ERS's external actuary at least 120 days prior to the start of each fiscal year as the amount necessary to avoid having the projected gross assets of ERS during any subsequent fiscal year fall below $1 billion. Due to the worsening fiscal crisis since the enactment of Act 3-2013, however, while certain public corporations and municipalities made their ERA-AUC payments, the Commonwealth and other participating employers were unable to pay most of the ERS-AUC and, as a result, ERS projected that it would deplete its liquid assets.

In August 2017, the Legislature enacted Act 106, pursuant to which the Commonwealth adopted a "pay-as-you-go" system ("PayGo") for the payment of pension benefits to retirees of all three Retirement Systems. Act 106 contemplates that the three Retirement Systems would transfer their remaining liquid assets to a segregated PayGo account under the custody of the Department of Treasury. The Commonwealth and other participating instrumentalities were to contribute to the PayGo system in lieu of the prior statutory employer contributions payable to the Retirement Systems to reimburse pension payments made by the Commonwealth to retired participants in the Retirement Systems. Legally separate entities whose employees were receiving pension payments, such as the municipalities, were required to reimburse the Commonwealth the amounts necessary to meet pension benefit payments to their respective retirees. The fiscal year 2020 Certified Budget for the Commonwealth includes approximately $2.575 billion to cover the expense, of which $1.997 billion is paid for out of the General Fund budget and $579 million is paid for out of special revenue budgets funded by reimbursements from participating public corporations and municipal employers, pursuant to Act 106.

Act 106 also established a new defined contribution plan for all ERS active participants, as well as TRS's Act 160 participants (discussed below). Generally, the required employee contribution to their defined contribution plan accounts is 8.5%, and such contributions are to be held in individual segregated accounts. Act 106 sets forth criminal penalties for employers that knowingly, and without cause, fail to pay PayGo contributions or remit employee payroll withholdings to the plan. To date, the Commonwealth has not established the individual retirement accounts mandated by Act 106. *See* section V.F.3.d) of this Disclosure Statement.

46

Act 106 created a thirteen-member Retirement Board for ERS, TRS and JRS composed of: (1) the Executive Director of AAFAF, (2) the Secretary of the Treasury, (3) the Director of the Puerto Rico Office of Management and Budget ("OMB"), (4) the Director of the Human Resources and Transformation Office, (5) an active teacher of the Department of Education designated by the Governor, (6) a representative of public corporations designated by the Governor, (7) a representative from the Judicial Branch designated by the Chief Justice, (8) the President of the Federation of Mayors, (9) the President of the Association of Mayors, (10) a TRS retiree designated by the Governor, (11) an ERS retiree designated by the Governor, (12) a representative of police officers designated by the Governor, and (13) a representative of the public interest designated by the Governor.  All powers of the trustee boards of ERS, TRS and JRS were transferred to the new Retirement Board and the independent boards were dissolved.

In 2013, the Commonwealth attempted to reform the TRS and JRS in a similar manner to the ERS through two separate statutes.  Before 2013, the TRS consisted of a defined benefit pension plan.  Act 160-2013 ("Act 160"), however, sought to freeze the TRS's defined benefit system and replace it with a defined contribution plan.  The Puerto Rico Supreme Court rejected part of Act 160 and, as a result, the TRS administers two benefit structures: (i) a defined benefit plan for active employees hired on or before July 31, 2014, and (ii) a defined contribution plan for employees hired on or after August 1, 2014 ("Act 160 Participants"), which were then transferred to the defined contribution plan under Act 106.

Act 162-2013, on the other hand, sought to freeze the defined benefit plan under JRS and establish a new hybrid retirement system for judges enrolled in the JRS.  In 2014, the Puerto Rico Supreme Court also rejected several portions of Act 162-2013.  Therefore, the JRS is now composed of three groups of participants: (i) judges appointed on or prior to December 23, 2013, which participate in a defined benefit plan; (ii) judges appointed between December 24, 2013, and June 30, 2014, which are covered by a defined benefit plan, but with a different benefit structure than the one available to the first group; and (iii) judges appointed on or after July 1, 2014, which participate in a hybrid program with defined benefit and defined contribution components.

Consequently, the pension benefits ascribed to defined benefit participants in the TRS and JRS pension plans prior to 2014 have not been frozen, as discussed above.  Pursuant to the Plan, as described below, all remaining defined benefits that continue to accrue under TRS and JRS will be frozen, and participants will be enrolled in the defined contribution plan under Act 106, or similar defined contribution plans.

In May 2019, the Commonwealth enacted Act 29-2019 which, among other things, rendered the Commonwealth solely responsible for PayGo payments to municipality retirees and eliminated the municipalities' obligation to reimburse the Commonwealth.  On July 3, 2019, the Oversight Board commenced an action against the Governor to block enforcement or nullify Act 29 on several grounds including that the Commonwealth violated PROMESA sections 108(a)(2), 204, and 207.[65]

---

[65] See section IV.C.3(e) of this Disclosure Statement for a discussion of the Oversight Board's action challenging Act.29-2019.

In July 2019, the Commonwealth enacted Act 71-2019, which granted the federal Social Security benefit to the members of the rank and file of the Puerto Rico Police Bureau. This Law reduces from 8.5% to 2.3% the employee's contribution to his or her defined contribution account created under Law 106-2017. This 6.2% reduction is the minimum contribution that the employee must make to be eligible for Social Security. In the case of those members of the rank and file of the Puerto Rico Police Bureau who have less than ten (10) years left to qualify for mandatory retirement as established in Law No. 447 of May 15, 1951, as amended, the reduction will apply optionally once they state that they wish to benefit from it within the term provided therefor.

ERS has approximately $3.17 billion of bond debt which the ERS bondholders assert is secured by certain assets at ERS and employer contributions to ERS. While Act 106 terminated employer contributions to ERS, the ERS bondholders asserted the new PayGo payments are the equivalent of employer contributions and they claim them as their collateral. On June 27, 2019, however, the Title III Court ruled the ERS bondholders do not have a perfected security interest in any post-petition employer contributions due to Bankruptcy Code section 552, and the First Circuit affirmed on January 30, 2020.[66] Previously, the Title III Court had ruled the ERS bondholders had never properly perfected any of their security interests but was reversed by the U.S. Court of Appeals for the First Circuit. The ERS bondholders have also asserted takings claims against the Commonwealth and the U.S. Government for having deprived them unconstitutionally of their original employer contributions.

3.    **PBA**

PBA is a public corporation created by Act No. 56 of June 19, 1958 (as amended, the "PBA Enabling Act"). PBA was created to design, construct, administer, and provide maintenance to office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops, and related facilities leased to the Commonwealth or any of its departments, agencies, instrumentalities, public corporations, or municipalities. The annual rent for each leased building is based on the amounts needed by PBA to cover the payment of:

1.   Principal, interest and other amortization requirements of the notes and bonds issued to finance the buildings;

2.   Operating and maintenance expenses of the buildings, including a reasonable proportional share of administrative expenses, excluding depreciation; and

3.   Costs of equipment replacement and extraordinary repairs.

Component (1), referred to as "Debt Service Rent" under applicable leases between PBA and the Commonwealth, is tied to the annual principal and interest payments due on the PBA Bonds. Components (2) and (3), described above, are subject to escalation to permit PBA to recover the costs incurred. Amounts due from departments and governmental agencies of the

---

[66] *Opinion and Order Granting Plaintiff's Motion for Summary Judgment as to Count III and Counterclaims II and III, and Denying Defendants' Motion for Summary Judgment*, dated June 27, 2019 [Case No. 17-03566, ECF No. 251], 385 F. Supp. 3d 138 (D.P.R. 2019), *aff'd In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457 (1st Cir. 2020).

Commonwealth may be subject to periodic revisions and/or adjustments based on the availability of funds at the Commonwealth level.

The PBA Enabling Act provides that the good faith and credit of the Commonwealth is pledged for the payment of rent under any lease agreement executed pursuant to the PBA Enabling Act with any department of the Commonwealth.  The Enabling Act also provides that the Department of the Treasury of the Commonwealth of Puerto Rico (the "Treasury Department") will make advances to PBA for any unpaid portion of rent payable to PBA by any agency or instrumentality of the Commonwealth that has entered into lease agreements with PBA.  Such advances are recorded as a reduction of accounts receivable since the responsibility of reimbursement belongs to the agency lessee in accordance with the PBA Enabling Act.

PBA was afforded broad powers under the PBA Enabling Act, including the power to make and execute contracts; acquire properties (including by eminent domain); prepare plans, projects, and cost estimates for construction, improvement, or repair of any property or facility; contract with Commonwealth departments, agencies, instrumentalities, public corporations or officials, or any private persons or entities with regard to the administration of any properties or facilities of PBA; and borrow money and issue bonds.

PBA is governed by a seven-member board comprised of the Secretary of the Department of Transportation and Public Works ("DTPW"), the Secretary of the Department of Education of the Commonwealth, the President of the GDB, and four members appointed by the Governor of Puerto Rico with the advice and consent of the Senate with staggered six-year terms.  As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of AAFAF as of January 18, 2017.[67]

PBA has constructed over 200 office buildings, including police stations, courthouses, and related parking facilities, with approximately 6.8 million square feet of rentable space for the use of and lease by various departments, agencies, and instrumentalities of the Commonwealth, among others.

PBA has built 376 school buildings with approximately 20.3 million square feet of rentable space.  All of the space part of the school buildings program is leased to the Department of Education.  The construction cost for the school building program is in excess of $2.5 billion.  The funding for the construction was primarily provided by PBA through the issuance of Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.  Additional school building and improvement plans are slated to occur.

---

[67] On July 16, 2019, PBA Executive Director Josean Nazario resigned over concerns of a potential conflict of interest in a contract PBA awarded to Elite General Contractors, Inc. ("EGC") for maintenance work at Puerto Rico public schools in 2017-2018.  Nazario had previously been a representative of EGC and at the time of the awarding of the contract, was a deputy director at PBA.  Nazario, whose sister-in-law owns EGC, was referred to the Government Ethics Office after administrative review determined that he had failed to ask for a waiver, recuse himself from the bidding process, or inform his superiors of his potential conflict of interest, which were required by local law and administration policy.

PBA has also constructed 18 health facilities with approximately 1.5 million square feet of rentable space which has been leased to the Department of Health. The construction of the health facilities to date has cost approximately $203 million, provided primarily by PBA through the issuance of bonds. In conjunction with the Department of Correction and Rehabilitation (the "<u>Department of Correction</u>"), PBA began a program in 1994 to provide construction, operation, and maintenance of correctional facilities to be leased to the Department of Correction by PBA. PBA constructed eight correctional facilities with approximately 1.7 million square feet of rentable space that cost approximately $287 million. The facilities are operated by the Department of Correction.

PBA has also constructed office buildings, schools, and health facilities that are financed by federal grants and Commonwealth appropriations. PBA is also able to undertake construction on behalf of or as the agent of other public agencies of the Commonwealth.

As of February 2017, PBA had approximately $4 billion in aggregate principal amount of bonds outstanding, which are guaranteed by the Commonwealth. The PBA Bonds are the subject of various claims to be resolved under the Plan. Pursuant to the PBA Enabling Act and the resolutions governing PBA bond issuances, the PBA Bonds are payable from rent payments under the PBA's leases (and a few subleases) to tenants (the "<u>PBA Leases</u>"), and that rent is required to be sufficient, in the aggregate, to pay, when due, the principal of and interest on the PBA Bonds. The Oversight Board has alleged, however, that the PBA Leases are not true leases and obligations purportedly due thereunder are simply mischaracterized general obligations of the Commonwealth. *See Complaint* [Adv. Proc. No. 18-00149, ECF No. 1] (the "<u>PBA Lease Complaint</u>"). PBA Bondholders have disputed the allegations raised in the PBA Lease Complaint. *See, e.g., Answers to Complaint* [Adv. Proc. No. 18-000149, ECF Nos. 56-60, 67]. If the Plan is confirmed, the Oversight Board believes no further litigation of any dispute regarding the validity, priority, or secured status of the GO/PBA/PRIFA BANs claims is necessary as the Plan will effect a global settlement of any such dispute that is binding on all parties in interest in the Title III Cases.

## B.    Debtors' Financial Obligations as of the Petition Date

### 1.    Bond Resolutions and Outstanding Bonds

#### a)    Commonwealth's Public Debt

The Commonwealth Constitution includes specific provisions regarding "public debt,"[68] which includes (i) GO Bonds and notes issued by the Commonwealth backed by the good faith, credit and taxing power of the Commonwealth and (ii) bonds and notes issued by its public instrumentalities and guaranteed by the good faith, credit and taxing power of the Commonwealth (the "<u>Commonwealth-Guaranteed Bonds</u>").

Section 8 of Article VI of the Commonwealth Constitution provides "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." If the Commonwealth has

---

[68] "Public debt" is also referred to herein as "<u>General Obligations</u>."

insufficient funds to pay all approved appropriations for a given fiscal year, the Commonwealth Constitution requires that available resources of the Commonwealth be used to pay "public debt" before being used for other purposes.  P.R. Const. art. VI, § 8.  Furthermore, the Commonwealth Constitution empowers a holder of bonds or notes evidencing "public debt" to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of and interest on such public debt when due.  P.R. Const. art. VI, § 2.  The Commonwealth Constitution also provides for a limit on "public debt."  The Commonwealth may not issue GO debt if the principal and interest on all such debt payable in any fiscal year, together with any amount paid by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth,[69] exceed 15% of the average annual internal revenues of the Commonwealth in the two preceding fiscal years (internal revenues consist principally of income taxes, property taxes, excise taxes, the portion of SUT not pledged to COFINA).  P.R. Const. art. VI, § 2.

*Historically Conditionally Appropriated Monies Subject to Retention.*  Certain excise and other taxes, and fee income of the Commonwealth has been historically conditionally appropriated to certain public corporations or other instrumentalities subject to the provision in section 8 of Article VI of the Commonwealth Constitution,[70] and may be subject to the Commonwealth's police power.  These historically conditionally appropriated monies that, by the terms of the applicable governing bond documents and statutes, are subject to the Commonwealth's retention include (i) a portion of the federal excise tax on offshore shipments of rum, which is collected by the U.S. Government, covered over to the Commonwealth's Puerto Rico Treasury Department, and a portion of the excise tax on petroleum products, both historically conditionally appropriated by Commonwealth law to PRIFA; (ii) vehicle license fees, excise taxes on gasoline, gas oil and diesel oil, a portion of the excise tax on petroleum products and a portion of the excise tax on cigarettes, which were historically conditionally appropriated by Commonwealth law to HTA;[71] (iii) a portion of the excise tax on cigarettes, which was historically conditionally appropriated by Commonwealth law to MBA; and (iv) a portion of the hotel room tax, which was historically conditionally appropriated by Commonwealth law to CCDA.  Since 2015, the Commonwealth has been retaining such monies pursuant to its Constitutional powers.  The retention and application of historically conditionally appropriated monies has been challenged by bondholders.[72]

---

[69]  Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% debt limitation has not been exceeded. Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the Commonwealth is required to make payments under its guarantee. Certain bondholders have alleged that payment of rent by the Commonwealth to the PBA under the PBA Leases are payments on account of obligations guaranteed by the Commonwealth and thus should be counted under the debt limit. *See Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth.* [ECF No. 9730].

[70]  *See* Financial Information and Operating Data Report, p.178, Commonwealth of Puerto Rico (December 18, 2016).

[71]  A portion of the vehicle license fees are turned over to PRIFA from HTA pursuant to that certain Financial Assistance Agreement, dated as of March 1, 2015, between HTA and PRIFA.

[72]  *See, e.g.,* section III.B.1. and V.E.4. for more information.

PROMESA section 202 grants the Oversight Board power over the budget. The Oversight Board believes PROMESA section 4 preempts inconsistent Commonwealth laws, which includes laws enacted prior to PROMESA that historically conditionally appropriated certain Commonwealth monies to its instrumentalities. The historically conditionally appropriated monies were retained by the Commonwealth during the Title III cases because the certified fiscal plans and budgets did not appropriate those monies to the respective instrumentalities, and PROMESA preempted the existing statutes conditionally appropriating such monies to the respective instrumentalities. Moreover, the existing statutes were enacted by prior legislatures and are not binding on the current legislature, whether preempted or not.

***Bond Resolution.*** GO Bonds are issued under specific authorizing legislation or Act No. 33 of December 7, 1942 (as amended, "Act 33"), and pursuant to resolutions authorizing the issuance of such bonds.

***Outstanding Bonds and Other Obligations.***[73] Currently outstanding GO Bonds[74] were issued between 1998 and 2014, bearing interest rates between 1.86% and 8.00%, and maturing between July 1, 2016 and July 1, 2041. As of the Commonwealth Petition Date, the Commonwealth had outstanding approximately $12.48 billion aggregate principal amount[75] of GO Bonds. Approximately $1,355,805,000 of the GO Bonds are insured by Assured Guaranty Corp., Assured Guaranty Municipal Corp. and/or their affiliates (collectively, "Assured"), $578,266,641 are insured by National Public Finance Guarantee Corp. ("National"), $249,090,000 are insured by Financial Guaranty Insurance Co. ("FGIC"), $24,960,000 are insured by Ambac Assurance Corp. ("Ambac"), and $100,000,000 are insured by Syncora Guarantee Inc. ("Syncora"). A schedule of the Commonwealth's outstanding GO Bonds is attached as Exhibit H.

---

[73] Amounts of outstanding bonds are based on best available public information and may be approximate.

[74] The Commonwealth's outstanding GO Bonds consist of the following: (i) Public Improvement Refunding Bonds, Series 1998, (ii) Public Improvement Bonds of 1998, (iii) Public Improvement Bonds of 1999, (iv) Public Improvement Refunding Bonds, Series 2000, (v) Public Improvement Bonds of 2001, Series A, (vi) Public Improvement Refunding Bonds, Series 2001, (vii) Public Improvement Refunding Bonds, Series 2002 A, (viii) Public Improvement Bonds of 2002, Series A, (ix) Public Improvement Bonds of 2003, Series A, (x) Public Improvement Refunding Bonds, Series 2003 A, (xi) Public Improvement Bonds of 2003, Series C-7, (xii) Public Improvement Bonds of 2004, Series A, (xiii) Public Improvement Bonds of 2005, Series A, (xiv) Public Improvement Refunding Bonds, Series 2006 A, (xv) Public Improvement Bonds of 2006, Series A, (xvi) Public Improvement Refunding Bonds, Series 2006 B, (xvii) Public Improvement Bonds of 2006, Series B, (xviii) Public Improvement Bonds of 2007, Series A, (xix) Public Improvement Refunding Bonds, Series 2007A, (xx) Public Improvement Refunding Bonds, Series 2007A-4, (xxi) Public Improvement Refunding Bonds, Series 2008 C, (xxii) Public Improvement Refunding Bonds, Series 2008 A, (xxiii) Public Improvement Bonds of 2008, Series A, (xxiv) Public Improvement Refunding Bonds, Series 2009 A, (xxv) Public Improvement Refunding Bonds, Series 2009 B, (xxvi) Public Improvement Refunding Bonds, Series 2009 C, (xxvii) Public Improvement Refunding Bonds, Series 2011 A, (xxviii) Public Improvement Refunding Bonds, Series 2011 C, (xxix) Public Improvement Refunding Bonds, Series 2011, (xxx) Public Improvement Refunding Bonds, Series 2011 D, (xxxi) Public Improvement Refunding Bonds, Series 2011 E, (xxxii) Public Improvement Refunding Bonds, Series 2012 B, (xxxiii) Public Improvement Refunding Bonds, Series 2012 A, and (xxxiv) Public Improvement Refunding Bonds, Series 2014 A.

[75] For capital appreciation bonds, this amount includes the accreted value as of the Commonwealth Petition Date.

As of the Commonwealth Petition Date, the Commonwealth had outstanding approximately $169.4 million aggregate principal amounts of loans from the GDB, which were subsequently transferred to the Debt Recovery Authority for the Government Development Bank (the "GDB Debt Recovery Authority") pursuant to GDB's Qualifying Modification (defined below). Such loans were issued by the Commonwealth pursuant to legislation authorizing the Commonwealth to issue such debt and to pledge its good faith, credit and taxing power for the repayment thereof. These loans bear interest at a variable rate equal to the U.S. Prime Rate, plus 150 basis points, subject to a floor of 6% and a legal interest rate limit of 12%, and mature on June 30, 2041, 2042 and 2043. For a summary of the GDB's Qualifying Modification under Title VI of PROMESA, see section V.K.1.g) of this Disclosure Statement.

On December 26, 2013, the General Services Administration of the Commonwealth ("GSA") entered into a credit agreement with Scotiabank de Puerto Rico, whereby Scotiabank extended GSA a non-revolving term loan up to a maximum of $33,270,451 for the purchase of four helicopters to be used by the Puerto Rico Police Department. This loan is unsecured, bearing interest at 3.02% and maturing on July 15, 2020.

Based on latest publicly available reports, as of the Commonwealth Petition Date, the Commonwealth had outstanding the following approximate amounts of Commonwealth Guaranteed Obligations: (i) $4 billion in PBA Bonds, (ii) $1.26 billion in PRASA Subordinated Bonds, (iii) $227 million in Port of the Americas Authority ("APLA") Bonds, and (iv) $78 million in PRIFA BANs.

Pursuant to Executive Order 2016-30 issued under Act No. 21 of 2016, known as the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (as amended, the "Moratorium Act"), the Governor declared the Commonwealth to be in a state of emergency, suspended payment of interest and principal on all Commonwealth GO Bonds, suspended payments by the Commonwealth of Commonwealth-Guaranteed Obligations and stayed all actions, including suits against the Secretary of the Treasury, to collect on such bonds and notes. On January 29, 2017, the Governor signed into law Act No. 5 of 2017, known as the Puerto Rico Fiscal Emergency and Fiscal Responsibility Act (as amended, "Act 5-2017"), which repealed certain provisions of the Moratorium Act and authorized additional emergency measures. Pursuant to Act 5-2017, however, the executive orders issued under the Moratorium Act would continue in effect until amended, rescinded or superseded. The emergency period under Act 5-2017 was set to expire December 31, 2019. On January 8, 2020, Governor Vázquez issued an executive order extending the emergency period by six months. The emergency period will expire on June 30, 2020. Some additional powers provided to the Governor through Act 5-2017 included authority to (i) exercise receivership powers to rectify the financial emergency, (ii) exercise general supervisory control over the functions and activities of all government entities within the Executive Branch, and (iii) issue executive orders to implement and enforce compliance with Act 5-2017.

Since July 1, 2016, the Commonwealth has not paid interest or principal on its GO Bonds or Commonwealth-Guaranteed Obligations.[76]

---

[76] Based on publicly available information, certain issuances were paid from Commonwealth reserve funds.

### Litigations Related to GO Bonds.[77]

      (i)      *Aurelius Capital Master, Ltd., et al. v. Commonwealth of Puerto Rico, et al.*, Case No. 18-1108 (1st Cir.)[78]

On June 29, 2017, certain holders of GO Bonds and bonds issued by certain Commonwealth instrumentalities and allegedly guaranteed by the Commonwealth brought an action in the Title III Court against the Commonwealth and the Oversight Board seeking declaratory and injunctive relief.  Among other things, the complaint sought declarations that (i) certain property tax and other monies historically conditionally appropriated to certain instrumentalities (collectively, the "Monies") can be applied only to pay public debt; (ii) the Commonwealth lacks an equitable or beneficial property interest in the Monies, and Plaintiffs have statutory liens on the Monies; (iii) Plaintiffs' alleged liens on historically conditionally appropriated monies are liens on special revenues; (iv) the Commonwealth's use of the Monies for any purpose other than to pay the public debt is an unconstitutional taking; and (v) the Monies must be segregated and cannot be used for any purpose other than paying public debt.  Plaintiffs also sought an injunction requiring Defendants to segregate and preserve the Monies.

Defendants filed a motion to dismiss on August 21, 2017.  Defendants principally argued the claims were precluded by PROMESA section 305, which bars the Court from interfering with property of the Commonwealth without the Oversight Board's consent.  Defendants also argued: (i) certain claims were precluded by PROMESA sections 4 and 106(e); (ii) Plaintiffs have no property interests in or liens against the Monies; and (iii) the Commonwealth Constitution does not create a property right recoverable under its debt-repayment priority scheme.  The Title III Court granted the motion and dismissed the action, holding that (i) certain claims sought impermissible advisory opinions because they were vague or would not resolve any current concrete dispute, (ii) the Takings Clause claim was not ripe because the Commonwealth Debtor had not yet proposed how it would compensate Plaintiffs for their alleged collateral in a plan of adjustment, and (iii) other claims were barred by PROMESA section 305 because they would interfere with the Commonwealth's use of its property or revenues or its governmental powers without the consent of the Oversight Board.  Plaintiffs appealed the decision to the U.S. Court of Appeals for the First Circuit, docketed as Case No. 18-1108.  On March 26, 2019, the First Circuit issued a written opinion affirming the Title III Court's dismissal of the bondholders' complaint.[79]

---

[77] If the Plan is confirmed, to Oversight Board believes no further litigation of any dispute regarding the validity, priority, or secured status of the GO/PBA/PRIFA BANs claims is appropriate as the Plan will effect a global settlement of any such dispute that is binding on all parties in interest in the Title III Cases.

[78] Opinion available at 918 F.3d 638 (D.P.R. 2019).

[79] *Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121, 124 (1st Cir. 2019).

(ii)     Challenges to the Validity of the GO Bonds and Commonwealth
         Guarantees

On January 14, 2019, the Oversight Board, through its Special Claims Committee, and jointly with the Official Committee of Unsecured Creditors (the "UCC"),[80] filed an omnibus objection to more than $6 billion of claims asserted by certain GO Bondholders.  The omnibus objection alleged claims of holders of 2012 and 2014 issuances of GO Bonds should be disallowed because those issuances violated the Commonwealth's Constitutional Debt Limit.[81]  Subsequently, the UCC and other parties filed objections to additional claims relating to GO and PBA bonds and other bonds guaranteed by the Commonwealth, which objections assert similar legal theories.  To provide procedural due process to all purported holders of the GO Bonds, the UCC and the Oversight Board filed a motion to establish procedures with respect to their omnibus objection, which the Court granted.  The Oversight Board and the UCC subsequently filed eight adversary proceedings against approximately 450 purported beneficial owners of the bonds identified by pseudonym and approximately 120 banks disclosed as record holders, seeking to expand the number of bond issuances and CUSIPs alleged to be invalid and seeking to claw back principal and interest payments with respect to the challenged bonds.  On July 24, 2019, the Court issued the *Order Regarding Stay Period and Mandatory Mediation* [ECF No. 8244] (the "Stay Order"),[82] which, among other things, stayed the litigation through November 30, 2019, which stay was subsequently extended through March 11, 2020.  Notwithstanding the stay, on December 19, 2019, the Court issued an interim case management order (the "Interim GO/PBA CMO") permitting certain proceedings related to GO Bonds to move forward, including certain issues raised by this objection.   Pursuant to that order, on February 5, 2020, Assured, the Ad Hoc Group of Constitutional Debt Holders, and the Ad Hoc Group of General Obligation Bondholders filed a motion to dismiss.  Also on February 5, 2020, the Lawful Constitutional Debt Coalition filed a separate motions to dismiss, and the Qualified School Tax Credit Bonds Noteholder Group (collectively, the "QTCB Noteholder Group") joined, in part, Assured's, the Ad Hoc Group of Constitutional Debt Holders', and the Ad Hoc Group of General Obligation Bondholders' motion, and on February 19, 2020, a number of parties filed joinders and supplemental motions. Responses in support of the objections to the validity of the GO Bonds are due on March 18, 2020.  On February 10, 2020, the Mediation Team filed its Amended Report,[83] recommending that this litigation remain stayed to provide the Debtors with an opportunity to confirm and consummate

---

[80] On June 15, 2017, the U.S. Trustee appointed the UCC in all of the Title III Cases except COFINA. *Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico*, [ECF No. 338].

[81] For instance, on May 21, 2019, the UCC filed the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds*, [ECF No. 7057], challenging the validity of the 2011 GO Bonds on the same grounds as in the Joint Claim Objection (as defined and discussed below).  *See* section V.H.7 of this Disclosure Statement for a detailed description of the various objections.

[82] *See* section V.I. of this Disclosure Statement for a detailed summary of the Stay Order.

[83] As defined in section V.I below.

the Plan, which would, among other things, resolve all challenges to the validity, priority, and secured status of the GO Bonds and the Commonwealth-Guaranteed Bonds.[84]

### (iii)   Challenges to the Secured Status of the GO Bonds

On May 2, 2019, the Oversight Board, through its Special Claims Committee, and jointly with the UCC, filed seven complaints[85] against more than 450 Defendants seeking declarations that the Defendant holders of bonds issued or guaranteed by the Commonwealth have entirely unsecured claims (to the extent their claims are valid at all), and do not possess liens against any of the Commonwealth's property, including, without limitation, on (i) the Commonwealth's good faith, credit, and taxing power, (ii) the Commonwealth's "available resources" (as referenced in the Commonwealth Constitution Article VI, section 8), (iii) certain monies historically conditionally appropriated to the Commonwealth's instrumentalities under Puerto Rico law, and (iv) property tax revenues authorized under Puerto Rico Act 83-1991.   These adversary proceedings also seek judgments (i) declaring the Commonwealth's interest in its property is entitled to priority over any interest the Defendant bondholders claim to possess in the Commonwealth's property, (ii) avoiding any liens bondholders claim to possess pursuant to the Bankruptcy Code's avoidance powers, and (iii) disallowing all secured claims filed against the Commonwealth by the Defendant bondholders.

On May 7, 2019, the Oversight Board and the UCC filed a joint motion seeking to (i) extend the deadlines to serve the Defendants in these adversary proceedings and (ii) stay the adversary proceedings until Plaintiffs or any Defendant requests to resume the proceeding for good cause.   Several parties filed motions to dismiss.   On June 13, 2019, the Court partially granted the joint motion and extended the deadline to serve the Defendants and stayed the adversary proceedings until September 1, 2019.   On July 24, 2019, the Court issued the Stay Order, which stay was extended through March 11, 2020.[86]   Notwithstanding the stay, pursuant to the Interim GO/PBA CMO,  on February 5, 2020, Assured and National filed a motion to dismiss [Adv. Proc. No. 19-00291, ECF No. 53], and numerous other parties filed joinders to motions to dismiss already on file.   In addition, multiple pro se defendants have filed answers to the complaints in these adversary proceedings.   Oppositions to the motions to dismiss are due on April 3, 2020.   On February 10, 2020, the Mediation Team filed its Amended Report, recommending that this litigation be stayed.[87]   On February 19, 2020, also pursuant to the GO/PBA CMO, certain Cooperativas filed motions to dismiss.

### (iv)   Challenges to the Priority of the GO Bonds

---

[84] *See* section V.I. of this Disclosure Statement for a detailed summary of the Mediation Team and the Amended Report.

[85] Adv. Proc. No. 19-00291 through 19-00297.

[86] *See* section V.I. of this Disclosure Statement for a detailed summary of the Stay Order.

[87] *See* section V.I of this Disclosure Statement for a detailed summary of the Mediation Team and the Amended Report.

On February 3, 2020, the UCC filed an omnibus objection to proofs of claim filed by certain GO bondholders asserting priority over Commonwealth unsecured creditors [ECF No. 10638] (the "UCC GO Priority Objection").  The UCC GO Priority Objection seeks an order reclassifying claims on account of GO Bonds or Commonwealth-Guaranteed Obligations as general unsecured claims, and ruling that such claims are not entitled to priority over the claims of other general unsecured creditors.  The UCC GO Priority Objection seeks reclassification because, according to the UCC, payment priorities created by Puerto Rico law are preempted by PROMESA in the Commonwealth's Title III case, and are "antithetical" to the overall purpose of PROMESA, the Bankruptcy Code, and the specific provisions of the Bankruptcy Code incorporated into PROMESA.  In light of that, the UCC contends that any payment priority that GO bondholders may assert pursuant to Puerto Rico law is preempted by PROMESA, and the GO bondholders are thus not entitled to a recovery greater than that received by other general unsecured claimholders. Moreover, according to the UCC, PROMESA section 201's requirement that a fiscal plan "respect the relative lawful priorities" of debt also does not establish that the GO Bonds have priority, because the requirement is found in Title II of PROMESA, not Title III, and therefore does not apply once a Title III case is filed because it would be "inconsistent with the section 507(a)(2) priority scheme incorporated into Title III."  UCC GO Priority Objection at 14.

On February 9, 2020, the UCC filed a motion seeking to set a briefing schedule for the UCC GO Priority Objection and to approve forms of notice to affected claimholders [ECF No. 10754] (the "Priority Objection Procedures Motion").  There, the UCC argued that, because the issues raised by the UCC GO Priority Objection are pure questions of law, no discovery was needed and the matter could proceed to prompt dispositive motion practice.  On February 10, 2020, the Mediation Team filed its Amended Report, recommending that this litigation be stayed.[88]  The Oversight Board, the PSA Creditors, and Peter Hein filed objections to the Priority Objection Procedures Motion.  The Oversight Board argued the Priority Objection should be stayed because the Plan would settle the relevant claims, and the UCC lacked standing to assert claim objections. The UCC filed a reply in support of its Priority Objection Procedures Motion on February 26, 2020, arguing that whether the GO Bonds are entitled to priority is a "gating issue" that needs to be addressed prior to confirmation of the Plan of Adjustment, and that standing is a legal question that is relevant to the Objection and not the Procedures Motion..

b)    **ERS Debt**

On January 24, 2008, ERS issued its senior pension funding bonds (the "ERS Bonds")[89] as limited, non-recourse obligations of ERS payable solely from, and purportedly secured solely by, certain employer contributions made to ERS by participating employers in the ERS pension

---

[88]  *See* section V.J.9 of this Disclosure Statement for a detailed summary of the Mediation Team and the Amended Report.

[89]  ERS's outstanding ERS Bonds consist of the following: (i) Senior Pension Funding Bonds, Series A (the "Series 2008A Bonds"), (ii) Senior Pension Funding Bonds, Series B (the "Series 2008B Bonds"), and (iii) Senior Pension Funding Bonds, Series C (the "Series 2008C Bonds").  These series are further discussed in the Analysis of the Pensions for the Commonwealth of Puerto Rico (May 2019), attached to this Disclosure Statement as Exhibit G (the "Pension Report").

plans. The purpose of this offering was to increase the assets of ERS available to invest and pay benefits.

The ERS Bonds were issued pursuant to the ERS Enabling Act, Act No. 447 of May 15, 1951, and the Pension Funding Bond Resolution, adopted by the Board of Trustees of ERS on January 24, 2008, as amended (the "ERS General Resolution"). Each series of the ERS Bonds also was issued pursuant to a supplemental resolution adopted by the ERS Board of Trustees. These supplemental resolutions provided for the issuance and terms of each series of ERS Bonds. Under the General Resolution and supplemental resolutions (collectively, the "ERS Resolution"), the Bank of New York Mellon ("BNYM") acts as fiscal agent for the ERS Bonds.

*Outstanding Bonds.*[90] The ERS Bonds bear interest rates between 5.85% and 6.55%, and mature between July 1, 2043 and July 1, 2058. As of the ERS Petition Date, ERS had outstanding $3.17 billion aggregate principal amount of its ERS Bonds issued under the ERS Resolution.[91] All of the ERS Bonds are uninsured. A schedule of outstanding ERS Bonds is attached as Exhibit H.

Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the then Governor suspended the Commonwealth's obligation to transfer employer contributions to ERS (up to an amount equal to the debt service payable by ERS during fiscal years 2016-2017) and suspended ERS's obligation to transfer pledged funds to the trustee under the ERS Resolution.

*Litigations Related to ERS Bonds.* The ERS Bonds were challenged in several related adversary proceedings described below. These adversary proceedings have all centered on the same issues: the scope of ERS bondholders' alleged security interest in collateral for the ERS Bonds and the degree to which perfection of those alleged security interests has occurred.

(i)    *Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC, et. al.*, Adv. Proc. No. 17-00213

On May 31, 2017, certain ERS bondholders filed a motion seeking relief from the Title III automatic stay (the "Adequate Protection Motion"). ERS Debtor opposed the Adequate Protection Motion, asserting, among other things, that the security interests against the pledged property claimed by the ERS bondholders was not properly perfected.

Following negotiations among the parties, ERS Debtor and the ERS bondholders agreed to the terms of a stipulation, which was ordered by the Title III Court. The stipulation provided for adequate protection payments regarding the ERS bondholders' alleged security interests, established a post-petition segregated account, and contemplated ERS Debtor would file a complaint by July 21, 2017. The stipulation also contemplated interest on the ERS Bonds would be paid when due from the segregated account established pursuant to a January 17, 2017 stipulation and that no further transfers from ERS Debtor should be made to such account. Pursuant to a series of further stipulations between ERS Debtor and the ERS bondholders, ERS

---

[90] Amounts of outstanding bonds are based on best available public information and may be approximate.

[91] For capital appreciation bonds, this amount includes the accreted value as of the ERS Commencement Date.

made adequate protection payments in the amount of debt service due on its bonds in full from a segregated account through June 2018, subject to a reservation of rights. The assets in this segregated account were depleted in July 2018 and no additional payments were made. Pursuant to the stipulations, ERS made payments of approximately $200 million to ERS bondholders, and deposited approximately $92 million in the post-petition segregated account.

On July 21, 2017, ERS Debtor, through the Oversight Board, commenced an adversary proceeding, styled *Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC*, Adv. Proc. No. 17-00213 (the "Lien-Challenge AP"). Defendants are various ERS bondholders who asserted security interests in a security agreement pursuant to the pension bond funding resolution of 2008. ERS Debtor sought (i) declaratory judgment determining (a) the scope of any lien and invalidating Defendants' unperfected security interests in property of ERS; (b) that any perfected prepetition security interests do not attach to assets received by ERS since the commencement of its Title III case pursuant to Bankruptcy Code section 552; (c) that ERS has complied with its obligations to certain bondholders to place pledged property into a segregated account; and (ii) an order directing funds deposited in an account established by stipulation of the parties be remitted to the Commonwealth. ERS Debtor argued that the security interests claimed by Defendants in ERS's assets were not properly perfected because, among other things, the collateral description contained in the financing statements describing the collateral only as "pledged property" was too vague to reasonably identify the collateral.

The Defendant bondholders filed counterclaims, seeking a judgment that (i) their security interests were properly perfected, (ii) their security interests were not avoidable in the Title III case, (iii) PROMESA could not be applied retroactively to eliminate the security interests, (iv) "pledged property" encompassed various categories of property, and (v) employer contributions were special revenues under Bankruptcy Code section 928(a) that remained subject to a lien post-petition.

On November 3, 2017, ERS Debtor and the Defendants filed cross-motions for summary judgment. On August 17, 2018, the Title III Court issued its *Opinion and Order Granting and Denying in Part Cross Motions for Summary Judgment* [Adv. Proc. No. 17-00213, ECF No. 215] (the "MSJ Order"), holding (i) the ERS Bondholders' security interests were unperfected because the applicable financing statements did not contain an adequate collateral description as required under the Uniform Commercial Code, (ii) purported amendments to those financing statements failed to identify the debtor by its correct name as required by the Uniform Commercial Code, (iii) the Oversight Board could avoid the Defendants' unperfected security interests pursuant to Bankruptcy Code section 544(a), which allows the trustee to avoid any transfer property or obligation of the debtor in certain instances (applicable in Title III case pursuant to PROMESA section 301(a)), and (iv) ERS Debtor did not violate a stipulation pertaining to employer contributions because it had no obligation to segregate the funds after May 1, 2017.

On July 3, 2018, prior to the Title III Court rendering its determination on the cross-motions for summary judgment, the ERS bondholders filed the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay* [ECF No. 3418] (the "Second Adequate Protection Motion"), requesting

59

relief from the automatic stay, or in the alternative, for adequate protection of their liens against property of ERS, in which the Commonwealth claims an interest.  On August 17, 2018, based upon the Title III Court's decision on the cross-motions for summary judgment, the Title III Court denied the Second Adequate Protection Motion.

On September 6, 2018, the Defendants appealed the MSJ Order and the order denying their Second Adequate Protection Motion.  On January 30, 2019, the First Circuit issued an opinion affirming in part, reversing in part, and vacating in part the MSJ Order.  The First Circuit determined the Defendants met the requirements for perfection of the alleged security interests as of December 17, 2015, and it remanded to the Title III Court for further consideration.  The First Circuit affirmed the dismissal of the claims regarding the January 17, 2017 stipulation.  On April 30, 2019, ERS Debtor filed a petition for certiorari to the United States Supreme Court concerning whether the ERS bondholders' asserted security interests were perfected (docketed as Case No. 18-1389).  The petition was denied on October 7, 2019.

On April 2, 2019, ERS Debtor filed the Motion of Debtor for Leave to File an Amended and Supplemented Adversary Complaint (the "Motion to Amend") [Adv. Proc. No. 17-00213, ECF No. 236], requesting the Title III Court grant ERS Debtor leave to file an amended complaint to raise issues concerning the nature and extent of the security interests alleged and the proper method of perfection of any security interest, and determine whether Bankruptcy Code section 552(a) operates to prevent the ERS bondholders' asserted lien from attaching to Employers' Contributions generated and received post-petition (the "Undecided Issue").  On May 6, 2019, the Title III Court denied in part and granted in part the Motion to Amend, granting ERS Debtor's request to determine the Undecided Issue, but denying ERS Debtor's motion insofar as it sought leave to amend the complaint in the Lien-Challenge AP, without prejudice to the filing of a new complaint.

On June 27, 2019, the Title III Court issued an order deciding the Undecided Issue (the "Section 552 Order").  In the Section 552 Order, the Title III Court granted summary judgment in favor of ERS Debtor, holding that Bankruptcy Code section 552 prevents any security interest resulting from liens granted in ERS bondholders' favor prior to the ERS Petition Date from attaching to revenues generated and received by ERS during the post-petition period.  That order also held that Employers' Contributions were not special revenues as defined by Bankruptcy Code section 902(a) and (d), and that Bankruptcy Code section 552 should not be construed as applying to only security interests granted after PROMESA's enactment.  On July 8, 2019, the Court issued an order and judgment closing the case.  On July 9, 2019, Defendant ERS bondholders filed notices of appeals of the Section 552 Order, and the appeals were docketed as Appeal Nos. 19-1699 and 19-1700.  The appeals were consolidated on July 26, 2019.  On January 30, 2020, the First Circuit affirmed the Section 552 Order, holding the ERS bondholders did not have a security interest against revenues generated and received by ERS on and after the ERS Petition Date.  On February 13, 2020, the ERS bondholders filed a petition for rehearing and rehearing *en banc*, which is currently pending.

      (ii)     *Altair Global Credit Opportunities Fund (A), LLC, et al. v.*
               *Commonwealth of Puerto Rico, et. al.*, Adv. Proc. Nos. 17-00219; 17-
               00220

On July 27, 2017, holders of allegedly secured bonds issued by ERS in 2008 brought actions concerning Joint Resolution 188, which directed ERS to liquidate and distribute its assets to the General Fund. The Plaintiff ERS bondholders sought a declaration that, following the passage of Joint Resolution 188, they remain secured creditors of ERS and/or the Commonwealth because (i) Joint Resolution 188 violates the automatic stay in the ERS Title III Case, and is therefore void; or (ii) if Joint Resolution 188 is not void, their security interest survives the transfer of the purported collateral. In the alternative, Plaintiffs alleged the diversion of their collateral violated the Takings and Contracts Clauses of the U.S. and Commonwealth Constitutions, and that they are entitled to a claim for compensation, equal to the full amount of the bonds, that cannot be impaired in a plan of adjustment. On November 18, 2017, Plaintiffs amended their complaints to make the same allegations about Act 106, which reformed the pension system and, among other things, converted the retirement systems' funding to a PayGo system.

Defendants moved to dismiss on November 17, 2017, generally arguing (i) Plaintiffs' claim of a perfected security interest should be dismissed as duplicative because it is being litigated in an earlier-filed action or, alternatively, dismissed because Plaintiffs did not adequately plead the existence of a perfected security interest, (ii) the automatic stay does not apply to actions by a government to enforce its police and regulatory powers, (iii) Plaintiffs lack standing to enforce the automatic stay, (iv) the ERS Resolution recognizes the Government's power to make legislative changes that may adversely affect ERS bondholders, (v) Plaintiffs do not state a claim for a constitutional taking, and (vi) all claims against the Oversight Board must be dismissed pursuant to PROMESA section 105, which provides the Oversight Board, its members, and its employees shall not be liable for any obligation of or claim against the Oversight Board or its members or employees or the territorial government resulting from actions taken to carry out PROMESA.

On September 6, 2018, the Court stayed these proceedings pending a decision from the First Circuit in the Lien-Challenge AP. On September 27, 2018, the Court terminated the pending motions to dismiss without prejudice, solely for the Court's statistical purposes and without any ruling on the merits, in view of the stayed proceedings. As stated above, on January 30, 2019, the First Circuit rendered an opinion on the Lien-Challenge AP.[92]

      (iii)    The Lien-Scope Adversary Proceedings

On May 20, 2019, ERS Debtor and the UCC filed two new complaints, *Financial Oversight & Management Board for Puerto Rico v. Andalusian Global Designated Activity Company*, [Adv.

---

[92] On February 26, 2019, Plaintiffs filed a motion to dismiss without prejudice, which the Court granted on March 1, 2019, as to Altair Global Credit Opportunities Fund (A), LLC and Nokota Capital Master Fund, L.P. As a result, the case was re-captioned *Andalusian Global Designated Activity Co. et al v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. Nos. 17-00219-LTS, 17-00220-LTS (D.P.R.). On March 5, 2019, the Title III Court entered an order allowing Crown Managed Accounts (for and on behalf of Crown/PW SP), LMA SPC (for and on behalf of Map 98 Segregated Portfolio), Oceana Master Fund Ltd., Pentwater Merger Arbitrage Master Fund Ltd., and PWCM Master Fund Ltd. to intervene in the adversary proceeding.

Proc. No. 19-00366, ECF No. 1] and *Financial Oversight & Management Board for Puerto Rico v. Glendon Opportunities Fund, L.P.* [Adv. Proc. No. 19-00367, ECF No. 1] ) (the "Lien-Scope APs"). The Lien-Scope APs allege the ERS bondholders do not hold valid and enforceable security interests in any of ERS Debtor's remaining assets or the proceeds thereof (other than the Accounts Receivable). Those remaining assets include, among other things, (i) certain cash and investments held by ERS, (ii) accounts receivable with respect to Additional Uniform Contributions required to be made by all participating employers beginning in 2013, and (iii) certain loans made to ERS participants, and repayments thereof. On May 30, 2019, summonses were returned as executed. On June 26, 2019, the Retiree Committee filed motions to intervene in both adversary proceedings, which the Title III Court granted in part. On July 24, 2019 the Court issued the Stay Order, which initially stayed these proceedings through November 30, 2020.[93]  On October 18, 2019, the parties submitted an *Urgent Joint Motion to Modify Order Regarding Stay and Mandatory Mediation with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* (the "ERS Stay Modification Motion"), which requested a modification of the stay order to permit litigation regarding (i) whether the bonds were *ultra vires* and (ii) the scope of the liens to move forward, and presented an agreed-upon schedule for such litigation. Discovery in these proceedings is ongoing. On October 24, 2019, the Court entered an order modifying the stay and setting a litigation schedule for the issues identified by the parties. On February 3, 2020, the parties filed an urgent joint motion to modify the litigation schedule, which the Court granted on February 6, 2020. Pursuant to the revised schedule, fact discovery must be completed by March 30, 2020, expert discovery must be completed by April 27, 2020, and summary judgment motions must be filed by May 6, 2020.

(iv)   Commonwealth's Objection to ERS Fiscal Agent Claim

On May 24, 2018, the ERS Fiscal Agent, BNYM, filed a proof of claim against the Commonwealth (Claim No. 16775), seeking recovery for the ERS Bonds on behalf of holders of ERS Bonds. The ERS Fiscal Agent based its claims on the Commonwealth's enactment of Joint Resolution 188, which directed ERS to liquidate and distribute its assets to the General Fund, and Act 106. A number of ERS bondholders also filed proofs of claims against the Commonwealth.

On March 12, 2019, the UCC filed an *Omnibus Objection to Claims Asserted by Holders of Bonds Issued by ERS*, [ECF No. 5580], on the ground the bond issuance exceeded ERS's statutory authority and was thus *ultra vires*, rendering the ERS Bonds null and void. On April 23, 2019, the Retiree Committee filed an *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth*, [ECF No. 6482], on the ground, among others, the bond issuance was *ultra vires*.

On April 23, 2019, the Retiree Committee filed an omnibus objection (the "Retiree Committee's ERS Bond Claims Objection") to all ERS bondholder claims asserted against both ERS and the Commonwealth on the grounds that the ERS Bonds were issued *ultra vires* and that the ERS bondholders have no enforceable claim with respect to the ERS Bonds. On July 2, 2019,

---

[93] *See* section V.I. of this Disclosure Statement for a detailed summary of the Stay Order.

the Retiree Committee filed its own procedures motion related to the adjudication of the Retiree Committee's ERS Bond Claims Objection.

On May 22, 2019, the Oversight Board filed an objection seeking disallowance of the ERS Fiscal Agent's claim because (a) secured claims resulting from the transfer of the Transferred Assets (assets transferred from ERS to the Commonwealth in exchange for the Commonwealth paying pensioners out of its General Fund) would be determined through the resolution of the Lien-Challenge AP, and even if the Lien-Challenge AP did not resolve the secured claims, UCC section 9-332(b) provides that the Commonwealth received the Transferred Assets free and clear of any such security interest once ERS transferred them to the Commonwealth, (b) no secured claims result from the cessation of the Employer Contributions and commencement of the PayGo payments, which are payments made to pensioners from the Commonwealth General Fund, as the Fiscal Agent does not have any security interest in the PayGo payments, and (c) constitutional claims based on the U.S. and Commonwealth Constitutions asserting legislation that implemented a revised retirement system violated the Contracts and Takings Clauses by redirecting the employer contributions away from ERS fail as a matter of law [ECF No. 7075].

On July 24, 2019, the Title III Court entered the Stay Order, which initially stayed the UCC's ERS Bond Claims Objection and the Retiree Committee's ERS Bond Claims Objection through November 30, 2019.[94]  On October 18, 2019, pursuant to the ERS Stay Modification Motion, the parties presented an agreed-upon schedule for such litigation.  Discovery in these proceedings is ongoing.  On October 24, 2019, the Court entered an order modifying the stay and setting a litigation schedule for the issues identified by the parties.  On February 3, 2020, the parties filed an urgent joint motion to modify the litigation schedule, which the Court granted on February 6, 2020.  Pursuant to the revised schedule, fact discovery must be completed by March 30, 2020, expert discovery must be completed by April 27, 2020, and summary judgment motions must be filed by May 6, 2020.

(v)   Claims Objections Pursuant to an Agreed Upon Order Establishing Procedures Regarding Objections to Certain ERS Bond Claims

On October 7, 2019, the Court entered an agreed-upon order establishing January 6, 2020 as the date by which objections must be filed to any claims filed by the ERS Fiscal Agent or certain groups of ERS Bondholders represented by Jones Day (the "Jones Day Group") and White & Case (the "White & Case Group"), and each of their members [Case No. 17-03566-LTS, ECF No. 676-2 at 6].  Pursuant thereto, the Oversight Board filed six objections to such claims, including the:

---

[94] *See* section V.I. of this Disclosure Statement for a detailed summary of the Stay Order.

1. Commonwealth's supplemental objection to the Fiscal Agent Claim, which added additional grounds for objection to the original objection filed to the Fiscal Agent Claim [ECF No. 9700];

2. ERS's objection to the Fiscal Agent's claim against ERS [ECF No. 9701];

3. Commonwealth's omnibus objection to claims filed by members of the Jones Day Group against the Commonwealth (each of which was substantially similar) [ECF No. 9702];

4. ERS's omnibus objection to claims filed by members of the Jones Day Group against ERS (each of which was substantially similar) [ECF No. 9703];

5. Commonwealth's omnibus objection to claims filed by members of the White & Case Group against the Commonwealth (each of which was substantially similar) [ECF No. 9704]; and

6. ERS's omnibus objection to claims filed by members of the White & Case Group against ERS (each of which was substantially similar) [ECF No. 9705].

(vi)     _Ultra Vires_ Objection

In addition to the six objections described above filed by the Oversight Board, other parties filed objections, including the UCC, which filed, among other things, an additional omnibus objection to claims asserted by ERS Bondholders against the Commonwealth and ERS. The omnibus objection asserted additional arguments to those already brought in the UCC's _ultra vires_ objection, in which the Committee objected to all ERS bond-related claims on the grounds that the ERS Bonds were issued _ultra vires_, and the Retirees' Objection, in which the Retirees objected to all ERS-bond related claims on _ultra vires_ grounds and on additional grounds [ECF No. 9708].[95]

The UCC argues the issuance of the ERS Bonds was illegally made in that the ERS Bonds were issued "_ultra vires_." The UCC argues ERS's statutory "authorization to incur debt" is limited to "seek[ing] a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts" per the ERS Enabling Act. The UCC also argues a government entity such as ERS has no inherent power to issue bonds to the public, and any such power must be expressly granted by statute. The UCC notes that whenever the Puerto Rico Legislative Assembly has granted bonding authority to a Commonwealth instrumentality (both before and after it authorized ERS in 2008 to "seek loans"), it has done so expressly and specified that the bonds may be sold

---

[95] On October 25, 2019, the Plaintiffs in _Altair Global Credit Opportunities Fund_ filed an informative motion submitting for the Court's consideration their response to certain arguments regarding the validity of bonds issued by ERS. According to Plaintiffs, that response was relevant to certain issues raised by the Government Defendants in their memorandum of law in support of their motion to dismiss in these proceedings [17-AP-0029-LTS ECF No. 76]

publicly or privately.  Ultimately, the UCC states that because it believes the ERS Bonds were issued *ultra vires*, they are null and void, and the bondholders have no remedy against ERS.

(vii)   *Cooperativa de Ahorro y Crédito Vegabajena v. Financial Oversight & Management Board for the Commonwealth of Puerto Rico*, Adv. Proc. No. 19-00028

On March 14, 2019, credit union Cooperativa de Ahorro y Credito Vegabajena filed an adversary complaint against ERS and the Oversight Board alleging it had a statutory (or other) lien against employee contributions made to ERS, which Plaintiff alleged its borrowers had assigned to it.  Plaintiff claimed the statutory lien arose under 2011 L.P.R.A section 196, which allowed financial service entities throughout the Commonwealth to enter into individual loan agreements with Commonwealth employees who participated in ERS.  The Plaintiff credit union alleged further that it had the right to enforce its alleged lien against employee contributions after certain of their borrowers defaulted on their loans.  The Plaintiff credit union had previously filed a motion to lift the automatic stay to enforce its alleged lien, which the Title III Court denied.  On May 3, 2019, ERS Debtor filed a motion to dismiss the complaint on the ground the employee-borrowers could not have assigned their employee contributions to Plaintiff because the employees did not have a retained right in contributions paid to ERS, and even if Plaintiff had a direct claim to the contributions, any statutory lien was not enforceable against the employee contributions because the property was not traceable to the particular employee-borrowers.  The Plaintiff credit union filed its opposition to the motion to dismiss on May 29, 2019, and ERS and the Oversight Board's reply was filed on June 20, 2019.  Plaintiff credit union filed a sur-reply on July 16, 2019.  On November 11, 2019, the Court issued an order requiring supplemental briefing.  On December 2, 2019, the Oversight Board submitted its supplemental brief, and on December 16, 2019, Plaintiff submitted its supplemental brief.

(viii)   Motion by ERS Bondholders to Appoint a Trustee

On November 19, 2019, ERS Bondholders filed a motion seeking the appointment of a trustee or an independent third-party fiduciary as a trustee under 11 U.S.C. sections 549 and 544 in the ERS Title III case.[96]  ERS Bondholders previously moved for the same relief in February 2019.[97]  ERS Bondholders argued the Oversight Board has failed to adequately protect their interests by failing to pursue certain purported claims on behalf of ERS against the Commonwealth.  ERS Bondholders asserted the Oversight Board has declined to pursue such alleged claims against the Commonwealth due to a purported conflict of interest created by the Oversight Board's representation of both the Commonwealth and ERS under PROMESA.  ERS Bondholders further alleged the purported conflict of interest could be remedied by appointing a

---

[96] *Renewed Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Appointment as Trustees Under 11 U.S.C. §926* [17-03566-LTS ECF No. 704] (the "Renewed Motion").

[97] *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Appointment as Trustees under 11 U.S.C. § 926*, [ECF No. 5169].

trustee under Bankruptcy Code section 926 to prosecute the alleged avoidance actions against the Commonwealth.

ERS Bondholders asserted two claims the Oversight Board has refused to pursue on their behalf meriting the appointment of a trustee—an avoidance action under Bankruptcy Code section 549 and an action under Bankruptcy Code section 544 to avoid a transfer.

On January 7, 2020, Judge Swain denied the Renewed Motion. On January 8, 2020, the ERS Bondholders filed a notice of appeal to the First Circuit, which was docketed as Case No. 20-1065. The First Circuit entered an order on January 15, 2020, setting an expedited briefing schedule and oral argument on March 4, 2020. On February 7, 2020, AAFAF, the Oversight Board, and the Retirees Committee filed their answering briefs. On February 21, 2020, Appellants filed their reply brief.

### c)     PBA Debt

PBA issued multiple series of bonds, the PBA Bonds as defined above, pursuant to certain bond resolutions, including: (i) Resolution No. 77, adopted on November 16, 1970 (the "1970 Bond Resolution"); and (ii) Resolution No. 468, adopted on June 22, 1995 (the "1995 Bond Resolution"; and, together with the 1970 Bond Resolution, the "PBA Bond Resolutions"), as supplemented by separate resolutions authorizing the issuance of each series of bonds under the 1995 Bond Resolution, including without limitation, (a) Resolution No. 1596, adopted on August 10, 2011, authorizing the issuance of the PBA Government Facilities Revenue Bonds, Series R (the "Series R Bonds"), and (b) Resolution No. 1618, adopted on December 19, 2011, authorizing the issuance of the PBA Government Facilities Revenue Bonds, Series T (the "PBA Series T Bonds"). By statute, (i) the Commonwealth has guaranteed the payment of rent by any department, agency, public corporation, or instrumentality of the Commonwealth pursuant to any lease agreement with PBA other than municipalities,[98] and (ii) the Commonwealth has also guaranteed the payment, when due, of principal of and interest on the PBA Bonds.[99]

***Outstanding Bonds***.[100]   As of the PBA Petition Date, PBA had approximately $3.968 billion in aggregate principal amount of bonds outstanding under the PBA Bond Resolutions, bearing interest rates between 1.08% and 7.00%. A schedule of outstanding PBA Bonds is attached as Exhibit H.

Pursuant to the PBA Enabling Act and the PBA Bond Resolutions, the PBA Bonds are payable from "rent" payments under purported "leases" pursuant to which PBA leases PBA properties to departments, agencies, instrumentalities, authorities, public corporations, and

---

[98] 22 L.P.R.A. § 916.

[99] Act No. 17-1968 of the Puerto Rico Legislative Assembly, as amended.

[100] Amounts of outstanding bonds are based on best available public information and may be approximate.

municipalities of the Commonwealth, and that "rent" is required to be sufficient, in the aggregate, to pay, when due, the principal of and interest on the PBA Bonds.[101]

Pursuant to the PBA Bond Resolutions, all payments in respect of debt service on the PBA Bonds must immediately be deposited into certain specified accounts, purportedly to be held in trust for holders of PBA Bonds. The PBA Bonds are purportedly secured by a lien on all funds in such accounts.[102] The PBA Bonds are not secured by mortgages on PBA property or by an assignment of PBA leases.

### *Litigations Related to PBA Bonds.* [103]

(i) <u>Lex Claims Litigation</u>

On July 20, 2016, certain holders of GO Bonds commenced an action in the U.S. District Court for the District of Puerto Rico against the Commonwealth and several of its officials, including the Governor. *Lex Claims, LLC v. García-Padilla*, Case No. 16-02374 (the "<u>Lex Claims Litigation</u>"). Plaintiffs alleged, among other things, that the Commonwealth Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure. COFINA bondholders who intervened argued that, because the Commonwealth pledged its good faith and credit for the payment of rent on PBA leases with agencies and instrumentalities of the Commonwealth, PBA bonds should have been included as direct debt of the Commonwealth in the debt limit calculation. The Lex Claims Litigation was dismissed pursuant to the settlement and compromise of the Commonwealth-COFINA Dispute (as defined in Section V.K.6) and confirmation of the COFINA plan of adjustment, as further discussed in section V.K.4.b) of this Disclosure Statement.

(ii) *<u>Financial Oversight & Management Board for Puerto Rico, et al. v. Puerto Rico Public Buildings Authority</u>*, Adv. Proc. No. 18-00149

On December 21, 2018, the Oversight Board, as representative of the Commonwealth, jointly with the UCC, filed a complaint against PBA, seeking a declaratory judgment that the purported leases entered into by PBA with departments, agencies, instrumentalities, authorities, public corporations, and municipalities of the Commonwealth are not arm's-length rental transactions, but rather disguised financing transactions, the sole purpose of which is to provide a vehicle for the Commonwealth to repay more than $4 billion in bonds it issued to finance the acquisition, construction and/or improvement of office space and other facilities used by various departments, agencies, and instrumentalities of the Commonwealth. Plaintiffs contend PBA has no right under PROMESA or the Bankruptcy Code to receive post-petition rent payments from, or assert administrative claims against, the Debtors. The Complaint seeks declarations that: (1) the leases between PBA Debtor and various governmental agencies are not subject to treatment in accordance with Bankruptcy Code section 365(d)(3), which requires the performance of all

---

[101] 22 L.P.R.A. §§ 907(g) and 916; 1995 Bond Resolution §§ 208(c), 701.

[102] *Id.* § 502.

[103] The Plan proposes to resolve all challenges to the PBA Bonds through a global compromise and settlement to be implemented under the Plan.

obligations of the debtor under any unexpired lease of nonresidential real property until such lease is assumed or rejected, and thus the Debtors have no obligation to make payments to PBA under the leases, and (2) PBA Debtor is not entitled to a priority administrative expense claim pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(2).

Several PBA Bondholders and the monoline insurers moved to intervene as Defendants, including the PBA Funds, Assured, Ambac, National, the PBA Funds Sub-Group,[104] the QTCB Noteholder Group, and the Lawful Constitutional Debtholder Coalition ("LCDC"). The Retiree Committee moved to intervene as a Plaintiff. The Oversight Board did not oppose intervention on the condition that it was subject to certain limitations and the Title III Court thereafter granted such intervention motions.

On March 19, 2019, the Defendant-intervenors filed answers and three of the intervening-Defendants—the QTCB Noteholder Group, the PBA Funds, and Assured—filed counterclaims.

On April 24, 2019, the Oversight Board filed motions to dismiss or strike each of the counterclaims. Specifically, the Oversight Board argued: (i) the Oversight Board cannot be sued under PROMESA section 105, which exempts the Oversight Board, its members and employees from liability for actions taken to carry out PROMESA; and (ii) the counterclaims should be dismissed as redundant. The UCC and Retiree Committee filed joinders to the Oversight Board's motions to dismiss.

On March 31, 2019, PBA Funds, Assured, and the QTCB Noteholder Group filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Oversight Board's response was filed on June 6, 2019. On June 21, 2019, the Oversight Board filed an urgent motion for modification of deadlines in anticipation of a motion to stay the adversary proceeding pending confirmation of a plan of adjustment (or, alternatively in the case of PBA, a qualifying modification under Title VI of PROMESA). On June 22, 2019, PBA filed a response consenting to the Oversight Board's motion to stay, although many other Defendant interveners opposed the urgent motion. On June 27, 2019, the Oversight Board filed a motion to stay the adversary proceeding pending confirmation of a joint Commonwealth and PBA plan of adjustment (or, alternatively in the case of PBA, a qualifying modification under Title VI of PROMESA) that incorporates the restructuring framework discussed in the PSA. On June 28, 2019, the Court granted the Oversight Board's urgent request to toll all existing deadlines in the adversary proceeding so that the schedule of the litigation could be assessed in context of the Oversight Board's stay motion and the proposed settlement. On July 8, 2019, AAFAF and the PBA filed a joint objection to the Oversight Board's motion to stay, arguing the Initial PSA was negotiated without input from PBA, PBA was not a Title III debtor and thus the Oversight Board cannot confirm any joint PBA/Commonwealth plan, and the plan contains "untenable provisions." On July 9, 2019, (i) the LCDC filed a response in support of the Oversight Board's motion to stay; (ii) Ambac and Assured filed objections to the Oversight Board's motion to stay; and (iii) PBA filed a response to the Oversight Board's motion to stay stating that it does not oppose the motion. On July 17, 2019, the QTCB Noteholder Group filed a statement in support of the Oversight Board's

---

[104] The Oversight Board later stipulated to the PBA Funds Sub-Group dismissing itself without prejudice from the case, which the Title III court approved.

motion.  The Oversight Board disagreed with AAFAF's positions or those of the Defendant-intervenors who oppose the stay motion, and on July 17, 2019, the Oversight Board filed its reply in support of the stay.  On July 24, 2019, the Court issued the Stay Order, which stay was extended through March 11, 2020.[105]

### (i)    Challenges to the Validity of PBA Bonds.

Certain parties have also filed objections to the validity of PBA Bonds.  The GO Bondholders filed an *Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 6099], asserting that, if PBA is determined to be an "unconstitutional evasion" of the Commonwealth's debt limit, any remedy for that violation would fall on holders of PBA Bonds, and accordingly, PBA Bonds, rather than later-vintage GO Bonds, should be invalidated.  The UCC has also filed an *Omnibus Objection of Official Committee of Unsecured Creditors Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds* [ECF No. 8141], which seeks the disallowance of all claims filed or asserted against the Commonwealth based on certain PBA bonds issued in 2011 and 2012, because, according to the UCC, their issuance violated the Constitutional Debt Limit.

### 2.    **Pension Obligations**

For a description of the Commonwealth's pension obligations, please see the Pension Report, attached hereto as Exhibit G.  In accordance with PROMESA section 211, the Oversight Board determined the pension systems of the Commonwealth were materially underfunded.  Accordingly, the Oversight Board conducted an analysis of the pension systems to assist the Oversight Board in evaluating the fiscal and economic impact of the pension cash flows.  The Pension Report discusses the history of the pension systems, reforms to increase sustainability of pension benefits, the issuances of ERS Bonds, the impact of PayGo expenditures on the Fiscal Plan forecasted annual surplus, and other related issues.[106]

### 3.    **Other Post-Employment Benefit Obligations**

The Commonwealth provides various other post-employment (non-pension) benefits ("OPEB") to retired employees including Christmas and medication bonuses, summer bonuses for JRS retirees, medical insurance plan contributions, disability benefits for high-risk positions, additional minimum death benefits, and other similar benefits for retired and disabled employees.  These various benefits are administered by ERS, JRS, and TRS.  The medical insurance plans

---

[105] See section V.I. of this Disclosure Statement for a detailed summary of the Stay Order.

[106] On June 28, 2019, the U.S. Government Accountability Office ("GAO") released an update to Congressional Committees on the public debt outlook for the five United States territories, including the Commonwealth (the "2019 GAO Report").  The GAO noted that, although the Oversight Board's reforms are intended to stabilize the pension system in the long term, officials and experts have stated that pension payments to current retirees have already begun crowding out spending for other government services due to the "pay-go" system.

consist of (i) Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution ("ERS MIPC"), covering substantially all full-time employees of the primary governments, certain municipalities of Puerto Rico and certain component units of the Commonwealth not having their own medical insurance plans; (ii) Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution ("JRS MIPC"), covering all judges of the Judiciary Branch of the Commonwealth; and (iii) Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution ("TRS MIPC"), covering all active teachers of the Department of Education of the Commonwealth and employees of TRS.

The plans were created under Act 95 of June 29, 1963. All three plans were sponsored by the Commonwealth. Benefits were provided through insurance companies whose premiums were paid by the retiree with the Commonwealth providing a matching share, up to $100 per month. ERS MIPC was an unfunded cost sharing, multiple employer plan, while JRS MIPC and TRS MIPC were unfunded, single employer plans.

For ERS MIPC and TRS MIPC, Commonwealth employees became members upon their date of employment and were eligible for benefits upon reaching the applicable pension benefits retirement age. However, Act 3-2013 eliminated this benefit to ERS MIPC members who retired after June 30, 2013, and Act 160 eliminated this benefit to TRS MIPC member who retired after July 21, 2014. For JRS MIPC, judges of the Judiciary Branch of the Commonwealth became members upon their date of employment and were eligible for benefits upon reaching the age of 60 with 10 years of service.

Each medical insurance plan was financed by the Commonwealth and funded on a pay-as-you-go basis. Funding of the medical insurance plans were provided to the ERS MIPC, JRS MIPC and TRS MIPC through appropriations each July 1 by (i) the Commonwealth's General Fund; (ii) certain corporations with their own treasuries; and (iii) certain public corporations with their own treasuries and municipalities for their former employees. There was no contribution requirement for plan members during active employment. Retirees contributed the amount of the healthcare insurance premium not covered by the Commonwealth. The annual OPEB cost and annual required contribution ("ARC") was computed as part of an actuarial valuation in accordance with GASB Statement No. 45. Under Act 106, these amounts were included in the PayGo pension amounts.

The PSAs that have been entered into with various parties contemplate the reduction of such benefits. *See* section II.B.1.b) of this Disclosure Statement for a more detailed description.

## C.    Puerto Rico's Revenue and Tax Regime[107]

The Commonwealth funds its operations from internal revenues (primarily revenues from taxes, fees and charges) as well as revenue from inter-governmental sources, primarily federal

---

[107] This section is not intended to exhaustively describe all Commonwealth revenues, but rather provides an overview of certain of the Commonwealth's most significant sources of revenue. This section is also not intended to provide tax advice, and taxpayers are urged to consult with their tax advisors concerning the U.S. federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan in their respective individual circumstances.

funds.[108]  The Commonwealth's tax revenues consist principally of income taxes, excise taxes and SUTs.  Such taxes are mostly collected pursuant to the provisions of Act No. 1-2011, known as the Puerto Rico Internal Revenue Code of 2011, as amended (the "2011 Code"), or other Special Revenue Fund laws.  Non-tax revenue sources include registration fees for motor vehicles, fees for services (including for judicial proceedings, public health services, and fulfillment of document requests), fines for motor vehicles, as well as fees for professional licenses, trademarks, housing-related fees, and other fees.

The Commonwealth accounts for most of the tax revenue it collects in its General Fund, which is its primary operating fund.  However, certain Commonwealth revenues from designated sources that are appropriated to designated agencies or instrumentalities for specified purposes are not accounted for in the General Fund but rather are accounted for in "Special Revenue Funds."[109] Special Revenue Fund revenues include: (i) certain taxes that were historically appropriated, subject to certain conditions, through Puerto Rico statutes to agencies, public corporations or other third parties, (ii) charges and fees for services collected by Commonwealth agencies, (iii) dividends or other distributions received by the Commonwealth from its public corporations, and (iv) certain other revenues.  Furthermore, certain other tax revenues, including the SUT revenues transferred to COFINA and expressly designated as not available revenues of the Commonwealth, are not accounted for in the General Fund or its Special Revenue Funds but are rather accounted for in other governmental funds administered and managed by the relevant government instrumentality.  Because the Commonwealth follows the practice of pooling its cash, all revenues accounted for in the General Fund and most revenue accounted for in the Special Revenue Funds (subject to certain limited exceptions) are deposited in the Commonwealth's centralized cash management system (the "Treasury Single Account" or "TSA").

---

For a description of Certain Material United States Federal Income Tax Considerations and Certain Puerto Rico Income Tax Considerations, please refer to Sections XI and XII of the Disclosure Statement, respectively.

[108] Included in inter-governmental revenue sources are the covered over payments resulting from federal excise taxes on beer, wine, and rum exported from Puerto Rico.

[109] All such revenues, including those accounted for in the Special Revenue Funds, are accounted for in the "General Fund" for purpose of the annual financial statements of the Commonwealth prepared in accordance with U.S. GAAP.

For fiscal year 2019, the Commonwealth preliminarily reported collections of approximately $11.4 billion in tax revenues (net of $480 million reserved for tax refunds) into its General Fund, up from approximately $9.3 billion in the prior fiscal year[110] and up from approximately $7.7 billion in fiscal year 2009, categorized as follows:

| Tax Category ($ in millions) | GF Revenue (FY 2009) | GF Revenue (FY 2018) | GF Revenue (FY 2019)[111] | GF Revenue (YTD November 2019)[112] |
|---|---|---|---|---|
| (a)  Income Taxes | | | | |
| • Individual Income Tax | $2,648 | $1,960 | $2,224 | $771 |
| • Corporate Income Tax | $1,376 | $1,776 | $2,492 | $1,325 |
| • Nonresident Withholding | $1,082 | $638 | $630 | $156 |
| (b)  Sales & Uses Taxes ("SUT")[113] | $797 | $1,646 | $2,299 | $517 |
| (c)  Excise and Other Taxes | | | | |
| • Act 154 Excise Tax | --- | $1,915 | $2,083 | $766 |
| • Beer/Alcohol Excise Tax | $277 | $265 | $275 | $107 |
| • Tobacco Excise Tax | $129 | $156 | $101 | $29 |
| • Motor Vehicle Excise Tax | $311 | $407 | $519 | $183 |
| • Others | $686 | $325 | $523 | $222 |
| (d)  Rum cover transfer payments | $404 | $227[114] | $230[115] | $144 |
| **Total** | **$7,710** | **$9,313** | **$11,376** | **$4,220** |

[110] "Puerto Rico Treasury Reports Closing of fiscal year 2019 with Record Revenues Totaling $11,376 Million," August 6, 2019.

[111] General Fund Net Revenues as reported by the Department of Treasury, available at: http://www.hacienda.gobierno.pr/sites/default/files/junio_2019_infg_publacion.pdf

[112] General Fund Net Revenues as reported by the Department of Treasury, available at: http://www.hacienda.gobierno.pr/sites/default/files/ingresos_netos_nov_2019_af_2020.pdf

[113] The SUT deposited into the General Fund equals the 10.5% Commonwealth assessed SUT less the 53.65% of the Pledged Sales Tax Base Amount transferred to COFINA each fiscal year.

[114] This amount reflects only the portion of the Rum Excise Taxes from the federal government that are subsequently transferred to the General Fund after a certain portion is retained in a Treasury lockbox account and subsequently distributed to certain on-island rum producers.  The total tax remittance from the federal government pursuant to 26 U.S.C. § 7652 for fiscal year 2018 was ~$430 million.

[115] *See supra* n. 94. The total tax remittance from the federal government pursuant to 26 U.S.C. § 7652 for FY 2019 was ~$433 million.

For fiscal year 2020, through November 2019, the latest data currently available shows General Fund collections totaled $4.22 billion, exceeding projections by $595.9 million.[116]  More recently, however, collections for fiscal year 2020, have started to underperform in several key categories.  In November, for instance, collections trailed estimates in seven categories (individual income taxes, nonresident withholdings, sales and use tax, Act 154 excise tax, alcoholic beverages, cigarettes and rum remittances) and only exceeded projections in three categories (corporate income tax, motor vehicles and "other").  Long term impacts are still being evaluated by the Department of Treasury.

Many of these taxes are collected by an integrated tax system, called Sistema Unificado de Rentas Internas or SURI, which is being deployed in phases from fiscal years 2017–2020.  The next major release was scheduled for February 24, 2020, which will migrate corporate and individual income taxes to the platform.  The benefits of the platform include improved filing and payment capabilities, digital workflows, and integration of previously disparate data sources.  These features are expected to, over time, improve the Department of Treasury's ability to serve taxpayers and enhance its compliance capabilities.

1. **2018 Puerto Rico Tax Amendments (Act 257-2018).**

There have been at least 11 major revisions to Puerto Rico's tax code since 1994, including at least six adjustments since 2013.[117]  Most recently, on December 10, 2018, Puerto Rico enacted Act 257-2018, which includes numerous amendments to Puerto Rico's Internal Revenue Code described in more detail in the tax discussion sections below.  This followed the repeal of certain parts of Act 72-2015, which had modified the SUT regime, introduced a Value Added Tax ("VAT"), and amended other income tax provisions.  A guiding tax policy principle embedded in Act 257-2018 was revenue neutrality.

Among the noteworthy features of Act 257-2018 are amendments to income tax provisions applicable to individuals and local corporations, changes to SUT provisions, the reintroduction of an Earned Income Tax Credit, and the legalization of certain games of chance.  Act 257-2018 reduced personal income taxes by enacting a 5% non-refundable tax credit and reducing the corporate tax base rate by 1.5%.  To compensate for the reduction in tax collections, Act 257-2018 placed greater reliance on the use of a new alternative basic tax ("ABT") and an expansion of the alternative minimum tax ("AMT").  Moreover, Act 257-2018 increased the withholding income tax rate on payments for services rendered in Puerto Rico made after December 31, 2018, from 7% to 10%.  The change in law does not, however, amend the tax treatment of corporations covered

---

[116]   General Fund Net Revenues as reported by the Department of Treasury, available at: http://www.hacienda.gobierno.pr/sites/default/files/ingresos_netos_nov_2019_af_2020.pdf

[117]   Reforms include: Act 40-2013, the "Tax Burden Redistribution and Adjustment Act;" Act 120-2014, the "Small and Medium Business Job Generation and Retention Act;" Act 72-2015, the "Adjustments to the Internal Revenue Code of 2011;" Administrative Orders 2017-01 and 2017-05; and Act 257-2018, the "2018 Puerto Rico Tax Reform Act."

by incentive laws that benefit from a range of company and industry specific tax credits, exemptions, and deductions.

Act 257-2018 reduced portions of the taxable SUT base and rate.  Starting October 1, 2019, Act 257-2018 reduced the SUT on prepared foods to 7%, subject to the business obtaining a certification from the Secretary of Treasury.  Act 257-2018 also exempted certain previously taxable items from the SUT, including e-books and digital books, female sanitary items, and certain legal services.  Finally, Act 257-2018 increased the threshold for the SUT exclusion for business to business and designated professional services based on annual volume of business from $50,000 to $200,000 after March 1, 2019.

Act 257-2018 also provides for the legalization of certain games of chance by addressing licensing and operations of machines, flow of funds to the government, the regulatory environment, and other guidance.

Because regulations have not yet been approved, no revenue has been collected from the legalization of these gaming machines.  The Oversight Board has also repeatedly expressed its concern that this potential activity could cannibalize existing fiscal plan revenues, in which case this provision of the Act would be inconsistent with the certified fiscal plan.

Finally, the statutory mandate of Act 257-2018 creates greater interdependencies among taxpayers and the information they are obligated to report, which is expected to enable greater oversight and verification of the information being reported to the government.

2.      **Tax Incentives and Tax Credits**

Regular corporations, incentive corporations, and individuals have collectively claimed, on average, $246 million in tax credits per year, reducing net revenue collections.

In addition to credits, deductions, and exemptions included in Puerto Rico's Internal Revenue Code, Puerto Rico has passed more than 60 pieces of legislation that offer tax incentives to persons and companies that meet certain criteria (collectively, the "Incentive Acts").  Incentive corporations that qualify for treatment under the Incentive Acts generally pay a significantly reduced income tax rate and typically receive waivers or exemptions from the payment of certain SUT, licensing, municipal, and other taxes and fees.

The cost of each credit is calculated independently.  As described in the Tax Expenditure Report, each cost estimate also excludes behavioral and macroeconomic feedback effects.  The behavioral impact effects the revenue implication of the removal of individual incentives due to economic choices of the tax payer to take advantage of remaining incentives.  As a result, the projection may exceed the actual revenue gains that would result if a particular provision were eliminated since, often times, the removal of a tax expenditure would cause taxpayers to change their behavior to minimize the amount of tax they would have to pay.  The macroeconomic feedback or dynamic effects estimate the impact of a tax incentive on the overall level of economic activity and the potential resulting impact on aggregate tax revenues.  According to the Department of Treasury's report, the cost of tax incentives to incentive corporations are also calculated somewhat uniquely because approximately 98% of the income taxed under the Incentive Acts is

income generated by foreign-owned incentive corporations.  The elimination of the Incentive Acts would not necessarily reduce dollar for dollar the corresponding tax expenditures as a result of the foreign-owned corporations' ability to shift activity to locations outside of the Commonwealth or potentially relocate operations over the longer-term as a result of, for example, an increase in tax rates.

Described below are several of the Incentive Acts widely used in the Commonwealth.[118] Act 60-2019, described in the next section, repealed and consolidated many of Puerto Rico's tax incentives, along with dozens of other tax decrees, incentives, subsidies and tax benefits, into a single statute with conforming benefits.

*Act 73-2008 (Economic Incentives for the Development of Puerto Rico Act).*  This act generally provides tax incentives to businesses that are established in Puerto Rico for manufacturing products on a commercial scale and to businesses engaged in a wide range of specific economic activities, such as scientific research and development, recycling, hydroponics, intangible property licensing, and software development.  Qualifying companies receive preferential income tax rates as low as 4% along with varying exemptions on property taxes, municipal license taxes, construction taxes, and certain SUT taxes.  As of December 31, 2019, 784 companies have received tax breaks from Act 73-2008.  This act represents $15.7 billion or 78% of the ~$20 billion tax expenditures estimated by the Department of Treasury in the inaugural tax expenditures report.

*Act 74-2010 (Puerto Rico Tourism Development Act).*  Corporations that construct, own, operate or administer hotels and engage in other tourism eligible activities can benefit from the provisions of Act 74-2010, known as the Puerto Rico Tourism Development Act.  Exempt businesses receive a tradeable tax credit based on the amount of the tourism investment amount, a tax exemption from income and real and personal property taxes, an exemption on municipal license taxes, a tax exemption on municipal construction excise taxes, and a tax exemption on excise taxes and SUT on the acquisition of certain items used in the tourism activity.

*Act 27-2011 (Puerto Rico Film Industry Economic Incentives Act).*  This act was designed to set forth an adequate framework for developing the Puerto Rico film industry.  The act offers tax exemptions and tax credits for production companies of short-films, regular films, documentaries, series, mini-series, music videos, commercials, video games, and TV productions such as reality shows.  Benefits include a 4% flat income tax rate on the net income derived from the eligible projects and tax exemptions on property taxes, municipal license taxes, construction excise taxes, and other municipal taxes.  As of December 31, 2019, 267 companies take advantage of this tax incentive.

*Act 83-2010 (Puerto Rico Green Energy Incentives Act).*  This act aims to promote the production of renewable energy.  The green energy fund is used to support "green energy" development.  Puerto Rico defines green energy as sustainable renewable energy and alternative renewable energy.  Sustainable renewable energy includes solar, wind, geothermal, biomass,

---

[118] This is not an exhaustive list of all incentives offered to individuals and corporations, but rather a representative sample of the types of incentives offered by the Government.

hydropower, marine and hydrokinetic and ocean thermal.  Alternative renewable energy includes municipal solid waste, landfill gas, anaerobic digestion and fuels cells.  Like other incentive structures, qualifying Act 83-2010 companies receive a 4% fixed income tax rate along with varying exemptions on distributions, property taxes, municipal license taxes and state excise tax and sales and use taxes for raw materials and machinery and equipment used in the production of Green Energy.  As of December 31, 2019, 102 companies receive this incentive.

*Act 20-2012 (Act to Promote the Exportation of Services).*  Act 20-2012 promotes the establishment of export service operations in Puerto Rico.  It provides tax incentives to businesses exporting services from Puerto Rico to persons outside of Puerto Rico with no nexus to Puerto Rico.  Among the incentives are a 4% income tax rate on net income from export services, no income tax on dividend distributions the business makes out of its earnings and profits derived from eligible activities, an exemption from municipal license taxes on the volume of business derived from eligible activities and an exemption from real and personal property taxes on certain export services activities.  As of December 31, 2019, 1,927 companies were doing business under this tax regime.  Act 20 companies paid $210 million in total taxes, including $90.3 million in corporate income taxes, $75.1 million in income tax from payroll, and $25.7 million in SUT from payroll, according to a study by a local economics firm, which was commissioned by the Department of Economic Development and Commerce ("DDEC").  The same study indicates Act 20 companies created 8,257 direct jobs and 16,692 indirect jobs in the local economy.

*Act 22-2012 (Act to Promote the Relocation of Investors to Puerto Rico).*  The tax benefits under Act 20-2012 are often complemented with the tax benefits under Act 22-2012, known as the Act to Promote the Relocation of Investors to Puerto Rico.  Among the incentives for Act 22-2012 residents are a 100% tax exemption from Puerto Rico income tax on all dividends, a 100% tax exemption from Puerto Rico income tax on all interest, and a 100% tax exemption from Puerto Rico income taxes on net long-term capital gains accrued after the individual resident investor ("IRI") becomes a Puerto Rico resident.  To qualify as an IRI under Act 22-2012, an individual must purchase residential property within two years after becoming a Puerto Rico resident, must open a bank account at a bank or credit union located in Puerto Rico, and must make charitable contributions to Puerto Rico charitable entities in the amount of $5,000 annually.  As of December 31, 2019, 2,339 grantees are qualified to receive Act 22-2012 benefits.  More than 82% of Act 22 grantees have a net worth below $10 million and only 4% have a net worth in excess of $50 million. 78% of Act 22 grantees are also Act 20 grantees.  According to a study by a local economics firm commissioned by the DDEC, Act 20 grantees promised to invest over $1.2 billion in the local economy, including $221 million in real estate, $391 million in machinery and equipment, and a further $650 million in other assets.

*Act 273-2012 (International Financial Center Regulatory Act).*  The Act provides tax exemptions to businesses engaged in eligible activities in Puerto Rico.  To receive this exemption, a business needs to become an International Financial Entity ("IFE") by applying for a permit and license and obtaining a tax exemption decree.  Benefits include a 4% flat income tax rate on the net income and reduced taxes on dividends, real and personal property, and municipal license taxes.  Of the income taxes paid by an IFE, 7.5% is deposited in the Special Fund for the Development of Export and Promoter Services of the Department of Economic Development and Commerce, created by the "Export Services Act" to promote growth of services and other eligible

businesses in Puerto Rico.  As of December 31, 2019, thirty-five companies work under this type of tax arrangement.

*Act 21-2019 (Development of Opportunity Zones of Economic Development Act of Puerto Rico of 2019).*  Approximately 95% of the territory of Puerto Rico is considered a qualified opportunity zone under the parameters established by the U.S. federal government.  Act 21-2019 provides tax incentives for investments in qualified opportunity zones.  Businesses will receive preferential tax rates, transferable tax credits, and partial exemptions of property and municipal taxes.  These provisions, among other benefits like the expedited permitting process, are intended to make Puerto Rico's market more appealing for investors looking to take advantage of opportunity zones.

*Act 14-2017 (Incentives Act for the Retention and Return of Medical Professionals).*  Signed into law on February 21, 2017, the purpose of the Incentives for the Retention and Return of Medical Professionals Act is to guarantee accessible and quality health services for all the residents of Puerto Rico; and offer an attractive tax incentives proposal for the medical professionals to stay in Puerto Rico, and at the same time, attract the setup of other professionals' medical practice in Puerto Rico.  A qualified physician  that requests and obtains a tax exemption grant under the Act will enjoy the following tax incentives for an initial term of 15 years: a 4% fixed income tax rate on eligible income generated as a result of offering his/her professional medical services; a 100% exemption (including Alternative Minimum Tax ("AMT")) on up to $250,000 received from eligible dividends, per year; and eligibility to contribute up to 25% of the net income to individual retirement plans (Keogh) or up to 25% of their salary in case of corporate retirement plans, as after tax contributions.  The qualified physician can request an extension of the grant for an additional 15 years, if he/she can demonstrate that said extension is in the economic benefit of Puerto Rico.  As of December 31, 2019, 3,796 physicians are registered to benefit from the provisions of the Act.

*Tax Credits and Disbursements Authorization Committee.*  On March 7, 2017, AAFAF issued Administrative Order 2017-01, which created a Tax Credits and Disbursements Authorization Committee (the "Committee").  The Committee evaluated pending and new tax credits applications and set limits on the use and timing of tax credits granted.  The Administrative Order also halted the granting of new tax credits authorized by various incentive acts.  The Committee was dissolved by Administrative Order 2018-10 issued on July 2, 2018 and all remaining controls and limitations established by the Committee were repealed by Act 60-2019, described more fully below.  On October 31, 2018, the Oversight Board issued a letter to, in part, call for the reinstatement of the Committee with the authority to restrict the percentage of net income that can be offset by tax credits and limitations on the number of years over which a tax credit can be claimed.  The certified Fiscal Plan also calls for the government to place a limit on the annual issuance of tax credits.

3.    **Puerto Rico Tax Incentives Code (Act 60-2019)**

On July 1, 2019, the Commonwealth enacted Act 60-2019 (the "Puerto Rico Tax Incentives Code" or "Incentives Code") to prospectively amend the tax incentives code and adopt a new legal and administrative framework to normalize the way new incentives are created, approved,

processed, and monitored.  Existing incentive laws, including many of the ones described above, were repealed and replaced by similar incentives in Act 60-2019.

To evaluate the fiscal benefit from each incentive, the legislation uses a Return on Investment ("ROI") approach combined with an assessment of fiscal multipliers to prioritize high value-added incentives relative to those that do not generate sufficient economic return.  The legislation, however, does not include explicit caps on, reductions to, or the elimination of any specific incentives.  Rather, the purpose of the Incentives Code is to measure the ROI of tax and economic incentives by grouping them under a transparent and uniform code.

Through the Incentives Code, the term, rate, and characteristics of incentives offered are harmonized across industries and credits.  The Incentives Code also creates a centralized Incentives Office for Businesses in Puerto Rico at DDEC and establishes an Incentives Concession Portal to centralize, standardize, and streamline the processes related to the application and approval of decrees, cash grants, tax credits, subsidies, and other incentives.

Many provisions of Act 60-2019 require the drafting and approval of regulations prior to their implementation.[119]

Act 60-2019 also required the public disclosure of beneficiaries of certain tax expenditures. In accordance with that requirement, DDEC disclosed on January 30, 2020, 8,364 companies and individuals that currently received certain tax incentives.  The online database offers the name of the grantee, the type of benefit and the decree's issue date.  At the moment, DDEC released the relevant information for recipients that receive benefits from the following Acts: Act 14-2017 (Physician Retention); Act 20-2012 (Exportation of Services); Act 22-2012 (Investor Relocation); Act 273-2012 (International Financial Center Regulatory Act); and Act 27-2011 (Film Production).  DDEC subsequently released additional data on February 11, 2020, disclosing recipients of the following tax expenditures: Act 73-2008 (Economic Incentives for the Development of Puerto Rico Act); Act 83-2010 (Puerto Rico Green Energy Incentives Act).

4.   **Commonwealth Taxes**

a)   **Income Taxes**

*Individual Income Tax.*

Puerto Rico's income tax code imposes tax on individuals at rates which range from 0.0% for those individuals making less than $9,000 a year to a maximum marginal rate of 33% for those with an income above $61,501.  Residents are taxed on income from nearly all sources, and only receive limited exemptions or deductions from their income, unless they receive a waiver under one of the incentive programs authorized by local law.

---

[119] Pursuant to PROMESA section 204(b)(4) and the Oversight Board's policy with respect thereto, proposed rules, regulations, administrative orders and executive orders covered by said policy, including all regulations under Act 60-2019, must be submitted to the Oversight Board before being issued to ensure compliance with the certified Commonwealth fiscal plan.

| If net taxable income is: | Tax will be: |
|---|---|
| Less than $9,000 | 0% |
| $9,001 to $25,000 | 7% |
| $25,001 to $41,500 | 14% |
| $41,501 to $61,500 | 25% |
| Greater than $61,501 | 33% |

As described above, the recently enacted local tax act, Act 257-2018, reduced the effective income tax rate for individuals by allowing a 5% non-refundable tax credit on the tax obligation due by individuals for tax years beginning after December 31, 2018. Consequently, many individual tax filers will only pay 95% of their total tax liability annually going forward. If an individual is subject to the AMT rate, they are not eligible for the 5% tax credit authorized by Act 257-2018.

This reduction in income tax is paid for, in part, by the establishment of a new optional gross tax-based regime for certain self-employed individuals established as part of Act 257-2018. For tax years beginning after December 31, 2018, self-employed individuals, whose income originates substantially from rendering services, can opt to use a fixed tax rate schedule to determine their income tax liability. The tax rate is determined according to a gross revenue schedule provided in the law, and ranges from 6% to 20%. The full schedule is:

| Gross Revenue Level: | Tax will be: |
|---|---|
| Less than $100,000 | 6% |
| $100,001 to $200,000 | 10% |
| $200,001 to $300,000 | 13% |
| $300,001 to $400,000 | 15% |
| $400,001 to $500,000 | 17% |
| Greater than $500,000 | 20% |

Beginning with tax year 2019, Act 257-2018 also reinstated an earned income tax credit ("EITC") in Puerto Rico. The value of the credit generally ranges from $300 to $2,000, depending on marital status, number of dependents, and adjusted gross income. Given concerns with the implementation of the Puerto Rico's previous EITC, the statute establishes new requirements for married taxpayers to be able to claim the credit. When claimed, the EITC will produce a cost to the government and reduce income tax collections.

For fiscal year 2019, the Commonwealth's individual net income tax collections in the General Fund amounted to approximately $2.2 billion.

***Regular Corporation Corporate Income Tax***. Corporations in Puerto Rico generally fall under one of two types, regular corporations or incentive corporations. Unless a corporation

qualifies for partial exemption from corporate income and other taxes under the tax incentives programs, it is considered as a regular corporation subject to corporate taxation at graduated rates.

Act 257-2018 reduced the maximum regular corporate income tax rate in Puerto Rico for tax years commencing after December 31, 2018. The reduction was made by reducing the base tax rate 1.5%, from 20% to 18.5%. As a result, the top marginal corporate tax rate, including relevant surtaxes, declined from 39% to 37.5%. The full normal corporate tax schedule is listed below:

| Net income subject to Surtax: | Base Tax: | Surtax: | Total Marginal Corporate Tax Rate: |
|---|---|---|---|
| Less than $75,000 | 18.5% | 5% | 23.5% |
| $75,001 to $125,000 | 18.5% | 15% | 33.5% |
| $125,001 to $175,000 | 18.5% | 16% | 34.5% |
| $175,001 to $225,000 | 18.5% | 17% | 35.5% |
| $225,001 to $275,000 | 18.5% | 18% | 36.5% |
| Greater than $275,001 | 18.5% | 19% | 37.5% |

To pay for the reduction in the corporate tax base rate, Act 257-2018 enables corporate taxpayers engaged in a trade or business in which income is derived substantially from services, and subject to withholding at source, to elect to use a fixed tax rate to determine their income tax liability. The fixed rate will apply to the gross income derived from the rendering of services as follows:

| Gross Revenue Level: | Tax will be: |
|---|---|
| Less than $100,000 | 6% |
| $100,001 to $200,000 | 10% |
| $200,001 to $300,000 | 13% |
| $300,001 to $400,000 | 15% |
| $400,001 to $500,000 | 17% |
| Greater than $500,000 | 20% |

Moreover, Act 257-2018 increased the withholding income tax rate on payments for services rendered in Puerto Rico made after December 31, 2018, from 7% to 10%. Combined with a new requirement under Act 257-2018 to reconcile returns quarterly, this new process is expected to lead to considerably higher tax collections.

Corporate revenue collections will also likely be enhanced from a recent change in the definition of Puerto Rico source income. Generally, compensation for work performed or personal services rendered physically outside of Puerto Rico are untaxed because they are considered as income from sources outside of Puerto Rico. Act 257-2018, however, provides a change whereby payments for services offered outside of Puerto Rico to any agency, dependency, or instrumentality

80

of the government of Puerto Rico, a public corporation, as well as the legislature, the judiciary and municipalities, or any other entity, created by state or federal law, whose funds come, totally or partially, from the General Fund will be considered as income from sources within Puerto Rico and taxed accordingly.

Puerto Rico also maintains an Alternative Minimum Tax regime. The alternative minimum tax rate is 18.5% for taxpayers with a volume of business of less than $3 million. If a taxpayer's volume of business is $3 million or more, the applicable AMT rate is 23%.

In addition to credits, deductions, and exemptions included in Puerto Rico's Internal Revenue Code, Puerto Rico has passed more than 60 pieces of legislation that offer tax incentives to persons and companies that meet certain criteria (collectively, the "Incentive Acts"). Incentive Corporations that qualify for treatment under the Incentive Acts generally pay a significantly reduced income tax rate and typically receive waivers or exemptions from the payment of certain SUT, licensing, municipal, and other taxes and fees.

In July 2019, one of Puerto Rico's largest tax filers completed a one-time corporate transaction, which is contributing to more than $500 million in out-performance of corporate income tax collections, relative to the fiscal plan forecast. The long term implications are still being evaluated by the Department of Treasury.

For fiscal year 2019, the combined General Fund and special revenue fund tax revenues for Commonwealth regular and incentive corporations amounted to approximately $2.6 billion.

***Non-Resident Withholding Tax.*** In general, non-residents are subject to a withholding tax on royalty payments received from Puerto Rico sources. The regular withholding rate on these payments to nonresidents is 29%, however certain taxpayers can enjoy a more favorable tax treatment. By law, 10% of the revenues derived from the withholding tax on royalties paid by companies operating under Act 73-2008 are supposed to be appropriated to the Economic Development Fund (the "FEDE"), an incentive fund administered by PRIDCO. The revenues appropriated to FEDE are recorded in a Special Revenue Fund used to provide economic incentive grants to private companies. However, the percentage transferred has historically been smaller than 10%.

In addition to the tax on royalties, unless an incentive decree is in place, dividends paid to non-resident corporations and individuals are subject to a withholding tax of 10% and 15%, respectively, and interest paid to non-resident affiliates is subject to a withholding tax of 29%.

For fiscal year 2019, Commonwealth nonresident withholding tax revenues amounted to approximately $646 million in both the General Fund and Special Revenue Funds.

***Other Income Taxes.*** Revenues from other income taxes include revenues from partnerships, tollgate taxes, taxes on interests and dividends and inheritance and gift taxes. For fiscal year 2019, total other income tax revenue amounted to approximately $42 million.

b)      **Sales and Use Tax (SUT)**

The Commonwealth's SUT was originally imposed in 2006 pursuant to Act No. 117-2006. The SUT replaced the prior 5% (effective 6.6%) general excise tax on imported goods and the 3.6% general excise tax on goods manufactured in Puerto Rico.

The SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations.  Certain items, such as fuel, crude oil and petroleum products and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the SUT.

The Commonwealth SUT had an original tax rate of 5.5%.  Act 117-2006 also authorized each municipal government to impose a SUT of 1.5% (the "Municipal SUT"), which generally has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth SUT.  Combined, the rate was 7.0%.  Act 18-2014 lowered the portion of the Municipal SUT allocated to the municipalities to 1.0% and allocated the other 0.5% to the Municipal Administration Fund, a fund created to provide a financial mechanism to finance the debt of the municipalities.

In 2013, Act 40-2013 eliminated various exemptions to the SUT, which broadened its base, and Act No. 46-2013 required the declaration and payment of the SUT on imported goods at the time of their entry into Puerto Rico.

On May 29, 2015, the Commonwealth enacted Act 72-2015 that, among other things, (i) increased the Commonwealth SUT rate to 10.5% effective on July 1, 2015, with the net 4.5% increase being for the benefit of the General Fund, and (ii) eliminated several exemptions.

Although the provisions enacted under Act 72-2015 have experienced various amendments since their original enactment, the Commonwealth SUT remains at 10.5%, a portion of which is allocated to COFINA in accordance with a statutory formula, as adjusted under the COFINA Plan of Adjustment, with the balance being allocated to the Commonwealth's General Fund.  With the 1.0% allocated to the Municipal SUT, the total Sales and Use Tax rate in Puerto Rico is 11.5%, one of the highest rates in the United States.  Separate from the general SUT, there is also a special 4% SUT that is generally applicable to business-to-business services and designated professional services with annual volume of business above $200,000.

Act 257-2018 amended both the rate and items subject to the Commonwealth SUT.  Act 257-2018 broadened the SUT base by expanding the taxability of certain categories, including discount shopping clubs and certain types of candies.  Act 257-2018 also reduced other portions of the taxable SUT base and rate.  Starting October 1, 2019, Act 257-2018 reduced the SUT on prepared foods sold by restaurants to 7.0%, subject to the restaurant obtaining a certification from the Secretary of Treasury.  Act 257-2018 also exempted certain previously taxable items from the SUT, including e-books and digital books, female sanitary items, and certain legal services.  Finally, Act 257-2018 increased the threshold for the SUT exclusion for business to business and

82

designated professional services based on annual volume of business from $50,000 to $200,000 after March 1, 2019.

The use of medical cannabis has been permitted in Puerto Rico since 2015 through Executive Order No. OE-2015-35 and implemented by the Regulations of the Puerto Rico Department of Health No. 8766, as amended. However, on July 9, 2017, the Governor of Puerto Rico signed into law Act 42-2017, the "Act to Manage the Study, Development and Research of Cannabis for Innovation, Applicable Norms and Limitations," which legalizes and regulates the use of cannabis in Puerto Rico for medical purposes but keeps recreational use prohibited. With this legislation, the new administration created a robust legal framework to protect the patients, and to address the regulation, control, and oversight of the medical cannabis industry. The sale of medical cannabis is subject to the 11.5% SUT. Doctors also pay $1,500 every three years for a permit to issue prescriptions to patients.

Due to the state of emergency caused by the recent seismic activity experienced throughout Puerto Rico, on January 9, 2020, the Secretary of the Department of Treasury announced the temporary elimination of the collection and payment of the SUT until 11:59 p.m. (AST) on January 31, 2020. This was done through Administrative Order 20-01, which informed merchants that individuals are exempt from paying SUT on taxable items considered as prepared foods, including carbonated beverages and baked goods and pastries as defined by the Internal Revenue Code of Puerto Rico. The SUT exemption does not apply to the sales of alcoholic beverages. This waiver was extended for an additional 30 days until February 28, 2020 for the municipalities under the major disaster declaration.

For fiscal year 2019, the Commonwealth received approximately $2.4 billion in General Fund and special revenue fund revenue from the SUT. Pursuant to its plan of adjustment, COFINA received $420 million in SUT revenue.

### c)   Excise, Other Taxes, and Other Monies and Revenues

***Act 154 Special Tax***. In 2010, the Commonwealth enacted Act 154-2010 ("Act 154") to address the Commonwealth's fiscal crisis at the time by increasing tax revenues derived and collected from the activities of foreign corporations and partnerships operating in Puerto Rico. In particular, Act 154 modified the income taxation of certain non-resident alien individuals, foreign corporations and foreign partnerships by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation and imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. This excise tax, which is imposed in lieu of an income tax based on the modified source income rule, affects mostly foreign corporations and partnerships that are principally engaged in the manufacturing of pharmaceuticals and other high-tech products. The special temporary excise tax imposed by Act 154 has become one of the Commonwealth's principal sources of tax revenues. In fiscal year 2019, ten companies accounted for more than 90% of the special temporary excise tax revenues.

Although the Act 154 excise tax was originally scheduled to apply for a limited period of time and to decline over time, the continuing of the fiscal crisis resulted in Act 154 being amended

in 2013. Under Act 2-2013, the declining rate, at 2.75% at the time, was reset back to 4.0% and the term was extended through 2017. In 2017, under Act 3-2017, the tax was further amended to extend the fixed 4% rate until December 31, 2027.

Upon the scheduled expiration of the Act 154 excise tax on December 31, 2027, Act 154 provides that such tax shall be replaced by the modified source of income rule. It is not clear the level of tax collection under the modified source of income rule would be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154.

In September 2019, U.S. Treasury Secretary Steve Mnuchin asked Governor Wanda Vázquez to present a transition plan to eliminate the temporary credit that has allowed foreign companies to fully deduct the 4% tax imposed by Act 154. Following the meeting, Puerto Rico's government announced a working group consisting of government and private sector individuals would be formed to identify potential alternatives to the tax. There is no assurance these efforts will be successful at developing or enacting a reform process that replaces revenues from Act 154 on a timely or substantive basis.

For fiscal year 2019, the Commonwealth collected approximately $2.1 billion in General Fund revenue from Act 154. There were no special revenue fund collections from Act 154 revenues in fiscal year 2019.

***Beer and Alcoholic Beverages Excise Tax***. Distillers, rectifiers, producers, manufacturers, and importers are generally taxed on distilled spirits, wines with 24% or less alcohol content by volume, imported champagne and sparkling or carbonated wines or imitations thereof, and beer, ale, porter, malt extract, and other similar fermented or unfermented products. If wines, champagne, and sparkling carbonated wines or imitations thereof have more than 24% alcohol content by volume, they are considered distilled spirits. The tax is imposed on a per-wine gallon or a per-proof gallon.

Since 1978 (Act 37-1978), the tax rate assessed on beer production has varied depending on whether the beer was brewed locally or imported. The recently enacted Act 86-2019 reduced excise tax rates for small beer producers. Persons producing fewer than 1.86 million gallons but greater than 400,000 gallons will be taxed at $1.50 per gallon and those producing fewer than 400,000 gallons will be taxed at $0.95 per gallon. Act 86-2019 maintained the existing 5-tier graduated scale for persons producing greater than 1.86 million gallons of beer in a year. The lowest tax in this tier is $2.55 per gallon for companies that produce between 1.86 million and 9 million gallons. The highest tax is $4.35 per gallon for companies that produce more than 31 million gallons, or for imported beers. Act 108-2004 additionally modified the way the tax was assessed, and, thereby the amount paid by companies subject to the tax. Imported beer producers pay the highest tax per gallon on the scale, regardless of their production level. Similarly, the excise tax on distilled spirits obtained from fermentation and distillation of any product other than those derived from sugarcane pay a $31.29 per measured gallon tax.

For fiscal year 2019, the Commonwealth collected approximately $275 million in General Fund revenue from such excise tax.

***Tobacco Products Excise Tax***.  The excise tax applicable to cigarettes, which has been increased multiple times in the past decade, is currently $25.50 per hundred cigarettes. The tax code also imposes a tax on cigars, rolling tobacco, chewing tobacco, powdered tobacco ("snuff"), electronic cigarettes, vaporizers, and other products derived from tobacco.

A portion of the proceeds of the cigarette excise tax has historically been conditionally appropriated for the payment of HTA and MBA debt obligations.  These tax collections were deposited in the TSA or other Commonwealth accounts.

Another portion of the proceeds of the cigarette excise tax has been appropriated for the following entities (i) the Puerto Rico School of Plastic Arts, (ii) the Puerto Rico Conservatory of Music Corporation, (iii) the Musical Arts Corporation, and (iv) the repository of archives and relics of former governors, to cover their operational expenses.  Such amounts are recorded in a Special Revenue Fund.

Since fiscal year 2016, a portion of the proceeds of the cigarette excise tax has been appropriated for the Integrated Transit Authority ("PRITA") to cover its operational expenses. Such portion is recorded in a Special Revenue Fund.

For fiscal year 2019, the Commonwealth collected approximately $188 million from the tobacco products excise tax; $101 million in General Fund and $87 million in special revenue fund collections.

***Motor Vehicles Excise Tax***.  The excise tax applicable to automobiles ranges from $637.50 to $9,253 plus 34% of the taxable price in Puerto Rico in excess of $44,890.  Motorcycles and all-terrain vehicles are also subject to an excise tax of 8% and 11.5%, respectively.  Other vehicles are subject to different excise tax rates on their taxable price in Puerto Rico (*e.g.*, truck tractors (17%), buses (20%), trucks (10%) and trailers of manual coupling or of light equipment (6.6%)).

A portion of the proceeds of the motor vehicle excise tax (initially $20 million annually but increasing to $40 million by 2020) has been appropriated for the Green Energy Fund to provide subsidies to Puerto Rico residents to cover the cost of purchasing energy-efficient materials and equipment.

For fiscal years 2019, the Commonwealth collected approximately $519 million in General Fund revenue from the motor vehicles excise tax.

***Custom Duties and Offshore Rum Excise Tax***.  Intergovernmental revenues include remittances from the federal government of federal excise taxes on shipments of rum, beer, and wine imported from Puerto Rico and foreign jurisdictions to the United States mainland, in accordance with section 7652 of the Internal Revenue Code and the Caribbean Basin Economic Recovery Act of 1983 (P.L. 98-67).

The excise taxes on shipments of certain rum, beer, and wine is imposed and collected by the United States Alcohol and Tobacco Tax and Trade Bureau and covered over to the Commonwealth.  The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently at $13.50 per proof gallon.  Of this amount, the lesser of $10.50 per proof

85

gallon and the actual excise tax imposed is currently covered over to the Commonwealth.  Since 1999, the United States Congress has also enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon.  The law does not impose any restrictions on how Puerto Rico can use the transferred revenues.

Puerto Rico distributes revenues from the remittances of excise tax on shipments of rum among various governmental entities and private rum producers.  In addition to sending funds to the General Fund, revenues from the excise tax are appropriated to, and distributed among (i) the Puerto Rico Conservation Trust Fund (the "Conservation Trust"), a Puerto Rico charitable trust charged with protecting Puerto Rico's natural resources, which receives each fiscal year an amount equal to approximately 45 cents per proof gallon of rum of the tax extender amount, (ii) the Puerto Rico Science, Research and Technology Trust Fund (the "Science Trust"), a government-sponsored trust created by Act 214-2004 to set and implement the public policy of the Commonwealth for technological and scientific research and development, which receives $5 million in excise tax revenues each fiscal year, and (iii) PRIDCO, for the benefit of the "Rums of Puerto Rico" incentive program, which receives up to $10 million each fiscal year.

Finally, up to 46% of the revenues from the excise tax corresponding to the rum sales of certain rum producers is transferred to such rum producers pursuant to certain incentive agreements signed with the Commonwealth.  This incentive program was created in direct response to the fact that in 2008, the Government of the U.S. Virgin Islands signed an agreement with Diageo USVI, Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, U.S. Virgin Islands, that would manufacture Captain Morgan branded products, which prior to 2012 were procured through a supply contract with the Serrallés distillery in Puerto Rico. As a result of the termination of the contract between Serrallés and Diageo, after 2011 the income received by the Commonwealth from the federal excise tax on rum shipments has materially decreased as Serrallés has not acquired other bulk rum clients sufficient to make up the entirety of the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to support the local rum industry as a result of the threat posed by the U.S. Virgin Islands' agreement with Diageo, and to protect the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, Act No. 178-2010 increased from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to, and promote, the Puerto Rican rum industry. The law also authorized the Governor to increase this percentage up to 46% through Executive Order.  Such Executive Order was issued, and the percentage limit was increased to 46% effective July 1, 2012. As contemplated by Act 178-2010 (now incorporated into Act No. 1-2011), the Commonwealth has entered into definitive agreements with the three main Puerto Rico rum producers. These agreements provide rum producers with 46% of the monies from the excise tax corresponding to the rum sales of each such rum producer.  Since May 2015, the federal government has deposited money received from federal rum excise taxes into a lockbox account of the Secretary of the Treasury at a private commercial bank.  The commercial bank and the Commonwealth have agreed to distribution instructions for moneys to be transferred from the lockbox to the Central Government, rum producers, and other transferees.   Prior to this arrangement, federal rum excise taxes were deposited in the TSA and the Treasury forwarded to PRIDCO the amounts necessary to pay the incentives due to the rum producers.

For fiscal year 2019, General Fund revenues from the federal excise tax on rum shipments were approximately $230 million. Other participants in the cover-over revenue stream received approximately $197 million in fiscal year 2019.

***Slot Machines*.** Slot machines are taxed in accordance with Act 221-1948, the Games of Chance Act. The Act requires the Commonwealth distribute slot revenue to various sources including the General Fund, the PRTC, and the University of Puerto Rico. Under the Games of Chance Act, slot machine revenue is split between operators and the government in varying proportions depending on the total revenue collected.

In fiscal year 2019, the General Fund and Special Revenue Funds received approximately $24 million and $297 million in revenue from slot machines. Additional funds were also distributed to the PRTC and the University of Puerto Rico.

***Games of Chance Machines Tax*.** Act 257-2018 included provisions for the licensing and operations of Games of Chance machines, flow of funds to the government, and the regulatory environment, among other guidance. Initially, the law legalizes 25,000 machines over two years. An additional 10,000 machines per year (20,000 total) are authorized in years 3 and 4 if the PRTC's Games of Chance Division concludes, based on a study, that the market for Games of Chance Machines is not saturated.

There is a $1,500 annual license fee per machine payable by wholesale owners. The fee is payable to the Department of Treasury, of which $300 shall be transferred to the PRTC for administrative services. There is also a $3,000 biennial license fee payable to the Department of Treasury by distributors, goods and services providers, and manufacturers. Machines must offer players at least an 83% payback on play activity. The remaining 17% revenue is split between the operator of the machine (67%) and the government (33%).

From the portion of revenue that is sent to the government, the revenue is split in various amounts between the General Fund (the first $40 million, if the license fees under the 2011 Code does not meet that threshold), municipalities for their ASES contribution (45%), and police retirement costs (50%). A small portion (5%) of the government's share also goes to the PRTC for maintenance and operations.

Because regulations for this provision of the law have not yet been approved, no revenue has been collected from this revenue stream.

***Sports Betting and eGaming*.** Puerto Rico recently enacted Act 81-2019, which legalizes onsite and online betting on professional and college sports events, as well as videogame and fantasy sports leagues. Act 81-2019 establishes that sports betting will be allowed in casinos, at horse-racing tracks and off-track betting parlors, at cockfighting arenas and over the internet. Additionally, "betting centers or districts" could be established in "strategic places" including tourism zones, historic zones or any other place that complies with the proposed law and regulations imposed by a newly established Gaming Commission that will regulate betting on sports, horse racing, electronic games and slot machines.

87

Under Act 81-2019, government revenue would be generated from operating license fees and taxes on bets and winnings.  In addition to licensing fee collections, the tax rate on bets will be 6% for bets made in person and 11.5% for bets made online. 50% of the revenue, after covering the cost of the newly established Gaming Commission, would be earmarked for public pensions with the remaining revenue being allocated to a range of other areas including youth sports, educational initiatives, law enforcement equipment, municipalities, and to treat gambling addiction.

Because regulations have not yet been approved, no revenue has been collected from this revenue stream.

***Traditional and Electronic Lottery.***  Puerto Rico oversees two types of lottery systems, a traditional and electronic lottery.  The Puerto Rico Lottery is the oldest modern lottery in the United States.  The system began in 1934 and is currently operated by the Puerto Rico Treasury Department.  The General Fund will recognize revenue from unclaimed lottery prizes that by law are recorded in the General Fund on a budgetary basis after the term for claiming lottery prizes has expired (180 days).  The recording of revenue in the General Fund however does not represent a cash transfer or deposit in to the TSA.  By law, 35% of annual net revenue from the electronic lottery is funded into the CRIM equalization fund with the purpose of supporting smaller municipalities.

In fiscal year 2019, the General Fund and Special Revenue Funds recognized or received approximately $170 million in revenue from the traditional and electronic lotteries.

***Excise Tax on Petroleum Products and its Derivatives ("*crudita*").***  The gross excise tax on petroleum products and its derivatives is $15.50 per barrel ($6.25 of which does not apply to diesel products).  $9.25 of such tax was historically conditionally appropriated for HTA and $6.25 to PRIFA.  This tax is subject to adjustment based on consumption and inflation every four years.

These tax collections were deposited in the TSA or other Commonwealth accounts.

***Gasoline, Gas Oil and Diesel Oil Excise Tax.***  The gasoline excise tax is currently set at $0.16 per gallon, and the tax on gas oil and diesel oil, is currently $0.04 per gallon.

These revenues were deposited in the TSA or other Commonwealth accounts.

***Aviation Fuel Tax.***  Act 82-1959, as amended, empowers the Puerto Rico Ports Authority to levy and collect a fee from importers of aviation fuel.  This fee is currently three cents per gallon of aviation fuel supplied to airlines and other suppliers.

***Hotel Occupancy Tax.***  Article 24 of Act 272-2003, as amended, imposes a hotel occupancy tax, collected directly by the PRTC, on all hotels and motel accommodations on the Commonwealth.  The fiscal year 2019 special revenue fund revenue recognized was $72.9 million.

Additionally, in accordance with Act 46-2017, the government started collecting the 7% room occupancy tax from short-term rental property operators.  The law amended the definition of "innkeeper/host" for the different business models that have entered the market and serve as

88

intermediaries between the hotels and guests. Entities like Airbnb, HomeAway and other digital platforms will collect "room tax" as mandated by the law.  Before the enactment of Act 46-2017, on June 22, 2017, the Governor and officials of Airbnb signed a voluntary agreement to directly collect and remit the tax.

*Horse Races, Insurance Premiums and Other Excise Tax Revenues.*  For fiscal years 2019, the Commonwealth collected approximately $156 million in General Fund revenue from horse races, insurance premiums and other excise taxes.  This includes revenues from horse racing, insurance premiums, and excise taxes on sugar, coffee, cement, and others.  The excise tax applicable to sugar and coffee is appropriated for the Integral Fund for the Development of Agriculture ("FIDA") administered by the Puerto Rico Land Authority.

*Interest Income.*  The government of Puerto Rico recently established a program to maximize interest generated through the monthly redistribution of TSA unreserved balances. According to Puerto Rico's Treasury Secretary, the redistribution of government-held bank accounts started in October 2019 and is projected to generate $124 million in interest income for the Commonwealth during fiscal year 2020.  The figure represents a 39 percent increase compared with interest accrued in fiscal 2019.

### 5.    Charges for Services

The Commonwealth charges fees and penalties for services rendered. The most important of these charges for services are described below.

*Public Health / Patient Fees*.  The Department of Health operates three hospitals in Puerto Rico located in San Juan and Bayamon, Puerto Rico.  The Department of Health is authorized to bill for medical services rendered in these medical facilities.  While the revenues earned are used exclusively for the operation of the medical facilities, appropriations from the General Fund are nevertheless still required to cover a significant amount of operating expenses.  All the revenues earned from these fees are recorded in a Special Revenue Fund.

*Judicial Service Fees*.  The Judicial Branch of the Commonwealth is authorized by law to charge fees related to the Puerto Rico court system.  Such revenues are to be used exclusively by the Judicial Branch of the Government.

*Document Rights Fees*.  Commonwealth agencies are authorized by law to charge a fee for certified documents or other official government documents, such as birth certificates and death certificates.

*Motor Vehicle Fines*.  Motor vehicle fines are assessed for a range of standing and moving violations.  Law 134-2019 was enacted to establish payment plans and incentives for debts on various fines and driver's licenses.  In fiscal year 2019 Special Revenue Funds received $79 million in revenue from motor vehicle fines.

*Motor Vehicles Permits Fees*.  The Vehicle and Traffic Law requires that the motor vehicles registration fees collected be used only for the operation of the centers for driving services (known as "CESCOS" for their acronym in Spanish), which are administered by the Department

89

of Transportation and Public Works.  Revenues from motor vehicle license fees are recorded in a Special Revenue Fund.

*Other*.   Other charges include charges provided by agencies, professional license fees, trademark fees, rental fees, public housing fees and other permit, fine and registration fees.  A significant portion of these license fees are recorded in Special Revenue Funds.  In fiscal year 2019, all other revenue sources of the Commonwealth represented $330 million in General Fund and $493 million in special revenue fund collections.

6.     **Property Taxes**

Property tax in Puerto Rico is charged on both real property and personal property, including inventory, to companies and individuals, mostly for the benefit of municipalities.

Real property taxes are assessed based on fiscal year 1957-1958 property values. No real property reassessment has been made since fiscal year 1957-1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in fiscal year 1957-1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed 1958 valuation (more than $215,000 in current dollars) in owner-occupied residences is available.  Personal property taxes, which account for approximately 46% of total collections of taxable property, are self-assessed.

The total property tax rate varies by municipality, with the ranges listed below for the fiscal year 2019-2020:

| Category | Real Property | Personal Property |
|---|---|---|
| Basic Fixed Property Tax Rate | 5.72% - 6.00% | 3.72% - 4.00% |
| Add'l. Special Property – State | 1.03% | 1.03% |
| Add'l. Special Property – Muni | Varies – 1.20% to 5.50% | Varies – 1.00% to 5.50% |
| Discount from State | (0.20%) | (0.20%) |
| **Total (Varies by Municipality)** | **7.75% to 12.33%** | **5.55% to 10.33%** |

Property taxes are assessed, determined and collected for the benefit of the municipalities by CRIM. 1.03% of the property tax based on the assessed value of all property (other than exempted property) is deposited in the Commonwealth's Debt Service Redemption Fund (which is not part of the General Fund).

7.     **Federal Funds**

*Federal Grants and Subsidies*.  The Commonwealth is the beneficiary of numerous federal programs, which provide funding for services provided by the Government. This includes federal funds for Puerto Rico's Medicaid program and Title I funds from the Federal Elementary and Secondary Education Act for Puerto Rico's Department of Education.  The Commonwealth also

receives more than $2 billion annually in federal funds to fund its Nutritional Assistance Program ("NAP"), which provides a monthly benefit for food to low-income households.

**Federal agencies transferring funds to Puerto Rico in fiscal year 2020**



The Commonwealth certified budget includes $8.7 billion of federal funds for fiscal year 2020, of which $7.6 billion pertains to the Commonwealth, and instrumentalities and public corporations included in the Commonwealth fiscal plan. There are also federal transfers in the form of direct payments made to individuals, such as social security retirement and disability insurance, Medicare supplementary medical and hospital insurance, or veteran benefits. Some disaster funding flows directly through the Central Office of Recovery, Reconstruction and Resilience ("COR3") and is not reflected in the federal funds' budgets.

The largest recipient of federal funds is the Administration for Socioeconomic Development of the Family, which manages NAP. In fiscal year 2020, the agency will receive approximately $2 billion in federal funding for NAP. Benefits are loaded directly onto Electronic Benefit Cards, which can be used at eligible food retailers.

The Puerto Rico Health Insurance Administration ("ASES") is expected to receive $1.7 billion in fiscal year 2020 of federal funding from the Department of Health and Human Services for Medicaid. ASES is responsible for making monthly payments to the local insurance carriers. It then needs to seek reimbursement of these expenses from the federal government. The Department of Health submits these claims to the federal government on behalf of ASES.

The Puerto Rico Department of Education ("PRDE") was expected to receive approximately $1.5 billion of federal funds in fiscal year 2020. By federal law, all basic educational services must be paid for using state funds while federal funds are used to provide non-basic services such as special education programs, school lunch programs for low-income students and Title I funding for low-income students. When drawing down federal funds for most grant programs, the PRDE must provide the required invoices and other documentation to the U.S. Department of Education ("USDE"). Once the drawdown request is approved the funds are transferred to the Department of Treasury where the PRDE must complete disbursements within

3 business days.  In June 2019, USDE ordered the Commonwealth to hire a fiduciary agent to perform the financial management of the federal funds sent to PRDE and ensure compliance with USDE grant requirements.  On October 7, 2019, PRDE issued a Request for Proposals for Third-Party Fiduciary Agent Services.  Its aim is to elicit proposals from qualified business organizations with proven experience providing independent fiscal management and oversight services in the public sector, to act as third-party fiduciary agent to perform financial management duties for USDE grant funds awarded to PRDE, in accordance with applicable federal requirements.  While the RFP has been issued to select the fiduciary agent, no announcement about the selected vendor has been made yet.

The Puerto Rico Department of Health ("PRDOH") is expected to receive approximately $560 million of federal funding in fiscal year 2020 from various federal agencies including: Department of Agriculture, Department of Health and Human Services, Environmental Protection Agency, and the Department of Education, among others.  Approximately $250 million of the amount received is related to the Special Supplemental Nutrition Program for Women, Infants, and Children (known as the WIC Program) which provides funds for supplemental foods, health care and nutritional education for low income women and children who are found to be at nutritional risk. Other programs include: bioterrorism preparedness, HIV care grants, maternal and child care grants and others.

***Medicaid Funding.***  As part of the recently enacted appropriations bill, the *Further Consolidated Appropriations Act of 2020* (Pub. Law 116-94), Congress authorized Medicaid reimbursement of approximately $2.6 billion and $2.7 billion, respectively, for the federal fiscal years 2020 and 2021.  While the Commonwealth has access to these funds, it may not ultimately generate reimbursable spending to completely utilize this availability.  In addition to the reimbursement funds, the new federal legislation increased Federal Medical Assistance Percentages ("FMAP") coverage to 76%, eliminated the Health Insurance Tax ("HIT"), and provided for additional funding of up to $200 million a year if the Medicaid plan covers doctors at least 70% of the Medicare schedule rate is certified and allows payments to health insurers to be audited.

The legislation also includes requirements to improve transparency and fiscal responsibility in Puerto Rico Medicaid administration:

i)      not later than six months after the date of enactment of the law, the agency responsible for the administration of the Puerto Rico Medicaid program will designate an official to act as the Program Integrity Lead of the program;

ii)     not later than 18 months after the date of promulgation, Puerto Rico is required to publish a plan on how it will develop measures to meet the payment error rate measurement ("PERM") requirements, including annual benchmarks and audits scheduled for compliance; and

iii)    a plan must be prepared to meet the Medicaid eligibility quality control ("MEQC") requirements.

92

Under this legislation, if the established fraud control measures are not complied with, there will be a maximum penalty of 2.5% reduction in the FMAP.

***Federal Disaster Aid.***  Puerto Rico was decimated by Hurricanes Irma and Maria in 2017. As a consequence, the Commonwealth anticipates receiving significant federal aid pursuant to various disaster aid statutes that assist with the rebuilding and reconstruction of damaged infrastructure.  Much of this funding is managed by COR3.  Public Assistance,[120] where FEMA reimburses the Commonwealth for eligible expenses related to hurricanes Irma and Maria, totals $6 billion in obligations so far.

In addition to the aid above, the Governor requested, and the President approved, a major disaster declaration following ongoing seismic activities that struck the Commonwealth starting in December 2019.  The incident period began on December 28, 2019 and a Major Disaster Declaration was declared on January 16, 2020.  The ongoing earthquakes have caused significant physical damage to residential and commercial structures on the southern part of the island, particularly to many schools which remain closed.  As of February 6, 2020, the President authorized Category A and B Public Assistance Emergency Work for six municipalities at a 75% reimbursement rate and Individual Assistance for 25 municipalities.  The general expectation is that, at some point, the President will declare eligibility of funds for categories C through G, meaning qualifying municipalities will be able to use funds for permanent work projects, not just emergency work.  The government has also requested additional municipalities to be included in the major disaster declaration, so ultimately it is possible the number of municipalities with access to Individual Assistance and/or Public Assistance will increase.

The Puerto Rico Department of Housing also recently launched its housing reconstruction program with the first $1.5 billion in Community Development Block Grant Disaster Recovery, ("CDBG-DR"), funding for Puerto Rico.  More than $20 billion has been assigned by the U.S. Department of Housing and Urban Development to address disaster-related unmet housing, infrastructure, mitigation and economic revitalization needs.

The United States Department of Housing and Urban Development ("HUD") recently announced the release of a draft Federal Register Notice for another $8.285 billion in CDBG-MIT funding.  HUD's Notice conditions the use of such CDBG funds to an action plan that is consistent with the applicable certified fiscal plans and budgets and requires the development of a uniform parcel ownership registry.  In addition, HUD recently appointed Robert Couch as a Federal Financial Monitor to oversee the disbursement of all HUD disaster recovery funds.

***Delays in Federal Funds.***  Several governmental entities in Puerto Rico are classified as high-risk grantees, imposing additional compliance and controls before federal funds are released. The intent of these additional conditions is to ensure effective implementation of federal programs through appropriate fiscal management and responsibility.  This also, however, has the potential

---

[120] The Public Assistance program reimburses local governments and certain private non-profit organizations for removing disaster-generated debris, the cost of preparing for and responding to the disaster and repairing or replacing eligible infrastructure including roads, bridges, buildings and utilities.  The Public Assistance program is funded by FEMA and administered by the Government of Puerto Rico. FEMA obligates funding for these projects directly to Puerto Rico.

to delay implementation of projects funded by federal dollars. The lack of substantial reform process at the local Department of Education, for instance, recently led federal officials to withhold disbursement of federal dollars to the department until substantial reforms are implemented and an independent fiduciary agent acceptable to USDE is selected. To better coordinate federal efforts, the Trump administration also recently appointed Coast Guard Rear Admiral Peter J. Brown to serve as a White House liaison responsible for better facilitating the federal response to Puerto Rico's disaster recovery.

### 8.   Ability to Raise Taxes Further in Puerto Rico

The capacity of a public entity to raise tax revenue is typically measured by the levels and rates of change in economic activity and the income of its citizens and businesses. The amount of tax paid by individuals and companies relative to total income ("tax burden") is one approximation of capacity to raise additional revenue through taxation. The composition of taxes is also relevant. For example, certain types of activity may be highly sensitive to taxation or incremental costs generally. Imposing or increasing taxes on such activity could significantly curb it or create additional uncertainties, which would undermine both potential tax revenue and economic growth.

Factors that may curb investment or introduce uncertainty include: (i) the availability of substitutable options that are taxed at lower rates than the tax base for which that rate is increasing; (ii) price elasticities between different forms of consumption or uses of resources; (iii) the magnitude of the increase; and (iv) the breadth of commodity coverage and geographic territory of the tax and the mobility of the taxpayer (i.e. where there are neighboring jurisdiction with a lower tax rate).

Consequently, in evaluating Puerto Rico's capacity to raise additional revenue through taxation, one must be mindful of its available base, in the aggregate and in specific categories of activity. On an aggregate basis, economic output and income can be approximated by gross domestic product ("GDP") and gross national product ("GNP"). GDP measures expenditures and income earned by residents and nonresidents within Puerto Rico, while GNP includes income earned by residents from local and foreign sources.

The difference between these two measures of economic activity and income is acute in Puerto Rico. According to preliminary estimates, in fiscal year 2018 nominal GNP was about 67% of nominal GDP. This arises from U.S. mainland corporations accounting for a substantial share of production taking place in Puerto Rico through activities of their subsidiaries, particularly in the manufacturing sector. The Commonwealth, however, other than through the Act 154 excise tax, imposes low taxes on these manufacturing activities because it grants tax exemption decrees to many of these companies to incentivize their establishment in Puerto Rico.

**Historical Relationship between**
**Gross National Product (GNP) and Gross Domestic Product (GDP)**
($ millions)

| Year | GNP | GDP | GNP as % GDP |
|------|-----|-----|--------------|
| 1970 | $4,688 | $5,035 | 93.1% |
| 1980 | $11,065 | $14,436 | 76.6% |
| 1990 | $21,619 | $30,604 | 70.6% |

| 2000 | $41,419 | $61,702 | 67.1% |
| 2010 | $64,295 | $98,381 | 65.4% |
| 2018 | $68,049 | $101,131 | 67.3% |

Source:  World Bank, St. Louis Federal Reserve (FRED).

As a result, using GDP to calculate the current tax burden in Puerto Rico may overstate the capacity of the Commonwealth to raise additional revenue through taxation.  Also, comparisons with international jurisdictions that evaluate the tax burden in Puerto Rico based on GDP may be misleading or require adjustments because Puerto Rico demonstrates behaviors more akin to a regional economy rather than a sovereign one, with the free flow of capital, people, and goods between Puerto Rico and the mainland U.S.

At the same time, although to a lesser extent, GNP may also overstate the available tax base.  Residents of Puerto Rico benefit from large transfers from the federal government. According to the Puerto Rico Planning Board, in fiscal year 2019, federal transfer payments accounted for 23% of personal income.  Under current federal law, some of these transfer payments earmarked for social welfare programs may not be taxed by the Commonwealth.

One should also account for differences in behavioral responses among specific categories that are taxable.  The impact of changes in the rates of taxation on consumption and employment from taxes on goods and services, on the one hand, and income, on the other hand, could vary materially, with respect to both incremental tax receipts and broad economic activity.

Puerto Rico has also already increased its tax burden significantly on various portions of the economy over the past decade, as the government enacted new taxes and fees on Commonwealth residents and businesses.  There have been at least eleven significant revisions to Puerto Rico's tax code since 1994, including six adjustments since 2013.[121]  This increased the tax burden on the local economy, particularly taxes on consumption and on exports.  As examples, recent adjustments in taxes and fees include:

**Tax Base –** Act 257-2018 increased the withholding tax and taxes on self-employed individuals and service-based corporations.   The law also eliminated many AMT deductions under certain circumstances, further raising taxes on some people and businesses.  This followed several other tax base broadening adjustments enacted by the government over the past decade.

**SUT & VAT –** Act 72-2015 increased the Sales and Use Tax from 7.0% to 11.5%, enacted a 4.0% tax on business-to-business services, and introduced a Value Added Tax regime (which would have substituted the SUT regime but was repealed pursuant to Act 54-2016).  Recent laws also expanded taxable items, including the collection of sales taxes on internet transactions pursuant to Act 25-2017, business telephone services and various purchases by credit unions, universities.

---

[121] Including Act 40-2013, the "Tax Burden Redistribution and Adjustment Act", Act 120-2014, the "Small and Medium Business Job Generation and Retention Act", Act 72-2015, the "Adjustments to the Internal Revenue Code of 2011", Administrative Orders 2017-01 and 2017-05, and Act 257-2018, the "2018 Puerto Rico Tax Reform Act."

**Act 154 –** In 2013, the Act 154 excise tax was amended under Act 2-2013 to increase the declining rate, at 2.75% at that time, back to 4.0% and extending the term through 2017.  It was originally set to be transitioned to a modified source income rule in 2016.   Act 3-2017 further extended the 4.0% rate on the excise tax through 2027.

**Excise and Other Taxes –** Act 46-2017 implemented a new tax on short-term rentals, such as HomeAway and Airbnb, while Act 25-2017 improved the SUT collection on online purchases of taxable products in Puerto Rico, and Act 26-2017 increased the tax on cigarettes.  Act 42-2017 created the legal framework and ability to tax medical cannabis.  More recently, Act 257-2018 legalized and proposed taxing certain games of chance machines and Act 81-2019 implemented taxation on eGaming and sports betting.

**Fees –** Act 24-2017 significantly increased traffic fines and fees for drivers' licenses and vehicle registrations, while other laws introduced a 1.5% contractor fee, added fees on money transactions, and increased vendor license fees for ATMs and video games machines, among others.

**Gross Tax –** Act 40-2013 implemented a new tax on gross sales commonly known as the 'Patente Nacional'.   Although the tax was subsequently repealed, its implementation significantly impacted low-margin businesses, such as supermarkets.

**Water –** Utility rates on water increased by more than 60% since July 2013.

**Petroleum "Crudita" Tax –** The gross excise tax on petroleum products and its derivatives is currently $15.50 per barrel ($6.25 of which does not apply to diesel products).  Act 31-2013 increased the wholesale tax on petroleum products from a range between $3.00 to $6.00 per barrel based on the price index per barrel ($3.00 was the tax rate applicable at the time) to a fixed $9.25 per barrel.  In January of 2015, Act 1-2015 further increased taxes on petroleum products (other than diesel) by creating a new $6.25 per barrel excise tax.

As shown below, while these tax increases have led to increases in overall collections they also led to a shift in the source of revenue.  The May 2019 Fiscal Plan also calls for further tax and fee increases over time.  These changes have made revenue estimates increasingly challenging to forecast and introduced structural complexity, instability, and internal inconsistency to the revenue structure.

Given this reality, while certain tax revenues may increase with an increase in tax rates, the amount of the revenue increase is unlikely to be perfectly correlated to the rate increase itself.  An increase in tax revenues is also not guaranteed because in certain circumstances a tax increase could push consumer behavior to pursue non-taxed alternatives that are sufficiently substitutable, potentially reducing tax revenues.  Furthermore, increasing taxes beyond a certain point may be counterproductive against efforts to stem the exodus of highly educated professionals and business that are needed to achieve the fiscal plan.

**Puerto Rico General Fund Tax Revenue Sources**
($ in billions)

| Tax | 2009 | 2009 Share of GF Revenue | 2019 | 2019 Share of GF Revenue |
|---|---|---|---|---|
| Individual Income Tax | $2.7 | 34% | $2.2 | 20% |
| Corporate Income Tax | $1.4 | 18% | $2.5 | 22% |
| Sales and Use Tax | $0.8 | 10% | $2.3 | 20% |
| Excise Taxes (inc. Act 154) | $0.7 | 9% | $3.0 | 26% |
| Rum Tax Remittances | $0.4 | 5% | $0.2 | 2% |
| Other Taxes | $1.8 | 23% | $1.2 | 10% |
| **Total GF Net Revenue** | **$7.7** | **100%** | **$11.4** | **100%** |

## D.    The Debtors' Cash Management Systems[122]

### 1.    The Commonwealth Cash Management System

The cash management system of the Commonwealth (the "Central Government Cash Management System") is highly complex.  Act No. 230 of July 23, 1974, as amended, provides that the Secretary of the Treasury is the officer in charge of the custody of all public funds of the Commonwealth. The Commonwealth follows the practice of pooling its cash resources of the General Fund, Federal Funds, and Special Revenue Funds for common treasury management and centralized disbursement.  Cash is pooled into multiple accounts, collectively referred to as the Treasury Single Account ("TSA").

While disaster funds are generally managed outside of the TSA, other federal funds are transferred directly into the TSA.  Most non-federal cash flows (e.g. taxes, fees and other charges) of the Commonwealth are swept to the TSA from a collection of other accounts that receive tax and other revenue collections (each, a "TSA Sweep Account").  The TSA and TSA Sweep Accounts are held at several private financial institutions.[123]

The diagram below illustrates the major cash flows relating to the TSA and the TSA Sweep Accounts:

---

[122] The Oversight Board's analysis of the Debtors' cash management systems is ongoing and the descriptions herein are subject to revision in all respects.

[123] Discussions of cash in III.E. refer to the combined balances of the TSA accounts.



Receipts for the TSA include tax collections, charges for services, intergovernmental collections (such as reimbursements from federal assistance grants), reimbursements from public corporations and municipalities for pension benefits paid and other receipts. Collections into the TSA are substantially comprised of both General Fund revenue and Special Revenue Funds revenue.

At the direction of the Department of Treasury, TSA disbursements include, directly or indirectly, many Central Government agencies payroll and related costs, vendor disbursements, appropriations, capital outlays, payments authorized under federal grants, disaster relief cost-sharing expenditures or advance payments, tax refunds, payments of current pension benefits and other disbursements.

These TSA disbursements are primarily for Central Government agencies that do not have independent treasuries. For budgeting purposes, these Central Government agencies receive appropriations from the General Fund or Special Revenue Funds. For instance, the Department of Education and the Police Bureau of the Department of Public Safety maintain budgets that are comprised of General Fund appropriations and Special Revenue Funds.

Certain agencies conduct cash management activities independently of the TSA, including: controlling accounts directly, authorizing or executing disbursements, and monitoring and planning cash flows. Some agencies maintain non-TSA accounts to address cash management needs that cannot be served by the centralized TSA structure. For example:

- the Public Housing Administration ("PHA") receives and disburses affordable housing subsidies in accordance with federal grants using non-TSA accounts,

- the Department of Labor manages employer contributions for Puerto Rico unemployment taxes, most of which are held on deposit at the United States Treasury,

- the Puerto Rico Lottery controls accounts for the receipt of ticket purchases and manages cash flows to meet projections for prize payouts, remitting net income back to the TSA.

a) **Cash Flows of the TSA**

Cash receipts relating to taxes, federal funds, and charges for services are received into TSA Sweep Accounts and automatically or manually swept into the TSA's main operating account. The TSA's main operating account will fund other accounts in the TSA as needed including to replenish fiscally mandated reserves and to invest for income yield. At the direction of the Department of Treasury, the TSA disburses on behalf of many Central Government agencies, for payroll, operating expenses, pension benefits, expenditures related to programs funded by Federal agencies, and various other budgeted appropriations.

AAFAF's report titled *Treasury Single Account FY 2019 Cash Flow* dated as of June 28, 2019, shows cash inflows and outflows of $23.8 billion and $19.7 billion, respectively, into the TSA in fiscal year 2019. The state collections substantially represent tax collections and other non-tax revenues. Other inflows represent PayGo fees paid by municipalities and public corporations and loan payments from public corporations. The federal fund receipts include various transfers including Medicaid reimbursements, NAP, and FEMA advance funding or reimbursements. The TSA disbursed approximately $19.7 billion for various purposes including payroll, non-payroll, and other appropriations. Generally, the TSA made all these expenditures for each of the fund types. In addition, the TSA disbursed pension benefits, tax refunds and NAP expenditures.

The largest tax categories are income taxes (individual and corporate income taxes), SUTs, Act 154 excise tax revenues, and other various types of taxes.

***Income Taxes.*** The Central Government collects income taxes from individuals, corporations, partnerships, and non-resident withholding taxes. Income taxes are generally deposited into the applicable account either from physical collection posts or through online collection portals of the Department of Treasury. Tax collections are also received from general tax accounts associated with the SURI tax collection platform. Collections are swept on a two-day lag. Substantially all income taxes are General Fund collections, able to be disbursed from the TSA following general appropriations for payroll, pension benefits, suppliers and operating expenses, capital outlays, tax refunds, and other appropriations.

***SUT.*** The Commonwealth SUT rate of 10.5% is deposited into an account from either a physical collection post or through online collection portals of the Department of Treasury. Of that percentage, 5.5% is transferred in an amount up to 53.65% of the Pledged Sales Tax Base Amount (as defined in the COFINA Plan of Adjustment) for the applicable fiscal year to

COFINA's indenture trustee account.[124]  The remainder of the Commonwealth SUT is composed of the 4.5% SUT surcharge enacted in 2015, which flows to the General Fund, and 0.5% of the SUT allocated and transferred to the Municipal Administration Fund, which in turn is distributed among three funds: Municipal Development Fund, Municipal Redemption Fund, and the Municipal Improvement Fund.[125]  The collections comprising the 4.5% portion of the SUT are swept on a two-day lag.  The below illustration presents a simplified flow of funds relating to these types of income taxes:



The process for SUT collection and remittance to the TSA has been revised for fiscal year 2020.  The Department of Treasury implemented a new process for fiscal year 2020 for SUT based on the SURI/general tax account system to provide for a real-time reconciliation between types of proceeds deposited into the TSA Sweep Accounts.  Prior to this new process, fines, interest payments, and the 4% B2B SUT were excluded from the waterfall and held back from COFINA's share of the PSTBA.  Until these excluded amounts could be manually reconciled, they remained in the TSA Sweep Account, with such amounts measuring between $50 and $60 million at various

---

[124] In fiscal year 2019, the Pledged Sales Tax Base Amount is $783,197,251 of which approximately $420 million is to be transferred to COFINA.  The Pledged Sales Tax Base Amount increases by 4.0% per annum until it reaches $1.85 billion.  *See Third Amended Plan Supplement and Plan Related Documents of Puerto Rico Sales Tax Financing Corporation*, [ECF No. 578].

[125] These accounts are in the name of Municipal Finance Corporation ("COFIM").

points in time.  The new cash management process allows for these amounts to be swept to the TSA on an accelerated basis.

*Excise Taxes.*  The Commonwealth assesses at least seven different categories of excise taxes, including the Act 154 Special Excise Tax, Beer and Alcoholic Beverages Excise Tax, Tobacco Products Excise Tax, Motor Vehicles Excise Tax, Excise Tax on Petroleum Products and Derivatives, Gasoline, Gas Oil, and Diesel Oil Excise Tax, and Alcohol Excise Tax.

*Motor vehicle license fees, alcoholic beverage license fees, entertainment machine license fees.*  Fees from the motor vehicle, alcohol, and entertainment machine license fees are deposited into the TSA.

*Charges for Services*.  Certain non-tax charges for services rendered and fees incurred are collected into the TSA as General Fund collections.  In the fiscal year ending June 30, 2019, the Commonwealth deposited into the TSA approximately $183.7 million.

*Slot Machine Revenues.*  The PRTC regulates slot machines at multiple casinos and the Hipodromo Camarero.  PRTC transfers 15.15% of slot machine revenues payable to government parties into the General Fund, via the TSA.  Such General Fund collections in the fiscal year June 30, 2019 were $24.1 million.  The remaining balance of slot machine revenues are appropriated as follows:  25.80% to a Special Fund at the Tourism Company, 13.60% to the Puerto Rico Tourist Industry Development Fund, and 45.45% to the General Fund of University of Puerto Rico, with the remaining balance being transmitted to hotel operators.[126]

*Rum Tax Remittances.*  Federal excise taxes on rum and other beer, wine and spirits are collected by the federal government and remitted to the Commonwealth ("Rum Tax Remittances") via a lockbox in the name of the Department of Treasury at a commercial bank.  This commercial bank distributes the proceeds from three different federal excise taxes (Puerto Rico rum, imported rum, and non-rum spirits) to various recipients, including, but not limited to, the Puerto Rico Department of Treasury, the Puerto Rico Conservation Trust (a private entity), PRIDCO, and eligible Puerto Rico rum producers (through the Paying Agent).  Of the total $434 million of Rum Tax Remittances generated during the fiscal year ending June 30, 2019, $242 million was transferred directly into the TSA.[127]

*Federal Grants Subsidies.*  Federal funds and reimbursements are deposited into the TSA and, in turn, disbursed to the agencies benefiting from the grant or being owed reimbursement. The TSA received $9.3 billion in federal funds in fiscal year 2019.  Of that amount, the largest federal transfers were to the NAP ($2.9 billion received and $2.8 billion disbursed to the Department of Family), Medicaid ($2.9 billion received and $2.7 billion disbursed to ASES),

---

[126] Under the Games of Chance Act, slot machine revenue is appropriated between operators and the government in varying proportions depending on the total revenue collected.

[127] The figures presented here are accrual basis.  During the fiscal year ending 2019, the cash collected for the Department of Treasury was $230 million of general fund collections relating to Rum Tax Remittances.

FEMA and other federal program funding or reimbursements ($3.1 billion received and $2.9 billion disbursed, including for payroll and vendor payments).

### b)   Selected Cash Flows Outside the TSA

Several entities or agencies perform treasury functions and disburse money independently of the TSA, typically because of statutory or other stipulated requirements.  The below is an illustrative list of these agencies and not intended to be complete.

***Public Housing Administration.***   The PHA administers federally funded affordable housing grants.  Substantially all the PHA budget is comprised of federal fund grants, which have specified that the grants are not to be commingled with other Commonwealth money.  All grant money is received into PHA accounts and disbursed to participating property managers.

***Electronic & Traditional Lottery.***   The traditional lottery is managed by the Department of Treasury, which collects lottery ticket receipts from vendors in the form of checks and ACH transfers into a main account.  There is a weekly transfer to fund the prize awards, which in turn funds the prize-disbursing account.  The prize-disbursing account dispenses cash and checks to prize winners. The main account also funds an operational zero-balance account ("ZBA") for payroll and supplier payments.  The electronic lottery collects money from ticket sellers via bank transfers into two ZBA accounts that sweep to an investment account.  All payments of prizes, payroll, taxes, annuities, or suppliers are disbursed through a different account.  The lottery distributes a share of net income to the TSA in accordance with Act 10-1989.

***Department of Labor and Human Resources ("DLHR").***   While the DLHR receives appropriations from several fund sources for its various operations, the DLHR also administers certain aspects of the state unemployment insurance program using cash entrusted to it.  Employers remit state unemployment tax assessments to the DLHR, which deposits these funds with an account in the name of the U.S. Department of Labor at the U.S. Department of Treasury, which in turn administers the distribution of benefits.  The DLHR does reimburse itself penalties assessed on employers and operational costs by transferring amounts from the tax collections to the TSA.  As of June 30, 2019, the DLHR had $687 million on account at the U.S. Treasury for the unemployment insurance program benefits.  DLHR also holds accounts used for disbursements under the Work Opportunity Incentive Fund and disbursements to disability benefits program beneficiaries.

***911 Emergency Services Bureau.***   Revenue is generated from remittances sent by the telephone companies for the charges to their subscribers for the payment of the Emergency Service 9-1-1 and the collection for the services to the agencies integrated to the Line of Services to Citizens 3-1-1. From these collections, the 9-1-1 Board may distribute a portion of these expenses to the other public safety agencies in accordance with Regulation No. 5303.

***Legislature.***   The Legislature receives a General Fund appropriation of one twelfth of its budget each month.  Proceeds are then separated to the legislature's various units (Senate, House, joint committee).  The legislative branch manages its appropriations through its own set of accounts to provide funding for legislative needs.  The Central Government pays and invoices the Legislature for the payment of PayGo costs.

*Judicial Branch.* The Judicial branch manages cash to provide funding for non-payroll operating expenses and certain local court costs. The Department of Treasury funds payroll of the judiciary staff directly remitting into the judiciary treasury operations the total of budget appropriations and statutory court fees collected by the Department of Treasury on behalf of the judicial system.

The Judicial branch's treasury holds and funds local accounts at courts throughout the island for promptly paying for direct court costs including jury costs as described above. Substantially all the remaining operating costs (consultants, contractors, lease costs, etc.) of the judicial branch are paid by check. Pursuant to Act 69-1991, as amended, and the Regulation of the Judicial Branch for the Management of Funds and Interests, the Judicial Branch is authorized to open bank accounts, deposit funds, accumulate interest on those deposits and spend the interest earned. The first 0.05% of interest accrued is required to be transferred back to the Department of Treasury.

### 2. ERS Cash Management Systems

ERS has had limited operations since PayGo was implemented. It uses internal cash to pay for current expenses. ERS maintains a segregated account pursuant to the joint stipulation entered as of July 14, 2017 [Case No. 17-03566-LTS, ECF Nos. 170, 171] providing for the deposit of employer contributions made by non-Commonwealth entities until the resolution of various claims among the parties to that stipulation.

### 3. PBA Cash Management Systems[128]

#### a) Cash Inflows

PBA receives its rental revenues through one of the following methods: governmental rental charges paid by the Department of Treasury on behalf of agencies; rental charges received directly by other government entities, disaster-related receipts and other receipts. In fiscal year 2019, the Department of Treasury paid $114.8 million on behalf of agencies while other government entities paid $19.3 million directly to PBA. In the same year, disaster-related receipts were $6.7 million from FEMA and $20 million from private insurance. Lastly, other operating receipts were comprised of $1.2 million from an insurance settlement and $2.5 million from interest income or from private tenant rent.

#### b) Cash Outflows

PBA's disbursements include operating expenses, PayGo, and disaster related disbursements. Major components of operating expenses in fiscal year 2019 are salaries and benefits ($52.9 million), purchased services ($17.7 million), payments for public services ($15.2 million), other operating expenses ($7.4 million). PayGo expenditures were $21.7 million. Disaster related expenditures were $1 million and $13.4 million, reimbursable by FEMA and insurance, respectively.

---

[128] AAFAF Component Liquidity for the Month of June 2019.

4.      **Bank Rationalization**

The Department of Treasury is conducting a multiphase project to centralize and automate cash management processes and financial reporting for the Central Government and its agencies to increase visibility into the treasury operations and prepare for the implementation of the new Enterprise Resource Planning system.  The Department of Treasury has compiled an inventory of the Central Government's bank accounts and is documenting ownership and control information, disposition, and cash flows for each.  The Department of Treasury is also identifying accounts for closure to achieve operating efficiencies through the centralization of the bank accounts' structure.  This project is intended to provide the Department of Treasury with more control and oversight over the accounts that previously were controlled by parties outside of the Department of Treasury and will support continuous improvement through reporting, controls, and compliance tracking.

**E.      Debtors' Cash Accounts**

The list of the Debtors' bank accounts, balances as of December 31, 2019, and preliminary restriction categorizations is attached hereto as Exhibit J.  The list is based on the most current information available to the Oversight Board's professionals and the Oversight Board's legal analysis and judgment regarding restriction categorizations are based on such information.

1.      **Independent Forensic Analysis Team's Report**

On January 31, 2018, the Oversight Board, acting by and through the Special Investigation Committee (the "Special Investigation Committee"),[129] retained Duff & Phelps, LLC (the "Independent Forensic Analysis Team" or "IFAT") to conduct an investigation into bank accounts of government entities, including the entities covered by the Commonwealth fiscal plan, UPR, HTA, ERS, and PREPA.  The scope of the assignment included (i) an inventory of cash, cash equivalents, and investments of the Puerto Rico Government, (ii) analysis of the sources and intended uses of these funds, and (iii) any documented legal restrictions on these funds.

The principal goal of the Independent Forensic Analysis Team was the publication of a report that described the processes employed, results obtained, and an opinion from the Independent Forensic Analysis Team on whether or not procedures performed validate the Commonwealth bank and investment accounts identified and account balances were accurately disclosed.  The investigation was dependent on the assumption that a significant number of the Commonwealth entities would voluntarily provide the Oversight Board with specific financial information.  The design of the investigation was tailored to collect and develop information as to whether the bank accounts identified by the Commonwealth entities contained restricted funds, the quantities, and the nature of restricted funds.

---

[129] The Special Investigation Committee of the Oversight Board is comprised of Members Ana J. Matosantos, David A. Skeel, and Judge Arthur J. Gonzalez (Ret.), and is charged with pursuing investigations pursuant to the authority granted to the Oversight Board by PROMESA Section 104(o) and such other authority vested in the Oversight Board under PROMESA.

a)   **Investigation Procedures**

For purposes of the report, the Independent Forensic Analysis Team identified a measurement date of June 30, 2018 (the "June 2018 Measurement Date"). The investigation included three components: (i) an information gathering process; (ii) an inquiry and data collecting process; and (iii) an analytical and reporting process.

*Information Gathering.* Gathering information was a sequenced process. A master database was created of government entities and their respective bank accounts as of the June 2018 Measurement Date. The information was primarily received from the Department of Treasury, AAFAF, and publicly available government information.

*Inquiry and Data Collecting Process.* Once the master database was created, each government entity that was reported was contacted using a standardized format. The government entities were contacted to obtain the relevant bank account information, along with authorization from government entities to allow respective financial institutions to provide information directly.

*Analytical and Reporting Process.* The final step was contacting the financial institutions identified to confirm information obtained and verify the self-reported information from the entities.

b)   **Additional Steps Regarding Independent Forensic Analysis Team's Report**

The Independent Forensic Analysis Team's report suggested additional tasks and activities to more fully develop information referred to in the report, which included updating the June 2018 Measurement Date to a more current measurement date, in consideration of the possibility that amounts may have materially changed between these dates. The changes to balances as of the new measurement dates, as well as additional procedures to reconcile balances and categorize restrictions, are addressed below. As the procedures for this analysis are also ongoing, the Oversight Board will continue to update the analysis on a periodic basis.

2.   **Ongoing Analysis of Bank Accounts**

Following the release of the Independent Forensic Analysis Team's report, the Oversight Board continued to perform an analysis of the cash accounts of the Commonwealth and its instrumentalities on a rolling basis, most recently as of December 31, 2019 (the "December 2019 Measurement Date").

As described below, the Oversight Board's ongoing analysis included the collection, processing, and review of over 6,050 documents provided by financial institutions, agencies, and other government entities. The documents included bank statements, brokerage statements, certificates and letters for certificates of deposit, account documentation, accounting records, agency formation and structure documentation, grant information, contracts, and statutes and legislation, among others. The analysis – conducted in English and Spanish via email, phone, in-person meetings, and through accounting and legal review – involved over 2,600 potential bank

accounts across more than 140 governmental entities to identify the relevant bank account population for the Commonwealth and its instrumentalities.

a)      **Summary of Procedures Performed**

The Oversight Board focused on, among other things, (i) confirming the population of bank accounts and establishing their balances, most recently as of the December 2019 Measurement Date, and (ii) assessing, based on available information for the legal analysis, whether the accounts include restricted funds.

The Oversight Board leveraged and enhanced the procedures noted in the IFAT report to rollforward the balances to the December 2019 Measurement Date. Specifically, in addition to obtaining balance information for a set population of accounts through requests to the governmental entities, the Oversight Board's procedures included obtaining credentials for access to online account platforms for each entity for a majority of the bank account balances. The online account access allows for the rolling forward of balances and identification of the population of accounts at each financial institution for each governmental entity. Requests for financial information were also sent to governmental entities and financial institutions in cases where online access was not available. Further procedures were performed to align financial institution data with information provided by governmental entities to reconcile differences.

Concurrently, the Oversight Board requested documentation regarding any governmental entity's restriction classification. Further procedures were performed to continuously support the governmental entities in providing the documentation for legal due diligence review. Because the vast majority of the balances was concentrated in 69 accounts out of the 527 accounts at the Commonwealth, ERS, and PBA, the Oversight Board's legal advisors performed the legal due diligence review of those accounts with balances in excess of $6.9 million to obtain over 95% coverage of total balances as of each respective measurement date. 458 accounts totaling approximately $191 million, approximately 1% of the total cash balance as of the December 2019 Measurement Date, were below the threshold and outside of the review threshold for legal due diligence.

The Oversight Board's procedures focused on governmental entities comprising the Central Government (comprised of executive, legislative, and judicial branch agencies), ERS, and PBA.[130]

(i)      *Identifying the Population of Bank Accounts and Establishing Their Balances:*

The Oversight Board sent letters in both English and Spanish requesting account balances as of the December 2019 Measurement Date to Financial Institutions ("FIs") for the Debtors'

---

[130] The surplus generated by certain public corporations that do not receive Commonwealth appropriations was not included in this analysis because the Commonwealth's ability to access such surplus amounts is uncertain without further court order or legislative action.

accounts.  The letters were sent in conjunction with a list of known accounts held by each governmental entity at the respective FI and requested the FIs send to the Oversight Board:

- either bank or brokerage statements for any cash and/or investment balances for accounts held by the institution relating to the applicable Debtor for each date indicated above, or online access for the Oversight Board to obtain the relevant data for each account;

- a list of signatories with authority over each account;

- information pertaining to any known liens, encumbrances or third-party claims; and

- details for any additional accounts held by a governmental entity that were not included within the initial list of accounts provided.

Simultaneously, letters were sent in conjunction with a list of known accounts to governmental entities in both English and Spanish requesting the following information:

- either bank or brokerage statements for any cash and/or investment balances for accounts held by the respective Debtor for each date indicated above, or a completed consent form granting online access to obtain the relevant data for each account from a FI;

- status of each account(s), such as open, closed, suspended, etc.;

- a list of signatories with authority over each account;

- details for any accounts related to the governmental entity that were not included within the list of accounts sent to the governmental entity; and

- indication of whether the funds in each account were categorized as restricted, unrestricted, or pooled.[131]

(ii)   ***Determining Whether Accounts and Balances Include Restricted Funds:***

As noted, requests sent to governmental entities included information pertaining to account classifications.  To help guide them, the agencies were provided with descriptions for various restricted and unrestricted account designations.  If viewed as restricted by the governmental entity, the governmental entity was requested to select the applicable category of restriction and send supporting documentation for the restriction, including information about the sources and uses of funds.  If viewed as unrestricted by the governmental entity, the governmental entity was requested to provide the sources and uses of funds for the account(s).

---

[131] Pooled accounts may contain both restricted and unrestricted funds.

A thorough examination of the documents provided was performed by the legal team to investigate and assess the conclusions on restrictions, which included:

- reviewing documentation gathered as part of the IFAT report;

- reviewing over 1,700 newly obtained documents from governmental entities regarding account classifications; and

- working alongside other parties, such as the Department of Treasury and AAFAF, to obtain and review the documentation required to make preliminary assessments regarding the classifications of government bank accounts.

The accounts were then classified in the following categories (the preliminary designation for each account above the review threshold of $6.9 million is provided in <u>Exhibit J</u>):

- **Restricted Accounts:**[132]

  - **Federal Funds/Law**: Funds received from the federal government or restricted by federal law or regulation for specific uses (e.g., Medicaid funds).  Such cash could be recouped or set off by the federal government if not used as it requires.

  - **Third Party Funds**: Funds belonging to third parties (e.g., child support payments held in accounts under the custody of the Child Support Administration).

  - **Third Party Contract**: Funds restricted for use due to contracts with third parties (e.g., debt service reserve funds held by the trustee).

  - **Court Order**: Funds restricted pursuant to court order.

  - **Tax-exempt Bond Proceeds**: Bond proceeds with restricted use under the Internal Revenue Code.

- **Accounts Asserted to be Restricted:**  Accounts with funds that are subject to active litigation regarding the restriction of funds (e.g., accounts at ERS subject to the determination of the scope of the ERS bondholders' security interest).

---

[132] The preliminary classification is based solely on certain legal restrictions.  In the course of the development of the restriction analysis, certain restriction categorizations covered cash intended to be used for certain purposes, such as emergency funds, even if the cash were legally available to general creditors.  The Oversight Board has since undertaken to limit restriction categorizations to (a) Federal Funds/Law, (b) Third Party Funds, (c) Third Party Contract, (d) Court Order, and (e) Tax-Exempt Bond Proceeds.  These categorizations are subject to change if new information warranting such change is received.

108

- **Unrestricted Accounts**: Accounts with funds that do not have legal restrictions. Unrestricted funds can be used to pay expenses pursuant to the certified fiscal plan and budget, and to pay creditors.[133]

- **Inconclusive Accounts**: Accounts with funds where information is currently too limited to identify the source and assess the potential restriction of funds.

- **Unreviewed Accounts**: Accounts whose balance is below the above-mentioned threshold totaling $6.9 million as of the December 2019 Measurement Date. Accounts with balances below the review threshold have been designated "Unreviewed" in Exhibit J.

b) **Summary of Preliminary Findings**[134]

While the Oversight Board's analysis is ongoing, the preliminary results show the Debtors maintain approximately $13.2 billion in balances as of the December 2019 Measurement Date across 486 accounts held at various financial institutions. An additional 41 accounts (for a total of 527 accounts) are pending supporting documentation from FIs and are currently under review. The list of such accounts and the respective governmental entities is attached as Exhibit J, and a summary is set forth below:

| Category | No. of Accts. | 12/31/2019 Balance | Restricted | Unrestricted[135] | Inconclusive | Unreviewed |
| --- | --- | --- | --- | --- | --- | --- |

---

[133] The analysis assumed some of the surplus of certain instrumentalities receiving appropriations from the Commonwealth may constitute unrestricted funds (assuming the respective appropriation could be reduced accordingly). The ability to extract surplus, however, differs from case to case, and is uncertain.

[134] The information included herein is a status update as of the date of this Disclosure Statement and should be considered preliminary and subject to material change. Amounts included throughout this Disclosure Statement with respect to the Debtors' cash accounts are subject to modification based on the receipt of additional information and review by legal counsel.

[135] Certain funds in Commonwealth accounts, including the TSA, and ERS accounts are subject to litigation in which certain parties assert such funds are restricted, as noted in Exhibit J. These include the (i) litigation with ERS bondholders regarding the scope of ERS bondholders' security interest (Adv. Proc. Nos. 19-00366-LTS and 19-00367-LTS), which, if successful for ERS bondholders, may result in all or the majority of funds in ERS accounts and certain funds in Commonwealth accounts to be restricted for ERS bondholders, and (ii) litigation with certain monoline insurers, among others, regarding alleged security interests against certain revenues that were historically conditionally appropriated to HTA, CCDA, and PRIFA. The monoline insurers, among others, assert security interests (i) against at least $1.397 billion in Commonwealth accounts which they contend should pay HTA bonds, (ii) against any hotel occupancy tax revenues allegedly unlawfully transferred to the Commonwealth rather than to payment of CCDA bonds, and (iii) against at least the first $117 million of rum taxes received by the Commonwealth each fiscal year which they contend should pay PRIFA bonds. *See, e.g., Financial Oversight and Management Board for Puerto Rico v. Assurance Corp., et al.*, Adv. Proc. No. 20-00004; *Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.,* Adv. Proc. No. 20-00005; *Financial Oversight and Management Board for Puerto Rico, et al. v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00007; *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp.. Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative, Adequate Protection* [ECF No. 10102]; *Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon's Motion Concerning Application of the Automatic Stay to the Revenues Securing the*

| | | | | | | |
|---|---|---|---|---|---|---|
| CW – Agencies | 463 | $3,666,414,520 | $2,278,883,411 | $993,448,712 | $229,495,205 | $164,587,193 |
| CW – TSA | 7 | 8,963,270,261 | 100,000,000 | 8,863,270,261 | - | - |
| *CW - Subtotal* | **470** | 12,629,684,781 | 2,378,883,411 | 9,856,718,972 | 229,495,205 | 164,587,193 |
| ERS Total | 22 | 425,140,790 | - | 419,570,285 | - | 5,570,505 |
| PBA Total | 35 | 103,845,267 | 7,455,745 | 75,543,189 | - | 20,846,335 |
| **Total** | **527** | **$13,158,670,838** | **$2,386,339,156** | **$10,351,832,446** | **$229,495,205** | **$191,004,031** |

Legal due diligence review for restriction classification was performed for over $13.0 billion out of the $13.2 billion in balances for the December 2019 Measurement Date. The remaining accounts totaling approximately $191 million were not reviewed for restriction designations as the balances for those accounts were below the review threshold of $6.9 million as of the December 2019 Measurement Date and have been classified as unreviewed. Legal due diligence is continuing; however, out of the $13.0 billion account balances analyzed, approximately $2.4 billion were classified as restricted, and $10.4 billion were classified as unrestricted funds (some of which may be restricted if certain parties are successful in litigation regarding their asserted security interests). The remaining $0.2 billion was categorized inconclusive until further documentation becomes available and the legal analysis can be completed.

(i)      *The Commonwealth:*

The Central Government of the Commonwealth consists of 89 governmental entities with 470 bank accounts across multiple FIs.  Currently, 433 bank accounts totaling approximately $12.6 billion as of the December 2019 Measurement Date have been confirmed through information directly from FIs. An additional 37 accounts were identified that are pending supporting information to complete the analysis.  Furthermore, several governmental entities do not maintain bank accounts; rather, their financial activities are managed by other governmental entities.  For example, the Department of Treasury manages funds on behalf of 38 governmental entities that do not maintain their own bank accounts.

Seven accounts managed by the Department of Treasury, commonly referred to as the TSA accounts, total approximately $9 billion of the Commonwealth's approximately $12.6 billion as of the December 2019 Measurement Date.  The Commonwealth's TSA accounts receive funds from, for example, sources such as tax collections and federal transfers and disburse funds to, for example, payroll and operational costs.

As of the December 2019 Measurement Date, approximately 99% of the confirmed balances in Commonwealth accounts (including TSA accounts) totaling approximately $12.6 billion were reviewed by the legal due diligence team. Of the approximately $12.5 billion reviewed, approximately $2.4 billion funds were assessed as restricted based on currently available

---

*CCDA Bonds* [ECF No. 10104]; *Motion for Leave to Amend Motion of Ambac Assurance Corporation, Assured guaranty Corp., Assured Guaranty Municipal Corp., and Financial Guaranty Insurance Company Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 10109], amending *Ambac Assurance Corporation's Motion and Memorandum of Law in Support of Its Motion Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 7176].

information and legal analysis, the majority of which are assessed as restricted by Federal Funds/Law.  The majority of the remaining $10.1 billion funds for Commonwealth entities, including the TSA accounts, are assessed as unrestricted (some of which may be restricted if certain parties are successful in litigation regarding their asserted security interests), with approximately $8.9 billion in funds attributable to the TSA[136] and $1 billion attributable to other Commonwealth entities. The remaining $0.2 billion in balances is currently assessed as inconclusive for purposes of restriction determinations.  Of the confirmed balances, $164.6 million in balances, or approximately 1%, is currently unreviewed.

(ii)     *ERS:*

As of the December 2019 Measurement Date, ERS maintains 22 bank accounts across multiple FIs.  Of those 22 accounts, 20 bank accounts totaling approximately $0.4 billion, have been confirmed through information directly from FIs.  An additional two accounts were identified that are pending supporting information to complete the analysis.

As of the December 2019 Measurement Date, approximately 99% of the confirmed balances in ERS accounts totaling approximately $0.4 billion were reviewed by the legal due diligence team.  Of the $0.4 billion in balances for ERS accounts as of the December 2019 Measurement Date, approximately $0.4 billion in balances were assessed unrestricted, subject to litigation with ERS bondholders regarding the scope of their asserted security interest, based on currently available information.  Of the confirmed balances, $5.6 million in balances, or approximately 1%, is currently unreviewed.

(iii)    *PBA:*

As of the December 2019 Measurement Date, PBA maintains 35 bank accounts across multiple FIs.  Of those 35 accounts, 33 totaling approximately $0.1 billion have been confirmed through information directly from FIs.  An additional two accounts were identified that are pending supporting information to complete the analysis.

As of the December 2019 Measurement Date, approximately 80% of the confirmed balances in PBA accounts totaling approximately $104 million were reviewed by the legal due diligence team.  Of the approximately $104 million in balances for PBA accounts as of the December 2019 Measurement Date, approximately $7.5 million in balances were assessed as restricted and $75.5 million in balances were assessed as unrestricted based on currently available information. The remaining $20.8 million is currently unreviewed.

c)      **Updates to Information Referenced in the IFAT Report**

The following provides a summary highlighting the areas of progress made since the IFAT analysis as of June 30, 2018 to the December 2019 Measurement Date:

---

[136] The Oversight Board believes most of the funds in the TSA are generally unrestricted except for Federal Funds remaining in pooled TSA accounts (approximating $100 million as of the December 2019 Measurement Date) and certain funds asserted to be restricted, as noted in fn. 135.

- Since the June 2018 Measurement Date, 63 new accounts totaling approximately $4.6 billion were identified and supported by financial documents. These new accounts were identified based on information provided by governmental entities and financial institutions. Also, an additional 4 accounts were identified and are currently pending support from financial institutions, resulting in a total of 67 new accounts (~14% increase) added to the previously identified population.

- Since the June 2018 Measurement Date, 189 accounts were removed from the reported population due to closed accounts, duplicate accounts, or non-existent accounts confirmed by financial institutions or governmental entities. Of these accounts, 32 were deemed as duplicate and 25 as non-existent, totaling approximately $167.5 million and $13.5 million (a total of $181 million) as of June 30, 2018, respectively.

d) **Continuation of Tasks and Activities Referenced in the IFAT Report**

The IFAT Report suggested nine additional tasks and activities to more fully develop the information. The Oversight Board has adopted the suggestions and continued procedures to enhance the information subsequent to the release of the IFAT Report. Accordingly, the following provides an update on the nine suggestions:

- The Oversight Board continued and updated its procedures to review and update account balances and restriction classifications, most recently as of the December 2019 Measurement Date.

- The Oversight Board updated its procedures to review accounts for restriction classifications across the population of accounts of Debtors currently in a Title III case that would result in a review of more than 95% of combined total account balances.

- The procedures to review and update account balances and restriction classifications included gathering additional documents for all governmental entities, which were used to update and enhance financial and legal due diligence procedures. Specifically, governmental entities and FIs were contacted regarding accounts and were asked to provide further information regarding closed or suspended accounts, as well as potential duplicate, non-existent, or new accounts. Follow-up calls and meetings were scheduled to clarify and ask questions about the information provided.

- Additional analytical procedures were performed for the review of restriction classifications, including obtaining governmental entities' descriptions of the various restriction categories for account designation and reviewing sources and uses of funds for accounts.

112

- Updated procedures were applied to obtain appropriate supporting documentation from governmental entities to inform the legal team's assessment of account designations.

- Updated procedures were applied to identify federal funds within the account balances were applied to all governmental entities. The procedures included obtaining information from the Department of Treasury, AAFAF, and other agencies.

- Discrepancies noted in the IFAT Report between agencies and FIs were reconciled through additional procedures, such as obtaining direct confirmation from FIs and clarifying current status of a bank account. Similarly, discrepancies noted between the IFAT Report and AAFAF were reconciled through additional procedures, such as identifying out-of-scope exclusions and timing differences. Currently, the unreconciled differences are less than 5% of the total balance as of the December 2019 Measurement Date.

e)   **Status of Review**

Approximately 95% of governmental entities provided a response to requests for information relating to account balances and restriction classifications. Governmental entities also provided online bank account access via the FIs for $10.9 billion held in 263 out of 527 bank accounts (approximately 50% of accounts and 83% of balances in the total population). Online bank account access to an additional $0.6 billion at 6 out of 527 bank accounts (approximately 1% of the total population) is expected to be provided by the agencies via the FIs. However, bank account statements for the remaining $1.6 billion held in 258 out of 527 bank accounts (approximately 49% of the total population) are expected to be obtained directly from the FIs and governmental entities.

The balances reported above as of the December 2019 Measurement Date for the Commonwealth, ERS, and PBA, have been substantively reconciled to the AAFAF Bank Account Balances Report as of December 31, 2019 ("AAFAF Report").[137]  Currently, the unreconciled differences are less than 5% of the total December 31, 2019 balance and are attributable to: (i) the AAFAF Report including balances for certain entities, such as public corporations; (ii) the AAFAF Report excluding balances for certain entities, such as legislative and judicial branch agencies; (iii) the AAFAF Report excluding certain investment accounts for certain entities; and (iv) timing differences in the availability of information.

The list of the Debtors' bank accounts, balances as of the December 2019 Measurement Date, and preliminary restriction categorizations is attached hereto as Exhibit J. The information presented in Exhibit J includes accounts where balances have been confirmed with FI information as of the December 2019 Measurement Date; follow up is ongoing to obtain FI information for

---

[137] *Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities, Information as of December 31, 2019* published by the AAFAF on January 31, 2020.

additional identified accounts.[138]  The Oversight Board and its advisors are continuing to analyze the restriction assessments for the accounts, and any determinations provided in Exhibit J are preliminary and in all respects subject to change based on new and additional information as it becomes available.  The Oversight Board will update this Disclosure Statement to a new measurement date as warranted until it is approved by the Court.

## F.   Commonwealth's Liquidity and Working Capital Analysis

The Commonwealth experienced severe cash shortfalls in the past leading to liquidity crises.  The Commonwealth does not maintain a formal policy requiring a minimum unrestricted fund balance or a minimum cash balance to fund government operations.  Rather, the government historically addressed these shortfalls through a variety of unsustainable liquidity measures, including: short-term borrowings (tax revenue anticipation notes), delaying the payment of third-party payables or amounts due to public corporations, deferring the disbursement of certain budgetary assignments, triggering, pursuant to Article VI, Section 8 of the Commonwealth Constitution, the retention of certain revenues of the Commonwealth for the payment of debt service on GO Bonds and delaying the payment of income tax refunds, among others.

In conformance with Government Finance Officers Association ("GFOA") guidelines, it is essential for the Commonwealth to establish and maintain an adequate level of unrestricted fund and liquidity balance.  This minimum cash balance will help ensure the government maintains a prudent level of financial resources at all times to mitigate against current and future liquidity risks (e.g., revenue shortfalls, timing differences and unanticipated expenditures) and to ensure stable tax rates.  This financial buffer can soften the need for severe spending cuts or tax increases when the government needs to balance its budget.  Because the unrestricted fund balance, coupled with segregated cash reserves, is vital to managing unexpected changes and maintaining fiscal health, its level is also tracked closely by rating agencies and used as a key metric for municipal bond ratings.

The target for an unrestricted fund/liquidity balance is typically calculated as a percentage of a government's General Fund spending, although financial resources available in other funds should also be considered in assessing the adequacy of unrestricted fund balance.  This percentage varies greatly between different jurisdictions based on a variety of risk enhancing or risk mitigating factors.  For example, governments that may be vulnerable to natural disasters, more dependent on a volatile revenue source, or potentially subject to cuts in state aid and/or federal grants may need to maintain a higher level of unrestricted fund balances.

### 1.   General Fund Minimum Liquidity

In establishing the minimum unrestricted General Fund/liquidity balance needed in Puerto Rico, the Oversight Board considered several risk factors, including: (i) the predictability of the government's General Fund revenues and the volatility of its General Fund expenditures (i.e., higher levels of unrestricted General Fund balance may be needed if significant revenue sources

---

[138] The balances for the accounts for which further FI information is required are currently marked as "pending" in Exhibit J.

are subject to unpredictable fluctuations or if operating expenditures are highly volatile); (ii) Puerto Rico's perceived exposure to significant one-time outlays (e.g., disasters, immediate capital needs, budget cuts); (iii) the potential drain upon General Fund resources from other funds, as well as, the availability of resources in other funds; (iv) the potential impact on Puerto Rico's future bond ratings and the corresponding increased cost of borrowed funds; and (v) commitments and assignments (i.e., the desire to maintain higher levels of unrestricted fund balance to compensate for any portion of unrestricted fund balance already committed or appropriated by the government for a specific purpose).

The Oversight Board also reviewed several third-party methodologies and approaches, including those proposed by the GFOA, Pew Charitable Trusts, and the U.S. Treasury. Additionally, the Oversight Board evaluated minimum cash balance protocols in other financially distressed U.S. jurisdictions, such as the City of Detroit. Each methodology is described below.

*GFOA*. Founded in 1906, GFOA is a professional association representing more than 20,000 state, provincial, and local government finance officers in the United States and Canada deeply involved in planning, financing, and implementing thousands of governmental operations in each of their jurisdictions. GFOA's mission is to advance excellence in public finance. To meet the many needs of its members, the organization provides best practice guidance and offers publications on budgeting, internal controls, debt management, treasury management, and other financial management topics.

The GFOA recommends that governments should maintain an unrestricted fund balance that will protect taxpayers and employees from unexpected changes in financial condition. The GFOA recommends that governments, at a minimum, should maintain unrestricted budgetary fund balance in their General Fund of no less than two months of regular General Fund operating revenues or regular General Fund operating expenditures.[139]

*Pew Charitable Trusts ("Pew")*. Founded in 1948, Pew is an independent nonprofit organization dedicated to improving public policy by conducting rigorous analysis, linking diverse interests to pursue common cause and insisting on tangible results. The organization maintains a dedicated research team focused on state fiscal health that frequently publishes thought provoking research and recommendations on state financial conditions, particularly on municipalities in distress.

Pew's research highlights that positive fund balances are needed to manage budgetary uncertainty, including revenue forecasting errors, budget shortfalls during economic downturns, and other unforeseen emergencies, such as natural disasters. The organization indicates this financial cushion can soften the need for severe spending cuts or tax increases when states need to balance their budgets. Building up a positive fund balance is a sign of fiscal recovery, but there is no one-size-fits-all rule on when, how, and how much to save. States with a history of significant economic or revenue volatility may desire larger cushions. Under Pew's methodology, the optimal unrestricted fund balance target depends on three factors: (i) the defined purpose of funds, (ii), the

---

[139] GFOA, Fund Balance Guidelines for the General Fund, September 2015.

volatility of a state's tax revenue; and (iii) and the level of coverage that the state seeks to provide for its budget.

Based on Pew's research, the 50-state median fund balance for 2018 was approximately 40 days of General Fund expenditures.[140]

*Community Disaster Loans ("CDLs")*.  In October 2017, shortly after hurricanes Irma and Maria devastated Puerto Rico, Congress appropriated $4.7 billion in CDL funding to Puerto Rico, subject to final negotiations between the Commonwealth and the U.S. Treasury.  The CDL Program provides operational funding to help local governments that have incurred a significant loss in revenue, due to a major disaster, that has or will adversely affect their ability to provide municipal services.

As part of the negotiation process, the U.S. Treasury and FEMA transmitted a cash balance policy to Puerto Rico that would govern the Commonwealth's ability to access CDL funding.  This cash balance policy, which was ratified by the U.S. Treasury and the Government in March 2018, would permit the Commonwealth to access CDL funding if minimum operating cash balances in the Government's TSA declined below certain levels.

*City of Detroit*.  The Oversight Board also evaluated minimum cash balance assumptions used by the City of Detroit, given its recent chapter 9 bankruptcy case.  As part of its restructuring and 40-year projections in the City's plan of adjustment, Detroit projected a minimum cash balance based on two months of payroll through fiscal year 2023 and a 5% of General Fund expenditures cash reserve thereafter.  These levels are still maintained annually to preserve fiscal discipline and controls in the City.

2.      **Additional TSA Analysis of Minimum Liquidity**

*TSA Cash Flow Analysis for all funds.*  The Oversight Board also evaluated the projected cash needs of the TSA, the Commonwealth's primary operating account.  The primary inflow for the TSA is tax revenue which is subject to economic risk and carries a seasonality component. The primary disbursements are payroll and pension related which are fixed in nature.  In estimating the minimum operating cash reserve, these considerations, along with sources of revenue, were taken into account.  The analysis reviewed and assessed the normalized fiscal year 2019 liquidity plan cash yields by assuming various month lags in receipts.  The months on hand lag assumptions were determined based on criticality of the payment and funding source.  For example, payroll funded by state collections requires a two-month reserve versus NAP which is a federally funded pass through that requires no reserve.

3.      **Other Liquidity Needs**

*Federal Grants, Subsidies*.  The Commonwealth is the beneficiary of numerous federal programs, which provide funding for government services in the areas of education, health, public safety and housing, among others. Most of the programs funded by federal government agencies

---

[140] Pew Charitable Trusts Budget Surpluses Are Helping Many States Boost Their Savings, March 2019.

are reimbursement based, meaning that the Commonwealth will typically disburse the funds and then seek reimbursement from the corresponding federal agency. Certain federal programs, however, provide for advances of federal funds to Puerto Rico to be disbursed by the Commonwealth at a later date. The TSA received $5.6 billion, $5.6 billion and $9.3 billion in federal funds in fiscal year 2017, fiscal year 2018 and fiscal year 2019, respectively. A portion of these receipts were in the form of advances of federal funds, for example for Medicaid related expenses and for NAP, and remained outstanding as part of the TSA balance as of June 30, 2019. Variances in timing between federal funds receipts and disbursements contribute to the minimum liquidity requirements of the government.

*Income Tax Refunds.* The Government collects income taxes from individuals and corporations throughout the fiscal year. Typically, at the end of the fiscal year, there is a certain amount of claimed and processed income tax refunds that remain outstanding. For fiscal year 2019, the Commonwealth preliminarily reported General Fund collections of approximately $11.376 billion in tax revenues (net of $480 million reserved for income tax refunds). The amount of income tax refunds outstanding and payable as of the end of the fiscal year contributes to the minimum liquidity requirements of the government.

*Additional needs.* In addition to core working capital requirements, it is likely the government will need to set aside working capital for several additional cash needs. This includes set asides to fully fund capital spending associated with consent decrees, set aside funding for potential local disaster aid needs, and funding working capital for Special Revenue Funds and other cash requirements.

4.      **Minimum Liquidity Recommendation**

*Minimum liquidity.* After analyzing the recommended values ascribed by each approach above, risk weighting Puerto Rico's financial characteristics, considering all budgets (including PayGo requirements), and evaluating the Commonwealth's revenue volatility, consistent with the PSA, the Oversight Board concluded the Government should maintain an unrestricted liquidity balance of no less than $2 billion. In addition, a separate emergency reserve, as described below, should be established as well.

*Emergency Reserve.* In addition to the minimum liquidity of $2 billion described above, the Oversight Board concluded Puerto Rico must also set aside appropriations annually into an emergency reserve. The purpose of the emergency reserve is different than that of the liquidity balance. It is designed specifically to ensure the government has adequate funds available to respond rapidly to emergency situations, such as natural disasters. According to the International Monetary Fund, the Caribbean region's already high vulnerability to natural disasters is likely to be exacerbated as the frequency and severity of disasters increase from climate change effects.

Following International Monetary Fund guidance provided to other Caribbean islands, the Oversight Board concluded this emergency reserve must eventually total $1.3 billion, or approximately 2.0% of fiscal year 2018 GNP, by reserving $130 million per year for 10 years. This would provide an adequate emergency reserve (2% to 4% of GNP). Unlike the fund balance, restrictions placed on these funds must ensure that it is only used in case of an emergency. The

117

Commonwealth is not permitted to disburse any amount from the emergency reserve without approval from the Oversight Board.

This emergency reserve account is currently maintained at a private financial institution.  As of December 31, 2019, the reserve account held $650 million, the accumulation of budgeted reserves from fiscal years 2017 ($200 million), 2018 ($190 million), and 2019 ($130 million), and 2020 ($130 million).  Based on documentation provided by the Department of Treasury, $89 million of the funds from fiscal year 2017 and $186 million of the funds from fiscal year 2018 were utilized on a budgetary basis to cover emergency related expenditures.  In addition, the Oversight Board authorized the use of up to $260 million of the cumulative 2019 and 2020 budgeted reserves for earthquake relief.  The fiscal year 2021 Commonwealth budget is anticipated to include a $276 million appropriation to replenish the emergency budget reserve used in 2017 and 2018.

Following the seismic events in January 2020, the Oversight Board made $260 million from the emergency fund available to the government through January 31, 2020.  As a result of the fiscal planning and prioritization embedded in the Certified Fiscal Plan and Certified Budgets, the Government was able to access its own funds on a timely basis to help the people of Puerto Rico, rather than be limited in its response in any way.  Due to the urgency of the needs, the funds were made available to the Government on the basis of after-the-fact reporting of the expended funds.  After the initial period ended on January 31, 2020, the Oversight Board adjusted the procedure for authorization of the use of funds maintaining an appropriate level of oversight and due diligence.  The unspent reserves remained available for reasonable earthquake-related needs, but on the basis of a request for release.

[*Remainder of Page Left Intentionally Blank*]

IV.     **Significant Events Leading to Commencement of the Title III Cases**

A.     **The Commonwealth's Steady Operational and Financial Decline**

*General.*   The Commonwealth and certain of its public corporations are in the midst of a profound fiscal crisis.  Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses, and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues.  This is mainly due to years of economic recession, recurring budget deficits, the financing of recurrent expenses with long-term debt, the failure to adequately fund legacy obligations such as pensions and the devastation caused by the hurricanes in 2017.

The Commonwealth's balance sheet deterioration, combined with continued structural imbalances between revenues and expenditures and the Commonwealth's inability to access the capital markets, resulted in the Commonwealth and certain of its instrumentalities becoming unable to make scheduled debt payments while continuing to provide government services and ultimately being placed into debt restructuring cases under Title III of PROMESA.

*The Commonwealth's Economy.*   The Commonwealth's economy entered a recession in the fourth quarter of fiscal year 2006, and the Commonwealth's GNP has contracted (in real terms) every fiscal year between 2007 and 2017, except for a 0.1% GNP growth in fiscal year 2012.  The slight GNP growth in fiscal year 2012 was due mainly to the large number of stimuli and deficit spending injected into the Commonwealth's economy during the period and not as a result of economic recovery.

In its May 2018 report (GAO-18-387), the GAO listed the following five main factors that contributed to Puerto Rico's economic condition:

- Outmigration and diminishing labor force.  Puerto Rico has experienced a steady decline in its population and labor force.

- Regulatory challenges in doing business in Puerto Rico.  These include the high cost to businesses in complying with Puerto Rico regulations such as the permitting process for new business, and federal laws such as the minimum wage law that may be a deterrent to employment in some local sectors.

- High cost of importing goods and energy.  Many of the goods used by businesses in Puerto Rico are imported, which increases their cost and Puerto Rico relies mainly on high cost petroleum products for its energy generation.

- Phase-out of the federal tax credit that concluded in 2006.  This affected mostly manufacturing operations in Puerto Rico, although there is no consensus as to the magnitude of the impact.

- Banking and housing struggles.  Puerto Rico banks have struggled, and several have disappeared. Housing prices have fallen by 25% since its peak in 2009.

119

The Puerto Rico Planning Board (the "Planning Board") has the legal responsibility of creating an annual Economic Report to the Governor and the Legislature, presenting the Commonwealth's economic outlook and an analysis of its economic behavior. According to the Planning Board's report released in May 2019, the Commonwealth's real GNP for fiscal years 2016 and 2017 decreased by 1.6% and 3.0%, respectively. The Planning Board's GNP forecast for fiscal year 2018, estimates a contraction of 4.7%. In each case, such analysis does not account for the impact of Hurricanes Irma or Maria.

In fiscal year 2017, preliminary aggregate personal income in the Commonwealth was $64.6 billion and personal income per capita was $19,139.

The economy of the Commonwealth is closely linked to the United States economy, as most of the external factors that affect the Commonwealth's economy are determined by the policies and performance of the United States economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation and tourist expenditures. During fiscal year 2017, approximately 78% of the Commonwealth's exports went to the United States mainland, which was also the source of approximately 54% of the Commonwealth's imports.

The fiscal plan for the Commonwealth certified by the Oversight Board on May 9, 2019 ("May 2019 Fiscal Plan") is based on forecasts of macroeconomic conditions, including Puerto Rico's real GNP growth, inflation rates, and Puerto Rican population growth. The May 2019 Fiscal Plan recognizes the significant decline in economic activity after Hurricanes Irma and Maria and includes projections of how the real GNP growth rates would have differed due to the storms with and without fiscal plan measures, structural reforms, and disaster relief spending. For example, without any fiscal plan measures, structural reforms, or the disaster relief spending, the real GNP growth rate is projected to have been a 17.7% decline in fiscal year 2018 and a 3.7% rebound in fiscal year 2019 due to the post-hurricane effects. But, with the implementation of the May 2019 Fiscal Plan, the real GNP growth rates are projected to be only a 4.7% decline in fiscal year 2018 and a 4.0% further increase in fiscal year 2019. The real GNP growth is projected to slow down beginning in fiscal year 2020.

The Puerto Rico economic projections are also affected by U.S. mainland growth projections and incorporates the data and projections from federal analyses. The annual inflation rates are forecasted to drop from 1.63% in fiscal year 2018 to 0.61% in fiscal year 2019 and 1.09% in fiscal year 2020. The annual inflation rates remain around 1.4% to 1.5% in the short- to mid-term years starting from fiscal year 2021.

The May 2019 Fiscal Plan also includes population forecast of continuing decline for the next several years. The hurricanes created a larger population decline of 5.1% in fiscal year 2018. From fiscal year 2019, Puerto Rico is projected to experience a population decline of 1.8% and smaller declines each subsequent year, with a 1.1% annual decline as of fiscal year 2024.[141]

---

[141] For a full discussion of the projections of the Certified Commonwealth Fiscal Plan, see Chapter 4 of the Certified Commonwealth Fiscal Plan, attached as Exhibit E to this Disclosure Statement.

*Recurrent Deficits.*  One of the principal causes of the Commonwealth's current fiscal crisis has been its inability to increase its revenues and reduce its expenditures to avoid recurrent structural deficits.  These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, or by deferring the cost of certain legacy liabilities.  The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities (such as employee retirement benefits), the ballooning cost of healthcare and the contraction of the revenue base due to prevailing economic conditions, have led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to generally accepted accounting principles in the United States.

*Employment.*  Total average annual employment, as measured by the Commonwealth's DLHR Household Employment Survey, known as the "Household Survey," has decreased in recent years.  The reduction in total employment began in the fourth quarter of fiscal year 2007, when total employment was 1,244,333, and continued consistently until the first half of fiscal year 2015, after which it mostly stabilized.  According to the Household Survey, the unemployment rate averaged 8.5% for fiscal year 2019, compared to 10.3% for the prior fiscal year.  This is down from 16.2% for fiscal year 2011.  The unemployment rate has declined by 35% since 2015; however, employment has increased by only 1.2%.

According to the DLHR's Current Employment Statistics Survey (Establishment Survey – NAICS Codes), total payroll non-farm employment decreased by 1% during fiscal year 2017 as compared to fiscal year 2016. Total private employment also fell during fiscal year 2017 by 0.6%, which translates to a reduction of almost 4,000 employees, as compared to the same period for the prior fiscal year.

*Aggregate Debt Burden of the Commonwealth and its Instrumentalities.*  As of May 3, 2017, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $72.8 billion (including accreted interest on capital appreciation bonds).  Of this amount, approximately $56 billion represents GO Bonds, debt payable from Commonwealth taxes or appropriations and debt of tax-supported public corporations.

For fiscal year 2020, the aggregate scheduled annual debt service on all bonds and notes issued by the Commonwealth and certain of its instrumentalities[142] is approximately $2.7 billion. The debt burden of the Commonwealth and its instrumentalities significantly increased during the past decade. A significant portion of the debt issued during this period was used to cover operational expenses of the Commonwealth and its public corporations.

The Commonwealth's ratio of tax-supported debt-to-revenue is more than double that of the U.S. states with the highest debt-to-revenue ratio, and almost seven times the U.S. state

---

[142] Instrumentalities include PBA, HTA, ERS, reorganized COFINA, GDB Debt Recovery Authority, PRIFA, PFC, and CCDA.

median.[143]  The Commonwealth's tax-supported debt per capita, as a share of GDP and as a share of personal income, is also disproportionally high when compared to mainland jurisdictions.

*Pension Liabilities.*  In addition to debt service on outstanding bonds, notes and other financial debt obligations, one of the most significant expenditures of the Commonwealth and its public corporations are pension benefits payable to retired employees.  The combined Retirement Systems' net pension liability was approximately $55.6 billion as of July 1, 2016.[144]  For further discussion and analysis of the pensions for the Commonwealth, see Oversight Board Report on Pensions, attached hereto Exhibit K.

Given the insolvency and impending exhaustion of ERS's liquid assets, the Oversight Board commenced the ERS Title III Case.  Furthermore, in August 2017, the Legislature enacted Act No. 106-2017, pursuant to which the Commonwealth adopted a PayGo system for the payment of pension benefits.  Under Act No. 106-2017, the Commonwealth makes pension payments from its General Fund.

**B.     Legislation Enacted by the Commonwealth to Address the Fiscal and Debt Crisis[145]**

1.     **Act 7-2009 ("Act 7")**

On March 9, 2009, the Commonwealth enacted Act 7, known as the "Special Act to Declare a State of Fiscal Emergency and to establish a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico."  This was the first statute where the Commonwealth exercised its police powers to address its fiscal crisis.  Act 7 implemented a number of initiatives, including a gradual operating expense reduction plan through a reduction of operating expenses and the reorganization of the Executive Branch, and a combination of temporary and permanent revenue raising measures. As part of the expenditure reduction measures, Act 7 established a plan for the downsizing of the government's payroll.  The first phase of the plan was an incentivized voluntary resignation and voluntary workday reduction program.  The second phase was a dismissals plan that went into effect if the expenditure reduction targets were not achieved by the first phase.  Such phase covered most Central Government employees and was applied according to employee seniority. Approximately 12,505 government employees were dismissed under the second phase.  The plan

---

[143] Based on data from the 2017 U.S. Census of Governments, the states with the highest levels of debt to revenue ratios are Massachusetts and Connecticut.  The states with the highest combined state and local government debt to revenue ratio are Kentucky, Illinois, and Texas (depending on what measure of revenue issued).  Kentucky also has the highest level of local government debt compared to local revenue.

[144] Excludes medical insurance plan contributions.

[145] Legislation enacted by the Commonwealth before and after the effectiveness of PROMESA on June 30, 2016 is preempted by section 4 of PROMESA to the extent it is inconsistent.  Additionally, it violates PROMESA section 204 to the extent the procedures for vetting the legislation for consistency with the certified fiscal plan are not followed, it violates PROMESA section 207 to the extent it modifies debt without Oversight Board consent, and it violates PROMESA section 108(a)(2) to the extent it would impair or defeat the purposes of PROMESA as determined by the Oversight Board.  By describing the legislation in this section of the Disclosure Statement, the Oversight Board is not waiving the application of PROMESA to any portion of it.

also imposed a temporary freeze on salary increases and other economic benefits included in laws, CBAs, and any other employee agreements.

### 2. Act 3-2013

As described above in section 0, on April 4, 2013, the Commonwealth enacted Act 3-2013 as a comprehensive reform of ERS. Act 3-2013 froze all retirement benefits accrued through June 30, 2013 and thereafter all future benefits would accrue under a defined contribution formula, raised the retirement age of participants, increase the employee contribution and reduced or eliminated post-employment benefits.

### 3. Act 66-2014 ("Act 66")

On June 17, 2014, the Commonwealth adopted Act 66, known as the Fiscal and Operational Sustainability Act, which imposed multiple fiscal measures, including: (i) the freezing of benefits under CBAs and the reduction of certain non-salary compensation; (ii) the contribution of the savings generated by certain public corporations to support certain General Fund expenditures; (iii) the freezing of formula appropriation increases to UPR and the municipalities; (iv) the freezing and reduction of formula appropriations to the Judicial Branch, the Legislature and certain other entities; (v) the reduction in school transportation costs; (vi) the reduction of rates for professional and purchased services; (vii) the freezing of water rates for governmental entities; and (viii) the implementation of a payment plan system for legal judgments. The measures were originally scheduled to sunset after fiscal year 2017, but most were extended by Act 3-2017 until fiscal year 2021.

### 4. Act 71-2014 ("Act 71")

After the rating agencies downgraded the Commonwealth's largest public corporations below investment grade and such entities were facing further liquidity constraints and a loss of access to the capital markets, the Commonwealth enacted Act 71 on June 28, 2014. Known as the Puerto Rico Debt Enforcement and Recovery Act, it provided an orderly process to allow certain public corporations to adjust their debts. Because the U.S. Congress excluded Puerto Rico's municipalities from seeking relief under chapter 9 of the Bankruptcy Code, the Commonwealth enacted Act 71 to fill that void by creating a legal framework that afforded an orderly debt restructuring process.

In June 2014, certain PREPA bondholders challenged the constitutionality of Act 71 before the District Court, which ruled in favor of bondholders and held that Act 71 was preempted by chapter 9 of the Bankruptcy Code. The District Court holding was upheld by the U. S. Court of Appeals for the First Circuit on July 6, 2015 and the U.S. Supreme Court on June 13, 2016.

### 5. The Moratorium Act and Creation of AAFAF (Act 21-2016)

On April 6, 2016, the Government enacted the Moratorium Act, which granted the Governor the authority to, among other things, (i) implement a moratorium on debt service payments, (ii) redirect certain monies historically conditionally appropriated to public entities for the payment of their obligations to the payment of essential services, and (iii) temporarily stay

related creditor remedies.  In connection with the Moratorium Act, then Governor Alejandro Garcia Padilla, issued a number of executive orders, including orders to declare a moratorium on the payment of debt service by various government entities.

AAFAF was also created under the Moratorium Act for the purpose of assuming GDB's role as fiscal agent, financial advisor and reporting agent to the Commonwealth and its instrumentalities and municipalities.[146]  In January 2017, the Legislature enacted Act 2-2017, which expanded AAFAF's role to include additional responsibilities related to the restructuring of the indebtedness of the Commonwealth and its instrumentalities and to oversee compliance with the fiscal plans and budgets of said entities approved by the Oversight Board pursuant to PROMESA.

### 6. Act 3-2017 ("Act 3")

On January 23, 2017, the Commonwealth enacted Act 3, which declared a fiscal and economic crisis and extended until July 1, 2021 the effectiveness of many of the fiscal austerity measures enacted by Act 66 that were originally scheduled to expire on July 1, 2017.  Act 3 adopted the following measures: (i) suspension of CBAs; (ii) freezing of compensation and employment benefits; (iii) reduction in the Department of Education's school transportation costs; (iv) implementing limitations on job openings; (v) eliminating 20% of trust employee positions; (vi) limiting the carryover of sick and vacations days between fiscal years; and (vii) application of a payment plan system for legal judgments.  Such measures may be terminated earlier if certain financial conditions are met, such as GNP growth of at least 1.5%, Commonwealth general obligations receive an investment grade credit rating, and no deficit financing is used by the Commonwealth.  Act 3 also extended the 4% excise tax imposed by Act 154 from December 31, 2017 until December 31, 2027.

### 7. Act 4-2017 ("Act 4")

On January 26, 2017, the Commonwealth enacted Act 4, known as the Transformation and Labor Flexibility Act, to increase participation in the labor market by adding flexibility to overtime regulations, increasing work requirements to become eligible for severance pay, and authorizing longer probationary periods.  In addition, work requirements to become eligible for the Christmas bonus were increased and the bonus was reduced by half during an employee's first year of employment.  Puerto Rico's law limiting the hours of operation of certain retail businesses on Sundays and certain holidays was also repealed.

### 8. Act 5-2017 ("Act 5")

On January 29, 2017, the Commonwealth enacted Act 5, known as the Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017, to repeal parts of Act 21-2016 and declare a financial emergency.  Although certain provisions of Act 21 were repealed, the debt moratorium orders issued under Act 21 continue in effect pursuant to Act 5.  Act 5 also established

---

[146] For a discussion of Act 5-2017, which amended the Moratorium Act, see section IV.B.5 of this Disclosure Statement.

an emergency period, during which the Governor may issue executive orders designating the priority for the use of available resources. The Governor was also granted broad receivership powers over government agencies in order to rectify the financial emergency.

Act 5 was amended by Act 46-2017 to authorize the Governor to continue extending the emergency period declaration by additional 6-month periods as long as the Oversight Board exists. The emergency period is currently set to expire on June 30, 2020, unless further extended by the Governor.

9.      **Act 26-2017 ("Act 26")**

On April 29, 2017, the Commonwealth enacted Act 26, known as the Fiscal Plan Compliance Act, to implement a broad array of fiscal measures to reduce costs across the Commonwealth and its public corporations and support the Commonwealth's compliance with the fiscal plan certified by the Oversight Board. Some of the most important measures implemented by Act 26 relate to the standardization of fringe benefits across the Central Government and public corporations. The measures adopted by Act 26 among other things: (1) reduced vacation and sick leave benefits; (2) reduced the number of public holidays; (3) reduced the Christmas bonus of employees of public corporations to $600 and conditioned its eligibility to six months of service per year or more; (4) replaced overtime pay for public employees with compensatory time; (5) eliminated the cash-out payment for sick day accruals and capped the liquidation for vacation leave accruals to 60 days; (6) nullified any provision of a CBA that provided public employees fringe benefits in excess of those set forth in Act 26; (7) imposed a special dividend tax on the Joint Underwriting Association; (8) ordered all public corporations and instrumentalities to transfer surplus revenues to the Treasury Department's General Fund; (9) established a process for selling real properties of the government; (10) shortened the effectiveness of most multiyear appropriations; (11) increased taxes on cigarettes and tobacco products; (12) reduced funding for the Conservatory of Music and the School of Plastic Arts; and (13) reduced until fiscal year 2021 the annual set aside for the Commonwealth's emergency fund.

Act 26 provides that when the fiscal situation has stabilized and the condition of the public fiscal situation so permits, the Fiscal Plan Compliance Committee established by the Act may suspend its effectiveness. The Committee is composed of three members, with the Governor, the Speaker of the House of Representatives, and the President of the Senate each appointing one member.

10.     **Act 106-2017 ("Act 106")**

On August 23, 2017, the Commonwealth enacted Act 106 to address the imminent depletion of the assets of the Commonwealth's retirement systems. Known as the Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Employees, Act 106 authorized the Commonwealth General Fund to assume the pension payments of the Retirement Systems through a PayGo system. Under the PayGo model, each employer is required to pay an amount determined by AAFAF corresponding to the actual payments of pension benefits to retirees and beneficiaries of such employer. Act 106 also created a defined contribution system for ERS participants. All contributions by ERS participants must

125

now flow into the defined contribution plan.  On May 17, 2019, the Commonwealth enacted Act 29-2019 to exempt municipalities from paying the PayGo charge for their retirees and the statutorily required contribution to the Commonwealth's Health Insurance Program.    The aggregate amount of the projected impact of such exemptions is approximately $311 million for fiscal year 2020, and $1.7 billion through fiscal year 2024.[147]

## C.    PROMESA[148]

### 1.    Enactment of PROMESA

On June 30, 2016, Congress enacted PROMESA, which provides a framework, among other things, for the Commonwealth and its covered instrumentalities to restructure their indebtedness by establishing:

- the Oversight Board, which provides oversight of the Commonwealth's and its covered instrumentalities[149] restructuring and revitalization efforts by, among other things: (i) certifying fiscal plans and budgets for the Commonwealth and its covered instrumentalities and (ii) representing the Commonwealth and its covered instrumentalities in any cases commenced under Title III of PROMESA;

- a court-supervised, quasi-bankruptcy process similar to chapter 9 of the Bankruptcy Code to allow the Commonwealth and its covered instrumentalities to restructure their indebtedness pursuant to a plan of adjustment; and

- a framework for the designation, oversight and implementation of critical infrastructure projects aimed at growing the Commonwealth's economy.

### 2.    Creation of the Oversight Board

PROMESA section 101(a) established the Oversight Board for the purpose of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets." The Oversight Board currently consists of seven voting members appointed by the President of the United States from a bipartisan list of nominees and a non-voting *ex officio* member appointed by

---

[147] The Oversight Board has filed an adversary proceeding challenging Act 29 as, among other things, unenforceable. For a summary of the Oversight Board's challenge, see section V.F.5(f) of this Disclosure Statement.  The Oversight Board's projected aggregate impact of such exemptions is currently being disputed in a litigation between the Oversight Board and the Government.

[148] This section summarizes certain provisions of PROMESA.  Although the Debtors believe that this description covers the material provisions of PROMESA, this summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, PROMESA.

[149] On September 30, 2016, the Oversight Board designated certain entities, including the Debtors, as covered instrumentalities.  Financial Oversight & Management Board for Puerto Rico, Annual Report, Fiscal Year 2017 (July 30, 2017).  On May 9, 2019, the Oversight Board supplemented the list of covered instrumentalities and designated 78 municipalities as covered instrumentalities under PROMESA.

the Governor.[150]  On August 31, 2016, President Obama appointed the Oversight Board's seven voting members, who are: (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González and (7) Ana J. Matosantos. As of August 21, 2019, Elí Díaz serves as the Commonwealth's non-voting *ex officio* member of the Oversight Board.

Each member of the Oversight Board serves a three-year term without any compensation and may be appointed to an unlimited number of consecutive terms.  When a term expires, Board members serve until replaced.  The President of the United States may remove any member for cause.[151]

In addition to its seven voting members and non-voting *ex officio* member, the Oversight Board also has an executive team, which includes: (i) Natalie A. Jaresko, as Executive Director and Interim Revitalization Coordinator, (ii) Jaime A. El Koury, as General Counsel, and (iii) Kyle A. Rifkind, as Deputy General Counsel and Restructuring Officer. Pursuant to the Oversight Board's bylaws, the Executive Director acts as the chief executive officer of the Oversight Board with general supervision and direction of its business affairs (including the power to enter into contracts on behalf of the Oversight Board), subject to the supervision and control of the Oversight Board.  The General Counsel acts as the chief legal officer of the Oversight Board.  The Revitalization Coordinator is responsible for executing the duties prescribed under PROMESA section 503 relating to the identification, prioritization and implementation of critical infrastructure projects for the Commonwealth.

In accordance with PROMESA section 108(a), the Oversight Board acts as an autonomous entity, such that neither the Governor nor the Legislature may exercise any control over the Oversight Board and its activities and cannot take any actions that would impair or defeat the purposes of PROMESA.  Although created by federal statute, the Oversight Board is not a "department, agency, establishment, or instrumentality of the Federal Government."  Instead, as set forth in PROMESA section 101(c)(1), the Oversight Board is deemed "an entity within the territorial government" of the Commonwealth.  The Oversight Board remains a small organization, with a flat hierarchy, and operates from offices located in San Juan, Puerto Rico and New York, New York.  One of its organizational goals during Fiscal Year 2019 was to take advantage of the incredible talent in Puerto Rico to build organizational strength through local recruiting, thereby reducing costs and the use of third-party consultants.  The overwhelming majority of the Oversight

---

[150] Certain creditors challenged the appointment and asserted it violated the Appointments Clause.  The dispute is currently pending before the U.S. Supreme Court.  *See* section V.F.1 of this Disclosure Statement.

[151] On February 15, 2019, the First Circuit issued a decision holding that PROMESA's provision for the appointment of members of the Oversight Board is unconstitutional.  However, the First Circuit affirmed the Title III Court's decision to deny the motions to dismiss the Title III petitions and stated that the ruling does not invalidate the Oversight Board's actions prior to the First's Circuit's judgment.  The First Circuit has since stayed its mandate to enable the Oversight Board to continue functioning during the U. S. Supreme Court's review of its decision.  On June 20, 2019, the U.S. Supreme Court granted the Oversight Board's petition for certiorari requesting review of the decision. For further discussion of litigation related to challenges under the Appointments Clause, see section V.F.1 in this Disclosure Statement.

Board's new hires are Puerto Ricans, several of whom have returned from the U.S. mainland to help Puerto Rico recover.

In accordance with PROMESA section 209, the Oversight Board will continue in existence until the Oversight Board certifies that: (i) the Commonwealth has adequate access to the short-term and long-term capital markets at reasonable interest rates to meet its borrowing needs and (ii) for at least four consecutive fiscal years: (a) the Commonwealth has developed its budgets in accordance with modified accrual accounting standards and (b) the expenditures made by the Commonwealth during each such fiscal year did not exceed its revenues during that year, as determined in accordance with modified accrual accounting standards.

### 3.     Oversight Board Powers and Responsibilities

***Certification of Fiscal Plans and Budgets***

One of the cornerstones of PROMESA is the development, certification and enforcement of fiscal plans and budgets for the Commonwealth and its covered instrumentalities.  Such fiscal plans and budgets provide a framework for achieving fiscal responsibility and access to the capital markets.  Fiscal plans are short-term and long-term planning tools, covering a period of at least five fiscal years, while budgets cover at least one fiscal year.  Budgets must be consistent with the fiscal plan then in effect.

PROMESA contemplates the Oversight Board and the elected government of the Commonwealth will work together to adopt a fiscal plan, but grants the Oversight Board the power to develop and certify its own fiscal plan if the government does not provide it with a proposed fiscal plan it determines to certify.  The process begins with the Oversight Board providing the Governor with a schedule for the development, submission, and certification of fiscal plans for the Commonwealth and any covered instrumentality.  The Governor is required to submit the proposed fiscal plan in accordance with such schedule.  Following submission, the Oversight Board may certify the proposed fiscal plan if it determines that such fiscal plan meets 14 statutory requirements set forth in PROMESA section 201(b), which are designed to "provide a method to achieve fiscal responsibility and access to the capital markets."  The fiscal plan must:

- provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws or (ii) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan;

- ensure the funding of essential public services;

- provide adequate funding for public pension systems;

- provide for the elimination of structural deficits;

- for fiscal years covered by a fiscal plan in which a stay under Title III or Title IV of PROMESA is not effective, provide for a debt burden that is sustainable;

- improve fiscal governance, accountability and internal controls;

128

- enable the achievement of fiscal targets;

- create independent forecasts of revenue for the period covered by the fiscal plan;

- include a debt sustainability analysis;

- provide for capital expenditures and investments necessary to promote economic growth;

- adopt appropriate recommendations submitted by the Oversight Board;

- include such additional information as the Oversight Board deems necessary;

- ensure that assets, funds or resources of a territorial instrumentality are not loaned to, transferred to or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III or a Qualifying Modification approved under Title VI of PROMESA; and

- respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

Fiscal plans must ensure the funding of essential public services. "Essential services" is a phrase used to refer, at a minimum, to services which, due to the police power, a court of competent jurisdiction can allow to be paid for from revenues to which a creditor has a priority claim or a valid, unavoidable secured claim. Use of such revenues pursuant to the police power may or may not give rise to additional claims of the affected creditors, depending on the circumstances. This Disclosure Statement and the Plan do not define "essential services" or "essential expenses" for several reasons including the following reasons.

*First*, Title II of PROMESA requires that a fiscal plan "ensure the funding of essential public services." This language sets a minimum floor on spending, meaning that the fiscal plan must fund essential services. At confirmation, the Title III Court considers the Plan. The fiscal plan's certification is outside the subject matter jurisdiction of the Title III Court pursuant to PROMESA section 106(e). PROMESA section 314(b)(7) requires that the Plan be consistent with the fiscal plan, but imposes no testing of the fiscal plan. Therefore, essential services are not in issue.

*Second*, each debtor's available revenues are property of each debtor subject to the exclusive subject matter jurisdiction of the Title III Court pursuant to PROMESA section 306(b). Title III of PROMESA incorporates the priority in section 507(a)(2) of the Bankruptcy Code, which grants priority for administrative expenses, but is silent as to the General Obligation claims in the Commonwealth's Title III case. Certain bondholders assert General Obligation claims are granted priority status, not by the Bankruptcy Code, but by the Commonwealth Constitution and PROMESA, including sections 201(b)(1)(N), 301(e), and 314(b). The Oversight

Board's settlement with holders of approximately $10 billion of General Obligation Bond and PBA Bond claims eliminates the need, in the Oversight Board's view, to litigate whether the General Obligation claims have priority, and any priority's terms.[152]  Therefore, the Oversight Board reasons that because the General Obligation claimholders are not claiming under the settlement revenues otherwise needed to pay essential services, there is no need to define essential services.  The definition of "essential services" therefore has no application or impact on how a creditor should vote on the Plan, which is the Disclosure Statement's primary focus.  *Third*, the settlement of the enforceability of the General Obligation claimholder's priority under the Commonwealth Constitution safeguards the payments to retirees under the Plan which could be adversely impacted if the General Obligation debtholders have an enforceable claim to all available revenues.  The settlement also safeguards the carrying out of the certified fiscal plan because it leaves no basis for the General Obligation debtholders to claim available revenues otherwise being deployed to pay expenses under the certified budget.  This again avoids disputes over essential services.  To obtain these benefits and safeguards, the Plan proposes treatments of holders of General Obligation claims which offer higher returns than the treatments offered to holders of some non-General Obligation claims.     Therefore, the Oversight Board asserts that there is no issue under PROMESA as to the priority of General Obligation debt vis-à-vis essential services.

*Fourth*, the Plan provides greater distributions to General Obligation claims than to some non-General Obligation claims  because holders of General Obligation claims may have a relative seniority to holders of non-General Obligation claims under the Commonwealth Constitution, which may be enforceable under PROMESA Title III.  This relative seniority, however, impacts rights of holders of junior claims, but is not a priority claim against the Commonwealth entitling holders of General Obligation debt to all available revenues.  Therefore, the definition of essential services has no application for purposes of Plan confirmations.

*Finally*, the concept of "essential services" is not conducive to simple listings of which services or expenses are essential, and which are not, because essential services may vary greatly over time and depending on circumstances post-confirmation.  For instance, if Commonwealth economic activity were so low during a period that elimination of any services would prevent sustainable economic growth then the Oversight Board might determine that all such services were essential.  The Commonwealth's certified fiscal plan covers periods of growth and shrinkage, and shows continued population shrinkage.  Accordingly, the best interest analysis for the Commonwealth analyzes creditors' recovery outside Title III by assuming different percentages of the certified fiscal plan and budget expenses are cut (on top of the cuts already in the fiscal plan) by various percentages, rather than engaging in a debate over each expense.  Thus, a definition of essential services is neither required by nor relevant to the best interest analysis pursuant to PROMESA.

After certification of the fiscal plan, the Oversight Board will provide to the Governor and the Legislature a schedule for the development and certification of budgets for the Commonwealth and its covered instrumentalities.  The Oversight Board must also provide to the Governor and the Legislature a revenue forecast for use in developing the budget.  If the Oversight Board determines

---

[152] The Oversight Board is unaware of any grant of a security interest in available revenues to such General Obligation claims.

the proposed Commonwealth budget submitted by the Governor is compliant with the approved fiscal plan, the Oversight Board will approve it and submit it to the Legislature.  If the Oversight Board determines the proposed budget is not compliant with the certified fiscal plan, it will provide a notice of violation to the Governor regarding the budget that includes a description of the necessary corrective action and an opportunity to correct such violation by submitting a revised budget that complies with the certified fiscal plan.  The Governor may submit as many revised budgets as the schedule established by the Oversight Board permits.  However, if the Governor fails to submit a Commonwealth budget that complies with the certified fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit to the Governor and the Legislature a budget that complies with the certified fiscal plan.  The Legislature will then submit to the Oversight Board the budget it adopts so that the Oversight Board can determine whether such budget complies with the certified fiscal plan.  If the budget adopted by the Legislature complies with the certified fiscal plan, the Oversight Board will approve it and such budget shall be in effect on the first day of the fiscal year.  If the Oversight Board determines that the budget adopted by the Legislature does not comply with the certified fiscal plan, the Oversight Board will provide to the Legislature a notice of violation that includes a description of the necessary corrective action and an opportunity to correct such violation.  The Legislature may submit as many revised budgets as the schedule established by the Oversight Board permits.  However, if the Legislature fails to adopt a budget that complies with the certified fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop a budget that complies with the certified fiscal plan and submit it to the Governor and the Legislature.  Such budget shall be deemed to be approved by the Governor and the Legislature and will be in effect on the first day of the fiscal year.  Budgets of instrumentalities are developed by the Governor and follow a similar process between the Governor and the Oversight Board, whereby the Governor develops an instrumentality budget and the Oversight Board reviews it to determine whether it complies with the instrumentality's certified fiscal plan.  If the Governor fails to develop an instrumentality budget that complies with the corresponding certified fiscal plan, the Oversight Board must develop it.

At the end of each fiscal quarter, the Governor must submit to the Oversight Board a financial report for the Commonwealth and each covered instrumentality describing actual revenues, expenditures and cash flows for such quarter.  If the Oversight Board determines that actual revenues, expenditures and cash flows are not consistent with the projected revenues, expenditures or cash flows set forth in the certified budget for such quarter, the Oversight Board will establish a deadline by which the Government must provide an explanation for the inconsistency that the Oversight Board finds reasonable or the Government must implement corrective actions to address such inconsistency.  If the Government fails to provide a reasonable explanation or to correct the inconsistency, the Oversight Board must certify to the President, the United States Congress, the Governor, and the Legislature that the Commonwealth is inconsistent with the certified budget and describe the amount of the inconsistency.  After providing such certification and determining that the Government has failed to correct the inconsistency, the Oversight Board can make appropriate reductions in non-debt expenditures to ensure that revenues and expenses are in line with the certified budget.  In the case of an instrumentality, the Oversight Board can also institute automatic hiring freezes and prohibit such instrumentality from entering into any contract.

131

Since the enactment of PROMESA on June 30, 2016, the Oversight Board has certified budgets for the Commonwealth for fiscal years 2018, 2019, and 2020. The Commonwealth's General Fund budget for fiscal year 2020 as certified by the Oversight Board authorizes approximately $9.1 billion in expenditures. The three largest categories of expenditures are: (1) K-12 and higher education (22%); (2) pension obligations due to PayGo (22%); and (3) healthcare (14%). Healthcare expenditures account for the increase in the General Fund budget primarily because of an increase in Medicaid expenses due to a reduction in healthcare Federal Funds.[153] The Commonwealth's fiscal year 2020 budget also included material reductions from the fiscal year 2019 budget in payroll expenditures ($156 million), subsidies to the UPR ($86 million) and municipalities ($44 million), and the elimination of the Christmas bonus ($58 million). In addition, for fiscal year 2020, the Oversight Board certified separate budgets for each instrumentality in order to provide greater transparency and improve budget monitoring.

In furtherance of the foregoing duties, the Oversight Board has the authority to enforce the certified fiscal plans and budgets by reviewing the activities of the government of the Commonwealth and its instrumentalities. Accordingly, the Commonwealth's proposed legislative acts must be submitted to the Oversight Board and must be accompanied by an estimate of the new law's impact on expenditures and revenues.

Since its creation, the Oversight Board and the former Governor disagreed on many occasions as to whether government reporting has complied with PROMESA and whether certain executive orders and newly enacted laws violated PROMESA and/or certified fiscal plans and budgets.

The Oversight Board also has the authority to review any of the contracts, rules, regulations and orders of the Commonwealth and its covered instrumentalities for their economic impact on the certified fiscal plans and budgets. If the Oversight Board determines any of the foregoing activities are inconsistent with a certified fiscal plan or budget, the Oversight Board may take any actions necessary to ensure that the enactment of a new law or execution of a new contract will not adversely affect compliance with the certified fiscal plan or budget. In addition, the Oversight Board at any time may submit to the Governor or the Legislature recommendations for actions that would ensure compliance with the fiscal plans or otherwise promote financial stability and management responsibility in the Commonwealth's public corporations. The Commonwealth may adopt or reject such recommendations, subject to providing a report to the President of the United States and Congress on its justifications for rejecting any recommendations. The Oversight Board, however, can in its certified fiscal plan adopt and impose recommendations the Governor declines to adopt. The Governor is appealing the Title III Court's ruling to that effect.[154]

PROMESA section 207 also provides the Commonwealth and its covered instrumentalities may not issue any debt without the approval of the Oversight Board.

---

[153] The 2019 GAO Report noted that given Puerto Rico's inaccessibility to capital markets and its fiscal condition, the Commonwealth government may not be able to cover future funding gaps when expanded federal funding for Medicaid expires.

[154] *See* section IV.C.3(h)(i) of this Disclosure Statement.

### Title III of PROMESA

If a consensual restructuring is not accomplished, Title III of PROMESA provides a quasi-bankruptcy option for the adjustment of the indebtedness of the Commonwealth and its covered instrumentalities. Eligibility for the Commonwealth or a Commonwealth instrumentality to be a debtor under Title III of PROMESA is conditioned on satisfaction of certain requirements, as set forth in PROMESA section 302. Pursuant to PROMESA section 304(b), the hearing to consider an objection to a Title III petition cannot commence until the 120th day after the petition is filed. At that hearing, the Title III Court will consider section 302's requirements that: (i) the entity has been designated by the Oversight Board as a covered territorial instrumentality; and (ii) the Oversight Board has issued a restructuring certification determining that (a) prior good-faith efforts were made with creditors to restructure the debt, (b) the entity's audited financial statements are publicly available and (c) the entity previously adopted a fiscal plan (the "Restructuring Certification"), and (iii) the entity desires to effect a plan to adjust its debts. The Oversight Board has exclusive authority, under PROMESA sections 304 and 312, to file a voluntary petition seeking protection under Title III and to file a plan of adjustment for the debtor and make modifications thereto. Furthermore, PROMESA section 315 grants the Oversight Board the right to "take any action necessary on behalf of the debtor to prosecute the cases of the debtor," and the Oversight Board "is the representative of the debtor" in the Title III case.

### Other Powers and Responsibilities

Pursuant to PROMESA section 208, within 30 days after the end of each Commonwealth fiscal year, the Oversight Board is required to submit an annual report to the President of the United States, Congress, the Governor and the Legislature. The annual report must describe the Commonwealth's progress in achieving PROMESA's objectives and how the Oversight Board has assisted such progress. In addition, the Oversight Board must describe the precise manner in which it used its funds during the fiscal year. The annual report may also include the Oversight Board's recommendations for further federal action, including amending PROMESA or enacting other legislation, to support compliance with certified fiscal plans.

In addition to the foregoing core responsibilities, the Oversight Board has also been granted other significant powers to assist in achieving its objectives. These additional powers include, among other things:

- holding hearings and sessions;

- obtaining official data from the Commonwealth, the federal government and creditors;

- issuing and enforcing subpoenas;

- entering into contracts;

- certifying voluntary restructuring agreements and protecting certain qualifying pre-existing restructuring agreements between the Commonwealth and its creditors;

- certifying debt modifications under Title VI of PROMESA;

133

- initiating civil actions to enforce its authority under PROMESA;

- investigating the Commonwealth's disclosure and selling practices related to its bonds;

- ensuring the prompt payment and administration of Commonwealth taxes through the adoption of electronic reporting, payment and auditing technologies;

- analyzing any materially underfunded pensions in the Commonwealth's pension system; and

- intervening in any litigation filed against the Commonwealth or its covered instrumentalities.

### *Implementation of Oversight Board Policies*

The Oversight Board implemented various initiatives in its efforts to meet the objectives of PROMESA, including, among other things:

a) **Improving the Government's Fiscal Governance, Accountability, Internal Controls, and Financial Affairs**

One of the Oversight Board's core responsibilities is to improve the Government's fiscal governance, accountability, and internal controls. Following the commencement of the Title III Cases, the Oversight Board continued to identify and implement structural and process improvements to fulfill its mandate pursuant to PROMESA.

A critical component of the Oversight Board's efforts in this area in Fiscal Year 2018 was the incorporation of the Office of the Chief Financial Officer for Puerto Rico ("OCFO")[155] into the certified fiscal plan for the Commonwealth. The Government previously established the base for the OCFO through an executive order, and the fiscal plan envisions an expansion of the role to implement financial management best practices from other states. The OCFO will centralize all financial management functions, including: (i) treasury and liquidity management; (ii) budget development, monitoring, and performance tracking; (iii) maintenance and integration of financial IT systems; (iv) procurement and human resources; (v) financial reporting including timely issuance of the CAFR; and (vi) general management and validation of funds, debt, and financial transactions.

The Oversight Board has exercised its powers pursuant to section 104(c)(2) of PROMESA which provides the Oversight Board the authority to request "direct access to such information systems, records, documents, information, or data." The Oversight Board entered into a memorandum of understanding with the OCFO to establish the procedures for granting the Oversight Board direct access to the Government's information systems. As part of the

---

[155] On June 24, 2019, after the removal of then CFO Raúl Maldonado, the Governor designated AAFAF Executive Director Christian Sobrino to be the Commonwealth's new CFO. Mr. Sobrino resigned from his positions as CFO and AAFAF Executive Director on July 13, 2019. On July 31, 2019, then Governor Rosselló named Omar Marrero as the Commonwealth's new CFO and executive director of AAFAF.

memorandum of understanding, and to be more efficient and effective in the transfer of knowledge, the Oversight Board and the OCFO established a working group composed of representatives from OCFO, the Puerto Rico Innovation & Technology Service and the Oversight Board to discuss related information systems and data.  The Oversight Board obtained access to certain financial data from the Puerto Rico Integrated Financial Accounting System ("PRIFAS"), one of the Government's payroll system and two applications from OMB.  The Oversight Board continues these efforts to gain visibility of the Governments' financial data and get a deeper understanding of current data limitations.

The Oversight Board established a series of reporting requirements to provide more transparency into the Government's financial management, including the TSA reporting requirement for the Central Government and the top agencies and public corporations (the "component units") within the Commonwealth fiscal plan.  The reports provide a snapshot of the Central Government's liquidity situation as compared to the projected annual liquidity plan.  This report is publicly reported by the Government on a weekly and monthly basis.

The Oversight Board also created a budget-to-actuals ("B2A") reporting requirement for the Central Government and the top twenty component units, as well as public corporations such as PREPA and PRASA, which has pushed the Government to add resources and capacity to its budgeting and accounting departments.  The B2A reporting requirement has enabled the Government to provide greater visibility to stakeholders into its actual spending patterns and an early warning mechanism to alert the Government and the Oversight Board if actual spending deviates from budgeted amounts.  The B2A report is publicly reported by the Government on a monthly basis.

Other reporting requirements implemented by the Oversight Board include: (i) monthly public reporting of pension obligation balances for the Government and public corporations, (ii) monthly public reporting of public employee payroll, headcount, and attendance data, (iii) quarterly reporting of revenue forecasts, and (iv) the full text of all Government on the Comptroller's website.

The Oversight Board also instituted a holdback provision in the General Fund budget which provides that recipients of appropriations may receive only a portion of their budgeted appropriations until the final quarter of the fiscal year so that the Government can determine whether revenue will be sufficient to permit the spending of the final appropriations in the fourth quarter.  For fiscal year 2019, that amount was 95%, meaning the remaining 5% of appropriations were held back.  For fiscal year 2020, that amount was 97.5%, meaning 2.5% was held back.  In addition, for fiscal year 2020, the Oversight Board eliminated the ability to use prior year appropriations beyond the first 60 days of the next fiscal year, to force the Government to close out the prior fiscal year on a timely basis, and established additional emergency reserves whose use is subject to Oversight Board approval.

b)      **Efforts to Drive More Successful Implementation of Fiscal Plan
Reforms**

The fiscal plan requires the Government to submit implementation plans to outline
timelines and Key Performance Indicators ("KPIs") for all fiscal measures and structural reforms,
and to provide monthly progress reports on implementation. These implementation plans and
progress reports are essential to ensure the Government is operating within the fiscal envelope and
making progress on structural reforms, and to afford the Oversight Board the opportunity to
provide feedback on critical efforts to restore fiscal sustainability and balance to Puerto Rico.

The Government was required to submit all implementation plans by June 30, 2018.
Approximately 73% of 128 implementation plans were received. In general, the submitted
implementation plans were not fully aligned with the Certified Fiscal Plan and did not provide
sufficient clarity to support compliance. As such, on September 2018, the Oversight Board
provided feedback to the agencies on the implementation plans submitted and requested the
Government take corrective actions and complete submissions on missing implementation plans.
The Government updated some implementation plans based on the feedback provided, but has not
submitted all implementation plans as required.

Through a collaborative process, the Oversight Board and the Government established an
implementation structure to provide insight into agency activities. Said structure, inclusive of
monthly progress reports and working group meetings, provided understanding on the agency
activities, risks and likelihood of hitting the savings targets established in the Certified Fiscal Plan.

The Oversight Board has worked diligently to drive more successful implementation
through:

1.  monthly meetings with priority agencies to spur implementation progress;

2.  publicly reporting the status of progress achieved in Government implementation plans
    and progress reports;

3.  utilized readiness assessments based on best practices to provide a framework for
    agencies to track progress on implementation and understand the scope of the different
    milestones; and

4.  public hearings on implementation in areas of much needed transformation.

In March 2019, for example, the Oversight Board held a Public Hearing on the progress
made to date by the Department of Public Safety. On September 26, 2019, the Oversight Board
held a Public Hearing on the progress made to date on Ease of Doing Business reforms.

c)      **Section 205 Recommendations**

Pursuant to PROMESA section 205, the Oversight Board may, at any time, submit
recommendations to the Governor or the Legislature on actions the Government may take to ensure
compliance with the certified fiscal plan, or to otherwise promote the financial stability, economic

growth, management responsibility, and service delivery efficiency of the Government.   The Oversight Board sent four section 205 Recommendations to the Government in Fiscal Year 2019:

- To recommend that the Governor rescind Executive Order 2018-033 ("EO18-33"), which set a minimum wage of $15 per hour for those performing work for federally funded construction projects.   Specifically, based on a preliminary analysis of the available information and research, the Oversight Board was concerned about the impact that EO18-33 will have on private sector employment, particularly in construction, but with the potential to leak into the broader economy.   The Governor declined to adopt this recommendation.

- To recommend that the Government take necessary steps to transfer the rights and ownership of the Puerto Rico Public Broadcasting Corporation to a private non-profit entity.   The Governor adopted this recommendation, albeit within a delayed time frame, and has set up a working group to implement it.

- To recommend that the Puerto Rico State Elections Commission (the "CEE" in Spanish) adjust its operations to fluctuate with the electoral cycle and restructure its organization to become more efficient.   The Governor declined to adopt this recommendation.

- To recommend the establishment of a competitive process for use of the Municipal Improvement Funds ("MIFs") and increase the transparency surrounding the capital project selection process.   On August 30, 2019, AAFAF responded on behalf of Governor Vázquez Garced that it believes the Legislature is the entity with the authority to adopt the recommendation concerning the use of Municipal Improvement Funds, because the Legislature "distributes and determines the use of the Municipal Improvement Funds. . . ." pursuant to Section 4050.09 of Act 1-2011.  Based on that belief, the Governor did not take a position on the recommendation.

      d)   **Title V Critical Projects Process**

On April 20-21, 2017, the Oversight Board hosted a summit on P3 and Title V Critical Projects.   Throughout the 2017 Fiscal Year, the Oversight Board and interim Revitalization Coordinator developed the criteria and processes for selecting, implementing, and monitoring critical infrastructure projects, particular to the energy industry.

Following the aftermath of Hurricanes Irma and Maria, the Revitalization Coordinator restarted the critical projects process, hiring the requisite personnel, retaining local firms for additional support, and overhauling the project submission website.

On June 27, 2018, Oversight Board designated "Viewpoint at Roosevelt," a public housing development funded with federal funds, as its first critical project.   This project is expected to provide both critically needed housing (over 130 housing units) as well as increase ridership in the local rail system because it is located in a "public transport corridor."

On July 31, 2018, the Oversight Board adopted a Title V policy that helped further specify procedural requirements the Revitalization Coordinator must follow when considering potential critical projects.  The policy clarifies requirements for projects that involve doing business with any government agency or public corporation, especially, energy related projects that require a Power Purchase and Operating Agreement ("PPOA").  All projects that require obtaining a contract or Request for Proposal ("RFP") award from any government agencies or public corporations must obtain such contract or RFP award prior to the project submission through Title V.  In the case of energy related projects, projects that require a PPOA must be validly assumed under Title III of PROMESA in order to satisfy the contract award requirement.

The Title V policy of July 31, 2018 gave way for the Revitalization Coordinator to focus efforts on projects that had obtained valid contract awards or RFP awards, and other projects, such as private to private or with a municipal government.

By the beginning of fiscal year 2019, the Revitalization Coordinator evaluated 55 projects totaling an excess of approximately $9 billion dollars.  Upon adoption of the Title V policy as of July 31, 2019, active projects had to be withdrawn from participation or placed on hold (at project sponsor's discretion) since approximately 80% were energy related requiring a valid PPOA assumed under Title III and the remaining approximately 19% required a government RFP or similar.  The remaining 1% of the 55 evaluated projects constituted a qualifying project (Viewpoint at Roosevelt Project) and a rejected project that did not meet initial requirements. Nevertheless, many energy related project sponsors continued to negotiate their contracts with PREPA through the respective process and demonstrated interest in reactivating their project submission upon successfully complying with the Oversight Board's Title V policy.

On August 26, 2019, the Oversight Board announced that it had designated a $5.3 million expansion of the Fajardo municipal landfill as its second critical project.  The project, which will play a significant role in revitalizing Puerto Rico's infrastructure, addresses the Commonwealth's need to diversify energy generation and solve the solid waste management crisis in the aftermath of hurricanes Irma and Maria.

There are currently no further projects in the pipeline.

e)      **Review of Legislative Acts and Certain Rules, Regulations, Administrative, and Executive Orders**

PROMESA section 204(a) requires that the Government submit to the Oversight Board all new laws, no later than 7 business days after the law is duly enacted.  The Governor must also submit certain rules, regulations, and executive orders to the Oversight Board for review and approval pursuant to sections 204(b)(2) and (b)(4) of PROMESA and policies established by the Oversight Board.  The singular objective is to assure that all enacted acts as well as any proposed rule, regulation, administrative order, and executive order will have no adverse impact on the certified fiscal plan or budget. The Government has consistently failed to comply with its obligations under section 204(a) to send acts no later than seven business days after enactment. Over 100 signed acts and joint resolutions were not submitted to the Oversight Board as required by PROMESA.  Most recently, the Oversight Board sent a letter to Governor Vázquez urging the

government to delay implementing Executive Order 2020-10 until after the Oversight Board has the opportunity to review the executive order and supporting documentation to ensure compliance with PROMESA section 204(b)(2). Executive Order 2020-10 would exempt the Commonwealth executive branch from having to follow contracting requirements in an effort to accelerate recovery efforts following the continued earthquakes.

The Oversight Board has commenced an action under PROMESA sections 108(a)(2), 204(a)(5), 204(c), and 207 to prevent the implementation of Act 29 and numerous joint resolutions, because such laws are significantly inconsistent with the applicable certified fiscal plan, reprogram funds without Oversight Board approval, modify debt without Oversight Board approval, and/or otherwise were not properly submitted to the Oversight Board pursuant to PROMESA section 204(a). This is the first action filed under PROMESA section 204. *See* section IV.C.3.h) of this Disclosure Statement for a summary of such action.

Following the commencement of such action, on October 25, 2019, Governor Vázquez signed Executive Order 2019-057, which creates a procedure for the express purpose of complying with PROMESA section 204(a). The procedure requires, among other things, the OMB and the Puerto Rico Department of Treasury to complete and submit to AAFAF within seven business days of the Governor's signing new legislation a certified analysis of the financial and budgetary impact of that law.

### f)    Contract Review

On November 6, 2017 (as modified on June 18, 2018), the Oversight Board established a policy, pursuant to PROMESA section 204(b)(2), to require prior Oversight Board approval of contracts with an aggregate value of $10 million or more that would be entered into by the Commonwealth or any covered instrumentality. The policy's objectives are to promote market competition and ensure a government contract's consistency with the applicable certified fiscal plan and certified budget. Accordingly, the Oversight Board focuses its review on whether the contract is consistent with the fiscal plan and in the case of disaster aid spending, provide observations regarding the compliance with federal funding and/or reimbursement requirements.

In order to make the contracting policy more transparent, the Oversight Board publishes a status report of each contract under review, including the name of the contracting party, the date of submission, the date of any response from the Oversight Board or from the contracting party, and a copy of all the Oversight Board's formal responses. The policy requires that the government contracting entity submit to the Oversight Board a certification whereby its head or general counsel certifies that no person has unduly intervened, offered anything of value or wielded any influence in connection with the execution of the contract. The policy requires that contractors submit a similar certification to the Oversight Board and disclose any sharing of any portion of its compensation with any third party. Since the inception of the Contract Review Policy, the Oversight Board has reviewed 197 contracts for a total aggregate value of over $16.5 billion.

Moreover, the Oversight Board included in the fiscal plan a requirement for the text of all government contracts to be made public on the Office of the Comptroller's website by September

30, 2018, and executed a memorandum of agreement with the Office of the Comptroller to promote transparency in government contracting.

### g)     Debt Transaction Approvals

In December 2017, the Oversight Board established a policy pursuant to PROMESA section 207 to require prior Oversight Board approval of any debt transaction to be entered into by the Commonwealth or any covered instrumentality.  The objectives of this policy are to promote fiscal prudence and ensure that the debt transactions are consistent with the applicable certified fiscal plan.

During Fiscal Year 2018, the Oversight Board approved a variety of debt transactions.  The Oversight Board approved, among other transactions, a loan from the Commonwealth to PREPA. The Oversight Board also approved the liquidation of guarantees that the GDB or its subsidiaries issued to private developments and the refinancing of certain loans that the Department of Housing and Urban Development issued to the municipalities of Camuy and San Lorenzo.

### h)     Oversight Board Ethics Website

On June 21, 2019, the Oversight Board announced the launching of its new Ethics Website,[156] an internet-based tool to promote transparency and ethics in the Oversight Board's day-to-day operations.  The site contains scores of Oversight Board governance documents, members' quarterly periodic transaction reports and annual financial disclosure reports, an interactive Ethics Advisor Blog, and other resources to guide visitors through the Oversight Board's ethics and good governance policies and actions.  The goal of this site is to continue to promote the importance of transparency and ethics in the work that the Oversight Board does for the Debtors' stakeholders, and to provide an interactive tool to share important documents, developments, resources, and mediate to promote ethics and integrity in everyday life, business, and policy.

### *Controversies over Board's Powers*

There has been litigation over the Oversight Board's powers and issues with the governmental reporting PROMESA requires to provide the transparency into the Government that the Oversight Board needs to implement PROMESA.[157]  The controversies have involved, among other things, whether the Oversight Board can impose what the Government considers policy choices and whether the Governor and Legislature can reprogram budget appropriations from prior years so as to spend money the Oversight Board has not approved.  These and certain other controversies are described below.

---

[156] http://www.oversightboard.pr.gov/ethics/

[157] As noted above, the Oversight Board has sent numerous letters to the Commonwealth Debtor seeking to rectify violations of PROMESA.

        (i)     *Rosselló Nevares v. The Financial Oversight and Management Board for Puerto Rico*, Adv. Proc. No. 18-00080

On July 5, 2018, Governor Rosselló and AAFAF filed a complaint against the Oversight Board, each individual Oversight Board member, and the Oversight Board's executive director, seeking declarations that (i) the Oversight Board lacks the authority to impose policy initiatives on the Commonwealth Government through a fiscal plan and/or budget, including the June 2018 Fiscal Plan and the Commonwealth budget for fiscal year 2019, as certified by the Oversight Board on June 29, 2018; (ii) the substantive policy mandates contained in the June 2018 Fiscal Plan, and rejected by the Governor pursuant to PROMESA section 205, are null and void; and (iii) the substantive policy mandates contained in the Oversight Board's fiscal year 2019 budget exceed the Oversight Board's powers and are null and void.   Plaintiffs also sought an injunction prohibiting Defendants from implementing and enforcing certain provisions included in the June 2018 Fiscal Plan that Plaintiffs characterize as recommendations.

On July 12, 2018, the Oversight Board filed a motion to dismiss the complaint.  On July 17, 2018, Plaintiffs filed an opposition to the motion to dismiss, and on July 20, 2018, the Oversight Board filed a reply in support of its motion to dismiss.  On August 7, 2018, the Title III Court entered an order granting in part and denying in part the motion to dismiss.  The Title III Court granted the motion to dismiss the Government's claims regarding (i) agency consolidation and compensation reductions/hiring freezes because there was not a ripe case or controversy and (ii) budgetary reprogramming because such reprogramming by the Government would be inconsistent with PROMESA's declaration that the budget certified by the Oversight Board is in full force and effect, and therefore preempted by section 4 of PROMESA.  The Title III Court did not dismiss claims regarding automatic budget reductions and corrective measures.  In so ruling, the Title III Court made certain substantive decisions.  Among other things, the Title III Court ruled that "[t]he power bestowed on the Oversight Board by Section 201(b)(1)(K) of PROMESA allows the Oversight Board to make binding policy choices for the Commonwealth, notwithstanding the Governor's rejection of Section 205 recommendations."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 330 F. Supp. 3d 685, 700 (D.P.R. 2018), *aff'd and remanded*, 945 F.3d 3 (1st Cir. 2019).  The Title III Court also rejected the Government's argument that unspent funds from prior-year budgets could be spent outside of the strictures of the current year's budget, despite section 204(c)'s prohibition on unapproved reprogramming.  The Court ruled:  "It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year.  Since a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget."  *Id.* at 704.

On September 10, 2018, Plaintiffs filed an urgent motion requesting certification of the Title III Court's August 7, 2018 opinion and order for immediate appeal under PROMESA sections 306(e)(3)–(4).  On October 9, 2018, the Title III Court entered a memorandum order certifying certain aspects of the August 27, 2018 opinion and order for interlocutory appeal.  The appeal was docketed as Case No. 18-8021.  The Oversight Board answered the complaint's remaining claims on November 2, 2018.

On November 20, 2018, the United States Court of Appeals for the First Circuit entered a judgment, concluding that review of the certified issues was warranted.  The appeal was docketed on November 28, 2018, as Case No. 18-2154.  Following briefing, oral argument was held on July 24, 2019.  On December 18, 2019, the First Circuit affirmed the District Court decision, confirming there is nothing in PROMESA section 205, "suggesting that, by first seeking the Governor's agreement on a matter, the Board somehow loses whatever ability it otherwise had to act unilaterally on the matter," and the Oversight Board has the power to adopt "a rejected recommendation if it otherwise has the power to adopt the recommended action on its own." *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 6-7 (1st Cir. 2019).  The First Circuit further affirmed the District Court's ruling on reprogramming, noting "PROMESA prohibits the Governor from spending any funds that are not budgeted regardless of whether the recommendation had been adopted" and "regardless of what any territorial laws say."  *Id.* at 8.

      (ii)     *Rivera - Schatz et al v. The Financial Oversight and Management Board for Puerto Rico et al.*, Adv. Proc. No. 18-00081

On July 9, 2018, Plaintiffs, Hon. Thomas Rivera-Schatz, in his official capacity as President of the Senate of Puerto Rico and on behalf of the Senate of Puerto Rico, and Hon. Carlos J. Méndez-Núñez in his official capacity as Speaker of the House of Representatives of Puerto Rico and on behalf of the House of Representatives (collectively, the "Legislature"), filed a complaint seeking declaratory and injunctive relief against the Oversight Board, and each of its members and its executive director solely in their official capacities.

The Legislature sought declaratory and injunctive relief, arguing the Oversight Board "overreached its powers" by "trying to force" the Legislature to pass a bill retroactively repealing Law 80 (Puerto Rico's wrongful dismissal act) as a condition for the approval of a Commonwealth's budget approved by the Legislature. The complaint also sought an injunction prohibiting Defendants from implementing the Oversight Board's 2019 budget and directing the Oversight Board to certify the 2019 budget approved by the Legislature on June 30, 2018.

On July 17, 2018, Defendants filed a motion to dismiss the complaint.  Following the completion of briefing and after a hearing on July 25, 2018, the Title III Court issued an order dismissing the complaint in its entirety.  The Title III Court held that it lacked jurisdiction to review the Oversight Board's certification decisions, as sought by the complaint, as such review is "directly precluded by Section 106(e)."  *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 364, 371 (D.P.R. 2018), *aff'd*, 916 F.3d 98 (1st Cir. 2019).  It also affirmed that the Oversight Board may use its "powers in a manner designed to incentivize assent to the policy goals supported by the Board."  *Id.* at 373.

On August 13, 2018, Plaintiffs filed a notice of appeal to the First Circuit, which was docketed as Case No. 18-1777.  On February 22, 2019, following briefing, the First Circuit affirmed the Title III Court's decision, ruling, among other things, that "[u]nder PROMESA's preemption provision, the grant of authority to the Board at sections 201 and 202 to approve Fiscal Plans and Budgets 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA],'" and that

"[w]hen the Board certified the 2019 Fiscal Plan and Budget … it [properly] exercised authority granted to it under PROMESA."  *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019).

(iii)    *Autonomous Municipality of San Juan v. Financial Oversight & Management Board for Puerto Rico, et al.*, Case No.  19-01474

On May 19, 2019, the Autonomous Municipality of San Juan ("San Juan") filed a complaint against the Oversight Board in the District Court for the District of Puerto Rico alleging that (i) the Oversight Board's designation of San Juan as a covered entity for purposes of oversight under PROMESA is without a rational basis; (ii) PROMESA is unconstitutional because it does not provide sufficient bounds to the Oversight Board's discretion and therefore violates the non-delegation doctrine; and (iii) the designation is invalid because the Oversight Board's members were appointed in violation of the Appointments Clause.  On July 1, 2019, the Oversight Board filed a motion to transfer the case to the Title III Court, which the District Court granted after briefing.  On August 9, 2019, the Oversight Board filed a motion to dismiss.  On September 13, 2019, San Juan filed its opposition to the motion to dismiss.  On October 8, 2019, the Oversight Board filed a reply in support of its motion to dismiss.  On December 5, 2019, the Title III Court issued an order granting the motion to dismiss counts I and II of the complaint and staying count III pending the Supreme Court's decision in the Appointments Clause litigation described below in Section V.F.1a.

(iv)    *Financial Oversight & Management Board for Puerto Rico v. Hon. Vázquez Garced, et al.*, Adv. Proc. No. 19-00393

On July 3, 2019, the Oversight Board filed a complaint against then-Governor Rosselló and AAFAF, challenging Act 29-2019 (which eliminates the obligation of municipalities to reimburse the Commonwealth for pension payments to municipality retirees and make payments to the Commonwealth's health plan) as well as 23 joint resolutions.  Specifically, the complaint alleges that (i) Act 29-2019, including its enactment and enforcement, violates PROMESA sections 204(a), 204(c) and 207;  (ii) the Oversight Board is entitled to a permanent injunction prohibiting Defendants from implementing Act 29-2019; (iii) the Oversight Board is entitled to an injunction compelling the Governor to submit PROMESA section 204(a) certifications for Act 29-2019, the new laws and non-certified joint resolutions; (iv) Act 29-2019 and the joint resolutions violate PROMESA section 108(a) and are not enforceable and are of no effect because they impair and/or defeat the purposes of PROMESA, as determined by the Oversight Board; and (v) the Governor's alleged policy of not providing certifications as required under PROMESA section 204 violates PROMESA section 108(a) because it impairs and/or defeats the purposes of PROMESA, as determined by the Oversight Board.

Defendants filed a motion to dismiss on July 15, 2019, and following the completion of briefing, the Title III Court heard oral argument on August 15, 2019.  Also on August 15, 2019, in light of former-Governor Rosselló's resignation, the case was re-captioned to name current Governor Vázquez as a Defendant.  On August 22, 2019, the Title III Court denied the motion to dismiss.  Defendants answered the complaint on September 10, 2019.  On December 13, 2019, the Oversight Board filed a motion for summary judgment.  Defendants filed their opposition to the

Oversight Board's motion on February 5, 2020.  The Oversight Board filed a reply in support of its motion for summary judgment on February 24, 2020.  Oral argument is scheduled for March 4, 2020.  On February 27, 2020, CRIM filed a motion for leave to file an amicus brief.  On February 28, 2020, Judge Swain issued an order scheduling briefing on the motion.

## D.      Adoption of Commonwealth Fiscal Year Budgets and Fiscal Plans

*Fiscal Plans.*  The Oversight Board is tasked with interacting with the Governor for fiscal plans and the Governor and legislature for budgets in the development, submission, approval, and certification of fiscal plans and budgets.  Thus, starting as early as September 2016, the Oversight Board alongside its economists, municipal consultants, and financial advisors spent hundreds of hours researching and hosting working sessions to understand the dire situation in Puerto Rico, and to research various ways in which states and sovereigns have exited such dire circumstances. The Oversight Board also held numerous internal and external meetings with the government officials and the various creditor groups.  The Oversight Board analyzed the many fiscal challenges that Puerto Rico faced and within only a few months was in a position to formulate its own fiscal plan or evaluate the Government's proposed fiscal plan.

The Oversight Board is tasked with determining in its sole discretion whether proposed fiscal plans comport with PROMESA section 201(b).  Among PROMESA's goals is that the fiscal plan provides Puerto Rico with permanent, pro-growth fiscal reforms,[158] and a method to achieve fiscal responsibility and access to the capital markets.

Through a collaborative process with the Commonwealth Government, the Oversight Board has certified fiscal plans that strive to restore fiscal accountability and achieve measurable objectives.  For example, the fiscal measures in the certified fiscal plans focus on enhancing tax payment processes so that revenue collection can increase while improving user experience.  They also highlight achieving efficient government services through right-sizing measures that improve services while reducing cost, as well as reduction of subsidies to non-Central Government entities who currently over-rely on Central Government support. These fiscal measures have been carefully developed by and through collaboration with the Government, while also emphasizing the effectiveness of government through thoughtful assessments and benchmark studies which bring measurable targets and milestones for quantitative and qualitative improvements.  The certified fiscal plans also endeavor to meet the future funding needs by planning for and developing initiatives to address various anticipated fiscal issues, including rapidly rising healthcare and pensions costs.

In addition to instituting fiscal measures, the Oversight Board has been working closely with the Government to counter over a decade of real economic decline – compounded by the devastating damages of the hurricanes – by identifying a series of structural reforms to ensure the competitiveness and rebuilding of Puerto Rico's economy.  Those reforms span from ease of doing

---

[158] PROMESA § 701 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.").

business reform to make it easier for new businesses to start and firms to invest, labor reform, energy reform, infrastructure reform, and to long-term educational investments.

***Annual Budgets***.  PROMESA section 202(c)(1) sets forth a process for the approval of annual budgets that must comply with the certified fiscal plan.  In the first instance, PROMESA section 202(c)(1) provides the Governor with the initial opportunity to develop and submit to the Oversight Board a budget for the applicable fiscal year.  The Oversight Board then conducts a detailed review of the proposed budgets to ensure that governmental appropriations are consistent with the certified fiscal plan, including priority government services, such as public safety, education, and healthcare, while implementing cost saving measures.

The preparation of a certified budget is a year-long process that the Oversight Board has refined to ensure that the certified budget contains the desired transparency and spending controls. As part of that process, the Oversight Board put in place significant controls on spending to restore fiscal discipline while outlining specific measures to promote efficiency and improved delivery of government services.  This currently includes controls on disbursements of appropriations such that 2.5% is set aside and held until the 4th quarter each fiscal year, any modifications to the certified budget must be submitted to the Oversight Board for its review and approval, and limitations on the use of prior year appropriations.

The Oversight Board also conducts due diligence on individual agencies requiring the government to submit support for their requested budgets. The process includes a review of spending trends by concept of spend while incorporating budget requirements for new programs and services.  For fiscal year 2020, the Oversight Board conducted dozens of meetings with OMB and individual agencies to discuss their spending patterns as well their planned spending for fiscal year 2020.  The meetings allowed agencies to highlight key areas of risk, anticipated changes in fiscal year 2020, required headcount, and their ability to implement measures as set forth in the certified fiscal plan.

The certified budget groups individual agencies that are expected to be consolidated as proposed by the Government and the fiscal plan. Each agency's budget provides detailed spending by concept of spend and by object code (*e.g.,* salaries, overtime, healthcare, leases, maintenance & repairs) to provide greater government spending transparency.  OMB and specific agencies further refined the budget by program within these parameters.

The certified budget that contains the spending appropriations for each agency specifies the manner in which funds are disbursed on a monthly basis to various governmental entities, obligate the Department of Treasury to provide updated net revenue forecasts, rescind prior year appropriations (except where specifically exempted), require AAFAF to certify unused appropriations of the prior year, suspending OMB's, AAFAF's, or the Department of Treasury's rights to reprogram or extend appropriations, and reiterate the requirement to comply with reporting requirements in the certified fiscal plans.  In addition, the certified budget requires that the Governor provide to the Oversight Board a quarterly report of revenue and expenditures consistent with PROMESA section 203.

1.    **Development and Certification of the March 2017 Commonwealth Fiscal Plan**

On October 14, 2016, then-Governor Alejandro García Padilla presented the Oversight Board with a fiscal plan that contemplated a budget deficit of $4.8 billion for fiscal year 2017, after the implementation of expenditure measures and revenue enhancements, and before allocating money for debt service.

On November 10, 2016, the Oversight Board issued a public invitation to interested third parties to comment on the October 14, 2016 fiscal plan submission.

The Oversight Board declined to certify the Governor's October 2016 fiscal plan as it did not believe the plan met the requirements of PROMESA.  Among other things, the Oversight Board was not satisfied that the proposed fiscal plan included sufficient measures to rein in expenses or grow revenue.  In rejecting the fiscal plan, the Oversight Board provided substantial comments and guidance, including by listing the five principles that would guide the Oversight Board in its decision whether to certify the next proposed fiscal plan.  These five principles addressed the temporal period of the fiscal plan and the 14 criteria under PROMESA section 201(b), the goals of the fiscal plan to stabilize the economic situation and increase resilience, an assessment of fiscal outlook and base-case scenario, an inclusion of appropriate mix of structural reforms, fiscal adjustment and debt restructuring, and an accompaniment of operational plan for the changes and reforms.

The prior administration did not submit a revised fiscal plan by December 15, 2016, as the Oversight Board had requested.  However, the Oversight Board continued to provide substantive detail on the goals and framework for the fiscal plan to then-Governor Alejandro García Padilla and then-Governor Rosselló in a letter dated December 20, 2016, with the hope of achieving a certifiable fiscal plan by January 31, 2017.

On January 2, 2017, the administration of newly elected Governor Rosselló took office. He immediately requested an extension of the fiscal plan submission deadline and engaged in collaborative discussions with the Oversight Board through in-person meetings and written correspondence.  The Oversight Board responded on January 18, 2017, with a proposed extension of the submission deadline to February 28, 2017 and provided detailed information on the specific goals, objectives, and fiscal parameters needed for a certifiable fiscal plan.

On February 28, 2017, the new administration submitted a proposed fiscal plan to the Oversight Board.  The Oversight Board raised concerns regarding the proposed fiscal plan.  After reviewing the proposed fiscal plan with the Governor's representatives and analyzing and deliberating over it, the Oversight Board informed the Governor on March 9, 2017 of its determination that the Governor's proposed fiscal plan did not satisfy PROMESA's requirements. The Oversight Board identified violations and recommended revisions.

Then-Governor Rosselló submitted a revised proposed fiscal plan on March 11, 2017, and representatives of the Governor and of the Oversight Board engaged in extensive discussions on March 11 and 12, 2017.  After the new administration complied with the requirements the Oversight Board had specified and submitted a final revised version on March 13, 2017, the

146

Oversight Board determined the final revised fiscal plan, with two amendments relating to (i) right-sizing measures and related implementation plan, liquidity plan, and cash reserve generation, and (ii) pension benefits, would comply with the requirements for certification. The Oversight Board voted unanimously to certify the fiscal plan on March 13, 2017 (the "March 2017 Fiscal Plan"). By letter dated April 15, 2017, the Oversight Board informed the Governor and the Legislature that it certified a revised version of the March 2017 Fiscal Plan (which had included the two Board imposed amendments) with corrections of certain typographical and formatting errors and the other minor data-conforming changes. The changes and the corrections did not materially alter the substance of the March 2017 Fiscal Plan, or the Oversight Board's view of such plan. On May 31, 2017, the Government requested to amend the certified March 2017 Fiscal Plan with the revised revenue forecast, which was also incorporated in the proposed fiscal year 2018 budget. On May 31, 2017, the Oversight Board unanimously re-certified the March 2017 Fiscal Plan with AAFAF's suggested revenue forecast revision.

2.    **Highlights of the March 2017 Certified Fiscal Plan**

The March 2017 Fiscal Plan (with its subsequent certified revisions in April and May 2017) was the first fiscal plan developed in accordance with PROMESA and marked a historic achievement by the Commonwealth and the Oversight Board to commit to fiscal responsibility and sustainability for the residents of Puerto Rico and the capital market stakeholders. The March 2017 Fiscal Plan provided for significant fiscal and economic measures projected to result in an economic recovery.

The March 2017 Fiscal Plan was built upon the two pillars of fiscal reform and structural reform. Fiscal reform measures were aimed at (1) enhancing revenues, (2) right-sizing the government while improving its efficiency, (3) adjusting healthcare spending, and (4) restructuring the pension system. Structural reform measures were aimed at increasing economic growth by (a) aiding business activity, (b) improving capital efficiency, (c) implementing energy reforms, and (d) promoting economic development through new investment / tourism institutions. Together, these reforms were estimated to improve the ten-year financial projections by $39.6 billion and to achieve a surplus of approximately $7.9 billion over ten years.

Specifically, the March 2017 Fiscal Plan projected to achieve $13.9 billion of additional revenue and $25.7 billion of expense savings through various measures.

Moreover, the March 2017 Fiscal Plan signaled the Government's initiatives to improve efficiencies and develop a new healthcare model and to overhaul the pension system and switch to a pay-as-you-go model, with prospective employee contributions segregated from the existing fund. The Oversight Board additionally required the Government to reduce annual benefit outlays by 10% while preventing retirees from falling into poverty.

Lastly, the March 2017 Fiscal Plan outlined several structural reforms that would improve the overall competitiveness of the economy and increase GNP growth. These structural reforms centered on improving the ease of business activities, improving capital efficiencies, leveraging and facilitating expedited private sector investments in modernizing energy sector, and promoting economic development.

3.      **The April 2018 Fiscal Plan Certification**

After the fiscal plan certification and the fiscal year 18 budget certification in June 2017, the Oversight Board and the Government focused on implementation of the March 2017 Fiscal Plan. The Government, however, disagreed with the pension reform and right-sizing measures that the Oversight Board imposed as part of the fiscal plan certified in March. On August 4, 2017, the Oversight Board held a public meeting about these measures.

Because the Government continued to disagree and indicate its refusal to comply with the certified fiscal plan requirement, the Oversight Board filed an adversary complaint against the Government on August 28, 2017 regarding the fiscal plan implementation.

Yet, before the issues could be adjudicated or settled further, Hurricanes Irma and Maria hit and devastated Puerto Rico in September 2017. The Oversight Board immediately acted to reallocate the fiscal resources that could help with the recovery efforts. On September 21, 2017, the day after Hurricane Maria made landfall, the Oversight Board also authorized the Governor to implement good-faith modifications to the certified fiscal year 2018 budget to reapportion up to $1 billion for emergency measures. On September 30, 2017, the Oversight Board urged maximum support for Puerto Rico from the federal government, announced its voluntary dismissal of the fiscal plan implementation litigation, and postponed discussions on fiscal plans until the next fiscal year.

Noting that the hurricanes "fundamentally changed Puerto Rico's reality," the Oversight Board engaged with the Government in an extensive, iterative and collaborative process over the next six months to determine the hurricane damages and to develop fiscal plans to account for the altered economic and demographic landscape. The Oversight Board also increased public engagement in the development of the Fiscal Plans. The Oversight Board held its tenth public meeting on October 31, 2017 during which it proposed three public listening sessions to invite public input and discussion of various assumptions and considerations for fiscal plan development purposes and set December 22, 2017 as the deadline for the Government to submit a proposed fiscal plan with a goal of final certification by February 2, 2018. The three public listening sessions on the proposed post-hurricane fiscal plans were held on November 16, 2017, November 30, 2017, and December 4, 2017. Discussions during these listening sessions included presentations by experts and community leaders as well as comments by residents of Puerto Rico.

On December 20, 2017, the Oversight Board granted Governor Rosselló's request to extend the deadline for submission of the Commonwealth's proposed fiscal plan to January 10, 2018. Accordingly, the Oversight Board also indicated its expectation to certify a fiscal plan by February 23, 2018. On January 10, 2018, the Oversight Board granted another two-week extension for the Government to submit a Commonwealth fiscal plan that would be aligned with the proposed fiscal plans for PREPA and PRASA by January 24, 2018. On January 24, 2018, the Government submitted proposed revised fiscal plans for the Commonwealth, PREPA, and PRASA.

On February 5, 2018, the Oversight Board issued a notice of violation under PROMESA section 201(c)(3)(B)(i) regarding the Commonwealth proposed fiscal plan. The Government submitted a revised proposed fiscal plan by the deadline indicated on the notice of violation,

148

February 12, 2018.  On February 16, 2018, the Oversight Board also announced that it expected to certify a fiscal plan for the Commonwealth by March 30, 2018.

After extensive discussion between the Oversight Board and the Government, each with and through its advisors, the proposed fiscal plan continued to be revised.  On March 23, 2018, Governor Rosselló submitted a new revised fiscal plan that projected a cumulative $5.5 billion surplus over the next six years.  The Oversight Board cancelled a public meeting that had been scheduled for March 26, 2018 regarding fiscal plan certification consideration and instead began reviewing the Government's submission.

On March 28, 2018, the Oversight Board outlined in a letter to Governor Rosselló changes that had to be made to the proposed fiscal plan in order to be compliant with the PROMESA requirements and objectives.  These included, among others, changes to the proposed labor reforms and pension plan reforms.  The Oversight Board required the Government to submit the next revision incorporating the indicated changes by April 5, 2018.

Governor Rosselló responded, on multiple occasions, by publicly disagreeing with the labor reform and pension plan reform parameters required by the Oversight Board.  The Government's next submission on April 5, 2018 also did not contain all of the required changes.

On April 15, 2018, the Oversight Board announced public meetings on April 19 and 20, 2018 for certification considerations of fiscal plans of the Commonwealth and of various instrumentalities.  Prior to the public meeting, the Oversight Board also released its own version of the fiscal plan on April 18, 2018.  After public presentations and discussions of the Government's proposed fiscal plan and the Oversight Board's proposed fiscal plan, the Oversight Board certified its proposed fiscal plan for the Commonwealth under PROMESA section 201(d)(2) and (e)(2) during the public meeting on April 19, 2018.

The Fiscal Plan for the Commonwealth certified on April 19, 2018 (the "April 2018 Fiscal Plan") estimated the hurricanes created tens of billions of dollars in damages and that approximately $62 billion of disaster relief funds would be provided from federal and private sources.  It also projected to generate $2.3 billion from revenue measures and $10.0 billion from expense measures for fiscal years 2018 through 2023.  From fiscal year 2018 through fiscal year 2048, the April 2018 Fiscal Plan projected to generate an approximately $39 billion cumulative surplus before debt service.

Although the April 2018 Fiscal Plan largely maintained and incorporated most of the fiscal measures developed under the March 2017 Fiscal Plan, the new certified fiscal plan also included additional information relating to the various industry trends and benchmarking from mainland states to refine the reforms.  It also included more robust reference to the current conditions in the Commonwealth and the implementation plan action items, milestones, and measurable performance targets.

For example, in the April 2018 Fiscal Plan, the government right-sizing measure provided for a detailed bottom-up approach for agencies representing over 80% of government spend, along with tested merger and efficiency benchmarks for personnel and non-personnel spend for other agencies.  The payroll freeze was also extended in the April 2018 Fiscal Plan and uniform

healthcare insurance contributions were confirmed as a separate measure. Specific initiatives were identified for healthcare reform, and tax reform in the April 2018 Fiscal Plan also required revenue neutrality for every proposed change.

The structural reforms in the April 2018 Fiscal Plan were also more robust than those in the March 2017 Fiscal Plan. They included specific benchmark assessments of the current state of Puerto Rico's economy, and referenced specific targets for labor reforms, ease of doing business reforms, energy and power regulatory reforms, and infrastructure reforms. The April 2018 Fiscal Plan outlined strategic reinvestments of over $1 billion in Puerto Rico for long-term prosperity and sustainability which would be possible if greater structural reforms were implemented. As the Oversight Board had highlighted that increasing labor participation could be the single most important reform for Puerto Rico's long-term economic well-being, the April 2018 Fiscal Plan provided detailed descriptions for the need for comprehensive labor reform and the goals, among others, to become an at-will employment jurisdiction, reduce mandated paid leave by half, make the Christmas bonus voluntary for private sector employees, institute a work requirement for the NAP and introduce an EITC program.

### 4.      The May 2018 Fiscal Plan Certification

Despite their different perspectives on labor reform, the Oversight Board and then-Governor Rosselló continued to engage in dialogue during April and May 2018 in a good-faith effort to reach common ground. After several rounds of good-faith negotiations, the Oversight Board and the Governor announced on May 20, 2018 that they reached an accommodation—in order to approve labor reform and thereby reduce fiscal plan implementation risks and avoid costly litigation—to amend the April 2018 Fiscal Plan. As part of the "accommodation" publicly released on May 30, 2018, the Legislature and the Governor would have to enact a law repealing Law 80 on or before June 27, 2018.

In exchange for the repeal of Law 80, the accommodation provided for implementation of certain Commonwealth-proposed fiscal plan provisions, including: (i) restoration of the Christmas bonus for public employees through fiscal years 2019 to 2023; (ii) additional annual $25 million appropriation to UPR for means-tested student scholarship through fiscal years 2019 to 2023; (iii) an additional annual $50 million appropriation for municipality economic development fund through fiscal years 2019 to 2023; and (iv) replacement of reinvestment initiatives provided in chapter 11 of the April 2018 Fiscal Plan with the authority of the Government to spend up to $345 million for fiscal years 2019 to 2023 on reform implementation, infrastructure and economic development initiatives in specified categories.

In compliance with the terms of the accommodation, then-Governor-Elect Rosselló announced on May 28, 2018, that he had submitted a bill to fully repeal Law 80. Also, the Oversight Board submitted a comprehensive report of nearly 2,200 pages, dated May 30, 2018, discussing labor reform and published it on its website.

On May 30, 2018, the Oversight Board published and unanimously re-certified a revised Commonwealth Fiscal Plan that incorporated the effects of the accommodation, including the anticipated repeal of Law 80 (the "May 2018 Fiscal Plan").

150

In the May 2018 Fiscal Plan, the Oversight Board agreed to revise several fiscal measures and reinvestment initiatives from the April 2018 Fiscal Plan and support the Government's proposals to provide for the annual Christmas bonus for public employees, $25 million annual student scholarships at the UPR, $50 million annual appropriations for the economic development initiatives, and $345 million multiyear fund for various economic development and reform implementation initiatives.  The Government's achievement of comprehensive labor and welfare reform would also enable the elimination of the cuts to the budgets of the Legislature and Judiciary required under the April 2018 Fiscal Plan.  The May 2018 Fiscal Plan also included a new structural reform relating to trading across borders reform in order to improve the ease of doing business.  This reform focused on domestic transportation and congestion as well as border compliance issue and was anticipated to counter the reduction in growth from excluding certain parts of labor reform from the accommodation.

The May 2018 Fiscal Plan projected to generate $2.3 billion from revenue measures and $9.5 billion from expense measures for fiscal years 2018 through 2023.  It also projected that the cumulative surplus from fiscal years 2018 to 2048 to be approximately $36 billion before debt service.

5.      **The June 2018 Fiscal Plan Certification**

On June 4, 2018, the President of the House Government Affairs Committee, Hon. Jorge Navarro, sent a letter to the Oversight Board noting the "different scope" between the proposal of the complete Law 80 repeal and the effect of the amendment to grandfather the Law 80 protections for existing employees, and inquiring about the consequence of noncompliance with the terms of the accommodation.

The Oversight Board responded the same day in a letter that outlined the consequence of noncompliance with the accommodation, which would essentially be the reversal of the accommodation terms and, at a minimum, the return to the assumptions and requirements underlying the April 2018 Fiscal Plan.

Even though Governor Rosselló voiced his support for the Law 80 repeal on multiple occasions and the two houses of the Legislature contemplated some modified repeal of Law 80, the Legislature ultimately failed to pass any repeal of Law 80 provisions by June 27, 2018.  On June 28, 2018, the Oversight Board cancelled the public meeting that had been scheduled for June 29, 2018 regarding the fiscal year 2019 budget certification, and announced its intention to re-certify the April 2018 Fiscal Plan, with some technical changes and updates to the macroeconomic information based on those reforms that were not implemented.

On June 29, 2018, the Oversight Board unanimously re-certified its revised version of the fiscal plan (the "June 2018 Fiscal Plan") that reverted to the April 2018 Fiscal Plan's fiscal measure requirements, with some important changes.  The June 2018 Fiscal Plan highlighted the Legislature's failure to institute the Oversight Board's most critical structural reform, the repeal of Law 80.  Therefore, the projected economic growth stemming from the labor reform was reduced significantly below both the April and May 2018 Fiscal Plans.  The work requirement for NAP, EITC program, and the increased target of greater ease of doing business reform relating to trading

across borders were preserved in the June 2018 Fiscal Plan.  References to tax law initiatives or any tax reform were removed given the Oversight Board's understanding that true tax reform was no longer being contemplated.  Finally, changes related to updated financial information and estimates as reflected in the May 2018 Fiscal Plan were maintained in the June 2018 Fiscal Plan, apart from changes needed in order to make the certified fiscal plan match the certified fiscal year 2019 budget (*e.g.*, allocation of previously unallocated capital expenditure, inclusion of reapportionments made in fiscal year 2018, etc.).

The June 2018 Fiscal Plan highlighted the importance of promoting public integrity and transparency at every part of the Government.  In recognition of the Governor's efforts in prioritizing the oversight and fiscal responsibility, the June 2018 Fiscal Plan noted that the budgets for the Office of the Comptroller and the Office of Government Ethics would not be affected by the agency-specific right-sizing measures.

In addition, the June 2018 Fiscal Plan projected approximately $12.6 billion from revenue measures and expense measures for fiscal years 2018 through 2023.  It also projected that the cumulative surplus from fiscal years 2018 to 2048 to be approximately $14.4 billion before debt service.  The June 2018 Fiscal Plan also incorporated many of the measures that the Government declined to adopt in a letter dated September 27, 2018.

The events surrounding the Oversight Board's Commonwealth fiscal plan certifications in April, May, and June 2018 and related fiscal year 2019 budget certifications became the focus of the two adversary complaints by Governor Rosselló and by the Legislature filed in July 2018, as further discussed in sections IV.C.3(h)(i) and (ii) of the Disclosure Statement.

6.     **The October 2018 Fiscal Plan Certification**

On August 1, 2018, the Oversight Board announced it would revise the June 2018 Fiscal Plan in order to incorporate material new information, including full fiscal year 2018 revenue and expenditure actuals, revised federal disaster relief spending estimates, and an adjustment to demographic projections.

The Oversight Board established a schedule for the Commonwealth to develop and submit a revised fiscal plan by August 17, 2018 and the Oversight Board to certify a new fiscal plan by September 21, 2018.  On August 15, 2018, the Oversight Board approved the Commonwealth's request to extend the submission deadline to August 20, 2018.  The Commonwealth submitted its proposed revised fiscal plan according to the extended deadline.  The proposed fiscal plan also included consideration of the COFINA settlement discussion.

On August 20, 2018, the Oversight Board hosted a public webinar to discuss demographic assumptions used for the June 2018 Certified Fiscal Plan.  The webinar included detailed presentation of key forecast fundamentals and data sources and sought public suggestions and feedback.

On August 30, 2018, the Oversight Board sent a letter to Governor Rosselló formulating a notice of violation pursuant to PROMESA section 201(c)(3)(B) in regards to the Commonwealth's proposed fiscal plan.  The letter indicated that the proposed fiscal plan did not reflect all the latest

information for baseline projections and included several new policies that were inconsistent with PROMESA's mandate and the reforms and measures identified in the previous June 2018 Fiscal Plan. The Oversight Board set September 7, 2018 as the deadline for the Commonwealth to submit a revised, proposed fiscal plan, including all financial and rightsizing models.

On September 7, 2018, the Commonwealth submitted its revised, proposed fiscal plan in response to the Oversight Board's notice of violation letter. This proposed plan incorporated the COFINA debt restructuring deal terms.

The initial target certification date of September 21, 2018 was extended based on the ongoing negotiations between the Oversight Board and the Commonwealth administration. The Oversight Board scheduled a public hearing for October 23, 2018 to review the proposed fiscal plan.

On October 19, 2018, the Oversight Board filed the proposed plan of adjustment for COFINA that was consistent with the COFINA fiscal plan certified on October 18, 2018, its related disclosure statement and settlement motion.

On October 22, 2018, the Oversight Board published a draft proposed fiscal plan for the Commonwealth that incorporated the COFINA restructuring. During the public hearing on October 23, 2018, the Oversight Board unanimously certified its version of the fiscal plan ("October 2018 Fiscal Plan").

The October 2018 Fiscal Plan revised its estimated disaster relief funding to approximately $82 billion from federal and private sources and updated projected roll-out of this spend based on information from FEMA and other sources. It also developed different pass-through rates for the impact of funding to the economy given new data related to the impact of various types of spending. Details surrounding population projections were updated, and revenue and expenditure actuals from fiscal year 2018 were used to update projections. The October 2018 Fiscal Plan indicated lower GNP growth upticks stemming from structural reforms versus those seen in the June 2018 Fiscal Plan. This was due to poorer-than-expected progress on structural reform implementation, especially related to the NAP work requirement and trading across borders reform (the latter of which was removed from the fiscal plan). Other changes included updating revenue projections based on actual results, which were higher than anticipated and updates for actual expenditures, specifically around payroll which had shown evidence of historical over-budgeting.

While various initiatives and goals of the October 2018 Fiscal Plan largely remained consistent from the June 2018 Fiscal Plan, the revised fiscal plan also incorporated the terms of the COFINA settlement and projected $12.4 billion of additional surplus from revenue measures and expense measures from fiscal year 2018 through fiscal year 2023. The October 2018 Fiscal Plan also projected nearly breakeven cumulative performance before debt service for fiscal year 2018 through fiscal year 2058.

Shortly after certification of the October 2018 Fiscal Plan, the Oversight Board launched an interactive, web-based reporting dashboard to track compliance with certified fiscal plans.

7.      **The May 2019 Fiscal Plan Certification**[159]

Since October 2018, the Oversight Board continued to assess and respond to various constituencies regarding the objectives, assumptions, and projections of the October 2018 Fiscal Plan.  The Oversight Board's efforts included ongoing discussions with the Government.

During the COFINA disclosure statement hearing on November 20, 2018, the Oversight Board disclosed that it discovered a pension payment forecast calculation error in the October 2018 Fiscal Plan.  On November 30, 2018, the Oversight Board announced that it had concluded that the pension forecast error resulted in an understatement of pension forecasts and projected PayGo payments of $3.35 billion.

On January 18, 2019, the Oversight Board sent a letter to the Government laying out the schedule to develop, submit, approve, and certify a revised fiscal plan for the Commonwealth and the fiscal year 2020 budget for the Commonwealth.  The January 18, 2019 letter provided for the Governor to submit a proposed fiscal plan by February 22, 2019 and the Oversight Board to expect certification by April 26, 2019.  Per the Government's request, the Oversight Board granted an extension for the Government to submit a proposed fiscal plan on February 22, 2019 to March 8, 2019.  The expected certification date remained unchanged at April 26, 2019.

On March 10, 2019, the Government submitted a revised fiscal plan draft.  On March 15, 2019, the Oversight Board sent a letter to Governor Rosselló formulating a notice of violation pursuant to PROMESA section 201(c)(3)(B) in regards to the Commonwealth's proposed fiscal plan.  The letter indicated the proposed fiscal plan required certain significant revisions (*e.g.*, within pension reform and healthcare reform) and additional supporting information.  The letter also highlighted that the Government's proposal included several new policies that were inconsistent with PROMESA's mandate and lacked detailed critical structural reform initiatives and the latest information for baseline projections.  The Oversight Board set March 22, 2019 as the deadline for the Government to submit a revised proposed fiscal plan.

Upon the Government's request, the deadline for submission of a revised draft was extended to March 27, 2019.  On March 27, 2019, the Government submitted a revised draft along with a letter responding to the Oversight Board's March 15, 2019 notice of violation.

The Oversight Board also held a public hearing on March 28, 2019, with the Puerto Rico Department of Public Safety on the implementation of the certified fiscal plan, including rightsizing and reporting measures. This highlighted several deficiencies in the department's approach to efficiency efforts.

On April 21, 2019, the Oversight Board sent a letter to the Government, outlining a new schedule for certification given delays from the initial schedule and the iterative process of requesting additional supporting information.  The Oversight Board set the new expected

---

[159] The certification of a new Commonwealth fiscal plan is currently expected on April 30, 2020.  Letter from Natalie A. Jaresko to Governor Vázquez Garced, President Rivera Schatz, and Speaker Méndez Núñez, Jan. 30, 2020, https://drive.google.com/file/d/1Y81ivGjzA8kqtIyqtRSIW9gkZs-1k_Ew/view.  To the extent necessary, the Debtors will submit revised best interests test reports reflecting the new fiscal plan data.

certification date of May 9, 2019.  On May 6, 2019, the Oversight Board announced that a public hearing would be held on May 9, 2019, as planned, to consider certification of the fiscal plan.

On May 9, 2019, the Oversight Board published a draft proposed fiscal plan for the Commonwealth.  During the public hearing that same day, the Oversight Board certified its version of the fiscal plan.[160]  The May 2019 Fiscal Plan incorporates a number of important updates for new information and data, such as slower disaster recovery funding rollout; updated population forecast; lower structural reform GNP growth upticks due to delays in or inadequate implementation of labor and welfare, ease of doing business, and power sector reform; a revised pensions expenditure forecast; updated Medicaid enrollment data; updated Medicaid enrollment data and healthcare reform measures; and additional funding for Special Revenue Fund capital expenditure.  In addition, the May 2019 Fiscal Plan refined assumptions related to the unwinding of disaster relief spending and fiscal measures, estimating it would happen in five as opposed to ten years; this means that GNP growth rates would contract faster, out-migration would increase faster, and population would decline further than previously projected.  Importantly, the May 2019 Fiscal Plan also incorporated the fiscal year 2020 budgetary decisions.

In addition to incorporating new information, the May 2019 Fiscal Plan urged the Government to take action to address the missed milestones and accelerate the pace of change based on inadequate implementation progress in fiscal year 2019.  Further, as part of its focus on transparency of spend, the May 2019 Fiscal Plan (and fiscal year 2020 budget) reduced spending in low-transparency areas like professional services and "line items with aggregated expenditures," and included investments in priority areas.  These investment areas include police compensation (which was brought to mainland averages) and equipment, healthcare staffing and capital expenditures, additional educational compensation and scholarship supports, firefighter salaries and equipment, the Forensics Sciences Institute payroll and equipment, and additional capital expenditure funding.

The May 2019 Fiscal Plan projects to generate $2.5 billion from revenue measures and $11 billion from expense measures for fiscal year 2019 through fiscal year 2024.  It also projects approximately $23 billion of cumulative surplus before debt service from fiscal years 2018 to 2048.  In addition, the May 2019 Fiscal Plan highlights that the Government has struggled to timely implement and report progress on the reforms and measures to date.  For example, the Government did not submit many implementation plans required under previous certified fiscal plans for submission by June 30, 2018 until September 2018, and some implementation plans were submitted as late as April 2019.  As a result, progress has been inconsistent and incomplete.  Therefore, the May 2019 Fiscal Plan adds monthly performance report requirements to ensure implementation progress and monitoring.[161]  Moreover, in many agencies where the Government

---

[160] Despite the substantial progress that has been made between the Commonwealth Government and the Oversight Board to narrow their differences, the May 2019 Fiscal Plan was certified with measures over the Commonwealth Government's objections.

[161] The GAO noted in its 2019 GAO Report that experts, as well as Puerto Rico officials, have expressed concern that the GDB Title VI restructuring and the COFINA Title III restructuring are based on an unrealistically optimistic expectation of Commonwealth economic growth.  However, the GAO reported that the May 2019 Fiscal Plan contains much more conservative projections for economic growth than previous fiscal plans.  The GAO also raised concerns about the feasibility of the May 2019 Fiscal Plan's proposed structural reforms to yield projected

has achieved budget targets set in the May 2019 Fiscal Plan, it has been through overreliance on voluntary transition policies, rather than more tailored policies, which may have the effect of reducing the Government's effectiveness over the medium to long term.

### 8.    Highlights of Priority Investments

Over the course of developing each certifiable fiscal plan, the Oversight Board has kept in mind the needs of the people of Puerto Rico and made priority investments in areas such as public safety, healthcare, and education. Most recently, the May 2019 Fiscal Plan continued and expanded upon these investments which aim to improve the quality of public services.

Paramount among these investments is an effort to improve public safety. First, the May 2019 Fiscal Plan invests in police officer compensation to improve competitiveness given the significant attrition the Puerto Rico Police Bureau ("PRPB") has experienced. Therefore, a salary and required benefits increase of 30% (~$11,500) over two years and $250 per sworn officer per year for life and disability insurance have been included. Additional investments include Social Security contributions for sworn officers, $122 million per year from fiscal year 2019 to fiscal year 2021 for police officers who are owed payment for past services, and $42 million in capital expenditure funding in fiscal year 2020.

Beyond investing in the PRPB, the Oversight Board also included more than $5 million in personnel funding and $15 million in non-personnel funding to other public safety agencies. Specifically, these investments will allow $500 compensation increases per employee for firefighters and purchases of new vehicles and safety equipment at the Puerto Rico Fire Bureau. The Forensics Science Institute will receive funding to hire more than 90 new employees and invest in forensic laboratory supplies.[162]

The Oversight Board also included investments in several agencies that provide healthcare services. First and foremost, the May 2019 Fiscal Plan provides an additional $1.4 billion in Medicaid funding from fiscal year 2019 to fiscal year 2024 in order to improve the stability of the healthcare system. Additionally, more than $15 million in annual funding has been invested to maintain nurse staffing levels, and $12 million has been provided to the Psychiatric Hospital so that it can achieve its Medicare certification. Lastly, more than $25 million in Special Revenue Funds expenditures have been approved in fiscal year 2020 to allow the Comprehensive Cancer Center to become fully functional.

The education of the children of Puerto Rico and their successful entrance into the workforce is also a core goal of Puerto Rico Department of Education and the Oversight Board, as these outcomes have been shown to drive long-term economic growth. With that objective in mind, the Oversight Board has expanded upon prior investments in teacher and director salaries and textbooks to include an additional $500 compensation increase per employee for all teachers and

---

economic benefits, and that the Oversight Board overestimated the volume and timeliness of federal hurricane relief funds.

[162] The fiscal year 2020 budget includes a salary increase of $1,500/year per firefighter (versus $500/year in the fiscal plan). The EMS fiscal year 2020 budget increased by $4.8 million over the fiscal year 2019 budget.

directors in the May 2019 Fiscal Plan. This investment increases teacher compensation by a total of more than $2,000 since the Oversight Board's inception, which represents the only increases received by teachers in the last decade.

The set of investments highlighted above represents the Oversight Board's commitment to the successful reform of the Government. Though not an exhaustive list, the investments will enhance service levels in areas that impact long-term economic success of the Commonwealth.

9.  **Fiscal Year 2018 Budget Certification**

Based on the March 2017 Fiscal Plan certification (and subsequent revisions), the Oversight Board initially set April 30, 2017 as the deadline pursuant to PROMESA section 202(a) for the Governor's submission to the Oversight Board for his proposed budget for fiscal year 2018 that complies with the March 2017 Fiscal Plan, a detailed implementation plan for the measures contained in the March 2017 Fiscal Plan, and a revised liquidity plan for the Commonwealth, including measures to generate a $200 million cash reserve by June 30, 2017 above the balances reflected in the March 2017 Fiscal Plan. The Oversight Board also provided the forecast of revenues for the fiscal year 2018 pursuant to PROMESA section 202(b). The Government made the requested submissions on April 30, 2017.

The process of elaborating the budget for fiscal year 2018 was a joint effort between the Government and the Oversight Board.

On June 2, 2017, the Oversight Board approved the submission to the Legislature of the Governor's proposed fiscal year 2018 budget pursuant to PROMESA section 202(c)(1)(A)(i), but also noted material concerns regarding budget allotments for certain programs and activities and significant outstanding questions regarding the implementation plans of spending reductions. The Oversight Board also set June 19, 2017 as the deadline for the Legislature to submit its adopted budget for the Oversight Board's review.

On June 27, 2017, the Oversight Board issued a notice of violation of the Legislature's June 26, 2017 budget submission pursuant to PROMESA section 202(d)(1)(B) based on the following analyses: (i) $16 million over-allocation of legislative expenditures; (ii) $78 million over-allocation of non-legislative expenditures; (iii) need for $25 million additional reductions on earmarks and special expenditure appropriations; (iv) need for specific implementations relating to at least $200 million of potential savings on the size of the government; and (v) correction of technical error relating to the Judiciary Branch appropriation. The Oversight Board requested a revised adopted version of the Legislature's budget by June 29, 2017. Upon the failure of the Legislature to adopt a complaint budget by June 29, 2017, the Oversight Board revised the fiscal year 2018 budget that would comply with the certified March 2017 Fiscal Plan and submitted it to the Governor and the Legislature under PROMESA section 202(e)(3) on June 30, 2017.

As noted, two months after the certification of compliant fiscal year 2018 budget, the Oversight Board authorized the Government to implement good-faith modifications to the certified fiscal year 2018 budget up to $1 billion for emergency measures following the devastating impact of Hurricanes Irma and Maria on Puerto Rico.

10.    **Fiscal Year 2019 Budget Certification**

The Oversight Board's review and certification of fiscal year 2019 budget under PROMESA section 202 also went through several deadline extensions and modified proposals in accordance with the changes in the fiscal plan certification process.  In fiscal year 2019, the Oversight Board was guided by several key objectives, consistent with goals of the fiscal plan:

a.    Improving long-term growth through structural reforms;

b.    Improving the business environment for firms and entrepreneurs in Puerto Rico;

c.    Promoting public safety in Puerto Rico;

d.    Improving education outcomes for children in Puerto Rico;

e.    Investing in preventative healthcare and higher quality healthcare;

f.    Enhancing transparency through a focus on fiscal controls and reporting; and

g.    Increasing the resiliency of critical infrastructure through modernization.

On December 12, 2017, the Oversight Board sent a letter to then-Governor Rosselló that outlined six guiding principles and set a submission timeline, starting from December 22, 2017 to June 29, 2018 as the expected date for the Oversight Board to certify the fiscal year 2019 budget. The six guiding principles provided that: (i) all budgets be compliant with their applicable fiscal plan and developed in accordance with modified accrual accounting standards; (ii) revenue forecasts to be provided by the Oversight Board to the Governor, Legislature, and Boards of Directors for use in developing relevant budgets; (iii) budgeted expenses be properly justified; (iv) reporting blueprint templates be agreed to by the Governor and the Oversight Board and the Government to report pursuant to these templates; (v) clear responsibility for enforcement of all elements of the budget and reporting deemed to be critical; and (vi) all expenditures, including capital expenditures, of the Commonwealth and instrumentalities to be made only pursuant to a budget certified by the Oversight Board.

On December 21, 2017, based on the extension of the proposed fiscal plan submission deadline, the Oversight Board also revised the fiscal year 2019 budget review timeline.  Similarly, after then-Governor Rosselló submitted a proposed fiscal plan on February 12, 2018 and the Oversight Board extended the fiscal plan certification deadline from February 23, 2018 to March 30, 2018, the Oversight Board again revised the fiscal year 2019 budget review schedule accordingly.

After the April 2018 Fiscal Plan was certified, then-Governor Rosselló presented a draft recommended fiscal year 2019 budget on May 4, 2018.  On May 10, 2018, the Oversight Board issued a notice of violation under PROMESA section 202(c)(1)(B) regarding the draft fiscal year 2019 budget and required revisions by May 15, 2018.  On May 14, 2018, then-Governor Rosselló announced that he was in discussion with the Oversight Board regarding fiscal plan and therefore would not submit a revised budget proposal by the May 15 deadline.  The Oversight Board also

158

granted an extension for submission and on May 18, 2018, the administration submitted a revised recommended fiscal year 2019 budget.

After the May 2018 Fiscal Plan was certified in accordance with the terms of the accommodation, the Oversight Board set out the necessary revisions to budgeted revenue on May 31, 2018, to make it consistent with the new certified fiscal plan.  The Governor submitted another draft resolution on the fiscal year 2019 budget the next day.

On June 5, 2018, the Oversight Board determined that the Governor's June 1 budget proposal was not compliant with the newly certified fiscal plan and posted its own version of a revised fiscal year 2019 budget that was compliant with the May 2018 Fiscal Plan.

After the Governor and the Legislature reviewed the proposed fiscal year 2019 budget and held public hearings, the Legislature considered its own version of the budget that was based on higher revenue projections and room for spending than the Oversight Board had projected.

Although the Oversight Board scheduled a June 29, 2018 public meeting to consider the fiscal year 2019 budget certification, this meeting was cancelled following the Legislature's failure to repeal Law 80 by the June 27, 2018 deadline per the accommodation.

On June 29, 2018, the Legislature approved an $8.71 billion fiscal year 2019 General Fund budget for submission to the Oversight Board.  But, on June 30, 2018, the Oversight Board unanimously certified a compliant fiscal year 2019 budget for the Commonwealth and instrumentalities.  The Oversight Board's version of the budget provided for expenditures of $8.76 billion of General Fund and $20.66 billion for the consolidated funds.  This certified budget was deemed to be compliant with the certified fiscal plans and deemed approved by the Governor and Legislature pursuant to PROMESA section 202(e)(3).

11.     **Fiscal Year 2020 Budget Certification**[163]

The fiscal year 2020 budget review and certification by the Oversight Board under PROMESA section 202 went through several deadline extensions and modified proposals in accordance with the changes in the fiscal plan certification process.

Following consultation with the Governor and the Legislature, the Oversight Board established a reasonable schedule for the development of the fiscal year 2020 budgets.  On January 18, 2019, the Oversight Board sent a letter detailing the agreed upon schedule for developing, submitting, and certifying the fiscal year 2020 budget for the Commonwealth (which complemented the Fiscal Plan certification schedule).

On January 30, 2019, the Oversight Board sent a letter to then-Governor Rosselló that outlined the requirements for a compliant fiscal year budget and, in accordance with PROMESA section 202(b), a forecast of revenues, agency spending targets, and other requirements.  The Oversight Board provided expenditure targets for fiscal year 2020 by agency.  In particular, the

---

[163]  A presentation on the fiscal year 2020 budget is accessible on the Oversight Board's website, https://oversightboard.pr.gov/.

Oversight Board provided parameters for agency payroll and operating expenditures as adjusted from the fiscal year 2019 budgets. The adjustments and reinvestments were proposed in an effort to facilitate additional savings contemplated by the certified fiscal plan and to reduce areas of spend that required more transparency.  The Oversight Board requested that in the budget each professional service contract be identified by one of the following categories: Accounting/Financial, Legal, Information Technology, or Other.  The category "Other" is only utilized if the contract is not best categorized in one of the three distinct categories or 'Medical' and 'Education' categories, which were added during the budget review process for specific agencies.  It was also asserted that the 'Other' category should not be more than 10% of the professional services budget. The same level of granularity was also applied to other personnel and non-personnel spend categories to enable tracking of savings and overall transparency.

On March 23, 2019, the Oversight Board provided an updated schedule for the certification of fiscal year 2020 budget following Government's request.  The revised schedule required the Commonwealth to submit a proposed fiscal year 2020 budget based on the January 28, 2019 forecast.  On April 8, 2019, the Commonwealth publicly posted its proposed budget submission on the AAFAF website.  Also, the budget submission and revision schedule was revised on April 21, 2019, in order to provide sufficient time to allow for the iterative process of information exchange and incorporate the most up-to-date information available.

On May 11, 2019, the Oversight Board provided a revised forecast for fiscal year 2020 in order to incorporate data provided by the agencies, risks proposed by agencies, focused investments, and fiscal priorities. The revised forecast was compliant with the May 2019 Fiscal Plan and incorporated all the changes mentioned above. The Government's original fiscal year 2020 budget submission was not compliant with the May 2019 Fiscal Plan and required resubmission. The Oversight Board laid out in detail the areas in which the fiscal year 2020 budget needed to be revised, as well as provided a revised revenue forecast. The Oversight Board's letter also included agency-specific requirements and budget resolution language revisions.

On May 13, 2019, Governor Rosselló announced an intention to submit the revised proposed budget by the May 17 deadline.  On May 17, 2019, the administration requested an extension on the submission deadline until May 22, 2019.  This prompted the Oversight Board to reiterate on May 20, 2019 the impact of the delay of a proposed budget. The Oversight Board restated the established positions and indicated that in addition to information provided previously to maintain consistency with the May 2019 Fiscal Plan: the Oversight Board had provided the OMB  the amounts to be included related to wage increases and disability benefits; requesting each professional service contract is identified in the categories specified in the January 30, 2019 letter; providing the allocation of capital expenditures utilities, insurance premiums, and PayGo by agency, per the Certified Fiscal Plan; and reiterating the level of detail required by the Oversight Board in the budget resolution.

On May 28, 2019, the Oversight Board submitted a compliant budget to the Legislature along with a letter to the Governor Rosselló, President Rivera Schatz, and Speaker Méndez to notify them of the compliant fiscal year 2020 budget. The budget was submitted following a review of the Governor's March 28, 2019 submission of the proposed Territory Budget for fiscal year 2020. Despite submitting a revised budget on May 22, 2019, the Government's budget submission

remained incomplete and non-compliant; the proposed budget still exceeded the spending targets in the May 2019 Fiscal Plan, while lacking sufficient detail and documentation.

On June 3, 2019, the Oversight Board sent a letter to President Rivera, president of the Senate of Puerto Rico, detailing the ways in which the Oversight Board determined the Governor's latest budget submission was not compliant with PROMESA. Specifically, in the Oversight Board's view, the proposed fiscal year 2020 budget would overspend by $573 million.

On June 9, 2019, Governor Rosselló made a budget address arguing the Commonwealth had sufficient resources to finance the proposed non-compliant $9.624 billion budget. The proposed budget for fiscal year 2020 was subsequently filed with the Legislature on June 11, 2019. The House Treasury, Budget and PROMESA Committee was slated to open public hearings on the spending package on June 12, 2019.

On June 12, 2019, the Oversight Board sent a letter to Governor Rosselló, President Rivera Schatz, and Speaker Méndez regarding the Compliance Certification dated June 3, 2019 that was submitted. The certification was deemed deficient in two aspects: (1) it was lacking the formal estimate required by PROMESA section 204(a)(2)(A), in order to lay out the "impact, if any, that the law will have on expenditures and revenues"; and (2) it did not provide an analysis of the impact that Act 29 will have on the May 2019 Fiscal Plan. Relying on PROMESA section 204(a)(4)(A), the Oversight Board directed the Commonwealth to provide (1) the missing estimate within seven business days and (2) an amended compliance certification reflecting such estimates.

A second letter was sent on June 12, 2019 extending the deadline for the legislature to submit a compliant budget. The Oversight Board reiterated their concerns that a compliant budget had been submitted by the Oversight Board to the Government on May 28, 2019, but the Government had not submitted it to the Legislature.

The Legislature failed to send a fiscal year 2020 budget to the Oversight Board to review for compliance with the May 2019 Fiscal Plan. As such, on June 30, 2019, the Oversight Board certified its own consolidated fiscal year 2020 budget for the Commonwealth.

The highlights of the certified fiscal year 2020 budget include:

- Continues the trend of spending within the Government's means in a transparent and prioritized way responsive to demographic realities.

- Supports the priorities of public safety, education, and healthcare services, and includes a higher level of capital expenditures spending consistent with the May 2019 Fiscal Plan.

- Funds social security for eligible police, teachers and judges as well as increases in salaries for teachers, police officers, and firefighters.

- Allocates sufficient funds to cover PayGo pension obligations for current retirees of the Central Government.

- Increases local budget funding of Medicaid program, given reduction in federal funds. This represents the largest cost increase for fiscal year 2020.

- Similar to fiscal year 2019, includes a UPR scholarship fund to supplement UPR's existing needs-based scholarships.

- Incorporates federal disaster aid local match funding, other new federal funding sources, and the second of ten annual emergency reserve installments.

- Significantly reduces professional services expenses year-over-year.

- Takes a comprehensive view of governmental spending.

As shown below, in total, the fiscal year 2020 Central Government budget is $20.21 billion, of which $9.05 billion is General Fund spending.



$ in millions

| Central Government *(see section 2 of presentation)* | |
|---|---|
| General Fund ("GF") [2] *(see section 3)* | $9,051 |
| Federal Funds ("FF") | 7,595 |
| Special Revenue Funds ("SRF") [3] | 3,563 |
| **Total Central Gov't inc. pensions** | **$20,210** |
| | |
| Instrumentalities [1,4] *(see section 6)* | |
| PREPA | $2,998 |
| PRASA | 1,351 |
| HTA | 864 |
| UPR | 1,349 |
| COFINA debt service [5] | 437 |
| GDB debt service [5] | 159 |
| **Total Instrumentalities** | **$7,158** |
| | |
| **Total public sector spending** [1] | **$27,368** |

**Total public sector spending** [1] **$27.4 billion**
*Including Instrumentalities with independent fiscal plans* [1]

Instrumentalities 26%

Pension PayGo 9%

Central Government 64%

Note: Due to rounding, numbers presented may not add up precisely to the totals provided.
1. Excludes CRIM, COSSEC, and Municipality spend.
2. Includes General Fund PayGo fees for Employee Retirement System ("ERS"), Teacher Retirement System ("TRS"), and Judicial Retirement System ("JRS") systems. See appendix for a more detailed breakdown of pension PayGo fees.
3. Includes $345m in SRF PayGo fees for certain instrumentalities and municipalities included in ERS, consistent with the certified Fiscal Plan. The Commonwealth processes ERS pension payments on behalf of municipalities and certain instrumentalities. All municipalities and other contributing instrumentalities outside of the Commonwealth budget the full pension PayGo fee. As a result, reimbursements of the pension PayGo fees are shown in the Central Government budget.
4. Budget for instrumentalities include utilities and Commonwealth transfers for FY20.
5. COFINA and GDB debt service is not included in the certified budgets. Actual GDB debt service on the new notes is variable and depends on collections from the pledged loan portfolio pursuant to contractual terms.
Source: FY20 certified budget, certified Fiscal Plan, dated May 9, 2019

The certified fiscal year 2020 budget also budgets for previously unbudgeted appropriations to enhance transparency and visibility with overall spending. Many of these incremental appropriations are shown below, although the bulk of additional cost relative to fiscal year 2019 comes from local Medicaid spending because of the expiration of 100% federal fund matching for that cost. As shown below, total local Medicaid spending in fiscal year 2020 increased to $917 million from $15 million in fiscal year 2019.



The certified fiscal year 2020 budget provides an unprecedented level of transparency to the general public on how the government spends its resources. The budget resolutions were combined into one document, include specific concepts of spending for each agency, minimized funds in pooled custody accounts, and limited unidentified allocations and identified professional services spending. The budget also attempts to budget for and cover all Commonwealth spending.

The budget also includes significant budget compliance mechanisms to control spending. Among the critical budgetary controls are the following provisions:

- *Budget preservation levers* – The budget provides for restriction on encumbrances and disbursements of General Fund appropriations such that 2.5% is held back until the fourth quarter of the fiscal year. The Judicial Branch, Public Broadcast Corp, agencies in the Department of Public Safety and Health grouping and PayGo appropriations are not subject to this withholding.

- *Restriction on prior year budgeted funds* – The budget provides for restriction on use of appropriations of prior fiscal years to a 60 day period after the end of the fiscal year, assuming such appropriations have been encumbered by June 30. Exceptions apply to permanent improvements as well as to equipment with long procurement cycles and certain appropriations held in custody by the Treasury Department.

- *Reporting requirements* – The budget provide for nature and cadence of reporting, quarterly certification of no assignment of prior year budget to current year expenses, monthly and quarterly budget versus actual reporting, and other support for implementation.

- ***Prior year reprogramming*** – The budget suspends the ability of OMB, AAFAF, and Department of the Treasury to authorize reprogramming or extension of appropriations of prior fiscal years.

- ***Budget reserves*** – The budget provides for restriction on use of reserves, particularly the emergency and capital expenditure reserves.

- ***PayGo fees*** – The budget authorizes OMB to perform appropriations offsets against agencies that are in arrears regarding PayGo, unemployment insurance or taxes.

- ***Compliance with Law 8-2017*** – The budget provides for the simultaneous transfer of funds allocated to payroll and related employee costs in implementing concept of mobility.

- ***Provision of quarterly budget*** – The budget provides for provision of detailed quarterly budget projections.

- ***Budgetary controls for all concepts of spend*** – The budget restricts any spending or encumbrance that exceeds authorized appropriations.

- ***Submission of Sábana file*** – The budget requires OMB to submit the government's budget in an Excel format known as the "Sábana file" which identifies both the General Fund budget and non-General Fund budgets within the Government's PRIFAS and other accounting systems, including detailed budget appropriations and allocations by agency, instrumentality, public corporation, fund type and concept of spend.

- ***Approval of budget reapportionments*** – The budget provides that reprogramming of budget appropriations must be approved by the Oversight Board.

## E.   Negotiations with Creditors

### 1.      Negotiations with Creditors Prior to the Enactment of PROMESA

During fiscal year 2016, the Commonwealth presented various proposals to bondholders and bond insurers seeking to reach an agreement for a voluntary restructuring of the debt of the Commonwealth and that of its public corporations.

On February 1, 2016, the Commonwealth published a proposal that sought to exchange $49.2 billion of tax-supported debt into $26.5 billion of mandatorily payable bonds and $22.7 billion in variable payment bonds (payable only in the event the Commonwealth outperformed certain revenue projections).  The proposal contemplated no interest payments until fiscal year 2018, no principal payments until fiscal year 2021, maximum annual debt service of $1.7 billion starting fiscal year 2021 and a final maturity in fiscal year 2051.  Several bondholder groups, particularly monoline bond insurers, issued statements after the Commonwealth published its proposal that were critical of such proposal.

164

On June 21, 2016, the Commonwealth published a second proposal that provided an incremental $52.7 billion of mandatorily payable debt service to creditors as compared to the Commonwealth's February 1, 2016 offer. The proposal continued to contemplate cash flow relief during the first four years but increased cash interest payments during such period and added a non-cash interest portion (payable-in-kind). Maximum annual debt service was set at $2.05 billion starting in fiscal year 2031, with a final maturity in fiscal year 2071. Certain holders of GO Bonds responded with a counterproposal that would have exchanged existing GO Bonds (approximately $18 billion face amount) for new GO Bonds at 89% of the existing face amount and new contingent bonds for the remaining 11% of the original principal amount, provided liquidity relief over the first five years, required new collateral guarantees, and validation through Title III or Title VI of PROMESA if such legislation was enacted by Congress. And an ad hoc group of COFINA senior bondholders also developed a counterproposal that included principal haircuts, liquidity relief, and required implementation through PROMESA with validation under Title III or VI.

The Commonwealth's proposals sought to ensure that debt service would never exceed 15% of projected consolidated revenues (as defined in the public presentation explaining the proposal) for the Commonwealth and its tax supported instrumentalities. Both proposals were also predicated upon a number of key assumptions (many of which are not under the control of the Commonwealth), including: (i) a 100% participation rate, (ii) Congress continuing the current level of health care funding provided to Puerto Rico under the Affordable Care Act, (iii) the Commonwealth extending the Act 154 excise tax and the IRS continuing to allow such tax to be creditable against U.S. federal income taxes (along with no further erosion of the Act 154 tax base), (iv) the implementation of all the measures contemplated by the Fiscal and Economic Growth Plan dated September 9, 2015, and (v) the Commonwealth achieving a 2% nominal growth rate.

2.      **Negotiations with Creditors Prior to Title III Filings**

The Commonwealth also made extensive efforts to reach a consensual restructuring with creditors prior to its Title III filing. From December 2016 through March 2017, the Oversight Board and the Commonwealth held more than thirty meetings with creditor representatives to seek a consensual restructuring of the Commonwealth's debt. In addition, prior to the termination of the PROMESA Title IV stay, the Oversight Board and the Commonwealth convened mediation on April 13, 2017, to find common ground and a consensual resolution. Before the filing of the Title III Cases, AAFAF made a proposal under Title VI of PROMESA that would have restructured GO Bonds, COFINA bonds, and bonds of certain instrumentalities that historically received certain conditionally appropriated monies from the Commonwealth, and a group of GO bondholders made a counterproposal. Those efforts were ultimately unsuccessful.

[*Remainder of Page Left Intentionally Blank*]

# V.      Overview of the Debtors' Title III Cases

## A.      Commencement of the Debtors' Title III Cases

### 1.      Filing of the Title III Petitions

After negotiations with its creditor constituencies, the Commonwealth was unable to negotiate—and saw no prospect of negotiating—an out-of-court resolution that would address its financial situation and lay a foundation for economic recovery and prosperity going forward without a renegotiation of outstanding debts. Pursuant to PROMESA section 405, the establishment of the Oversight Board operated as a temporary stay of all actions, claims, and proceedings in any court or tribunal with respect to any liability, as defined in PROMESA section 405(a), of the Commonwealth and its territorial instrumentalities. As soon as the PROMESA section 405 stay expired, numerous pending lawsuits against the Commonwealth and its territorial instrumentalities would be allowed to continue, and dozens of creditors threatened to file or pursue lawsuits against the Commonwealth and its territorial instrumentalities. Accordingly, on May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing the Commonwealth Title III Case. On May 21, 2017, the Oversight Board issued restructuring certifications for ERS and HTA pursuant to PROMESA sections 104(j) and 206 and filed voluntary petitions for relief for ERS and HTA pursuant to PROMESA section 304(a) in the Title III Court. On September 26, 2019, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PBA pursuant to PROMESA section 304(a), commencing the PBA Title III case. On June 29, 2017, the Court entered an order granting the joint administration of the Title III cases of the Commonwealth, HTA, and ERS, for procedural purposes only [ECF No. 537]. On October 9, 2019, the Court entered an order granting the joint administration of the initial Title III cases and the new PBA Title III case for procedural purposes only.

***Appointment of Statutory Committees.*** On June 15, 2017, the UCC and the Retiree Committee were appointed [ECF Nos. 338, 340]. The current members of the UCC are (i) The American Federation of Teachers (AFT), (ii) Doral Financial Corporation, (iii) Genesis Security, (iv) Service Employees International Union (SEIU), (v) Unitech Engineering, (vi) Baxter Sales and Distribution Puerto Rico Corp., and (vii) Tradewinds Energy Barceloneta, LLC [ECF No. 3927]. The current members of the Retiree Committee are (i) Blanca Paniagua, (ii) Carmen Nunez, (iii) Juan Ortiz, (iv) Lydia Pellot, (v) Marcos A Lopez, (vi) Miguel Fabre, (vii) Milagros Acevedo, and (viii) Rosario Pacheco [ECF No. 340].

***Mediation Team.*** On June 23, 2017, the Title III Court entered the *Order Appointing Mediation Team* [ECF No. 430] "to further the goal of the successful, consensual resolution of the issues raised in these debt adjustment proceedings." The members of the Mediation Team currently include: (1) Judge Barbara Houser (Bankr. N.D. Tex.); (2) Judge Thomas Ambro (3d. Cir.); (3) Judge Nancy Atlas (S.D. Tex.); (4) Judge Victor Marrero (S.D.N.Y.); and (5) Judge Roberta Colton (Bankr. M.D. Fla.). The Oversight Board and Debtors owe their utmost gratitude to the mediators who are each sitting federal judges and who, without compensation, have

tirelessly and indefatigably worked successfully to promote increasing consensus and progress towards a revitalized Puerto Rico.

### B.    Hurricanes Irma, Maria, and Dorian, the January 2020 Earthquakes, and the Oversight Board's Response

*Hurricanes Irma and Maria.*  Shortly following the commencement of the Title III Cases, in September 2017, Hurricanes Irma and Maria struck Puerto Rico causing widespread damage throughout the island and exacerbating the economic challenges described above.  Hurricane Maria made landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period.  Hurricane Maria crossed Puerto Rico diagonally, entering through the southeast and exiting through the northwest region of the island. The hurricane caused catastrophic destruction in Puerto Rico, leaving the island completely without power and flooding many streets and roads.  Only two weeks prior to Hurricane Maria, Hurricane Irma—one of the strongest hurricanes ever recorded in the Atlantic—passed by Puerto Rico's northern coast.  As a result of the massive impact of the hurricanes, the Government and the Oversight Board undertook a series of actions to address the crisis.

On September 21, 2017, the Oversight Board authorized the Government to "reallocate" up to $1 billion of its budget for emergency funding to recover from the hurricane's effects and to ensure it had resources to begin immediate emergency response and recovery efforts in anticipation of federal funds.  This would enable the Government to act quickly to reapportion (reprogram) funds as needed, without seeking the Oversight Board's approval prior to movement of funds.

On October 4, 2017, taking into account the need to focus on the needs of residents to restore basic services and the nature of the destruction across Puerto Rico, the Oversight Board withdrew the litigation it had initiated to enforce in court the Government's compliance with certain measures in the certified Fiscal Plan and postponed the implementation of any furloughs measures for at least a year.

The Oversight Board (its members and executive staff) was active in Washington D.C. advocating for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity to maintain services.  The Oversight Board joined the Governor in requesting cost-sharing waivers, lifting funding caps, increased financial assistance, and most important, expedited responses to the Governor's requests.[164]  The Oversight Board participated in hundreds of meetings in the U.S. Congress with Members of Congress and staff, dozens of meetings with the federal agencies, including OMB and U.S. Treasury, and dozens of informational meetings with reporters, think-tanks, universities, among others.

Oversight Board officials appeared before several Congressional committees to testify.  On November 7, 2017 Ms. Natalie A. Jaresko testified before the U.S. House of Representatives' Committee on Natural Resources "Examining Challenges in Puerto Rico's Recovery and the Role

---

[164] Oversight Board Urges Maximum Support for Puerto Rico with Trump Administration Officials, Congress, Press Release, September 30, 2017, https://drive.google.com/file/d/1kD5kywyNexMkbEdtjQynZax5gcnYPhSV/view.

of the Financial Oversight and Management Board."[165]   On November 7, 2017, Mr. Noel Zamot testified before the U.S. House of Representatives' Committee on Natural Resources "Examining Challenges in Puerto Rico's Recovery and the Role of the Financial Oversight and Management Board."[166]   On November 14, 2017, Ms. Natalie A. Jaresko testified before the U.S. Senate's Committee on Energy and Natural Resources "Hurricane Recovery Efforts in Puerto Rico and the U.S. Virgin Islands."

The Oversight Board met with federal and territorial authorities in Puerto Rico, from the aftermath of the hurricane until present day, including dozens of meetings with FEMA officials at the local headquarters, and dozens of meetings with territorial officials.

The Oversight Board wrote to the President, the Secretary of the Treasury and the Congressional Leadership formally requesting support.  In a letter to Congressional Leadership dated October 3, 2017, the Oversight Board sought federal support in the following areas: maximum amount of federal assistance, access to an emergency liquidity program, parity treatment for Medicaid funding, and waivers of caps and local share requirements for federal assistance.[167]

In an October 6, 2017 letter to President Trump, the Oversight Board reiterated the request to support Governor Rosselló's request and those requests outlined in the letter to the Congressional leadership.[168]

In an October 10, 2018 letter to Secretary Mnuchin, the Oversight Board urged the Department of the Treasury to consider the proposal that the Oversight Board developed with the Government to address the pressing liquidity needs of the Commonwealth and its instrumentalities.[169]

Regarding liquidity, the Oversight Board collaborated with the Government to provide short term and medium term worst case liquidity estimates in light of the revenue shortfalls that

---

[165] Testimony of Natalie Jaresko, Executive Director, Financial Oversight Management Board for Puerto Rico before the House Committee on Natural Resources: "Examining Challenges in Puerto Rico's Recovery and the Role of the Financial Oversight and Management Board," November 7, 2017, https://drive.google.com/file/d/1prDID1QmnX_nD2XwZmRl2AzAZzgIDsMA/view.

[166] Written Testimony of Noel Zamot, Executive Director , Financial Oversight Management Board for Puerto Rico before the House Committee on Natural Resources: "Examining Challenges in Puerto Rico's Recovery and the Role of the Financial Oversight and Management Board," November 7, 2017, https://drive.google.com/file/d/1p9zv_86gXQ7XeD1o9Gopw_xs5c-5KrGp/view.

[167] Letter from José B. Carrión to United States Congressional Leaders, October 3, 2017, https://drive.google.com/file/d/1XkrMHCDxl-eiDbAcnjt8RFHrri7jAoCj/view.

[168] Letter from José B. Carrión to United States President Trump, October 6, 2017, https://drive.google.com/file/d/1gkGAw4WcH9kIBNOsANsnTw7-yKoiCDkx/view.

[169] Letter from Jose B. Carrión to United States Congressional Leaders, October 10, 2017, https://drive.google.com/file/d/1dHC0i3yiggV_5aDXG-Lmy0IkLR1tCih6/view; press release "The Governor and the Financial Oversight and Management Board Each Ask the Trump Administration to Address Liquidity Issues Following Hurricane Maria," October 10, 2017, https://drive.google.com/file/d/1gJmhmQMusQDTo2dh6Bdh-0jYJHrU5aQH/view.

the Commonwealth could experience, and to address the funds that will be needed to advance rebuilding efforts. The Oversight Board held several meetings with the U.S. Treasury to discuss Puerto Rico's access to CDLs.

Additionally, the Oversight Board certified the recovery plan on August 28, 2018, as directed by Congress in the Bipartisan Budget Act, but provided two caveats to its certification. First, the Oversight Board expressed concern that the recovery plan lacked sufficient detail of funding sources and estimates a much greater amount of federal funding than the certified fiscal plan for Puerto Rico projects. Second, the Oversight Board indicated that the recovery plan did not address oversight of federal funds and the recovery process. Moreover, the Oversight Board did not receive the recovery plan for consideration until after the Government had provided it to Congress.

***Hurricane Dorian.***   On August 27, 2019, President Trump issued an emergency declaration to address Hurricane Dorian, which made landfall in Puerto Rico on August 26, 2019. The declaration authorized FEMA to coordinate disaster relief efforts. On August 28, 2019, the Oversight Board authorized the use of $260 million in aggregate emergency reserve funds from fiscal year 2019 and fiscal year 2020 to address Hurricane Dorian.

***January 2020 Earthquakes.***   Beginning on December 28, 2019, a series of earthquakes and aftershocks struck Puerto Rico. More than 2,000 earthquakes or tremors have struck the island since then. The earthquakes caused both significant damage to homes and buildings on Puerto Rico's southern coast as well as significant damage to PREPA's Costa Sur power plant, which typically generates as much as 25% of the island's power. After the 6.5 magnitude earthquake on January 7, 2020, FEMA announced federal emergency aid had been made available to Puerto Rico to supplement local response efforts, following a request from Governor Vazquez. The Oversight Board also approved the Commonwealth's request for access to emergency reserve funds from fiscal years 2019 and 2020 in the amount of approximately $260 million to manage near-term earthquake emergency related expenses. These emergency reserve funds were included and certified by the Oversight Board in the fiscal 2019 and 2020 budgets so that the Commonwealth would be prepared to fund emergency needs in the event of another natural disaster following Hurricane Maria. On January 16, 2020, President Trump signed a major disaster declaration authorizing access to Category A and B relief at a reimbursement rate of 75% federal and 25% local. The declaration supplements local recovery efforts in the aftermath of the continued earthquakes. Currently, 16 municipalities are covered by the major disaster declaration enabling a range of federal assistance, including certain provisions under the Stafford Act. The municipalities under the current disaster declaration include: Adjuntas, Cabo Rojo, Corozal, Jayuya, Lajas, Lares, Maricao, San Germán, San Sebastián, Villalba, Guánica, Guayanilla, Peñuelas, Ponce, Utuado and Yauco.

On January 16, 2020, the U.S. House Appropriations Committee also introduced a supplemental spending bill that would provide Puerto Rico with an additional $3.35 billion in disaster relief to assist with damage caused by the ongoing earthquakes and seismic activity. The $3.35 billion package includes $100 million for education, $1.25 billion to rebuild roads and $2 billion in additional CDBG-DR disaster relief.

1.    **Federal Disaster Assistance Funding**

    a)    **Extent of Damage**

There are multiple views on how to measure the impact and extent of damage caused by Hurricanes Irma and Maria and recent earthquakes—ranging from assessing only the damage to productive capital assets, to the cost of all rebuilding needed for the Commonwealth. The following sources provide various methods of measuring Hurricanes Irma's and Maria's impact and extent of damage:

- Puerto Rico's Build Back Better (BBB) plan, published in November 2017 estimates rebuilding cost at $94.4 billion—this includes costs related to healthcare, resiliency spend, among others.[170]

- Puerto Rico's "Transformation and Innovation in the Wake of the Devastation," certified by the Oversight Board in August 2018, outlines the Government of Puerto Rico's perspective on the full set of capital investments needed for Puerto Rico to recover from Hurricanes Irma and Maria. Fully funding these roughly 270 actions would require approximately $139 billion over years 2018-2028.[171]

- The NOAA estimate of damage in Puerto Rico and the U.S. Virgin Islands due to Maria is $90 billion, with a 90% confidence range of +/- $25.0 billion, or $65.0 to $115.0 billion.[172]

- In December 2018, the Puerto Rico Planning Board issued a report citing that the storm's impact on the economy was $43.135 billion,[173] which included both physical damage and business interruption (e.g., losses due to systems going down, etc.).

Preliminary damage assessments for the devastating earthquakes is still underway but is expected to be considerable. As estimates are confirmed, a new fiscal plan will be certified to reflect the new information.

    b)    **Federal Aid Provided and To Be Provided**

The May 2019 Fiscal Plan projects that approximately $83 billion of disaster relief funding in total from federal and private sources will be disbursed in the reconstruction effort. Such amount will be used for a mix of funding for individuals (*e.g.*, reconstruction of houses, personal

---

[170]   Governor of Puerto Rico, *Build Back Better Puerto Rico* (Nov. 2017), *available at* http://www.documentcloud.org/documents/4198852-Build-Back-Better-Puerto-Rico.html.

[171]   Central Office for Recovery, Reconstruction and Resiliency, *Transformation and Innovation in the Wake of Devastation: An Economic and Disaster Recovery Plan for Puerto Rico* (Aug. 8, 2017), *available at* https://recovery.pr/tpbackend_prod/api/document/download/566.

[172]   Richard J. Pasch, Andrew B. Penny, & Robbie Berg, *National Hurricane Center Tropical Cyclone Report: Hurricane Maria* (National Hurricane Center) (Feb. 14, 2019), *available at* https://www.nhc.noaa.gov/data/tcr/AL152017_Maria.pdf.

[173]   *See* Antonio R. Gómez, *Junta de Planificación revisa sus números y reporta un alza,* Negocios, Dec. 4, 2018.

expenditures related to the hurricanes such as clothing and supplies), funding for the public (*e.g.*, reconstruction of major infrastructure, roads, and schools), and to cover part of the Commonwealth's share of the cost of disaster relief funding (recipients often must match some portion of federal public assistance spend).[174]

Of the total $83 billion, $49 billion is estimated to come from FEMA's Disaster Relief Fund ("DRF") for public assistance, hazard mitigation, mission assignments, and individual assistance. An estimated $8 billion will come from private and business insurance payouts, and $6 billion is related to other federal funding. The May 2019 Fiscal Plan includes approximately $20 billion from the CDBG-DR.

The major sources of disaster relief funding are detailed below:

- **FEMA Disaster Relief Fund (DRF):** FEMA provides Individual Assistance to individuals and families who have sustained uncovered losses due to disasters. FEMA also provides Public Assistance for infrastructure projects and other permanent improvements. FEMA's Hazard mitigation funds projects to reduce or eliminate long-term risks. FEMA's Mission Assignments provide emergency work and debris removal services primarily in the immediate aftermath of the disaster.[175]

- **HUD Community Development Block Grant-Disaster Recovery (CDBG-DR):** Based on the Action Plan submitted by the Puerto Rico Department of Housing,[176] HUD provides CDBG-DR funding that can be used for assistance to individuals (*e.g.*, housing repair) and public assistance (*e.g.*, infrastructure development), or by the Government for certain operational costs (*e.g.*, to cover their disaster relief cost match). The 2019 Fiscal Plan assumes, based on directives in the supplemental appropriation included in the Bipartisan Budget Act of 2018, that approximately $2 billion will be used to repair Puerto Rico's electric infrastructure (Public Assistance), and that approximately $2.4 billion in CDBG funding will be used to cover cost share for the Commonwealth and its instrumentalities for seven years per statute. On January 16, 2020, HUD Secretary Ben Carson formally announced a grant agreement with Puerto Rico, making an additional $8.2 billion available to Puerto Rico to help with disaster recovery efforts. HUD also released a draft notice that was to be submitted in the Federal Register to provide Puerto Rico with the guidelines for establishing its plan to use long-term mitigation funds appropriated by Congress.

---

[174] Puerto Rico's cost-match responsibility was estimated using FEMA-provided data, adjusted by category as necessary for waivers and exceptions

[175] The 2019 Fiscal Plan does not attribute economic impact FEMA's Administrative funding, which is used for FEMA's personnel (primarily outside of Puerto Rico), travel, and other internal costs.

[176] The Governor of Puerto Rico appointed the Puerto Rico Department of Housing as the responsible agency to administer the CDBG-DR grant program in close collaboration with the COR3. The U.S. Department of Housing and Urban Development (HUD) approved the Action Plan corresponding to the first allocation of $1.5 billion on July 29, 2018. On February 28, 2019, HUD approved Substantial Amendment 1 to the Action Plan. Non-Substantial Amendment 2 was submitted to HUD in August 2019. Action Plan and subsequent amendments *available at* https://www.cdbg-dr.pr.gov/en/action-plan/.

171

- **Private insurance funding:** Large personal property and casualty losses have been incurred in the aftermath of Hurricane Maria.  Early analysis of data from the Office of the Insurance Commissioner of Puerto Rico, adjusted for self-insured and other types of coverage, was used to determine the amount that will be paid out to individuals and businesses for major damages.

- **Other supplemental federal funding:** Additional federal funding has been allocated to various agencies and projects in Puerto Rico following the hurricane.  This money is directed at a wide range of recovery efforts, from reconstruction of damaged buildings (*e.g.*, funding to repair damage to Job Corps centers in Puerto Rico) to funding for health programs and environmental management (*e.g.*, USDA funding to repair water systems in rural areas).

### C.    Claims Process and Bar Date

#### 1.    Section 924/925 Lists

Bankruptcy Code section 924 requires debtors to file a list of creditors.  Bankruptcy Code section 925 provides that "[a] proof of claim is deemed filed" for claims set forth on the list of creditors required by Bankruptcy Code section 924 except as to claims that are "listed as disputed, contingent, or unliquidated." 11 U.S.C. § 925.[177]

#### 2.    Bar Date Orders

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order") and *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), the Title III Court established the following bar dates for filing proofs of claim in the Title III Cases:

- June 29, 2018 at 4:00 p.m., Atlantic Standard Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is the first business day that is 35 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is 35 days after the date that a notice of an amendment to the List of Creditors

---

[177] *See Notice of Filing of Creditor List for the Commonwealth of Puerto Rico*, [ECF No. 1215]; *Notice of Filing of Amendments to Creditor List for the Commonwealth of Puerto Rico*, [ECF No. 2582]; *Notice of Filing of Creditor List for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*, [17-BK-3567-LTC ECF No. 207]; *Notice of Filing of Creditor List for Puerto Rico Public Buildings Authority*, [19-bk-5523 ECF No. 33].

is served on a claimant as the bar date for any Claims relating to such amendment to the List of Creditors.

The Bar Date Orders authorized the following parties to file master proofs of claim on behalf of the constituencies described below:

- The indenture trustees, fiscal agents, or any similar agent or nominee (each a "Bond Representative") for each respective series of bonds issued by a debtor or non-debtor (to the extent such Bond Representative exists) may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents;

- Each union may file a separate master proof of claim on behalf of its respective constituents against the applicable Debtor on account of all obligations due under their respective CBAs or applicable statutes; and

- Each agent under any credit agreement may file a separate master proof of claim against the applicable debtor on behalf of itself and all lenders under such credit agreement.

3.      **ERS Pre-Solicitation Procedures**

On February 11, 2020, the Debtors filed a motion[178] to establish procedures to obtain complete or updated information from holders of Active and Retired Employee Retirement Benefit Claims (Class 39), which will assist the Debtors to reduce the number of solicitation packages returned undeliverable, and ensure the claim amounts for holders of claims in Active and Retired Employee Retirement Benefit Claims (Class 39) of the Plan are accurately calculated. On February 20, 2020, the UCC filed a limited response to the Debtors' motion [ECF No. 11335]. On February 26, 2020, the Debtors filed a reply in support of the motion.

[Pursuant to the *Order (A) Establishing Pre-Solicitation Procedures for Certain Holders of Retirement Benefit Claims, (B) Establishing Procedures and Deadlines for Submission of Information Necessary for Solicitation of Acceptance or Rejection of Plan of Adjustment, and (C) Approving Form and Notice Thereof* [Case No. 17-3566, ECF No.   ] (the "ERS Pre-Solicitation Procedures Order"), the Title III Court established the following Pre-Solicitation Procedures in ERS's Title III Case:

- May 7, 2020 is the Return Date by which Employee Claimants must submit the Information Form with the Requested Information to Prime Clerk;

---

[178] *Motion of the Commonwealth of Puerto Rico and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for an Order (A) Establishing Pre-Solicitation Procedures for Certain Holders of Retirement Benefit Claims, (B) Establishing Procedures and Deadlines for Submission of Information Necessary for Solicitation of Acceptance or Rejection of Plan of Adjustment by Such Claimants, and (C) Approving Form and Manner of Notice Thereof,* [ECF No. 10839].

- all Information Forms must: (i) be written in English or Spanish; (ii) include an original or electronic signature of the Employee Claimant or an authorized agent of the Employee Claimant; and (iii) substantially conform to the Information Form; and

- all Information Forms shall be delivered and received by Prime Clerk no later than 4:00 p.m. (Atlantic Standard Time) on the Return Date]

4.     **[The PBA Bar Date Order**

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [Case No. 19-05523-LTS, ECF No. _____] (the "PBA Bar Date Order") the Title III Court established the following bar dates for filing proofs of claim in PBA's Title III Case:

- April 30, 2020 at 4:00 p.m., Atlantic Standard Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is the first business day that is 35 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any PBA Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is 35 days after the date that a notice of an amendment to the PBA Creditor List is served on a claimant as the bar date for any PBA Claims relating to such amendment to the PBA Creditor List.

[The PBA Bar Date Order authorizes the following parties to file master proofs of claim on behalf of the constituencies described below:

- The Bond Representatives for each respective series of bonds issued by PBA (to the extent such Bond Representative exists) may file a master proof of claim against PBA on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond document; and

- Each union may file a separate master proof of claim on behalf of its respective constituents against PBA on account of all obligations due under their respective CBAs or applicable statutes.]

5.     **Alternative Dispute Resolution Procedures**

On June 5, 2019, the Debtors filed the *Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 7224], seeking an order establishing an alternative dispute resolution procedure ("ADR Procedures") for resolving certain general unsecured claims, including unliquidated litigation claims, asserted against the

174

Commonwealth, PBA, or ERS (as well as other Title III Debtors), and approving a proposed mailing to creditors whose claims did not provide sufficient information to enable the Debtors to reconcile their claims.

At the July 24, 2019 omnibus hearing, the Court requested certain modifications to the proposed ADR Procedures.  By order dated August 13, 2019, the Title III Court approved the proposed mailing, and adjourned consideration of the ADR Procedures and forms of notice pending the submission of revised proposed procedures and forms of notice consistent with the guidance provided by the Court.

On January 7, 2020, the Debtors filed their *Amended Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 9718] (the "Amended ADR Motion").  The Amended ADR Motion seeks approval of amended ADR procedures (the "Amended ADR Procedures") that would allow the Commonwealth, ERS, HTA, PREPA, and PBA, through the Oversight Board, and/or the Title III Court to identify claims that will be resolved through ADR.  The Amended ADR Procedures establish a process for the Debtors and the claimants to attempt to resolve the amount of the claim through an exchange of offers and counteroffers, and if no resolution is reached, a streamlined mediation procedure.  If the claim remains unresolved following these processes, the Amended ADR Procedures further provide for the claimant to elect whether to resolve their claim using one of three methods: (1) litigation before the Commonwealth's courts (subject to certain restrictions); (2) binding arbitration; or (3) litigation before the Title III Court.  At the January 29, 2020 omnibus hearing, the Court approved the Amended ADR Motion, subject to the submission of revised procedures and forms of notice consistent with the Court's comments on the record at the hearing.

6.      **Administrative Claims Reconciliation**

On October 8, 2019, the Debtors filed their *Motion for Entry of an Order (A) Authorizing Administrative Reconciliation of Certain Claims, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 8827] (the "ACR Motion").  The ACR Motion seeks approval of ACR procedures (the "ACR Procedures") that would allow the Commonwealth, ERS, HTA, PREPA, and PBA, through the Oversight Board, and/or the Title III Court to determine which claims will be resolved through ACR.  The ACR Procedures establish a process for the Court to permit certain types of claims which are administrative in nature—including tax refund claims, union grievance claims, public employee claims, and pension claims—to be resolved by the Commonwealth's existing administrative processes.  At the October 30, 2019 omnibus hearing, the Court provisionally approved the ACR Motion, pending the submission of revised proposed ACR Procedures.  Those revised proposed ACR Procedures were filed on December 18, 2019 [ECF No. 9617].  On February 5, 2020, the Court entered a notice requesting the Debtors submit a revised Spanish-language version of the form of notice of transfer to administrative reconciliation procedures [ECF No. 10699].

7.      **Significant Claim Objections Filed to Date**

As of the date of this Disclosure Statement, approximately 110,841 proofs of claim have been filed in the Title III Case against the Commonwealth, totaling approximately $33.2 trillion in asserted liabilities plus unliquidated amounts.  Approximately 52,665 proofs of claim have been filed in relation to, or reclassified to be asserted against, ERS totaling approximately $10.2 trillion in asserted liabilities, plus unliquidated amounts.  Approximately 2,244 proofs of claim have been filed in relation to, or reclassified to be asserted against, ERS, totaling approximately $10.2 trillion in asserted claims, in addition to unliquidated amounts asserted.  In accordance with the terms of the Bar Date Orders, the Debtors believe that many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended or duplicative of other proofs of claim, including master proofs of claim filed against the Debtors on behalf of certain bondholders.

Pursuant to the *Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (c) Granting Related Relief* [ECF Nos. 4230, 4230-1] (the "Initial Objection Procedures"), and the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), (C), Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7440], the Commonwealth, HTA, ERS, and COFINA, through the Oversight Board have filed ninety-six omnibus objections and fifty-three individual objections to claims.  Those omnibus objections sought to disallow certain claims on the bases that they lacked sufficient information to permit the Oversight Board to reconcile the claim, were asserted against the incorrect debtor, were subsequently amended, were duplicative of other proofs of claim, or, otherwise asserted amounts for which the asserted debtor entity are not liable.  ERS and the Commonwealth have also filed individual objections and omnibus objections to proofs of claim filed by the ERS Fiscal Agent and certain ERS bondholders against ERS and the Commonwealth.

Significant claim objections were also filed to certain bondholder claims, and are described in section III.B.1 of this Disclosure Statement.

**D.     Rejection or Assumption of Unexpired Leases of Nonresidential Real Property**

The Commonwealth is party to hundreds of nonresidential real estate leases (the "Real Estate Leases").  The decision to assume or reject the Real Property Leases involves the consideration of various factors, not all of which can be addressed expeditiously.  On July 21, 2017, the Commonwealth Debtor filed a motion seeking approval of an extension of time to assume or reject any unexpired Real Estate Leases pursuant to Bankruptcy Code section 365(d)(4) (the "365(d)(4) Deadline"), made applicable to these cases by PROMESA section 301(a) [ECF No. 705].  On August 10, 2017, the Court entered an order extending the deadline to November 29, 2017 [ECF No. 994].  Following the filing of the PBA Title III case, the Court extended the order entered in the Commonwealth case to PBA, and provided that PBA's deadline to assume or reject leases is extended to April 23, 2020, with all rights reserved for PBA to seek further extensions  [Case No. 19-05523-LTS, ECF No. 13].

The Commonwealth Debtor sought further extensions of the 365(d)(4) Deadline with the lessors' consent pursuant to Bankruptcy Code section 365(d)(4)(B)(ii).  For that purpose, the Commonwealth Debtor bifurcated its deadline extensions requests into (i) PBA Leases and (ii) leases with other entities as lessors.

(i) PBA Leases.  On February 13, 2018, the Commonwealth Debtor sought to extend the 365(d)(4) Deadline for PBA Leases through and including September 25, 2018, with PBA Debtor's consent [ECF No. 2494].  On February 28, 2019, the QTCB Noteholder Group filed the *Reservation of Rights of the QTCB Noteholder Group to Motion for Entry of Third Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Bankruptcy Code section 365(d)(4)*  [ECF No. 2602].  After a hearing, a revised order was granted extending the 365(d)(4) Deadline for PBA Leases through and including July 27, 2018, and it expressly preserved bondholders' rights.[179]  Thereafter, the Commonwealth Debtor, with PBA's consent, has been further extending the 365(d)(4) Deadline for PBA Leases.  The current 365(d)(4) Deadline for PBA Leases is July 29, 2020 [ECF No. 10290].

(ii) Leases with Other Entities.  On November 22, 2017, the Commonwealth Debtor sought to extend the 365(d)(4) Deadline for leases with other entities until the earlier of (i) January 1, 2019, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for each Debtor [ECF No. 1852].  The Commonwealth is party to leases with hundreds of lessors.  Despite contacting each lessor, it was unlikely the Commonwealth Debtor could receive affirmative consent from each lessor as a direct consequence of the widespread destruction and mass power outages on the island of Puerto Rico following Hurricane Maria that has made it extremely difficult for parties to communicate with each other.  In turn, the Debtors and their advisors had been unable to obtain written consent of all their landlords to grant the requested extension of time for the Debtors to assume or reject Real Property Leases.  Accordingly, the Commonwealth Debtor sought to extend the 365(d)(4) Deadline for leases with other entities that either provided affirmative consent or did not expressly decline such consent.  The rights of parties whose consent was "deemed" because consent was not expressly denied were preserved [ECF No. 2292].  No party expressly denied consent.  On December 13, 2018 and January 22, 2019, the Commonwealth Debtor sought to further extend the 365(d)(4) Deadline for leases with other entities until the earlier of (i) January 1, 2020, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for each Debtor, using the same mechanism of "deemed" consent.  On January 29, 2019, the Court entered an order extending the 365(d)(4) Deadline through the earlier of (i) January 1, 2020, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on

---

[179] "Except as expressly stated in this Order, nothing in the Motion or this Order shall (a) impair or modify the rights and claims of PBA under or related to the PBA Leases under PROMESA or applicable law; nor (b) impair or modify the rights or claims of any holders of bonds issued by PBA, either directly or as third party beneficiaries, under or related to the PBA Leases under PROMESA or applicable law." *Order Granting Motion for Entry of A Third Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Under Which the Puerto Rico Public Buildings Authority is the Lessor Pursuant to Bankruptcy Code Sections 365(d)(4),* [ECF No. 2689].

which a plan of adjustment is confirmed for each Debtor [ECF No. 4977], except with respect to four leases whose landlords expressly denied consent. Such four leases are deemed rejected pursuant to Bankruptcy Code section 365(d)(1). On December 17, 2019, the Commonwealth Debtor again sought to further extend the 365(d)(4) Deadline for leases with other entities until the earlier of (i) January 1, 2021, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for each Debtor, using the same mechanism of "deemed" consent [ECF No. 9610]. The Court entered an order extending the 365(d)(4) Deadline through the earlier of (i) January 1, 2021, (ii) the date of expiration or termination of such leases pursuant to their own terms, or (iii) the date on which a plan of adjustment is confirmed for each Debtor [ECF No. 9670]. There were no leases whose landlords expressly denied consent.

**E.     Title III Stay Matters**

   1.     **Generally**

Upon commencement of a Title III case, Bankruptcy Code section 362(a), made applicable by PROMESA section 301(a), provides for an automatic stay of certain actions by non-debtor third parties (the "Title III Stay"). On June 29, 2017, the Title III Court confirmed the applicability of Bankruptcy Code section 362(a) to the Title III Cases pursuant to the *Order Pursuant to PROMESA Section 301(a) and Bankruptcy Code Sections 105(a), 362(a), 365 and 922 Confirming (I) Application of the Automatic Stay to Government Officers, Agents, and Representatives, (II) Stay of Prepetition Lawsuits, and (III) Application of Contract Protections* [ECF No. 543]. Since the applicable Petition Date, the Debtors have taken steps to preserve the important "breathing spell" the Title III Stay provides, address the Debtors' financial condition, and expeditiously develop a plan of adjustment.

   2.     **Lift Stay Protocol**

In order to reduce the burden on the Title III Court, and to efficiently address requests for relief from the Title III Stay in these unprecedented Title III Cases, the Debtors developed a protocol by which parties may request relief from the Title III Stay, and by which the Debtors may consensually resolve such requests. On August 17, 2017, the Title III Court entered an order implementing a protocol for filing motions for relief from the Title III Stay [ECF No. 1065-1] (the "Lift Stay Protocol"). Under the Lift Stay Protocol, a movant is required to (a) send notice to counsel to the Oversight Board and AAFAF to advise them of movant's intent to seek relief from the Title III Stay at least fifteen (15) business days prior to filing a motion seeking such relief, and (b) meet and confer with the Debtors during such 15-day period. On October 24, 2017, the Lift Stay Protocol was amended (a) to allow the Debtors (i) to enter into stipulations modifying or lifting the Title III Stay without further order of the Court, and (ii) in their discretion, to modify or lift the Title III Stay with respect to any prepetition ordinary course civil action against a debtor without the filing of a notice or order of the Court, and (b) to require the Debtors to file an omnibus lift stay motion every 60 days, identifying each modification to the Title III Stay agreed to by the Debtors during the relevant period and seeking retroactive court approval of such modifications as of the relevant modification date.

3.        **Omnibus Lift Stay Motions**

Since the implementation of the Lift Stay Protocol, the Debtors have filed fourteen omnibus lift stay motions, involving approximately 2,337 actions, seeking retroactive court approval of modifications to the Title III Stay.

4.        **Significant Stay Matters**

a)        ***Gracia-Gracia, et al. v. Commonwealth of Puerto Rico*, Case No. 18-1463 (1st Cir.)**

A class of vehicle owners who purchased private insurance after paying mandatory premiums ("Gracia-Gracia") filed an action in the Commonwealth Court of First Instance seeking reimbursement of duplicative automobile insurance premiums paid to the Commonwealth (collectively, the "Gracia-Gracia Prepetition Action"). Gracia-Gracia alleged that the transfer of duplicative premiums to the Secretary of the Treasury violated the Takings Clause, Due Process Clause, and Equal Protection Clause of the U.S. Constitution. Following a number of appeals and decisions on remand, the First Circuit determined that due process required the Commonwealth to give claimants at least one year to make reimbursement claims after adequate notice.

In 2016, following the First Circuit's decision, the parties to the Gracia-Gracia Prepetition Action entered into settlements that require the Commonwealth to provide notice to class members about claims procedures for reimbursement of duplicative premiums, the processing of claims for reimbursement, and the payment of attorneys' fees.

On February 7, 2018, Gracia-Gracia filed a motion to modify the automatic stay to allow the enforcement of the entered settlements. The Title III Court granted the request in part, modifying the automatic stay to permit the notice and claim submission and review process, but denying the request in all other respects, including the payment of reimbursements and attorneys' fee awards.

Plaintiffs appealed and argued the duplicate premiums held in the Commonwealth's reserve account, and subject to the automatic stay, belong to the class members and are not the property of Debtors. The Debtors disagreed with this contention. The appeal was argued to the First Circuit on June 5, 2019.

By opinion dated September 25, 2019, the United States Court of Appeals for the First Circuit affirmed the portion of the Title III Court's decision denying stay relief in respect of the unsegregated insurance premiums, and in respect of the segregated premiums, remanded for a new determination on stay relief based on a preliminary determination of whether the premium funds were property of the Commonwealth or property of plaintiffs.[180] On October 16, 2019, the Court issued a mandate in connection with the judgement dated September 25, 2019. On January 22, 2020, Gracia-Gracia and the Commonwealth informed the Title III Court they had reached a

---

[180] Claims of the Gracia-Gracia claimants are unimpaired pursuant to the Plan because the Plan proposes to assume the settlement agreements.

stipulation to resolve the Gracia-Gracia Plaintiffs' request for stay relief.  The matter has been
adjourned until April 22, 2020.[181]

> b)   ***Autonomous Municipality of Ponce v. Commonwealth of Puerto Rico***,
>       **Case No. 18-2194 (1st Cir.)**

On May 4, 2018, the Autonomous Municipality of Ponce ("AMP") filed a motion to
modify the automatic stay to allow AMP to enforce a judgment in a previous action; *Municipio de
Ponce v. Autoridad de Carreteras y Transportación,* Case No. AC93-0485.  The former judgment
required the Commonwealth, HTA, and PREPA to complete certain municipal projects related to
an agreement between the Commonwealth and AMP.  On November 2, 2018, the Title III Court
denied AMP's request to modify the stay because AMP failed to demonstrate cause.

AMP's appeal of the Title III Court's decision was docketed on December 27, 2018, as
Case No. 18-2194.  AMP filed its opening brief on March 18, 2019, and the Oversight Board filed
a brief in opposition on May 1, 2019.  On June 5, 2019, AMP filed its reply.  Oral argument took
place on September 11, 2019.  By opinion dated September 25, 2019, the United States Court of
Appeals for the First Circuit affirmed the Title III Court's decision denying stay relief and ruled
the municipality's right to specific performance was a claim because money damages could be
substituted.  On October 16, 2019, the First Circuit issued a mandate.

> c)   ***PFZ Properties, Inc. v. Commonwealth of Puerto Rico***, **Adv. Proc.
>       No. 18-00056**

The Commonwealth commenced eminent domain proceedings in 2008 against PFZ
Properties, Inc. ("PFZ") with respect to certain beachfront land comprising approximately 1,300
acres located in the Municipality of Loiza.  The Commonwealth voluntarily dismissed the
proceedings without prejudice due to a lack of resources to litigate or pay PFZ.

On May 14, 2018, PFZ commenced an adversary proceeding seeking (i) a declaration that
the Commonwealth Debtor effected a regulatory taking of the property for which the Takings
Clause of the Fifth Amendment of the U.S. Constitution requires just compensation in the amount
of $75.55 million, and (ii) interest plus attorney's fees on account of certain conduct of the
Commonwealth which PFZ alleges caused unreasonable delay, and for any damages it may have
suffered on account of the taking of the property and subsequent voluntary dismissal of
proceedings.

PFZ and the Commonwealth entered into a stipulation whereby PFZ agreed to dismiss the
adversary proceeding without prejudice and the Commonwealth Debtor agreed to partially lift the
Title III stay for the limited purpose of determining the amount, if any, of PFZ's claims.  On July
30, 2018, the Title III Court dismissed the action without prejudice.

---

[181] *Order in Connection with Informative Motion Regarding Motion Requesting Relief of Stay Under 362(d)(1) of the
Bankruptcy Code (Docket Entry No. 11756)*, [ECF No. 1171].

      d)     ***Mandry-Mercado v. Commonwealth of Puerto Rico, et al.*, 17-2168, 18-
2035**

Pro se plaintiff Javier Mandry-Mercado ("Mandry-Mercado") filed a combined motion to
vacate and reconsider an order granting limited relief from the automatic stay. Judge Swain's
order allowed the parties in a long-running inverse condemnation dispute to continue litigating in
the Commonwealth Court of First Instance. Plaintiff filed his motion on the grounds that the
attorney who filed the motion for relief provided misleading information to the Court. On April
17, 2018, Judge Swain issued an order denying Mandry-Mercado's motion to vacate and
reconsider, and he filed a notice of appeal, which was docketed as Case No. 17-2168. Judge Swain
issued an order certifying that Mandry-Mercado's appeal "would not be taken in good faith,"
which prompted the First Circuit to issue an order directing him to show cause pursuant to 28
U.S.C. § 1915(a)(3). Mandry-Mercado filed a response pursuant to the First Circuit's order on
September 18, 2018.

On November 19, 2018, the case was submitted to the First Circuit. On January 30, 2019,
the First Circuit entered a judgement denying Plaintiff's request to proceed *in forma pauperis* and
affirming the orders on appeal for lack of a substantial question. Plaintiff Mandry-Mercado filed
a petition for rehearing on February 11, 2019, which the First Circuit denied on May 16, 2019. On
May 23, 2019, the First Circuit issued a mandate.

On July 6, 2018, Mandry-Mercado filed a motion seeking standing to assert certain claims
on behalf of the Commonwealth. On July 11, 2018, Judge Swain denied the motion. Mandry-
Mercado appealed, and on October 22, 2018, the notice of appeal was docketed by the First Circuit
as Case No. 18-2035. On November 13, 2018, the First Circuit issued a notice of default. On
February 5, 2019, it entered a judgment dismissing the appeal. On February 6, 2019, Mandry-
Mercado filed a motion for reconsideration.

      e)     **The DRA Parties' Lift-Stay Motion**

On June 25, 2019, Cantor-Katz Collateral Monitor LLC, monitor for the Government
Development Bank Debt Recovery Authority ("DRA"), and AmeriNational Community Services
LLC, servicer for the GDB DRA bonds issued pursuant to GDB's PROMESA Title VI qualifying
modification (collectively, the "DRA Parties"), filed a motion for relief from the automatic stay to
exercise remedies against DRA's asserted HTA collateral, including gasoline taxes, gas oil and
diesel oil taxes, motor vehicle and license fees, toll revenues, petroleum products taxes and
cigarette taxes. To secure DRA's obligations pursuant to the GDB DRA bonds, GDB transferred,
among other things, its HTA loan and bond assets to DRA.

The DRA Parties argued that (i) the Commonwealth and HTA's alleged depletion of the
HTA collateral without providing adequate protection provides cause to lift the stay, and (ii) the
Commonwealth and HTA lack any property interest or equity in the HTA collateral, which are
unnecessary for an effective reorganization.

In the alternative, the DRA Parties requested the Title III Court require the Commonwealth
and HTA to provide adequate protection by paying current interest under the HTA loans and bonds.
Pursuant to a stipulation among the DRA Parties, AAFAF, and the Oversight Board, the Title III

Court ordered that the briefing and hearing schedule regarding the motion be bifurcated to first consider the issue of the DRA Parties' standing to seek the relief requested in the motion.

On August 15, 2019, AAFAF, the Oversight Board, and the DRA Parties filed a joint stipulation to the Stay Order, which submitted the DRA Lift Stay Motion to the Stay Order, as described below in section V.I.9 of this Disclosure Statement, which the Court approved on August 16, 2019. The stay contemplated by the Stay Order was extended through March 4, 2020. The Mediation Team's Interim Report, described in more detail in section V.H.7.e), included a proposed schedule for litigation of the DRA Lift Stay Motion. On December 6, 2019, the Oversight Board and the DRA Parties independently filed responses to the Interim Report.

On December 18, 2019, AAFAF, the Oversight Board, and the DRA Parties filed an amended joint stipulation regarding the DRA Parties' motion for relief from the stay, which Judge Swain approved by order dated December 19, 2019. Pursuant to the amended joint stipulation and order, the briefing and hearing schedule regarding the lift stay motion will be bifurcated to first determine the DRA Parties' standing to bring the stay motion. The timeline for resolution of the standing issue is dependent on whether the Court rules on the stipulation filed by the DRA Parties in connection with their effort to intervene in the proceedings. *Joint Stipulation Regarding (I) the DRA Parties' Motion and Memorandum of Law in Support of Their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection [ECF No. 7643]; and (II) the DRA Parties' Motion and Memorandum of Law in Support of Their Notice that the DRA is a Party in Interest and Can Participate in the Monolines Amended Lift Stay Litigation*, [ECF No. 10835] (the "DRA Stip").

f)      **CCDA Lift Stay Motion**

On January 16, 2020, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, FGIC, and The Bank of New York Mellon, as the fiscal agent, filed a motion [ECF No. 10104] for (i) an order that the automatic stay does not apply to their proposed action to enforce CCDA bondholders' rights to revenues from hotel taxes, or, in the alternative, (ii) relief from the automatic stay to pursue the proposed action, or, in the further alternative, (iii) adequate protection for their collateral.

Movants allege they insure bonds issued by CCDA, which are secured by tax revenues generated under the Hotel Occupancy Tax Act. Movants also allege the automatic stay does not apply to their proposed action because the Commonwealth has no property interest in the revenues, which are the property of CCDA bondholders. Movants further argue that if the automatic stay does apply, it should be lifted because (i) the Commonwealth has no equity in the Hotel Taxes and they are unnecessary to an effective reorganization under Bankruptcy Code section 362(d)(2); (ii) Movants lack adequate protection under Bankruptcy Code section 362(d)(1); and (iii) the Commonwealth has violated PROMESA, Commonwealth law and the Constitution by taking bondholders' property.

On January 31, 2020, the Court entered an Amended Interim Case Management Order [ECF No. 10595] setting deadlines for opposition and reply briefs limited to issues of standing and secured status and scheduling a March 5, 2020 preliminary hearing on the CCDA Lift Stay Motion

on whether the movants have standing to sue and security or other property interests in the relevant revenues [ECF No. 10104].

On February 3, 2020, the Commonwealth filed an opposition to Assured, Ambac, National, and FGIC's motion for relief from the automatic stay in connection with CCDA bonds [ECF No. 10615].  The UCC and AAFAF filed partial joinders to the Commonwealth's opposition.

On February 12, 2020, Assured, Ambac, National, and FGIC filed an urgent motion seeking to adjourn the hearing on the CCDA, HTA, and PRIFA lift stay motions until April 22, 2020 and to extend the deadline for their replies in support of their lift stay motions until April 6, 2020.  According to the movants, this adjournment was necessary in order to permit time to obtain discovery.  On February 14, 2020, the Court entered an order granting the motion and adjourning the preliminary hearing until April 2, 2020, and allowed for certain discovery by the movants to occur.  The Court also entered an order referring any discovery disputes (associated with such discovery) to Magistrate Judge Dein, and setting a hearing on any discovery disputes for March 4 and 5, 2020.  On February 25, 2020, Ambac, Assured, and FGIC filed a joint motion to compel the production of documents in connection with the HTA, PRIFA and CCDA lift-stay motions.  On February 28, 2020 the Government Parties filed their omnibus opposition to the joint motion to compel.  Also on February 28, 2020, the parties filed an informative motion setting the deadline for replies in support of the HTA, PRIFA, and CCDA lift stay motions for March, 23, 2020.

g)     **HTA Lift Stay Motion**

On August 23, 2019, Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. (together with AGC, "Assured"), and National Public Finance Guarantee Corporation ("National"), filed a motion for (i) relief from the automatic stay to allow them to enforce the application of pledged toll and excise tax revenues to the payment of bonds issued by HTA, or, in the alternative, (ii) adequate protection of their interests in the pledged revenues.

Movants allege they insure bonds issued by HTA that are secured by toll revenues collected directly by HTA and excise taxes collected on behalf of HTA by the Commonwealth.  Movants assert they have a first priority lien on these pledged revenues, which have been improperly diverted from HTA to the Commonwealth.  Movants assert that the Court should lift the stay because (i) the revenues are unnecessary to an effective reorganization because the Commonwealth lacks a property interest in them, and (ii) Movants lack adequate protection under Bankruptcy Code section 362(d)(1).

On July 24, 2019, the Court issued the Stay Order, which stay was extended through March 4, 2020.  Notwithstanding the Stay Order, on December 19, 2019, the Court entered an interim case management order regarding certain issues related to revenue bonds (the "Initial Interim Revenue Bonds CMO"), which required that any amendments to the lift stay motion be filed by January 16, 2020.

On January 16, 2020, Assured, National, Ambac Assurance Corporation, and FGIC filed an amended lift stay motion [ECF Nos. 10102, 10107], which includes the above mentioned allegations and further alleges that the Court should lift the automatic stay because otherwise

Movants' due process rights will be violated.  The amended lift stay motion seeks the same relief as the original lift stay motion.

On January 31, 2020, the Court entered an Amended Interim Case Management Order [ECF No. 10595] setting deadlines for opposition and reply briefs limited to issues of whether Movants have standing to sue and security or other property interests in the relevant revenues, and scheduling a March 5, 2020 preliminary hearing on such issues.  On February 3, 2020, the Oversight Board filed an opposition to 'the amended motion for relief from the automatic stay in connection with HTA Bonds [17-03567-LTS, ECF No. 680].  The UCC and AAFAF filed partial joinders to the Commonwealth's opposition.

On February 11, 2020, the DRA Parties filed a notice that the DRA is a party in interest and can participate in the HTA Lift Stay Motion, or in the alternative, a motion to permit their intervention in the HTA Lift Stay Motion [ECF No. 10835].  On February 18, 2020, the Monolines filed a joint opposition to the DRA Parties' motion.  On February 19, 2020, AAFAF and the Oversight Board entered into a stipulation with the DRA Parties to establish a briefing and hearing schedule for the DRA Parties' Lift Stay Motion [ECF No. 11285].  On February 20 2020, the Monolines filed a limited objection to the stipulation [ECF No. 11325].  On February 25, 2020, the Oversight Board and AAFAF filed a joint reply in support of the stipulation [ECF No. 11735].

On February 12, 2020, Assured, Ambac, National, and FGIC filed an urgent motion seeking to adjourn the hearing on the CCDA, HTA, and PRIFA lift stay motions until April 22, 2020 and to extend the deadline for their replies in support of their lift stay motions until April 6, 2020.  According to the movants, this adjournment was necessary in order to permit time to obtain discovery.  On February 14, 2020, the Court entered an order granting the motion and adjourning the preliminary hearing until April 2, 2020, and allowed for certain discovery by the movants to occur.  The Court also entered an order referring any discovery disputes (associated with such discovery) to Magistrate Judge Dein, and setting a hearing on any discovery disputes for March 4 and 5, 2020.  On February 25, 2020, Ambac, Assured, and FGIC filed a joint motion to compel the production of documents in connection with the HTA, PRIFA and CCDA lift-stay motions.  On February 28, 2020 the Government Parties filed their omnibus opposition to the joint motion to compel.  Also on February 28, 2020, the parties filed an informative motion setting the deadline for replies in support of the HTA, PRIFA, and CCDA lift stay motions for March, 23, 2020.

h)     **PRIFA Lift Stay Motion**

On May 30, 2019, Ambac Assurance Corporation ("Ambac") filed a motion for (i) an order that the automatic stay does not apply to its action against the United States Treasury for an equitable lien on pledged rum taxes before they are transferred to the Commonwealth and its action against the Commonwealth to enforce its lien on pledged rum taxes, or, in the alternative, (ii) relief from the automatic stay to pursue the actions, or, in the further alternative, (iii) adequate protection for its collateral.  Ambac alleges that the automatic stay does not apply because the Commonwealth does not have a property interest in the pledged rum taxes.  Ambac further alleges that the Commonwealth has violated PROMESA and Commonwealth law by diverting the pledged rum taxes.

184

On June 6, 2019, the Oversight Board filed an urgent motion to dismiss the motion, alleging, among other things, that only the bond trustee has standing to institute an action relating to bonds issued by PRIFA.  On June 7, 2019, the Court denied the Oversight Board's urgent motion without prejudice to the Oversight Board raising the same arguments in its opposition to Ambac's motion.  On July 3, 2019, the Oversight Board and AAFAF filed oppositions to the lift stay motion. The Oversight Board's opposition incorporated its argument from its motion to dismiss that Ambac lacks standing to institute the motion.  On July 16, 2019, Ambac and FGIC filed a reply.  On July 19, 2019, the Oversight Board filed a sur-reply.

On July 24, 2019, at Ambac's request and the Oversight Board's consent, the Court included the PRIFA Lift Stay Motion in the Stay Order, which stay was extended through March 11, 2020.  Pursuant to the Initial Interim Revenue Bonds CMO, any motion for leave to amend the lift stay motion be filed by January 16, 2020.

On January 16, 2020, Ambac, FGIC, Assured Guaranty Corp., Assured Guaranty Municipal Corp. and U.S. Bank Trust National Association filed a motion for leave to amend, which proposed adding (i) the trustee as a moving party, (ii) discussion of the First Circuit's decision in *Gracia-Gracia v. Financial Oversight & Management Board*, 939 F.3d 340 (1st Cir. 2019), and (iii) discussion of factual developments regarding the pledged rum taxes.

In the proposed amended motion, Movants removed the argument that the automatic stay does not apply, but included the arguments that the stay should be lifted because (i) the Commonwealth lacks equity in the rum tax remittances deposited in the TSA, and (ii) the rum taxes are unnecessary to an effective reorganization because the Commonwealth lacks a property interest in them.

On January 22, 2020, the Oversight Board filed its opposition to the motion to amend and AAFAF filed a limited joinder to the Oversight Board's opposition.  On January 25, 2020, Movants filed a reply in support of their motion to amend.  On January 31, 2020, the Court granted Ambac's motion for leave to amend.  Also on January 31, 2020, the Court entered an Amended Interim Case Management Order [ECF No. 10595] limiting briefing on the lift stay to issues of standing and movants' security interest and setting a March 5, 2020 preliminary hearing on whether the movants have standing to sue and security or other property interests in the relevant revenues.

On January 31, 2020, Movants filed their amended PRIFA stay relief motion [ECF No. 10602].

On February 3, 2020, the Commonwealth filed a supplemental opposition to the PRIFA stay relief motion [ECF No. 10611].  The UCC and AAFAF filed limited joinders to the Commonwealth's opposition.  Bacardi International Limited and Bacardi Corporation (together with Bacardi International Limited, "Bacardi") filed its own opposition to the PRIFA Motion [ECF No. 10609].  Destilería Serrallés Inc. joined the Commonwealth and Bacardi's oppositions [ECF No. 10612].

On February 12, 2020, Assured, Ambac, National, and FGIC filed an urgent motion seeking to adjourn the hearing on the CCDA, HTA, and PRIFA lift stay motions until April 22, 2020 and to extend the deadline for their replies in support of their lift stay motions until April 6,

2020.  According to the movants, this adjournment was necessary in order to permit time to obtain discovery.  On February 14, 2020, the Court entered an order granting the motion and adjourning the preliminary hearing until April 2, 2020, and allowed for certain discovery by the movants to occur.  The Court also entered an order referring any discovery disputes (associated with such discovery) to Magistrate Judge Dein, and setting a hearing on any discovery disputes for March 4 and 5, 2020.  On February 25, 2020, Ambac, Assured, and FGIC filed a joint motion to compel the production of documents in connection with the HTA, PRIFA and CCDA lift-stay motions.  On February 28, 2020 the Government Parties filed their omnibus opposition to the joint motion to compel.  Also on February 28, 2020, the parties filed an informative motion setting the deadline for replies in support of the HTA, PRIFA, and CCDA lift stay motions for March, 23, 2020.

## F.    Significant Adversary Proceedings and Related Litigation

Over the course of the Title III cases, the Oversight Board has represented the Debtors' interests in numerous, multi-billion-dollar adversary proceedings, contested matters, and lawsuits brought primarily by creditors, but also by the government or legislature in two instances.  Significantly, virtually all the litigation was commenced by different creditor groups against the Oversight Board.  To date, there have been 63 adversary proceedings filed against the Oversight Board, the Commonwealth, and the instrumentalities, as well as over 300 avoidance actions filed against creditors.

As discussed above, included in these actions, in addition to cases filed by creditors, were actions initiated by the Government and municipalities in efforts to enjoin the Oversight Board from fulfilling what it regards as its duties.[182]  The Oversight Board has attempted to uphold and reaffirm the operation of PROMESA as a tool to restructure Puerto Rico's debt, and to date the courts have not granted any relief preventing the Oversight Board from continuing its statutory mission.

### 1.    Appointments Clause Litigation

#### a)    *Aurelius Investments, LLC, et al. v. Commonwealth of Puerto Rico, et al.*, Case Nos. 18-1671; 18-8014 (1st Cir.)

On August 7, 2017, Appellants, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, "Aurelius"), moved to dismiss the Commonwealth's Title III petition and challenged the constitutionality of PROMESA [ECF No. 913].  Aurelius alleged that the Oversight Board lacked authority to initiate the Title III Case because its members were appointed in violation of the Appointments Clause and the principle of separation of powers.  In response, the Oversight Board argued that its members were not "Officers of the United States" under the Appointments Clause, and that the Oversight Board's powers were purely local, not federal, as would be needed to qualify for Appointments Clause coverage.  The Oversight Board argued that even if the individual members were federal officers, the Appointments Clause was not violated because the Oversight Board's members exercised authority in Puerto Rico, an

---

[182] *See, e.g.*, *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.*, Adv. Proc. No. 18-00080; *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R.*, Adv. Proc. No. 18-00081; *Autonomous Municipality of San Juan v. Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 19-01474-GAG (D.P.R.).

unincorporated territory, where the Territories Clause endows Congress with plenary powers.  In the alternative, the Oversight Board argued that the Oversight Board's members' appointment did not require Senate advice and consent because they were "inferior officers."

On July 13, 2018, the Title III Court denied Aurelius' motion to dismiss the Commonwealth's Title III petition.  Aurelius appealed.  On September 7, 2018, the First Circuit consolidated the appeal with *Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority*, Case No. 18-1787 and *Assured Guaranty Corp. v. Financial Oversight & Management Board for Puerto Rico*, Case No. 18-1746.

On February 15, 2019, the First Circuit issued an opinion ruling that PROMESA's provision for the appointment of members of the Oversight Board is unconstitutional.  However, the First Circuit affirmed the Title III Court's decision to deny the motions to dismiss the Title III petitions and stated that its ruling does not invalidate the Oversight Board's actions prior to the First Circuit's judgment under the de facto officer doctrine.  The First Circuit further ruled the President and the Senate have 90 days to cure the defective appointments and that during the 90-day stay, the Oversight Board may continue to operate.

The Oversight Board filed a petition for writ of certiorari on April 23, 2019, which was docketed as U.S. Supreme Court Case No. 18-1334.  On April 24, 2019, the Oversight Board filed a motion with the First Circuit to stay the mandate pending the Supreme Court's disposition.  The motion was fully briefed, and on May 6, 2019, the First Circuit extended the stay of the mandate by 60 days until July 15, 2019.

Aurelius filed a petition for a writ of certiorari on May 24, 2019, which was docketed as U.S. Supreme Court Case No. 18-1475.  The UCC filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1496.  The United States filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1514.  Unión de Trabajadores de la Industria Eléctrica Y Riego ("UTIER") filed a petition for a writ of certiorari on June 5, 2019, which was docketed as U.S. Supreme Court Case No. 18-1521.

On June 18, 2019, the Oversight Board filed a motion with the First Circuit to further stay the issuance of the mandate pending the resolution of the above cases in the Supreme Court.  Also on June 18, 2019, the White House announced it was re-nominating all seven members of the Oversight Board for the remainder of their terms.  On June 19, 2019, the Supreme Court granted all of the petitions for writs of certiorari and consolidated the cases.  On July 2, 2019, the First Circuit granted the Oversight Board's motion to stay the mandate pending the Supreme Court's disposition.  On July 25, 2019, the Oversight Board, the Retiree Committee and the UCC filed their opening briefs.  On August 22, UTIER and Aurelius filed their opening briefs.  Amicus briefs have been filed by Anthony Michael Sabino, Alan Mygatt Tauber and the DRA Parties.  On September 19, 2019, the Oversight Board and the COFINA Senior Bondholders' Coalition filed their opening briefs, AAFAF filed its reply brief, and the Retirees Committee, the United States, and the UCC filed consolidated opening and reply briefs.  On October 7, 2019, UTIER filed its reply brief. On October 8, 2019, Aurelius filed its reply brief.  Oral argument was held on October 15, 2019, but the Supreme Court has not yet issued a decision.

b) ***Assured Guaranty Corp., et al. v. Financial Oversight and Management Board for Puerto Rico, et al.***, **Adv. Proc. No. 18-0087**

On July 23, 2018, Plaintiffs Assured Guaranty Corp. and Assured Guaranty Municipal Corp., like Aurelius, filed a complaint challenging the constitutionality of PROMESA on the grounds that the appointment of the members of the Oversight Board violates the Appointments Clause and separation-of-powers principles of the U.S. Constitution because the members were not appointed by the President with the advice and consent of the Senate. Plaintiffs seek declarations that the appointment of the Oversight Board's members violated the Appointments Clause and that the Oversight Board's actions to date are null and void. Plaintiffs also seek to enjoin Defendants from taking any further action until the Oversight Board's members have been lawfully appointed.

On August 3, 2018, the Title III Court issued a stipulated judgment for Defendants on the grounds that the issues raised in this complaint were already decided by the Title III Court's order, dismissing Aurelius's Appointments Clause challenge (discussed above) because the process for appointing the Oversight Board's members did not violate the Appointments Clause. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 318 F. Supp. 3d 537 (D.P.R. 2018). On the same day, Plaintiffs filed a notice of appeal to the First Circuit which was docketed as Case No. 18-1746.

On September 7, 2018, the First Circuit consolidated the appeal with *UTIER v. Puerto Rico Electric Power Authority*, Case No. 18-1787 and *Aurelius Investments, LLC v. Commonwealth of Puerto Rico*, Case Nos. 18-1671; 18-8014. For more information on the appeal, see the description in section V.F.1.a) above.

c) ***UTIER v. Puerto Rico Electric Power Authority, et al.***, **Adv. Proc. No. 17-00228**

On August 6, 2017, Plaintiff UTIER, like Aurelius and Assured, filed a complaint challenging the constitutionality of PROMESA section 101, which provides for the appointment process of the Oversight Board, and the separation-of-powers principles of the U.S. Constitution because the members were not appointed by the President with the advice and consent of the Senate. UTIER seeks (i) declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid, and (ii) enjoinment of the Oversight Board from exercising any authority granted to it by PROMESA. On November 10, 2017, Plaintiff filed an amended complaint.

On November 20, 2017, Defendants moved to dismiss the amended complaint, arguing (i) UTIER lacks standing, because it has not alleged harm from the Oversight Board's appointment and acts; and (ii) UTIER failed to state a claim under the Appointments Clause because (a) the Oversight Board does not implicate the Appointments Clause since it is part of the territorial, rather than federal, government, and (b) the Appointments Clause does not apply to Puerto Rico. Defendants further argued that UTIER seeks relief far broader than required by the claims it asserts.

On August 15, 2018, the Court entered an opinion and order granting Defendants' motion to dismiss the amended complaint. The Court held that UTIER had standing, but, like in Aurelius's

188

Appointments Clause challenge, *In re Financial Oversight & Management Board for Puerto Rico*, 318 F. Supp. 3d at 557, there was no violation of the Appointments Clause. The Court held that (i) the Oversight Board is an instrumentality of the Commonwealth established pursuant to Congress's plenary powers under the Territories Clause; and (ii) its members are not officers of the United States.

On August 16, 2018, Plaintiff filed a notice of appeal to the First Circuit (docketed as Case No. 18-1787). On September 7, 2018, the First Circuit consolidated the appeal with *Assured Guaranty Corp. v. Financial Oversight & Management Board for Puerto Rico*, Case No. 18-1746 and *Aurelius Investments, LLC, v. Commonwealth of Puerto Rico*, Case Nos. 18-1671 and 18-8014. For more information on the appeal, see the description in section V.F.1.a above.

On March 1, 2019, UTIER filed a petition for a panel rehearing or rehearing en banc, requesting that the First Circuit determine that all of the Oversight Board's acts and determinations taken since August 6, 2017, are null and void. UTIER also sought to enjoin the Oversight Board from taking any action under PROMESA, including pursuing Title III cases or certifying fiscal plans and budgets, until the Oversight Board's members are constitutionally appointed. On March 7, 2019, the First Circuit denied UTIER's petition for rehearing.

d)   ***Hernandez-Montañez, et al. v. Financial Oversight & Management Board for Puerto Rico, et al.*, Adv. Proc. No. 18-00090**

On July 25, 2018, certain members of the Popular Democratic Party Minority in the Puerto Rico House of Representatives and the Popular Democratic Party filed a complaint (i) seeking a judgment declaring that the Oversight Board's members were appointed in a manner that violates the Appointments Clause of the U.S. Constitution, (ii) seeking a judgment declaring that the delegation of executive and legislative authority to the Oversight Board is a violation of the separation of powers doctrine, and (iii) requesting a declaratory judgment that the Oversight Board's use of its control over the budget to allegedly strong-arm adoption of its own policies constitutes "impermissible interference" with federally-protected legislative autonomy. Plaintiffs also seek an order enjoining Defendants from exercising their authority under PROMESA if Plaintiffs succeed on their constitutional claims, and an order enjoining Defendants from improperly interfering with the legislative process if they succeed on their legislative autonomy claim. Plaintiffs further argue that the Oversight Board exceeded its authority under PROMESA to approve fiscal plans and certify budgets with its "imposition" of policies. Some of these measures that Plaintiffs cite as "coercive" include (i) restrictions on authority of the Puerto Rico Treasury and the Office of Budgetary Management, (ii) establishment of requirements for the review of government contracts and (iii) the elimination of Christmas bonuses.

On August 24, 2018, the parties filed a joint status report in which Plaintiffs agreed to stay their Appointments Clause claim while Aurelius's Appointments Clause appeal was pending (*Aurelius Investments, LLC v. Commonwealth of Puerto Rico*, Case Nos. 18-1671 and 18-8014) and agreed to dismiss their legislative autonomy claim. The parties disagreed as to whether Plaintiffs' remaining claim that the Oversight Board improperly holds the budget hostage should be stayed pending the resolution of the Aurelius Appointments Clause appeal. On November 20, 2018, Magistrate Judge Dein entered an order staying the case pending resolution of the

consolidated appeals in *Aurelius Investments, LLC v. Commonwealth of Puerto Rico*, No. 18-1671 and *Assured Guaranty Corp. v. Financial Oversight & Management Board for Puerto Rico*, No. 18-1746.  For more information on the appeal, see the description in section V.F.1.a above.

2.      **Bondholder Litigation**

a)      ***Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.,*** **Adv. Proc. No. 17-00155; 17-00156**

On June 3, 2017, Assured and certain other Plaintiffs who insure bonds issued by HTA filed actions against the Commonwealth, HTA, and other Defendants, alleging Defendants illegally diverted certain HTA special revenues to the Commonwealth's General Fund.  The Plaintiffs seek declaratory and injunctive relief, arguing Defendants violated the special revenue provisions of the Bankruptcy Code (sections 902, 922(d), and 928(a)), which exempt pledged post-petition special revenues from the automatic stay.  Plaintiffs argued the bonds in question were special revenue bonds under section 902, were not subject to the automatic stay under section 922(d), and the liens against the special revenues were only subject to necessary operating expenses under section 928(a).  Plaintiffs sought enforcement of these provisions in the form of an injunction ordering Defendants to pay the special revenues.

On July 23, 2017, the Plaintiffs filed amended complaints alleging AAFAF improperly directed BNYM to refrain from applying or delivering funds held in HTA's Debt Service Reserve Accounts to the Existing HTA Bonds.  According to Plaintiffs, the funds in those accounts are the property of the bondholders, not the Debtor.

On July 28, 2017, Defendants filed motions to dismiss, arguing among other things (i) Plaintiffs failed to state a claim under sections 922(d) and 928(a) of the Bankruptcy Code because they did not allege facts showing they had a perfected security interest in HTA's revenues; (ii) sections 922(d) and 928(a) do not require the pledged special revenues, if any were alleged, be turned over; (iii) Plaintiffs did not allege facts establishing an enforceable lien on HTA revenues; (iv) the Court lacked subject matter jurisdiction over the relief requested in the Complaint under PROMESA section 305, which limits the jurisdiction and the powers of the Court; and (v) Plaintiffs did not state a claim to the funds from the Reserve Accounts, as they do not own the accounts.

On January 30, 2018, the Title III Court granted the motions to dismiss.  On February 9, 2018, Plaintiff filed an appeal to the United States Court of Appeals for the First Circuit.  The appeal was docketed as Case Nos. 18-1165 and 18-1166.  On March 26, 2019, the First Circuit affirmed the Title III Court's decision, finding that it did not err when it dismissed the amended complaint on the grounds that neither Bankruptcy Code section 922(d) nor section 928(a) entitle the plaintiffs to the relief they sought.  The First Circuit held that these sections "permit, but do not require, continued payment during the pendency of the bankruptcy proceedings" and "stand for the premise that any consensual prepetition lien secured by special revenues will survive the period of municipal bankruptcy, and, accordingly, municipalities can elect to voluntary continue payment on these debts during the course of the bankruptcy proceedings so as to not fall behind and thus be at risk of being unable to secure financing in the future." *Assured Guar. Corp.*, 919

F.3d at 132-33.  On September 20, 2019, Appellants filed a petition for a writ of certiorari with the Supreme Court, which was docketed as Case No. 19-391.  On November 26, 2019, the Oversight Board filed an opposition to the petition.  On December 11, 2019, Appellants filed a reply in support of their petition.  On January 13, 2020, the Supreme Court denied the petition.

b)     ***Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 18-00059**

On May 23, 2018, Assured Guaranty Corp. and FGIC filed actions against the Commonwealth, AAFAF, Governor Rosselló and other Defendants, alleging the April 2018 Commonwealth Fiscal Plan and related acts and orders violate PROMESA and the United States Constitution.  Plaintiffs insure GO Bonds, which they allege are entitled to first priority payment under the Commonwealth Constitution.  Plaintiffs also insure bonds issued by HTA, CCDA, and PRIFA which they allege are secured by enforceable and perfected liens against special revenues. Plaintiffs allege the Fiscal Plan disregards these priorities.  Plaintiffs seek declaratory judgments that (i) the Fiscal Plan violates PROMESA sections 201(b), which delineates the requirements for the approval of fiscal plans, 303, which reserves the rights of covered territories to control their own instrumentalities and territories, and 407, which prohibits transfers of property of any territorial instrumentality of Puerto Rico "in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on . . .", and Bankruptcy Code section 928(a), which states that special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case; (ii) the Oversight Board lacked the authority to certify the Fiscal Plan; (iii) the Fiscal Plan does not constitute a "Fiscal Plan" under PROMESA section 5, (iv) a plan of adjustment cannot be confirmed based on the Fiscal Plan and the court should not hold a confirmation hearing on the Fiscal Plan; (v) the challenged actions violate the Contracts, Takings, and Due Process Clauses and Article I, Section 1 of the United States Constitution; and (vi) the challenged actions violate PROMESA section 303(1), which concerns applicability of the sections of PROMESA to cases, and PROMESA section 303(3), which reserves the rights of covered territories to control their own instrumentalities and territories.

Defendants filed an urgent motion to stay the litigation on June 25, 2018, arguing the issues raised in this adversary proceeding are substantially similar to those raised in *Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00159.  Magistrate Judge Dein granted the motion to stay this litigation pending a decision from the First Circuit in *Ambac*, determining that many of the questions on appeal in *Ambac* overlap with the issues in this case and that the requested stay does not significantly delay litigation.  On August 27, 2018, Plaintiffs filed an objection to the Magistrate Judge Dein's order, and on September 18, 2018, Defendants filed a response.  On November 2, 2018, the Title III Court entered an order affirming the stay.  As noted above, the First Circuit Court of Appeals affirmed the dismissal of the *Ambac* action and in light of that decision, the Defendants filed an unopposed motion for an extension of time to respond to the complaint, which the Court granted on July 16, 2019.  During this time, the parties are meeting and conferring to determine the impact of the *Ambac* opinion on this case, and whether Plaintiffs intend to amend their complaint.  On August 20, 2019, the UCC filed a motion to intervene in this action.  On August 28, 2019, the parties filed a joint motion requesting that the litigation be subject to the Stay Order, which stay was extended through March 11, 2020, as described in section V.I.9

of this Disclosure Statement.  On February 10, 2020, the Mediation Team filed its Amended Report, recommending that this litigation remain stayed until after confirmation.[183]

c)  ***ACP Master LTD, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00189**

On June 29, 2017, a group of holders of GO Bonds issued by the Commonwealth and of bonds issued by certain Commonwealth instrumentalities that are allegedly guaranteed by the Commonwealth filed a complaint against the Commonwealth and the Oversight Board.  Plaintiffs asserted their bonds are secured by an absolute and enforceable first claim and lien against all the Commonwealth's available resources and that their debt is senior to all other debt issued by the Commonwealth.  Plaintiffs also claimed their bonds are "Constitutional Debt" entitled to unique protections under the Commonwealth Constitution because they are backed by a pledge of the Commonwealth's good faith, credit, and taxing power.  Plaintiffs further alleged the Constitutional Debt is entitled to full and timely payment.  Plaintiffs sought declarations that (i) the Revenues can only be applied to pay Constitutional Debt; (ii) the Commonwealth lacks an equitable or beneficial property interest in the Revenues and that Plaintiffs have statutory liens on the Revenues; (iii) Plaintiffs' liens on the claw back revenues are liens on special revenues; (iv) the Commonwealth's diversion of the Revenues is an unconstitutional taking; and (v) the Revenues must be segregated and cannot be used for any purpose other than paying Constitutional Debt. Plaintiffs also seek an injunction requiring Defendants to segregate and preserve the Revenues.

Defendants filed a motion to dismiss on August 21, 2017, arguing (i) the claims were precluded by PROMESA section 305, which limits the jurisdiction and the power of the Court, or seek advisory opinions, (ii) certain claims were precluded by PROMESA section 4, which provides that PROMESA preempts any inconsistent territorial law and section 106(e), which precludes jurisdiction of U.S. Courts to review challenges to the Oversight Board's certification determinations, (iii) Plaintiffs have no property interests in or liens on the Revenues, (iv) the Commonwealth Constitution does not create a property right recoverable under its debt-repayment priority scheme, and (v) certain counts failed because Plaintiffs had an adequate remedy at law (money damages).

The Court granted the motion to dismiss on January 30, 2019.  The Court held that certain claims sought (1) impermissible advisory opinions and (2) were barred by PROMESA section 305 because they would interfere with the Commonwealth's use of its property or revenues, or its governmental powers without the consent of the Oversight Board.

On February 1, 2018, Plaintiffs filed a notice of appeal to the First Circuit (Case No. 18-1108).  On March 26, 2019, the First Circuit affirmed the Title III Court's decision.

---

[183] *See* Section V.I.3 for a detailed description of the Mediation Team and the Amended Report.

d)      ***Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.***, Adv.
        **Proc. No. 17-00159**

On June 6, 2017, Ambac filed a complaint against the Commonwealth, HTA, the Oversight Board, AAFAF, and various government officials claiming the Defendants violated Ambac's constitutional and statutory rights as insurer of the HTA Revenue Bonds.  Ambac has issued financial guaranty insurance policies covering payment of principal and interest on approximately $494 million in net par accreted value of HTA's bonds and claimed further to directly own approximately $16 million in such bonds.  Ambac asserted that HTA Bonds are secured by liens on (i) revenues from toll facilities; (ii) gasoline, diesel, crude oil and other special excise taxes; and (iii) special excise taxes consisting of motor vehicle license fees (collectively, the "Pledged Special Revenues").

Ambac argued Defendants diverted the alleged Pledged Special Revenues in such a way that junior unsecured debts were prioritized over senior secured debt.  These actions, Ambac alleged, caused unnecessary payment defaults on the HTA Revenue Bonds.  Due to these defaults, Ambac paid claims totaling approximately $52 million to bondholders.

Ambac sought declaratory and injunctive relief, claiming that (i) the Moratorium Legislation and Moratorium Orders, the Fiscal Plan, and the Fiscal Plan Compliance Act, which HTA allegedly acted pursuant to in order to divert the Pledged Special Revenues, were unconstitutional, violated the Contracts Clause, and null; (ii) the diversion violated the Takings and Due Process Clauses; (iii) the Moratorium Orders' alleged deprivation of Ambac's access to the Title III Court was unconstitutional; and (iv) Defendants violated sections 303 and 407 of PROMESA and sections 922 and 928 of the Bankruptcy Code.

Defendants argued the Court lacked jurisdiction to decide the issues raised in Ambac's complaint. Specifically, Defendants asserted (i) Ambac had no standing to file the complaint because it had not suffered any concrete injury, and (ii) any and all rights will not be determined until the filing of a proposed plan of adjustment.

The Title III Court dismissed the complaint, holding (i) Ambac had standing to file the complaint, but (ii) the Court lacked subject matter jurisdiction regarding the Plaintiff's lien interest and otherwise ruled that Ambac failed to state a claim upon which relief could be granted.  Ambac filed an appeal with the First Circuit, docketed as Case No. 18-1214.  On June 24, 2019, the First Circuit issued an opinion and order affirming the Title III Court's decision.  On September 23, 2019, Appellants filed a petition for certiorari, which was docketed as Case No. 19-387.  On January 13, 2020, after briefing had concluded, the Supreme Court denied the petition.

e)      ***Peaje Investment, LLC v. Puerto Rico Highways & Transportation
        Authority, et al.***, Adv. Proc. Nos. 17-00151; 17-00152

On May 31, 2017, Peaje Investment, LLC ("Peaje"), a holder of over $64 million in 1968 bonds issued by HTA, brought an action for declaratory and injunctive relief regarding (i) the validity of its lien and (ii) HTA's supposedly improper use of toll revenues to fund other debt obligations.  Peaje alleged that HTA toll revenues deposited with BNYM had been wrongfully diverted by HTA to pay other debt obligations or other expenses since May of 2016, leaving the

bondholders' account nearly drained.  Further, the Plaintiff alleged that it has a first priority statutory lien on the toll revenues.  According to Peaje, this purported statutory lien protects "pledged special revenues" on the bonds from stay restrictions under certain provisions of the Bankruptcy Code.  Accordingly, Peaje sought a judgment ordering the Defendants to resume depositing toll revenues with BNYM as fiscal agent.  Moreover, the Plaintiff asserted the wrongful diversion of the bondholders' lien to pay "necessary operating expenses" of HTA violates the Takings Clause under the Fifth Amendment of the U.S. Constitution.  Alternatively, the Plaintiff argued its priority liens can only be subordinated to expenses to preserve a "project or system" that generates specific collateral securing the bonds.  Peaje also filed a motion for a temporary restraining order and preliminary injunction to (i) enjoin HTA from continuing to take the toll revenues for purposes other than paying the bonds, and (ii) seek adequate protection for its purported collateral.

Plaintiff's arguments in its motion for preliminary and permanent injunctive relief became the subject of a full evidentiary hearing.  The Court issued a ruling denying Plaintiff's request for injunctive relief on the basis that Peaje failed to demonstrate (1) it has a valid statutory lien and (2) it would suffer irreparable harm without injunctive relief.  Further, the ruling concluded that even if the lien were found to have been valid, expert testimony had demonstrated that Peaje is adequately protected.  Immediately after the ruling, Plaintiff filed a notice of appeal to the First Circuit, docketed as Case No. 17-2165; 17-2166.  On August 8, 2018, the First Circuit entered a ruling affirming the Title III Court's conclusion regarding the absence of a statutory lien.

Shortly after filing the notice of appeal to the First Circuit, Peaje filed an amended complaint in the Title III action seeking a declaration that its lien is valid and perfected and an injunction to ensure that HTA resumes depositing the toll revenue.  This time, Peaje included references to UCC financing statements to evidence perfection.  Peaje also expanded upon its assertion in its original complaint that it is exempt from any stay.  It declared in the amended complaint that it is not bound by various emergency measures enacted by the Commonwealth, and not bound by PROMESA and the certification of the fiscal plan, which allow the government to appropriate funds to service general debt obligations.  Peaje's amended complaint also contained numerous claims resembling the *Ambac* adversary proceeding described above.

The Oversight Board filed an answer to the amended complaint and denied the material allegations.  HTA also asserted various affirmative defenses to the amended complaint.  HTA argued, among other things, the UCC financing statements do not bear the correct name of the Debtor, rendering them insufficient to perfect a security interest as a matter of law.  The Defendants also challenged Peaje's assertion that the court could adjudicate certain claims, arguing the court lacks subject matter jurisdiction under provisions of PROMESA that prohibit the court from reviewing fiscal plan certifications and preclude interference with political or governmental powers of the debtor, any of its property or revenue, or the use and enjoyment by the debtor of any income-producing property.  Moreover, HTA asserted that the Plaintiff's Takings Clause claim is not viable because the Plaintiff possesses no "cognizable" property right.  On October 22, 2018, the Court issued an order directing the parties to file a joint status report informing the Court of their respective positions in light of the First Circuit's decision.

On October 26, 2018, Peaje filed a petition for a writ of *certiorari* regarding the denial of its claim to a statutory lien with the Supreme Court, which was docketed October 30, 2018 as Case No. 18-560. On November 14, 2018, the parties filed a status report noting the pendency of Peaje's petition for writ of *certiorari*, as well as appeals filed by Ambac Assurance Corporation (Case No. 18-1214) and Assured Guaranty Corporation, et al. (Case Nos. 18-1165, 18-1166), and requesting an order directing them to file a further joint status report. On February 19, 2019, the Supreme Court denied the petition for a writ of *certiorari*.

On July 1, 2019, the Court entered an order directing the parties to file a joint status report on or before September 15, 2019. On September 15, 2019, the parties filed a joint status report requesting the entry of an order directing them to submit a further status report on December 16, 2019, to inform the Court of the status of and parties' positions in connection with the following matters: (i) the Appointments Clause cases before the Supreme Court (Case Nos. 18-1334, 18-1475 and 18-1496), and (ii) the Assured (Case Nos. 18-1165 and 18-1166) and Ambac (Case No. 18-1214) appeals. On September 16, 2019, the Court issued an order directing the parties to file a further joint status report on December 16, 2019. On December 16, 2019, the parties filed a joint status report informing the Court that (i) Assured and Ambac filed petitions for writ of certiorari to the Supreme Court that have been distributed for conference on January 10, 2020, and (ii) the Supreme Court heard oral argument in the Appointments Clause cases on October 15, 2019. The Supreme Court subsequently denied both petitions. On February 14, 2020, the parties filed a joint status report, noting that the Oversight Board had filed complaints objecting to the proofs of claim filed by Peaje against the Commonwealth and HTA, and the Court has ordered the parties file a further joint status report on or before April 20, 2020.

      f)      ***Cooperativa de Ahorro y Crédito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 18-00028**

On March 22, 2018, several credit unions chartered under Puerto Rico law filed an adversary complaint against the Commonwealth, the Oversight Board, and other Commonwealth instrumentalities (including COFINA, HTA, ERS, and PREPA), seeking declaratory judgment that their Puerto Rico debt holdings are not dischargeable and seeking monetary damages for alleged fraud in issuing and encouraging local credit unions to purchase Puerto Rico debt service instruments. On August 6, 2018, the Oversight Board, for itself and as representative of COFINA, the Commonwealth and certain other instrumentalities, moved to dismiss the complaint. Also on August 6, 2018, GDB filed a separate motion to dismiss. In addition, several parties filed joinders to the motions to dismiss or were granted leave from the Title III Court to file joinders.

On April 16, 2018, Plaintiffs filed an amended complaint, which eliminated claims premised on securities law and added claims for breach of contract, racketeering, fraud, non-dischargeability, damages, takings, and unjust enrichment.

On February 5, 2019, the Title III Court issued an Amended Confirmation Order confirming COFINA's Third Amended Plan of Adjustment. On February 12, 2019, COFINA's Third Amended Plan of Adjustment was substantially consummated and became effective. Pursuant to paragraph 30 of the Amended Confirmation Order, "the plaintiffs in that certain adversary proceeding before the Title III Court, captioned C*ooperativa de Ahorro y Credito*

*Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Case No.18-00028, shall be entitled to continue pursuit of such litigation against all parties other than COFINA and Reorganized COFINA, subject to all available rights and defenses with respect to claims and causes of action asserted therein."

On July 22, 2019, Defendants filed motions to dismiss the amended complaint.  On December 6, 2019, Plaintiffs filed a motion for leave to file a second amended complaint.  On February 4, 2020, the Oversight Board, on its own behalf and on the behalf of the debtors, filed a response to Plaintiffs' motion for leave.  On the same date, the GDB and the GDB Debt Recovery Authority filed their own responses to Plaintiffs' motion for leave, and both AAFAF and the individual government defendants filed joinders to those responses.  On February 21, 2020, Plaintiffs filed a reply in support of their motion for leave to file a second amended complaint.

3. **Union Litigation**

a) ***American Federation of State, County, & Municipal Employees v. Financial Oversight & Management Board for Puerto Rico***, Adv. Proc. Nos. 17-00242; 17-00243

On August 22, 2017, AFSCME, a collective bargaining representative for certain Commonwealth employees, filed two identical complaints arguing the Oversight Board violated PROMESA by adopting and implementing amendments to a Fiscal Plan proposed by the Governor that the Oversight Board had already approved.  Plaintiff claimed the amendments to the Fiscal Plan violated the Takings Clause of the United States Constitution and the Takings and Due Process Clauses of the Commonwealth Constitution by allegedly taking employees' individual retirement account balances.  Plaintiff further alleged violations of PROMESA section 201, which delineates the requirements for approval of Fiscal Plans and section 203, which outlines the Oversight Board's powers if finding noncompliance with the budget, breach of fiduciary duty, and unjust enrichment.  The complaints in both cases were identical.

Before Defendants responded, AFSCME moved to stay the proceedings, and the Court stayed both cases on October 23, 2017.  On December 13, 2018, in Adv. Proc. No. 17-00242, AFSCME filed a Notice of Dismissal and on December 14, 2018, the Court entered judgment without prejudice.  On April 3, 2019, AFSCME moved to dismiss Adv. Proc. No. 17-00243 without prejudice.  The Court issued an order dismissing the case without prejudice on April 5, 2019.

b) ***Hermandad de Empleados del Fondo del Seguro del Estado, Inc., et al. v. Commonwealth of Puerto Rico, et al.***, Adv. Proc. No. 18-00091

On July 25, 2018, two unions, (i) Hermandad de Empleados del Fondo del Seguro del Estado, Inc. a/k/a Union de Empleados de la Corporacion del Fondo del Seguro del Estado ("UECFSE"), a union of CFSE employees and (ii) Union de Medicos de la Corporacion del Fondo del Seguro del Estado Corp. ("UMCFSE"), a union of physicians who are responsible for providing medical services to injured workers, filed an action against the Commonwealth, the Oversight Board, and the exclusive provider of work-related insurance coverage, the State Insurance Fund Corporation ("CFSE").  Plaintiffs, who participate in the Employee Retirement

196

System and characterize themselves as creditors of the Commonwealth, seek relief declaring, among other things, that the June 29, 2018 Fiscal Plan (the "June 2018 Fiscal Plan") is unlawful and unable to form the basis of any plan of adjustment. The request is attributed to a $317.5 million cost reduction over a five-year period which Plaintiffs argue would impair the union members' CBA that is deemed an "essential service" that should be ensured under PROMESA section 201, which delineates the requirements for approval of Fiscal Plans. Plaintiffs argue that the June 2018 Fiscal Plan, among other things, violates the Contracts Clause of the United States Constitution and the Commonwealth Constitution's Right to Collective Bargaining provision.

On August 3, 2018, the Court entered an order adjourning Defendants' deadline to respond until after the pending motion to dismiss in *UTIER v. Puerto Rico Electric Power Authority*, Adv. Proc. No. 17-00229, in which the Plaintiffs pled the same statutory violations, is decided. That motion was decided on September 26, 2018, with the Court partially granting PREPA's motion to dismiss. Defendants moved to dismiss the complaint on January 25, 2019 based on the Court's holdings in the *UTIER* case, Adv. Proc. No. 17-00229. Plaintiffs filed their omnibus opposition on March 7, 2019. The Oversight Board filed its reply on April 5, 2019. The Defendant government officials (Rosselló Nevares, et al.) also filed their reply in April 5, 2019. On September 27, 2019, the Title III Court issued an order granting Defendants' motion to dismiss.

On October 4, 2019, Plaintiffs filed an appeal in the First Circuit, which was docketed as Case No. 19-2028. Appellees filed their opening brief on December 17, 2019. On December 19, 2019, Appellees filed a motion to extend the deadline to file their answering brief. On December 27, 2019, the Court issued an order granting Appellees' motion to extend the deadline to file their answering brief. Appellees filed their answering brief on February 18, 2020, and AAFAF's Executive Director filed a joinder thereto on February 19, 2020.

c)    ***Union de Empleados de la Corporacion del Fondo del Seguro del Estado v. Government of the United States of America, et al.*, Adv. Proc. No. 18-00066**

On May 30, 2018, UECFSE, UMCFSE, and two union members filed an action against the United States, the Governor, the Commonwealth and the Oversight Board. In their second amended complaint, filed on October 5, 2018, Plaintiffs allege PROMESA violates the United States Constitution and various international treaties and charters. Plaintiffs' claims are based primarily on their views on the *Insular Cases*, which gave the United States unilateral authority over its territories, and the United States' alleged treatment of Puerto Rico as a colony. Plaintiffs seek declaratory judgments that (i) PROMESA violates the First, Fifth, Thirteenth, Fourteenth, and Fifteenth Amendments; and (ii) the Oversight Board's acts to date are unconstitutional and null. Plaintiffs further request that the court (i) overturn the *Insular Case*; (ii) enjoin Defendants from acting pursuant to the authority granted by PROMESA; and (iii) direct Congress to decolonize Puerto Rico.

On December 19, 2018, the Oversight Board and the United States filed motions to dismiss, arguing (i) Plaintiffs lack standing; (ii) Plaintiffs' claims regarding decolonizing Puerto Rico and international law seek advisory opinions; (iii) the international treaties do not create judicially enforceable rights; (iv) Plaintiffs fail to state claims for violations of the First, Fifth, Thirteen,

Fourteenth, and Fifteenth Amendments; and (v) Plaintiffs' request that the court overrule the *Insular Cases* fails to state a claim.

On March 1, 2019, Plaintiffs filed an omnibus opposition brief, arguing (i) Plaintiffs have standing; and (ii) Plaintiffs have stated claims for violations of the First, Fifth, Thirteenth, Fourteenth, and Fifteenth Amendments, as well as for violations of international law.  The U.S. Government filed its reply in support of its motion to dismiss on April 5, 2019. The Oversight Board filed its reply in support of its motion to dismiss on April 8, 2019.

On November 15, 2019, Judge Swain issued an opinion and order granting Defendants' motions to dismiss the second amended complaint.  On November 26, 2019, Plaintiffs filed a notice of appeal to the First Circuit, which was docketed as Case No. 19-2243.  On January 22, 2020, Appellants filed a motion to expedite the appeal.  On January 27, 2020, the Oversight Board filed a motion noting that it consents to the schedule proposed by Appellants, but disputes the arguments concerning the merits of the appeal raised in Appellants' motion.  Under the proposed schedule, briefing will conclude on April 27, 2020, and oral argument will be heard during the first week of June 2020.

d) ***American Federation of Teachers, et al. v. Commonwealth of Puerto Rico, et al.,*** **Adv. Proc. No. 18-00134.**

On November 15, 2018, two labor unions representing Puerto Rico Government employees, filed an action against the Commonwealth, the Retirement Board of the Government of Puerto Rico, AAFAF and their respective officers.  The Unions claim to be aggrieved because (i) the Commonwealth has not implemented the transition to individual defined-contribution retirement accounts within the time frame purportedly contemplated by Puerto Rico Law 106-2017, which restructured the payment of pensions; (ii) the Oversight Board failed to compel them to do so; and (iii) Banco Popular de Puerto Rico has been enriched because the relevant employee contributions have been kept in a Banco Popular account bearing little or no interest.  On the basis of these allegations, Plaintiffs seek (i) relief for violation of Law 106 (against all Defendants except the Oversight Board and Banco Popular); (ii) relief for breach of fiduciary duty or aiding and abetting breach of fiduciary duty (against all Defendants); (iii) relief for unjust enrichment (against the Commonwealth and Banco Popular); and (iv) an accounting (against the Commonwealth and Banco Popular).

On January 8, 2019, the Oversight Board filed a motion to dismiss.  The parties filed several joint motions to extend the briefing deadlines to continue their discussions regarding the implementation of Law 106, and the Court granted the motions.  On October 29, 2019, the Court issued an order directing the parties to file a joint status report.  That same day, Plaintiffs filed a status report stating that there is no imminent need to proceed with litigation because although the Commonwealth had yet to implement the individual retirement accounts mandated by Law 106, the Commonwealth had taken certain necessary preliminary steps to do so.  Plaintiffs' status report also stated that it would be appropriate for the parties to provide a further status report in January 2020.  On November 1, 2019, Defendants filed status reports joining Plaintiffs' status report.  On January 24, 2020, the parties filed a joint status report stating the Commonwealth is continuing to

take steps to establish the retirement accounts, and it would be appropriate for the parties to provide a further status report in April 2020.  All litigation deadlines have been extended *sine die*.

e) ***Asociación de Profesoras y Profesores del Recinto v. Commonwealth of Puerto Rico, et al***, Adv. Proc. No. 17-00197

On July 9, 2017, Asociación de Profesoras y Profesores del Recinto Universitario de Mayagüez, Inc. ("APRUM"), an organization of teachers at UPR, filed a complaint against the Commonwealth, Oversight Board, the Governor, Gerardo Portela Franco, Hon. Raúl Maldonado Gautier, José Iván Marrero Rosado, and Natalie A. Jaresko. A second amended complaint was filed on May 11, 2018. APRUM alleged that the Commonwealth and the UPR fiscal plans and budgets failed to meet the requirements of PROMESA section 201, which delineates the requirements for approval of Fiscal because they reduced the budgeted subsidies from the Commonwealth to UPR.  Plaintiff contended the appropriations to UPR were lower than previously set by Puerto Rico Act 3-2017, which was passed to adjust judicial and legal framework to allow compliance with the Fiscal Plan, and that without the enactment of new legislation, such reduction was "illegal."

On July 2, 2018, Defendants filed their motion to dismiss the second amended complaint. The Defendants argued (i) the Court lacks subject matter jurisdiction because the claims did not arise under Title III; (ii) the Court lacks subject matter jurisdiction to review certified fiscal plans and budgets under section 106(e), which precludes U.S. district courts from reviewing challenges to the Oversight Board's certification determinations; (iii) the Plaintiff lacks constitutional or prudential standing and is not a party in interest under Bankruptcy Code section 1109; (iv) PROMESA prohibits the Court from interfering with the Commonwealth Debtor's decisions about the use of its property and revenues; and (v) PROMESA sections 4 and 108, which includes definitions and guarantee the autonomy of the Oversight Board,  provide that PROMESA, and the certification of fiscal plans and budgets pursuant thereto, prevail over any inconsistent territorial law and preclude enforcement of any statute that would impair or defeat the purpose of Title III.

On July 27, 2018, APRUM filed an urgent motion to hold the adversary proceeding in abeyance and to amend the briefing schedule, so that APRUM could assess how or whether to proceed with this action.  Judge Dein issued an order granting APRUM's motion.

On August 21, 2018, APRUM filed a motion to voluntarily dismiss its amended complaint, which the Court granted.

f) ***Asociación Puertorriqueña de Profesores Universitarios, et al. v. University of Puerto Rico, et al***, Adv. Proc. No. 19-00034

On April 16, 2019, Asociación Puertorriqueña, an organization of active and retired professors at UPR, and several beneficiaries of the UPR retirement plan filed a complaint against UPR, its governing board, members of the governing board, the university president, and the Oversight Board.  The complaint sought, among other things, declaratory judgments and injunctions providing that the Oversight Board's oversight acts in relation to the Retirement System are "null and void," allegedly because the UPR retirement system is a trust that is not a covered instrumentality and is outside the Oversight Board's power, and that the UPR Governing

Board cannot comply with the Oversight Board's fiscal plans and budgets impacting the retirement system. The complaint also sought (i) an order directing the Governing Board to comply with certain funding requirement for the retirement system and UPR, (ii) an order directing UPR to pay purported damages relating to trust property to the retirement system, (iii) orders removing UPR's Governing Board as trustee of the retirement system and replacing it with the retirement system board.

Plaintiffs filed an amended complaint on July 10, 2019, which included the additional allegation that the Oversight Board induced the Governing Board to breach its fiduciary duty to the retirement system. The amended complaint also added an additional prayer for relief seeking compensatory damages. On August 23, 2019, the Oversight Board and UPR filed motions to dismiss the amended complaint. On October 4, 2019, Plaintiffs filed an opposition to the Oversight Board's motion to dismiss. On October 25, 2019, the Oversight Board and UPR filed replies in support of their motions to dismiss. On November 1, 2019, Judge Swain issued an order referring the motions to dismiss to Magistrate Judge Dein for a report and recommendation.

4.     **Healthcare Center Litigation**

a)     ***Atlantic Medical Center, Inc., et al. v. Commonwealth of Puerto Rico***,
       **Adv. Proc. No. 17-00278**

On November 17, 2017, various non-profit healthcare entities (the "Atlantic Medical Plaintiffs") filed a complaint seeking declaratory judgment that their claims for payments for Medicaid services owed by the Commonwealth cannot be impaired in a Title III case because PROMESA requires the Commonwealth to satisfy any obligations under federal grant programs.

Plaintiffs seek a declaratory judgment that their claims for all supplemental payments for Medicaid services owed by the Commonwealth for the years since 1997—and that are the object of Adversary Proceeding No. 17-0227 (LTS)—are non-dischargeable under PROMESA and otherwise unimpaired by the Commonwealth's Title III case. Plaintiffs rely on PROMESA section 7 (48 U.S.C. § 2016), which states that PROMESA "shall not be construed as impairing or in any manner relieving a territorial government from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory," and PROMESA section 304(h), which precludes discharge of obligations arising under federal policy or regulatory laws, including those relating to public safety.

On February 2, 2018, the Court entered an order consolidating this case with a separate adversary proceeding seeking identical relief filed by Corporación De Servicios Integrales de Salud del area de barranquitas, Comerio, Corozal, Naranjito y orocovis ("CSI"). *See Corporación De Servicios Integrales De Salud Del Area De Barranquitas, Comerio, Corozal, Naranjito Y Orocovis v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00292. The consolidation order specified that all motions should be filed under Atlantic Medical Center, the lead case.

The Commonwealth Debtor moved to dismiss the consolidated complaints on February 22, 2018, arguing the claims were unripe, as they required the Court to determine dischargeability but a plan of adjustment had not yet been proposed.

200

On August 7, 2018, Magistrate Judge Dein issued a report and recommendation on the Commonwealth Debtor's motion to dismiss recommending that the motion to dismiss be granted and both complaints be dismissed without prejudice to refiling when a plan of adjustment for the Commonwealth has been proposed, or to allege specific impairment due to PROMESA.   On November 27, 2018, the Title III Court issued an order overruling objections to and adopting the report and recommendation.

On December 10, 2018, the Atlantic Medical Plaintiffs filed a notice of appeal to the First Circuit, which was docketed as Case No. 18-2228.  On December 13, 2018, CSI filed a notice of appeal to the First Circuit, which was docketed as Case No. 19-1202, appealing the Order overruling objections and adopting the report and recommendation and the judgement dismissing the underlying case.  On March 6, 2019, this case was consolidated with the appeal that the Atlantic Medical Plaintiffs had filed (Case No. 18-2228).

The Atlantic Medical Plaintiffs, as appellants, filed their opening brief on April 18, 2019, and CSI filed its opening brief on May 10, 2019.  The Commonwealth, as appellee, filed its consolidated answering brief on July 11, 2019.  The Atlantic Medical Plaintiffs filed their reply brief on August 5, 2019 and CSI filed its reply brief on August 13, 2019.  Oral argument is scheduled for March 6, 2020.

> b)   ***Corporación De Servicios Integrales De Salud Del Area De Barranquitas, Comerio, Corozal, Naranjito y Orocovis v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00298**

On December 28, 2017, a health care provider filed a complaint seeking declaratory judgment against the Commonwealth that sections 28 and 29 of Law 66-2014, which establish payment plans for judgments against the Commonwealth and provide that the Commonwealth may not be compelled to pay judgments if it does not have the funds, violate (i) the Due Process and Contracts Clauses of the United States Constitution and are preempted by Federal Medicaid law, (ii) section 903 of the Bankruptcy Code, which reserves the power of a state to control municipalities, and (iii) PROMESA section 303, which reserves the power of a covered territory to control instrumentalities and its own territory.  In a prepetition action, Plaintiff obtained a $51 million judgment against the Commonwealth for failure to make Medicare payments in a Commonwealth court.

On March 28, 2018, the Commonwealth Debtor moved to dismiss the complaint, arguing Plaintiff's challenges to Law 66-2014 fail because, (i) since the Commonwealth filed its Title III case, it is the automatic stay, rather than Law 66-2014, that bars collection of the judgment; (ii) the one-year statute of limitations for challenging the law, which was passed in 2014, has expired; (iii) the judgment is not a "contract" that is protected by the Contracts Clause; and (iv) PROMESA aims to require continued compliance with federal law, not to mandate that the Commonwealth remedy its past failure to make Medicaid payments.

On September 25, 2018, Magistrate Judge Dein *sua sponte* issued an order staying the motion to dismiss pending a ruling by the First Circuit related to *Asociacion de Salud Primaria de Puerto Rico v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00227, and a ruling on the

objections to the Court's report and recommendation dismissing the complaint in *Atlantic Medical Center v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00278.  On October 2, 2019, Plaintiffs filed an objection to the Court's order staying the case.  On April 5, 2019, Judge Swain issued an order affirming Magistrate Judge Dein's order staying the case and overruling Plaintiffs' objection.

c)   ***Asociación de Salud Primaria de Puerto Rico, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00227**

Prior to the commencement of the Commonwealth Title III Case, various not-for-profit corporations that provide comprehensive primary and preventive health care services throughout the Commonwealth to patients that lack health insurance filed an action in the Puerto Rico Court of First Instance, San Juan (the "Commonwealth Court") against the Commonwealth and related government offices and officials seeking a money judgment for supplemental payments that should have been paid by the Commonwealth for Medicaid services provided by the Plaintiffs.  On August 2, 2017, certain other creditors of the Plaintiffs removed the action to the Title III Court, asserting that the Title III Court has jurisdiction in the action because it arises "under," arises "in" or is "related to" the Commonwealth Title III Case.

On November 14, 2017, the Puerto Rico Department of Justice, on behalf of the Commonwealth, filed a motion for abstention seeking to have the case remanded to the Puerto Rico Court of First Instance.  On December 11, 2017, the Title III Court entered an amended order referring the case to Magistrate Judge Dein for general pretrial management and for a report and recommendation regarding the Commonwealth's motion for abstention.  On April 2, 2018, Judge Dein recommended that the Title III Court remand the adversary proceeding to the Puerto Rico Court of First Instance.  Plaintiffs filed objections to Judge Dein's report and recommendation.  On July 10, 2018, the Title III Court overruled these objections and adopted Judge Dein's report and recommendation to abstain from the proceeding.  On February 16, 2019, the Plaintiffs filed an appeal to the United States Court of Appeals for the First Circuit.  The appeal was docketed as Case No. 19-1189.  The Commonwealth moved to dismiss the appeal for lack of jurisdiction on September 23, 2019.  On October 3, 2019, Appellants filed an opposition to the motion to dismiss the appeal.  On October 8, 2019, the Commonwealth filed a reply in support of its motion to dismiss the appeal.  The First Circuit has not ruled on the motion to dismiss the appeal.  On October 28, 2019, Appellants filed their opening brief on appeal.  Appellee filed its answering brief on December 16, 2019.  Appellants' reply brief on appeal was due on January 3, 2020, but Appellants did not file one.

5.    **Revenue Bond Litigation**

On July 24, 2019, the Court issued the Stay Order, which temporarily stayed certain adversary proceedings and contested matters identified therein.  As part of the stay, the Court ordered the parties to enter into a period of mandatory mediation to, among other things, facilitate the preparation and filing of proposed scheduling orders with respect to certain adversary proceedings and contested matters relating to revenue bonds issued by certain Commonwealth instrumentalities.  The Commonwealth, the Oversight Board, and certain creditors met extensively with the Mediation Team and drafted and submitted proposed scheduling orders.  On November 27, 2019, the Mediation Team filed an *Interim Report and Recommendation* with proposed interim

orders, including a proposed interim order for the preliminary scheduling of the litigation of issues related to the revenue bonds. On December 19, 2019, the Court entered an Interim Case Management Order for Revenue Bonds (the "Revenue Bond Interim CMO") and set a January 10, 2020 deadline for the Mediation Team to file an Amended Report (which was subsequently extended to February 10, 2010).

The Revenue Bond Interim CMO directed, among other things, the filing and preliminary litigation of four adversary complaints relating to proofs of claim filed by certain revenue bond creditors and monoline insurers against the Commonwealth and/or HTA in respect of HTA, PRIFA and CCDA revenue bonds. Each of these proceedings are described below.

On January 21, 2020, the monoline insurers Assured, National, Ambac, and FGIC filed an objection to the Oversight Board's response to the Interim Report (the "Revenue Bondholders"). The Revenue Bondholders argue that the Title III Court should hold a final hearing on the lift stay motions and stay the revenue bond adversary proceedings pending the results of the lift stay motions. In their objection, the Revenue Bondholders also seek permission to conduct discovery in connection with the pending lift stay motions. On January 27, 2020, the Oversight Board filed a response to the Revenue Bondholders' objection, arguing that staying the revenue bond adversary proceedings would risk incomplete resolution of key threshold issues, and that no discovery should be permitted until certain gating issues on the Revenue Bondholders' security interests or other liens, if any, are determined.

As per the Revenue Bond Interim CMO, the deadline for the defendants in the revenue bond adversary proceedings to respond to the complaints in those proceedings was February 27, 2020.

> a) ***Financial Oversight and Management Board for Puerto Rico, et al. v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00007**

On January 16, 2020, Plaintiffs the Oversight Board, acting in its capacity as representative of HTA, and the UCC[184] filed an action against Ambac, Assured, National, FGIC, Peaje, and BNYM, as fiscal agent (collectively, the "HTA Defendants"), challenging the proofs of claim filed against HTA and other lien claims asserted by the HTA Defendants as insurers and/or holders of certain bonds issued by HTA (the "HTA Bonds") (the "HTA Claim Challenge Action"). The HTA Defendants filed proofs of claim (or alleged other claims of liens) in the HTA Title III case asserting, among other things, (i) the HTA Bonds are secured by statutory or equitable liens against certain of HTA's property, (ii) HTA Defendants hold ownership interests in certain of HTA's property, (iii) HTA Defendants have first priority, perfected security interests against HTA's property extending beyond the security interests (if any) granted in the documents governing the HTA Bonds, (iv) breaches of contract and tort claims arising from the Commonwealth's retention of revenues from gasoline and cigarette taxes and vehicle license fees levied and collected by the Commonwealth which were historically conditionally appropriated and transferred to HTA, (v)

---

[184] The UCC is co-plaintiff with respect to certain claims asserted in this adversary proceeding that are substantially similar to the counts asserted in the prior pending HTA lien challenge adversary proceedings filed on May 20, 2019 [Adv. Proc. Nos. 19-362, 19-363, 19-364, and 19-365].

violations of the Commonwealth and U.S. Constitutions, and (vi) their security interests continue to attach to revenues received by HTA postpetition.

Plaintiffs allege the HTA Defendants' purported secured HTA Bond claims should be disallowed except as to those amounts deposited and held in certain specified deposit accounts by the fiscal agent pursuant to the HTA Enabling Act and documents governing the HTA Bonds.  In addition, Plaintiffs seek disallowance of all HTA Defendants' proofs of claim (or other claims of lien) related to the HTA Bonds on the grounds that, among other things, (i) the HTA Defendants' proofs of claim other than BNYM's are duplicative of the master proofs of claim filed by BNYM, as fiscal agent, (ii) the HTA Enabling Act and documents governing the HTA Bonds do not create statutory or equitable liens, (iii) the HTA Defendants do not have an ownership interest in any HTA revenues, (iv) security interests against any other funds not held by the fiscal agent are unperfected and avoidable pursuant to Bankruptcy Code sections 544 and 551, (v) HTA's revenues are not special revenues as defined in Bankruptcy Code section 902(2), (vi) claims for postpetition revenues and interest must be disallowed pursuant to Bankruptcy Code sections 502(b)(2) and 552, (vii) the HTA Defendants do not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (viii) the HTA Defendants do not have an allowable claim under PROMESA section 407, and (ix) the HTA Defendants do not properly allege any tort claims against HTA.

On February 11, 2020, the UCC moved to intervene in those counts in the HTA Claim Challenge Action in which the UCC is not a co-plaintiff [Adv. Proc. No. 20-00007, ECF No. 15]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to the UCC as interveners under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00007, ECF No. 20].  Also on February 18, 2020, the Monolines filed a joint opposition to the UCC's motion [Adv. Proc. No. 20-00007, ECF No. 22].  On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00007, ECF No. 31].

Also on February 11, 2020, the DRA Parties moved to intervene in the HTA Claim Challenge Action [Adv. Proc. No. 20-00007, ECF No. 14].  On February 18, 2020, the Oversight Board filed its response objecting to the DRA Parties' motion [Adv. Proc. No. 20-00007, ECF No. 23].  Also on February 18, 2020, the Monolines filed a joint opposition to the motion [ECF No. 21].  On February 27, 2020, Assured, Ambac, National, FGIC and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00007, ECF No. 35].  Peaje filed a joinder to the motion [ECF No. 36, Adv. Proc. No. 20-00007].  On February 28, 2020 the Ad Hoc Group of FGIC Noteholders filed a motion to intervene.

b)    ***Financial Oversight and Management Board for Puerto Rico v. Ambac
Assurance Corp., et al.*, Adv. Proc. No. 20-00005**

On January 16, 2020, Plaintiff the Oversight Board, acting in its capacity as representative
of the Commonwealth, filed an action against the HTA Defendants challenging the proofs of claim
filed against the Commonwealth and other lien claims asserted by the HTA Defendants as insurers
and/or holders of HTA Bonds (the "Commonwealth-HTA Claim Challenge Action"). The HTA
Defendants filed proofs of claim (or alleged other claims of liens) in the Commonwealth Title III
case asserting, among other things, (i) the Commonwealth has liability for not appropriating and
transferring certain revenues from gasoline and cigarette taxes and vehicle license fees levied and
collected by the Commonwealth which were historically conditionally appropriated and
transferred to HTA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various
statutory and contractual theories to render their proofs of claim allowable.

The Oversight Board contends the HTA Bonds are non-recourse, and the Commonwealth
has no liability with respect to the HTA Bonds as it is neither an issuer nor a guarantor of the HTA
Bonds pursuant to the HTA Enabling Act and documents governing the HTA Bonds. The
Oversight Board seeks disallowance of all HTA Defendants' proofs of claim (or other claims of
lien) related to the HTA Bonds as against the Commonwealth on the grounds that, among other
things, (i) the HTA Defendants' proofs of claim other than BNYM's are duplicative of the master
proofs of claim filed by BNYM, as fiscal agent, (ii) the HTA Defendants lack standing to assert a
claim against the Commonwealth as to the Bonds, (iii) the HTA Defendants' purported security
interests are limited to those funds received by HTA and deposited in specified deposit accounts
held by the fiscal agent, (iv) the HTA Defendants lack subrogation, reimbursement, or contribution
rights, (v) the pre-PROMESA retention of HTA revenues by the Commonwealth was permitted
by Commonwealth law, the HTA Enabling Act and the documents governing the HTA Bonds, (vi)
the Commonwealth's retention of HTA revenues is neither a breach of contract nor a tort against
the Commonwealth, (vii) any purported Commonwealth obligation to appropriate and transfer
funds to HTA was preempted by PROMESA, (viii) the HTA Defendants do not have an allowable
claim under the Contract, Due Process, or Takings Clauses of the Commonwealth and U.S.
Constitutions, (ix) the HTA Defendants do not have a secured claim, a priority claim, a perfected
security interests, or a claim for postpetition revenues, (x) the HTA Defendants do not have an
ownership interest in any HTA revenues, and (xi) the HTA Defendants do not have an allowable
claim under PROMESA section 407.

On February 11, 2020, the UCC moved to intervene in the Commonwealth-HTA Claim
Challenge Action [Adv. Proc. No. 20-00005, ECF No. 9]. On February 18, 2020, the Oversight
Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does
not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to
(and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. §
1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to
the UCC as interveners under section 1109, including the right to appeal decisions in this adversary
proceeding and potentially block settlement [Adv. Proc. No. 20-00005, ECF No. 16]. Also on
February 18, 2020, the Monolines filed a joint opposition to the UCC's motion [Adv. Proc. No.
20-00005, ECF No. 19]. On February 26, 2020, the UCC filed a reply in support of its motion to
intervene [Adv. Proc. No. 20-00005, ECF No. 30].

Also on February 11, 2020, the DRA Parties moved to intervene in the Commonwealth-HTA Claim Challenge Action [Adv. Proc. No. 20-00005, ECF No. 11].  On February 18, 2020, the Oversight Board filed its response objecting to the DRA Parties' motion [Adv. Proc. No. 20-00005, ECF No. 17].  Also on February 18, 2020, the Monolines filed a joint opposition to the motion [Adv. Proc. No. 20-00005, ECF No. 18].  On February 25, 2020, the Oversight Board and Peaje filed a joint motion to extend the deadline for Peaje to respond to the adversary complaint.  On February 26, 2020, the Court issued an order granting the motion [Adv. Proc. No. 20-00005, ECF No. 29].  On February 27, 2020, Assured, Ambac, National, FGIC and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00005, ECF No. 34].

c)   ***Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00003**

On January 16, 2020, Plaintiff the Oversight Board, acting in its capacity as representative of the Commonwealth, filed an action against Ambac, Assured,[185] FGIC, and U.S. Bank Trust National Association ("U.S. Bank"), as trustee (collectively, the "PRIFA Defendants") challenging the proofs of claim filed against the Commonwealth and other lien claims asserted by the PRIFA Defendants as holders and/or insurers of certain bonds issued by PRIFA (the "PRIFA Bonds") (the "PRIFA Claim Challenge Action").  The PRIFA Defendants filed proofs of claim (or alleged other claims of liens) in the Commonwealth Title III Case asserting, among other things, (i) the Commonwealth has liability for not appropriating and transferring certain excise tax revenues on rum produced in Puerto Rico and sold on the U.S. mainland, levied and collected by the Commonwealth, which were historically conditionally appropriated and transferred to PRIFA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various statutory and contractual theories to render their proofs of claim allowable.

The Oversight Board contends the PRIFA Bonds are non-recourse, and the Commonwealth has no liability with respect to the PRIFA Bonds as it is neither an issuer nor a guarantor of the PRIFA Bonds pursuant to the PRIFA Enabling Act and document governing the PRIFA Bonds.  The Oversight Board seeks disallowance of all PRIFA Defendants' proofs of claim (or other claims of lien) related to the PRIFA Bonds as against the Commonwealth on the grounds that, among other things, (i) the PRIFA Defendants' proofs of claim other than U.S. Bank's are duplicative of the master proof of claim filed by U.S. Bank, as trustee, (ii) the PRIFA Defendants lack standing to assert a claim against the Commonwealth as to the PRIFA Bonds, (iii) the PRIFA Enabling Act and documents governing the PRIFA Bonds do not create statutory or equitable liens, (iv) the PRIFA Defendants do not have an ownership interest in any rum excise tax revenues, (v) the PRIFA Defendants' purported security interests are limited to those funds received by PRIFA and deposited in specified deposit accounts held by the fiscal agent, (vi) the PRIFA revenues are not special revenues as defined in Bankruptcy Code section 902(2), (vii) the PRIFA Defendants lack subrogation, reimbursement, or contribution rights, (viii) the retention of the rum excise tax revenues by the Commonwealth was permitted by Commonwealth law, the PRIFA Enabling Act and the documents governing the PRIFA Bonds, (ix) the Commonwealth's retention of the rum excise tax revenues is neither a breach of contract nor a tort against the Commonwealth, (x) any purported Commonwealth obligation to appropriate and transfer funds to PRIFA was preempted

---

[185] Only Assured Guaranty Corp., not Assured Guaranty Municipal Corp. or any other affiliates, is a defendant.

by PROMESA, (xi) the PRIFA Defendants do not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (xii) the PRIFA Defendants do not have an allowable claim under PROMESA section 407, and (xiii) the PRIFA Defendants do not have a secured claim, a priority claim, a perfected security interests, or a claim for postpetition revenues.

On February 11, 2020, the UCC moved to intervene in the PRIFA Claim Challenge Action [Adv. Proc. No. 20-00003, ECF No. 9]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to the UCC as interveners under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00003, ECF No. 14]. Also on February 18, 2020, Assured, Ambac, and FGIC filed an opposition to the UCC's motion [Adv. Proc. No. 20-00003, ECF No. 15]. On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00003, ECF No. 18]. On February 27, 2020, Ambac, Assured and FGIC filed a joint motion to dismiss [Adv. Proc. No. 20-00003, ECF No. 21]. U.S. Bank filed a joinder to the motion [Adv. Proc. No. 20-00003, ECF No. 20].

     d)     ***Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corp., et al.*, Adv. Proc. No. 20-00004**

On January 16, 2020, Plaintiff the Oversight Board, acting in its capacity as representative of the Commonwealth, filed an action against Ambac, Assured,[186] FGIC, and BNYM, as fiscal agent (collectively, the "CCDA Defendants"), challenging the proofs of claim filed against the Commonwealth and other lien claims asserted by the CCDA Defendants as holders and/or insurers of certain bonds issued by CCDA (the "CCDA Bonds"). The CCDA Defendants filed proofs of claim (or other claims of liens) in the Commonwealth Title III case asserting, among other things, (i) the Commonwealth has liability for not appropriating and ensuring the transfer certain hotel occupancy taxes, which were historically conditionally appropriated and transferred by the Puerto Rico Tourism Company to CCDA, (ii) violations of the Commonwealth and U.S. Constitutions, and (iii) various statutory and contractual theories to render their proofs of claim allowable.

The Oversight Board contends the CCDA Bonds are non-recourse, and the Commonwealth has no liability with respect to the CCDA Bonds as it is neither an issuer nor a guarantor of the CCDA Bonds pursuant to the CCDA Enabling Act and documents governing the CCDA bonds. The Oversight Board seeks disallowance of all CCDA Defendants' proofs of claim (or other claims of liens) related to the CCDA Bonds as against the Commonwealth on the grounds that, among other things, (i) the CCDA Defendants' proofs of claim other than BNYM's are duplicative of the master proof of claim filed by BNYM, as fiscal agent, (ii) the CCDA Enabling Act and the documents governing the CCDA Bonds expressly exclude the Commonwealth from liability, (iii) the CCDA Defendants lack subrogation, reimbursement, or contribution rights, (iv) the pre-PROMESA retention of the hotel occupancy tax revenues by the Commonwealth was permitted

---

[186] Only Assured Guaranty Corp., not Assured Guaranty Municipal Corp. or any other affiliates, is a defendant.

by Commonwealth law and the documents governing the CCDA Bonds, (v) all laws purportedly appropriating the hotel occupancy tax revenues to CCDA were preempted by PROMESA, (vi) the Commonwealth's retention of the hotel occupancy tax revenues is not a breach of contract or a tort against the Commonwealth, (vii) the CCDA Defendants do not have an allowable claim under the Contract, Due Process, and Takings Clauses of the Commonwealth and U.S. Constitutions, (viii) the CCDA Defendants do not have an allowable claim under PROMESA section 407, (ix) the CCDA Defendants do not have a secured claim, a priority claim, perfected security interests, or a claim for postpetition revenues, and (x) the CCDA Defendants do not have an ownership interest in any occupancy tax revenues.

On February 11, 2020, the UCC moved to intervene in the CCDA Claim Challenge Action [Adv. Proc. No. 20-00004, ECF No. 11]. On February 18, 2020, the Oversight Board filed its limited opposition to the UCC's motion stating that the Oversight Board: (i) does not oppose the UCC intervening with the same limited intervention rights the UCC has agreed to (and been granted) in the past, in at least ten prior instances of intervention under 11 U.S.C. § 1109; and (ii) objects to the UCC's attempting to intervene with greater rights than are afforded to the UCC as interveners under section 1109, including the right to appeal decisions in this adversary proceeding and potentially block settlement [Adv. Proc. No. 20-00004, ECF No. 16]. Also on February 18, 2020, Assured, Ambac, and FGIC filed an opposition to the UCC's motion [Adv. Proc. No. 20-00004, ECF No. 17]. On February 26, 2020, the UCC filed a reply in support of its motion to intervene [Adv. Proc. No. 20-00004, ECF No. 20]. On February 27, 2020, Ambac, Assured, FGIC and BNYM filed a joint motion to dismiss [Adv. Proc. No. 20-00004, ECF No. 22].

6. **Miscellaneous Litigation**

a) ***Pinto-Lugo, et al. v. United States, et al.*, Adv. Proc. No. 18-00041**

Various labor unions and non-profit organizations filed an action on April 24, 2018 against the United States, the Oversight Board, and the Governor. On July 30, 2018, the Court granted Plaintiffs' motion for leave to file an Amended Complaint. The Amended Complaint alleges PROMESA is unconstitutional because it purportedly violates the First, Fifth, and Fourteenth Amendments to the United States Constitution, international treaties, and the Declaration of Independence. Plaintiffs primarily base their arguments on the *Insular Cases* and the United States' alleged treatment of Puerto Rico as a colony. Plaintiffs request (i) a declaration that PROMESA violates the aforementioned constitutional provisions, and various human rights provisions in the Declaration of Independence, the United Nations Charter, the United Nations Declaration of Human Rights, and the International Covenant of Civil and Political Rights; (ii) the removal of two Oversight Board members; (iii) a stay of the Title III Cases and the adoption of fiscal plans until an audit of the Commonwealth's debt can occur and any persons engaging in illegal conduct surrounding the sale of bonds is held liable; (iv) the United States assume the Commonwealth Debtor's public debt; and (v) an order prohibiting any interference with PREPA or UPR.

On August 23, 2018, the United States, the Oversight Board, and the Governor each separately moved to dismiss the case. In its motion to dismiss, the Oversight Board argued (i) Plaintiffs lack standing, (ii) certain claims are barred by PROMESA section 4, which grants

debtors the power to sell and also preempts anything inconsistent in the Commonwealth Constitution, 105, which exempts the Oversight Board, its members and employees from liability for actions taken to carry out PROMESA and 210(a), which states that the United States is not responsible for payment of principal and interest on Puerto Rico-issued obligations, (iii) the treaties do not create binding domestic legal obligations, (iv) the Declaration of Independence cannot for the basis of a claim and does not give rise to a private cause of action, (v) Congress is not constrained by separation-of-powers principles when it legislates pursuant to the Territories Clause, (vi) the court does not have the authority to remove Oversight Board members and (vii) the Oversight Board is not obligated to conduct an audit under PROMESA.

On October 24, 2018, Plaintiffs filed an opposition to the motion to dismiss and request for partial declaratory judgement.  On October 29, 2018, Defendants moved to strike Plaintiffs' opposition on the ground it was non-compliant.  The Court granted Defendants' urgent motion on November 27, 2018 with leave for Plaintiffs to file a complaint opposition by December 21, 2018 (which deadline was later extended to January 4, 2019).

On January 4, 2019, Plaintiffs re-filed their opposition to the motions to dismiss, asserting that (i) the amended complaint satisfies the pleading standard; (ii) the Oversight Board violates the Declaration of Independence in that Puerto Ricans have not consented to grant it power; (iii) Congress does not have plenary power over residents of the territories under the Territories Clause; (iv) regulations enacted under the Territories Clause must be needful; (v) the Oversight Board violates the First Amendment, the Due Process Clause, and certain international treaties; (vi) Plaintiffs have standing; and (vii) the United States is obligated to assume the public debt of Puerto Rico.

Defendants filed their replies in support of their motions to dismiss on March 18, 2019. On March 22, 2019, the Court granted Plaintiffs' motion for leave to file a sur-reply.  Plaintiffs' sur-reply was filed on April 20, 2019.  On August 7, 2019, the Court issued an order granting Defendants' motion to dismiss and giving Plaintiffs leave to file a motion to seek permission to file an amended complaint.

On October 8, 2019, Plaintiffs filed a motion for leave to file a second amended complaint. On October 15, 2019, Plaintiffs filed a proposed second amended adversary complaint.  Plaintiffs filed an opposition to Defendants' joint motion to strike on October 18, 2019.  Judge Dein issued an order denying Defendants' motion to strike on October 22, 2019.  On November 15, 2019, Governor Vazquez-Garced and the Oversight Board filed oppositions to Plaintiffs' motion for leave to file a second amended complaint.  On November 21, 2019, Plaintiffs filed a motion requesting an extension of time to reply in support of their motion for leave to further amend the complaint.  On December 10, 2019, Plaintiffs filed a reply in support of their motion for leave to file a second amended complaint.

b)    ***Cooperativa de Ahorro y Crédito Abraham Rosa, et al. v. Public
Corporation for the Supervision and Insurance of Cooperatives of
Puerto Rico, et al.***, **Adv. Proc. No. 19-00389**

On July 1, 2019, Plaintiffs, a group of credit unions, filed a complaint against Public Corporation for the Supervision and Insurance of Cooperatives of Puerto Rico ("COSSEC"), seeking declaratory and injunctive relief in connection with share and deposit insurance. Plaintiffs argue that they have complied with the requirements to avail themselves of coverage provided by COSSEC, which they allege has been undercapitalized. Plaintiffs sought a preliminary and permanent injunction commanding COSSEC to resort to the resources of the Puerto Rico Treasury Department in order to adequately provide share and deposit insurance to Plaintiffs. Also on July 1, Plaintiffs filed a motion to seal the proceeding. On July 2, 2019, the Court issued an order directing Plaintiffs to show cause for why the proceeding should be sealed. Plaintiffs filed a reply in support of their motion to seal on July 9, 2019. On July 15, 2019, Plaintiffs filed a motion for an order to show cause and request for a preliminary injunction. On July 18, 2019, Defendants filed a response to Plaintiffs' motion to seal, stating that Defendants did not take any position on the issue of whether the motion to seal should not be denied and why all documents in the proceedings should not be unsealed. On July 25, 2019, the Oversight Board filed a motion to stay all responses to the complaint until 30 days after the Court issued a ruling on Plaintiffs' motion for a preliminary injunction hearing. On July 26, 2019, the Court issued an order denying (i) Plaintiffs' motion to seal and (ii) Plaintiffs' motion for a preliminary injunction hearing. On July 29, Plaintiffs filed a notice of appeal of the order denying their motion to seal and motion for a preliminary injunction hearing. On August 2, 2019, in the First Circuit, Plaintiffs filed a motion to stay the order denying their motion to seal in Case No. 19-1755. On August 7, 2019, Defendants (and Appellees) filed their response. On August 9, 2019, the First Circuit issued an order temporarily staying the Title III Court's order to unseal the adversary proceeding. On August 14, 2019, the First Circuit issued an order withdrawing the interim stay of the unsealing of the adversary proceeding effective August 16, 2019. On August 16, 2019, in the Title III Court, Plaintiffs filed a motion to temporarily extend the stay, which the Court denied. On January 15, 2020, Appellants filed a motion to voluntarily dismiss the appeal without prejudice. On February 3, 2020, the Court issued its mandate and judgment dismissing the appeal without prejudice.

c)    ***Puerto Rico Horse Owners Association, Inc. v. Commonwealth of
Puerto Rico, et al.,*** **Adv. Proc. No. 19-00392**

On July 2, 2019, a non-profit organization, Puerto Rico Horse Owners Association, filed an action against the Commonwealth, the Oversight Board and its executive director (in her official capacity), the Governor of Puerto Rico and certain government officials (in their official capacities) seeking declaratory relief that funds from uncashed winning tickets bet on horse races are not property of the Commonwealth, and should be paid to the Racing Administrator for distribution to certain Puerto Rico horse breeders. On July 3, 2019, Plaintiff filed an amended complaint purporting to correct a clerical error. On September 3, 2019, the government official Defendants filed a motion to dismiss the amended complaint. The Commonwealth, the Oversight Board, and Natalie Jaresko also filed a motion to dismiss the amended complaint on September 3, 2019. On September 4, 2019, AAFAF filed a motion to dismiss the amended complaint. On October 15, 2019, Plaintiff filed an omnibus opposition to the motions to dismiss. On November

210

3, 2019, Plaintiff filed a second amended complaint. On November 4, 2019, Defendants filed motions to dismiss the second amended complaint. On November 19, 2019, Plaintiff filed an opposition to the motions to dismiss. On December 2, 2019, the Oversight Board and AAFAF filed replies in support of their motions to dismiss. On February 28, 2020, Plaintiffs filed a motion for an order directing Defendants to state their position in connection with the motions to dismiss.

d)    **UCC Objection to Claim of GDB**

On July 15, 2019, the UCC filed an objection to GDB's claim against the Commonwealth Debtor based on (i) section 502(d) of the Bankruptcy Code, which instructs courts to disallow claims by transferees of a voidable transfer if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises, and (ii) section 502(b)(1), which states that unenforceable claims may not be allowed. The UCC argued that GDB received both constructive and actual fraudulent transfers from the Commonwealth in the form of 2014 GO Bonds because, among other things, the transfers were made to benefit GDB, the Commonwealth was undercapitalized, the Commonwealth did not receive reasonably equivalent value in exchange for the transfers, and that GDB received preferential transfers. The UCC cited to the Kobre Kim report, which stated that GDB abused its position as a lender to the Title III Debtors by increasing their debt load in a way that benefitted GDB as a creditor relative to other creditors. The UCC furthermore alleged that GDB could not substantiate its claims. On September 9, 2019, the Title III Court issued an order subjecting the objection to the Stay Order, which stay was extended through March 11, 2020.[187]

On January 8, 2020, the UCC filed an omnibus objection to proofs of claim filed by GDB and Scotiabank and to all claims against the Commonwealth based on its guaranty of certain PRIFA notes.

**G.    Rule 2004 Motions**

1.    **GO Bondholders/Monolines Rule 2004 Motion Concerning Fiscal Plan Development**

On August 25, 2017, National filed a Rule 2004 motion seeking documents regarding the Commonwealth's financial condition and its fiscal plan [ECF No. 1177]. On the same day, the Ad Hoc Group of GO bondholders, Assured, and the Mutual Fund Group filed a joint Rule 2004 [ECF No. 1178]. On September 12, 2017 Ambac filed a Rule 2004 seeking similar financial information [ECF No. 1283]. On September 19, 2017 FGIC [ECF Nos. 1334, 1335] and the ERS Secured Creditors [ECF No. 1340] joined National and the GO Group (defined herein) motions, while the Retiree Committee joined all three. Also on September 19, the UCC filed a response [ECF No. 1344], and the Oversight Board objected to the three Rule 2004s [ECF No. 1345]. AAFAF joined the Oversight Board's omnibus objection on October 31, 2017. On November 2, 2017 UCC joined the three Rule 2004s. On November 7, 2017, the GO Group [ECF No. 1665], National [ECF No. 1667], and Ambac [ECF No. 1668] filed replies in support of their respective motions and ERS Secured Creditors filed a reply in support of their joinder [ECF No. 1670]. On

---

[187] *See* section V.L of this Disclosure Statement for a detailed summary of the Mediation Report.

November 17, 2017, the Court issued an order denying the motions without prejudice [ECF No. 1824].

On November 28, 2017, the Ad Hoc Group of General Obligation Bondholders filed a renewed motion for an order authorizing discovery regarding the Commonwealth's financial condition and its fiscal plan, in which numerous parties, including the UCC, certain ERS bondholders, Ambac, Assured, and National [ECF No. 1870]. The Commonwealth filed an objection to the renewed joint motion on December 6, 2017, asserting, *inter alia*, that the common interest and deliberative process privileges precluded discovery into development of the fiscal plan [ECF No. 1928]. On February 26, 2018, Magistrate Judge Dein entered an order upholding the assertion of the deliberative process and common interest privileges, but ordering the parties to prepare privilege logs. On June 22, 2018, Magistrate Judge Dein held a hearing addressing the parties' disputes regarding the assertion of privileges over fiscal plan development materials. The parties have thereafter engaged in consensual discussions to resolve their disputes.

### 2.    Ambac Rule 2004 Motion Concerning PRIFA Rum Taxes

On June 7, 2019, Ambac Assurance Corporation filed a Rule 2004 motion concerning PRIFA rum taxes [ECF No. 7328] (the "PRIFA Rum Tax 2004 Motion"), which FGIC [ECF No. 7676] and the UCC [ECF No. 7881] later joined. The PRIFA Rum Tax 2004 Motion seeks discovery regarding the identification and quantification of rum tax revenues, as well as any transfers of such tax revenues. The Oversight Board opposed the motion on July 9, 2019, joined by AAFAF [ECF Nos. 7891, 7896]. Bacardi also filed an objection on July 9, 2019 [ECF No. 7897]. Ambac replied in support of its motion on July 16, 2019 [ECF No. 8029]. Further proceedings with respect to the PRIFA Rum Tax 2004 Motion were stayed pursuant to the Court's Stay Order. On February 10, 2020, the Mediation Team filed its Amended Report, recommending that the PRIFA Rum Tax 2004 Motion be denied without prejudice.

### 3.    Ambac Rule 2004 & Compliance Motions Concerning Pension Liabilities

On June 18, 2019, Ambac Assurance Corporation filed a motion to compel compliance with prior orders [ECF No. 7505] and a Rule 2004 motion (together with ECF No. 7505, the "Pension Liabilities Motions") [ECF No. 7507] concerning pension liabilities. The Ad Hoc Group of Constitutional Debtholders [ECF No. 7531], Assured [ECF No. 7588], Ad Hoc Group of General Obligation Bondholders [ECF No. 7714], and the UCC [ECF No. 7883] joined the Rule 2004 motion; FGIC joined both [ECF No. 7674]. On July 9, 2019 the Oversight Board filed an omnibus opposition [ECF No. 7895] to the motion to compel and Rule 2004 motion. Ambac replied on July 23, 2019 [ECF No. 8230]. At the same time, the parties met and conferred and agreed to productions of certain documents responsive to the requests in the Pension Liabilities Motions. As a result of those efforts, the parties jointly requested several adjournments to any hearing on the Pension Liabilities Motions. On February 27, 2020, the parties filed a joint status report and a joint motion to adjourn the hearing. Judge Dein issued an order granting the motion to adjourn until April 22, 2020 [ECF No. 11808].

4.      **Rule 2004 Motions Concerning Commonwealth Assets and Commonwealth Cash Restriction Analysis**

On October 28, 2019, Ambac filed two Rule 2004 motions: one seeking discovery concerning Commonwealth assets [ECF No. 9022] ("CW Asset Motion"), and the other seeking discovery concerning the Commonwealth's available cash and analyses regarding restricted versus unrestricted cash ("CW Cash Motion") [ECF No. 9023].  On November 8, 2019, the Oversight Board filed an urgent motion to strike Ambac's Rule 2004 motions and for sanctions, arguing that the CW Asset Motion and the CW Cash Motion violated the mandatory stay imposed by the Court in July 2019 [ECF No. 9131].  On December 3, 2019, Ambac filed an objection to the Oversight Board's urgent motion.  ECF No. 9404.  On December 10, 2019, the Oversight Board filed a reply in support of its urgent motion to strike [ECF No. 9531].

On January 23, 2020, the Court denied the Oversight Board's motion to strike.  ECF No. 10332.  However, the Court further held that the discovery requests in the CW Asset Motion and the CW Cash Motion were "sweepingly broad" and "objectively unreasonable."  *Id.*  The Court ordered the parties to confer and file a joint status report on or before February 12, 2020.  *Id.* Numerous parties, including the UCC, Servicios Integrales de la Montana, Assured, National, and FGIC filed joinders, seeking to participate in meet and confer sessions and to receive discovery produced pursuant to the CW Cash and CW Asset Motions.  On February 3, 2020, FGIC filed a joinder to the CW Cash and CW Asset Motions.  On February 6, 2020, Magistrate Judge Dein issued an order requiring the parties to respond to the joinders in their joint status report [ECF No. 10727].   On February 12, 2020, the parties filed a joint status report, stating that they are continuing to meet and confer to resolve disputes regarding the scope of the requests.  The parties further stated that they do not object to the joinder entities' requests to participate in meet and confers and to receive documents, but reserve the right to object to future requests.  On February 26, 2020, the parties filed a further joint status report.  On February 28, 2020, Judge Dein issued an order directing the parties to file a further joint status report.

## H.     Oversight Board's Investigation of Potential Causes of Action

The Oversight Board is vested with broad investigative powers.  Pursuant to PROMESA section 104(o), which empowers the Oversight Board to investigate the disclosure and selling practices in connection with the purchase of bonds issued by the Debtors, and related section, the Oversight Board, through its Special Investigation Committee, pursued an investigation into potential causes of actions related to Puerto Rico's fiscal crisis.

1.      **Independent Investigator Report**

a)      **Process and Mandate**

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP (the "Independent Investigator") to conduct an investigation into certain matters relating to Puerto Rico's fiscal crisis in furtherance of the Oversight Board's mandate pursuant to PROMESA.

Specifically, the Independent Investigator was asked to investigate: (i) the factors contributing to Puerto Rico's fiscal crisis, including changes in the economy, expansion of spending commitments and entitlement programs, changes in the federal funding it receives, and reliance on debt to finance a structural budget deficit; (ii) Puerto Rico's debt, the general use of proceeds, the relationship between the debt and Puerto Rico's structural budget deficit, the range of its debt instruments, and how Puerto Rico's debt practices compare to the debt practices of states and large municipal jurisdictions; and (iii) Puerto Rico's debt issuance, disclosure, and selling practices, including its interpretation of Puerto Rico's Constitutional Debt Limit. In consultation with the Special Investigation Committee and the Oversight Board's General Counsel, the Independent Investigator focused its inquiry on the following specific areas: GDB; Puerto Rico's Public Utilities; COFINA; ERS; Puerto Rico's Budgeting, External Reporting, and Accounting Functions; calculation of the Constitutional Debt Limit; the credit rating agencies; selling practices for Puerto Rico-related Bonds; Puerto Rico's government ethics framework; issuers' use of interest rate swaps; Puerto Rico's lack of a clear mechanism for validating Puerto Rico-related bonds before they issue; and the possession tax credit.

The Special Investigation Committee's principal goals for the investigation were: (i) to identify any policies (or lack of safeguards) that contributed to the Puerto Rico debt crisis, including factors that permitted Puerto Rico and certain of its instrumentalities ("Issuers") to issue significant amounts of debt without adequate sources of repayment; and (ii) to identify potential value recovery from culpable parties and identify matters for regulatory attention, all to assist the Oversight Board in its mission to restore fiscal balance and economic opportunity and to promote Puerto Rico's access to the capital markets.

b)      **Investigation Procedures**

In May 2017, the Oversight Board adopted the PROMESA Investigative Procedures to establish the procedural framework for the investigation.[188] Those PROMESA Investigative Procedures authorize the Oversight Board to commence an "Informal Investigation" and a "Formal Investigation" to probe activities or conduct for which the Oversight Board has authority to investigate under PROMESA. The key procedural difference between the two types of investigations is that the Oversight Board is only authorized to issue process to compel testimony and production of investigative materials upon the commencement of a Formal Investigation.[189] The Independent Investigator used both formal and informal investigative techniques to achieve the mandate set out by the Special Investigation Committee.

On October 18, 2017, the Special Investigation Committee, acting on behalf of the Oversight Board, approved a Resolution Initiating Formal Investigation for Purpose of Issuing Investigative Subpoenas (the "Investigative Subpoenas Resolution").[190] In general terms, under

---

[188] The PROMESA Investigative Procedures are available at https://oversightboard.pr.gov/documents/.

[189] PROMESA Investigative Procedures, §§ 3.1(b), 3.2(b)(2). Section 104 of PROMESA vests the Oversight Board with the power to issue subpoenas "requiring the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, documents, electronic files, metadata, tapes, and materials of any nature relating to any matter under investigation by the Oversight Board." 48 U.S.C. § 2124(f)(1).

[190] The Investigative Subpoenas Resolution is available at https://oversightboard.pr.gov/documents/.

the Investigative Subpoenas Resolution, a Formal Investigation is deemed initiated for the purpose of authorizing the Independent Investigator to issue Investigative Subpoenas[191] in certain circumstances.[192]

Starting in September 2017, in furtherance of the Informal Investigation, the Independent Investigator delivered letters to more than 90 entities (collectively, the "Document Preservation and Request Letters"). The Document Preservation and Request Letters identified various categories of documents that the Independent Investigator deemed relevant to the Informal Investigation and requested that the recipients of the letters preserve and produce any responsive documents in their possession, custody, or control. After the Document Preservation and Request Letters were sent, the Independent Investigator scheduled and conducted conferences with the recipients (most by phone, some in person) to reiterate the requests and discuss a process for identification and delivery of documents to the Independent Investigator.

Witnesses, in the main, cooperated with the Independent Investigator, and the Independent Investigator used the tools available through the Informal Investigation. That cooperation—facilitated by the Independent Investigator's use of its subpoena power only as needed—enabled the Independent Investigator to complete the investigation in an efficient and timely manner, consistent with the objectives of PROMESA and as requested by the Special Investigation Committee. The Independent Investigator was especially mindful of avoiding the delay and cost of litigating subpoenas.

Over the course of the investigation, the Independent Investigator received a total of approximately 260,800 documents consisting of approximately 2,740,000 pages, from 32 parties. Those parties include, among others, a number of Puerto Rico entities, financial institutions, rating agencies, financial advisors, professionals, and regulators.

The Independent Investigator also secured direct, read-only access to the email custodial files of dozens of employees and former employees of GDB through its representative, AAFAF.[193] On behalf of GDB, AAFAF produced to the Independent Investigator approximately 36,000 documents from that database.

---

[191] An "Investigative Subpoena" is defined in section 1.3(a)(16) of the PROMESA Investigative Procedures to mean a subpoena issued by the Oversight Board or its authorized agent pursuant to PROMESA section 104(f)(i), substantially in the form of an exhibit attached to the Investigative Subpoenas Resolution.

[192] Those circumstances would occur where a witness has not voluntarily cooperated with the Independent Investigator's requests for documents or an interview, where the witness has communicated that it cannot voluntarily cooperate with the Independent Investigator's requests, or where the witness has provided an interview but the Independent Investigator, in consultation with the Oversight Board's General Counsel, determines that it would be appropriate to have the witness testify under oath.

[193] That access was obtained through PROMESA section 104(c)(2), which provides as follows: "Notwithstanding any other provision of law, the Oversight Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Oversight Board to carry out its responsibilities under this Act. At the request of the Oversight Board, the Oversight Board shall be granted direct access to such information systems, records, documents, information, or data as will enable the Oversight Board to carry out its responsibilities under this Act." 48 U.S.C. § 2124(c)(2).

Pursuant to the Investigative Subpoenas Resolution, the Independent Investigator issued 12 Investigative Subpoenas (five of which were withdrawn after issuance based on the recipient's subsequent agreement to voluntarily cooperate with the Independent Investigator).[194]   Without exception, the recipients of the Investigative Subpoenas produced documents to the Independent Investigator in response to those subpoenas.

From December 2017 to August 2018, the Independent Investigator conducted a total of approximately 120 voluntary witness interviews, probing a wide range of topics relevant to the investigation.  The individuals interviewed included four former governors of Puerto Rico, former and current senior government officers, underwriters, credit rating agencies, auditors, outside professionals and advisors.

Throughout the investigation, the Independent Investigator engaged in robust cooperation and consultation with the UCC and Retiree Committee.  Beginning in November 2017, the Independent Investigator regularly engaged with both the UCC and Retiree Committee regarding the investigation.  Specifically, in addition to cooperation and communication by calls and e-mails when needed, the Independent Investigator participated in weekly telephone conferences with counsel for the UCC and Retiree Committee respectively.  During those conferences, the Independent Investigator provided information regarding witnesses to be interviewed in the coming week, solicited input on questions to ask of witnesses, provided counsel to the UCC and Retiree Committee with its preliminary observations regarding the results of the investigation in areas in which the UCC and Retiree Committee had expressed interest, and also facilitated the UCC and Retiree Committee's access to materials that were provided to the Independent Investigator.

c)      **Major Findings from the Independent Investigation about the Debtors**

On August 20, 2018, the Independent Investigator published its Final Investigative Report. This Disclosure Statement includes a summary of the Independent Investigator's primary findings relating only to each of the Debtors who are covered by the Plan.  The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.[195]

(i)      *Commonwealth of Puerto Rico*

The Final Investigative Report includes findings related to budgeting and accounting, the role of GDB, and the Constitutional Debt Limit, all of which impacted the debt issued by the Commonwealth.

---

[194] The recipients of Investigative Subpoenas (apart from those that were withdrawn) were Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp, and Santander Securities LLC.

[195] A comprehensive overview of the entire Final Investigative Report is available in the Executive Summary, available at the Oversight Board's website at https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

(ii)     *Budgeting and Accounting*

With regard to the Commonwealth's budgeting, external reporting, and accounting functions, discussed in Part VIII of the Final Investigative Report, the Independent Investigator found that the Commonwealth failed to:  (i) develop budgets based on accurate growth and revenue estimates, to which it could adhere; (ii) develop the infrastructure and resources it needed to support efficient accounting functions; and (iii) optimize its use of independent auditors.  These failures often caused the Commonwealth's external financial reports to be late, which, in turn, resulted in a loss of investor confidence and the ability of interested parties to acquire sufficient transparency into matters that concerned, or were otherwise intertwined with, the Commonwealth's fiscal health.  The budgetary failures and reliance on erroneous assumptions of economic growth and unreasonable revenue projections also resulted in substantial deficits.

(iii)    *The Role of GDB*

As addressed in Part IV of the Final Investigative Report, GDB's dual roles as fiscal agent and lender for certain Commonwealth instrumentalities and public corporations were in tension, and that tension became untenable over time.  The tension was compounded by structural deficiencies that allowed the policy considerations of various gubernatorial administrations to affect the decision-making of GDB in its capacities as both lender and fiscal agent.

As it related to GO issuances, the tension between GDB's dual roles influenced GDB's decisions to approve new debt issuances for the purpose of "scooping and tossing" older obligations or as an alternative to forcing certain Commonwealth instrumentalities and public corporations to implement measures that would have made them less dependent on borrowed liquidity, but that could have increased the costs of living for voters.

The approximately $3.5 billion of GO Bonds that GDB, in its capacity as fiscal agent, authorized to issue in 2014 (the "2014 GO Bond Issuance") is a specific example of a "scoop and toss" bond issuance.  About $1.9 billion of that issuance was to be used to repay loans that Puerto Rico and PBA had drawn from GDB.  According to a witness who worked first at GDB and subsequently at an underwriter for Puerto Rico-Related Bonds, the very reason for the 2014 GO Bond Issuance was to help "reliquify" GDB so that it could resume its role as bridge loan provider to the government.

According to the Final Investigative Report, the 2014 GO Bond Issuance also illustrates several respects in which policy considerations influenced GDB's decision-making.  The investigation revealed that GDB first considered the issuance in early 2013.  At that time, the issuance was contemplated as a way to raise capital that HTA could use to satisfy an outstanding debt of about $2 billion.  HTA owed the debt to GDB as a result of loans that HTA had drawn to help bridge its operational deficits.  The loans dated back to 2008.  But to implement the issuance, HTA needed to increase its revenues.  GDB officials encouraged the Governor to increase the gas tax in order to accomplish that, but the Governor declined to do so.  Instead, on June 25, 2013, Puerto Rico increased the portion of the excise tax that HTA received on petroleum products from $3.00 per barrel to $9.25 per barrel, and transferred to HTA the portion of motor vehicle license fee proceeds that was originally due to the Department of Treasury.  The anticipated revenues were

insufficient to implement the contemplated HTA offering.  Due to the combined effect of the unwillingness to increase the gas tax, HTA's prior budget overruns, and its shortfalls in anticipated revenues, an HTA offering was no longer viable.  GDB prepared instead to go to market with the 2014 GO Bond Issuance, from which a meaningful portion of the bond proceeds were slated to repay GDB lines of credit.

The Independent Investigator also collected information from witnesses that by approximately March 2014, the GDB Board had realized that Puerto Rico would not be able to issue its financial statements for the fiscal year ended 2013 before the May 1, 2014 deadline that the Securities and Exchange Commission ("SEC") Rule 15c2-12 and relevant continuing disclosure agreements required—*unless* GDB could first obtain proceeds from the 2014 GO Bond Issuance.  In essence, GDB needed those proceeds so that GDB could demonstrate twelve-months of liquidity on its financial statements and, as a result, appear to still be a "going concern" for accounting purposes.  This was because HTA could not repay the $2 billion debt it owed to GDB, and GDB did not otherwise have sufficient cash to appear objectively likely to remain solvent for the foreseeable future.

(iv)   *The Constitutional Debt Limit*

In Part IX of the Final Investigative Report, the Independent Investigator examined Puerto Rico's interpretation of the Constitutional Debt Limit found in section 2 of Article VI of the Commonwealth Constitution and the historical processes and procedures pursuant to which it performed the Constitutional Debt Limit Calculation during the relevant period.

The Independent Investigator found that Puerto Rico has historically interpreted the Constitutional Debt Limit to require that only the following be included in the Debt Limit Calculation: (i) direct obligations for which it is has pledged its good faith, credit and taxing power; and (ii) certain debt servicing payments on bonds or notes it has guaranteed. In other words, debt issued by the public corporations (unless that debt is guaranteed by Puerto Rico) is not included in the Debt Limit Calculation and is not limited by the Constitutional Debt Limit.

The evidence reviewed supports the conclusion that Puerto Rico employed a reasonably robust process for these Debt Limit Calculations.  The Independent Investigator found, moreover, that various contingent, yet foreseeable, obligations of Puerto Rico were excluded from the Constitutional Debt Limit Calculation by statute or based on outside legal opinions.  For example, through Act No. 39 of August 1, 2005 ("Act 39"), Puerto Rico pledged the "good faith, the credit and the power to impose taxes of the Commonwealth" for amounts payable—interest, specifically—under Swap agreements entered into by the Commonwealth and by PBA.  Act 39 expressly excludes, however, any amount payable or to be paid by the Commonwealth in termination fees for Commonwealth Basis Swaps and PBA Swaps from the Debt Limit Calculation.

The Independent Investigator did not find any evidence that Puerto Rico's government personnel thought Puerto Rico misinterpreted the relevant constitutional provision or calculated the debt inaccurately.  The Independent Investigator did not take any position as to whether

the  Constitutional Debt Limit was, in fact, violated or whether certain obligations should have been included in the Debt Limit Calculations.

(v)   ***HTA***

As discussed in Part IV of the Final Investigative Report, the investigation revealed that HTA historically relied on GDB to step in to cover operational expenses, particularly when it was unable to access the capital markets.  Many of those loans were, according to former GDB officials, used to cover HTA's budget deficits.  With regard to HTA in particular, GDB evaluated and approved its loans very quickly, at times within hours, after a request was submitted.  According to witnesses, this was to avoid potential adverse consequences stemming from HTA's lack of fiscal health, such as HTA having to shut down the Tren Urbano if its operator had not been paid.  There is also evidence that, in certain instances, GDB may have approved financing requests by HTA notwithstanding circumstances that, if GDB and the recipients had been private actors, might have led to additional due diligence.

Gubernatorial will across administrations also affected GDB's decision-making with respect to HTA's debt load.  For example, during Governor Fortuño's administration, GDB increased HTA's line of credit to approximately $2 billion.  At the time, the total of GDB's loans receivable was approximately $9 billion.[196]  GDB did this, according to one witness, so that HTA would not have to raise vehicle registration fees, public transportation fees, tolls, or the gasoline tax (known as "la crudita" in Spanish); all of which would have increased costs for ordinary voters.

Then, by early 2013, Governor García Padilla's administration decided that GDB should no longer support the public corporations through appropriations.  At the same time, however, witnesses reported that the Governor remained reluctant to raise Public Utility rates or related taxes—or would not agree to increase them as much as GDB management recommended.

(vi)   ***ERS***

Part VII of the Final Investigative Report presents the results of the investigation into ERS, and specifically into its decision to issue pension obligation bonds of ERS Debtor in 2008 in the aggregate amount of approximately $3 billion.

ERS struggled perennially with unfunded liabilities—by June 30, 2005, it had actuarial liabilities of $12.284 billion, of which only 19% were funded.  To address the underfunding, an investment bank proposed that ERS issue bonds secured by the stream of Employer Contributions, which included a recommendation that ERS "issue at least $7 billion" in bonds, to make near-term payments and invest the remainder in an arbitrage strategy.

In the first half of 2008, ERS issued nearly $3 billion of bonds exclusively into the local bond market (*i.e.*, no bonds were made available for purchase by individuals or funds located outside of Puerto Rico).  Evidence indicates additional ERS Bonds were not issued in the second

---

[196] For context, the Commonwealth had a projected budget of approximately $9 billion in 2013.  *See* Commonwealth of P.R., *Basic Financial Statements and Required Supplementary Information: Year ended June 30, 2013*, 246 (June 30, 2014).

half of 2008 because of unanticipated market behavior. Then, in 2009, even as credit markets began to re-open, additional ERS Bonds were not issued as a matter of policy.

Without additional proceeds beyond the initial $3 billion being invested, the arbitrage strategy had little chance of succeeding. The arbitrage strategy may have succeeded if reasonable predictions had held true, but they did not.

By 2017, retirement benefits from the retirement systems for public employees such as ERS had switched to PayGo, meaning that all benefit payments would come out of tax revenue.

(vii) **PBA**

As discussed in Part IX of the Final Investigative Report, the Independent Investigator found no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional Debt Limit. The Independent Investigator did not take a position as to whether the PBA Bonds should have been included in the Debt Limit Calculations.

PBA owns and leases a number of buildings that it leases or subleases to various governmental agencies. PBA has issued PBA bonds, about $4.1 billion outstanding in early 2017, which PBA Bondholders assert are payable from and secured by a pledge of the rental payments owed to PBA by the lessees. Each month, the treasury forwarded funds to GDB for PBA rental payments, which were deposited into a PBA account.

The Independent Investigator found that Puerto Rico has a longstanding practice of treating direct debt and guaranteed debt differently for the purposes of debt limit calculation. Furthermore, several witnesses stated they were not aware of anyone expressing the view that PBA bonds should have been included in the debt limit calculation. Lastly, independent auditors opined in 2013 that the debt limit had not been exceeded.

d) **Summary of Potential Causes of Action as Relevant to the Debtors**

In its Final Investigative Report, the Independent Investigator evaluated whether its factual findings support the view that any of the parties involved in Puerto Rico's fiscal crisis committed conduct that is actionable under certain U.S. federal, state, and local laws. The Independent Investigator discussed its consideration of certain, but not all, potential claims available to Title III Debtors (or their estates) and investors, among other stakeholders, under applicable U.S. federal law (including securities laws and the Bankruptcy Code, as made applicable by PROMESA), the law in Puerto Rico, and the law of other U.S. jurisdictions as indicated by choice of law analyses. This discussion was undertaken for the statutory purposes outlined in PROMESA and not for reliance by any specific litigant. Its overview of and application of the law is not legal advice and its factual findings do not constitute admissible evidence in any pending or future litigation.

Set forth below is a summary of potential causes of action identified by the Independent Investigator in the Final Investigative Report on a debtor-by-debtor basis.[197]   The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.

(i)   ***Commonwealth of Puerto Rico***

The Independent Investigator identified several potential causes of action relating to the 2014 GO Bond Issuance.  First, the Final Investigative Report discusses potential claims (and likely defenses) premised on a violation of securities law disclosure requirements in the Official Statement and related documents concerning the possibility at the time that Puerto Rico would seek to restructure its indebtedness after the 2014 GO Bonds were issued.  Specifically, the Independent Investigator presented available evidence that Puerto Rico failed to disclose that it had engaged financial and legal advisors with reputable restructuring practices until after the 2014 GO Bonds were issued.

Second, the Final Investigative Report discusses potential claims (and likely defenses) premised on a violation of continuing disclosure requirements imposed by applicable securities law on certain entities working on behalf of Puerto Rico—specifically, whether Puerto Rico, its underwriters and/or auditors could be held liable for Puerto Rico's failure, despite repeated assurances to the contrary, to complete and disclose its 2013 audited financial statements prior to the issuance of the 2014 GO Bonds.

Third, the Final Investigative Report discusses potential common law and bankruptcy claims such as unjust enrichment and equitable subordination against one of the underwriters of the 2014 GO Bonds based on the underwriter's decision to underwrite after it had advised against the issuance and to collect a fee for doing so.

Lastly, the Independent Investigator identified potential claims against GDB stemming from certain GO Basis Swaps with Goldman and Morgan Stanley that were entered into in 2006.  Specifically, the Final Investigative Report discusses that the basis swaps may have violated Puerto Rico statutory law if their execution was not "for the best interests of the Commonwealth." Potential liability claims against GDB may exist on that basis alone. Additionally, if GDB's board members owed fiduciary duties to Puerto Rico, claims for breaches of those duties in connection with the Basis Swap also may exist.  As touched on in the Report, strong defenses to these claims may exist as well.

(ii)   ***ERS***

Between January and June 2008—at the onset of the Great Recession—ERS issued three series of pension obligation bonds in an aggregate amount of almost $3 billion.  Proceeds from the bonds were issued to address ERS's short-term cash flow problems, with the remainder to be invested with the expectation that the investment would grow and give the pension an additional

---

[197]   The discussion of potential causes of action spans nearly 100 pages of the Final Investigative Report.  The summary herein is qualified in its entirety by the Final Investigative Report, which parties should reference in the event of any ambiguity or conflict.

return after it paid debt service on the bonds, thereby improving ERS's substantial underfunding. In the years following the issuance, various stakeholders publicly disputed the wisdom of this arbitrage strategy, ERS's legal authority to issue the bonds in the first place, and the validity of bondholders' purported security interest in ERS's incoming stream of statutory contributions from Puerto Rico's participating public employers.  Against this backdrop, the Independent Investigator identified a number of potential claims and discussed whether they were supported by available evidence.

First, the Final Investigative Report discusses potential claims (and likely defenses) premised on a violation of securities law disclosure requirements in the Official Statement and related documents.  According to the Independent Investigator, evidence indicates that disclosures addressed the risks of the arbitrage strategy but may have omitted material details about ERS's authority to issue the bonds, Puerto Rico's ability to eliminate the employer contribution stream into ERS and/or the use of ERS bond proceeds.

Second, the Final Investigative Report discusses potential claims (and likely defenses) that the relevant control persons of ERS and GDB breached their fiduciary duties to ERS.  According to the Independent Investigator, such claims are not strongly supported by available evidence and are unlikely to lead to any recovery for ERS stakeholders.  Further, if such claims could be sustained, the Final Investigative Report discusses potential claims for aiding and abetting a breach of fiduciary duty which might then be available against various underwriters and advisors of ERS and GDB.

Finally, the Final Investigative Report discusses potential claims based on the selling practices in connection with the ERS Bond issuances.  In particular, certain bond underwriters and advisors and their affiliates were engaged by ERS in multiple fee-generating capacities, giving rise to potential conflicts of interest.  The Independent Investigator noted that the evidence did not indicate that such conflicts resulted in undue advantage or gain to these entities or detriment to ERS and its other stakeholders.  However, if such evidence comes to light, the Independent Investigator discussed the potential for common law and bankruptcy claims to be brought against the relevant underwriter or advisor for professional negligence, unjust enrichment, and/or equitable subordination.[198]

(iii)   ***PBA***

The Final Investigative Report did not identify any potential causes of action against PBA, and it found no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional Debt Limit.

---

[198] Though not mentioned in the Final Investigative Report, ERS did commence litigation against UBS Financial Services prior to the commencement of the Title III cases, stating claims in the nature of, among other things, professional negligence relating to its services advising ERS and underwriting the ERS bond transactions.  That litigation is ongoing in the Puerto Rico court of first instance.  *See Administracion de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico y Otros v. UBS Financial Services y Otros*, Civil No. K AC2011-1067.

e) **Summary of Recommendations Related to the Debtors**

The Final Investigative Report includes recommendations related to each of the topics investigated by the Independent Investigator. This Disclosure Statement includes a summary of the Independent Investigator's recommendations relating only to each of the Debtors (in light of ongoing litigation, the Independent Investigator did not provide specific recommendations related to ERS and PBA). The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.

(i) *Commonwealth of Puerto Rico*

(1) **Budgeting and Accounting**

The Independent Investigator recommended the following reforms to Puerto Rico's budgeting and accounting systems:

- Adopt a more rigorous budgeting process;
- Continue to transition to GAAP-compliant budgeting;
- Study the viability of creating a dedicated and centralized board that is devoted to:
  - Aggregating critical data; and
  - Preparing and releasing the consolidated external reports.
- Adopt a modernized accounting and budgeting system;
- Create a board to expedite preparation of external reports;
- Reshape responsibilities of Department of Treasury;
- Require that OMB and Planning Board report to Treasury;
- Adopt mechanism to sanction entities which fail to comply with accounting/budgeting system;
- Limit turnover of accounting employees;
- Prohibit turnover of auditors without cause;
- Centralize and streamline the budgeting, accounting, and financial reporting functions;
- Provide online public access to spending data; and
- Adopt a formal deadline for publishing external financial reports.

(2) **The Role of GDB**

The Independent Investigator recommended that Puerto Rico's political branches should evaluate measures to separate the fiscal agent and lending functions for GDB's successor, and

223

consider reforms for each role.  The Independent Investigator recommended that the new fiscal agent:

- Stagger terms, or terms that span gubernatorial administration changes, for board members;

- Condition disbursements from the Department of Treasury upon the fiscal agent's review and approval;

- Cast the fiscal agent as an impartial conduit of information to its clients and to the investing public;

- Improve oversight of the Commonwealth instrumentalities and public corporations it advises with access to the joint and integrated accounting systems; and

- Create a separate department or division that is specifically tasked with overseeing all relevant Commonwealth instrumentalities and public corporations and monitoring or even auditing their finances.

The Independent Investigator also recommended that the new lending entity:

- Stagger terms, or terms that span gubernatorial administration changes, for board members;

- Adopt policies and procedures for re-evaluating at quarterly intervals the collectability and other risks associated with existing public-sector financing;

- Consider the role of any statutory repayment guarantee, but that should not be the sole, or controlling, factor to inform the collectability analysis; and

- More closely align credit policies with the framework that a private bank would apply to evaluate risks to its own loan portfolio.

(3)   <b>Constitutional Debt Limit</b>

The Independent Investigator recommended that the Commonwealth should consider whether it may be worthwhile for its judiciary to review the meaning of section 2 of Article VI of the Commonwealth Constitution, as well as the methods pursuant to which the Commonwealth determines the types of debt servicing payments to be included within the debt limit calculation.

2.   **Appointment of Special Claims Committee and Retention of Counsel**

Within a few days of receiving the published Final Investigative Report, the Oversight Board executed a unanimous written consent appointing the independent Special Claims

224

Committee to pursue claims resulting from the findings of the Investigation.[199]  The Oversight Board then issued a RFP for counsel to the newly formed committee.

On November 28, 2018, the Oversight Board, acting by and through its Special Claims Committee, retained Brown Rudnick LLP as counsel to the Special Claims Committee to assist the Special Claims Committee in the investigation, initiation of negotiation, and/or prosecution of potential claims that might arise from conduct described in the Final Investigative Report ("Claims Counsel").  Additionally, in February 2019, the Special Claims Committee retained a financial advisory services firm to assist Claims Counsel in its investigation of potential claims.

The Final Investigative Report did not address Avoidance Actions[200] and did not identify specific claims or causes of action the Commonwealth and its instrumentalities might hold against individuals and entities involved in their financial transactions.  Rather, the Final Investigative Report outlined the necessary informative and analytical background which would serve as a springboard for the Special Claims Committee to identify actionable claims that the Commonwealth and its instrumentalities might hold relating to the Commonwealth Debtor's financial crisis.

Thus, immediately after its retention, Claims Counsel began investigating and analyzing the conclusions in the Final Investigative Report to determine and recommend whether there were viable causes of action that the Oversight Board could assert for the benefit of the Commonwealth's taxpayers and legitimate creditors.

---

[199] The members of the Special Claims Committee are Andrew G. Biggs, Arthur J. González, Ana J. Matosantos and David A. Skeel, Jr.

[200] Causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code.  There are essentially two different legal theories for these avoidance actions: preference and fraudulent transfer. A *preference* is a payment in the 90 days prior to the bankruptcy to a "preferred" creditor, *i.e.*, someone who got paid more than usual when others in similar situations were not being paid due to Puerto Rico's insolvency.  (For parties with family relationships to elected officials, and others with "insider" relationships to the government, the relevant period is one year, not 90 days.)  11 U.S.C. § 547.  A *fraudulent transfer* is, most importantly, a payment made for which Puerto Rico did not receive "reasonably equivalent value" in exchange.  If not, even if the transfer was not intentionally wrongful or fraudulent, Puerto Rico can recover the funds because the money rightfully should benefit all creditors and citizens.  11 U.S.C. §§ 544, 548.  Preferences and fraudulent transfers can be "avoided" and funds recovered by Puerto Rico from the transferees; likewise or in the alternative, the avoidance liability may cause the transferee's claims against Puerto Rico may be set off or disallowed.  *See* 11 U.S.C. §§ 502, 545, 550, 553.

Avoidance actions are very common in large bankruptcy proceedings, including those involving government entities.  They allow debtors to ensure that money transferred to third parties in the period before bankruptcy was appropriately and fairly spent, and if not, recover that money for the benefit of creditors and taxpayers.  Importantly, avoidance actions of this type do not intend to convey that a third party vendor committed any wrongdoing.  Rather, avoidance actions ensure no one creditor is favored by payments made prior to the bankruptcy filing and that a fair distribution of a debtor's assets is made in accordance with applicable law.  As with any other civil lawsuit, the Plaintiff (*i.e.*, the Oversight Board, in some cases along with the UCC) has the burden to prove each element of the avoidance action by a preponderance of the evidence in order for the third party vendor to be found liable to and have to return the money to the estate.

3.      **Counsel Investigation and Statute of Limitations Concerns**

Claims Counsel examined the documents related to the Final Investigative Report to assist it in identifying meritorious causes of action. Furthermore, and as described additionally below, the Special Claims Committee made frequent and numerous inquiries to other professionals involved in the Title III Cases, as well as potential Defendants and other parties in order to obtain reports, financial data, presentations, and other materials necessary for the Oversight Board to assert its causes of action. In sum, Claims Counsel reviewed and is reviewing, among other things:

- The 600-page Final Investigative Report;

- Approximately 100,000 documents provided to date that support the facts and legal analysis contained in the Final Investigative Report;

- Records of millions of transfers by the Title III Debtors to third parties during the four-year avoidance period prior to the Petition Date;

- Thousands of documents identifying recipients of purported principal and interest payments on allegedly invalid bonds, through records of tens of thousands of transactions; and

- Over 1,600 notices of participation filed in connection with the Joint Claim Objection (defined below) evidencing current holders of the allegedly invalid bonds.

The Oversight Board's investigative activity and commencement of litigation has been largely driven by applicable statutes of limitations. Most notably, the statute of limitations for avoidance actions pursuant to 11 U.S.C. section 546(a)(1) expired on May 2, 2019 for actions brought on behalf of the Commonwealth, on May 20, 2019 for HTA and ERS, and July 1, 2019 for PREPA. The expiration of the statute of limitations could, in many instances, preclude the Oversight Board's ability to prosecute many of the claims described herein.

The Oversight Board has taken a number of measures to protect its claims against statute of limitations defenses. Foremost among these, the Oversight Board commenced hundreds of adversary proceedings prior to the expiration of the applicable statute of limitations. In some cases described in greater detail below, the Oversight Board has commenced litigation with the explicit intention of preserving rights, notwithstanding that prosecution of its claims would not be an optimal resource allocation at the present time, and has accordingly requested that the litigation itself be stayed for the time being.

Additional measures to preserve claims include efforts to toll the statute of limitations by consent through tolling agreements with parties potentially liable to the Commonwealth Debtor. Alternatively, the Oversight Board has requested that the Court toll applicable statutes of limitations to the extent that it is prevented from commencing litigation against appropriate Defendants within applicable time limits.

4.      **Causes of Action Against Third-Party Professionals and Personnel**

The Oversight Board's investigation suggested that from 2008 through 2014 (the final issuance of bonds by the Commonwealth to date), numerous third-party professionals knowingly participated in bond issuances that may have been unlawful, that deepened the insolvency of the Commonwealth, and that resulted in other harm to the Commonwealth and its instrumentalities, including damage to the Commonwealth's credit.  Accordingly, the Oversight Board investigated and commenced pursing claims against numerous parties for wrongful acts in relation to debt issuances by the Commonwealth and certain of its instrumentalities and public corporations.  The parties include:

- Underwriters of alleged invalid or wrongfully issued debt;

- Law firms that advised on debt transactions;

- Auditors of the Commonwealth's finances; and

- Counterparties to interest rate swap agreements.

Some of these debt transactions are described in greater detail below.  In sum, these "Third Party Defendants" provided services that in many cases gave rise to fiduciary obligations to act in the best interests of the Commonwealth.  The Third Party Defendants collected substantial fees by facilitating more and more debt transactions, enabling the Commonwealth and its instrumentalities to issue purported debt instruments notwithstanding the Commonwealth's insolvency and the constitutional and statutory limitations on debt issuances.

The Oversight Board filed Adv. Proc. No. 19-00280[201] against the Third Party Defendants.  The Oversight Board's complaint articulates claims in the nature of breach of fiduciary duty and aiding and abetting a breach of fiduciary duty,[202] professional malpractice, fraudulent transfer, and unjust enrichment.  In addition to filing its complaint, the Oversight Board has negotiated tolling agreements with a number of potential Defendants and will either settle its claims out of court or commence litigation against such parties following further investigation.

Together, these several dozen Third Party Defendants earned nearly $300 million in fees for services that allegedly damaged the Commonwealth.  The swap counterparties received an additional $90 million in swap termination fees.  Although the Oversight Board is pursuing damages in an amount to be determined, these fee payments are likely the minimum recovery to be sought.  Under various other damages theories, the Oversight Board may seek to recover billions of dollars unlawfully transferred by the Commonwealth and/or its instrumentalities to other parties

---

[201] *The Special Claims Committee of the Financial Oversight and Management Board for Puerto Rico, acting by and through Its Members, The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Barclays Capital, et al.*, 19-AP-00280 (the "Underwriter Litigation").

[202] The Oversight Board has alleged that certain parties aided and abetted GDB in GDB's breach of its fiduciary duty to the Commonwealth and its instrumentalities.  Claims against GDB itself have been released pursuant to GDB's PROMESA Title VI modification.  *See* section V.K.1 of this Disclosure Statement for a brief description of the GDB Title VI modification proceedings.

as a result of the Third Party Defendants' malfeasance. The Plan provides for this litigation to continue after confirmation.

### 5. Avoidance Actions Against Vendors

The Final Investigative Report focused on large-scale debt financing transactions and did not concern potential avoidance actions relating to the billions of dollars in payments by the Title III Debtors to parties who purported to provide goods and services to Debtors the pursuant to purported contracts (the "Vendor Payments" to "vendors").[203] Accordingly, the Special Claims Committee began investigating the Vendor Payments to ensure that such payments complied with applicable law.

In concert with the UCC, the Oversight Board obtained from AAFAF records of all payments to vendors within the four years prior to commencement of the respective Title III cases. The Special Claims Committee, in collaboration with the UCC, reviewed records of millions of individual payments to hundreds of thousands of unique vendors, totaling over $12 billion. After reviewing the contracts on file and excluding government bodies and non-profit organizations, among others, the Oversight Board identified over $4 billion in payments to approximately 345 vendors as potentially recoverable under avoidance theories.[204]

### a) Tolling Agreements and Litigation

After concluding its review and identifying potentially liable parties, the Oversight Board provided the vendors an opportunity to toll the statute of limitations for filing the vendor avoidance actions, *i.e.* extend by agreement the time provided for the Oversight Board to file an avoidance action. As such, in the weeks prior to the respective statute of limitations expirations, Claims Counsel sent to each vendor a cover letter and tolling agreement which the vendors could sign and return in order to avoid the filing of a complaint and preserving the Title III Debtors' rights with respect to its avoidance claims. This effort led to negotiation of approximately 85 tolling agreements with vendors who purportedly contracted with the Commonwealth (and none with HTA or ERS vendors).

After excluding the parties to the tolling agreements, the Oversight Board filed approximately 250 vendor avoidance actions seeking to recover approximately $3 billion in payments to vendors.[205] The Oversight Board has announced its preference to settle these actions, and the potential claims subject to tolling agreements, pursuant to a voluntary out-of-court dispute resolution procedure that is outlined on the notice website in the Title III Cases and described more fully below.

---

[203] "Vendors" and "Vendor Payments" refers to contractors and payments made pursuant to contract, respectively, as opposed to transferees of payments made pursuant to legislative appropriation.

[204] Approximately 335 of the vendors identified contracted with the Commonwealth, one with ERS, and the remainder with HTA. The vast majority of the damages sought, over $4 billion, relate to purported contracts with the Commonwealth.

[205] The UCC joined in some, but not all of these avoidance actions.

### b)    Informal Resolution Procedures

On June 7, 2019, the Oversight Board and the UCC filed an omnibus motion in the Title III cases of the Commonwealth Debtor, HTA, ERS Debtor, and PREPA, requesting approval of case management procedures in the avoidance proceedings brought against vendors.[206]  The Vendor Action Procedures Motion specifically requested approval of procedures governing (i) litigation procedures and deadlines, (ii) voluntary mediation, and (iii) settlement (the "Vendor Action Procedures").  On July 12, 2019, the Court entered an order approving the Vendor Action Procedures, which were then served on all Defendants to the vendor avoidance actions along with the summons and complaint.[207]

With respect to the litigation procedures and deadlines, the Vendor Action Procedures provide that court documents must be filed in accordance with the case management orders entered by the Court in the Commonwealth Title III case.  *See Tenth Amended Notice, Case Management and Administrative Procedures* [ECF No. 8027-1].  The procedures further require service of the procedures and order approving them upon any Defendants, and specify manners and addresses of service consistent with applicable rules.  Additionally, the Vendor Action Procedures provide for relaxation of deadlines for responsive and dispositive pleadings, discovery, and other filings, subject to alteration by request of any party.

These deadlines provided in the Vendor Action Procedures generally continue all litigation deadlines for approximately six months. During this period, the Oversight Board and UCC intend to engage in an informal resolution process described as the "Information Exchange," whereby the Oversight Board and vendors will conduct additional diligence within specified parameters and thereafter commence settlement negotiations.

The Vendor Action Procedures outline a mediation process whereby the Oversight Board and any Defendant(s) may select mediators, schedule mediation, and advise the court of mediation progress.  The mediation process is by its own terms fully voluntary and non-binding and adjustable by agreement of the parties; the Vendor Action Procedures merely outline the mediation process and would provide advance approval thereof, obviating the need for parties to seek court approval of a litigation stay during the pendency of the mediation.

Since the filing of the Vendor Action Procedures Motion, the Special Claims Committee and the UCC have been working to resolve the tolling agreements and avoidance actions entered into with or filed against vendors.  As of January 16, 2020, ninety-eight adversary proceedings have been dismissed as a result of a vendor-defendant's participation in the informal resolution process because the vendor submitted sufficient documentation in the form of invoices, purchase

---

[206] *See Notice of Hearing Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements*, [ECF No. 7325] (the "Vendor Action Procedures Motion").

[207] *See Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements*, [ECF No. 7941] (order with attached, revised Vendor Action Procedures).

orders, and contracts to substantiate the prepetition payments they received.  Likewise, as of January 16, 2020, forty-one tolling agreements with vendors have resulted in no further action from the Special Claims Committee and the UCC for the same reasons.

As of this time, approximately twenty avoidance action defendants and eight tolled parties have been flagged for potential monetary settlement due to information exchanges suggesting avoidance liability.  The Special Claims Committee and the UCC are preparing and/or conducting settlement discussions with these parties.

In November, 2019, the Special Claims Committee and the UCC filed a motion to modify the Vendor Action Procedures, and the Title III Court granted the motion, to continue facilitating the informal, out-of-court resolution of the avoidance actions.[208]  The Modified Vendor Action Procedures Order extends the discovery and litigation deadlines to April 2020 to allow the parties more time to informally resolve the lawsuits before formal litigation is necessary.

### 6.  ERS Bond Validity Claims

During Claims Counsel's analysis of ERS and its outstanding indebtedness, it determined that there were potential legal infirmities with respect to ERS Bonds that led to the conclusion that bonds may not have been valid or legally binding.  Consistent with Claims Counsel's determination, AAFAF has alleged in related litigation that the ERS Bonds are null and void,[209] and the multiple parties have objected to claims filed against ERS in respect of the bonds.[210]

The objecting parties have requested that the Court approve procedures for litigation of their objections to the ERS bond-related claims.  Similarly, the Oversight Board has commenced litigation to claw back payments made in respect of purported principal and interest obligations to parties holding ERS Bonds in excess of $2.5 million.[211]

The Court's Stay Order issued July 24, 2019 stayed all litigation concerning ERS bond validity through November 30, 2019.  Following Court-ordered mediation, the Oversight Board and other objecting parties reached agreement with groups of ERS bondholders regarding a schedule to litigate debt validity issues to summary judgment, which schedule was approved by an

---

[208] See *Order Granting Omnibus Motion To Extend Deadlines In Order Granting Omnibus Motion By The Financial Oversight And Management Board For Puerto Rico, Acting By And Through The Members Of The Special Claims Committee And The Official Committee Of Unsecured Creditors To (I) Establish Litigation Case Management Procedures And (II) Establish Procedures For Approval Of Settlements,* [ECF No. 9476] (the "Modified Vendor Action Procedures Order").

[209] Adv. Proc. No. 17-00219, [ECF No. 44] (motion to dismiss complaint relating to alleged security interests in ERS property).

[210] *See Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico,* Case No. 17-03283, [ECF No. 5580]; *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth,* [ECF No. 6482].

[211] *See* Adv. Proc. Nos. 19-00355 through 19-00361.

order of the Court.[212]  The Court's ERS debt validity litigation scheduling order provides that the "Invalidity Actions" to avoid past payments in respect of the ERS bonds are stayed in all substantive respects, subject to defendants' opportunity to participate in the limited form of debt validity litigation permitted by the order.

As further described above in section III.B.1, the Oversight Board has also challenged the validity and scope of the ERS bondholders' collateral.  On June 27, 2019, the Title III Court ruled the ERS bondholders do not have a perfected security interest in any post-petition employer contributions due to Bankruptcy Code section 552, and the First Circuit affirmed on January 30, 2020.[213]  Previously, the Title III Court had ruled the ERS bondholders had never properly perfected any of their security interests, but was reversed by the U.S. Court of Appeals for the First Circuit.  The remaining litigation regarding the ERS bonds described in section III.B.1 remains outstanding.

### 7.     Disputes to be Settled Pursuant to the Plan

As described above, disputes in connection with the GO Bonds, PBA Bonds, and PRIFA BANs will be compromised and settled pursuant to the confirmation of the Plan, which includes disputes regarding the validity, priority, and asserted secured status of the GO Bonds and PBA Bonds.

### a)     Debt-Related Objections[214]

During Claims Counsel's analysis of the Commonwealth's application of the Commonwealth Constitution's debt limit provision, it determined that there were potential legal infirmities with respect to several PBA and GO Bonds that led to the conclusion that bonds may not have been valid or legally binding.

In sum, the Special Claims Committee, based on advice of its Claims Counsel, determined that the Commonwealth had issued debt in violation of the Constitutional Debt Limit contained in the Commonwealth Constitution.  The Commonwealth Constitution ostensibly prevents the Commonwealth from binding its citizens to a level of debt that cannot be repaid without oppressive taxation and sacrificing services necessary to maintain the health, safety, and welfare of Puerto Rico.  The Special Claims Committee determined that the Commonwealth and its financiers and

---

[212] *See Order Granting Urgent Joint Motion to Modify Order Regarding Stay and Mandatory Mediation with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*, [ECF No. 8962].

[213] *Opinion and Order Granting Plaintiff's Motion for Summary Judgment as to Count III and Counterclaims II and III, and Denying Defendants' Motion for Summary Judgment*, dated June 27, 2019 [Case No. 17-03566, ECF No. 251], 385 F. Supp. 3d 138 (D.P.R. 2019), *aff'd In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457 (1st Cir. 2020).

[214] Additionally, the Amended Plan contemplates a global settlement of the issues raised by the *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020*, [ECF No. 10638], described in section III.B.1.a. of this Disclosure Statement.

related professionals had characterized billions of dollars in debt as an obligation of an entity, PBA, whereas the debt was more properly characterized as direct debt obligations of the Commonwealth Debtor.

### (i)    *Constitutional Debt Limit Concerns*

The Commonwealth's approximately $13 billion in outstanding GO Bonds is among the largest components of Puerto Rico's debt burden.   GO Bonds are bonds backed by the Commonwealth's good faith, credit and taxing power, rather than revenues from any particular source.  Given their ability to bind the Commonwealth to long-term liabilities that may largely, if not only, be repaid by taxing Commonwealth citizens and businesses, GO bond issuances are restricted by Puerto Rico's constitution in several ways, including a dollar amount limit calculated in relation to available tax revenue.

As provided below, the Oversight Board has alleged, among other things, that certain GO bond issuances violated the Constitutional Debt Limit and accordingly were null and void.[215] Bondholders have disputed the Oversight Board's allegations and raised affirmative defenses to the Oversight Board's claims.  These fact disputes and defenses are discussed below.  Several other parties have joined in, supplemented, or otherwise raised additional objections to claims of purported holders of GO and PBA bonds (such objections together, the "Bond Claim Objections").[216]

### (1)    **Debt Limit Provision and Calculation**

In 1961, the Commonwealth Constitution was amended to limit the Commonwealth's borrowing on the basis of the amount of debt service the Commonwealth would have to pay relative to its historical revenues, establishing the Constitutional Debt Limit.  Specifically, Article VI, section 2 of the Commonwealth Constitution provides that:

> [N]o direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the good faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by

---

[215] *See* Joint Claim Objection.

[216] For the avoidance of doubt, the Bond Claim Objections include the Joint Claim Objection, the Expanded Objection, the PBA Bond Objection, the Conditional Objection, the LCDC Omnibus Objection, and the UCC 2020 Objection, as such objections are described and defined below.  The term "Bond Claim Objections" is intended to include all omnibus objections to PBA and GO Bonds relating to such bonds' validity as described herein.

bonds or notes guaranteed by the Commonwealth, shall exceed 15%
of the average of the total amount of the annual revenues raised
under the provisions of Commonwealth legislation and covered into
the Treasury of Puerto Rico in the two fiscal years next preceding
the then current fiscal year; and no such bonds or notes issued by
the Commonwealth for any purpose other than housing facilities
shall mature later than 30 years from their date and no bonds or notes
issued for housing facilities shall mature later than 40 years from
their date; and the Commonwealth shall not guarantee any
obligations evidenced by bonds or notes if the total of the amount
payable in any fiscal year on account of principal of and interest on
all the direct obligations referred to above theretofore issued by the
Commonwealth and then outstanding and the amounts referred to in
item (ii) above shall exceed 15 percent of the average of the total
amount of such annual revenues.

The type of obligation described in the first phrase above, referencing obligations of the
Commonwealth backed by its good faith, credit and taxing power, is colloquially referred to as
"general obligation" or "constitutional" debt.  The annual revenues "raised under the provisions of
Commonwealth legislation and covered into the Treasury of Puerto Rico" are known as the
Commonwealth's "internal revenues" and consist primarily of revenues from income taxes,
property taxes, SUTs, and excise taxes (subject to certain exceptions).

### (2)     Alleged Debt Limit Violations

As described in greater detail below at sub-part 7.d, the PBA Bonds bear hallmarks
suggesting they are general obligations of the Commonwealth backed by the Commonwealth's
good faith, credit and taxing power.[217]  Moreover, the terms of the PBA Bonds (including certain
covenants governing the underlying leases) were disclosed to the public at all relevant times.
Nevertheless, in calculating the Constitutional Debt Limit, the Commonwealth did not include the
$4 billion in PBA Bonds as "money borrowed directly by the Commonwealth evidenced by bonds
or notes for the payment of which the good faith, credit and taxing power of the Commonwealth
shall be pledged."

The UCC has asserted that, when the PBA Bonds are included in the Constitutional Debt
Limit calculations, the PBA and GO Bonds violate the Constitutional Debt Limit beginning in

---

[217]Courts have held that a debt issuance may be recognized as a general obligations of a government entity based on
such hallmarks, even when the debt is purportedly issued by a third party.  *See, e.g.*, *Winkler v. State School Bldg.
Authority*, 189 W.Va. 748, 760-63 (1993); *Cerajewski v. McVey*, 225 Ind. 67, 72 (1947); *Rankin v. Love*, 125 Mont.
184, 189-90 (1951); *City of Phoenix v. Phoenix Civic Auditorium & Convention Ctr. Ass'n, Inc.*, 99 Ariz. 270, 282
(1965); *Montano v. Gabaldon*, 766 P.2d 1328, 1329 (N.M. 1989); *Ayer v. Comm'r*, 340 Mass.586, 593-98 (1960);
*see also See Suppl. Op. Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing*, at
pp. 60-68, *In re City of Detroit*, Case No. 13-53846 (Bankr. E.D. Mich. Dec. 31, 2014), ECF No. 8993 (holding
that settlement providing reduced distributions to bondholders in light of analogous bond validity concerns was
reasonable).

2011.[218]  To date, the Oversight Board has included in its "Joint Claim Objection" only the GO bonds issued in 2012 and 2014, reserving the right to expand its objection to additional series of bonds issued prior.[219]  The Oversight Board acknowledges that the 2011 GO Bonds are subject to litigation risk in connection with purported violations of the Constitutional Debt Limit, as reflected in the UCC's objection to the 2011 GO Bond claims. As of February 2020, the Oversight Board was continuing to analyze issues relating to the 2011 GO Bonds and had previously reserved its determination as to any adjustment to the proposed plan treatment for the 2011 GO Bond claims. The Oversight Board's views are reflected in the PSA and the Plan, which provide for discounted treatment of 2011 GO Bonds in light of purported debt limit violations.

### (3)      Special Concerns Regarding the 2014 Bonds

In their objection to the 2012 - 2014 GO bonds, the Oversight Board and UCC assert that, notwithstanding the characterization of PBA Bond debt, the Commonwealth violated the

---

[218] Two groups of objectors dispute the date of any Constitutional Debt Limit breach.  The GO Group has alleged that the debt limit may have been breached earlier than 2011.  *See Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, [ECF No. 6099] (the "Conditional Objection"); *see also* sub-part 7.a.iii below.  The GO Group argues that, to the extent the Court determines that the Oversight Board and UCC's objections are merited, the Court must also find that the pre-2012 bonds are invalid under one or more theories, including among others, that (a) if the Commonwealth engaged in a sham by mischaracterizing PBA debt, then all PBA debt is invalid, and/or (b) that a statute regulating calculation of debt service costs for purposes of the Constitutional Debt Limit need not be applied.  The relief requested in the Joint Claim Objection and related litigation is predicated on a finding that the PBA debt was mischaracterized in relation to the Constitutional Debt Limit, not that the PBA itself or its purported borrowings were unlawful, notwithstanding certain pleadings describing the PBA as a "sham" in colloquial terms.  Likewise, the GO Group argues effectively that if the Court disregards one Constitutional Debt Limit calculation practice, it should discard others as well.  However, the GO Group provides no support for its preferred methodology, which would disregard the purpose and effect of interest rate swap transactions that effectively capped debt service costs, and were recognized by statute as doing so.  For these reasons among others, the Oversight Board believes that the Conditional Objection is not merited, and the Plan does not reflect any diminution in distributions to holders of early vintage bonds subject to the Conditional Objection.

The LCDC has objected to GO and PBA Bonds arguing that PBA Bonds should be treated under the Constitutional Debt Limit not as direct, general obligations of the Commonwealth but as guarantee obligations of the Commonwealth.  *See Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth*, [ECF No. 9730] ("LCDC Omnibus Objection").  As such the LCDC maintains that the PBA Bonds should be counted toward the Constitutional Debt Limit to the extent payments were made by the Commonwealth as opposed to any other purported lessor.  Thus, approximately 80-98% of the face amount of outstanding obligations would apply to the limit under recent payment practices, as opposed to 100% as asserted by the Oversight Board, and as a result the LCDC asserts a breach of the Constitutional Debt Limit at a relatively later date than the Oversight Board.

[219] *See Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*, ECF No. 4784 (the "Joint Claim Objection").

Constitutional Debt Limit in 2014 by failing to account for $425 million in debt service costs paid through withholdings against the proceeds of the issuance.

The 2014 GO bonds were issued in the aggregate principal amount of $3.5 billion. However, the Commonwealth effectively borrowed $3.1 billion, withholding approximately $425 million of the proceeds because it understood that it otherwise would lack resources or revenues to pay the first few years of interest on the bonds.  Although this type of withheld interest financing is not uncommon in municipal project financing, where a project may take years to begin generating revenues for the payment of debt service, it is not common with respect to general obligation borrowing, and evidences the Commonwealth's inability to pay its debts at the time of the bond issuance.

The $425 million of capitalized interest payments were excluded from the calculation of the Constitutional Debt Limit.  None of the issuance documents explain why the payments should not be included in the Constitutional Debt Limit calculation of "principal of and interest on [general obligation] bonds and notes."  When properly included in the debt limit calculation, the 2014 GO bonds violate the debt limit, even without inclusion of the PBA debt obligations.

Certain bondholders have argued that the capitalized interest payments were properly excluded from Constitutional Debt Limit calculations.[220] The bondholders' principal argument is that the Constitutional Debt Limit restriction on amounts "payable in any fiscal year" cannot apply where there exists a sinking fund reserved and pledged for the payment of existing obligations. Bondholders argue that because the Commonwealth obligated itself to use the sinking fund to make payments on the bonds, the funds were effectively property of bondholders and thus payments to be made using such funds were not "payable" within the meaning of the Commonwealth Constitution.

(ii)    ***Validity of Bonds Issued Over Debt Limit, and Defenses***

The Oversight Board argues that bond obligations purportedly incurred in breach of a government issuer's express authority are void.[221]  Accordingly, the Bond Claim Objections allege that violations of the Constitutional Debt Limit render certain GO and PBA Bonds null and void.

On and after February 5, 2020 pursuant to the Court's scheduling order governing these matters, bondholders moved to dismiss the Bond Claim Objections.  The bondholders argue that, among other things, the PBA Bonds should not be counted as direct obligations for purposes of the Constitutional Debt Limit, and that even if the Commonwealth did violate the Constitutional Debt Limit the appropriate remedy is either not to invalidate the bonds at all, or to invalidate only a portion of the bonds.

---

[220] *See* Ad Hoc Group Motion, 37-41.

[221] *See, e.g.*, *State v. Spring City*, 123 Utah 471, 475 (1953); *State ex rel. Nuveen v. Greer*, 88 Fla. 249, 260 (1924); *Eaton v. Shiawassee Cty.*, 218 F. 588, 591 (6th Cir. 1914); *McCurdy v. Shiawassee Cty.*, 154 Mich. 550, 556 (1908).

To date, several bondholders and groups thereof have filed motions to dismiss the Bond Claim Objections and related memoranda (the "Motions to Dismiss Bond Claim Objections").[222]

In the Motions to Dismiss Bond Claim Objections, bondholders raise a number of arguments to the effect that the GO and PBA Bonds did not breach the Constitutional Debt Limit or should otherwise not be held invalid.  These arguments are summarized herein.

- Bondholders argue that Puerto Rico's constitution precludes characterization of PBA Bonds as general obligation or constitutional debt because the Constitutional Debt Limit applies to "money borrowed directly by the Commonwealth" and not money borrowed by the PBA.[223]

---

[222] The Motions to Dismiss Bond Claim Objections include, to date, *Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* [ECF No. 10702] (the "Ad Hoc Group Motion"); *Supplemental Memorandum of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. in Support of Motion to Dismiss* [ECF No. 10704] (the "AHG Supplement"); *The QTCB Noteholder Group's Response to Certain Omnibus Objections and Limited Joinder to the Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* (the "QTCB Response") [ECF No. 10705]; *Individual Commonwealth GO and PBA Bondholder Motion to Dismiss Claims Objections to Claims by Holders of Commonwealth GO and PBA Bonds* [sic] [ECF No. 11148] (the "Hein Motion"); *Response and Joinder of Kenneth Kirschenbaum and Kenneth Kirschenbaum Faily Trust to Motions to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* [ECF No. 11149]; *Joint Motion Requesting Dismissal of "Omnibus Objections" to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 11258] (the "Cooperative Motion"); *DRA Parties' Motion to Dismiss (I) Official Committee of Unsecured Creditors' Objection on Constitutional Debt Limit Grounds to Claim Of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bond Issued by Port of Americas Authority [Dkt. No. 9735] And (II) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant To Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth [Dkt. No. 9730]* [ECF No. 11260].

Several parties have filed statements joining in the above motions to dismiss and, in some cases, seeking to extend the requested relief to related litigation regarding tort claims and avoidance claims relating to extension of Commonwealth guarantees to debt issued by other entities.  *See, e.g.*, ECF Nos. 11153, 11241, 11247, 11251, 11261, 11264, 11267, 11281, 11292.

Additionally, the LCDC has filed the *Omnibus Motion to Dismiss of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Rule 7012, of Claim Objections Filed or Asserted by the Financial Management Oversight Board for Puerto Rico and the Official Committee of Unsecured Creditors* [sic] [ECF No. 10697] (the "LCDC Motion").  The LCDC Motion seeks dismissal of objections filed by the Oversight Board and others, but not the LCDC Omnibus Objection.  In other words, the LCDC disputes the legal theories asserted in the other Bond Claim Objections but seeks similar relief.

[223] *See, e.g.*, Ad Hoc Group Motion, 13-18.

- Bondholders argue that the PBA's legal existence and history confirms its legitimacy such that the PBA's obligations may not be considered obligations of the Commonwealth.[224]

- Bondholders argue that certain GO Bonds issued in July 2011, denominated and accounted as 2011 bonds, were in fact issued in fiscal year 2012 and should be considered 2012 bonds that did not breach the Constitutional Debt Limit even under the Oversight Board's accounting methods.[225]

- Bondholders dispute the Oversight Board's method of accounting for bond validity and requested remedies, arguing that some bonds should be held partially valid and that prior issuances found to be invalid should not count in calculations with respect to subsequent issuances.[226]

Bondholders have raised additional arguments specific to allegations raised by the LCDC and other parties. For instance, one group of bondholders argued that if the PBA is indeed a "sham designed to circumvent" the Constitutional Debt Limit, its bonds should be held entirely invalid.[227] Others have argued that a holding that bonds are invalid would violate the U.S. Constitution, among other reasons because it would be an unlawful taking under the 5th Amendment.[228]

(1)    **Equitable Defenses**

The Motions to Dismiss Bond Claim Objections additionally articulate defenses to the Bond Claim Objections based upon equitable theories such as estoppel and unjust enrichment.[229] In sum, bondholders argue that the Commonwealth received the proceeds of the bond issuances, and it would be unjust to permit the Commonwealth to escape its obligations simply because the Commonwealth failed to ensure it complied with applicable law prior to issuing the bonds. Moreover, bondholders argue that the Commonwealth's recitals in connection with the issuance of the Challenged Bonds, attesting to the Commonwealth and PBA's borrowing authority, foreclose any challenge to the bonds' validity. Relatedly, bondholders argue that principles of

---

[224] *Id.* at 18-23. This argument relies in part upon factual evidence, which the Oversight Board disputes both in substance and on the procedural grounds that such evidence may not be considered by the Court within a motion under Fed. R. Bankr. Pro. 7012.

[225] *See id.* at 41. The Commonwealth's fiscal year begins July 1; bonds entered after July 1, 2011 would ordinarily be considered to be fiscal year 2012. The Oversight Board has accounted for such bonds (denominated 2011 Series D/E GO Bonds) within fiscal year 2011 because the Commonwealth appears to have performed relevant Constitutional Debt Limit calculations predicated on the bonds' being issued in fiscal year 2011. Indeed, the information necessary to calculate the Constitutional Debt Limit for bonds and recite legal compliance therewith did not exist at the time the Commonwealth Legislative Assembly approved and issued the bonds together with recitals.

[226] *See id.* at 59-64.

[227] *See* AHG Supplement.

[228] Hein Motion, 6.

[229] *See, e.g.*, Ad Hoc Group Motion; Hein Motion; QTCB Response; Cooperative Motion.

judicial prudence should be applied to limit the Court's decision on these issues to prospective effect, so as to avoid significant hardships to bondholders.[230]  Certain bondholders also argue that the Constitutional Debt Limit constitutes a bar on legislative action and not on bondholder rights or remedies.[231]

The Oversight Board believes these defenses are unlikely to succeed.  The Puerto Rico Supreme Court has "unequivocally rejected" the application of equitable estoppel as developed in the common law for use in its civil law system, and likewise does not recognize unjust enrichment defenses that implicate constitutional public policy concerns.[232]  Relevant case law suggests that a private party transacting with the Commonwealth takes the risk that, if the transaction runs afoul of a clear public policy embodied in a statute or the constitution, no remedy will be available against the Commonwealth.  Courts have remarked that although this doubtless causes significant hardship to the counterparty to an unlawful transaction, the opposite result causes significant hardship to citizens and taxpayers and offends principles of justice and the rule of law.[233]

### (2)    Uniform Commercial Code Defenses

Although not raised in any Motions to Dismiss Bond Claim Objections, the Oversight Board has anticipated that bondholders may raise defenses under Article 8 of the Uniform Commercial Code, adopted in Puerto Rico as Article 8 of the Commercial Transactions Act and codified in Title 19 of the annotated Laws of Puerto Rico.  The Uniform Commercial Code contains two provisions dealing with the issuance of invalid securities.  Section 8-202 provides for the validation of invalid securities under specified conditions as a defense to an issuer's assertion of invalidity.  Section 8-210 provides a remedy to holders of securities issued in excess of the issuer's power.[234]

These Code-based defenses appear unlikely to succeed for a number of reasons, including most prominently that statutes that purport to override the Commonwealth Constitution are

---

[230] *See* Ad Hoc Group Motion, 50-54.

[231]  *See* QTCB Response.

[232] *See CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 76 (D.P.R. 2006) (refusing to recognize estoppel defense); *Hatton v. Municipality of Ponce*, 134 D.P.R. 1001, 1010 (1994) (no unjust enrichment defense where government contract violated clear public policy); *see also Vicar Builders Dev., Inc. v. ELA*, 192 D.P.R. 256, 267-70 (2015) (government may not ratify unlawful contract through later conduct).

[233] *See Buchanan v. City of Litchfield*, 102 U.S. 278, 293 (1880) (denying relief to aggrieved private party holding bonds in violation of debt limit and declaring that "the settled principles of law cannot, with safety to the public, be disregarded in order to remedy the hardships of special cases"); *City of Litchfield v. Ballou*, 114 U.S. 190, 822-23 (1885) (denying relief to same party on equitable theory, noting that "[t]he money received on the bonds having been expended . . . to impose the amount thereof as a lien upon [public property] would be equally a violation of the constitutional [debt] prohibition . . . The holders of the bonds and agents of the city are *participes criminis* in the act of violating that prohibition, and equity will no more raise a resulting trust in favor of the bondholders than the law will raise an implied *assumpsit* against a public policy so strongly declared.").

[234] The Uniform Commercial Code provisions most likely to be raised in defense of the GO Bonds are sections 8-202 and 8-210.  For a more detailed analysis of relevant Uniform Commercial Code provisions, see Joint Claim Objection, ¶¶ 106-128.

themselves unlawful.[235]  Principles of law enshrined in a constitution cannot be set aside by legislative or judicial action.[236]  The Oversight Board articulates additional defenses within its Joint Claim Objection.

### (iii)     *Bond Claim Objections to and Procedures*

Based on Claim Counsel's advice, the Oversight Board, acting by and through the Special Claims Committee, joined the UCC in commencing litigation contending that several 2012 and 2014 issuances of GO Bonds violated Puerto Rico's Constitutional Debt Limit, and that claims by purported holders of the GO Bonds for principal and interest should be disallowed.[237]

Providing procedural due process (including but not limited to appropriate notice) to all potential purported holders of the GO bonds regarding the Joint Claim Objection required that the UCC and Oversight Board propose a robust procedure by which all purported holders of 2012 and 2014 GO Bonds could be notified of the Joint Claim Objection and have an opportunity to respond to the Joint Claim Objection.  *See Urgent Motion of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured* Creditors, *Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Requesting Related Relief*

---

[235] While this fact is inherent to the constitutional system of laws, it has been repeatedly held true where parties assert statutory defenses to alleged constitutional debt limit violations and related defects in government expenditures. *See, e.g.*, *Weinberger v. Bd. of Pub. Instruction of St. Johns Cty.*, 93 Fla. 470, 481-82 (1927) ("[W]hen bonds are issued in violation of a mandatory provision of the Constitution, as, for instance, when in excess of the debt limit fixed by the Constitution. . .such bonds are void ab initio, and cannot be validated by curative legislation."); *Nolan Cty. v. State*, 83 Tex. 182, 200 (1891) ("Where a contract, which a municipal corporation has attempted to create, is invalid merely for want of legislative authority to create it, it can be made valid by a subsequent law. But if, at the time of its attempted creation, the legislature could not have authorized it, it may be doubted whether the legislature could make it valid, although in the mean time [sic], by a change in the constitution, the restriction upon its own power may have been removed.").

[236] *See* sources cited above; *McPherson v. Foster Bros.*, 43 Iowa 48, 69-70 (1876) ("Th[e] view [that purchasers of unconstitutional bonds should have a remedy] presents the suggestion of an ingenious plan for setting at naught the provision of the Constitution of the State under consideration. It is commended on the ground that, if the Constitution be enforced so as to cure the evil from which it is intended to protect the people of the state, it would operate to ensnare and defraud those who deal with political corporations. In such a case, according to the sentiment of the above quotation, the Constitution becomes an instrument of fraud, and on that ground may be violated. It must be confessed that it is a novel thought, to disregard the supreme law of the state because it operates to ensnare and defraud innocent persons. The error of the quotation is based upon a partial view of the rights of those who are called innocent purchasers, and want of attention to the object and purpose of the constitutional restriction in question.").

[237] *See* Joint Claim Objection.  The UCC additionally alleged that the bonds were invalid because they violated Article VI, section 7 of the Commonwealth Constitution, which provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." The Oversight Board did not take a position with respect to whether any GO Bonds violated this constitutional provision, but reserved its rights to raise this or additional objections relating to the GO Bonds. *See* Joint Claim Objection, p. 32 n. 18.

[ECF No. 4788] (the "<u>Initial Procedures Motion</u>" and the procedures contained therein, the "<u>Procedures</u>").

The Court granted the Initial Procedures Motion with modifications to the initially proposed Procedures.[238]  Pursuant to the approved Procedures, (1) the Depository Trust and Clearing Corporation ("<u>DTC</u>") posted a notice of the Joint Claim Objection in its legal notification system; (2) a notice of the Joint Claim Objection was published in several English-language and Spanish-language newspapers; and (3) the affected purported holders of challenged GO Bonds were identified by the thirty-seven (37) CUSIPs identified in the Joint Claim Objection. Furthermore, the Procedures established that purported holders were given sixty (60) days from the date of the Procedures Order granting the Initial Procedures Motion by which to file a Notice of Participation, which was to provide, among other facts, whether the purported holder opposed the Joint Claim Objection.  Purported bondholders filed over one thousand Notices of Participation.

Subsequent to the Joint Claim Objection, and as more fully described below, the Oversight Board and the UCC filed litigation seeking to avoid and recover principal and interest payments in respect of purported bond obligations, including GO and PBA Bonds issued beginning in March 2011.  Later, the UCC filed an objection to claims against the Commonwealth Debtor on account of GO Bonds issued in and after March 2011 and for PBA Bonds issued in and after March 2011.[239]

In tandem with the Joint Claim Objection and Expanded Objection, a group of holders of GO Bonds, the GO Group, filed a so-called "conditional objection" to certain bonds issued prior to 2012.[240]  The GO Group argued that, to the extent the Court were to determine that the Oversight Board and UCC's objections are merited, the Court would also have to find that the pre-2012 bonds are invalid under one or more theories, including among others, that (a) if the Commonwealth engaged in a sham by mischaracterizing PBA debt, then all PBA debt is invalid, and/or (b) that a statute regulating calculation of debt service costs for purposes of the Constitutional Debt Limit need not be applied.  Regardless, the GO Group took the position that no objection to the GO

---

[238] *See Order, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, Establishing Initial Procedures with Respect to Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Granting Related Relief,* ECF No. 5143 (the "<u>Procedures Order</u>").

[239] *See Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Bonds* [ECF No. 7057] (the "<u>Expanded Objection</u>"); *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds,* ECF No. 8141 (the "<u>PBA Bond Objection</u>"). The Oversight Board and UCC then requested approval of similar procedures to govern the Expanded Objection and to litigate both the Joint Claim Objection and Expanded Objection in omnibus fashion. *See Amended Motion of (I) Financial Oversight and Management Board, Acting Through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, to (A) Extend Deadlines and (B) Establish Revised Procedures with Respect to Omnibus Objections to Claims of Holders of Certain Commonwealth General Obligation Bonds Issued in 2011, 2012 and 2014, and for Related Relief,* [ECF No. 7154].

[240] *See* Conditional Objection.

Bonds would be merited, including its own Conditional Objection. For that reason among others, the Court denied the GO Group's motion for approval of procedures to litigate the Conditional Objection on grounds of ripeness. However, the GO Group later renewed its motion for approval, stating that the PSA and the Plan and Disclosure Statement ripen the Conditional Objection.[241]

The LCDC also filed a statement in response to the Joint Claim Objection, supporting it in part and refuting it in part.[242] The LCDC Statement supported invalidating the late vintage GO Bonds but refuted the challenges to the validity of the PBA structure. As an alternative, the LCDC Statement provided that whether the GO bondholder group has an allowable claim is irrelevant, as they are not entitled to any distribution upon the claim because the GO 2012 and 2014 bonds violated the express terms of the Constitutional Debt Limit.

On July 24, 2019, the Court issued the Stay Order, staying, among other things, the Joint Claim Objection, the Expanded Objection and the renewed Conditional Objection, which stay was extended through March 11, 2020. Pursuant to the Interim GO/PBA CMO, both the UCC and the LCDC filed claim objections supplementing the previously filed briefing.[243] The UCC reiterated its arguments from its previous objections and supplemented with challenges to the following bonds and notes as invalid: GDB Notes issued on or about July 2012, July 2013, and June 2016; PBA 2004 and 2006 bonds that were refinanced into a single, Commonwealth-guaranteed bond held by the GDB in 2015; the ScotiaBank Proof of Claim filed on June 13, 2018 for claims on an alleged invalid "Scotiabank Note;" and PRIFA Notes issued in 2015. The UCC asserts that certain GDB notes, certain PBA bond guaranty, the ScotiaBank note, and certain PRIFA guaranty should be disallowed because the notes and guaranties were all issued in violation of the Constitutional Debt Limit, and are therefore null and void.

While the LCDC Omnibus Objection renewed the previous argument that the 2012 and 2014 vintage bonds are null and void, it clarified its position and, with new arguments, asserted that post-2012 PBA bonds were also issued in violation of the Constitutional Debt Limit, along with the PRIFA BANs and the Ports bonds. The LCDC adopted the approach of reading the Commonwealth Constitution to establish two distinct debt limits, one for (i) "direct obligations for bonds issued by the Commonwealth," and one for (ii) "obligations for bonds guaranteed by the Commonwealth provided that the Commonwealth made debt service payments on account of such guarantee obligations." However, the LCDC Omnibus Objection asserted that rental payments from the Commonwealth constitute payments on account of the Commonwealth guarantee, which

---

[241] *See Notice of Hearing on Renewed Motion of the Ad Hoc Group of General Obligation Bondholders, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Conditional Objection to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, [ECF No. 7814].

[242] *See Statement of Position of the Lawful Constitutional Debt Coalition Regarding Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 6180] ("LCDC Statement").

[243] LCDC Omnibus Objection; *Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico (Claim Number 29485) Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bond Issued by Port of Americas Authority, (II) Claim of Scotiabank de Puerto Rico (Claim Number 47658) Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority*, [ECF No. 9735] ("UCC 2020 Objection").

must therefore be included in the calculation of debt service for bonds issued directly by the Commonwealth.[244]

On February 5, 2020, pursuant to deadlines stated in the Court's interim case management order regarding PBA and GO bond litigation, certain bondholders filed motions to dismiss the PBA and GO bond objections.  The movant parties comprised certain bondholder groups that had actively participated in mediation regarding the scheduling order and PBA and GO validity generally.  Pursuant to the scheduling order, further motions to dismiss were filed on or before February 19, 2020.[245]

As noted above, on February 9, 2020, the Oversight Board entered into the PSA, which proposes to resolve the bond validity litigation discussed above.

On February 10, 2020, following disclosure of the PSA, the Mediation Team submitted a revised report and recommendation that further litigation under the GO/PBA litigation scheduling order should be stayed in furtherance of plan confirmation.  The Oversight Board and consenting bondholders, likewise, have agreed to seek a general stay of all such litigation pending plan confirmation.

### (iv)    *Additional Concerns Raised in Related Filings*

Sub-parts 7.a.i-iii hereof describes allegations that GO and PBA bonds were invalid as a result of breaches of the Constitutional Debt Limit.  The Oversight Board has reserved the right to expand its objections to additional bond series and has alleged additional facts and applicable law giving rise to concerns as to the validity of the GO bonds and related transfers.  These additional concerns are discussed below.

### (1)    **Balanced Budget Clause Violations**

Just as the Constitutional Debt Limit restricts the Commonwealth from issuing debt that violates public policy by exceeding Puerto Rico's ability to pay as evidenced by historical revenues, additional constitutional provisions restrict the Commonwealth from issuing debt and using the proceeds for purposes that similarly fail to serve the public good.  Article VI, section 7 of the Commonwealth Constitution (the "Balanced Budget Clause") provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The UCC has alleged in the Joint Claim Objection that certain of the GO Bonds violated the Balanced Budget Clause because the documented and disclosed purpose of the borrowing was

---

[244] *LCDC Omnibus Objection*, [ECF No. 9730], ¶ 2.

[245] The motions described in this paragraph comprise the "Motions to Dismiss Bond Claim Objections" discussed above at sub-part 7.a.ii.

to finance structural deficits in the Commonwealth budget.  The Oversight Board has reserved the right to join in this argument.[246]

General obligation debt proceeds in many jurisdictions may only be used to finance capital projects such as land acquisition and infrastructure development.  The practice of "deficit financing," alleviating budget deficits by borrowing money rather than reducing expenses or increasing taxes, is viewed as fiscally unsound and inadvisable for general obligation borrowing.  Indeed, GDB at one time advertised the sale of GO Bonds by noting the "forthright and fundamental fact: that deficit financing is specifically prohibited in the Constitution of the Commonwealth."  GDB Advertisement, *Barron's* Magazine, February 1974.

Notwithstanding GDB's past assertions, there is some dispute as to the correct interpretation of the Constitution.  The English version of the Commonwealth Constitution that was approved by the U.S. Congress provides that "[t]he appropriations made for any fiscal year shall not exceed the **total revenues**, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  Because bond proceeds are not "revenues," this language is best understood to prohibit deficit financing.

By contrast, the Spanish version of the Commonwealth Constitution adopted by the Legislature uses the term "recursos totales," which in English means "total **resources**," not "total **revenues**," which would be rendered as "rentas totales" in Spanish.  The legislative history suggests that the term "recursos totales" was intentionally deployed by the drafters to encompass bond issuances; however, the federal law providing for effectiveness of the Commonwealth Constitution indicates that the English version is to be considered official.

No court has ruled on the question of whether the Commonwealth Constitution forbids deficit financing.  Certain bondholders have argued that the UCC's interpretation of the Balanced Budget Clause is incorrect,[247] asserting that the UCC invents a reading based on limits established under various state constitutions but not the text of the Commonwealth Constitution.  Moreover, although numerous courts have held that violation of a debt service limit results in a finding that bonds are null and void, few courts have addressed the appropriate remedy for violations of deficit financing restrictions;[248] bondholders have argued that Puerto Rico's Balanced Budget Clause governs appropriations, not borrowing, and that a debt invalidation remedy for an appropriations violation would be inconsistent with the meaning and purpose of the Constitution.[249]

---

[246] Joint Claim Objection, p. 32 fn. 18.

[247] Ad Hoc Group Motion, 42-46.

[248] Several courts have held that bonds are invalid where the language of the relevant constitution explicitly forbids borrowing amounts not payable from budgeted revenues.  *See, e.g.*, *City of Winchester v. Winchester Bank*, 306 Ky. 45, 46-47 (1947); *Austin Western Road Mach. Co. v. City of New Madrid*, 185 S.W.2d 850, 855 (Mo. Ct. App. 1945); *State v. Spring City*, 123 Utah 471, 476-78 (Utah 1953).

[249] *See* Ad Hoc Group Motion, 46-48.  One court has held that the remedy for an appropriations clause violation was to require budget balancing on a prospective basis. *See Lance v. McGreevey*, 180 N.J. 590, 599 (NJ 2004) (citing N.J. Const. art. VIII, § 2).  In that case, the issuer was not alleged to be insolvent and the Court expressed concern

b)      **Invalidity Actions**

As described above, the various objections to the validity of GO and PBA Bonds seek disallowance of the claims filed against the Commonwealth in respect thereof.  Another potential consequence of the bonds' invalidity would be that any amounts paid by the Commonwealth on account of such purported bonds (i) were *per se* unlawful and are recoverable under Puerto Rico law, and (ii) are avoidable as fraudulent transfers pursuant to the Bankruptcy Code and Puerto Rico law.

Accordingly, the Oversight Board commenced litigation to "claw back" principal and interest payments on the bonds that had been paid out to purported bondholders in the four years prior to the commencement of the Commonwealth Title III Case.[250, 251]  The Oversight Board limited this litigation (to the best of its ability after gathering information, as described below) to holders in excess of $2.5 million in the bonds at issue during the lookback period, in other words, excluding small-scale diversified portfolio investors and pursuing relief only against sophisticated investors that should have understood the bonds' infirmities prior to investing.  In the event the request sought in the Invalidity Action is sustained, recipients of payments of principal and interest on account of the Challenged Bonds may be required to return such payments to the respective issuers.

Unlike the claims objections described above, the Invalidity Actions required the Oversight Board to engage in a complicated discovery process to identify the appropriate Defendants.[252]  The Oversight Board obtained several orders from the Court requiring numerous banks that held the bonds on behalf of both themselves and "beneficial holder" clientele to produce records of transfers of principal and interest payments to beneficial holders.[253]  The Oversight Board then received from the banks a large amount of confidential information identifying the purported bondholders and the transfers at issue.[254]  Pursuant to stringent confidentiality restrictions, the Oversight Board then identified the disclosed parties as Defendants by pseudonym in relevant litigation and submitted to the court under seal a "key" document identifying the parties by name.

---

over "disruption to the State government."  *Id.*  It is likewise not clear that the facts and law of the case would be applicable to the present circumstances.

[250] These "Invalidity Actions" actions are Adv. Proc. Nos. 19-00281 through 19-00288, inclusive.

[251] PROMESA and Puerto Rico law, among others, permit the Oversight Board to "look back" and avoid transfers made during the four years prior to the commencement of the cases.

[252] For the avoidance of doubt: the objections to claims were filed against *current* holders of GO and PBA Bonds and relate to going-forward obligations.  The Invalidity Action is filed against parties who held the same bonds between 2013 and 2017.  Overlap may be limited due to active trading.

[253] *See* ECF Nos. 6384, 6493, 6967.

[254] To date, not all of the banks have complied with the discovery orders.  To the extent of such non-compliance, the Oversight Board has assumed that the banks, as record holders of the bonds, were likewise the beneficial holders of the bonds and are thus the appropriate Defendants to the Invalidity Action.

On April 30 and May 1, 2019, the Oversight Board and the UCC filed the Invalidity Actions with the Court, commencing eight adversary proceedings in total.[255]   To date, the Invalidity Litigation Defendants include approximately 450 purported beneficial owners of the bonds identified by pseudonym.  More litigation may be filed, and/or new Defendants named to the litigation, as banks continue to provide information identifying beneficial holders of the bonds, notwithstanding that discovery deadlines have now expired.

After filing the Invalidity Actions, the Oversight Board and the UCC requested that the Court stay the litigation and extend service deadlines.[256]   In the Litigation Stay Motion, the Oversight Board and the UCC noted that the Invalidity Actions had been filed in order to preserve rights prior to expiration of the relevant statute of limitations, but that aggressive prosecution of the litigation would not be warranted under the circumstances of the Title III Cases (including the opportunity to settle related disputes by confirmation of a plan of adjustment). The court granted the motion in part, extending service and litigation deadlines to September 1, 2019, and requiring the Oversight Board to meet and confer with interested parties and submit a joint case management order to govern the actions no later than July 17, 2019.[257]   The Oversight Board has served the Invalidity Actions complaints and summonses.

Pursuant to the Stay Order, the Invalidity Actions are stayed through March 11, 2020. Pursuant to the Interim GO/PBA CMO, the Invalidity Actions are to be stayed in all respects pending resolution of the debt validity issues contained in the various GO and PBA bond objections described above.  By the Court's order, defendants to the Invalidity Actions were provided the opportunity to participate and receive notice in the debt validity litigation, but are not required to do so to maintain any rights or status within the Invalidity Actions.

The PSA and Plan provide for dismissal of the Invalidity Actions following confirmation. The Mediation Team has recommended that the Invalidity Actions remain stayed in their entirety pending confirmation.

c)      **Lien Challenge Actions**

For a description of the lien challenge actions[258] to be settled pursuant of the Plan, *see* section III.B.1.a) of this Disclosure Statement.

---

[255] For logistical reasons relating to law firm conflicts of interest and the Court's document processing capabilities, the Oversight Board was required to file the complaints against Defendants in tranches.

[256] *See Omnibus Motion by Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and Its Special Claims Committee to Extend Time for Service of Summonses and Complaints and to Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds*, [ECF No. 6857] (the "Litigation Stay Motion").

[257] *See Order Regarding Omnibus Motion by Official Committee of Unsecured Creditors, Financial Oversight and Management Board, and its Special Claims Committee to Extend Time for Service of Summonses and Complaints and Stay Certain Adversary Proceedings Relating to Certain Challenged GO Bonds*, [ECF No. 7426].

[258] These actions were brought by the Oversight Board (not its Special Claims Committee).

d)      **PBA Litigation**

Historically, in calculating general obligations pursuant to subsection (i) of the Constitutional Debt Limit, the Commonwealth included within its accounting of general obligations only those bonds issued directly by the Commonwealth and specifically denominated as GO Bonds.  As provided below, however, the Oversight Board alleges that the Commonwealth simultaneously created and issued bonds that were general obligations but were neither denominated as such nor included in the Constitutional Debt Limit calculation.

PBA ostensibly exists to acquire, develop and manage real property for the benefit of the Commonwealth.  However, PBA in some cases acquires its properties from the Commonwealth itself via lease; such properties are then leased back to the Commonwealth and its agencies.  The Oversight Board and other parties have alleged that the actual function of PBA has been to issue bonds backed by the good faith, credit and taxing power of the Commonwealth, using the aforementioned purported real property sublease obligations to pass funds from the Commonwealth to bondholders without facially implicating the Constitutional Debt Limit.

The Oversight Board has alleged that the PBA Leases are not true leases, should not be entitled to administrative priority, and should be characterized as general obligations of the Commonwealth for purposes of the Constitutional Debt Limit [Adv. Proc. No. 18-00149, ECF No. 1].[259]  As described more fully in the PBA Lease Complaint, among other court filings, the Oversight Board argued that the PBA Leases demonstrate various hallmarks of not being true leases but rather disguised bond payments.  These include:

- "Rent" payments calculated in accordance with debt service requirements, as opposed to PBA's costs or comparative market rent prices.

- Adjustment of rent obligations upward or downward as necessary in relation to PBA Bond financing costs.

- Expiration of PBA Lease obligations on maturity dates of PBA Bonds.

- "Absolute and unconditional obligation" provisions requiring purported lessees to pay "rent" in full at all times and under all circumstances for the remainder of the lease term (*i.e.*, the life of the PBA Bonds), even if the property has been sold or destroyed, and including due to the fault of PBA.

- "Operating Rental" components designed to cause all actual building maintenance and operation expenses to pass through PBA to lessees, so that costs of ownership are paid by lessees in addition to debt service.

---

[259] Additional details regarding this action are provided in Section III.B.1.c.

Pursuant to the terms of the PBA Leases, the holders of the PBA Bonds are third-party beneficiaries thereof.  The Commonwealth has historically paid a significant portion of the purported lease obligations to PBA, an estimated 80-98% in recent years.

As a result, the Oversight Board and the UCC have concluded that whether flowing through purported leases or directly from the Commonwealth treasury, the Commonwealth makes the payments on the PBA Bonds, irrespective of any purported operations or activities of PBA.  The Bond Claim Objections[260] assert that the PBA Bonds are, in all relevant respects, backed by the Commonwealth's good faith, credit and taxing power, not by revenues from any purported Leases or other PBA operations.

The litigation described herein relating to the infirmities of the PBA bonds is to be settled pursuant to the Plan, on terms described therein and in the PSA, as described above.

e)      **Avoidance of Debt Guarantees (including PRIFA BANs Litigation)**

Between 2013 and 2017, the Commonwealth pledged its good faith credit and taxing power to guarantee approximately $830 million in debt issued by certain instrumentalities, including PRASA, APLA, GDB, and PRIFA (the "Guaranteed Indebtedness").  Claims Counsel's investigation identified several potential causes of action with respect to the Guaranteed Indebtedness.

First, for reasons similar to those articulated above with respect to the GO and PBA Bonds, the Guaranteed Indebtedness may have violated the debt limit in the Commonwealth Constitution.  The Commonwealth Constitution limits the Commonwealth's ability not only to borrow but to extend guarantees once its outstanding debts exceed a certain ratio to its historical revenues.

Second, guarantees by an insolvent debtor of a third party's obligation may be avoided as constructive fraudulent transfers if the debtor did not receive reasonably equivalent value in exchange.  In some cases, the Commonwealth did not receive reasonably equivalent value in exchange for its extension of a guarantee because the obligors of the debts did not use the debt proceeds in a manner that provided any benefit to the Commonwealth and because the Commonwealth's guarantee only served to burden it with onerous obligations.

To date, the Oversight Board has filed one avoidance action and has negotiated tolling agreements with the DRA relating to the Guaranteed Indebtedness.  The filed action is Adv. Proc. No. 19-00269.[261]  The Oversight Board anticipates that this action will be dismissed upon confirmation of the Plan.

---

[260] The Bond Claim Objections include the objections to the validity of the PBA and GO Bonds filed by the Oversight Board, UCC, and other parties.  See section V.I.5.a.

[261] *The Special Claims Committee of The Financial Oversight and Management Board for Puerto Rico, acting by and through Its Members and the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as co-trustees respectively, of The Commonwealth of Puerto Rico v. BNY Mellon, et al.*, 19-AP-00269 (the "Guarantee Obligation Avoidance Action").

## I.   The Stay Order and Mediation Team Reports

### 1.   The Stay Order

As stated previously, in May 2019, the Oversight Board and the UCC filed a joint motion seeking to (i) extend the deadlines to serve the Defendants in the Avoidance Action adversary proceedings and (ii) stay the adversary proceedings until Plaintiffs or any Defendant requests to resume the proceeding for good cause.  In June 2019, the Court partially granted the joint motions and extended the deadlines to serve the Defendants and stayed the adversary proceedings until September 1, 2019.  At the July 24, 2019 Omnibus Hearing, the Court issued the Stay Order, staying not only the adversary proceedings, but also many contested matters in which stays were requested in the Title III Case until November 30, 2019. The Court explained that in light of the anticipated filing of the Commonwealth Plan in August 2019, the parties should work with the Mediation Team Leader, Hon. Barbara J. Houser, in order to reach consensus as to prioritization of matters for litigation or mediation and to create standardized and comprehensive schedules and notice and participation mechanisms.  The Order intended the stay to prevent the parties from litigating overlapping issues and to facilitate the efficient resolution of matters.

The Stay Order also directed mandatory mediation for all parties to the matters listed in order to facilitate confirmation of a plan of adjustment for the Commonwealth Debtor.  The order directed the Mediation Team Leader to facilitate discussions and communications between the parties.

The Order applies to about 20 motions and 30 adversary proceedings, including:

- the Oversight Board and the UCC's omnibus objection to claims asserted by certain GO Bondholders, described in sections III.B.1(a)(ii) and V.I.5(a) of this disclosure statement;

- the seven adversary proceedings initiated by the Oversight Board and the UCC against more than 450 Defendants seeking declarations that holders of bonds issued or guaranteed by the Commonwealth Debtor have entirely unsecured claims, described in section III.B.1.a.(ii) of this disclosure statement;

- the eight clawback actions filed by the Oversight Board's Special Claims Committee and the UCC seeking to claw back principal and interest payments against approximately 600 purported beneficial owners of bonds and 50 banks disclosed as record holders, described in sections III.B.1.a.(ii) and V.I.5(b) of this disclosure statement;

- Ambac's lift-stay motion concerning PRIFA rum tax bonds, described in section V.E.4(c) of this disclosure statement;

- the UCC's omnibus objection to claims against the Commonwealth Debtor asserted by holders of certain PBA Bonds, described in section V.I.5(a) of this disclosure statement;

- the adversary proceeding initiated by the Oversight Board against PBA Debtor seeking a declaration that PBA Debtor leases are not true leases and obligations purportedly due thereunder are simply mischaracterized general obligations of the Commonwealth Debtor, described in section III.B.1(c)(ii) of this disclosure statement;

- the UCC's objection to claims of holders of certain ERS Bonds, described in section III.B.1(b)(iii) of this disclosure statement;

- the two adversary proceedings filed by ERS Debtor and the UCC against certain ERS Bondholders challenging the validity of certain ERS Bondholders' purported interests, described in section III.B.1(b)(i) of this disclosure statement;

- the UCC's objection to GDB's claim against the Commonwealth;

- and the UCC's objection to claims of holders of certain 2011 GO Bonds, described in section III.B.1(a)(ii) of this disclosure statement.

The Court subsequently entered orders extending the general stay, permitting limited forms of litigation regarding debt validity issues (as described above), and requiring the Mediation Team to submit final recommendations in February 2020. On February 10, 2020, following disclosure of the PSA, the Mediation Team submitted a revised report and recommendation that further litigation under the GO/PBA litigation scheduling order should be stayed in furtherance of plan confirmation.

2. **Interim Report and Recommendation of the Mediation Team**

Pursuant to the Court's Stay Order, which temporarily stayed certain adversary proceedings and contested matters identified therein, and ordered the parties to enter into a period of mandatory mediation, the Mediation Team performed two principal tasks. First, the Mediation Team addressed the scheduling and sequencing of issues identified in the Mediation Order or identified by the parties as issues relevant to confirmation of the plan of adjustment for one or more of the Title III debtors. *See Interim Report and Recommendation of the Mediation Team* [ECF No. 9365] (the "Interim Report") at 1-2. Second, the Mediation Team engaged the parties in substantive mediation sessions as the Mediation Order directed. *Id.* at 2.

During mediation the active ERS litigation parties agreed to accelerate consideration of issues related to ERS. Interim Report at 3; *see Urgent Joint Motion to Modify Order Regarding Stay and Mandatory Mediation with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [ECF No. 8899] ("Joint Urgent Motion"). A motion for approval of agreed procedures for objections to claims by holders of bonds issued by ERS was negotiated by the parties and entered by the Court. ECF Nos. 8761, 8818. In addition, the ERS litigation parties agreed to a scheduling order to address matters pending before the Court that relate to the validity of ERS bonds and the scope of liens held by the ERS bondholders. This

proposed order was filed with the Court on October 18, 2019, and entered by the Court on October 24, 2019.  Joint Urgent Motion; ECF No. 8962.

The Mediation Team originally planned to submit to the Court a comprehensive report and recommendation regarding scheduling of all relevant issues in the Title III cases on or before November 27, 2019.  Interim Report at 4.  However, at that time, the Oversight Board, the Government of Puerto Rico, and various creditors remained engaged in ongoing negotiations regarding the terms of a possible amended plan of adjustment.  *See id.*  Because an amended plan of adjustment would render any scheduling recommendations by the Mediation Team moot, the Mediation Team filed an Interim Report which addressed only the scheduling of disputed issues that should proceed in the near-term.  *Id.*  Specifically the Interim Report addressed, *inter alia*, scheduling and sequencing of litigation concerning (i) the validity of certain challenged series of GO and PBA bonds, (ii) the secured or unsecured status of claims on GO and PBA bonds, (iii) and the rights, as against the Commonwealth, of holders of "revenue bonds" and other debt issued by certain Puerto Rico instrumentalities.  As detailed in the Interim Report, the Mediation Team believes that these issues are among the most fundamental and pivotal in the Title III cases, and litigation on these issues should commence as soon as practicable.  *Id.* at 5.  After consulting with the relevant parties and receiving written recommendations, the Mediation Team, as part of the Interim Report, submitted scheduling proposals with respect to these litigations, among others.  The Mediation Team further recommended that, with the exception of the deadlines set forth in the proposed scheduling orders, the mandatory mediation stay be extended through January 31, 2020, and that the Court set a deadline of January 10, 2020, for the Mediation Team to submit an amended report (the "Amended Report") further addressing scheduling of litigation.  All parties were free to object to the scheduling recommendations in the Interim Report and proposed scheduling orders.

The first proposed order submitted by the Mediation Team is a scheduling order applicable to contested matters and adversary proceedings related to issues (i) and (ii) above concerning GO and PBA bonds (the "Proposed Interim GO/PBA CMO").  The Proposed Interim GO/PBA CMO provides for, among other things, briefing and hearings in the context of Rule 12(b) motions to dismiss and/or Rule 12(c) motions for judgment on the pleadings as to the GO lien challenge and Clawback Litigations,[262] as well as a schedule for filing, briefing and hearing certain claim objections to PBA bonds and to certain challenged GO Bonds.  *See* Interim Report.

The second proposed interim scheduling order is applicable to certain contested matters and adversary proceedings addressing issue (iii) above, concerning the rights of holders of revenue bonds issued by HTA, PRIFA, and CCDA against the Commonwealth (the "Proposed Interim Revenue Bonds CMO").  Pursuant to the Proposed Interim Revenue Bonds CMO, issues related to revenue bonds were to be raised in three motions to lift the automatic stay and four adversary proceedings, as described in sections V.E.4.f)-h) and V.F.5 above.  The Proposed Interim Revenue Bonds CMO provides a schedule for briefing and hearing of the PRIFA, HTA, and CCDA Lift Stay Motions, as well as briefing and hearing in the context of Rule 12(b) motions to dismiss and/or Rule 12(c) motions for judgment on the pleadings as to the Revenue Bond Litigations.  *See*

---

[262] As defined in the Interim Report, the Clawback Litigation consists of the adversary proceedings docket numbers 19-ap-281 through 19-ap-288 (defined as "Invalidity Actions" under the Plan).

Interim Report.  In addition, certain provisions of the Proposed Interim Revenue Bonds CMO have been challenged by Ambac, Assured, National, and FGIC, as well as the UCC, as described below.

The third proposed scheduling order addresses the motion for relief from the stay filed by the DRA Parties.  The parties to that contested matter have agreed upon the sequencing of scheduling of issues, which are described in section V.E.4.e) above.

On December 6, 2019, numerous parties, including the Oversight Board, Ambac, National, FGIC, Assured, the UCC, the DRA Parties, and Peter C. Hein, filed responses to the Mediation Team's Interim Report.  ECF Nos. 9493, 9504, 9440, 9485, 9505, 9503, 9508.  In particular, the Oversight Board requested the Court make certain proposed modifications to the Proposed Interim Revenue Bonds CMO, including (i) scheduling Ambac's PRIFA Lift Stay Motion for an immediate hearing; (ii) providing for the continuance of final hearings on the HTA and CCDA Lift Stay Motions until motions to dismiss the Revenue Bond Litigations are resolved; (iii) clarifying the scope of the Oversight Board's consent regarding section 305; and (iv) imposing reasonable limitations on the length and number of briefs.

On December 11, 2019, the Court held a hearing to consider the Interim Report, the proposed scheduling orders, and the parties' objections and responses thereto.  At the hearing, the Court stated it would make certain changes to the proposed interim orders on matters that were of particular importance between December 11, 2019, and the January 29, 2020 omnibus hearing, at which it anticipated considering the Mediators' Amended Report and scheduling recommendations contained therein.  *See* Hearing Transcript dated December 11, 2019.

On December 19, 2019, the Court entered two interim case management orders, including the *Interim Case Management Order for Revenue Bonds* [ECF No. 9620] (the "Interim Revenue Bonds CMO"), which includes certain changes addressed by the Court at the December 11, 2019 omnibus hearing.  The Court further entered an order extending the stay period of the Court's prior orders to January 31, 2020, extending the deadline for the Mediation Team to file its Amended Report to January 10, 2020, and setting a hearing to consider the Amended Report for January 29, 2020.  ECF No. 9618.

Shortly thereafter, in response to a request by the Mediation Team, the Court entered an order postponing the prior January 10, 2020 deadline for the Mediation Team to file the Amended Report to February 10, 2020.  *See Order Partially Amending Order Addressing the Filing of an Amended Report by the Mediation Team and Extending (a) Stay Period, (b) Mandatory Mediation, and (c) Certain Deadlines Related Thereto (Docket Entry No. 9618), and Setting Deadline for Further Reponses to Urgent Motion for Extension of Filing Deadline for Mediation Team Amended Report (Docket Entry No. 9638)* [ECF No. 9639] (the "December 23 Order").  The December 23 Order also adjourned the hearing on the Amended Report to March 4, 2020, and extended the stay to March 11, 2020.

On December 26, 2019, Assured and National filed an objection, motion for reconsideration, and/or reservation of rights with respect to the December 23 Order.  ECF No. 9655.  The Court overruled that objection, but invited further objections to the Interim Revenue Bonds CMO to be filed on or before January 21, 2020, with responses due January 27, 2020.  ECF

251

No. 9661.  The Court also scheduled a hearing for January 29, 2020, to address any arguments concerning the continuation of the provisions of, and the proposed amendments to, the Interim Revenue Bonds CMO prior to the March 4, 2020 hearing.  *Id.*  On January 21, 2020, Assured, National, Ambac, and FGIC filed an objection to the Interim Revenue Bonds CMO (the "Interim Revenue Bonds CMO Objection"), asserting that, to avoid perceived constitutional defects, (i) the HTA, PRIFA, and CCDA Lift Stay Motions should be permitted to proceed to final hearings in short order, while the Revenue Bond Litigations should be stayed and (ii) references to section 305 should be deleted from the Interim Revenue Bonds CMO.  ECF No. 10251.  Assured, National, Ambac, and FGIC further alleged that, in the event the HTA, PRIFA, and CCDA Lift Stay Motions proceed to final hearings, certain discovery should be permitted with respect to the Motions.  On the same day, the UCC also filed an objection to the Interim Revenue Bonds CMO, alleging that the page limitations on intervenors in the Revenue Bond Litigations should not apply to it.  ECF No. 10249.  On January 27, 2020, the DRA Parties filed a joinder to the Interim Revenue Bonds CMO Objection.  Also on January 27, 2020, the Oversight Board filed its response to the Interim Revenues Bonds CMO Objection, (i) asserting that staying the Revenue Bond Litigation while proceeding to a final hearing on the Lift Stay Motions risks further delay and incomplete resolution of key threshold issues, and that the Lift Stay Motions should be bifurcated so that issues of standing and secured status could be determined first, (ii) agreeing that the Interim Revenue Bonds CMO should not include any reference to PROMESA section 305, and (iii) arguing that no discovery should be permitted until certain gating issues on security interests and liens are determined.  At the January 29, 2020 omnibus hearing, the Court bifurcated the issues of standing and secured status, modified the briefing schedule for the Lift Stay Motions, permitted limited discovery on preliminary issues, and scheduled a hearing on the bifurcated Lift Stay Motions for March 5, 2020.  On January 31, 2020, the Court entered an amended interim case management order for revenue bonds ("Amended Interim Revenue Bonds CMO"), reflecting the modifications discussed at the January 29 omnibus hearing.

### 3.   Amended Report and Recommendation of the Mediation Team

On February 10, 2020, the Mediation Team filed its *Amended Report and Recommendation of the Mediation Team* [ECF No. 10756] (the "Amended Report").  The Mediation Team noted that since the filing of the Interim Report, the PSA was signed by Oversight Board and the holders of approximately $8 billion in claims of GO/PBA bonds, notice of which was made publically available on February 9, 2020.  Amended Report at 8.  Furthermore, the Mediation Team noted that, after the filing of the Amended Plan and an Amended Disclosure Statement, the Oversight Board intends to proceed forward towards confirmation of the Amended Plan, and that if the Amended Plan is confirmed, the Oversight Board and the GO/PBA Bondholders believe no further litigation of any dispute regarding the validity, priority, or secured status of the GO/PBA/PRIFA BANs claims is appropriate.  *Id.* at 8-9.

In light of the execution of the PSA and the global settlement contemplated therein, the Mediation Team made a series of recommendations regarding the Interim GO/PBA Scheduling Order and related matters, including recommending that: the Interim GO/PBA Order be set aside such that no further deadlines set forth in such order need be complied with by any party; and any other pending and not yet filed adversary proceedings and contested matters relating to validity,

priority, or secured status of the GO/PBA/PRIFA BANs claims be stayed pending a decision on confirmation of the Amended Plan. *Id.* at 9-10.

The Mediation Team also made a series of recommendations regarding other interim orders and the ERS Scheduling Order, including recommending that: the ERS Scheduling Order remain in effect and the litigation contemplated in the Order proceed forward; certain gating issues identified in the Amended Interim Revenue Bonds Order be decided on the merits at the March 5, 2020 preliminary lift stay hearing; and the Amended Interim Revenue Bonds Order be modified (1) to incorporate a schedule for filing partial summary judgment motions in the relevant Revenue Bond Adversary Proceedings and (2) to set a schedule for the filing and determination of any motion seeking relief regarding alleged conflicts of interest with respect to the Oversight Board's acting for both the Commonwealth and HTA. *Id.* at 10-14. The Mediation Team recommended the parties meet and confer: regarding the schedule for any further discovery, briefing, and a final lift stay hearing; and following the preliminary hearing on the lift stay motions. *Id.* at 16-17. Finally, the Mediation Team recommended the Interim DRA Order be made final. *Id.* at 18.

The Mediation Team then proposed a series of recommendations concerning other litigation subject to the stay, *see id.* at 18-19, including recommending:

- The PRIFA Rum Tax 2004 Motion [ECF No. 7328] be denied without prejudice in light of discovery being undertaken in connection with the lift stay motion and pending adversary proceeding;
- The motion to stay contested matters pending confirmation of Commonwealth Plan [ECF No. 7640] be granted;
- The GO Bondholders' renewed motion establishing procedures with respect to omnibus conditional objections to claims filed or asserted by PBA and PBA/GO Bondholders [ECF No. 7814] remain stayed pending decision on confirmation of Amended Plan;
- The urgent motion for stay of adversary proceeding supplemental to pending motion to stay GO bond proceedings pending confirmation of Commonwealth Plan [ECF No. 7882] be granted;
- The UCC's objection to the GDB's claim against the Commonwealth (Claim No. 29,485) [ECF No. 8000] remain stayed pending the decision on confirmation of the Amended Plan, with the objection to be unstayed and go forward thereafter;
- Ambac's motion to strike certain provisions of the PSA [ECF No. 8020] be denied without prejudice given the signing of the New PSA;
- The Oversight Board's motion to stay the PBA adversary proceeding pending confirmation of Commonwealth Plan [ECF No. 99 in Adv. Proc. No. 18-149] be granted;
- *Assured v. Commonwealth* [18-ap-59] remain stayed pending decision on confirmation of Amended Plan;
- The Guarantee Obligation Avoidance Action [19-ap-269] remain stayed pending decision on confirmation of Amended Plan;
- The Clawback Litigation [19-ap-281 through 19-ap-288] remain stayed pending decision on confirmation of Amended Plan;

253

- The Underwriter Litigation [19-ap-280] remain stayed pending the decision on confirmation of the Amended Plan;
- The HTA Avoidance Actions [19-ap-362; 19-ap-363; 19-ap-364; 19-ap-365] remain stayed until the Court orders the stay lifted or a plan is confirmed for HTA.

The Mediation Team also set out a potential schedule for the pre-disclosure statement hearing period, the disclosure statement hearing, and the confirmation hearing, *see id.* at 20-26 (as further described in section II of this Disclosure Statement). With respect to issues to be decided post-confirmation, the Mediation Team further recommended the following issues remain stayed until after the Amended Plan is confirmed and goes into effect: any preference or fraudulent transfer actions; final fee applications; underwriter and related party litigation, including 19-ap-280 (which relates to the Underwriter Litigation, described at V.J.4); the UCC's Objection to the GDB's Proof of Claim No. 29,485 [ECF No. 8000]; and any other objections to claims not addressed prior to confirmation. *Id.* at 26.

Several parties filed responses to the Mediation Team's Amended Report. On February 18, 2020, Peter C. Hein filed a response to the Amended Report in which he objected to the use of confidential mediation [ECF No. 11284]. On February 19, 2020, AAFAF filed a response stating that the Court should not adopt the schedule proposed in the Amended Report because the AAFAF did not support the Amended Plan and, accordingly, AAFAF contended that the Amended Plan could not be confirmed [ECF No. 11159]. On February 21, 2020, Ambac, Assured, National, FGIC, and the UCC also filed responses to the Amended Report. The UCC, *inter alia*, urged the Court to reject the Mediation Team's recommendation that certain litigations related to GO, PBA, and PRIFA BAN issues should be stayed, and requested the Court resolve certain "additional gating issues," including the UCC's GO Priority Objection, the claim objections to the validity of certain GO Bonds, and the Lien Challenge Actions, before approving the disclosure statement [ECF No. 11482]. Assured, Ambac, National and FGIC filed a joint response, (*i*) asserting that the Mediation Team's recommendations are "inconsistent with due process" because of the accelerated timeline to reach determinations on certain issues, and because they would limit the taking of discovery; (*ii*) objecting to the scheduling of a disclosure statement hearing; and (*iii*) objecting to the recommendation that the PRIFA Rule 2004 Motion be denied without prejudice because it seeks information broader than what is anticipated to be disclosed in connection with the PRIFA Lift Stay Motion [ECF No. 11493]. In addition, Ambac, Assured, and National filed separate statements objecting to the Amended Report's recommendation to stay litigation related to the priority, validity, and secured status of the GO Bonds [ECF Nos. 11496, 11497, 11498]. In addition, Assured's statement asserted that the Amended Plan was "patently unconfirmable" for several reasons, including that it allegedly violated the Commonwealth Constitution [ECF No. 11497]. The DRA Parties filed a response (*i*) expressing "concern" that the Mediation Team's recommended schedule does not "contain a comprehensive and detailed resolution" of issues related to the alleged "clawback" of certain revenues; (*ii*) requesting the revenue bond scheduling order be modified to permit the DRA Parties to participate in the HTA Lift Stay Motion with respect to certain issues that allegedly overlap with the DRA Lift Stay Motion; and (*iii*) opposing the proposal to stay the UCC GO Priority Objection [ECF No. 11495].

Also on February 21, 2020, the Oversight Board and the PSA Parties filed statements in support of the Amended Report. The Oversight Board supported the Mediation Team's

254

recommendation to stay litigations relating to priority, validity and secured status of GO Bonds, as well as the recommendation to proceed to resolve the revenue bond litigations through summary judgment motions [ECF No. 11492]. The PSA Parties also support the Mediation Team's recommendation to stay litigation related to the priority, validity and secured status of GO Bonds in light of the Amended Plan's proposal to settle those litigations [ECF No. 11499].

## J.      Public Corruption Investigations

On May 28, 2019, a federal grand jury returned an indictment charging three officials of the Puerto Rico Senate, Chrystal Robles-Baez, Isoel Sanchez-Santiago, and Angel Figueroa-Cruz, with alleged corruption involving a scheme to defraud the Legislature using "ghost employees." Defendant Robles-Baez allegedly certified and requested payments indicating that she had provided professional services to the Office of Governmental Affairs, when in fact she had not. Defendants Robles-Baez and Sanchez-Santiago also allegedly used the personal identifying information of several individuals to create the impression that Robles-Baez had provided them with professional services when she in fact had not. Robles-Baez furthermore was alleged to have used Sanchez-Santiago's contacts, services and assistance to fraudulently justify work she did not actually complete. Figueroa-Cruz, the Executive Director of the Office of Governmental Affairs at the time, allegedly falsely certified Robles-Baez's bills and invoices for payment.

On June 20, 2019, in connection with a request for information by federal law enforcement agencies, the Government announced the cancellation of certain contracts awarded by the Treasury Department, ASES and other government entities to the accounting firm BDO Puerto Rico.

On June 24, 2019, former Governor Rosselló removed Treasury Secretary Raúl Maldonado from office after he made public allegations of acts of corruption by employees of the Treasury Department. Mr. Maldonado was also removed from his position as Director of the OMB and Chief Financial Officer of the Commonwealth. Then Governor Rosselló stated that he had lost trust in Mr. Maldonado because he had never raised the corruption allegations made in his public statement with the Governor. The following day, ASES Executive Director Ángela Ávila-Marrero resigned. ASES had awarded information technology and auditing services contracts to BDO Puerto Rico.

On June 28, 2019, the FBI's San Juan Field Office announced that it was investigating patterns of conduct concerning government corruption and fraud regarding government contracts. The FBI sought additional evidence from the public with respect to government contracting based on the following indicators: (1) contracts approved, or jobs awarded, to individuals or companies who were not the lowest bidders, and may have been significantly less qualified than other competitors for the contract or position; (2) a failure to follow ordinary business practices in the awarding of jobs or contracts; and (3) large expenses paid by a company that received a government contract, which would not have been necessary if one of the company's competitors had received the contract.

On July 9, 2019 a federal grand jury indicted three government officials and three other government contractors on numerous charges, including theft of government funds, wire fraud, money laundering, and conspiracy. The indictment involves approximately $15.6 million in

contracts.  The prosecution outlined three separate fraud schemes. Federal authorities said the arrests were initiated by the Office of Inspector General of the U.S. Department of Education and were separate from the investigation initiated after the statements made by former CFO Maldonado.  The investigation is ongoing.

In addition, current and former high-ranking government officials have been questioned by federal law enforcement agencies in connection with the government contracts probe.

On February 7, 2020, the Oversight Board announced that it selected UHY LLP to commence a review of audit, accounting and other services performed by BDO Puerto Rico since 2016 for the Commonwealth of Puerto Rico and several instrumentalities.  The initial phase of the investigation is focused on the five government entities audited by BDO Puerto Rico.  Those entities are: PREPA, HTA, TRS, Puerto Rico Automobile Accident Compensation Administration (ACAA), and Puerto Rico's public broadcasting corporation (WIPR).  A review of BDO Puerto Rico's consulting services is expected to follow.  The focus of the review is of a financial nature. Legal actions or remedies are not within the scope of the investigation.

## K.  Related Debt Restructurings

### 1.  GDB Title VI Case

#### a)  Background

The GDB is a public corporation and governmental instrumentality of the Commonwealth, whose principal functions were to act as fiscal agent, paying agent, financial advisor, financing source and depositary of funds for the Government and its instrumentalities, public corporations and municipalities.

On April 6, 2016, the former Governor, Alejandro Garcia Padilla, issued a number of executive orders under the Moratorium Act to: (i) declare a state of emergency at GDB, (ii) impose restrictions on the withdrawal of funds deposited with GDB and of other disbursements by GDB, and (iii) implement a moratorium on the payment of debt service on GDB's outstanding notes.

#### b)  GDB Restructuring Support Agreement

After many months of negotiations, on May 15, 2017, AAFAF, GDB and certain other creditors of GDB entered into a GDB Restructuring Support Agreement (as amended, modified or supplemented, the "GDB RSA") to effectuate a consensual restructuring of certain other creditors of GDB's indebtedness through a Title VI case under PROMESA.  The severe damage and devastation inflicted on Puerto Rico by Hurricanes Irma and Maria necessitated certain modifications to the GDB RSA and pushed back the timeframe for consummating the Qualifying Modification.  As a result, the GDB RSA underwent six amendments. On May 8, 2018, the Oversight Board certified the GDB RSA, as amended.

### c)  Commencement of Title VI Proceeding

On August 10, 2018, GDB commenced an action under Title VI of PROMESA by filing an application seeking approval of the Qualifying Modification with the U.S. District Court for the District of Puerto Rico (the "Title VI Action").  The Title VI Action was pending before Judge Swain and captioned Case No. 18-1561 (LTS).

### d)  Solicitation of Votes and Approval of the Qualifying Modification.

The day prior to commencing the Title VI Action, on August 9, 2018, GDB and AAFAF launched solicitation of votes to approve or reject the Qualifying Modification.  The Qualifying Modification was overwhelmingly approved by GDB's creditors, with 74% of eligible creditors participating in the vote and 97% of such creditors voting to approve the Qualifying Modification. In addition, the Oversight Board, as the Administrative Supervisor in Title VI, provided all necessary certifications, as required by PROMESA section 601.  The District Court approved the Qualifying Modification on November 6, 2018.

### e)  Terms of the Qualifying Modification

The Qualifying Modification became effective as of November 29, 2018 (the "Closing Date").  The key terms of the Qualifying Modification are described below.

### (i)  *Recovery Authority Bonds*

Holders of outstanding GDB public bonds, net depositors of funds at GDB, and certain claimants of contingent and unliquidated claims held claims totaling approximately $4.23 billion as of the Closing Date (such aggregate claims, the "Participating Bond Claims"). Holders of Participating Bond Claims received on the Closing Date in exchange for their claims new bonds ("Recovery Authority Bonds") issued by a newly formed statutory public trust and government instrumentality of the Commonwealth (the "Recovery Authority") created pursuant to the GDB Restructuring Act enacted on August 24, 2017 and amended on July 18, 2018 (the "GDB Restructuring Act").  Holders of certain claimants of contingent and unliquidated claims that constituted Participating Bond Claims will only receive the Recovery Authority Bonds if their claims materialize in the future.

The following are the principal terms of the exchange and the Recovery Authority Bonds:

- For every $1,000 of claims, holders of Participating Bond Claims received $550 of Recovery Authority Bonds.

- The Recovery Authority's only assets are those GDB transferred to the Recovery Authority on the Closing Date (the "Restructuring Property").  The Restructuring Property includes GDB's municipal loan portfolio, a portion of its public entity loan portfolio, certain real estate property, beneficial interests in causes of action and cash.  Holders of Recovery Authority Bonds will receive interest and principal payments solely from the proceeds of the Restructuring Property. There is no

257

recourse against the Commonwealth or GDB with respect to the payment obligations under the Recovery Authority Bonds.

- The Recovery Authority Bonds have a coupon of 7.5% and mature in 2040. Based on cash flow projections, it is unlikely that holders of Recovery Authority Bonds will receive all interest due in cash or that the principal amount of the Recovery Authority Bonds will be paid in full.

- Pursuant to the GDB Restructuring Act, in establishing the net amount of claims or of assets, loans owed to GDB by municipalities, such loans were set off on a one-for-one basis with deposits with GDB by the same municipalities.

(ii)     *Conditions of Exchange*

Concurrently with, and as a condition to, the exchange of claims for the Recovery Authority Bonds, the claims the Commonwealth and other public entities have against GDB were resolved pursuant to the terms of the GDB Restructuring Act and the creation of a separate trust—the Public Entity Trust (the "PET"). The primary purpose of the PET is to provide any available distribution to certain public corporation depositors, as well as administer the restoration of federal funds deposited at GDB. Pursuant to the GDB Restructuring Act, on the Closing Date, the balance of liabilities owed between the Commonwealth and its agents, instrumentalities and affiliates (each a "Non-Municipal Government Entity") and GDB were determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date. Those Non-Municipal Government Entities having net claims against GDB, after giving effect to the foregoing adjustment, received their pro rata share of interests in the PET, which were deemed to be full satisfaction of any and all claims such Non-Municipal Government Entity may have against GDB. As a result of the PET transaction, the Commonwealth's deposit claims against GDB was offset against the Commonwealth's unsecured debts to GDB, resulting in GDB holding a net claim against the Commonwealth in the amount of approximately $926.9 million as of the Closing Date.

The assets of the PET (the "PET Assets") consist of the claim against the Commonwealth, which was the subject of a proof of claim filed in the Commonwealth Title III case, and $20 million cash.

(iii)     *Payment of Surplus Tax Proceeds*

On the Closing Date, GDB paid, in cash, to each municipality that had undisbursed cash deposits at GDB on account of proceeds of the special additional tax which GDB certified as surplus from the Municipal Public Debt Redemption Fund (as defined in the Municipal Financing Act) prior to January 1, 2017 (such surplus, the "Excess CAE"), an amount equal to 55% of such undisbursed Excess CAE. The remaining portion of such undisbursed Excess CAE was discharged and no such municipality with Excess CAE has any further rights or claims against GDB or any other party with respect to such Excess CAE.

258

### f) Challenges to the GDB RSA and Qualifying Modification

A number of parties at different times presented litigation challenges to various aspects of the GDB Title VI process.  Some municipalities, bondholders and certain other creditors of GDB, challenged, directly and indirectly, the solicitation and the Qualifying Modification alleging:

- the pools of claimants should include a separate pool for municipalities with its own voting requirements;

- their deposits with GDB did not constitute "Bonds" as defined in PROMESA and therefore Title VI of PROMESA did not apply;

- some deposits were not the property of GDB but instead were held in trust and therefore belong to the respective depositors;

- the sale of GDB bonds were offered maliciously and under false pretenses and therefore such bondholders should be treated differently; and/or

- PROMESA and the actions of the Oversight Board were unconstitutional.

In addition, the UCC sought derivative standing to represent the Commonwealth in the GDB Title VI process, which was denied.

All these challenges were ultimately dismissed, withdrawn, or settled.

### g) Occurrence of the GDB Qualifying Modification

The GDB restructuring contemplated by the GDB RSA required the approval of the Oversight Board and an order from the Title III Court.  On July 12, 2017, the Oversight Board authorized GDB to avail itself of Title VI of PROMESA, pursuant to PROMESA section 601(e).  On May 8, 2018, the Oversight Board certified the GDB RSA.  The Oversight Board gave its final approval pursuant to PROMESA section 601(m)(1)(B) on November 2, 2018.  On November 6, 2018, the Title III Court issued an order that the requirements of PROMESA section 601(m)(1)(D) had been satisfied.  The Closing Date took place on November 29, 2018, on which date all definitive documents were executed, the GDB assets were transferred to the Recovery Authority and the Public Entity Trust, the Participating Bond Claims were cancelled, all related claims were released, the guarantee provided by the Commonwealth in respect of an aggregate of $110 million of GDB bonds was extinguished, and the Recovery Authority Bonds were issued.

## 2. HTA Title III Case

### a) Background

HTA is a public corporation and governmental instrumentality of the Commonwealth established in 1965 under Act No. 74-1965 (as amended, the "HTA Act") that has responsibility for the construction and maintenance of roads and highways and other transportation systems in Puerto Rico.

HTA is governed by a seven-member board comprised of the Secretary of Department of Transportation and Public Works ("DTPW") (serving as the President of the board), the President of the Planning Board, the Secretary of the Treasury, the Executive Director of AAFAF, and three other members from the private sector appointed by the Governor with the advice and consent of the Senate. HTA has broad powers to carry out its responsibilities in accordance with DTPW's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities constructed, owned, or operated by HTA, the ability to set tolls for the use of the highway facilities, and the power to issue bonds, notes, or other obligations. HTA plans and manages the construction of all major projects relating to the Commonwealth's toll highway system, undertakes major repairs, and maintains the toll ways.

### b) Commencement of the HTA Title III Case

On May 21, 2017, the Oversight Board issued restructuring certifications for HTA pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA pursuant to PROMESA section 304(a) with the Title III Court, commencing cases under Title III of PROMESA.

On June 29, 2017, the Court entered an order granting the joint administration of the Title III cases of the Commonwealth, HTA, and ERS, for procedural purposes only [ECF No. 537].

### 3. PREPA Title III Case

### a) Commencement of the PREPA Title III Case

On July 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PREPA, pursuant to PROMESA section 304(a), commencing the PREPA Title III Case.

On October 6, 2017, the Title III Court entered an order granting the joint administration of the Title III Cases of the Commonwealth, HTA, ERS, and COFINA, and the PREPA Title III Case, for procedural purposes only [Case No. 17-4780, ECF No. 340].

### b) Significant Developments in the PREPA Title III Case

### (i) *The Receiver Motions*

On July 18, 2017, certain holders and monoline insurers of bonds issued by PREPA filed a motion seeking to lift the stay to pursue the appointment of a receiver [Case No. 17-4780, ECF No. 74] ("Initial Receiver Motion"). On September 14, 2017, the Court denied the Initial Receiver Motion because, among other things, the Court considered movants' requested relief prohibited by PROMESA section 305, which limits the jurisdiction and powers of the Court over certain matters. See [Case No. 17-4780, ECF No. 299] ("District Court Receiver Opinion").

On August 8, 2018, the First Circuit reversed and remanded the Title III Court Receiver Opinion, holding that PROMESA section 305 does not prohibit the Court from lifting the stay to allow PREPA bondholders to seek appointment of a receiver. *See Fin. Oversight & Mgmt. Bd. for*

*P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13 (1st Cir. 2018) (the "Remand Decision").

On October 3, 2018, certain monoline insurers of bonds issued by PREPA—Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured"), National Public Finance Guarantee Corp. ("National") and Syncora Guarantee Inc. ("Syncora")—filed a renewed motion to lift the stay to pursue the appointment of a receiver. [Case No. 17-4780, ECF No. 975] (the "Renewed Receiver Motion"). Pursuant to several orders of this Court, see [Case No. 17-4780, ECF Nos. 1176, 1183, 1204], the briefing schedule for the Renewed Receiver Motion was extended by several months. On May 9, 2019, the Court entered an order staying the briefing on the Renewed Receiver Motion until after the Court's ruling on (i) the PREPA 9019 Motion (as defined below) and (ii) a related motion to dismiss the Renewed Receiver Motion. See [Case No. 17-4780, ECF No. 1230].

On May 3, 2019, Assured joined the Definitive RSA (as defined below). On May 10, 2019, the Oversight Board and AAFAF filed a motion to dismiss the Renewed Receiver Motion. [Case No. 17-4780, ECF No. 1233] (the "Motion to Dismiss"). On September 9, 2019, National and Syncora joined the Definitive RSA. Pursuant to the Definitive RSA as amended through September 9, 2019, upon entry of an order approving certain settlements and provisions contained in the PREPA 9019 Motion, Assured, National, and Syncora will withdraw the Renewed Receiver Motion. On September 13, 2019, the Court issued an order staying the briefing on the Motion to Dismiss [Case No. 17-4780, ECF No. 1638].

### (ii)   *The PREPA Postpetition Financing Motion*

On January 27, 2018, the Oversight Board and AAFAF filed an urgent joint motion for PREPA to obtain postpetition financing of $1.3 billion secured by a first priming lien. See [Case No. 17-4780, ECF No. 549] ("PREPA Financing Motion"). The Court determined that it would not grant the PREPA Financing Motion, but would hold the motion in abeyance without prejudice to an amendment in the short term limited to a smaller draw-down amount and administrative super-priority, and without prejudice to the possible future request for additional funding and/or priming liens. Feb. 15, 2018 Hr'g Tr. at 232:10-14.

On February 16, 2018, the Oversight Board and AAFAF filed an urgent joint application [Case No. 17-4780, ECF No. 722] (the "Urgent Joint Application"), seeking entry of a revised proposed order approving a $300 million credit facility and granting the lender a superpriority administrative expense claim (the "Revised Financing"). On February 19, 2018, the Court entered an order approving the Revised Financing [Case No. 17-4780, ECF No. 744] (the "PREPA Financing Order"). On March 8, 2019, PREPA repaid all of the outstanding amounts under the Revised Financing.

### (iii)   *The PREPA Definitive RSA*

After months of negotiation, on July 30, 2018, the Oversight Board and AAFAF announced that they had entered into a preliminary Restructuring Support Agreement with members of the Ad Hoc Group of PREPA Bondholders (the "Preliminary RSA"). The Preliminary RSA contemplated the inclusion of a variety of restructuring terms in an eventual plan of adjustment,

261

and also contemplated the negotiation and execution of a definitive restructuring support agreement.

Following the Preliminary RSA, the Oversight Board and AAFAF continued negotiating with the Ad Hoc Group of PREPA Bondholders regarding the terms of a definitive Restructuring Support Agreement. Ultimately, Assured joined the negotiations. On May 3, 2019, these efforts to reach a consensual resolution culminated in the execution of a definitive Restructuring Support Agreement ("Definitive RSA"), which provides for the resolution of the claims and entitlements of the Ad Hoc Group of PREPA Bondholders, Assured, and other holders of uninsured PREPA bonds that join the Definitive RSA. Among other things, the Definitive RSA provides the bondholders' party to the Definitive RSA will support a plan of adjustment for PREPA providing them with a certain level of economic recovery. Parties that do not sign the Definitive RSA are not bound by the deal. On September 9, 2019, the parties to the RSA agreed to amend the Definitive RSA to provide for the joinder of Assured and National.

On May 10, 2019, the Oversight Board and AAFAF filed a motion under Bankruptcy Rule 9019 (the "PREPA 9019 Motion") seeking approval of certain of the settlements and compromises embodied in the Definitive RSA. Briefing on the PREPA 9019 Motion is ongoing.

4. **COFINA Title III Case**

a) **Commencement of COFINA Title III Case**

On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA, pursuant to PROMESA section 304(a), commencing the COFINA Title III Case.

On June 1, 2017, the Title III Court entered an order granting the joint administration of the Commonwealth Title III Case and the COFINA Title III Case, for procedural purposes only. [ECF No. 242].

b) **Confirmation of COFINA Plan of Adjustment**

On January 16 and 17, 2019, the Title III Court considered the confirmation of the COFINA plan of adjustment with the settlement motion for the settlement and compromise of the Commonwealth-COFINA Dispute, as further described below. On February 4, 2019, the Title III Court confirmed the COFINA plan of adjustment approving the entry into the settlement agreement with respect to COFINA [ECF Nos. 5047, 5048, 5053, 5055, 5104]. On the same day, the Title III Court approved the Settlement Motion.

On February 5, 2019, the Title III Court entered the *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation [ECF No. 5055] and the Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5053]. On February 12, 2019, the COFINA plan of adjustment was substantially consummated and became effective (the "Effective Date of the COFINA Plan of Adjustment").

262

As further explained in section V.G.4.b. of this Disclosure Statement, the confirmation of the COFINA Plan of Adjustment approved COFINA's entry into the settlement agreement that provided the terms of the settlement and compromise of the Commonwealth-COFINA Dispute and the allocation of the Disputed SUTs.

### c) Challenges to the Confirmation of COFINA's Plan of Adjustment

Following the occurrence of the Effective Date of the COFINA Plan of Adjustment, a number of parties commenced challenges to the confirmation of the COFINA Plan of Adjustment and the settlement and compromise of the Commonwealth-COFINA Dispute contained therein.

***Appeals of the Order Confirming the COFINA Plan of Adjustment.*** On February 22, 2019, appellants (i) Rene Pinto-Lugo and Manuel Natal-Albelo (*Pinto-Lugo v. Commonwealth of P.R.*, Case No. 19-1181 (1st Cir.)) ("Pinto-Lugo"), (ii) Mark Elliott, Lawrence B. Dvores, and Peter C. Hein (*Elliott v. Commonwealth of P.R.*, Case No. 19-1182 (1st Cir.)) ("Elliott"), and (iii) Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandia, Cooperativa de Ahorro y Crédito de Juana Diaz, and Cooperativa de Ahorro y Crédito de Rincon (*Cooperativas v. COFINA*, Case No. 19-1391 (1st Cir.)) ("Cooperativas") filed separate appeals of the order confirming the COFINA plan of adjustment. On June 28, 2019 with respect to the Cooperativas appeal and on April 12, 2019 with respect to the Pinto-Lugo and Elliott appeals, the Oversight Board filed a motion to dismiss each appeal as equitably moot, arguing that since the COFINA plan of adjustment has been fully consummated and relied upon by innocent third parties, granting the appellants' request to overturn the confirmation of plan would be impractical and inequitable. In particular, COFINA's obligations under its old bonds have been canceled, new bonds have been issued and have been traded in public markets, distributions have been made to creditors, and litigations have been dismissed with prejudice. On the same day, the COFINA Senior Bondholders' Coalition filed a motion to intervene in the appeal in support of the Oversight Board.

On May 15, 2019, Pinto-Lugo filed an opposition to the motion to dismiss, arguing the equitable mootness doctrine is inapplicable to the appeal. On the same day, the Elliot Appellants filed an opposition to the motion to dismiss, arguing Appellants' constitutional objections trump the equitable mootness doctrine.

On May 29, 2019, the Oversight Board filed replies in support of its motions to dismiss the Elliott and Pinto-Lugo appeals. In its response to the Pinto-Lugo opposition, the Oversight Board argued that because the equitable mootness doctrine applies in cases brought under chapter 9 of the Bankruptcy Code, it is applicable to the appeal. In its response to the Elliott opposition, the Oversight Board noted that the Elliott Appellants cited no authority in support of their argument that courts are reticent to apply the equitable mootness doctrine in cases involving constitutional claims and presented evidence to the contrary. Pinto-Lugo filed his sur-reply July 26, 2019. On August 29, 2019, the Court issued an order consolidating Pinto-Lugo and Elliott. On November 7, 2019, the Pinto-Lugo and Elliott Appellants filed their opening briefs. Appellees filed an answering brief on February 14, 2020. On February 19, 2020, Appellants filed a motion to extend the deadline to file their reply brief.

On June 28, 2019, the Oversight Board filed a motion to dismiss the Cooperativas appeal. On August 29, 2019, the Cooperativas Appellants filed their opposition to the motion to dismiss. The Oversight Board filed its reply in support of its motion to dismiss on September 16, 2019. On October 4, 2019, the First Circuit issued an order denying the Oversight Board's motion to dismiss the appeal.  The Cooperativas filed their opening brief on December 27, 2019.  On February 21, 2020, Appellees filed their answering briefs.

On September 17, 2019, Peter Hein filed a supplemental and amended joint notice of appeal regarding the order confirming the COFINA plan of adjustment (the "Elliott Appeal II"). The Elliott Appeal II was docketed as Case No. 19-1960.  On October 28, 2019, the Court issued an order consolidating the Elliot II Appeal with Pinto-Lugo and Elliot.  On January 2, 2020, Appellant filed his opening brief.  Appellees filed their answering brief on February 14, 2020.

***Natal-Albelo v. Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 19-00003***.  Originally filed on December 6, 2018 in the Commonwealth of Puerto Rico Court of First Instance, the Oversight Board removed this case to the Title III Court on January 14, 2019. Plaintiff Natal-Albelo's complaint seeks declaratory and injunctive relief providing that (1) approval of the Bill of the House of Representatives 1837 ("Bill 1837"), which later became Act 241-2018, is unconstitutional, and (2) Act 91-2006 ("Act 91"), which originally created the COFINA structure, is unconstitutional. Plaintiffs argue that, among other things, the House of Representatives' actions during the approval of Bill 1837: (i) were unconstitutional and violated Plaintiff Natal-Albelo's dignity because they made light of Plaintiff Natal-Albelo's requests to speak; (ii) violated the rights of Plaintiff Natal-Albelo, a non-partisan Representative, to be heard under the equal protection clauses of the federal and Commonwealth Constitutions; (iii) violated Plaintiffs' rights of dignity, equal protection of laws, the right to freedom of expression, voting, and due process of law under the federal and Commonwealth Constitutions; and (iv) were taken in bad faith. Plaintiffs further argue that Act 91, under which COFINA was created in 2006, is unconstitutional because it: (a) provides for the issuance of debt that exceeds the constitutional limits of public debt provided in sections 2 and 7 of Article VI of the Commonwealth Constitution and (b) allows the refinancing of the unconstitutional public debt.

On March 21, 2019, the Oversight Board filed a motion to stay the adversary proceeding until a final resolution of the Pinto-Lugo appeal of COFINA's Third Amended Title III Plan of Adjustment.

On the same day, Plaintiffs filed a motion to remand for lack of subject matter jurisdiction, which the Court later struck from the record due to procedural issues with the motion. The Title III Court permitted Plaintiffs the opportunity to refile a motion for remand and stayed all other briefing, including briefing on the Oversight Board's motion to stay, pending resolution of the renewed remand motion. Plaintiffs filed their renewed motion to remand on May 10, 2019. Briefing of this motion is pending.  On June 7, 2019, AAFAF filed a motion to intervene, which the Court granted.  On June 27, 2019, the Court issued an order referring the matter to Magistrate Judge Dein.  On July 31, 2019, the Court issued an order denying Plaintiffs' motion to remand. On August 13, 2019, the Court issued an order continuing the stay of the proceeding until the resolution of the appeal.

5. **General Background**

A dominant issue in the Commonwealth Title III Case was the dispute regarding ownership of the SUTs purportedly transferred by the Commonwealth to COFINA to secure repayment of certain indebtedness of COFINA (the "Commonwealth-COFINA Dispute").  If such revenues were property of COFINA, then there would be approximately $750 million less available per year (which annual amount will increase over time) to pay the Commonwealth Debtor's liabilities and expenses.

6. **The Commonwealth-COFINA Dispute and the Lex Claims Litigation**

On July 20, 2016, certain holders of the GO Bonds commenced an action in the U.S. District Court for the District of Puerto Rico against the Commonwealth and several of its officials, including the Governor. *Lex Claims, LLC v. García-Padilla*, Case No. 16-2374-FAB (D.P.R. June 20, 2016).[263] Plaintiffs argued, among other things, that (i) the Commonwealth Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure, and (ii) the SUTs purportedly transferred to COFINA are an "available resource" pursuant to article VI, section 8 of the Commonwealth Constitution, which provides that if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, section 8.

7. **Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute**

On August 10, 2017, the Title III Court entered an order (the "Procedures Order") [ECF No. 996], which, among other things, provided that (a) the Oversight Board authorized the UCC to serve as the agent for the Oversight Board, as representative of the Commonwealth in the Commonwealth Title III Case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "Commonwealth Agent"); and (b) the Oversight Board authorized Bettina Whyte to serve as the agent for the Oversight Board, as representative of COFINA in its Title III case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "COFINA Agent" and together with the Commonwealth Agent, the "Agents").[264]  The Procedures Order also expressly acknowledged that the Oversight Board retained its authority to separately develop a settlement to the Commonwealth-COFINA Dispute and propose plans of adjustment for the Commonwealth and COFINA.  Procedures Order ¶ 4(n). The Procedures Order was agreed to by all the major stakeholders after the mediators worked tirelessly to craft a consensus.

---

[263] The Lex Claims Litigation has been dismissed pursuant to the settlement and compromise of the Commonwealth-COFINA Dispute and confirmation of the COFINA plan of adjustment.

[264] Following the entry of the Procedures Order, the Agents, along with certain creditor parties, engaged in confidential mediation with Chief Bankruptcy Judge Barbara Houser.

8.     ***Official Committee of Unsecured Creditors v. Whyte***, **Adv. Proc. No. 17-00257**[265]

On September 8, 2017, the UCC,[266] as Commonwealth Agent, commenced an adversary proceeding to prosecute the Commonwealth-COFINA Dispute, Adv. Proc. No. 17-00257.  On September 15, 2017, the COFINA Agent filed her answer to the Complaint (the "Answer and Counterclaims") [ECF No. 27].

In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and GO bondholders, as well as other parties that had been permitted to intervene in the adversary proceeding, filed counterclaims and cross-claims regarding ownership of the applicable portion of the SUT.  On February 21, 2018, the Commonwealth Agent, the COFINA Agent, and several of the intervening parties, filed cross-motions for summary judgment.

Concurrently with the litigation in the adversary proceeding, the Agents participated in court-sanctioned mediation to settle the Commonwealth-COFINA Dispute.  Through the auspices of the Mediation Team, the Agents reached an understanding set forth in that certain Agreement in Principle on a settlement of the Commonwealth-COFINA Dispute.  On June 7, 2018, the Agents announced the terms of their Agreement in Principle, which contemplates, among other things, that, starting in fiscal year 2019, the Commonwealth and COFINA will share the Pledged Sales Tax Base Amount, on a 46.35% and 53.65% basis, respectively. [Adv. Proc. No. 17-00257, ECF No. 486].

On September 27, 2018, in light of the agreements and compromises set forth in the COFINA plan of adjustment and related settlement, the Title III Court, *sua sponte*, entered an order terminating the pending summary judgment motions without prejudice to restoration of the motions on or after October 3, 2018. [Adv. Proc. No. 17-00257, ECF No. 544].

On February 20, 2019, following the occurrence of the effective date of the COFINA plan of adjustment, the parties to the adversary proceeding filed a joint stipulation to dismiss the case with prejudice, which the Title III Court approved.

9.     **Compromise and Settlements**

On February 4, 2019, the Title III Court entered the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 5045] (the "Settlement Order").  On the same day, the Court confirmed the COFINA plan of adjustment, approving the entry into a settlement agreement with respect to COFINA. [ECF Nos. 5047, 5048, 5053, 5055].  On February 12, 2019, the COFINA

---

[265] Pursuant to the settlement and compromise of the Commonwealth-COFINA Dispute and confirmation of the COFINA plan of adjustment, on February 20, 2019, the parties filed a joint stipulation of dismissal with prejudice, which was entered on February 21, 2019.

[266] The UCC is the statutory committee of unsecured creditors appointed in the Commonwealth Title III Case, ERS Title III Case, and HTA Title III Case.

plan of adjustment was substantially consummated and became effective (the "Effective Date of the COFINA Plan of Adjustment") [ECF No. 5104].

Pursuant to the Settlement Order and section 2.1 of the COFINA plan of adjustment, the Commonwealth-COFINA Dispute was compromised and settled as follows:

### a)      COFINA Interests

COFINA was granted an ownership interest in the COFINA Pledged Taxes and all rights thereto, including the right to receive the COFINA Pledged Taxes pursuant to the First Dollars Funding[267] in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of a certain minimum fixed amount of the SUT revenues ("Fixed Income") in any given fiscal year until the COFINA Senior Lien Bonds have been paid or satisfied in full in accordance with their terms (the "COFINA Portion").

### b)      Commonwealth Interests

The Commonwealth was granted an ownership interest that is second in priority of payment, funding and collections, in the COFINA Pledged Taxes and all rights thereto subject to the First Dollars Funding.  This ownership interest includes the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given fiscal year of the Commonwealth, and (b) all COFINA Pledged Taxes after the COFINA Senior Lien Bonds have been paid or satisfied in full in accordance with their terms.  The Commonwealth shall have no ownership interest in the COFINA Portion, and the Commonwealth Portion[268] shall exclude the COFINA Portion.

---

[267] The "First Dollars Funding" is defined as the allocation of "first dollars" collected from COFINA Pledged Taxes, including, without limitation, the criteria set forth in section 16.5 of the COFINA Plan required to be satisfied in order to permit, among other things, quarterly deposits of "first dollars" collected from COFINA Pledged Taxes.

[268] The "Commonwealth Portion" is defined as, collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given fiscal year, and (b) all COFINA Pledged Taxes after the COFINA Senior Lien Bonds have been paid or satisfied in full in accordance with their terms; provided, however, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion; and, provided, further, that (y) subject to the provisions regarding the Additional Bonds Test and the First Dollars Funding set forth in sections 16.3 and 16.5 of the COFINA Plan, respectively, the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year unless and until COFINA has received the COFINA Portion and (z) the Commonwealth shall have no right to receive Debt Service Savings in any fiscal year unless and until all debt service payments on the COFINA Senior Lien Bonds required to be made or set aside in such fiscal year, including any overdue debt service payments from all prior fiscal years, are made as required, in accordance with the provisions regarding the Additional Bonds Test set forth in section 16.3 of the COFINA Plan; and, provided, further, that the COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and, in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, the COFINA Portion shall not be subject to the automatic stay in any such Commonwealth proceeding.

c) **Distribution of Amounts Held in BNYM Debt Service, Reserve, and Other Accounts**

(i) *Pre-Fiscal Year 2019 BNYM Deposits*

Of the $78,355,837.63 of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon held by BNYM, as the Existing COFINA Bond trustee, for the benefit of the bondholders (collectively, the "Pre-FY2019 BNYM Deposits") in accordance with the adversary proceeding, $33,355,837.63 was distributed to the Commonwealth.

(ii) *Fiscal Year 2019 BNYM Deposits*

As of the Effective Date of the COFINA Plan of Adjustment, COFINA received, for purposes of distribution in accordance with the plan of adjustment, one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income, plus any earnings thereon (collectively, the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding.

(iii) *Residual Fiscal Year 2019 BNYM Deposits*

Any remaining FY2019 BNYM Deposits after distribution of the COFINA FY2019 BNYM Deposits was to be distributed to the Commonwealth.

d) **First Dollars Funding**

The COFINA Portion will be funded annually from "first dollars" collected from the COFINA Pledged Taxes until the COFINA Senior Lien Bonds have been paid or satisfied in full in accordance with their terms.

Beginning in fiscal year 2024 of the Commonwealth, if (i) for any date of determination at which time the Oversight Board or any successor is in existence, (1) the prior and then-current fiscal year budgets are balanced, as determined by the Oversight Board (or its successor in interest), and (2) the Commonwealth is current on its continuing disclosure requirements relating to its audited financial statements; (ii) quarterly bucketing of twenty-five percent (25%) of the COFINA Portion associated with the then-current fiscal year of the Commonwealth is shown to be necessary to avoid intra-fiscal year tax revenue anticipation notes borrowing; and (iii) collection of prior fiscal year COFINA Pledged Taxes provided a two times (2x) coverage of the COFINA Portion, then, in each quarter, until the COFINA Senior Lien Bonds have been paid or satisfied in full in accordance with their terms:

(a) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the COFINA Portion associated with the then-current

fiscal year of the Commonwealth will be deposited into the Revenue Fund for transfer to the Debt Service Fund[269] (the "Post-FY24 Deposits"); and

(b)      thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be deposited in accordance with the "Flow of Funds" established in the COFINA Junior Lien Bond Indenture.

However, in any quarter in which there is a shortfall in the amounts required to be deposited under the Post-FY24 Deposits, then such shortfall will be added to the amount required to be paid in accordance with the Post-FY24 Deposits in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "Debt Service Fund" held by the trustee for the benefit of, and payment of debt service with respect to, the COFINA Senior Lien Bonds.

### e)      Additional Terms of Compromise and Settlement

The Commonwealth will have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year of the Commonwealth unless and until COFINA has received the COFINA Portion.  The Commonwealth will have no right to receive Debt Service Savings[270] in any fiscal year of the Commonwealth unless and until all debt service payments on the COFINA Senior Lien Bonds required to be made or set aside in such fiscal year of the Commonwealth, including any overdue debt service payments from all prior fiscal years of the Commonwealth, are made as required.  The COFINA Portion will not be property of the Commonwealth, and if there is any subsequent Title III case or similar or other proceeding of the Commonwealth, in any forum, it shall not be subject to the automatic stay.

### f)      Compromise Date

The effective date of the compromise and settlement is retroactive to July 1, 2018 and, in addition to receipt of the net Pre-FY 2019 BNYM Deposits and the COFINA FY19 BNYM Deposits on the Effective Date of the COFINA Plan of Adjustment, COFINA owns and is entitled to receive, the COFINA Portion commencing as of fiscal year 2019.

*[Remainder of Page Left Intentionally Blank]*

---

[269] The "Debt Service Fund" is defined as the account established pursuant to the New Bond Indenture in the name of the trustee for the COFINA Bonds, which account shall be for the purpose of receiving, holding and distributing funds for the benefit and payment of debt service with respect to the COFINA Senior Lien Bonds.

[270] "Debt Service Savings" are defined as, for each fiscal year, the difference between (a) principal and interest due on COFINA Bonds and COFINA refunding bonds, then outstanding, prior to the issuance of COFINA refunding bonds and/or Reorganized COFINA's purchase of COFINA Bonds and COFINA refunding bonds in the open market and (b) principal and interest due on COFINA Bonds and COFINA refunding bonds that will remain outstanding after the issuance of such COFINA refunding bonds and/or Reorganized COFINA's purchase of such COFINA Bonds and COFINA reorganized bonds.

# VI.    The Title III Plan of Adjustment

## A.    General

### 1.    Filing of a Plan of Adjustment

A plan of adjustment provides for the treatment and discharge of the debts of the Title III Debtor.  Only the Oversight Board may file a plan of adjustment, either with the petition or by the time set by the court, and it may only do so if it determines, in its sole discretion, that the Plan is consistent with the applicable certified Fiscal Plan.[271]  The Oversight Board may modify the Plan at any time before confirmation, provided that the modified plan meets the requirements of PROMESA Title III.[272]

### 2.    Contents of a Plan of Adjustment

Notwithstanding otherwise applicable nonbankruptcy law, among other things, a plan of adjustment (i) designates classes of claims (claims in a class must be "substantially similar"),[273] (ii) specifies any classes of claims that are not impaired under the plan of adjustment and specifies the treatment accorded to classes of claims or interests that are impaired, (iii) provides the same treatment for each claim of a particular class unless the holder of a particular claim agrees to less favorable treatment, and (iv) provides adequate means for the plan of adjustment's implementation through, for example the retention of property by the Title III Debtor, the transfer or sale of property to another entity, the satisfaction or modification of any lien or indenture, and the curing or waiving of any default.[274]

A class of claims is impaired under a plan of adjustment, unless the plan of adjustment either (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such a claim or interest; or (ii) notwithstanding applicable nonbankruptcy law that entitles the holder of the claim or interest to demand or receive accelerated payment after default the plan of adjustment cures the default, reinstates the maturity of the claim or interest, compensates the holder for damages incurred as a result of any reasonable reliance by such holder on such applicable nonbankruptcy law and (for failures to perform nonmonetary obligations) compensates the holder for any actual pecuniary loss incurred by such holder, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder.[275]

---

[271] PROMESA §§ 312(a)-(b), 104(j)(3).

[272] PROMESA § 313.

[273] In determining whether claims are "substantially similar," the Oversight Board is to consider whether such claims are secured and whether such claims have priority over other claims.  PROMESA § 301(e).

[274] 11 U.S.C. §§ 1123(a)(1)-(5), 1122(a).

[275] 11 U.S.C. § 1124.

3.    **Acceptance of a Plan of Adjustment**

The holder of an allowed claim may vote to accept or reject a plan of adjustment. PROMESA specifically excludes from the definition of "holder of a claim or interest" for such purpose any "Issuer" or "Authorized Instrumentality of the Territory Government Issuer" (as defined in PROMESA Title VI) or a corporation, trust or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, provided that the other beneficiaries of such claims are not excluded, and provided that with respect to insured bonds, such "holder of a claim or interest" will be the monoline insurer insuring such bonds to the extent such insurer is granted the right to vote insured bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable documents.[276]

A class that is not impaired under the plan of adjustment is conclusively presumed to accept the plan, and a class that is not entitled under the plan of adjustment to receive or retain any property on account of the holders' claims is deemed not to have accepted the plan of adjustment.[277]  A class of claims accepts a plan of adjustment if it has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class (other than those designated as not in good faith under Bankruptcy Code section 1126(e)).[278]

4.    **Solicitation of Acceptances of Plan of Adjustment**

Prior to soliciting acceptances or rejections from the holders of claims, the Oversight Board is required to issue, and have the court approve, a disclosure statement providing adequate information to holders of claims and interests in order to solicit acceptances for the Plan.[279]  The type of adequate information provided should enable a hypothetical investor of the relevant class to make an informed judgment about the Plan.  The same disclosure statement must be transmitted to each holder of a claim of a particular class, but alternate disclosure statements differing in the amount or kind of information provided may be transmitted to different classes.[280]

B.    **Overview of the Plan of Adjustment**

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE DEBTORS URGE ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS **EXHIBIT A**.

---

[276] PROMESA § 301(c)(3).

[277] 11 U.S.C. §§ 1126(f)-(g).

[278] 11 U.S.C. § 1126(c).

[279] 11 U.S.C. §§ 1125, 1126(b).

[280] 11 U.S.C. § 1126(c).

Bankruptcy Code section 1123, made applicable to the Title III Case by PROMESA, provides that except for administrative claims, a plan of adjustment must categorize claims against a debtor into individual classes. Although PROMESA and the Bankruptcy Code give the Debtors significant flexibility in classifying claims, Bankruptcy Code section 1122 dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan identifies 52 Classes of Claims (certain of which encompass numerous individual series of the relevant debt, as set forth on the Exhibits to the Plan). These Classes take into account the differing nature and priority of Claims against the Debtors. Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan (as is required by Bankruptcy Code section 1123(a)(1)) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims. Only certain holders of Claims that are impaired under the Plan are entitled to vote and receive Distributions under the Plan.

For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of Article LIX of the Plan, the "holder" of a Claim means any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim. Solely for purposes of Article LXII of the Plan and section 1126 of the Bankruptcy Code, the "holder" of any Bond Claims will be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Bond Claims.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim. Upon Confirmation, the Plan will be binding on all holders of a Claim regardless of whether such holders voted on the Plan or voted to accept the Plan.

The following discussion sets forth the classification and treatment of all Claims against the Debtors. It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan.

## C.    Compromise and Settlement of Disputes / Restructuring of Entities

### 1.    Litigation Resolution

The Plan sets forth the terms and conditions for the global compromise and integrated settlement of the following disputes:

- The Debt Related Objections challenging, among other things, the validity, priority, secured status, and related rights of the 2011 CW Bond Claims, 2011 CW Series

D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond Claims, 2011 PBA Bond Claims, 2012 PBA Bond Claims, and PRIFA BANs[281]

- The Invalidity Actions[282]

- The Lien Challenge Actions[283]

- Disputes raised by certain holders of GO Bond Claims asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, MBA, and PRIFA, as applicable[284]

- Disputes between the Commonwealth and PBA regarding (i) the PBA Litigation, (ii) the amount of the Rent Claim, if any, and (iii) the ownership of the PBA Property and claims PBA may assert against the Commonwealth under leases, agreements, and applicable law[285]

- The PRIFA BANs Litigation[286]

2.     **Allowance of Bond Claims**

For purposes of confirmation and consummation of the Plan, and distributions to be made under the Plan, on the Effective Date, the following claims will be allowed or disputed in the following amounts:[287]

- Vintage PBA Bond Claims and Vintage PBA Bond Claims (Insured) will be allowed in the aggregate amount of $2,661,239,877.06

- 2011 PBA Bond Claims will be allowed in the aggregate amount of $1,335,422,892.78

- 2012 PBA Bond Claims will be allowed in the aggregate amount of $674,308,470.06

- Vintage CW Bond Claims and Vintage CW Bond Claims (Insured) will be allowed in the aggregate amount of $5,842,761,317.99

---

[281] *See* section III.B.1.a)of this Disclosure Statement for a summary of such dispute.

[282] *See* section V.I.5 of this Disclosure Statement for a summary of such dispute.

[283] *See* section V.F.2 of this Disclosure Statement for a summary of such dispute.

[284] *See* section V.F.5 of this Disclosure Statement for a summary of such disputes..

[285] *See* section III.B.1.c)(ii) of this Disclosure Statement for a summary of such dispute.

[286] *See* section V.H.7of this Disclosure Statement for a summary of such dispute.

[287] Amounts below include principal and accrued and unpaid interest up to, but not including, the Commonwealth Petition, HTA Petition Date, ERS Petition Date, or PBA Petition Date, as applicable.

- ERS Bond Claims will be disputed in the aggregate amount of $3,168,698,777.00

- 2011 CW Bond Claims will be allowed in the aggregate amount of $476,425,522.88

- 2011 CW Series D/E/PIB Bond Claims will be allowed in the aggregate amount of $645,673,111.48

- 2012 CW Bond Claims will be allowed in the amount of $2,938,901,920.90

- 2014 CW Bond Claims will be allowed in the amount of $3,836,611,111.11

- 2014 CW Guarantee Bond Claims will be allowed in the amount of $345,380,885.83

3.     **Releases, Injunctions and Exculpation**

The releases, injunctions, and exculpation provided in Article LXXIV of the Plan are integral to obtaining the value provided under the settlements in the Plan.  The releases, injunctions, and exculpation under the Plan and the Plan Support Agreements constitute an essential component of the compromises reached and are not severable from the other provisions of the Plan.

4.     **Purchase and Sale of Certain ERS Assets**

On the Effective Date, the Commonwealth will purchase all of ERS's right, title, and interest in ERS's assets subject to a valid and perfected lien or security interest for an aggregate purchase price in an amount equal to the sum of (a) 100% of cash in ERS accounts as of the Effective Date, (b) 95% of the face amount of performing employee loans as of the Effective Date, (c) 100% of the market price of the COFINA Senior Lien Bonds held by ERS as of the Effective Date, and (d) 50% of the book value of the ERS portfolio of private equity interests held by ERS as of the Effective Date.

5.     **Conveyance of the Conveyed Commonwealth Share**

On the Effective Date, pursuant to the Confirmation Order and the COFINA Junior Lien Bonds Legislation, the Commonwealth will transfer the Conveyed Commonwealth Share to COFINA in consideration for the issuance of, and performance with respect to, the COFINA Junior Lien Bonds.  From and after the Effective Date and until such time as the COFINA Junior Lien Bonds and any securities issued to refinance the COFINA Junior Lien Bonds, together with such other amounts as may be due and owing in accordance with the COFINA Junior Lien Bonds Indenture, have been paid or satisfied in full in accordance with the terms and provisions of the COFINA Junior Lien Bonds Indenture, COFINA will be the sole and exclusive owner of the Conveyed Commonwealth Share.   Upon such payment or satisfaction, the Conveyed

274

Commonwealth Share will be transferred to the Commonwealth, as evidenced by a residual certificate to be executed and delivered on the Effective Date.

**D.     Provisions for Payment of Administrative Expense Claims**

Administrative Expense Claims and Professional Claims are not classified and therefore are excluded from the classes outlined in Article IV of the Plan.

**1.     Administrative Expense Claims**

On either the Effective Date or the date on which an Administrative Expense Claim becomes an allowed claim, whichever date is later, the Debtors will pay in full the Administrative Expense Claim or satisfy the Allowed Administrative Expense Claim with an agreement between the Debtors and claimant.  However, if the Allowed Administrative Expense Claim was incurred in the ordinary course by the Debtors before the Effective Date, the claim will be paid in full and performed by the Debtors in accordance with the terms of any agreement or documents governing the transactions.  Furthermore, if any ordinary course expense is not billed, or a written request for payment is not made, within one hundred twenty (120) days after the Effective Date, the ordinary course expense will be barred and the holder of the claim will not be entitled to receive payment for the expense.

**2.     Professional Compensation and Reimbursement Claims**

All entities awarded compensation or reimbursement will be paid in full in the amount allowed by the Title III Court as soon as reasonably practicable on the later of (i) the Effective Date and (ii) the date of the Final Order from the Court allowing the claims or upon mutually agreed upon terms.  However, to qualify for repayment, each professional must file an application to be compensated for the professional services rendered and expenses charged within 120 days after the Effective Date.  The Debtors will compensate for professional services and reimburse expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

**3.     Consummation Costs**

In order to compensate certain parties for the cost of negotiation, confirmation, and consummation of the PSA and the Plan, each Initial PSA Creditor will be entitled to receive a pro rata share of cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to 1.25% of the aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (insured or otherwise), without duplication.  Such holder's pro rata share will be based on the holder's respective position as of 5:00pm (EST) on February 9, 2020.

**4.     AFSCME Professional Fees**

AFSCME will be reimbursed its reasonable professional fees and expenses incurred in order to compensate AFSCME for the cost of negotiation, confirmation, and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions.

5.      **PSA Restriction Fee**

In exchange for executing and delivering the PSA (or the Joinder Agreement or Annex Agreement, as applicable) and agreeing to all of its terms and conditions, including the agreement to "lock-up" their bonds, each of the PSA Restriction Fee Creditors will be entitled to receive the PSA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan.  The Restriction Fee available to each PSA Restriction Fee Creditor will equal the Restriction Fee Percentage times the aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication, and to the extent any such Claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such Claim) held by such PSA Restriction Fee Creditor as of the expiration of the PSA Restriction Fee Period.

Each PSA Restriction Fee Creditor who acquired any PBA Bond Claims, CW Bond Claims, or CW Guarantee Bond Claims (without duplication, and, to the extent such claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such Claim) after the Joinder Deadline will be entitled to receive such PSA Restriction Fee equal to: the Restriction Fee Percentage times the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication, and to the extent any such Claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such Claim) held by such PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment and the entry of the Confirmation Order.

If a PSA Restriction Fee Creditor sold any PBA Bond Claims, CW Bond Claims, or CW Guarantee Bond Claims (without duplication, and, to the extent such claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote any such Claim) for which it would have been entitled to receive the PSA Restriction Fee, the purchasing party will be entitled to receive the PSA Restriction Fee on account of such sold bonds.

The aggregate PSA Restriction Fee and Consummation Costs cannot exceed $350,000,000.00.

If the PSA is terminated pursuant to Section 7.1(c)(i) of the PSA or the Oversight Board terminates the PSA for any reason (other than (i) a breach of the PSA by a non-Governmental Party, or (ii) the denial of confirmation of the Plan), Consummation Costs up to $100,000,000.00 will be paid, ratably, in cash, as an allowed administrative expense claim under the plan of adjustment for the Commonwealth.

In all other circumstances, upon termination of the PSA, no Consummation Costs or PSA Restriction Fee will be payable to the party to the PSA terminating the PSA.

6.      **Retail Support Fee**

If a Class of Retail Investors (Classes 3, 7, 12, 25, 26, 29, and 35) votes to accept the Plan, the members of such Class will be entitled to receive their pro rata share of such Class's allocable share of the aggregate Retail Support Fee of up to $50,000,000.00 in the amount equal to: the Restriction Fee Percentage times the aggregate amount of Retail CW Bond Claims, and Retail

276

PBA Bond Claims (without duplication, and to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim ), and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim in accordance with the definitive issuance documents and applicable law held by such accepting Class of Retail Investors.

If the entire $50,000,000.00 of the Retail Support Fee is not fully allocated, the balance of the Retail Support Fee will be reallocated to PSA Restriction Fee Creditors and those Retail Investors that are members of Classes that voted to accept the Plan.

7.      **Non-Severability**

The allowance and payment of the Consummation Costs and PSA Restriction Fees provided in the Plan compensate the PSA Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied in the Plan and are not severable from the other terms and provisions set forth in the Plan.

## E.      **Classification and Treatment of Claims**

| Class 1:<br><br>Vintage PBA Bond Claims | **Classification:** Class 1 consists of all claims against PBA on account of Vintage PBA Bonds that are (a) <u>not</u> insured by Ambac, Assured, FGIC, or National, and (b) <u>not</u> held by a Retail Investor[288] in the aggregate amount equal to or less than $1,000,000.00.<br><br>The Vintage PBA Bonds include the following: |
|---|---|

|  | Issue Date |
|---|---|
| Government Facilities Revenue Refunding Bonds, Series C | 1/30/02 |
| Government Facilities Revenue Bonds, Series D | 1/30/02 |
| Government Facilities Revenue Refunding Bonds, Series F | 10/24/02 |
| Government Facilities Revenue Bonds, Series G | 10/24/02 |
| Government Facilities Revenue Refunding Bonds, Series H | 4/03/03 |
| Government Facilities Revenue Bonds, Series I | 6/10/04 |
| Government Facilities Revenue Refunding Bonds, Series K | 5/27/04 |
| Government Facilities Revenue Bonds, Series L | 6/01/93 |
| Government Facilities Revenue Refunding Bonds, Series M-1 | 12/20/07 |
| Government Facilities Revenue Refunding Bonds, Series M-2 | 12/20/07 |
| Government Facilities Revenue Refunding Bonds, Series M-3 | 12/20/07 |
| Government Facilities Revenue Bonds, Series N | 12/20/07 |
| Government Facilities Revenue Refunding Bonds, Series P | 7/01/09 |

---

[288] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.

| Government Facilities Revenue Refunding Bonds, Series Q | 10/28/09 |

*Treatment:*  On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim will receive its Pro Rata Share of the Vintage PBA Bond Recovery,[289] consisting of $611,331,186.05 in Cash.

*Voting*:  Class 1 is Impaired by the Plan.  Class 1 and each holder of an Allowed Vintage PBA Bond Claim are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: $2,257,221,339.10[290]

*Projected Recovery from PBA*:  23.0%. Total recovery on account of both an Allowed Vintage PBA Bond Claim, and an Allowed Vintage CW Guarantee Bond Claim, or an Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 77.582%.

---

**Class 2:**

Vintage PBA Bond Claims (Insured)

*Classification:*  Class 2 consists of all claims against PBA on account of Vintage PBA Bonds, of which the payment of principal and interest has been insured by Ambac, Assured, FGIC, or National.

*Treatment:*  On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Insured) will receive its Pro Rata Share of the Vintage PBA Bond Recovery,[291] consisting of $611,331,186.05 in Cash.

*Voting*:  Class 2 is Impaired by the Plan.  Class 2 and each holder of an Allowed Vintage PBA Bond Claim (Insured) are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: $404,018,537.96

*Projected Recovery from PBA*:  23.0%.  Total recovery on account of both an Allowed Vintage PBA Bond Claim (Insured), and an Allowed Vintage CW Guarantee Bond Claim (Insured) is approximately 77.582%.

---

[289] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Insured), and Retail Vintage PBA Bond Claims.

[290] Includes Retail Vintage PBA Bond Claims.

[291] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Insured), and Retail Vintage PBA Bond Claims.

| Class 3:<br><br>Retail Vintage PBA Bond Claims | **Classification:** Class 3 consists of all claims against PBA on account of Vintage PBA Bonds held by a Retail Investor[292] in the aggregate amount equal to or less than $1,000,000.00.<br><br>**Treatment:** On the Effective Date, each holder of an Allowed Retail Vintage PBA Bond Claim will receive its Pro Rata Share of (a) the Vintage PBA Bond Recovery,[293] consisting of $611,331,186.05 in Cash, and (b) the Retail Support Fee,[294] consisting of $50,000,000.00 in Cash.<br><br>If Class 3 votes to reject the Plan, holders of Retail Vintage PBA Bond Claims in Class 3 will not receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>**Voting**: Class 3 is Impaired by the Plan. Class 3 and each holder of an Allowed Retail Vintage PBA Bond Claim are entitled to vote to accept or reject the Plan.<br><br>**Allowed Amount of Claims**: (Amount Included in Vintage PBA Bond Claims)<br><br>**Projected Recovery from PBA**: 23.0%.[295] Total recovery on account of both a Retail Vintage PBA Bond Claim, and (x) an Allowed Vintage CW Guarantee Bond Claim or (y) an Allowed Vintage CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 77.582%. |
| Class 4:<br><br>2011 PBA Bond Claims | **Classification:** Class 4 consists of all claims against PBA on account of 2011 PBA Bonds that are <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2011 PBA Bonds include the following:<br><br><table><tr><td></td><td>**Issue Date**</td></tr><tr><td>Government Facilities Revenue Bonds, Series R</td><td>8/24/11</td></tr><tr><td>Government Facilities Revenue Bonds, Series S</td><td>8/24/11</td></tr></table> |

---

[292] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.

[293] The Vintage PBA Bond Recovery is shared among the Vintage PBA Bond Claims, Vintage PBA Bond Claims (Insured), and Retail Vintage PBA Bond Claims.

[294] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

[295] Does not account for Retail Support Fee.

| | Government Facilities Revenue Bonds, Series T | 12/22/11 |
|---|---|---|
| | **Treatment:** On the Effective Date, each holder of an Allowed 2011 PBA Bond Claim will receive its Pro Rata Share of the 2011 PBA Bond Recovery,[296] consisting of $306,768,911.72 in Cash. **Voting:** Class 4 is Impaired by the Plan. Class 4 and each holder of an Allowed 2011 PBA Bond Claim are entitled to vote to accept or reject the Plan. **Allowed Amount of Claims:** $1,335,422,892.78 **Projected Recovery from PBA:** 23.0%. Total recovery on account of both an Allowed 2011 PBA Bond Claim, and (x) an Allowed 2011 CW Guarantee Claim or (y) an Allowed 2011 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 76.810%. | |
| **Class 5:** Retail 2011 PBA Bond Claims | **Classification:** Class 5 consists of all claims against PBA on account of 2011 PBA Bonds held by a Retail Investor[297] in the aggregate amount equal to or less than $1,000,000.00. **Treatment:** On the Effective Date, each holder of an Allowed Retail 2011 PBA Bond Claim will receive its Pro Rata Share of (a) the 2011 PBA Bond Recovery,[298] consisting of $306,768,911.72 in Cash, and (b) the Retail Support Fee,[299] consisting of $50,000,000.00 in Cash. If Class 5 votes to reject the Plan, holders of Retail 2011 PBA Bond Claims in Class 5 will not receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan. **Voting:** Class 5 is Impaired by the Plan. Class 5 and each holder of an Allowed Retail 2011 PBA Bond Claim are entitled to vote to accept or reject the Plan. | |

---

[296] The 2011 PBA Bond Recovery is shared among the 2011 PBA Bond Claims and Retail 2011 PBA Bond Claims.

[297] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.

[298] The 2011 PBA Bond Recovery is shared among the 2011 PBA Bond Claims and Retail 2011 PBA Bond Claims.

[299] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

|  | *Allowed Amount of Claims*: (Amount Included in 2011 PBA Bond Claims)<br><br>*Projected Recovery from PBA*: 23.0%.[300]  Total recovery on account of both a Retail 2011 PBA Bond Claim, and (x) an Allowed 2011 CW Guarantee Bond Claim, or (y) an Allowed 2011 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 76.810%. |
|---|---|
| **Class 6:**<br>2012 PBA Bond Claims | *Classification:*  Class 6 consists of all claims against PBA on account of 2012 PBA Bonds that are <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2012 PBA Bonds include the following:<br><br><table><tr><td></td><td>**Issue Date**</td></tr><tr><td>Government Facilities Revenue Refunding Bonds, Series U</td><td>6/21/12</td></tr></table><br>*Treatment:*  On the Effective Date, each holder of an Allowed 2012 PBA Bond Claim will receive its Pro Rata Share of the 2012 PBA Bond Recovery,[301] consisting of $154,899,902.23 in Cash.<br><br>*Voting*:  Class 6 is Impaired by the Plan.  Class 4 and each holder of an Allowed 2012 PBA Bond Claim are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*: $674,308,470.06<br><br>*Projected Recovery from PBA*:  23.0%.  Total recovery on account of both an Allowed 2012 PBA Bond Claim and (x) an Allowed 2012 CW Guarantee Claim, or (y) an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 72.217%. |
| **Class 7:**<br>Retail 2012 PBA Bond Claims | *Classification:*  Class 7 consists of all claims against PBA on account of 2012 PBA Bonds held by a Retail Investor[302] in the aggregate amount equal to or less than $1,000,000.00.<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed Retail 2012 PBA Bond Claim will receive its Pro Rata Share of (a) the 2012 |

---

[300] Does not account for Retail Support Fee.

[301] The 2012 PBA Bond Recovery is shared among the 2012 PBA Bond Claims and Retail 2012 PBA Bond Claims.

[302] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.

|  | PBA Bond Recovery,[303] consisting of $154,899,902.23 in Cash, and (b) the Retail Support Fee,[304] consisting of $50,000,000.00 in Cash.<br><br>If Class 7 votes to reject the Plan, holders of Retail 2012 PBA Bond Claims in Class 7 will not receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>*Voting*:  Class 7 is Impaired by the Plan.  Class 7 and each holder of an Allowed Retail 2012 PBA Bond Claim are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*: (Amount Included in 2012 PBA Bond Claims)<br><br>*Projected Recovery from PBA*:  23.0%.  Total recovery on account of both a Retail 2012 PBA Bond Claim, and (x) an Allowed 2012 CW Guarantee Bond Claim, or (y) an Allowed 2012 CW Guarantee Bond Claim (Taxable Election), as applicable, is approximately 72.217%. |
| **Class 8:**<br>PBA/DRA Secured Claim | *Classification:*  Class 8 consists of all claims against PBA on account of the loan allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of $66,222,028.00, the repayment of which is asserted to be secured by the proceeds of the sale or disposition of certain PBA Property and subordinated to all rights and recoveries with respect to the PBA Bonds.<br><br>*Treatment:*  PBA/DRA Secured Claims will not receive a distribution pursuant to the Plan.<br><br>*Voting*: Class 8 is Impaired by the Plan.  Class 8 and the holder of the PBA/DRA Secured Claim are deemed to have rejected the Plan.<br><br>*Allowed Amount of Claims*: $66,222,028.00<br><br>*Projected Recovery from PBA*: 0% |
| **Class 9:** | *Classification:*  Class 9 consists of all claims against PBA that are not Vintage PBA Bond Claims, Vintage PBA Bond Claims (Insured), Retail Vintage PBA Bond Claims, 2011 PBA Bond Claims, Retail 2011 PBA |

---

[303] The 2012 PBA Bond Recovery is shared among the 2012 PBA Bond Claims and Retail 2012 PBA Bond Claims.

[304] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| PBA General Unsecured Claims | bond Claims, 2012 PBA Bond Claims, Retail 2012 PBA Bond Claims, PBA/DRA Secured Claims, or PBA/DRA Unsecured Claims.<br><br>PBA General Unsecured Claims include claims held by an employee of PBA related to ordinary course employment matters, including, a claim related to termination, holiday pay, vacation, sick leave, back-pay, or other similar claims, but do not include claims related to retiree benefits.<br><br>***Treatment:***  On the Effective Date, Allowed PBA General Unsecured Claims will be unimpaired, and each holder of an Allowed PBA General Unsecured Claim will be entitled to receive:<br><br>    (a)  restatement of the claim, including payments of cash necessary to satisfy the requirement of reinstatement under Bankruptcy Code section 1124(2),<br><br>    (b)  payment of the allowed amount of such holder's claim, in full, in cash, on or as soon as practicable after the latest to occur of (1) the Effective Date, (2) the date on which such PBA General Unsecured Claim becomes allowed, (3) the date on which such Allowed PBA General Unsecured Claim is otherwise due and payable, and (4) such other date as may be mutually agreed to by such holder and Reorganized PBA, or<br><br>    (c)  such other treatment as may be mutually agreed to by and among such holder and Reorganized PBA.<br><br>***Voting***: Class 9 is Unimpaired by the Plan.  Class 9 and each holder of an Allowed PBA General Unsecured Claim are deemed to accept the Plan.<br><br>***Allowed Amount of Claims***: [＿＿＿]<br><br>***Projected Recovery from PBA***: 100% |
| **Class 10:**<br><br>PBA/DRA Unsecured Claim | ***Classification:***  Class 10 consists of all claims against PBA on account of the subordinated loans allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of $134,357,498.00.<br><br>***Treatment:***  PBA/DRA Unsecured Claims will not receive a distribution pursuant to the Plan.<br><br>***Voting***: Class 10 is Impaired by the Plan.  Class 5 and the holder of the PBA/DRA Unsecured Claim are deemed to have rejected the Plan. |

| | |
|---|---|
| | **Allowed Amount of Claims**: $134,357,498.00<br><br>**Projected Recovery from PBA**: 0% |
| **Class 11:**<br><br>Vintage CW Bond Claims | **Classification:** Class 11 consists of all claims against the Commonwealth on account of Vintage CW Bonds that are (a) <u>not</u> insured by Ambac, Assured, FGIC, National, or Syncora, and (b) <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The Vintage CW Bonds include the following:<br><br>*table below*<br><br>**Treatment:** On the Effective Date, each holder of an Allowed Vintage CW Bond Claim will receive its Pro Rata Share of the Vintage CW Bond |

| | Issue Date |
|---|---|
| Public Improvement Bonds of 1998 | 3/15/98 |
| Public Improvement Bonds of 1999 | 12/01/98 |
| Public Improvement Bonds of 2001, Series A | 6/07/01 |
| Public Improvement Bonds of 2002, Series A | 10/25/01 |
| Public Improvement Bonds of 2003, Series A | 8/08/02 |
| Public Improvement Bonds of 2004, Series A | 10/16/03 |
| Public Improvement Bonds of 2005, Series A | 10/07/04 |
| Public Improvement Bonds of 2006, Series A | 8/10/06 |
| Public Improvement Bonds of 2006, Series B | 8/30/06 |
| Public Improvement Bonds of 2007, Series A | 10/04/07 |
| Public Improvement Bonds of 2008, Series A | 9/18/08 |
| Public Improvement Refunding Bonds, Series 1998 | 1/29/98 |
| Public Improvement Refunding Bonds, Series 2000 | 4/05/00 |
| Public Improvement Refunding Bonds, Series 2001 | 6/07/01 |
| Public Improvement Refunding Bonds, Series 2002A | 10/25/01 |
| Public Improvement Refunding Bonds, Series 2003A | 8/08/02 |
| Public Improvement Refunding Bonds, Series 2003C-7 | 5/06/03 |
| Public Improvement Refunding Bonds, Series 2006A | 6/23/06 |
| Public Improvement Refunding Bonds, Series 2006B | 8/10/06 |
| Public Improvement Refunding Bonds, Series 2007A | 10/16/07 |
| Public Improvement Refunding Bonds, Series 2007A-4 | 10/16/07 |
| Public Improvement Refunding Bonds, Series 2008A | 5/07/08 |
| Public Improvement Refunding Bonds, Series 2008C | 5/07/08 |
| Public Improvement Refunding Bonds, Series 2009A | 9/17/09 |
| Public Improvement Refunding Bonds, Series 2009B | 11/17/09 |
| Public Improvement Refunding Bonds, Series 2009C | 12/16/09 |
| Public Improvement Refunding Bonds, Series 2011A | 2/17/11 |

| | |
|---|---|
| | Recovery,[305] consisting of $818,976,245.16 in Cash, $1,777,813,107.26 in New GO Bonds, and $1,777,919,756.81 in COFINA Junior Lien Bonds.<br><br>***Taxable Election***:  Each holder of an Allowed Vintage CW Bond Claim that is a Puerto Rico Investor[306] may elect to have its Allowed Vintage CW Bond Claim treated as a Vintage CW Bond Claim (Taxable Election) in Class 14 and have its distribution modified by the Vintage Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***:  Class 11 is Impaired by the Plan.  Class 11 and each holder of an Allowed Vintage CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $4,109,703,562.03<br><br>***Projected Recovery from CW – Taxable Election:*** 74.874%<br><br>***Projected Recovery from CW – No Taxable Election***:  74.874% |
| **Class 12:**<br><br>Retail Vintage CW Bond Claims | ***Classification:***  Class 12 consists of all claims against the Commonwealth on account of Vintage CW Bonds held by a Retail Investor[307] in the aggregate amount equal to or less than $1,000,000.00.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed Retail Vintage CW Bond Claim will receive its Pro Rata Share of (a) the Vintage CW Bond Recovery,[308] consisting of $818,976,245.16 in Cash, $1,777,813,107.26 in New GO Bonds, and $1,777,919,756.81 in |

---

[305] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Insured), and Retail Vintage CW Bond Claims.

[306] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

[307] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.

[308] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Insured), and Retail Vintage CW Bond Claims.

|  | COFINA Junior Lien Bonds, and (b) the Retail Support Fee,[309] consisting of $50,000,000.00 in Cash. |
|---|---|
|  | If Class 12 votes to reject the Plan, holders of Retail Vintage CW Bond Claims in Class 12 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan. |
|  | *Taxable Election*:  Each holder of an Allowed Retail Vintage CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail Vintage CW Bond Claim treated as a Vintage CW Bond Claim (Taxable Election) in Class 14 and have its distribution modified by the Vintage Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |
|  | *Voting*:  Class 12 is Impaired by the Plan.  Class 12 and each holder of an Allowed Retail Vintage CW Bond Claim are entitled to vote to accept or reject the Plan. |
|  | *Allowed Amount of Claims*: (Amount Included in Vintage CW Bond Claims) |
|  | *Projected Recovery from CW*:  74.874% |
| **Class 13:**<br><br>Vintage CW Bond Claims (Insured) | *Classification:*  Class 13 consists of all claims against the Commonwealth on account of Vintage CW Bonds that are insured by Ambac, Assured, FGIC, National, or Syncora.<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Insured) will receive its Pro Rata Share of the Vintage CW Bond Recovery,[310] consisting of $818,976,245.16 in Cash, $1,777,813,107.26 in New GO Bonds, and $1,777,919,756.81 in COFINA Junior Lien Bonds. |

---

[309] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

[310] The Vintage CW Bond Recovery is shared among the Vintage CW Bond Claims, Vintage CW Bond Claims (Insured), and Retail Vintage CW Bond Claims.

| | |
|---|---|
| | *Voting*:  Class 13 is Impaired by the Plan.  Class 13 and each holder of an Allowed Vintage CW Bond Claim (Insured) are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*: $1,733,057,755.96<br><br>*Projected Recovery from CW:* 74.874% |
| **Class 14:**<br><br>Vintage CW Bond Claims (Taxable Election) | *Classification:*  Class 14 consists of all claims against the Commonwealth by a holder of an Allowed Vintage CW Bond Claim or an Allowed Retail Vintage CW Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such Vintage CW Bond Claim or Retail Vintage CW Bond Claim will be a Vintage CW Bond Claim (Taxable Election) up to such Vintage CW Bond Claim's or Retail Vintage CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a Vintage CW Bond Claim or Retail Vintage CW Bond Claim (as applicable).<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the Vintage Taxable Bond Distribution.<br><br>*Voting*:  Class 14 is Impaired by the Plan.  However, holders of Claims in Class 14 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>*Allowed Amount of Claims*: The amount of Claims in Class 14 entitled to a distribution depends upon how many holders of Vintage CW Bond Claims in Class 11 elect to be treated under Class 14.<br><br>*Projected Recovery from CW*:  74.874% |
| **Class 15:**<br><br>Vintage CW Guarantee Bond Claims | *Classification:*  Class 15 consists of all claims against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bonds, including, any obligation for which the Commonwealth has pledged its good faith, and credit as authorized by the Legislature on or prior to December 31, 2012 (but not including any Vintage CW Guarantee Bond Claim (Insured)).<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim will receive its Pro Rata Share of the Vintage |

287

| | |
|---|---|
| | CW Guarantee Bond Recovery,[311] consisting of $272,070,193.05 in Cash, $590,603,156.26 in New GO Bonds, and $590,638,586.06 in COFINA Junior Lien Bonds.<br><br>***Taxable Election***:  Each holder of an Allowed Vintage CW Guarantee Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Vintage CW Guarantee Bond Claim treated as a Vintage CW Guarantee Bond Claim (Taxable Election) in Class 17 and have its distribution modified by the Vintage Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***:  Class 15 is Impaired by the Plan.  Class 15 and each holder of an Allowed Vintage CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $1,738,699,949.76<br><br>***Projected Recovery from CW***: 70.896%.  Total recovery on account of both an Allowed Vintage PBA Bond Claim and an Allowed Vintage CW Guarantee Bond Claim is approximately 77.582%. |
| **Class 16:**<br><br>Vintage CW Guarantee Bond Claims (Insured) | ***Classification:***  Class 16 consists of all claims against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bonds that are insured by Ambac, Assured, FGIC, or National.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Insured) will receive its Pro Rata Share of the Vintage CW Guarantee Bond Recovery,[312] consisting of $272,070,193.05 in Cash, $590,603,156.26 in New GO Bonds, and $590,638,586.06 in COFINA Junior Lien Bonds.<br><br>***Voting***:  Class 16 is Impaired by the Plan.  Class 16 and each holder of an Allowed Vintage CW Guarantee Bond Claim (Insured) are entitled to vote to accept or reject the Plan. |

---

[311] The Vintage CW Guarantee Bond Recovery is shared among the Vintage CW Guarantee Bond Claims and Vintage CW Guarantee Bond Claims (Insured).

[312] The Vintage CW Guarantee Bond Recovery is shared among the Vintage CW Guarantee Bond Claims and Vintage CW Guarantee Bond Claims (Insured).

| | |
|---|---|
| | *Allowed Amount of Claims*: $311,208,741.24<br><br>*Projected Recovery from CW:* 70.896%.  Total recovery on account of both an Allowed Vintage PBA Bond Claim (Insured) and an Allowed Vintage CW Guarantee Bond Claim (Insured) is approximately 77.582%. |
| **Class 17:**<br><br>Vintage CW Guarantee Bond Claims (Taxable Election) | *Classification:*  Class 17 consists of all claims against the Commonwealth by a holder of an Allowed Vintage CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such Vintage CW Guarantee Bond Claim will be a Vintage CW Guarantee Bond Claim (Taxable Election) up to such Vintage CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a Vintage CW Guarantee Bond Claim.<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the Vintage Taxable Bond Distribution.<br><br>*Voting*:  Class 17 is Impaired by the Plan.  However, holders of Claims in Class 17 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>*Allowed Amount of Claims*: The amount of Claims in Class 17 entitled to a distribution depends upon how many holders of Vintage CW Guarantee Bond Claims in Class 15 elect to be treated under Class 17.<br><br>*Projected Recovery from CW*:  70.896%.  Total recovery on account of both an Allowed Vintage PBA Bond Claim and an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) is approximately 77.582%. |
| **Class 18:**<br><br>2011 CW Bond Claims | *Classification:*  Class 18 consists of all claims against the Commonwealth on account of 2011 CW Bonds that are (a) <u>not</u> insured by Assured, and (b) <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2011 CW Bonds include the following:<br><br>{{TABLE}} |

Table inside Class 18 cell:

| | Issue Date |
|---|---|
| Public Improvement Refunding Bonds, Series 2011A | 7/12/11 |
| Public Improvement Refunding Bonds, Series 2011C | 3/17/11 |

| | |
|---|---|
| | *Treatment:*  On the Effective Date, each holder of an Allowed 2011 CW Bond Claim will receive its Pro Rata Share of the 2011 CW Bond Recovery,[313] consisting of $62,790,793.58 in Cash, $136,304,680.98 in New GO Bonds, and $136,312,857.80 in COFINA Junior Lien Bonds. |
| | *Taxable Election*:  Each holder of an Allowed 2011 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2011 CW Bond Claim treated as a 2011 CW Bond Claim (Taxable Election) in Class 21 and have its distribution modified by the 2011 Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |
| | *Voting*:  Class 18 is Impaired by the Plan.  Class 18 and each holder of an Allowed 2011 CW Bond Claim are entitled to vote to accept or reject the Plan. |
| | *Allowed Amount of Claims*: $250,507,930.17 |
| | *Projected Recovery from CW – Taxable Election:* 70.401%. |
| | *Projected Recovery from CW – No Taxable Election*: 70.401%. |
| **Class 19:**<br><br>Retail 2011 CW Bond Claims | *Classification:*  Class 19 consists of all claims against the Commonwealth on account of 2011 CW Bonds held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed Retail 2011 CW Bond Claim will receive its Pro Rata Share of (a) the 2011 CW Bond Recovery,[314] consisting of $62,790,793.58 in Cash, $136,304,680.98 in New GO Bonds, and $136,312,857.80 in COFINA Junior Lien Bonds, and (b) the Retail Support Fee,[315] consisting of $50,000,000.00 in Cash. |

[313] The 2011 CW Bond Recovery is shared among the 2011 CW Bond Claims, 2011 CW Bond Claims (Insured), and Retail 2011 CW Bond Claims.

[314] The 2011 CW Bond Recovery is shared among the 2011 CW Bond Claims, 2011 CW Bond Claims (Insured), and Retail 2011 CW Bond Claims.

[315] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | If Class 19 votes to reject the Plan, holders of Retail 2011 CW Bond Claims in Class 19 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.<br><br>***Taxable Election***:  Each holder of an Allowed Retail 2011 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail 2011 CW Bond Claim treated as a 2011 CW Bond Claim (Taxable Election) in Class 21 and have its distribution modified by the 2011 Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***:  Class 19 is Impaired by the Plan.  Class 19 and each holder of an Allowed Retail 2011 CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: (Amount Included in 2011 CW Bond Claims)<br><br>***Projected Recovery from CW – Taxable Election:*** 70.401%<br><br>***Projected Recovery from CW – No Taxable Election***: 70.401% |
| **Class 20:**<br><br>2011 CW Bond Claims (Insured) | ***Classification:***  Class 20 consists of all claims against the Commonwealth on account of 2011 CW Bonds that are insured by Assured.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Insured) will receive its Pro Rata Share of the 2011 CW Bond Recovery,[316] consisting of $62,790,793.58 in Cash, $136,304,680.98 in New GO Bonds, and $136,312,857.80 in COFINA Junior Lien Bonds.<br><br>***Voting***:  Class 20 is Impaired by the Plan.  Class 20 and each holder of an Allowed 2011 CW Bond Claim (Insured) are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $225,917,592.71 |

---

[316] The 2011 CW Bond Recovery is shared among the 2011 CW Bond Claims, 2011 CW Bond Claims (Insured), and Retail 2011 CW Bond Claims.

| | *Projected Recovery from CW:* 70.401%. |
|---|---|
| **Class 21:** <br><br> 2011 CW Bond Claims (Taxable Election) | *Classification:*  Class 21 consists of all claims against the Commonwealth by a holder of an Allowed 2011 CW Bond Claim or an Allowed Retail 2011 CW Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor. <br><br> If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2011 CW Bond Claim or Retail 2011 CW Bond Claim will be a 2011 CW Bond Claim (Taxable Election) up to such 2011 CW Bond Claim's or Retail 2011 CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2011 CW Bond Claim or Retail 2011 CW Bond Claim, as applicable. <br><br> *Treatment:*  On the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2011 Taxable Bond Distribution. <br><br> *Voting*:  Class 21 is Impaired by the Plan.  However, holders of Claims in Class 21 elected to be treated in such Class and, therefore, are deemed to accept the Plan. <br><br> *Allowed Amount of Claims*: The amount of Claims in Class 21 entitled to a distribution depends upon how many holders of 2011 CW Bond Claims in Class 18 and Retail 2011 CW Bond Claims in Class 19 elect to be treated under Class 21. <br><br> *Projected Recovery from CW*:  70.401% |
| **Class 22:** <br><br> 2011 CW Guarantee Bond Claims | *Classification:*  Class 22 consists of all claims against the Commonwealth on account of the Commonwealth's good faith, credit and taxing power guarantee of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2011 up to and including December 31, 2011, and (b) the 2011 PBA Bonds. <br><br> *Treatment:*  On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim will receive its Pro Rata Share of the 2011 CW Guarantee Bond Recovery, consisting of $134,596,119.40 in Cash, $292,177,882.65 in New Go Bonds, and $292,195,410.17 in COFINA Junior Lien Bonds. |

| | |
|---|---|
| | ***Taxable Election***:  Each holder of an Allowed 2011 CW Guarantee Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2011 CW Guarantee Bond Claim treated as a 2011 CW Guarantee Bond Claim (Taxable Election) in Class 23 and have its distribution modified by the 2011 CW Guarantee Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***:  Class 22 is Impaired by the Plan.  Class 22 and each holder of an Allowed 2011 CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $1,028,653,981.05<br><br>***Projected Recovery from CW***:  69.894%.  Total recovery on account of both an Allowed 2011 PBA Bond Claim and an Allowed 2011 CW Guarantee Claim is approximately 76.810%. |
| **Class 23:**<br><br>2011 CW Guarantee Bond Claims (Taxable Election) | ***Classification:***  Class 23 consists of all claims against the Commonwealth by a holder of an Allowed 2011 CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2011 CW Guarantee Bond Claim will be a 2011 CW Guarantee Bond Claim (Taxable Election) up to such 2011 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2011 CW Guarantee Bond Claim.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2011 CW Guarantee Taxable Bond Distribution.<br><br>***Voting***:  Class 23 is Impaired by the Plan.  However, holders of Claims in Class 23 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>***Allowed Amount of Claims***: The amount of Claims in Class 23 entitled to a distribution depends upon how many holders of 2011 CW Guarantee Bond Claims in Class 22 elect to be treated under Class 23. |

|  | *Projected Recovery from CW*: 69.894%.  Total recovery on account of both an Allowed 2011 PBA Bond Claim and an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) is approximately 76.810%. |
|---|---|
| **Class 24:**<br><br>2011 CW Series D/E/PIB Bond Claims | *Classification:*  Class 24 consists of all claims against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds that are (a) <u>not</u> insured by Assured, and (b) <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2011 CW Series D/E/PIB Bonds include the following:<br><br>
|  |  |

<table>
<tr><td></td><td>**Issue Date**</td></tr>
<tr><td>Public Improvement Bonds of 2011</td><td>7/12/11</td></tr>
<tr><td>Public Improvement Refunding Bonds, Series 2011D</td><td>7/12/11</td></tr>
<tr><td>Public Improvement Refunding Bonds, Series 2011E</td><td>7/12/11</td></tr>
</table>

*Treatment:*  On the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim will receive its Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery,[317] consisting of $89,205,408.70 in Cash, $193,644,865.49 in New GO Bonds, and $193,656,482.08 in COFINA Junior Lien Bonds.

*Taxable Election*:  Each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2011 CW D/E/PIB Bond Claim treated as a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) in Class 26 and have its distribution modified by the 2011 CW Series D/E/PIB Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

*Voting*:  Class 24 is Impaired by the Plan.  Class 24 and each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: $634,719,627.45

*Projected Recovery from CW – Taxable Election:* 73.800%.

*Projected Recovery from CW – No Taxable Election*: 73.800%.

---

[317] The 2011 CW Series D/E/PIB Bond Recovery is shared among the 2011 Series D/E/PIB Bond Claims, 2011 CW Series D/E/PIB Bond Claims (Insured), and Retail 2011 CW Series D/E/PIB Bond Claims.

| Class 25: | **Classification:** Class 25 consists of all claims against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds that are insured by Assured. |
|---|---|
| 2011 CW Series D/E/PIB Bond Claims (Insured) | **Treatment:** On the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Insured) will receive its Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery, consisting of $89,205,408.70 in Cash, $193,644,865.49 in New GO Bonds, and $193,656,482.08 in COFINA Junior Lien Bonds. |
| | **Voting**: Class 25 is Impaired by the Plan. Class 25 and each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Insured) are entitled to vote to accept or reject the Plan. |
| | **Allowed Amount of Claims**: $10,953,484.03 |
| | **Projected Recovery from CW:** 73.800% |
| Class 26: | **Classification:** Class 26 consists of all claims against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00. |
| Retail 2011 CW Series D/E/PIB Bond Claims | **Treatment:** On the Effective Date, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim will receive its Pro Rata Share of (a) the 2011 CW Series D/E/PIB Bond Recovery,[318] consisting of $89,205,408.70 in Cash, $198,644,865.49 in New GO Bonds, and $193,656,482.08 in COFINA Junior Lien Bonds and (d) the Retail Support Fee,[319] consisting of $50,000,000.00 in Cash. |
| | If Class 26 votes to reject the Plan, holders of Retail 2011 CW Series D/E/PIB Bond Claims in Class 26 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan. |
| | **Taxable Election**: Each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail 2011 CW Series D/E/PIB Bond Claim treated as a 2011 |

---

[318] The 2011 CW Series D/E/PIB Bond Recovery is shared among the 2011 Series D/E/PIB Bond Claims, 2011 CW Series D/E/PIB Bond Claims (Insured), and Retail 2011 CW Series D/E/PIB Bond Claims.

[319] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | CW Series D/E/PIB Bonds Claim (Taxable Election) in Class 27 and have its distribution modified by the 201 CW Series D/E/PIB Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***:  Class 26 is Impaired by the Plan.  Class 26 and each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: (Amount Included in 2011 CW Series D/E/PIB Bond Claims)<br><br>***Projected Recovery from CW – Taxable Election:*** 73.800%.<br><br>***Projected Recovery from CW – No Taxable Election***: 73.800%. |
| **Class 27:**<br><br>2011 CW Series D/E/PIB Bond Claims (Taxable Election) | ***Classification:***  Class 27 consists of all claims against the Commonwealth by a holder of an Allowed 2011 CW Series D/E/PIB Bond Claim or an Allowed Retail 2011 CW Series D/E/PIB Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[320]<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2011 CW Series D/E/PIB Bond Claim or Retail 2011 CW Series D/E/PIB Bond Claim will be a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) up to such 2011 CW Series D/E/PIB Bond Claim's or Retail 2011 CW Series D/E/PIB Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2011 CW Bond Claim or Retail 2011 CW Bond Claim (as applicable).<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2011 CW Bond Series D/E/PIB Claim (Taxable Election) will receive its Pro Rata Share of the 2011 CW Series D/E/PIB Taxable Bond Distribution. |

---

[320] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

| | |
|---|---|
| | ***Voting***: Class 27 is Impaired by the Plan. However, holders of Claims in Class 27 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>***Allowed Amount of Claims***: The amount of Claims in Class 27 entitled to a distribution depends upon how many holders of 2011 CW Series D/E/PIB Bond Claims in Class 23 and Retail 2011 CW Series D/E/PIB Bond Claims in Class 26 elect to be treated under Class 27.<br><br>***Projected Recovery from CW***: 73.800% |
| **Class 28:**<br>2012 CW Bond Claims | ***Classification:*** Class 28 consists of all claims against the Commonwealth on account of 2012 CW Bonds that are (a) <u>not</u> insured by Assured, and (b) <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2012 CW Bonds include the following:<br><br>*(see table below)*<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed 2012 CW Bond Claim will receive its Pro Rata Share of the 2012 CW Bond Recovery,[321] consisting of $384,506,437.66 in Cash, $834,676,938.11 in New GO Bonds, and $834,727,009.69 in COFINA Junior Lien Bonds.<br><br>***Taxable Election***: Each holder of an Allowed 2012 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2012 CW Bond Claim treated as a 2012 CW Bond Claim (Taxable Election) in Class 31 and have its distribution modified by the 2012 CW Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the |

| | Issue Date |
|---|---|
| Public Improvement Refunding Bonds, Series 2012A | 4/03/12 |
| Public Improvement Refunding Bonds, Series 2012B | 3/29/12 |
| The loan extended pursuant to that certain Credit Agreement, dated as of December 26, 2013, between the General Services Administration of the Commonwealth and Scotiabank de Puerto Rico, which, as of the Commonwealth Petition Date, was in the aggregate outstanding principal amount of approximately $23,764,000.00 | |
| Hacienda loans (Loan ID Nos. 200017-215-001-003-53 and 200017-215-001-003-56), which, as of the Commonwealth Petition Date, were in the aggregate outstanding principal amount of $198,203,767.00 | |

---

[321] The 2012 CW Bond Recovery is shared among the 2012 CW Bond Claims, 2012 CW Bond Claims (Insured), and Retail 2012 CW Bond Claims.

| | Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. |
|---|---|
| | **Voting**: Class 28 is Impaired by the Plan. Class 28 and each holder of an Allowed 2012 CW Bond Claim are entitled to vote to accept or reject the Plan. |
| | **Allowed Amount of Claims**: $2,545,325,618.54 |
| | **Projected Recovery from CW – Taxable Election:** 69.887% |
| | **Projected Recovery from CW – No Taxable Election**: 69.887% |
| **Class 29:** Retail 2012 CW Bond Claims | **Classification:** Class 29 consists of all claims against the Commonwealth on account of 2012 CW Bonds held by a Retail Investor[322] in the aggregate amount equal to or less than $1,000,000.00. |
| | **Treatment:** On the Effective Date, each holder of an Allowed Retail 2012 CW Bond Claim will receive its Pro Rata Share of (a) the 2012 CW Bond Recovery,[323] consisting of $384,506,437.66 in Cash, $834,676,938.11 in New GO Bonds, and $834,727,009.69 in COFINA Junior Lien Bonds, and (b) the Retail Support Fee,[324] consisting of $50,000,000.00 in Cash. |
| | If Class 29 votes to reject the Plan, holders of Retail 2012 CW Bond Claim in Class 29 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan. |
| | **Taxable Election**: Each holder of an Allowed Retail 2012 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail 2012 Bond Claim treated as a 2012 CW Bond Claim (Taxable Election) in Class 31 and have its distribution modified by the 2012 CW Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States |

---

[322] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.

[323] The 2012 CW Bond Recovery is shared among the 2012 CW Bond Claims, 2012 CW Bond Claims (Insured), and Retail 2012 CW Bond Claims.

[324] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | |
|---|---|
| | Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***: Class 29 is Impaired by the Plan.  Class 29 and each holder of an Allowed Retail 2012 CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: (Amount Included in 2012 CW Bond Claims)<br><br>***Projected Recovery from CW – Taxable Election:*** 69.887%<br><br>***Projected Recovery from CW – No Taxable Election***: 69.887% |
| **Class 30:**<br><br>2012 CW Bond Claims (Insured) | ***Classification:***  Class 30 consists of all claims against the Commonwealth on account of 2012 CW Bonds that are insured by Assured.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Insured) will receive its Pro Rata Share of the 2012 CW Bond Recovery,[325] consisting of $384,506,437.66 in Cash, $834,676,938.11 in New GO Bonds, and $834,727,009.69 in COFINA Junior Lien Bonds.<br><br>***Voting***: Class 30 is Impaired by the Plan.  Class 30 and each holder of an Allowed 2012 CW Bond Claim (Insured) are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $393,576,302.36<br><br>***Projected Recovery from CW:*** 69.887% |
| **Class 31:**<br><br>2012 CW Bond Claims (Taxable Election) | ***Classification:***  Class 31 consists of all claims against the Commonwealth by a holder of an Allowed 2012 CW Bond Claim or an Allowed Retail 2012 CW Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[326] |

---

[325] The 2012 CW Bond Recovery is shared among the 2012 CW Bond Claims, 2012 CW Bond Claims (Insured), and Retail 2012 CW Bond Claims.

[326] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

| | |
|---|---|
| | If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2012 CW Bond Claim or Retail 2012 CW Bond Claim will be a 2012 CW Bond Claim (Taxable Election) up to such 2012 CW Bond Claim's or Retail 2012 CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2012 CW Bond Claim or Retail 2012 CW Bond Claim (as applicable).<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2012 Taxable Bond Distribution.<br><br>***Voting***:  Class 31 is Impaired by the Plan.  However, holders of Claims in Class 31 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>***Allowed Amount of Claims***: The amount of Claims in Class 31 entitled to a distribution depends upon how many holders of 2012 CW Bond Claims in Class 28 and Retail 2012 CW Bond Claims in Class 29 elect to be treated under Class 31.<br><br>***Projected Recovery from CW***:  69.887% |
| **Class 32:**<br><br>2012 CW Guarantee Bond Claims | ***Classification:***  Class 32 consists of all claims against the Commonwealth on account of the Commonwealth's good faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered, or enacted pursuant to legislation or resolution between January 1, 2012 to and including December 31, 2013, and (b) 2012 PBA Bonds.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim will receive its Pro Rata Share the 2012 CW Guarantee Bond Recovery, consisting of $62,164,981.71 in Cash, $134,946,184.28 in New GO Bonds, and $134,954,279.60 in COFINA Junior Lien Bonds.<br><br>***Taxable Election***:  Each holder of an Allowed 2012 CW Guarantee Bond Claim that is a Puerto Rico Investor[327] may elect to have its Allowed 2012 CW Guarantee Bond Claim treated as a 2012 CW Guarantee Bond Claim (Taxable Election) in Class 33 and have its |

---

[327] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

300

| | distribution modified by the 2012 CW Guarantee Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***:  Class 32 is Impaired by the Plan.  Class 32 and each holder of an Allowed 2012 CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $519,408,567.83<br><br>***Projected Recovery from CW***:  63.931%.  Total recovery on account of both an Allowed 2012 PBA Bond Claim and an Allowed 2012 CW Guarantee Claim is approximately 72.217%. |
|---|---|
| **Class 33:**<br>2012 CW Guarantee Bond Claims (Taxable Election) | ***Classification:***  Class 33 consists of all claims against the Commonwealth by a holder of an Allowed 2012 CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[328]<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2012 CW Guarantee Bond Claim will be a 2012 CW Guarantee Bond Claim (Taxable Election) up to such 2012 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2012 CW Guarantee Bond Claim.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2012 Taxable Bond Distribution.<br><br>***Voting***:  Class 33 is Impaired by the Plan.  However, holders of Claims in Class 33 elected to be treated in such Class and, therefore, are deemed to accept the Plan. |

---

[328] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

| | |
|---|---|
| | ***Allowed Amount of Claims***: The amount of Claims in Class 33 entitled to a distribution depends upon how many holders of 2012 CW Guarantee Bond Claims in Class 32 elect to be treated under Class 33.<br><br>***Projected Recovery from CW***:  63.931%.  Total recovery on account of both an Allowed 2012 PBA Bond Claim and an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) is approximately 72.217%. |
| **Class 34:**<br>2014 CW Bond Claims | ***Classification:***  Class 34 consists of all claims against the Commonwealth on account of 2014 CW Bonds that are <u>not</u> held by a Retail Investor in the aggregate amount equal to or less than $1,000,000.00.<br><br>The 2014 CW Bonds include the following:<br><br>| | Issue Date |<br>|---|---|<br>| General Obligation Bonds of 2014, Series A | 3/17/14 |<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2014 CW Bond Claim will receive its Pro Rata Share of the 2014 CW Bond Recovery,[329] consisting of $511,689,820.74 in Cash, $1,110,763,438.54 in New GO Bonds, and $1,110,830,072.33 in COFINA Junior Lien Bonds.<br><br>***Taxable Election***:  Each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed 2014 Bond Claim treated as a 2014 CW Bond Claim (Taxable Election) in Class 36 and have its distribution modified by the 2014 CW Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.<br><br>***Voting***:  Class 34 is Impaired by the Plan.  Class 34 and each holder of an Allowed 2014 CW Bond Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $3,836,611,111.11[330] |

---

[329] The 2014 CW Bond Recovery is shared among the 2014 CW Bond Claims, Retail 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims.

[330] Includes Retail 2014 CW Bond Claims.

<table>
<tr><td></td><td>*Projected Recovery from CW – Taxable Election:* 65.358%

*Projected Recovery from CW – No Taxable Election*: 65.358%</td></tr>
<tr><td>**Class 35:**

Retail 2014 CW Bond Claims</td><td>*Classification:*  Class 35 consists of all claims against the Commonwealth on account of 2014 CW Bonds held by a Retail Investor[331] in the aggregate amount equal to or less than $1,000,000.00.

*Treatment:*  On the Effective Date, each holder of an Allowed Retail 2014 CW Bond Claim will receive its Pro Rata Share of (a) the 2014 CW Bond Recovery,[332] consisting of $511,689,820.74 in Cash, $1,110,763,438,54 in New GO Bonds, and $1,110,830,072.33 in COFINA Junior Lien Bonds, and (b) the Retail Support Fee,[333] consisting of $50,000,000.00 in Cash.

If Class 35 votes to reject the Plan, holders of Retail 2014 CW Bond Claim in Class 35 will <u>not</u> receive the Retail Support Fee, which will be reallocated to the PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan.

*Taxable Election:*  Each holder of an Allowed Retail 2014 CW Bond Claim that is a Puerto Rico Investor may elect to have its Allowed Retail 2014 Bond Claim treated as a 2014 CW Bond Claim (Taxable Election) in Class 36 and have its distribution modified by the 2014 CW Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

*Voting*: Class 35 is Impaired by the Plan.  Class 35 and each holder of an Allowed Retail 2014 CW Bond Claim are entitled to vote to accept or reject the Plan.

*Projected Recovery from CW – Taxable Election:* 65.358%</td></tr>
</table>

---

[331] A "Retail Investor" means an individual who purchased GO Bonds and/or PBA Bonds for his or her own brokerage account, trust account, custodial account or in a separately managed account.

[332] The 2014 CW Bond Recovery is shared among the 2014 CW Bond Claims, Retail 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims.

[333] The Retail Support Fee is shared among the Retail Vintage PBA Bond Claims, Retail 2011 PBA Bond Claims, Retail 2012 PBA Bond Claims, Retail Vintage CW Bond Claims, Retail 2011 CW bond Claims, Retail 2011 CW Series D/E/PIB Bond Claims, Retail 2012 CW Bond Claims, and Retail 2012 CW Bond Claims, to the extent the Class for such Claims votes to accept the Plan.

| | *Projected Recovery from CW – No Taxable Election*:  65.358% |
|---|---|
| **Class 36:**<br><br>2014 CW Bond Claims (Taxable Election) | *Classification:*  Class 36 consists of all claims against the Commonwealth by a holder of an Allowed 2014 CW Bond Claim or an Allowed Retail 2014 CW Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[334]<br><br>If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2014 CW Bond Claim or Retail 2014 CW Bond Claim will be a 2014 CW Bond Claim (Taxable Election) up to such 2014 CW Bond Claim's or Retail 2014 CW Bond Claim's, as applicable, ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2014 CW Bond Claim or Retail 2014 CW Bond Claim (as applicable).<br><br>*Treatment:*  On the Effective Date, each holder of an Allowed 2014 CW Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2014 Taxable Bond Distribution.<br><br>*Voting*:  Class 36 is Impaired by the Plan.  However, holders of Claims in Class 36 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>*Allowed Amount of Claims*: The amount of Claims in Class 36 entitled to a distribution depends upon how many holders of 2014 CW Bond Claims in Class 34 and Retail 2014 CW Bond Claims in Class 35 elect to be treated under Class 36.<br><br>*Projected Recovery from CW*:  65.358% |
| **Class 37:**<br><br>2014 CW Guarantee Bond Claims | *Classification:*  Class 37 consists of all claims against the Commonwealth on account of the Commonwealth's good faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Commonwealth Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered, or enacted pursuant to legislation or resolution between January 1, 2014 to but not including the Commonwealth Petition Date, (b) the Ports of the Americas Authority bond, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of $225,543,000.00, and (c) PRIFA Bond Anticipation Notes, Series |

---

[334] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

| | 2015, which, as of the Commonwealth Petition Date, were in the outstanding principal amount of $78,145,000.00.

*Treatment:*  On the Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim will receive its Pro Rata Share of the 2014 CW Bond Recovery,[335] consisting of $511,689,820.74 in Cash, $1,110,763,438,54 in New GO Bonds, and $1,110,830,072.33 in COFINA Junior Lien Bonds.

*Taxable Election*:  Each holder of an Allowed 2014 CW Guarantee Bond Claim that is a Puerto Rico Investor[336] may elect to have its Allowed 2014 CW Guarantee Bond Claim treated as a 2014 CW Guarantee Bond Claim (Taxable Election) in Class 38 and have its distribution modified by the 2014 CW Guarantee Taxable Bond Distribution.  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section IX of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

*Voting*:  Class 37 is Impaired by the Plan.  Class 37 and each holder of an Allowed 2014 CW Guarantee Bond Claim are entitled to vote to accept or reject the Plan.

*Allowed Amount of Claims*: $345,380,885.83

*Projected Recovery from CW*:  65.358% |
|---|---|
| **Class 38:**

2014 CW Guarantee Bond Claims (Taxable Election) | *Classification:*  Class 38 consists of all claims against the Commonwealth by a holder of an Allowed 2014 CW Guarantee Bond Claim that elects, deemed or otherwise, to receive a Taxable Bond Distribution and the holder is a Puerto Rico Investor.[337]

If the Taxable Bond Distributions elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims exceeds the Maximum Taxable Bond Election Amount, such 2014 CW Guarantee |

---

[335] The 2014 CW Bond Recovery is shared among the 2014 CW Bond Claims, Retail 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims.

[336] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

[337] A "Puerto Rico Investor" is an entity that is, or what is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion).

| | |
|---|---|
| | Bond Claim will be a 2014 CW Guarantee Bond Claim (Taxable Election) up to such 2014 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount, and the remainder will be a 2014 CW Guarantee Bond Claim.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election) will receive its Pro Rata Share of the 2014 Taxable Bond Distribution.<br><br>***Voting***:  Class 38 is Impaired by the Plan.  However, holders of Claims in Class 38 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>***Allowed Amount of Claims***: The amount of Claims in Class 38 entitled to a distribution depends upon how many holders of 2014 CW Guarantee Bond Claims in Class 37 elect to be treated under Class 38.<br><br>***Projected Recovery from CW***:  65.358% |
| **Class 39A:**<br><br>Retiree Claims | ***Classification:***  Class 39A consists of:<br><br>    (a)    All claims against ERS on account of being or having been a participant in ERS for retiree benefits that accrued as of July 1, 2013,<br><br>    (b)    All claims against JRS on account of being or having been a participant in JRS for (i) pension benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in JRS that such participant would be entitled to receive upon the participant's future retirement, and<br><br>    (c)    All claims against TRS on account of being or having been a participant in TRS for (i) pension benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in TRS that such participant would be entitled to receive upon the participant's future retirement,<br><br>held by a person who, as of July 1, 2019 receives a pension or annuity as a participant or a beneficiary of a participant in ERS, JRS, or TRS (excluding any participant in ERS whose hire date was on or after January 1, 2000 and any former employee of the Government of Puerto Rico who left public service and was not reimbursed for such person's contributions and/or any accrued benefit up to and including the date of separation).<br><br>***Treatment:*** |

306

Adjustment of Benefits.  Each holder of an Allowed Retiree Claim will receive, beginning on the Benefit Reduction Date,[338] monthly payments as modified by Exhibit E to the Plan and detailed below.

*Benefits Earned Before May 4, 2017*:  All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows:

The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,200.00 per month and any participant receiving $1,200.00 or less per month will not be affected. The minimum benefit thresholds will remain at $1,200, $1,000, and $600 as applicable. Accrued pension amounts and threshold will not be indexed for any reason in the future, except for Pension Benefit Restoration provisions.

For all calculation purposes, and until certified financial information for the period after July 1, 2016 is provided, Retiree pension and other benefit information as of July 1, 2016 will be used for calculation of benefits in the Plan.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

    (a) 8.5% of the Total Monthly Benefit has been reduced;

    (b) the Total Monthly Benefit has reached $1,200.00 per month; or

    (c) 25% of the difference of the Total Monthly Benefit *plus* the Monthly Medical Insurance benefit, if any, *minus* either (i) $1,000 for those Retirees without access Social Security when accruing their pension or (ii) $600 per month for those Retirees with access to Social Security when accruing their pension.

If Class 39A votes to reject the Plan, the total reduction will be the lesser of 10% or reduction of the Total Monthly Benefit to $1,200.00.

The Total Monthly Benefit will be reduced in the following order:

    (a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the

---

[338] The Benefit Reduction Date is the later to occur of (a) July 1, 2020, and (b) the first July 1 after the Effective Date. However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

(b) Reduction of Summer Bonus:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

(c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

(d) Reduction of Base Pension:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants on and after May 4, 2017 will not be reduced.

Benefit Restoration.  During the period from the Benefit Reduction Date up to and including the conclusion of fiscal year 2033, if in a particular fiscal year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such fiscal year, and (b) paid to any such participant on or before October 1 following the conclusion of such fiscal year.  However, such Benefit Restoration will be capped at the Monthly Benefit Reduction times twelve (12) for each such participant for a particular fiscal year.

***Preemption:***  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Retiree Claims in the Plan, are preempted as inconsistent with PROMESA.

308

| | |
|---|---|
| | *Voting*:  Class 39A is Impaired by the Plan.  Class 39A and each holder of an Allowed Retiree Claim are entitled to vote to accept or reject the Plan.<br><br>*Allowed Amount of Claims*:  [____]<br><br>*Projected Recovery from CW*:  [____] |
| **Class 39B:**<br><br>Active ERS Participant Claims | *Classification:*  Class 39B consists of all claims against ERS by employees hired before January 1, 2000 on account of being or having been a participant in ERS for retiree benefits that accrued as of July 1, 2013, held by a person who, as of July 1, 2019, does <u>not</u> receive a pension or annuity as a participant in ERS (either active or as a deferred annuity).  Active ERS Participant Claims do not include Claims held by a participant, whose hire date was on or after January 1, 2000, based on participation in System 2000.<br><br>*Treatment:*<br><br><u>Adjustment of Benefits</u>.  Each holder of an Allowed Active ERS Participant Claim will receive, beginning on the later to occur of the Benefit Reduction Date[339] or the first payment of retirement benefits after such holder's pension commencement date, monthly payments as modified detailed below.<br><br>*Benefits Earned Before May 4, 2017*:  All accrued pension benefits earned by participants before May 4, 2017 under Act 1 and Act 477 will be subject to reduction as follows:<br><br>The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,200.00 per month and any participant receiving $1,200.00 or less per month will not be affected.  The minimum benefit thresholds will remain at $1,200, $1,000, and $600 as applicable. Accrued pension amounts and threshold will not be indexed for any reason in the future, except for Pension Benefit Restoration provisions.<br><br>For all calculation purposes, and until certified financial information for the period after July 1, 2016 is provided, Retiree pension and other benefit information as of July 1, 2016 will be used for calculation of benefits in the Plan. |

---

[339] The Benefit Reduction Date is the later of (a) July 1, 2020, and (b) the first July 1 after the Effective Date.  However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

    (a) 8.5% of the Total Monthly Benefit has been reduced;

    (b) the Total Monthly Benefit has reached $1,200.00 per month; or

    (c) 25% of the difference of the Total Monthly Benefit *plus* the Monthly Medical Insurance benefit, if any, *minus* either (i) $1,000 for those Retirees without access Social Security when accruing their pension or (ii) $600 per month for those Retirees with access to Social Security when accruing their pension.

If Class 39B votes to reject the Plan, the total reduction will be the lesser of 10% or reduction of the Total Monthly Benefit to $1,200.00.

The Total Monthly Benefit will be reduced in the following order:

    (a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

    (b) Reduction of Summer Bonus:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

    (c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

    (d) Reduction of Base Pension:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

| | |
|---|---|
| | *Benefits Earned On or After May 4, 2017*: Accrued pension benefits earned by participants from and after May 4, 2017 will not be reduced.<br><br>*Exemption from cut formula:* The portion of the calculated pension related to annuitized Law 3 contributions plus interest accrued at the rate provided therefor by Puerto Rico law on such contributions through May 3, 2017 will be exempt from the benefit reduction formula. Allowed Active ERS Participant Claims who have already retired and converted their contributions to a system paid annuity are not eligible for the treatment described in this class, but will be subject to the pension reduction applicable to other Participants in accordance with Class 39A.<br><br>Benefit Restoration. During the period from the Benefit Reduction Date up to and including the conclusion of fiscal year 2033, if in a particular fiscal year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such fiscal year, and (b) paid to any such participant on or before October 1 following the conclusion of such fiscal year. However, such Benefit Restoration will be capped at the Monthly Benefit Reduction <u>times</u> twelve (12) for each such participant for a particular fiscal year.<br><br>***Preemption:*** All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Active ERS Participant Claims in the Plan, are preempted as inconsistent with PROMESA.<br><br>*Voting*: Class 39B is Impaired by the Plan. Class 39B and each holder of an Allowed Active ERS Participant Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: [ ____ ]<br><br>***Projected Recovery***: [ ____ ] |
| **Class 39C:**<br><br>Active JRS Participant Claims | ***Classification:*** Class 39C consists of all claims against JRS on account of being or having been a participant in JRS for (i) retiree benefits accrued as of May 4, 2017, and (ii) any additional retiree benefits in JRS that such participant would be entitled to receive upon the participant's future retirement, held by a person who, as of July 1, 2019, does <u>not</u> receive a pension or annuity as a participant in JRS (either active or entitled to a deferred annuity). |

311

*Treatment:*

Adjustment of Benefits.  Each holder of an Allowed Active JRS Participant Claim will receive, beginning on the later to occur of the Benefit Reduction Date,[340] or the first payment of pension benefits after such holder's pension commencement date, monthly payments] as modified by Exhibit F of the Plan and further detailed below.

*Benefits Earned Before May 4, 2017*:  All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows:

The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,200.00 per month and any participant receiving $1,200.00 or less per month will not be affected.

For all calculation purposes, and until certified financial information for the period after July 1, 2016 is provided, Retiree pension and other benefit information as of July 1, 2016 will be used for calculation of benefits in the Plan.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

   (a) 8.5% of the Total Monthly Benefit has been reduced;

   (b) the Total Monthly Benefit has reached $1,200.00 per month; or

   (c) 25% of the difference of the Total Monthly Benefit *plus* the Monthly Medical Insurance benefit, if any, *minus* either (i) $1,000 for those Retirees without access Social Security when accruing their pension or (ii) $600 per month for those Retirees with access to Social Security when accruing their pension.

If Class 39C votes to reject the Plan, the total reduction will be the lesser of 10% or reduction of the Total Monthly Benefit to $1,200.00.

The Total Monthly Benefit will be reduced in the following order:

   (a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the

---

[340] The Benefit Reduction Date is the later of (a) July 1, 2020, and (b) the first July 1 after the Effective Date.  However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

(b) Reduction of Summer Bonus:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

(c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

(d) Reduction of Base Pension:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Additional benefits for service on or after May 4, 2017 will be frozen as of the Effective Date so such participant is no longer able to accrue pension benefits after such date.

Future pension benefits will be calculated using service and pay accrued through the Effective Date of the Plan.  Participants who were not eligible to retire as of the Effective Date of the plan will have retirement eligibility delayed up to 3 years.  The retirement benefits for service on or after the Effective Date (including limitations on service transfer, defining the accrued benefit for those not vested at the freeze, COLA elimination, DC and Social Security benefits, and benefit eligibility / definition for different cohorts based on age and service) will be modified consistent with the terms and conditions set forth on the term sheet attached as Exhibit F to the Plan.

Benefit Restoration.  During the period from the Benefit Reduction Date up to and including the conclusion of fiscal year 2033, if in a particular fiscal year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such fiscal year, and (b) paid to any such participant on or before October 1 following the conclusion of such fiscal

313

| | |
|---|---|
| | year.  However, such Benefit Restoration will be capped at the Monthly Benefit Reduction <u>times</u> twelve (12) for each such participant for a particular fiscal year.<br><br>***Preemption:***  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Active JRS Participant Claims in the Plan, are preempted as inconsistent with PROMESA.<br><br>***Voting***: Class 39C is Impaired by the Plan.  Class 39C and each holder of an Allowed Active JRS Participant Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: [ ___ ]<br><br>***Projected Recovery***:  [ ___ ] |
| **Class 39D:**<br><br>Active TRS Participant Claims | ***Classification:***  Class 39D consists of all claims against TRS on account of being or having been a participant in TRS for (i) retiree benefits accrued as of May 4, 2017, and (b) any additional retiree benefits in TRS that such participant would be entitled to receive upon the participant's future retirement, held by a person who, as of  July 1, 2019, does <u>not</u> receive a pension or annuity as a participant in TRS (either active or entitled to a deferred annuity).<br><br>***Treatment:***<br><br><u>Adjustment of Benefits</u>.  Each holder of an Allowed Active TRS Participant Claim will receive, beginning on the later to occur of the Benefit Reduction Date,[341] or the first payment of pension benefits after such holder's pension commencement date,  monthly payments as modified by Exhibit G of the Plan and detailed below.<br><br>*Benefits Earned Before May 4, 2017*:  All accrued pension benefits earned by participants before May 4, 2017 will be subject to reduction as follows:<br><br>The Total Monthly Benefit (which includes the Monthly Base Pension, Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus) cannot be reduced below $1,200.00 per month and any participant receiving $1,200.00 or less per month will not be affected. |

---

[341] The Benefit Reduction Date is the later of (a) July 1, 2020, and (b) the first July 1 after the Effective Date.  However, if the first July 1 after the Effective Date is less than 180 days from the Effective Date, the "Benefit Reduction Date" will be the first day of the month that is 180 days after the Effective Date.

The minimum benefit thresholds will remain at $1,200, $1,000, and $600 as applicable. Accrued pension amounts and threshold will not be indexed for any reason in the future, exccept for Pension Benefit Restoration provisions.

For all calculation purposes, and until certified financial information for the period after July 1, 2016 is provided, Retiree pension and other benefit information as of July 1, 2016 will be used for calculation of benefits in the Plan.

The Total Monthly Benefit will be reduced until the lesser of the following (the "Maximum Reduction"):

(a) 8.5% of the Total Monthly Benefit has been reduced;

(b) the Total Monthly Benefit has reached $1,200.00 per month; or

(c) 25% of the difference of the Total Monthly Benefit *plus* the Monthly Medical Insurance benefit, if any, *minus* either (i) $1,000 for those Retirees without access Social Security when accruing their pension or (ii) $600 per month for those Retirees with access to Social Security when accruing their pension.

If Class 39D votes to reject the Plan, the total reduction will be the lesser of 10% or reduction of the Total Monthly Benefit to $1,200.00.

The Total Monthly Benefit will be reduced in the following order:

(a) Reduction of Christmas Bonus: First, the Monthly Christmas Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction or the Monthly Christmas Bonus has been eliminated;

(b) Reduction of Summer Bonus:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, second, the Monthly Summer Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Summer Bonus has been eliminated;

(c) Reduction of Medicine Bonus: If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, third, the Monthly Medicine Bonus will be reduced until the Total Monthly Benefit reaches the Maximum Reduction, or the Monthly Medicine Bonus has been eliminated;

(d) Reduction of Base Pension:  If the reduction of the Total Monthly Benefit has not reached the Maximum Reduction, fourth, the Monthly

315

Base Pension will be reduced until the Total Monthly Benefit reaches the Maximum Reduction.

The receipt of Social Security benefits and the Monthly Medical Benefit will not affect the reductions above.

*Benefits Earned On or After May 4, 2017*: Additional benefits for service on or after May 4, 2017 will be frozen as of the Effective Date so that participants are no longer able to accrue pension benefits after such date. Future pension benefits will be calculated using service and pay accrued through the Effective Date of the plan.

Participants who were not eligible to retire as of the Effective Date of the plan will become eligible to retire with a DB benefit upon attaining age 63 and 10 years of service. The retirement benefits for service on or after the Effective Date (including limitations on service transfer, DC and Social Security benefits, and benefit eligibility / definition for different cohorts based on age and service) will be modified consistent with the terms and conditions set forth on the term sheet attached as Exhibit G to the Plan.

<u>Benefit Restoration</u>.  During the period from the Benefit Reduction Date up to and including the conclusion of fiscal year 2033, if in a particular fiscal year, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each participant based on the amount of total reductions experienced by each such participant during such fiscal year, and (b) paid to any such participant on or before October 1 following the conclusion of such fiscal year.  However, such Benefit Restoration will be capped at the Monthly Benefit Reduction <u>times</u> twelve (12) for each such participant for a particular fiscal year.

***Preemption:***  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed Active TRS Participant Claims in the Plan, are preempted as inconsistent with PROMESA.

***Voting***: Class 39D is Impaired by the Plan.  Class 39D and each holder of an Allowed Active TRS Participant Claim are entitled to vote to accept or reject the Plan.

***Allowed Amount of Claims***: [____]

316

| | *Projected Recovery*:  [____] |
|---|---|
| **Class 39E:**<br><br>System 2000<br>Participant Claims | *Classification:*  Class 39E consists of claims by holders of accrued benefits under System 2000 or Act 3, whose hire date was on or after January 1, 2000.<br><br>*Treatment:*<br><br>Holders of Allowed System 2000 Participant Claims will receive the amount of their contributions to these plans from 2000 through June 30, 2017, plus interest accrued at the rate provided therefor by Puerto Rico law on such contributions through May 3, 2017.  Such amount will be deposited into the defined contribution accounts established under Act 106-2017.<br><br>If the total amount of contributions to these plans plus interest on such contributions through the Petition Date is less than or equal to $1,500,000,000.00, on the Effective Date, each holder of an Allowed System 2000 Participant Claim will such holder's Pro Rata share of such aggregate amount.<br><br>If the total amount of contributions plus interest accrued through the Petition Date exceeds $1,500,000,000.00, the Oversight Board and AFSCME will develop a payment plan mutually acceptable to both parties to pay out the remaining balance of the contributions in excess of $1,500,000,000.00.  In all events, the full amount of contributions will be paid to all holders of Allowed System 2000 Participant Claims not later than December 31, 2025.<br><br>As of the Effective Date, holders of Allowed System 2000 Participant Claims with System 2000 contributions from 2000 through June 30, 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability benefits paid or administered by the retirement system (including Act 127 benefits).<br><br>Allowed System 2000 Participant Claims who have already retired and converted their contributions to a system paid annuity are not eligible for the treatment described in this class and will not receive a cash payment, but will be subject to the pension reduction applicable to other Participants in accordance with Class 39A.<br><br>*Preemption:*  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified and/or preserved |

| | in whole or in part by the Plan, to the extent inconsistent with the treatment of Allowed System 2000 Participant Claims in the Plan, are preempted as inconsistent with PROMESA.<br><br>*Voting*: Class 39E is Impaired by the Plan.  Class 39E and each holder of an Allowed System 2000 Participant Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: [____]<br><br>***Projected Recovery***:  [____] |
|---|---|
| **Class 40:**<br><br>AFSCME Employee Claims | ***Classification:***  Class 40 consists of all claims against the Commonwealth related to those certain collective bargaining agreements between AFSCME and the Commonwealth, listed on Exhibit L to the Plan.<br><br>***Treatment:***<br><br>Rejection of AFSCME Collective Bargaining Agreements.  On the Effective Date, the existing collective bargaining agreements between the Commonwealth, its applicable agencies and instrumentalities, on the one hand, and AFSCME and its related union affiliates, on the other hand, will be rejected pursuant to Bankruptcy Code section 365 and replaced with modified collective bargaining agreements to be entered into in accordance with the terms and conditions set forth on Exhibit J to the Plan.[342]  Such modifications include (i) a term of five (5) years beginning as of the Effective Date, (ii) provisions regarding layoffs and downsizing, (iii) terms regarding System 2000, and (iv) terms for sharing Excess Cash Surplus.<br><br>Each holder of an Allowed AFSCME Employee Claim will receive the following in full consideration, satisfaction, release and exchange of such holder's Allowed AFSCME Employee Claim resulting from such rejection:<br><br>Additional AFSCME Distributions:  On or as soon after the Effective Date, AFSCME and its member employees will receive the following additional payments and distributions set forth in Appendix II to Exhibit H of the Plan: (i) a one-time payment of $500 to each of the Union represented participants; (ii) a one-time payment of $5,000,000.00 to AFSCME to be distributed as a one-time cash bonus to its member |

---

[342] *See* section II.B.1.b) of this Disclosure Statement for a summary of the terms of the AFSCME PSA.

| | |
|---|---|
| | employees; and (iii) a one-time payment of $5,000,000.00 to AFSCME as a support fee.<br><br>Pre-Petition Arbitration and Grievance Claims: Any distributions on account of Claims for liquidated damage amounts from the disposition of a pre-petition action brought due to a grievance and arbitration procedures under the CBA between the Commonwealth and AFSCME must be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) 30 days after the disposition and (ii) 60 days after the Effective Date.<br><br>**Preemption:**  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require or enforce employee pension and other benefits that are modified by the Plan, to the extent inconsistent with the treatment of Allowed AFSCME Employee Claims in the Plan, are preempted as inconsistent with PROMESA.<br><br>**Voting**: Class 40 is Impaired by the Plan.  Class 40 and each holder of an Allowed AFSCME Employee Claim are entitled to vote to accept or reject the Plan.<br><br>**Allowed Amount of Claims**: [____]<br><br>**Projected Recovery from CW**:  [____] |
| **Class 41:**<br>CW General Unsecured Claims | **Classification:**  Class 41 consists of all claims against the Commonwealth, except (a) any Claim treated in any other Class under the Plan, (b) an Inter-Instrumentality Claim, (c) any Claim subject to the provisions of the ACR Order, or (d) any Claim determined by the Title III Court not to be a CW General Unsecured Claim.<br><br>**Treatment:**  On the Effective Date, each holder of an Allowed CW General Unsecured Claim will receive its Pro Rata Share of the CW GUC Recovery[343] comprised of (a) $263,364,746.43 in New GO Bonds, (b) $263,380,545.46 in COFINA Junior Lien Bonds, and (c) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.<br><br>Distributions to a holder of an Allowed CW General Unsecured Claim cannot exceed 100% of such holder's Allowed CW General Unsecured Claim.  If Allowed CW General Unsecured Claims have been paid in full, the excess value in the CW GUC Recovery will be redistributed, on |

[343] The CW GUC Recovery is shared among the CW General Unsecured Claims, CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims, and CW/MBA Claims.

| | |
|---|---|
| | a pro rata basis, to the benefit of holders of Allowed CW/Convention Claims, Allowed CW/HTA Claims, Allowed CW/PRIFA Rum Tax Claims, and Allowed CW/MBA Claims.<br><br>***Voting***:  Class 41 is Impaired by the Plan.  Class 41 and each holder of an Allowed CW General Unsecured Claim are entitled to vote to accept or reject the Plan.<br><br>***Estimated Allowed Amount of Claims***: [$5,566,100,716]<br><br>***Projected Recovery from CW***:  3.9%<br><br>***Election to be Treated as Convenience Claim (Class 52)***:  Any holder of an Allowed CW General Unsecured Claim may elect to (a) reduce the amount of such Allowed CW General Unsecured Claim to $10,000.00, and (b) have such reduced claim be treated pursuant to Class 52 (Convenience Claims), receiving a projected recovery of 100% of such reduced claim.  Any holder of multiple Allowed CW General Unsecured Claims may elect to (a) reduce the amount of such multiple Allowed CW General Unsecured Claims to an aggregate amount of $20,000.00, and (b) have such reduced claims be treated pursuant to Class 52 (Convenience Claims), receiving a projected recovery of 100% of such reduced claims.<br><br>Such election must be made on the ballot and receive by the Debtors on or prior to the Ballot Date.  Any election received on the Debtors after the Ballot Date will not be binding on the Debtors. |
| **Class 42:**<br>CW/HTA Claims | ***Classification:***  Class 42 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including, without limitation, claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30 and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed CW/HTA Claim will receive its Pro Rata Share of the CW GUC Recovery[344] |

[344] The CW GUC Recovery is shared among the CW General Unsecured Claims, CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims, and CW/MBA Claims.

320

|  | comprised of (a) $263,364,746.43 in New GO Bonds, (b) $263,380,545.46 in COFINA Junior Lien Bonds, and (c) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.<br><br>***Voting***:  Class 42 is Impaired by the Plan.  Class 42 and each holder of an Allowed CW/HTA Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $5,786,167,494<br><br>***Projected Recovery from CW***:  3.9% |
|---|---|
| **Class 43:**<br><br>CW/Convention Center Claims | ***Classification:***  Class 43 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including, without limitation, claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31 and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed CW/Convention Center Claim will receive its Pro Rata Share of the CW GUC Recovery[345] comprised of (a) $263,364,746.43 in New GO Bonds, (b) $263,380,545.46 in COFINA Junior Lien Bonds, and (c) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.<br><br>***Voting***:  Class 43 is Impaired by the Plan.  Class 43 and each holder of an Allowed CW/Convention Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims***: $414,393,096<br><br>***Projected Recovery from CW***: 3.9% |
| **Class 44:**<br><br>CW/PRIFA Rum Tax Claims | ***Classification:***  Class 44 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the |

[345] The CW GUC Recovery is shared among the CW General Unsecured Claims, CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims, and CW/MBA Claims.

| | |
|---|---|
| | provisions of the Commonwealth Constitution, any statute, regulation, or executive order including, without limitation, claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee. <br><br> **Treatment:**  On the Effective Date, each holder of an Allowed CW/PRIFA Rum Tax Claim will receive its Pro Rata Share of the CW GUC Recovery[346] comprised of (a) $263,364,746.43 in New GO Bonds, (b) $263,380,545.46 in COFINA Junior Lien Bonds, and (c) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests. <br><br> **Voting**:  Class 44 is Impaired by the Plan.  Class 44 and each holder of an Allowed CW/PRIFA Rum Tax Claim are entitled to vote to accept or reject the Plan. <br><br> **Allowed Amount of Claims**: $1,892,926,265 <br><br> **Projected Recovery from CW**:  3.9% |
| **Class 45:** <br> CW/MBA Claims | **Classification:**  Class 45 consists of all claims against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order. <br><br> **Treatment:**  On the Effective Date, each holder of an Allowed CW/MBA Claim will receive its Pro Rata Share of the CW GUC Recovery[347] comprised of (a) $263,364,746.43 in New GO Bonds, (b) $263,380,545.46 in COFINA Junior Lien Bonds, and (c) net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests. <br><br> **Voting**:  Class 45 is Impaired by the Plan.  Class 45 and each holder of an Allowed CW/MBA Claim are entitled to vote to accept or reject the Plan. |

---

[346] The CW GUC Recovery is shared among the CW General Unsecured Claims, CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims, and CW/MBA Claims.

[347] The CW GUC Recovery is shared among the CW General Unsecured Claims, CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Rum Tax Claims, and CW/MBA Claims.

| | |
|---|---|
| | *Allowed Amount of Claims*: $28,903,666<br><br>*Projected Recovery from CW*: 3.9% |
| **Class 46:**<br>CW Appropriations Claims | *Classification:*  Class 46 consists of all claims against the Commonwealth arising from or related to (a) indebtedness payable from appropriations of the Commonwealth Legislature under existing loans or legislative resolutions (including notes held by PFC for the repayment of PFC indebtedness), and (b) loans payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Restructuring Authority or the GDB Public Entity Trust.<br><br>*Treatment:*  Allowed CW Appropriations Claims will not receive a distribution pursuant to the Plan.<br><br>*Voting*:  Class 46 is Impaired by the Plan.  Class 46 and each holder of an Allowed CW Appropriations Claim are deemed to have rejected the Plan.<br><br>*Estimated Allowed Amount of Claims*: [____]<br><br>*Projected Recovery from CW*:  0% |
| **Class 47:**<br>CW 510(b) Subordinated Claims | *Classification:*  Class 47 consists of all claims, to the extent determine pursuant to a final order, against the Debtors or their assets arising from or relating to (a) rescission of a purchase or sale of an existing security of a Debtor or an affiliate of a Debtor, (b) purchase, sale, or retention of such a security, or (c) reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such claim.<br><br>*Treatment:*  Allowed CW 510(b) Subordinated Claims will not receive a distribution pursuant to the Plan.<br><br>*Voting*:  Class 47 is Impaired by the Plan.  Class 47 and each holder of a CW 510(b) Subordinated Claim are deemed to have rejected the Plan.<br><br>*Estimated Allowed Amount of Claims*: $0<br><br>*Projected Recovery from CW*:  0% |
| **Class 48:**<br>ERS Bond Claims | *Classification:*  Class 48 consists of all claims against ERS arising from or related to the ERS Bonds, including interest accrued thereon during the period up to, but not including, the ERS Petition Date.<br><br>The ERS Bonds include the following: |

|  | Issue Date |
|---|---|
| Senior Pension Funding Bonds, Series 2008A | 1/31/08 |
| Senior Pension Funding Bonds, Series 2008B | 6/02/08 |
| Senior Pension Funding Bonds, Series 2008C | 6/30/08 |

*Election to Settle ERS Bond Claim*:  Each holder of an ERS Bond Claim may elect to have its ERS Bond Claim be treated as a Settling ERS Bond Claim (Class 48) and receive a Pro Rata Share of the ERS Bond Settlement.

If a holder of an ERS Bond Claim elects, deemed or otherwise, to accept the ERS Bond Settlement, such claim will be deemed to be a Settling ERS Bond Claim and the holder will (a) have relinquished its rights to receive distributions in accordance with Class 48, (b) release and discharge the Commonwealth and the United States of America from any and all claims and causes of action asserted, or which could have been asserted, in the ERS Takings Action and the ERS Litigation, and (c) be deemed to accept the Plan as a holder of a claim in Class 49.

If a holder of an ERS Bond Claim elects not to accept the ERS Bond Settlement, such holder will be a participant in the ERS Litigation.  On the Effective Date, such holder's Pro Rata Share of the ERS Bond Cash will be placed in the ERS Reserve as if such claim had been an Allowed ERS Bond Claim as of the Effective Date, pending the entry of a final, non-appealable order resolving or settling the ERS Litigation.

*Treatment:*  On the Effective Date, if the claimholder shall have prevailed in the ERS Litigation, each holder of an Allowed ERS Bond Claim will receive its Pro Rata Share of ERS Cash determined to be the collateral for payment of the ERS Bonds after any collateral has been sold to the Commonwealth in accordance with the Plan.

*Voting*:  Class 48 is Impaired by the Plan.  Class 48 and each holder of an Allowed ERS Bond Claim are entitled to vote to accept or reject the Plan.

*Amount of Claims*: $3,168,698,777.00 (disputed)

*Projected Recovery from ERS*:  [____]

| Class 49:

Settling ERS Bond Claims | *Classification:*  Class 49 consists of all claims against ERS by a holder of an ERS Bond Claim that elects, deemed or otherwise, to participate in the ERS Bond Settlement. |

324

| | |
|---|---|
| | **Treatment:**  On the Effective Date, each holder of an Allowed Settling ERS Bond Claim will (i) receive ERS Cash determined to be the collateral for payment of the ERS Bonds after any collateral has been sold to the Commonwealth in accordance with the Plan, (ii) release and discharge the Commonwealth and the United States of America from any and all claims and causes of action asserted, or which could have been asserted, in the ERS Takings Action and the ERS Litigation, and (iii) be released from all claims and causes of action set forth in the ERS Invalidity Actions.<br><br>**Voting**:  Class 49 is Impaired by the Plan.  However, holders of Claims in Class 49 elected to be treated in such Class and, therefore, are deemed to accept the Plan.<br><br>**Allowed Amount of Claims**:  The amount of Claims in Class 49 entitled to a distribution depends upon how many holders of ERS Bond Claims in Class 48 elect to be treated under Class 49.<br><br>**Projected Recovery from ERS**:  12.7% |
| **Class 50:**<br><br>ERS General Unsecured Claims | **Classification:**  Class 50 consists of all claims against ERS that are not an ERS Bond Claim or Settling ERS Bond Claim.<br><br>**Treatment:**  On the Effective Date, each holder of an Allowed ERS General Unsecured Claim will receive its Pro Rata Share of the ERS GUC Pool.  The ERS GUC Pool consists of (a) $5,000,000 in original principal amount of New GO Bonds <u>plus</u> (b) the net recoveries of the Avoidance Actions Trust.  The total amount in the ERS GUC Pool available for distribution may not exceed $10,000,000.  Distributions to a holder of an Allowed ERS General Unsecured Claim cannot exceed 100% of such holder's Allowed ERS General Unsecured Claim.<br><br>Amounts in the ERS GUC Pool in excess of the aggregate amount of Allowed ERS General Unsecured Claims, or $10,000,000 will be reallocated, on a pro rata basis, to holders of Allowed CW/Convention Center Claims, Allowed CW/HTA Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims.<br><br>**Voting**:  Class 50 is Impaired by the Plan.  Class 50 and each holder of an Allowed ERS General Unsecured Claim are entitled to vote to accept or reject the Plan.<br><br>**Estimated Allowed Amount of Claims**: [____]<br><br>**Projected Recovery from ERS**:  [____] |

| | |
|---|---|
| | ***Election to be Treated as Convenience Claim (Class 52)****:*  Any holder of an Allowed ERS General Unsecured Claim in an amount greater than $10,000.00 may elect to (a) reduce the amount of such Allowed ERS General Unsecured Claim to $10,000.00, and (b) have such reduced claim be treated pursuant to Class 52 (Convenience Claims), receiving a projected recovery of 100% of such reduced claim.<br><br>Any holder of multiple Allowed ERS General Unsecured Claims may elect to (a) reduce the amount of such multiple Allowed ERS General Unsecured Claims to an aggregate amount of $20,000.00, and (b) have such reduced claims be treated pursuant to Class 52 (Convenience Claims), receiving a projected recovery of 100% of such reduced claims.<br><br>Such election must be made on the ballot and receive by the Debtors on or prior to the Ballot Date.  Any election received on the Debtors after the Ballot Date will not be binding on the Debtors. |
| **Class 51:**<br><br>Gracia Gracia Claims | ***Classification:***  Class 51 consists of all claims against the Commonwealth by a member of the class of vehicle owners who purchased private insurance after paying the compulsory insurance premium, certified in the Gracia Gracia CW Action and Gracia Gracia Federal Action.<br><br>***Treatment:***  On the Effective Date, the settlement reached and approved in (a) the Gracia Gracia CW Action pursuant to that certain Joint Motion on Partial Agreement and Stipulation, dated March 29, 2016, as approved pursuant to that certain Partial Judgment, dated July 8, 2016, and (b) the Gracia Gracia Federal Action pursuant to that certain Stipulation for Permanent Injunction, dated February 29, 2016, as approved pursuant to that certain judgment dated March 1, 2016, will be assumed.<br><br>Member of the class certified in the Gracia Gracia CW Action and the Gracia Gracia Federal Action, and the counsel to such classes, will receive funds in accordance with the terms and provisions of the settlements assumed above.  Pursuant to the Confirmation Order, all pending motions, applications, litigations, and appeals with respect to the Gracia Gracia CW Action and the Gracia Gracia Federal Action will be withdrawn with prejudice.<br><br>***Voting***:  Class 51 is unimpaired by the Plan.  Class 51 and each holder of an Allowed Gracia Gracia Claim are deemed to have accepted the Plan.<br><br>***Allowed Amount of Claims***:  [____]<br><br>***Projected Recovery from CW***:  100% |

| Class 52: Convenience Claims | **Classification:** Class 52 consists of (a) all Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claim that are equal to or less than $10,000.00, (b) claims held by holders of Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims, as applicable, that have elected to reduce the amount of such Allowed CW General Unsecured Claim to $10,000.00.  In addition, Class 52 includes claims by holders of multiple Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims that have elected to reduce all such Claims to an aggregate amount of $20,000.00.

**Treatment:**  On the Effective Date (or the date the Convenience Claim becomes an Allowed Claim), each holder of an Allowed Convenience Claim will receive the full amount of such Allowed Convenience Claim, in cash.

**Voting**:  Class 52 is unimpaired by the Plan.  Class 52 and each holder of an Allowed Convenience Claim are deemed to have accepted the Plan.  Holders of Claims that have elected to have their Claim reduced and be treated as a Convenience Claim are deemed to accept the Plan.

**Estimated Allowed Amount of Claims**: [____]

**Projected Recovery from the Debtors**:  100% |

## F.    Provisions Regarding the New GO Bonds, COFINA Junior Lien Bonds, and Additional Indebtedness

**THE NEW GO BONDS WILL BE ISSUED PURSUANT TO THE TERMS AND PROVISIONS OF THE NEW GO BONDS INDENTURE.  THE NEW GO BONDS INDENTURE CONSTITUTES PART OF THE PLAN SUPPLEMENT AND WILL BE FILED SEPARATELY WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE, OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES, IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER. PURSUANT TO THE PLAN SUPPORT AGREEMENT, THE NEW GO BONDS INDENTURE WILL BE CONSISTENT WITH THE PLAN SUPPORT AGREEMENT IN ALL RESPECTS AND OTHERWISE BE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO EACH PARTY TO THE PLAN SUPPORT AGREEMENT.  THE DESCRIPTION OF THE TERMS AND PROVISIONS OF THE NEW GO BONDS AND THE NEW GO BONDS INDENTURE IN THIS SECTION VI.F OF THE DISCLOSURE STATEMENT REPRESENTS THE DEBTORS' BEST AVAILABLE DESCRIPTION AS OF THE DATE HEREOF, AND THE ACTUAL TERMS AND PROVISIONS OF THE NEW GO BONDS AND THE NEW GO BONDS INDENTURE ARE SUBJECT TO MATERIAL CHANGE WITHOUT FURTHER NOTICE BY THE DEBTORS EXCEPT AS PROVIDED IN THE PLAN SUPPLEMENT.  TO THE EXTENT THERE IS ANY CONFLICT BETWEEN THE**

**DESCRIPTION IN THIS SECTION VI.F OF THE DISCLOSURE STATEMENT AND THE NEW GO BONDS INDENTURE, THE NEW GO BONDS INDENTURE GOVERNS IN ALL RESPECTS.**

**THE COFINA JUNIOR LIEN BONDS WILL BE ISSUED PURSUANT TO THE TERMS AND PROVISIONS OF THE COFINA JUNIOR LIEN BONDS INDENTURE. THE COFINA JUNIOR LIEN BONDS INDENTURE CONSTITUTES PART OF THE PLAN SUPPLEMENT AND WILL BE FILED SEPARATELY WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE, OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES, IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER.  PURSUANT TO THE PLAN SUPPORT AGREEMENT, THE COFINA JUNIOR LIEN BONDS INDENTURE WILL BE CONSISTENT WITH THE PLAN SUPPORT AGREEMENT IN ALL RESPECTS AND OTHERWISE BE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO EACH PARTY TO THE PLAN SUPPORT AGREEMENT.  THE DESCRIPTION OF THE TERMS AND PROVISIONS OF THE COFINA JUNIOR LIEN BONDS AND THE COFINA JUNIOR LIEN BONDS INDENTURE IN THIS SECTION VI.F OF THE DISCLOSURE STATEMENT REPRESENTS THE DEBTORS' BEST AVAILABLE DESCRIPTION AS OF THE DATE HEREOF, AND THE ACTUAL TERMS AND PROVISIONS OF THE COFINA JUNIOR LIEN BONDS AND THE COFINA JUNIOR LIEN BONDS INDENTURE ARE SUBJECT TO MATERIAL CHANGE WITHOUT FURTHER NOTICE BY THE DEBTORS EXCEPT AS PROVIDED IN THE PLAN SUPPLEMENT.  TO THE EXTENT THERE IS ANY CONFLICT BETWEEN THE DESCRIPTION IN THIS SECTION VI.F OF THE DISCLOSURE STATEMENT AND THE COFINA JUNIOR LIEN BONDS INDENTURE, THE COFINA JUNIOR LIEN BONDS INDENTURE GOVERNS IN ALL RESPECTS.**

1.    **General**

The New GO Bonds will be issued pursuant to the terms and provisions of the New GO Bonds Indenture and will be distributed as set forth in the Plan.  The definitive documentation governing the New GO Bonds generally shall provide for the terms set forth in this summary, subject to the results of any election permitted by the Plan and other adjustments permitted or required by the Plan.

The COFINA Junior Lien Bonds will be issued pursuant to the terms and provisions of the COFINA Junior Lien Bonds Indenture and will be distributed as set forth in the Plan.  The definitive documentation governing the COFINA Junior Lien Bonds generally shall provide for the terms set forth in this summary, subject to the results of any election permitted by the Plan and other adjustments permitted or required by the Plan.

This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the New GO Bonds, the New GO Bonds Indenture, the COFINA Junior Lien Bonds, the COFINA Junior Lien Bonds Indenture and the Plan.

2.    **The New GO Bonds**

On the Effective Date, Reorganized Commonwealth shall issue the New GO Bonds as current interest bonds with seven (7) different maturity dates, having an aggregate original principal amount of $5,334,295,000.  The New GO Bonds will be secured by a statutory first lien and pledge of the Debt Service Reserve Fund and the Debt Service Fund and a pledge of the Commonwealth's good faith, credit and taxing powerin accordance with Article VI, Section 2 of the Commonwealth Constitution and applicable laws of the Commonwealth as of the Effective Date.  The New GO Bonds will be dated as of, and will accrue interest from, March 1, 2020.

*The principal amounts, maturities, interest rates, and amortization schedules for the New GO Bonds are as shown in Exhibit I to the Plan.*

Interest on the New GO Bonds will be paid on [July 1, 2020 and each January 1 and July 1 thereafter] until the New GO Bonds have been paid or satisfied in full in accordance with their terms.  All debt service on the New GO Bonds that is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid. Interest shall accrue on such overdue debt service at the regular coupon rate, and shall compound semi-annually, until the applicable New GO Bonds are paid or satisfied in full in accordance with their terms.  Interest on the New GO Bonds will be computed on the basis of a 360-day year consisting of twelve 30-day months. The New GO Bonds will not carry any default rate of interest. The New GO Bonds will be issued as fully registered bonds in denominations to be specified in the New GO Bonds Indenture.

Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such Taxable New GO Bonds shall be distributed to holders of Allowed Claims in the following order of priority:  (1) *first*, to holders of Allowed Taxable Election CW Claims, and (2) *second*, pro rata to all other holders of Allowed Claims which are recipients of New GO Bonds, without duplication.

a)    **Call Provisions/Optional Redemption**

The New GO Bonds maturing on July 1, 2021, July 1, 2023, July 1, 2025, July 1, 2027 and July 1, 2029 are not subject to redemption prior to maturity.

The New GO Bonds maturing on and after July 1, 2030 are subject to redemption prior to maturity, at the election or direction of Reorganized Commonwealth, in whole or in part (and, if in part, in an authorized denomination provided for under the New GO Bonds Indenture), in any order of maturity, on any date that is on or after July 1, 2030, upon thirty (30) days' prior written notice, on and after July 1, 2029, at a redemption price equal to the par amount thereof, plus accrued interest to the redemption date.

The New GO Bonds are subject to mandatory sinking fund redemption as set forth in Exhibit I of the Plan.

The call prices for New GO Bonds maturing on July 1, 2033 and July 1, 2039 are as follows: (i) July 1, 2030 through and including to June 30, 2031 is 103% of Par, (ii) July 1, 2031

through and including June 30, 2032 is 102% of Par, (iii) July 1, 2032 through and including June 30, 2033 is 101% of Par, and (iv) July 1, 2033 onwards is 100% of Par.

If less than all the New GO Bonds of a particular tenor are called for redemption prior to maturity, Reorganized Commonwealth will select the maturity or maturities of such tenor of the New GO Bonds to be redeemed, and the Depository Trust Company, on behalf of the New GO Bonds Trustee, will select the New GO Bonds within the same maturity of such series to be redeemed by means of a random lottery.

The New GO Bonds are not subject to redemption prior to maturity at the election of the holders thereof.

b)      **Deemed Annual Allocation**

Until the New GO Bonds have been paid or satisfied in full in accordance with their terms, each fiscal year, the Commonwealth shall satisfy its obligations to holders of New GO Bonds, by allocating to the payment of principal and interest with respect to the New GO Bonds issued to such holders, *first*, the 1.03% property tax levied pursuant to Act 83-1991 and collected by the Municipal Revenues Collection Center with respect to the New GO Bonds until the total amount of such property taxes shall have been paid to holders of the New GO Bonds, *second*, the monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution until the total amount of such monies shall have been paid to holders of the New GO Bonds, and, *third*, other resources of the Commonwealth.

c)      **Monthly Deposits of Interest and Principal**

Until the New GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's annual obligation with respect to the payment of principal on the New GO Bonds.  Upon deposit thereof, the New GO Bond Trustee, on behalf of the holders of New GO Bonds, shall have a valid and perfected statutory lien and security interest on such monies deposited, which monies shall be held in trust for the benefit of the New GO Bonds.  On the Effective Date, the Commonwealth will deposit into the Debt Service Fund such amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

d)      **Certain Covenants of Reorganized Commonwealth Relating to the New GO bonds**

The Definitive Documents, including the New GO Bonds Indenture, the New GO Bond Legislation and/or the Confirmation Order, will contain customary terms, conditions and covenants, including, without limitation, covenants by Reorganized Commonwealth that it will, among other things:

(i)      take no action that would (A) impair the monthly deposits of interest and principal referred to in Section 57.1(e) of the Plan, (B) limit or alter the rights vested in the Debtors or Reorganized Debtors in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the New GO Bonds, or (C) impair the rights and remedies of the holders of the New GO Bonds; and

(ii)      do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to holders of any federally tax-exempt New GO Bonds shall be and remain excludable from gross income for federal income tax purposes.

e)      **Debt Service Reserve Fund**

The New GO Bonds shall have a Debt Service Reserve Fund into which the Debt Service Reserve Fund Requirement (i) shall be funded (A) on the Effective Date or (B) in five (5) equal annual installments over an initial five-year period from and after the Effective Date, which election shall be made, in the joint and absolute discretion of the Oversight Board and the Commonwealth, on or prior to the Effective Date, (ii) once deposited, shall be held in trust by the New GO Bonds Trustee for the benefit of holders of New GO Bonds, and (iii) shall be subject to a statutory lien once deposited with the New GO Bonds Trustee for the benefit of holders of New GO Bonds.

f)      **Rights of Acceleration**

The New GO Bonds shall not have rights of acceleration.

g)      **Residual Interest of the Commonwealth**

Any funds held by the New GO Bonds Trustee in excess of the required deposits pursuant to the New GO Bonds Indenture will be released from the New GO Bonds Indenture to, or at the discretion of, the Commonwealth, including to the extent funds remain in the Debt Service Reserve Fund upon payment or satisfaction in full of the New GO Bonds in accordance with their terms, such amounts will revert and be distributed to, or at the direction of, the Commonwealth.

h)      **Direct Right of Action**

Pursuant to the New GO Bonds Indenture, and subject to such additional rights as provided therein, the New GO Bonds Trustee shall have a direct right of action to enforce the terms of the New GO Bonds Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and the Debt Service Reserve Fund and seeking specific performance remedies for any breach of covenants in the New GO Bonds Indenture.

i)      **New GO Bonds Indenture**

Provisions governing, among other things, amendments of or supplements to the New GO Bonds Indenture, events of default, remedies, priority of payments after default under the New GO

331

Bonds Indenture, and defeasance under the New GO Bonds Indenture will be set forth in the New GO Bonds Indenture.  The New GO Bonds Indenture will be executed and delivered on or prior to the Effective Date.

### j) Governing Law

The New GO Bonds Indenture and the New GO Bonds issued thereunder will be governed by the laws of the State of New York, without giving effect to principals of conflicts of law.

### 3. Issuance of COFINA Junior Lien Bonds

On the Effective Date, Reorganized Commonwealth shall cause COFINA to issue the COFINA Junior Lien Bonds, consisting of CIBs, as current interest bonds with seven (7) different maturity dates, having an aggregate original principal amount of $5,334,615,000.  The COFINA Junior Lien Bonds will be securities payable from the Conveyed Commonwealth Share and shall, in all respects, be subject to the First Dollars Funding obligations with respect to the COFINA Senior Lien Bonds. The COFINA Junior Lien Bonds will be dated as of, and will accrue interest from, March 1, 2020.  Repayment of the COFINA Junior Lien Bonds shall be secured by a second lien on the COFINA Pledged Taxes that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies, to the COFINA Senior Lien Bonds. Repayment of the COFINA Junior Lien Bonds shall not be payable from the COFINA Revenues.

***The principal amounts, maturities, interest rates, and amortization schedules for the COFINA Junior Lien Bonds are as shown in Exhibit J to the Plan.***

Interest on the COFINA Junior Lien Bonds will be paid on [July 1, 2020 and each January 1 and July 1 thereafter] until the COFINA Junior Lien Bonds are paid or satisfied in full in accordance with their terms.  All debt service on the COFINA Junior Lien Bonds that is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid.  Interest shall accrue on such overdue debt service at the regular coupon rate, and shall compound semi-annually, until the applicable COFINA Junior Lien Bonds are paid or satisfied in full in accordance with their terms.  Interest on the COFINA Junior Lien Bonds will be computed on the basis of a 360-day year consisting of twelve 30-day months. The COFINA Junior Lien Bonds will not carry any default rate of interest. The COFINA Junior Lien Bonds will be issued as fully registered bonds in denominations to be specified in the COFINA Junior Lien Bonds Indenture.

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the COFINA Junior Lien Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the COFINA Junior Lien Bonds, including promptly responding in good faith to documentary or other requests, following consultation with up to two (2) Initial PSA Creditors jointly designated by the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group, each of which shall have executed a confidentiality agreement in form and substance satisfactory to the Oversight Board and restricting such Initial PSA Creditors from trading New GO Bonds and COFINA Junior Lien Bonds, including based upon the Government Parties' judgment with respect to expected benefits.

Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable COFINA Junior Lien Bonds are issued, such Taxable COFINA Junior Lien Bonds shall be distributed to holders of Allowed Claims in the following order of priority: (1) *first*, to holders of Allowed Taxable Election CW Claims, and (2) *second*, pro rata to all other holders of Allowed Claims and recipients of COFINA Junior Lien Bonds, without duplication.

### a)    Call Provisions/Optional Redemption

The COFINA Junior Lien Bonds maturing on July 1, 2021, July 1, 2023, July 1, 2025, July 1, 2027 and July 1, 2029 are not subject to optional redemption prior to maturity.

The COFINA Junior Lien Bonds maturing on and after July 1, 2030 are subject to redemption prior to maturity, at the election or direction of Reorganized Commonwealth, in whole or in part (and, if in part, in an authorized denomination provided for under the COFINA Junior Lien Bonds Indenture), in any order of maturity, on any date that is on and after July 1, 2030, upon thirty (30) days' prior written notice at a redemption price equal to the par amount thereof, plus accrued interest to the redemption date.

The COFINA Junior Lien Bonds are subject to mandatory sinking fund redemption as set forth in Exhibit J to the Plan.

The call prices for the COFINA Junior Lien Bonds maturing on July 1, 2033 and July 1, 2039 are as follows: (i) July 1, 2030 through and including June 30, 2031 is 103% of Par, (ii) July 1, 2031 through and including June 30, 2032 is 102% of Par, (iii) July 1, 2032 through and including June 30, 2033 is 101% of Par and (iv) July 1, 2033 onwards is 100% of Par.

### b)    Certain Covenants for COFINA Junior Lien Bonds

The Definitive Documents, including the COFINA Junior Lien Bonds Indenture and the COFINA Junior Lien Bond Legislation, will contain customary terms, conditions and covenants for similarly structured bonds, including, without limitation, covenants by Reorganized Commonwealth that it will:

(i)    take no action that would (A) impair COFINA's right to receive the COFINA Pledged Taxes, including the Conveyed Commonwealth Share, (B) limit or alter the rights vested in Reorganized Commonwealth or COFINA in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the COFINA Junior Lien Bonds, (C) materially and adversely impair the collection of the COFINA Pledged Taxes in any fiscal year, or (D) impair the rights and remedies of the holders of the COFINA Junior Lien Bonds with respect to the COFINA Pledged Taxes; and

(ii)    do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to holders of any federally tax-exempt COFINA Junior Lien Bonds shall be and remain excludable from gross income for federal income tax purposes.

c)    **Rights of Acceleration**

The COFINA Junior Lien Bonds shall not have rights of acceleration.

d)    **COFINA Junior Lien Bonds Indenture**

Provisions governing, among other things, amendments of or supplements to the COFINA Junior Lien Bonds Indenture, events of default, remedies, priority of payments after default under the COFINA Junior Lien Bonds Indenture, and defeasance under the COFINA Junior Lien Bonds Indenture will be set forth in the COFINA Junior Lien Bonds Indenture. The COFINA Junior Lien Bonds Indenture will be executed as of the Effective Date.

e)    **Governing Law**

The COFINA Junior Lien Bonds Indenture and the COFINA Junior Lien Bonds issued thereunder will be governed by the laws of the State of New York, without giving effect to principals of conflicts of law.

4.    **Sharing of Benefits Regarding Tax-Exempt Treatment of the New GO Bonds and COFINA Junior Lien Bonds**

Notwithstanding the terms and provisions of Sections 57.1 and 57.2 in the Plan, in the event that the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel that the ratio of the aggregate amount of all taxable New GO Bonds and taxable COFINA Junior Lien Bonds to be issued on the Effective Date to the total aggregate amount of all New GO Bonds and all COFINA Junior Lien Bonds is less than twelve percent (12%), the benefits of such determination shall be shared as described in Section 57.3 of the Plan.

5.    **Provisions Regarding Additional Indebtedness of Reorganized Commonwealth, its Agencies and Public Corporations**

a)    **Comprehensive Cap on All Net Tax-Supported Debt**

During the Debt Policy Period,[348] in addition to the limit on the Commonwealth's incurrence of good faith, credit and taxing power set forth in the Commonwealth Constitution, (a) the Commonwealth shall adopt and maintain a Debt Management Policy that includes a comprehensive cap on the Maximum Annual Debt Service[349] payable on Net Tax-Supported

---

[348] **Debt Policy Period**: The period commencing on the first (1st) calendar day immediately following the Effective Date and ending on the date on which there are no New GO Bonds Outstanding.

[349] **Maximum Annual Debt Service**: The maximum scheduled annual debt service (including principal and interest payments due and payable on bonds bearing current interest and, in the case of capital appreciation bonds or similar instruments, the maturity value due and payable on such instruments) for any fiscal year on Net Tax-Supported Debt; *provided*, *however*, that, in the case of variable rate debt, the calculation shall assume that such debt bears interest at the maximum annual rate permitted by law; and, *provided*, *further*, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in

Debt,[350] and (b) the Commonwealth and its instrumentalities (including COFINA) shall not incur additional Net Tax-Supported Debt if the proposed issuance thereof would cause the ratio of (i) Maximum Annual Debt Service due in any future fiscal year on all Net Tax-Supported Debt Outstanding to (ii) the average of the annual Debt Policy Revenues[351] during the immediately preceding two (2) fiscal years, as certified by the Secretary of the Treasury of the Commonwealth (the "Secretary of Treasury"), to exceed nine and sixteen one hundredths percent (9.16%), including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the COFINA Senior Lien Bonds and the COFINA Junior Lien Bonds.  Such debt limitation

---

Section 57.4 of the Plan, the Debt Management Policy may establish additional provisions or clarifications regarding the calculation of the Maximum Annual Debt Service.

[350] **Net Tax-Supported Debt**:  Any Tax-Supported Debt, excluding any (a) debt guaranteed by the good faith, credit and taxing power of the Commonwealth that is not payable from or secured by Debt Policy Revenues requiring its continued payment from non-Debt Policy Revenues, to the extent that the Commonwealth's guarantee has not been drawn upon in the five (5) most recently completed fiscal years, and (b) debt being refinanced through the proceeds of the proposed bond or note issuance.

**Tax-Supported Debt**:  Collectively, without duplication, (a) direct debt of the Commonwealth for the payment of which the good faith, credit and taxing power of the Commonwealth has been pledged (including the New GO Bonds), (b) debt issued by any Entity and guaranteed by the good faith, credit and taxing power of the Commonwealth, (c) debt issued by any Entity (including the COFINA Senior Lien Bonds and the COFINA Junior Lien Bonds), whether or not guaranteed by the Commonwealth, that is secured by or payable from (i) Debt Policy Revenues, or (ii) lease agreements with the Commonwealth or any agency thereof, whether or not subject to annual or periodic legislative appropriations and (d) any other debt identified as Tax-Supported Debt in the Debt Management Policy; *provided, however,* that the following shall not be considered Tax Supported Debt: (A) tax and revenue anticipation notes with a final maturity occurring within the same fiscal year of their issuance; and (B) debt issued to respond directly to damage or destruction and associated risks to the health, safety and welfare of the people of Puerto Rico caused by hurricanes, earthquakes or other natural disasters, pandemics, terrorism and similar emergencies; and, *provided, further,* and without limiting the foregoing, "Tax-Supported Debt" *excludes* (x) revenue bonds of an Entity payable solely from user charges or securitization and transition charges imposed upon customers or former customers of a utility or transportation system, including the self-supporting debt of PRASA, PREPA, HTA or any related securitization entity, and (y) any other debt that is not payable from Debt Policy Revenues, pursuant to the Debt Management Policy, in each case, to the extent such debt is not guaranteed by the good faith, credit and taxing power of the Commonwealth; and, *provided, further,* that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 57.4 of the Plan, the Debt Management Policy may contain additional provisions and clarifications regarding which debt is considered Tax-Supported Debt..

[351]**Debt Policy Revenues**:  Collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Commonwealth Legislature, including, without limitation, any such revenue assigned to, or owned by, COFINA or any other  instrumentality of the Commonwealth (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth and (c) all other revenues identified as "Debt Policy Revenues" in the Debt Management Policy; *provided, however,* that "Debt Policy Revenues" shall *exclude* (x) revenues and funds generated or assessed and collected by (i) the Entities listed on Exhibit 79 to the CW Fiscal Plan, (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, [and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund]; and, *provided, further,* that, for purposes of illustration, with respect to FY2019, and as reflected in the CW Fiscal Plan, "Debt Policy Revenues" were Sixteen Billion Seven Hundred Eight Million Seventy Thousand Dollars ($16,708,070,000.00), including, without limitation, all Sales Taxes.

335

shall be in addition to any other limitations imposed by applicable law and nothing herein shall be construed as superseding, amending or repealing the additional debt limitation imposed by the Commonwealth Constitution on public debt and guarantees backed by the Commonwealth's good faith, credit and taxing power.  The Secretary of Treasury's certification of compliance with the debt limit pursuant to this subsection (a) shall be conclusive and binding absent manifest error; *provided*, *however*, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

Article VI, Section 2 of the Commonwealth Constitution provides, among other things, (i) that no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the good faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (A) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year, and (B) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed fifteen percent (15%) of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two (2) fiscal years next preceding the then current fiscal year, and (ii) that the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (B) above exceeds fifteen percent (15%) of the average of the total amount of such annual revenues.

b)      **Adoption and Maintenance of a Debt Management Policy**

During the Debt Policy Period, the Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past debt issuance practices of the Commonwealth are not repeated. While the Commonwealth may revise and update its Debt Management Policy to reflect changing bond market conditions and standards (including, but not limited to, related changes to collections, revenues, taxes, fees, etc.), the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(i)      Long-Term Borrowing for Capital Improvements Only:  To ensure the Commonwealth achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Tax-Supported Debt issued after the Effective Date may only be incurred to finance Capital Improvements,[352] as determined by the issuer

---

[352]**Capital Improvements**:  Any project or projects funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities,

of such debt approved by AAFAF, or to refinance Tax-Supported Debt in accordance with subsection (iv) below.  Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in the issuer's reasonable discretion, are necessary to carry out such Capital Improvements, including any and all expenses incurred in connection with the issuance itself.

(ii)    30-Year Maturity Limitation on All Tax-Supported Borrowing:  No Tax-Supported Debt issued on or after the Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such debt may be refinanced by any debt extending such legal final maturity date beyond such original maturity date limitation; provided, however, that, the foregoing shall not apply to (A) Tax-Supported Debt issued to finance public housing facilities, subject to the limitation established in the Commonwealth Constitution, or (B) Tax-Supported Debt issued to refinance debt that was Outstanding prior to the Effective Date and had a legal maturity of more than thirty (30) years, subject to subsection (iv) below.

(iii)   Required Principal Amortization:  No series of Tax-Supported Debt issed from and after the Effective Date may be issued unless its principal commences to amortize within two (2) years of its original issuance date, or such other period not to exceed five (5) years from original issuance as may be permitted under the U.S. Internal Revenue Code for tax exempt financings of new construction or reconstruction of Capital Improvements, and continues amortizing in each and every year until such debt is no longer outstanding.

(iv)    Refinancings Permitted only for Cash Flow Savings in every fiscal year:  Refinancings of Tax-Supported Debt are permitted only if (A) there is no increase in the amount of bond principal and interest payable in any fiscal year, and (B) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Commonwealth in its Debt Management Policies; provided, however, that refinancings without cash flow savings in every fiscal year are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future fiscal year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

Notwithstanding the foregoing, nothing contained herein shall prohibit the Commonwealth from adopting, maintaining and complying with a Debt Management Policy that is more restrictive

---

including buildings, park facilities, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit.

than the requirements set forth above.  The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## G.    Treatment of Executory Contracts and Unexpired Leases

All executory contracts and leases of nonresidential real property with any Debtor will be treated as follows:

| Category | Treatment |
|---|---|
| **Executory Contract or Unexpired Lease Rejected or Assumed and Assigned by an Order of the Title III Court Entered Before the Confirmation Date** | ***Treatment.***  Will be unaffected by the Plan.  The order of Title III Court with respect to such executory contract or unexpired lease will continue to govern. |
| **Executory Contract or Unexpired Lease Listed in Schedule to Plan Supplement** | ***Treatment.***  The Plan Supplement will include a schedule of executory contracts and unexpired leases that will be assumed, or assumed and assigned as of the Effective Date.  The scheduled may be amended at any time before the Confirmation Date.  Pursuant to the Bankruptcy Code, as a condition of assumption of an executory contract, the debtor must promptly cure any defaults, and if there is a default, provide adequate assurance that the debtor will continue to perform under the contract. ***Notice and Cure of Defaults.***  At least 20 days before the Confirmation Hearing, the Debtors will file and serve a notice to parties to such contracts or leases.  The notice will include the amount to be paid by the Debtors to cure any default for each executory contract or unexpired lease. ***Objections.***  Any party to such executory contract or unexpired lease will have 20 days from the date of service of the notice to file and serve any objection to the cure amounts listed and to any proposed adequate assurance of future performance the debtor may provide.  If there are any objections filed, the Title III Court will hold a hearing on the objection. |
| **Collective Bargaining Agreements** | Except as provided in Articles XXX and XXVII of the Plan (Provisions for Treatment of Active Employee Claims), none of the Debtors' collective bargaining agreements will be (a) treated as executory contracts, or (b) assumed or rejected or otherwise treated under the Plan. The Debtors' collective bargaining agreements will remain in effect subject to Puerto Rico Law and Articles XXX and XXVII of the Plan regarding the payment and ongoing treatment of pension and related claims and obligations. |
| **Executory Contracts and Unexpired Leases of PBA and relating to the lease or sublease of PBA Property** | ***Treatment.***  Will be unaffected by the Plan. |

| Category | Treatment |
|---|---|
| **Executory Contracts and Unexpired Leases that have been registered with the Office of the Comptroller of Puerto Rico** | *Treatment.*  Will be unaffected by the Plan. |
| **All Other Executory Contracts and Unexpired Leases** | *Treatment.*  Will be rejected by the Debtors as of the Effective Date.<br><br>*Notice.*  Notice of any executory contract or unexpired lease to be rejected will be served on parties to such contract or lease.<br><br>*Rejection Damages.*  Any party seeking to assert a claim for damages resulting from the rejection of an executory contract or unexpired lease must file a proof of claim on or before 30 days after (i) the Confirmation Date, or (ii) the date of the entry of an order by the Title III Court approving the rejection of such executory contract or unexpired lease, whichever is later.<br><br>If a party fails to file a proof of claim for damages resulting from the rejection of an executory contract or unexpired lease within the deadline above, such claim will be forever barred and unenforceable against the Debtors. |

*Insurance Policies*.  Each of the Debtors' insurance policies and any related agreements, documents, or instruments will be treated as executory contracts under the Plan.  However, such treatment will not discharge or relieve Ambac, Assured, FGIC, National, or Syncora of their respective obligations to holders of claims under policies of insurance and applicable law and governing documents with respect thereto.

*Indemnification and Reimbursement Obligations*.  Any obligation of the Debtors to indemnify and reimburse its directors or officers that were directors or officers on or prior to the relevant petition date (including any director and officer insurance policies) will be assumed as of the Effective Date.

Any indemnification obligation of the Debtors arising from conduct of officers and directors from and after the relevant petition date will be treated as Administrative Expense Claims.  Under no circumstances will the Debtors or the Reorganized Debtors, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors.  *See* section VI.D of this Disclosure Statement for a summary of the treatment of Administrative Expense Claims.

*Disputes Regarding Executory Contracts and Unexpired Leases*.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors will have 45 days following the entry of a final order resolving such dispute to alter their treatment of such contract or lease.

*PRASA Guarantee*.  On the Effective Date, the Commonwealth will assume all of its obligations (including the guarantee of payment of principal, interest, and any premium) in connection with (a) PRASA Revenue Refunding Bonds, 2008 Series A, issued in the original principal amount of $159,055,000.00 and (b) PRASA Revenue Refunding Bonds, 2008 Series B, issued in the original principal amount of $125,700,000.00.

## H.     Rights and Powers of Disbursing Agent

The disbursing agent will be the Commonwealth or an entity/ies designated by the Oversight Board and AAFAF on or before the Effective Date to make or facilitate distributions in accordance with the Plan.

*Powers of the Disbursing Agent*.  The Disbursing Agent will be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations of the Plan, and (d) exercise any other powers vested in the Disbursing Agent by an order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the Plan.

*Fees and Expenses Incurred From and After the Effective Date.*  The reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date, and any reasonable compensation and expense reimbursement claims (*e.g.*, reasonable fees and expenses of counsel) incurred by the Disbursing Agent will be paid in cash without further order of the Title III Court.

*Exculpation*.  The Disbursing Agent will be exculpated by all entities (including holders of claims and other parties in interest) from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Disbursing Agent, except for actions or omissions to act arising out of gross negligence or willful misconduct of the Disbursing Agent.  No holders of a claim or other party in interest may have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

## I.     Provisions Governing Distributions

*Time and Manner of Distributions.*

*Distributions to Holders of Claims*.  The Disbursing Agent will make distributions to holders of the following claims within ten (10) business days after the Effective Date.  *See* section VI.E of the Disclosure Statement for the applicable distributions to be made to holders of such claims.

- Allowed PBA Bond Claims

- Allowed CW Bond Claims

- Allowed CW Guarantee Bond Claims

- Allowed ERS Bond Claims

- Allowed CW General Unsecured Claims

- Allowed ERS General Unsecured Claims

Distribution of the Retail Support Fee, if any, to a holder of an Allowed PBA Bond Claim or Allowed CW Bond Claim is subject to the delivery, on or before the Voting Deadline, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

*Distributions to Holders of Allowed PBA General Unsecured Claims.*  The Disbursing Agent will make distributions to holders of Allowed PBA General Unsecured Claims in the treatment provided for holders of Allowed PBA General Unsecured Claims in Class 9.

***Distributions of Cash to Holders of Certain Other Claims.***  Distributions to holders of Allowed Administrative Expense Claims will be made in cash as soon as practicable after the later of (i) the Effective Date, or (ii) the date on which the claim becomes an allowed claim.

***Timeliness of Payments.***  Any payment or distribution made within ten (10) business days after the date specified in the Plan will be considered timely made.  When a distribution is due on a day other than a business day, such distribution will be made on the next business day, without interest, and will be considered to have been made on the date due.

***Distributions by the Disbursing Agent.***  All distributions under the plan will be made by the Disbursing Agent, unless otherwise specified.  The Disbursing Agent will hold all property to be distributed under the Plan in trust for all entities entitled to receive such property.  The Disbursing Agent will not hold an economic or beneficial interest in such property.

***Manner of Payment under the Plan.***  Cash payments will be made by either check or wire transfer.  However, no cash payment will be made until the amount payable is equal to or greater than ten dollars ($10.00).

***Delivery of Distributions.***  Distributions and deliveries to holders of allowed claims will be made (a) at the address of the applicable holder in the schedules filed with the Title III Court, unless the holder filed a proof of claim with an updated address, or the Debtors have been notified in writing of a change of address, or (b) through The Depository Trust Company.

However, initial distributions for holders of the following claims may be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the applicable governing documents for Allowed Bond Claims.

Distributions of the PSA Restriction Fees, Retail Support Fee, Retail Support Fee Return, and Consummation Costs in cash will be made to the applicable parties in a manner mutually agreed upon between such party and the Disbursing Agent.  The trustee or fiscal agent for each such obligation will, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents.

The Debtors, its agents and servicers, and the Disbursing Agent have no obligation to recognize any transfer of Bond Claims after the Distribution Record Date.  However, the New GO Bonds and COFINA Junior Lien Bonds will be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the COFINA Junior Lien Bonds Indenture, respectively.

*Cancellation of Notes, Instruments, Certificates, and Other Documents.*  On the Effective Date, the PBA Bonds, ERS Bonds, GO Bonds and all instruments and documents related thereto will be cancelled, terminated and of no further force or effect against the Debtors.  The Debtors and the applicable trustee, paying agent, or fiscal agent will have no continuing obligations or duties and responsibilities under the PBA Bonds, ERS Bonds, and GO Bonds.  The obligations of the parties to the Debtors under the PBA Bonds and GO Bonds and all related instruments and documents will be discharged.

However, the PBA Bonds, ERS Bonds, and GO Bonds and related instruments and documents will continue in effect for the limited purposes below:

(i)     to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform related necessary administrative or other functions,

(ii)    to allow holders of Allowed Bond Claims to receive distributions in accordance with the terms and provisions of the Plan,

(iii)   for any trustee, agent, contract administrator or similar entity under all instruments and related documents to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements,

(iv)    to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, or

(v)     as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a monoline insurer.

The Oversight Board will request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.

*Undeliverable/Reserved Distributions.*

*Holding of Undeliverable Distributions by the Disbursing Agent.*  If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution will be made until the Disbursing Agent is notified, in writing, of such holder's then-current address. Undeliverable distributions will remain in the possession of the Disbursing Agent until the distribution becomes deliverable.  All entities ultimately receiving previously undeliverable cash

will not be entitled to any interest or other accruals thereon of any kind.  The Disbursing Agent is not required to locate any holder of an allowed claim.

*Failure to Claim Undeliverable Distributions*.  The Disbursing Agent will file a list with the Title III Court setting forth the names of any entity for which checks have been issued, but have not been cashed, or for which any other distribution has been returned as undeliverable.  Such list will be filed within 180 days after the Effective Date (or within 180 days after a claim has been allowed, whichever is later).

Any holder of an allowed claim on such list will have six (6) months from the date the list is filed to identify itself and assert its right to receive a distribution.  After six (6) months, such holder will be barred from asserting any entitlement to the undeliverable distribution.

***Withholding and Reporting Requirements.***  All distributions under the Plan will be subject to any withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority.  Each holder of an allowed claim that will receive a distribution under the Plan will be responsible for paying any taxes imposed on such holder on account of such distribution, including income, withholding and other tax obligations.

Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until the holder of an allowed claim has made arrangements for payment of any withholding tax obligations.  If the party issuing any instrument or making any distribution under the Plan fails to withhold a distribution, and is later held liable for the amount of such withholding, the holder must reimburse such party.

The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9.  If the holder fails to comply with such a request within one year, the distribution shall be deemed an Unclaimed Distribution.

***Time Bar to Cash Payments.***  Checks issued by the Disbursing Agent will be null and void if not cashed within one hundred twenty (120) days from and after the date of issuance.  Requests for reissuance of any check must be made directly to the Disbursing Agent.

Any claim related to a voided check must be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of the check, if the check represents a final distribution.  After such date, all claims related to voided checks will be discharged and forever barred and the Disbursing Agent will retain all monies for such check to redistribution to holders of allowed claims in accordance with the terms and provisions of the Plan.

***Distributions After Effective Date.***  Distributions made after the Effective Date to holders of claims that are not allowed claims as of the Effective Date, but which later become allowed claims, will be deemed to have been made in accordance with the terms and provisions of the Plan.

***Setoffs.***  The Disbursing Agent may set off against any allowed claim and the distributions to be made pursuant to the Plan, the claims, rights, and causes of action of any nature that the Debtors or Reorganized Debtors may hold against the holder of such allowed claim.

However, neither the failure to effect such a setoff nor the allowance of any claim will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights, and causes of action that the Debtors or the Reorganized Debtors may possess against such holder.

***Allocation of Plan Distributions Between Principal and Interest.*** To the extent that any allowed claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), distributions will be allocated first, to interest accrued and unpaid as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, second, to the principal amount of the claim (as determined for federal income tax purposes), and then to the extent the consideration exceeds the principal amount of the claim to other amounts (such as accrued but unpaid interest).

However, the Debtors or Reorganized Debtor's treatment of any distributions for its tax purposes will not be binding on any creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

***Payment of Trustee Fees and Expenses.*** At least five (5) days before the Effective Date, trustees will provide invoice summaries and supporting documentation to the Oversight Board and AAFAF, on behalf of the Debtors, relating to all incurred and unpaid trustee claims as of such date, together with an estimate of trustee claims to be incurred from such date up to and including the Effective Date. Within fifteen (15) Business Days after receipt of such invoice summaries, the Debtors will notify the trustee, in writing, of any dispute relating to the reasonableness of any portion of the trustee claims. Any portion of the trustee claims that is not disputed by the Debtors will be paid by the Debtors on the Effective Date without further approval of the Title III Court. Upon notification of a dispute, trustees (a) must submit an application to the Title III Court seeking a resolution of such dispute by the Title III Court or (b) waive, in writing, payment of such disputed amount. Upon the entry of an order of the Title III Court authorizing payment of any disputed amount, the Debtors will pay such allowed portion of such trustee claims.

To the extent any trustee claim is incurred from and after the Effective Date, Reorganized Debtors will be responsible and, upon presentation of supporting documentation in form and substance satisfactory to Reorganized Debtors, will satisfy such post-Effective Date trustee claims. Under no circumstance will the Disbursing Agent, the Debtors or Reorganized Debtors be responsible for any indemnification obligation, cost, or expense of Trustees associated with the gross negligence, intentional fraud or willful misconduct of Trustees in making any distribution pursuant to the Plan.

***Beneficial Owner.*** For all purposes of the Plan, including for purposes of distributions pursuant to the Plan, except with respect to Claims arising from bonds insured by Suncora, the "holder" of a Claim means any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim.

However, solely for purposes of Article LXII of the Plan and section 1126 of the Bankruptcy Code, the "holder" of any Bond Claims will be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Bond Claims.

***Value of Distributions***.  For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash will be valued in the amount distributed and (b) the New GO Bonds and the COFINA Junior Lien Bonds will be valued at the original principal amount thereof.

## J.    Avoidance Actions Trust

### 1.    Execution of Avoidance Actions Trust Agreement

On or before the Effective Date, the Debtors and the Avoidance Actions Trustee will execute the Avoidance Actions Trust Agreement and establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests.  The Avoidance Actions Trust and the Avoidance Actions Trust Interests will be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their claims are allowed before or after the Effective Date.

The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those stated in the Plan, but only to the extent that they do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for federal income tax purposes.

### 2.    Purpose of the Avoidance Actions Trust

The Avoidance Actions Trust will be established for the sole purpose of litigating or settling the Avoidance Actions and distributing its assets in accordance with Treasury Regulation section 301.7701-4(d).

### 3.    Avoidance Actions Trust Assets

The Avoidance Actions Trust Assets consist of the Avoidance Actions and such other actions that have been brought by or on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth on Exhibit F to the Plan.

On the Effective Date, the Debtors will transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Avoidance Actions Trust Assets may be transferred subject to certain liabilities as provided in the Plan or the Avoidance Actions Trust Agreement. The transfer will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors and their predecessors, successors and assigns, and each other Entity will be released pursuant to Section 74.2 of the Plan, and will be discharged and released from all liability with respect to the delivery.

### 4.    Administration of the Avoidance Actions Trust

The Avoidance Actions Trust will be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan.  If there are inconsistencies between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement will govern.

5.      **The Avoidance Actions Trustee and the Avoidance Actions Trust Board**

If the Avoidance Actions Trustee dies, is terminated, or resigns for any reason, the Avoidance Actions Trust Board will designate a successor. The Avoidance Actions Trustee cannot be a director or officer of any affiliate of the Avoidance Actions Trust.

The Avoidance Actions Trust Board will consist of three (3) members appointed as of the Effective Date to govern the Avoidance Actions Trust, with two (2) directors selected by the UCC, and one (1) director selected by the Oversight Board.

6.      **Role of the Avoidance Actions Trustee**

The Avoidance Actions Trustee will have the rights, powers, and duties to:

a)      hold, manage, convert to cash, and distribute the Avoidance Actions Trust Assets, including resolving the claims belonging to the Avoidance Actions Trust;

b)      hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, regardless of when their claims are allowed;

c)      investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Avoidance Actions Trust;

d)      file all tax and regulatory forms, returns, reports, and other documents required with respect to the Avoidance Actions Trust;

e)      control, prosecute, and/or settle objections to claims on behalf of the Avoidance Actions Trust; and

f)      hold, manage, and distribute cash or non-cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority.

The Avoidance Actions Trustee will act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

7.      **Avoidance Actions Trustee's Tax Power for Debtors**

From and after the Effective Date, the Avoidance Actions Trustee will prepare and file all tax returns required to be filed or that the Avoidance Actions Trustee otherwise deems appropriate on behalf of the Debtors.

8.      **Transferability of Avoidance Actions Trust Interests**

The Avoidance Actions Trust Interests will not be transferable or assignable except for by will, intestate succession, or operation of law.

346

9.      **Cash**

The Avoidance Actions Trustee may invest cash as permitted by section 345 of the Bankruptcy Code. The investments must be investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), or under IRS guidelines, rulings, or other controlling authorities.

10.      **Distribution of Avoidance Action Trust Assets**

The Avoidance Actions Trustee will distribute to the holders of allowed claims on account of their Avoidance Actions Trust Interests, on a semi-annual basis, all unrestricted cash on hand. This includes any cash received from the Debtors on the Effective Date, and treating any permissible investment as cash for purposes of distribution.

However, this semi-annual distribution will not include:

a)      Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust;

b)      Amounts retained in connection with Disputed Claims in accordance with Section 64.3 of the Plan to pay reasonable incurred or anticipated expenses (e.g., taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets).

The Avoidance Actions Trustee will not be required to make a semi-annual distribution if (i) the aggregate, net amount of unrestricted cash available for distribution (taking into account the exclusions above) would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and (ii) such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00). The Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, may decide to forego the first quarterly distribution to holders of Avoidance Actions Trust Interests if the Avoidance Actions Trustee is not prepared to make the distribution. If this occurs, the distribution will be made to such holders as soon as practicable after the Avoidance Actions Trustee is administratively prepared to do so.

11.      **Funding, Costs, and Expenses of the Avoidance Actions Trust**

On the Effective Date, the Avoidance Actions Trust will be funded on a one-time basis in an amount of $5,000,000.00.

The reasonable costs and expenses of the Avoidance Actions Trust, which include the fees and expenses of the Avoidance Actions Trustee and its retained professionals, will be paid out of the Avoidance Actions Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any claims will be considered costs and expenses of the Avoidance Actions Trust.

12.      **Compensation of the Avoidance Actions Trustee**

The Avoidance Actions Trustee will be entitled to reasonable compensation consistent with that of similar functionaries in similar roles, the payment of which will be subject to the approval of the Title III Court, but subject to approval and consent of the Avoidance Actions Trust Board.

13.    **Retention of Professionals/Employees by the Avoidance Actions Trustee**

The Avoidance Actions Trustee may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board, if the Avoidance Actions Trustee deems it appropriate, without Title III Court approval and subject to consent of the Avoidance Actions Trust Board.

14.    **Federal Income Tax Treatment of the Avoidance Actions Trust**

a)    **Avoidance Actions Trust Assets Treated as Owned by Creditors.**

For federal income tax purposes, all parties will treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as

(i)    a transfer of the Avoidance Actions Trust Assets directly to the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the Avoidance Actions Trust Claims Reserve, followed by

(ii)    the transfer of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to the Avoidance Actions Trust Claims Reserve) by the beneficiaries to the Avoidance Actions Trust in exchange for Avoidance Actions Trust Interests.

The Avoidance Actions Trust Beneficiaries will be treated as the grantors and owners of their respective share of the Avoidance Actions Trust Assets for federal income tax purposes (other than Avoidance Actions Trust Assets that are allocable to the Avoidance Actions Trust Claims Reserve). This will also apply to state and local income tax purposes, to the extent allowed by law.

b)    **Tax Reporting.**

(i)    The Avoidance Actions Trustee will file Tax Returns for the Avoidance Actions Trust, treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 60.14 of the Plan. The Avoidance Actions Trustee also will annually send a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for U.S. federal income tax purposes to each holder of an Avoidance Actions Trust Interest. The statement will instruct all holders to use the statement in preparing their U.S. federal income tax returns or to forward the appropriate information to the holder's beneficial holders, with instructions to use the statement in

348

preparing their U.S. federal income tax returns. The Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(ii)     Pursuant to the Plan, the Avoidance Actions Trustee, in consultation with the Avoidance Actions Board, will, in good faith, value the Avoidance Actions Assets. The Avoidance Actions Trustee shall make the respective values of the Avoidance Actions Assets available from time to time, to the extent relevant, and all parties to the Avoidance Actions Trust (including, without limitation, the Debtors, the Avoidance Actions Trustee and Avoidance Actions Trust Beneficiaries) must consistently use the value of the assets transferred to the Avoidance Actions Trust provided by the Debtors or the Avoidance Actions Trustee pursuant to the Plan for all U.S. federal income tax purposes.

(iii)    Allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to the Avoidance Actions Trust Claims Reserve) will be determined by: reference to the manner in which an amount of cash representing the taxable income would be distributed (were the cash allowed to be distributed at the time) if, immediately prior to the distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Avoidance Actions Trust Claims Reserve) to the holders of the Avoidance Actions Trust Interests. The value will be adjusted for prior taxable income and loss and take into account all prior and concurrent distributions from the Avoidance Actions Trust. Taxable loss of the Avoidance Actions Trust will be allocated by: reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. The tax book value of the Avoidance Actions Trust Assets will be equal their fair market value on the Effective Date, adjusted with IRC tax accounting principles, Treasury Regulations, and other applicable authorities.

(iv)    Subject to guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the Avoidance Actions Trustee will

    (1)    elect to treat any Avoidance Actions Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9

    (2)    to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All other parties (including, without limitation, the Debtors and the Avoidance Actions Trust Beneficiaries) must report for United States federal, state and local income tax purposes consistently with the foregoing.

350

(v)     The Avoidance Actions Trustee will be responsible for payment of any Taxes imposed on the trust or its assets, including the Avoidance Actions Trust Claims Reserve, out of the Avoidance Actions Trust Assets. If any Cash retained on account of Disputed Claims in the Avoidance Actions Trust Claims Reserve is insufficient to pay the portion of Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets of the Avoidance Actions Trust Claims Reserve), the Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent the Disputed Claims have been resolved, deducted from any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution of the Disputed Claims.

c)     **Tax Withholdings by Avoidance Actions Trustee.**

The Avoidance Actions Trustee may withhold and pay taxes on all amounts required to be withheld pursuant to the IRC or foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests. All amounts withheld and paid (or placed in escrow pending resolution of the need to withhold) will be treated as amounts distributed to holders of Avoidance Actions Trust Interests for all purposes of the Avoidance Actions Trust Agreement. The Avoidance Actions Trustee will be authorized to collect tax information from the holders of Avoidance Actions Trust Interests (including social security numbers or other tax identification numbers) that it deems necessary to effectuate the Plan, the Confirmation Order, and the Avoidance Actions Trust Agreement. In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests will be required to identify themselves to the Avoidance Actions Trustee and provide tax information and the specifics of their holdings to the extent the Avoidance Actions Trustee deems appropriate. This identification requirement applies to all holders, including those who hold their securities in street name.  The Avoidance Actions Trustee may refuse to distribute to any holder of an Avoidance Actions Trust Interest who fails to provide it the information in a timely fashion, and until the information is delivered, may treat the holder's Avoidance Actions Trust Interests as disputed. If the information is not given to the Avoidance Actions Trustee within six (6) months of the original request to provide it, no further distributions will be made to the holder of the Avoidance Actions Trust Interest. Upon the delivery of the information by a holder of an Avoidance Actions Trust Interest, the Avoidance Actions Trustee will make a distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by the delay in providing tax information. If the Avoidance Actions Trustee fails to withhold amounts received or distributable with respect to the holder and the Avoidance Actions Trustee is later held liable for the amount of the withholding, such holder will reimburse the Avoidance Actions Trustee to the extent the amounts were actually distributed to such holder.

d)  **The Avoidance Actions Trustee and the Avoidance Actions Trust will be discharged or dissolved, upon the earlier to occur of**

(i)  all of the Avoidance Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust Agreement;

(ii)  the Avoidance Actions Trustee determines, with the consent of the Trust Advisory Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit; or

(iii)  all distributions required to be made by the Avoidance Actions Trustee under the Plan and the Avoidance Actions Trust Agreement have been made. The Avoidance Actions Trust may not be dissolved later than three (3) years from the Effective Date unless the Title III Court, upon motion six-months prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets. The extension is not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Avoidance Actions Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as an Avoidance Actions trust for United States federal income tax purposes. If at any time the Avoidance Actions Trustee determines, in reliance upon its retained professionals, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Avoidance Actions Trustee may apply to the Title III Court for authority to

(1)  (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC

(2)  exempt from United States federal income tax under section 501(a) of the IRC, and

(3)  dissolve the Liquating Trust.

15.  **Indemnification of Avoidance Actions Trustee**

The Avoidance Actions Trustee and its employees, agents and professionals (i) will not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee, except acts arising out of their own willful

misconduct or gross negligence, and (ii) will be entitled to indemnification and reimbursement for fees and expenses  in defending actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the parties entitled to indemnification will be paid solely from the Avoidance Actions Trust Assets and will be entitled to a priority distribution, ahead of the Avoidance Actions Trust Interests and any other claim to or interest. The Avoidance Actions Trustee will be entitled to rely, in good faith, on the advice of its retained professionals.

### K.    Prosecution and Extinguishment of Claims Held by the Debtors

From and after the Effective Date, the Avoidance Actions Trustee will have the exclusive right and power to (a) litigate any avoidance, recovery, subordination, or other actions or remedies identified on Exhibit E to the Plan under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, or under non-bankruptcy law, and (b) compromise and settle such claims with the approval of the Title III Court. The net proceeds of any such litigation or settlement will be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

### L.    Acceptance or Rejection of the Plan, Effect of Rejection by One or More Classes of Claims

*Impaired Classes to Vote.*  As of the Voting Record Date (June 3, 2020), each holder of a claim in the impaired classes below are entitled to vote separately to accept or reject the Plan.

*Acceptance by Class of Creditors.*  An impaired class accepts the Plan if (i) at least two-thirds (2/3) in dollar amount of the Allowed Claims of such class who have voted accept the Plan, and (ii) more than one-half (1/2) in the number of the Allowed Claims of such class that have voted accept the Plan.

*Cramdown.*  If any impaired class of claims reject, or fail to accept, the Plan, the Debtors may (i) request the Title III Court to confirm the Plan in accordance with the "cramdown" provisions of the Bankruptcy Code, or (ii) subject to the consent of the PSA Creditors, amend the Plan.  For a summary of the "cramdown" provisions under the Bankruptcy Code, *see* section VII.C.1 of this Disclosure Statement.

### M.    Rights and Powers of Disbursing Agent

The disbursing agent will be the Commonwealth or an entity designated by the Oversight Board and the Commonwealth on or before the Effective Date to make or facilitate distributions in accordance with the Plan.

*Powers of the Disbursing Agent.*  The Disbursing Agent will be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations of the Plan, and (d) exercise any other powers vested in the Disbursing Agent by an order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the Plan.

*Fees and Expenses Incurred From and After the Effective Date.*  The reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date, and any reasonable compensation and expense reimbursement claims (*e.g.*, reasonable fees and expenses of counsel) incurred by the Disbursing Agent will be paid in cash without further order of the Title III Court.

*Exculpation.*  The Disbursing Agent will be exculpated by all entities (including holders of claims and other parties in interest) from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Disbursing Agent, except for actions or omission to act arising out of gross negligence or willful misconduct of the Disbursing Agent.  No holders of a claim or other party in interest may have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

## N.   Procedures for Treatment of Disputed Claims

*Objections to Claims; Prosecution of Disputed Claims.*  The Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, will file and serve any objections to claims no later than 180 days following the Effective Date, or such later date as approved by the Title III Court.  All objections, affirmative defenses, and counterclaims will be litigated to final order.  The Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, will have the authority to file, settle, compromise, or withdraw any objections to claims, without approval of the Title III Court.

Any Bond Claim filed by any entity for amounts due under existing securities will be disallowed, expunged, and removed from the claims registry on the Effective Date.

Claims subject to resolution pursuant to the ADR Procedures and ADR Procedures Order will continue to be addressed under such procedures.

*Estimation of Claims*.  On and after the Effective Date, the Reorganized Debtors may request the Title III Court to estimate for final distribution purposes any contingent, unliquidated, or disputed claim, regardless of whether the Debtors previously objected to or sought to estimate such claim.

The Title III Court will retain jurisdiction to consider any request to estimate any claim.

If the Title III Court estimates any contingent, unliquidated, or disputed claim, the estimated amount will be either the allowed amount of such claim, or a maximum limitation on such claim, as determined by the Title III Court.  If the estimate constitutes the maximum limitation on such claim, the Reorganized Debtors may in the future object to the ultimate allowance of such claim.

*Disputed Claims Holdback.*  The Reorganized Debtors will hold, for the benefit of each holder of a disputed claim, the distribution such holders would receive if the disputed claim were allowed, until the disputed claim is settled, estimated by the Title III Court, or allowed.  The amount of the distribution held back will be the lesser of (i) the liquidated amount stated in the filed proof of claim relating to such disputed claim, (ii) the amount of the disputed claim estimated

by the Title III Court as the maximum amount in which such claim may ultimately become an allowed claim, or (iii) such other amount agreed upon by the holder of such disputed claim and Reorganized Debtors.  The recovery of any holder of a disputed claim cannot exceed the lesser of (i), (ii), or (iii) above.

To the extent that Reorganized Debtors retain the New GO Bonds or COFINA Junior Lien Bonds on behalf of disputed claims holders, Reorganized Debtors shall exercise voting or consent rights with respect to such bonds until such bonds are distributed.

*Allowance of Disputed Claims.*  When a disputed claim becomes an allowed claim (in whole or in part), the Reorganized Debtors will make distributions pursuant to the treatment specific under the Plan to the holder of such claim, to the extent the claim is allowed.  Such distribution will be made no more than 90 days after such claim is determined to be allowed.  With respect to the PBA Bond Distribution, Vintage CW Bond Distribution, and the New Bonds held back, any earnings that have accrued on such distribution will also be distributed.

*Non-Accrual of Interest.*  No holder of a claim (allowed or otherwise) will be entitled to interest accruing on or after the relevant petition date on any claim or right.  Interest will not accrue or be paid on any disputed claim with respect to the period from the Effective Date to the date of final distribution, if such disputed claim becomes an allowed claim.

*Disallowance of Claims.*  If (a) an entity is liable to turn over any property or monies to the Debtors, and (b) such entity has failed to turn over such property or monies to the Debtors by the applicable deadline, all claims of such entity will be disallowed.

*Authority to Amend List of Creditors.*  Except with respect to Bond Claims, the Debtors may amend the List of Creditors with respect to any claim and to make distributions based on such amended List of Creditors without approval of the Title III Court.  If any amendment reduces the amount of a claim or changes the nature or priority of a claim, the Debtors will provide the holder of such claim with notice of the amendment.  Such holder will have 20 days to file an objection to the amendment with the Title III Court.  If no objection is filed, distributions will be made based on such amended List of Creditors without approval of the Title III Court.

## O.  Governance and Provisions Regarding Pension Reserve

*Formation and Responsibilities of Pension Reserve.*  On or before the Effective Date, the Commonwealth will take all necessary steps to establish the Pension Reserve Trust, a reserve trust which will be utilized to secure the Commonwealth's pension obligations under Act 106.

*Funding of the Pension Reserve.*  On the Effective Date, the Commonwealth will contribute to the Pension Reserve Five Million Dollars ($5,000,000.00) to fund the initial administrative fees, costs, and expenses of the Pension Reserve Trust.  From and after fiscal year 2020 until fiscal year 2027, the Reorganized Commonwealth will make annual contributions before October 1st in the amount equal to (a) the Base Contribution,  (b) an additional amount calculated as the lower of the primary surplus for the fiscal year and the projected Fiscal Plan primary surplus for such fiscal year, minus the sum of (i) the Base Contribution for the fiscal year, plus (ii) the Commonwealth debt service obligation under the Plan for the fiscal year, plus (iii)

355

Two Hundred Million ($200,000,000); provided, however, that the additional amount cannot be lower than zero dollars, and (c) subject to applicable laws (including PROMESA Titles I and II), such additional amounts as the Reorganized Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust.  The Pension Reserve Trust will be managed by an independent entity whose members must meet the independent, professionalism, experience, and qualification standards set forth in the Pension Reserve Deed of Trust, and will be subject to all government contracting, ethics, and conflicts of interest laws and regulations.

*Non-Impairment Covenant.*  The Commonwealth will covenant in the Pension Reserve Deed of Trust for the benefit of all participants that, payments and other obligations owed to participants under the Plan (including PayGo obligations and all components of the Total Monthly Retirement Benefit after any adjustment pursuant to the Plan) will remain in place and unaltered until all obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents and the New GO Bond Legislation.  Such obligations are enforceable by the Oversight Board, and any affected ERS Participant, JRS Participant, or TRS Participant. With respect to any such provision, the Pension Reserve Deed of Trust cannot be amended or modified by the Commonwealth (i) without the express prior written consent of the Oversight Board (if in existence), and a majority in number of the ERS Participant, JRS Participant, or TRS Participant receiving benefits pursuant to the Plan, the Definitive Documents, the New GO Bond Legislation, and the COFINA Junior Lien Bonds Legislation at the time of the proposed modification or (ii) pursuant to a new Title III case for the Commonwealth and a confirmed and effective plan of adjustment.

## P.     Conditions Precedent to Confirmation of the Plan

*Conditions Precedent to Confirmation of the Plan.*  The following conditions must be satisfied before the Plan may be confirmed:

1.  *Fiscal Plan Certification*:  The Oversight Board must certify that a Fiscal Plan is consistent with the Plan, and certify the submission of the Plan (including any modification to the Plan through the Confirmation Date).

2.  *Required Orders*:  The Title III Court must have entered orders providing for the following:

    a)  Approving the disclosure statement as containing "adequate information" pursuant to Bankruptcy Code section 1125;

    b)  Authorizing the solicitation of votes and elections with respect to the Plan;

    c)  Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

    d)  Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article LXXIV of the Plan;

e) Determining that the compromises and settlements set forth in the Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

f) Determining that all applicable tests, standards, and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtors, and the Plan;

g) Approving the documents in the Plan Supplement, other than the New GO Bonds Legislation and the COFINA Junior Lien Bonds Legislation (to the extent included in the Plan Supplement) and the Reorganized Debtors By-Laws, and determining that such documents are valid and binding on parties;

h) Determining that the New GO Bonds Legislation and the COFINA Junior Lien Bonds Legislation, each to the extent enacted, are a valid means for the implementation of the Plan and the issuance of the New GO Bonds and COFINA Junior Lien Bonds, respectively; and

i) Authorizing the Reorganized Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement, and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement.

3. *Form of Orders*: The Confirmation Order and the Plan must be in a form and in substance reasonably acceptable to the Oversight Board, the Debtors, and the Initial PSA Creditors.

4. *Confirmation Order*: The Confirmation Order must include (i) determinations that all of the settlements and compromises contained in the Plan satisfy the applicable standards under Bankruptcy Code sections 365, 1123(b)(3), and 1129, and Bankruptcy Rule 9019, (ii) the releases, exculpations, and injunctions set forth in Article LXXIV of the Plan, and (ii) the provisions set forth in Section 67.1(b) of the Plan.

***Waiver of Conditions Precedent to Confirmation***.  Subject to the provisions of the Plan Support Agreements, the Oversight Board may waive each of the conditions above, in whole or in part, by filing a notice with the Title III Court at any time.

## Q.   Conditions Precedent to the Effective Date

***Conditions Precedent to the Effective Date.***  The following conditions must be satisfied before the occurrence of the Effective Date and the substantial consummation of the Plan:

1. *Fiscal Plan Certification*:  The Oversight Board must determine that the Plan is consistent with the Debtors' Fiscal Plan, and certify the submission of the Plan (including any modification to the Plan through the Confirmation Date).  The Fiscal

Plan certified as of the Effective Date shall include provisions for the payment of principal and interest with respect to the New GO Bonds.

2. *Entry of the Confirmation Order*: The Title III Court must enter the Confirmation Order providing for the following:

a) Authorizing the Debtors and the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

b) Decreeing that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

c) Authorizing the Debtors and Reorganized Debtors to (1) make all distributions and issuances as required under the Plan, and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

d) Determining the New GO Bonds and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, as provided in the New GO Bonds Legislation and the New GO Bonds Indenture or the Confirmation Order, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico and federal law;

e) Determining that the Commonwealth shall have pledged its good faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest on the New GO Bonds;

f) Determining that, pursuant to the New GO Bonds Legislation, upon deposit of monies in the Debt Service Fund and the Debt Service Reserve Fund, there shall be statutory liens on such monies for the purposes of securing payment of the New GO Bonds, which statutory liens on such monies shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms;

g) Authorizing the sale, transfer and conveyance of the Conveyed Commonwealth Share to COFINA in consideration for the Allowed Claims and the issuance of, and performance with respect to, the COFINA Junior Lien Bonds;

h) Determining that the COFINA Junior Lien Bonds and the covenants by COFINA, and the Commonwealth, as applicable, and the liens on, and pledges of, the COFINA Pledged Taxes (and all other provisions made to pay or secure payment of the COFINA Junior Lien Bonds) for the benefit of the holders of the COFINA Junior Lien Bonds, as provided in the COFINA Junior Lien Bonds Legislation and the COFINA Junior Lien

358

Bonds Indenture or the Confirmation Order, constitute valid, binding, legal and enforceable obligations of COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law;

i)      Determining the Conveyed Commonwealth Share (and any substituted collateral on the terms and conditions provided for herein or in the COFINA Junior Lien Bonds Legislation) is the property of COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of the Commonwealth or any instrumentality of the Commonwealth, other than (1) the Commonwealth's right to receive in the Conveyed Commonwealth Share upon the payment or satisfaction of the COFINA Junior Lien Bonds and any securities issued to refinance the COFINA Junior Lien Bonds, in full in accordance with their terms, (2) liens and claims afforded to holders of COFINA Senior Lien Bonds under the COFINA Senior Lien Bonds Legislation, the COFINA Plan, the COFINA Confirmation Order, and the COFINA Senior Lien Bond Indenture, and (3) the holders of the COFINA Junior Lien Bonds under the Plan and the Confirmation Order, and shall not be "available resources" or "available revenues" of the Government of Puerto Rico, as used in Section 8 of Article VI of the Commonwealth Constitution or as otherwise used in the Commonwealth Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution);

j)      Determining that, pursuant to the COFINA Junior Lien Bonds Legislation, the COFINA Junior Lien Bonds have been granted and are secured by a statutory second lien on the COFINA Pledged Taxes as described in Section 57.2 of the Plan, which lien shall remain in full force and effect until the COFINA Junior Lien Bonds have been paid or satisfied in full in accordance with their terms;

k)      Determining that the statutory lien on the COFINA Pledged Taxes, as provided in the COFINA Junior Lien Bonds Legislation, and all other provisions to pay or secure payment of the COFINA Junior Lien Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral as provided in the COFINA Confirmation Order;

l)      Determining that the transfer of the Conveyed Commonwealth Share (and any substitution of collateral on the terms and conditions provided for herein or in the COFINA Junior Lien Bond Legislation) pursuant to the COFINA Junior Lien Bonds Legislation and the Plan is appropriate and binding and specifically enforceable against COFINA, the Commonwealth, and the Reorganized Commonwealth, their respective creditors, subject to (1) the claims and liens of the holders of the COFINA Senior Lien Bonds and (2) the Commonwealth's right to receive the Conveyed Commonwealth Share

359

upon payment or satisfaction of the COFINA Junior Lien Bonds in full in accordance with their terms, and is a valid provision made to pay or secure payment of the COFINA Junior Lien Bonds;

m)   Determining the Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtors, (2) Reorganized Debtors, (3) the Commonwealth and its instrumentalities, (4) COFINA, (5) each entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including bondholders and holders of beneficial interests in bonds issued by the Debtors, COFINA, or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights are impaired pursuant to the Plan (and if impaired, whether or not such person or entity accepted the Plan), (6) any other entity, and (7) any heirs, successors, assigns, agents or other similar parties of such persons or entities;

n)   Providing that each Fiscal Plan, certified as of, or subsequent to, the Effective Date, shall include provisions for the principal and interest payable on the New GO Bonds;

o)   Determining that the statutory first lien on funds once deposited into the Debt Service Fund and the Debt Service Reserve Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights herein and in the Confirmation Order;

p)   Providing that the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to monies on deposit in the Debt Service Fund and the Debt Service Reserve Fund as of the commencement thereof;

q)   Determining that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth as determined in accordance with modified accrual accounting standards;

r)   Providing that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds under

360

PROMESA, the Commonwealth Constitution or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding; and

s)    Determining the Plan is consistent with the Debtors' Fiscal Plans and satisfies section 314(b)(7) of PROMESA.

3.    *No Injunction*:  The Confirmation Order must not be stayed in any respect.

4.    *Authorizations:*  All (1) authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan (including the New GO Bonds Legislation and the COFINA Junior Lien Bonds Legislation) have been obtained or enacted or entered and not revoked or reversed, and (2) completion of any other required legislative or other governmental action required to consummate the Plan.

5.    *Execution of Documents; Other Actions:*  The Definitive Documents and all actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered are in full force and effect.

6.    *Opinions:*  Usual and customary legal opinions for issuances of the type similar to the New GO Bonds and the COFINA Junior Lien Bonds by outside counsel to the Debtors covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the Initial PSA Creditors, must be delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan.

7.    *Constitutional Claims:*  The Title III Court must have entered an order finding that any Claim asserted against the Debtors, the Reorganized Debtors, and any other public corporation or instrumentality of the Commonwealth based on any bonds issued or guaranteed by or loans made to or guaranteed by any such entity will be determined to be a Claim arising before the Petition Date and classified in Classes _____ (except Allowed ERS Bond Claims to the extent secured) and will be dischargeable and discharged pursuant to the Plan or Confirmation Order and the Debtors, the Reorganized Debtors, and any other public corporation or instrumentality of the Commonwealth will have no liability on account of such claim.

   ***Waiver of Conditions Precedent.***    Subject to the provisions of the Plan Support Agreements, the Oversight Board may waive each of the conditions above at any time without any notice to any party, other than the PSA Creditors and the Government Parties, and without further notice to or action by the Title III Court.

***Effect of Non-Occurrence of Conditions to Effective Date.*** If the Confirmation Order is vacated by a final order before the Effective Date, the Plan will be null and void in all respects, unless the order vacating the Confirmation Order provides otherwise.

## R.   Modification, Revocation, or Withdrawal of the Plan

***Modification of the Plan.*** The Oversight Board may alter, amend, or modify the Plan or Exhibits at any time prior to or after the Confirmation Date, but before the Effective Date.[353] A holder of a claim that has accepted the Plan will be deemed to have accepted the Plan as altered, amended, or modified so long as the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the claim of such holder.

***Revocation or Withdrawal of the Plan.*** Subject to the terms and provisions of the Plan Support Agreements, the Oversight Board may revoke or withdraw the Plan at any time before the Confirmation Date.

If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan will be null and void, and nothing in the Plan will constitute a waiver or release of any claim by the Debtors or any other entity, or prejudice the rights of the Debtors or any other entity in any further proceeding involving the Debtors.

***Amendment of Plan Documents.*** From and after the Effective Date, the right to make any amendment, modification, or supplement to the Plan Supplement, Exhibits to the Plan Supplement, or Exhibits to the Plan will be governed by the terms of such document.

***No Admission of Liability.*** The submission of the Plan is not intended to be and will not be construed as an admission or evidence in any pending or subsequent suit, action, proceeding or dispute regarding any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any entity with respect to any of the matters addressed in the Plan.

The Plan and any settlement entered, act performed, or document executed in connection with the Plan (i) may not be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any entity; (ii) may not be used as an admission or evidence of any liability, fault or omission of any entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; and (iii) may not be used as an admission or evidence against Reorganized Debtors, the Debtors, or any other person or entity with respect to the validity of any Claim.

The Plan and any settlement entered, act performed, or document executed in connection with the Plan will not be admissible in any proceeding for any purposes, except to carry out the terms of the Plan. However, once the Plan is confirmed, any entity may file the Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based

---

[353] Any such alteration, amendment, or modification is subject to the requirements of sections 104(j) and 313 of PROMESA, Bankruptcy Code sections 942 and 1127(d), and the terms of the Plan Support Agreements.

on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## S.   Corporate Governance and Management of Reorganized Debtors

*Corporate Action.*  On the Effective Date, all matters under the Plan that would require approval of the directors of the Debtors or Reorganized Debtors (including the authorization to issue the New GO Bonds, the COFINA Junior Lien Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment of directors and officers of Reorganized Debtors pursuant to the Plan) will be authorized and approved in accordance with the New GO Bonds Legislation, the COFINA Junior Lien Bonds Legislation, and the new corporate governance documents and without further action by any entity under any other applicable law, regulation, order, or rule.

Matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by Reorganized Debtors will be authorized and in effect in accordance with the New GO Bonds Legislation and the COFINA Junior Lien Bonds Legislation and the new corporate governance documents.  After the Confirmation Date, the Debtors and Reorganized Debtors will take any and all actions deemed appropriate in order to consummate the transactions contemplated in the Plan in accordance with the New GO Bonds Legislation, the COFINA Junior Lien Bonds Legislation, and the new corporate governance documents, as applicable.

*Amendment of By-Laws.*  To the extent applicable, the by-laws of the Reorganized Debtors will be amended as of the Effective Date to provide substantially as set forth in the Reorganized Debtors By-Laws.

*Dissolution of ERS.*  On or as soon as practicable after the Effective Date, ERS will be dissolved and all existing directors and officers of ERS will be relieved of any further duties and obligations.  Upon such dissolution, all remaining assets of ERS will be transferred to the Commonwealth.

*Officers of Reorganized Debtors.*  To the extent applicable, the board of directors of Reorganized Debtors will elect officers of Reorganized Debtors as of or after the Effective Date.

*PBA Governance Structure*.  No changes to the PBA Governance structure or PBA collective bargaining agreements will be implemented during or after the PBA Title III Case, unless approved by the Oversight Board upon consultation with AAFAF.

## T.   Provisions Regarding Oversight Board and Compliance with PROMESA

*Effect of Confirmation.*  Nothing in the Plan or the Confirmation Order will discharge, substitute, alter, or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of each Reorganized Debtor under PROMESA. Beginning on the Effective Date, the Reorganized Debtors will be required to comply with all of the terms and conditions of PROMESA, including Title III of PROMESA.

363

*Ongoing Role of the Oversight Board.*  Nothing in the Plan or the Confirmation Order will discharge any or all obligations of each Debtor under PROMESA.  From and after the Effective Date, the Oversight Board's power and responsibilities under PROMESA will continue and the Debtors' duties and obligations will continue and be unaffected by the Plan and the consummation of the Plan.

*Preemption of Laws.*  As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, all laws of the Commonwealth, other than budgets certified by the Oversight Board, inconsistent with PROMESA, will be preempted.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016 that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws will not be enforceable to facilitate payment of such indebtedness, and will not be enforceable if enforcement of such laws would be inconsistent with any provision of PROMESA having continuing applicability and effectiveness. A list of Commonwealth laws preempted by PROMESA is attached as Exhibit K to the Plan. Certain litigation relating to any of the statutes or Commonwealth Constitution provisions listed in such exhibit preempted by PROMESA will be dismissed, with prejudice, as of the Effective Date.  The list of Commonwealth laws in Exhibit K to the Plan may not include all Commonwealth laws that are preempted by PROMESA.  Parties may in the future litigate issues regarding the preemption by PROMESA of Commonwealth laws not specifically listed in Exhibit K to the Plan or Section 71.3 of the Plan.

## U.    Provisions Regarding Committees

*Dissolution of Committees.*  On the Effective Date, each of the UCC and the Retiree Committee will be dissolved and will have satisfied all of its respective duties and obligations. The committees will be released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Cases.

To the extent that, as of the date immediately prior to the Effective Date, either the UCC or the Retiree Committee was a party to a contested matter or adversary proceeding in connection with the Title III Cases, including, the Debt Related Litigation, the PBA Litigation, the Invalidity Actions, the Lien Challenge Actions, the ERS Litigation, the Appointments Clause Litigation and any claim objection, beginning on the Effective Date, the Reorganized Debtors or the Avoidance Actions Trustee will be deemed to have assumed such role and responsibility in connection with the contested matter.  Upon assumption, the UCC or the Retiree Committee will be relieved of any role, responsibility or obligation with respect to the contested matter.

Retention of Jurisdiction

*Retention of Jurisdiction.*  The Title III Court will retain exclusive jurisdiction over any matter arising under PROMESA or related to the Title III Cases and the Plan, or the following:

1.     Matters to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any claim not compromised or settled pursuant to the Plan (including matters addressing the resolution of

request for payment of any claim and objections to the secured or unsecured status, priority, amount, or allowance of claims);

2.    Matters related to Executory Contracts or Unexpired Leases.  This includes (i) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

3.    Ensuring that distributions to holders of allowed claims are accomplished under the provisions of the Plan and adjudicating any and all disputes arising from or relating to distributions under the Plan;

4.    Adjudicating, deciding, or resolving any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors or Reorganized Debtors that may be pending on the Effective Date or brought after the Effective Date;

5.    Deciding and resolving all matters related to the granting and denying any applications for allowance of compensation or reimbursement of expenses to professionals authorized under to PROMESA, the Plan or orders entered by the Title III Court;

6.    Entering and implementing orders that are either necessary or appropriate to execute, implement, consummate, or enforce the provisions of (i) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Cases and (ii) the Plan, the Confirmation Order, Definitive Documents and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the Plan;

7.    Resolving cases, controversies, suits, disputes or any other challenges that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, Definitive Dcouments or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

8.    Approving  any modification of the Plan, the Confirmation Order, or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order;

9.    Remedying any defect or omission or reconciling any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or entering any order in aid of confirmation pursuant to

sections 945 and 1142(b) of the Bankruptcy Code, in a manner as may be necessary or appropriate to consummate the Plan;

10. Adjudicating, deciding, or resolving any matters relating to the Debtors' compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

11. Determining matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order. The Title III Court will only have jurisdiction to the extent that any related document does not provide for another court or courts to have exclusive jurisdiction;

12. Adjudicating all controversies, suits or issues that may arise regarding the validity of any actions taken by any entity pursuant to or in furtherance of the Plan or Confirmation Order, including issuance of the New GO Bonds and the COFINA Junior Lien Bonds, and entering any necessary or appropriate orders or relief in connection with such adjudication. The Title III Court will only have jurisdiction to the extent that any related document does not provide for another court or courts to have exclusive jurisdiction;

13. Entering and implementing orders that are necessary or appropriate to enforce the Plan and Definitive Documents entered to advance rate covenants and non-impairment covenants referenced in Article LV of the Plan;

14. Entering and implementing any orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. Entering an order or final decree concluding or closing the Title III Cases pursuant to section 945(b) of the Bankruptcy Code;

16. Enforcing and clarifying any orders previously entered by the Title III Court in the Title III Cases; and

17. Hearing any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## V.  Miscellaneous Provisions

1.  **Title to Assets**

On the Effective Date, title to all assets and properties of the Debtors enumerated in the Plan will be vested in Reorganized Debtors. Such assets and properties will be free and clear of all liens, except as provided in the Plan and Confirmation Order.

2.     **Discharge and Release of Claims and Causes of Action**

a)     Distributions provided under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge and release of all claims or causes of action (including any interest on such claims or causes of action from and after the Petition Date) against the Released Parties that arose prior to the Effective Date relating to the Title III Cases, Debtors or Reorganized Debtors or any of their respective assets or interests of any nature, whether or not any property will be distributed or retained pursuant to the Plan.

b)     On the Effective Date, the Debtors and Reorganized Debtors will be discharged and released from any and all claims, causes of action and any other debts that arose prior to the Effective Date (including prior to the Petition Date), and all debts of the type specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed, (b) a claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a claim voted to accept the Plan.

c)     The Confirmation Order will be a judicial determination, as of the Effective Date, of the discharge and release of all claims, causes of action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code. The Confirmation Order's discharge will void any judgment obtained against the Debtors or Reorganized Debtors and their respective assets, and property at any time to the extent such judgment is related to a discharged claim, debt or liability.  As of the Effective Date, each holder of a claim in any Class under the Plan will release, waive and discharge against the Debtors and Reorganized Debtors, and their respective assets, all such claims.

d)     Each of the PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, will:

(i)     be deemed to have released and agreed not to sue or seek to recover damages or any other type of relief against any of the Government Releases based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions;

(ii)     not aid any person in taking any action with respect to the Government Released Claims that is prohibited by section 74.2 of the Plan.

3.     **Injunction on Claims**

Except as otherwise provided in the Plan, the Confirmation Order or other Final Order of the Title III Court, any party who has held, holds, or might hold claims or any other debt or liability that is released pursuant to the Plan are permanently enjoined from:

a)     commencing or continuing any action on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their assets or property;

b)     enforcing, attaching, collecting or recovering any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan;

c)     creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan; and

d)     asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan, except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment. This injunction extends to all successors and assigns of the Released Parties and their respective assets and property.

4.     **Integral to Plan**

The discharge, injunction, exculpation, and releases in Article LXXIV of the Plan is essential to the implementation of the Plan. Each of the released parties may independently seek enforcement of every provision of Article LXXIV.

5.     **Releases by the Debtors and Reorganized Debtors**

On the Effective Date, each of the Debtors, Reorganized Debtors and the Disbursing Agent will irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all claims or causes of action that the Debtors, Reorganized Debtors, and the Disbursing Agent have or may claim in the future. This applies to anyone claiming through the Debtors, Reorganized Debtors or the Disbursing Agent, on their behalf, or for their benefit and includes causes of action for damages, indemnification, contribution, costs, fees or any other basis in law or equity.

6.    **Injunction Related to Releases**

As of the Effective Date, all entities that have held, currently hold, or may hold a Released Claim will be permanently barred from the following actions regarding such Released Claim:

a)    commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum;

b)    enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order;

c)    creating, perfecting or in any way enforcing in any matter, directly or indirectly, any lien;

d)    setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any entity released under section 74.5 of the Plan; or

e)    continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

7.    **Exculpation**

*Government Parties.*  The Oversight Board, AAFAF, the Debtors, COFINA, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, will not have or incur any liability to any entity for any act taken in connection with:

a)    the Title III Cases;

b)    the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;

c)    the Disclosure Statement; and

d)    any contract, instrument, release or other agreement or document provided for in connection with the consummation of the transactions set forth in the Plan.

The exculpation provision in section 74.7 of the Plan will not affect the liability of any entity from any such act or omission that constitutes intentional fraud or willful misconduct.  The exculpation provision in section 74.7(a) of the Plan will not prejudice the right of any of the

369

Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals, to assert reliance upon advice of counsel as a legal defense.

*PSA Creditors.* Each of the PSA Creditors solely in its capacity as a party to the PSA and a Creditor, from the Petition Date up to and including the Effective Date, and each of their respective Related Persons will not have any liability to any entity for any act taken or omitted to be taken in connection with:

> a) the Title III Cases;
>
> b) the mediation;
>
> c) the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;
>
> d) the Disclosure Statement;
>
> e) the Plan Support Agreement;
>
> f) the Definitive Documents; and
>
> g) any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan.

The provisions of section 74.7(b) of the Plan do not affect the liability of any entity resulting from any intentional fraud or willful misconduct.

*Retiree Committee.* Each of the Retiree Committee members, solely in its capacity as a member of the Retiree Committee and a Creditor and each of the Retiree Committee's Related Persons will not have any liability to any entity for any act taken or omitted to be taken, from the Petition Date up to and including the Effective Date, in connection with:

> a) the Title III Cases;
>
> b) the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;
>
> c) the Disclosure Statement;
>
> d) the Retiree Committee Plan Support Agreement; and
>
> e) any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the Settlement Agreement.

370

The provisions of section 74.7(c) of the Plan do not affect the liability of any entity resulting from any intentional fraud or willful misconduct.

*AFSCME.* Each of AFSCME solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, from the Petition Date up to and including the Effective Date, and each of their respective Related Persons will not have any liability to any entity for any act taken or omitted to be taken in connection with:

      a)     the Title III Cases;

      b)     the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein;

      c)     the Disclosure Statement;

      d)     the Settlement Agreement; and

      e)     any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the Settlement Agreement.

The provisions of section 74.7(d) of the Plan do not affect the liability of any entity resulting from any intentional fraud or willful misconduct.

8.     **Appointments Related Litigation**

If a Final Order is entered in connection with the Appointments Related Litigation subsequent to entry of the Confirmation Order, any entity receiving distributions pursuant to the Plan agrees that such Final Order will not in any way reverse, affect, or modify the transactions contemplated in the Plan and the Confirmation Order, including the releases, exculpations, and injunctions provided in Article LXXIV of the Plan.

9.     **Bar Order**

To the extent provided in the Plan, all entities are permanently barred from pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind against any of the Released Parties relating in any way to any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases. This bar includes any claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising from the Title III Cases, either directly or indirectly by any person for the benefit of any Released Party arising from the claims, acts, facts, transactions, occurrences, statements or omissions that are or could have been in the Title III Cases or any other action brought on behalf of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

10.     **No Waiver**

The releases and injunctions set forth in sections 74.5 and 74.6 of the Plan will not limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized Debtors or the PSA Creditors to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

11.     **Supplemental Injunction**

All entities who have held or asserted, currently hold or assert, or may hold or assert, any Released Claims against any of the Released Parties based upon or relating to the Title III Cases, any claim against the Debtors, whenever and wherever asserted, anywhere in the world, sounding in any theory of law, will be permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of collecting, recovering or receiving any payment with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including:

a)      Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

b)      Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

c)      Creating, perfecting or enforcing any lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

d)      Asserting, implementing or effectuating any setoff, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

e)      Taking any act that does not conform to the provisions of the Plan, the Confirmation Order.

12.     **Post-Effective Date Fees and Expenses**

After the Effective Date, Reorganized Debtors may retain professionals and pay reasonable professional fees and expenses incurred related to implementation and consummation of the Plan without further approval from Title III Court.  Without limiting the foregoing, from and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtors, pay the fees and reimburse the expenses of the Oversight

Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

13. **Securities Act Exemption**

The offering, issuance, and distribution of the New GO Bonds and COFINA Junior Lien Bonds pursuant to the terms hereof will be exempt from registration under:

a) the Securities Act;

b) any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of section 5 of the Securities Act; and

c) any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

14. **Severability**

Subject to the terms and provisions of the PSA, if the Title III Court determines before the Confirmation Date that any term or provision of the Plan is invalid, void, or unenforceable, the Title III Court may alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable. The Title III Court's alteration will be consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

15. **Governing Law**

The rights, duties, and obligations arising under the Plan shall be governed by PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and the laws of the Commonwealth (to the extent not inconsistent with PROMESA), unless other federal law is applicable or expressly provided otherwise.

16. **Closing Case**

The Oversight Board will file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court promptly upon the full administration of the Title III Cases. The Title III Court will continue to retain jurisdiction over all matters in Article LXXIII of the Plan after the closing of the Title III Cases.

17. **Inconsistencies**

If there is any inconsistency between the information contained in the Disclosure Statement and the terms of the Plan, the terms of the Plan will govern.

If there is any inconsistency between the terms of the Plan and the terms of the Confirmation Order, the terms of the Confirmation Order will govern and be considered a modification of the Plan, unless the Confirmation Order modifies the economic terms of the Plan.

18.    **Document Retention**

From and after the Effective Date, the Debtors may maintain documents in accordance with their standard document retention policy, which can be altered, amended, modified, or supplemented by the Debtors.

19.    **Immediate Binding Effect**

On the Effective Date, the terms of the Plan and the Plan Supplement will be immediately effective and enforceable and deemed binding on any and all holders of claims and their respective successors and assigns (whether or not the claim of any such holder is impaired under the Plan or such holder has accepted the Plan). The releases, exculpations, and settlements effected under the Plan will be operative and subject to enforcement by the Title III Court from the Effective Date.

Once approved by the Title III Court, the compromises and settlements embodied in the Plan, along with the treatment of any associated allowed claims, will not be subject to collateral attack or other challenge by any entity in any court or other forum. As such, any entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement before the Plan is confirmed, and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

20.    **Additional Documents**

On or before the Effective Date, the Oversight Board may file agreements and other documents to evidence the terms and conditions of the Plan. The Debtors and all holders of claims receiving distributions pursuant to the Plan and all other parties in interest may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary to implement the provisions and intent of the Plan.

21.    **Reservation of Rights**

The Plan will have no force or effect unless the Title III Court enters the Confirmation Order. The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement will not be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of claims prior to the Effective Date. The rights and powers of the Government under the Commonwealth Constitution and PROMESA, including sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing in the Plan will be deemed a waiver of any such rights and powers except as expressly set forth in the Plan.

22.    **Successors and Assigns**

The rights, benefits, and obligations of any entity named or referred to in the Plan or the Confirmation Order will be binding on, any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian of each entity except as expressly provided otherwise in the Plan.

23.    **Term of Injunctions or Stay**

All injunctions or stays in effect in the Title III Cases and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) will remain in full force and effect until the Effective Date, the Plan or the Confirmation Order provides otherwise.  All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

24.    **Plan Supplement**

All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if they were included in the Plan.  When the Plan Supplement is filed, copies of the documents will be available (1) upon written request to the Oversight Board's counsel at the address on the cover page of this Disclosure Statement, (2) by downloading such documents from https://cases.primeclerk.com/puertorico/, or (3) on the Title III Court's website, available via PACER.  The terms of the Plan will govern over the terms of any document in the Plan Supplement, to the extent there are any inconsistencies.  With respect to matters governed by the New GO Bond Indenture, to the extent that any provisions of the Plan are inconsistent with the New GO Bond Indenture or the COFINA Bond Indenture, the New GO Bond Indenture or the COFINA Bond Indenture, as the case may be, will control.

*[Remainder of Page Left Intentionally Blank]*

# VII.   Confirmation of the Plan of Adjustment

## A.   Confirmation Hearing

PROMESA and the Bankruptcy Code require the Title III Court, after notice, to conduct a Confirmation Hearing at which it will hear arguments in support of the Plan, any objections to the Plan, and consider evidence with respect to whether the Plan should be confirmed.  At the Confirmation Hearing, the Title III Court will confirm the Plan only if all of the requirements of PROMESA section 314 described below are met.

On _____, the Title III Court entered the _____ [ECF No. ___] (the "Scheduling Order").  Among other things, the Scheduling Order provides that the Confirmation Hearing will begin on _____, _____ (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge, at the Title III Court, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined.  The Confirmation Hearing may be adjourned from time to time by the Title III Court or the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## B.   Deadlines to Object to Confirmation

The Disclosure Statement Order establishes the objection deadline to confirmation of the Plan as _____ at _____ (Atlantic Standard Time).  Objections to confirmation of the Plan must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Title III Court, and served on the following parties so that they are received no later than the applicable deadline set forth above:

- the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: Commonwealth of Puerto Rico);

- the attorneys for the Oversight Board as representative of the Debtors, Proskauer Rose LLP, 11 Times Square, New York, New York 10036, Attn: Martin J. Bienenstock, Esq., and Brian Rosen, Esq.;

- the co-attorneys for the Oversight Board as representative of the Debtors, O'Neill & Borges LLC, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918-1813, Attn: Hermann D. Bauer, Esq.;

- the attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: John J. Rapisardi, Esq., Nancy Mitchell, Esq., and Maria J. DiConza, Esq.;

- the attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, Marini Pietrantoni Muniz, LLC, Luis C. Marini-Biaggi, Esq., MCS Plaza, Suite 500, 255 Ponce de León Ave., San Juan PR 00917;

376

- the attorneys for the Official Committee of Unsecured Creditors, Paul Hastings LLP, 200 Park Ave., New York, NY 10166, Attn: Luc A. Despins, Esq., Andrew V. Tenzer, Esq., Michael E. Comerford, Esq., and G. Alexander Bongartz, Esq.;

- those creditors holding the 20 largest unsecured claims against the Debtors (on a consolidated basis);

- the attorneys for the Official Committee of Unsecured Creditors, Casillas, Santiago & Torres LLC, El Caribe Office Building, 53 Palmeras Street, Ste. 1601, San Juan, PR 00901, Attn: Juan J. Casillas Ayala, Esq. and Alberto J.E. Añeses Negrón, Esq.;

- the attorneys for the Official Committee of Retired Employees, Jenner & Block LLP, 919 Third Ave., New York, NY 10022, Attn: Robert Gordon, Esq. and Richard Levin, Esq., and Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege, Esq. and Melissa Root, Esq.;

- the attorneys for the Official Committee of Retired Employees, Bennazar, García & Milián, C.S.P., Edificio Union Plaza, PH-A, 416 Ave. Ponce de León, Hato Rey, PR 00918, Attn: A.J. Bennazar- Zequeira, Esq.;

- the attorneys for the LCDC, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn: Susheel Kirpalani, Esq., and Eric Kay, Esq.;

- the attorneys for the QTCB Group, Morgan, Lewis & Bockius LLP, One State Street, Hartford, CT 06103, Attn: Kurt A. Mayr, Esq., David L. Lawton, Esq., and Shannon B. Wolf;

- the attorneys for the Ad Hoc Group of Constitutional Debtholders, Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Gary S. Lee, Esq., James A. Newton, Esq., and Andrew Kissner, Esq.;

- the attorneys for the GO Group, (i) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Andrew Rosenberg, Esq. and Karen Zeituni, Esq.; (ii) Willkie, Farr & Gallagher LLP, 1875 K Street, NW, Washington, DC 20006, Attn: Mark Stancil, Esq.; and (iii) Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP, 2000 K Street, NW, Washington, DC 20006, Attn: Donald Burke, Esq.;

- the attorneys for AFSCME, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Kenneth Pasquale, Esq., and Sherry J. Millman, Esq.; and

- all parties that have requested notice pursuant to Rule 2002 of the Bankruptcy Rules.

For purposes of filing objections in these cases, the address of the Title III Court is: United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl St., Suite No. 3212, New York, New York 10007-1312

## C. Requirements for Confirmation of the Plan of Adjustment

At the Confirmation Hearing, the Title III Court will determine whether the Plan satisfies the requirements of PROMESA section 314. The Debtors believe that the Plan will satisfy all of the applicable statutory requirements of PROMESA and the Bankruptcy Code. Among the requirements for confirmation are that the Plan (1) is accepted by the requisite Holders of impaired Classes of Claims or, if not so accepted, is "fair and equitable" and does not discriminate unfairly as to the non-accepting class, (2) is in the "best interests" of creditors, (3) is feasible, and (4) complies with the applicable provisions of PROMESA and the Bankruptcy Code.

### 1. Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan. Only those holders of claims who actually vote to accept or reject the plan count in the tabulation. The impaired classes must accept the plan in order for the plan to be confirmed without application of the "cramdown" test contained in sections 1129(b)(i), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code.

#### a) Cramdown

PROMESA and the Bankruptcy Code provide that the Title III Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired class of claims accepts the plan and the so-called "cramdown" provisions set forth in sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The plan of adjustment may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each class of claims that is impaired under and has not accepted the plan. The Debtors believe that the Plan and the treatment of all Classes of Claims under the Plan satisfy the following requirements for nonconsensual confirmation of the Plan.

#### b) "Fair and Equitable"

Uncertainty exists as to the contours of the "fair and equitable" requirement in Title III. Outside of the context of Title III, the "fair and equitable" requirement generally requires, among other things, that, unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims. This is known as the "absolute priority rule." Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases. Courts that have addressed this requirement in context of a chapter 9 case have indicated that, because there are no equity holders in chapter 9 cases (who, in theory, would be junior in priority to a debtor's general unsecured creditors), the absolute priority rule cannot be applied in chapter 9 cases and, thus, in such cases, the "fair and equitable" requirement should not be interpreted as synonymous with the absolute priority rule. Instead, courts have held that the

378

requirement that the "fair and equitable" requirement in chapter 9 is understood as requiring that, where a debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan, will receive all that they can reasonably expect under the circumstances.

The Debtors believe that the Plan is "fair and equitable" with respect to Holders of Claims against the Debtors because it provides such Holders of Claims with all they reasonably can expect under the circumstances of the Title III Cases. The commencement of the Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage, and the economic decline and outmigration eroding the Debtors' revenues. The Debtors believe that the Plan is "fair and equitable" because the creditor recoveries proposed therein have been calculated – and, in certain cases, negotiated – to reasonably compensate Holders of Claims while enabling the Debtors to (A) avoid a recurrence of the financial difficulties that led to the commencement of the Title III Cases and (B) institute desperately-needed reinvestment initiatives to ensure the Debtors' continued operation.

### c) Unfair Discrimination

A plan of adjustment does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims. The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE PLAN BY ONE OR MORE IMPAIRED CLASSES, THE OVERSIGHT BOARD RESERVES THE RIGHT TO REQUEST THE TITLE III COURT TO CONFIRM THE PLAN IN ACCORDANCE WITH PROMESA AND SECTION 1129(b)(1), (b)(2)(A) AND (b)(2)(B) OF THE BANKRUPTCY CODE. THE OVERSIGHT BOARD HAS RESERVED THE RIGHT TO MODIFY THE PLAN TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THE PLAN UNDER SECTION 314 OF PROMESA AND SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES MODIFICATION.**

### d) The "Best Interests of Creditors" Test

Notwithstanding acceptance of the Plan by each impaired Class of Claims, the Title III Court also must determine that the Plan is in the best interests of creditors pursuant to PROMESA section 314(b)(6). The "best interests of creditors" test under PROMESA "shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." The plain language of the test requires the court to consider the recoveries to all creditors collectively, not individual recoveries.[354] The failure of plan confirmation and dismissal of a debtor's title III

---

[354] This interpretation is consistent with the approach taken by courts in chapter 9 cases, where Bankruptcy Code section 943(b)(7) requires the plan to be "in the best interests of creditors," similarly using the plural "creditors." *See In re City of Detroit*, 524 B.R. 147, 217 (Bankr. E.D. Mich. 2014). *See also In re City of Stockton,* 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015) (By its terms, the "best interests" test in chapter 9 is collective rather than individualized).

case, in most instances, would result in a race to the courthouse that would leave many creditors with no recovery at all.

The best interests test analyses (the "<u>Best Interests Test Reports</u>") the Title III Court considers—*i.e.*, of recoveries creditors of each Debtor could expect based on available remedies under the non-bankruptcy laws and the Commonwealth Constitution—that were based on the May 2019 Fiscal Plan are attached hereto as <u>Exhibit L</u>. The Debtors believe that the Plan satisfies the best interests of creditors test set forth in PROMESA section 314(b)(6).

The Oversight Board intends to certify a new fiscal plan before the solicitation of this Disclosure Statement occurs.[355] Accordingly, to the extent necessary, the Debtors will submit revised best interests test reports reflecting the new fiscal plan data.

e) **Feasibility**

PROMESA section 314(b)(6) requires that a plan of adjustment be in the best interests of creditors and feasible. While the statute explains the best interests of creditors requirement means the Court shall consider what creditors would recover pursuant to available remedies outside Title III, the statute does not provide guidance as to what is meant by "feasible," beyond the word itself. Chapter 9 of the Bankruptcy Code is the chapter available to municipalities of the States. It also imposes a feasibility requirement in its section 943(b)(7) without providing further guidance. Courts have interpreted the feasibility requirement in chapter 9 to mean the municipality will be viable, and the plan offers a reasonable prospect of success and is workable. The debtor must show it can satisfy the obligations in its plan. Unlike chapter 9, Title III also contains a requirement that the Title III Plan of Adjustment be consistent with the certified fiscal plan. Significantly, pursuant to PROMESA section 201(b)(1)(I), the certified fiscal plan must contain a debt sustainability analysis. Accordingly, the feasibility of the Title III Plan of Adjustment is at least partially determinable by whether the plan provides for an amount of ongoing debt within the range of the debt sustainability analysis in the certified fiscal plan.

***Commonwealth.*** Based on the debt sustainability analysis and projections in the May 2019 Fiscal Plan, Reorganized Commonwealth should be able to pay its debts under the Plan when they come due and the Commonwealth should be viable. If needed, the Debtors will update the analysis when the new fiscal plan is certified, but expect that under the new fiscal plan, the Commonwealth will be able to pay its debts under the Plan when they come due.

***ERS.*** Pursuant to the Plan, ERS will no longer be responsible for the payment of pension obligations or debt service. ERS's pension obligations are contained as expenditures within the Commonwealth's May 2019 Fiscal Plan through the PayGo system to be funded from Commonwealth sources of revenue and municipal contributions. Therefore, pursuant to the Plan, ERS will not have material future payments.

---

[355] The certification of a new Commonwealth fiscal plan is currently expected on April 30, 2020. Letter from Natalie A. Jaresko to Governor Vázquez Garced, President Rivera Schatz, and Speaker Méndez Núñez, Jan. 30, 2020, https://drive.google.com/file/d/1Y81ivGjzA8kqtIyqtRSIW9gkZs-1k_Ew/view.

**PBA.**  Pursuant to the Plan, PBA will not have material future payments.

Accordingly, the Debtors believe that the Plan meets the feasibility requirement of PROMESA section 314(b)(6).

### f)     Compliance with Applicable Provisions of PROMESA and the Bankruptcy Code

In addition to the foregoing, the Plan must comply with other applicable provisions of PROMESA and the Bankruptcy Code, as follows:

- The Plan must comply with the provisions of the Bankruptcy Code made applicable by PROMESA section 301 (PROMESA § 314(b)(1));

- The Plan must comply with the provisions of PROMESA Title III (PROMESA § 314(b)(2));

- The Debtors must not be prohibited by law from taking any action necessary to carry out the Plan (PROMESA § 314(b)(3));

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan must provide that on the Effective Date each holder of a claim of a kind specified in 507(a)(2) of the Bankruptcy Code will receive on account of such claim cash equal to the allowed amount of such claim (PROMESA § 314(b)(4));

- Any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the Plan must be obtained, or such provision must be expressly conditioned on such approval (PROMESA § 314(b)(5));

- The Plan must be consistent with the Fiscal Plan certified by the Oversight Board under Title III (PROMESA § 314(b)(7));

- The Debtors, as the proponents of the Plan by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2); PROMESA § 301(a)); and

- The Plan must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3); PROMESA § 301(a)).

### 2.     Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated numerous alternatives to the Plan, including alternative structures and terms of the Plan and delaying the adoption thereof.  While the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Allowed Claims against the Debtors, if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan of adjustment. The Debtors (or another party in interest) may also

move to dismiss the Title III cases pursuant to 11 U.S.C. § 930 (as incorporated by PROMESA § 301(a).

The Plan was formulated after months of difficult negotiations among numerous creditor constituencies, including in connection with numerous mediation sessions ordered by the Title III Court (*see* section VI.E of this Disclosure Statement).   Under the circumstances, the Debtors believe that the Plan provides the greatest and earliest possible recoveries to Creditors and that acceptance and confirmation of the Plan are in the best interests of the Debtors and all Creditors. The Debtors further believe that any alternative to the Plan would result in unnecessary delay, uncertainty, litigation, and expense, the net effect of which would result in recoveries to Creditors less than the distributions to be made to Creditors under the Plan.   The Debtors, therefore, believe that confirmation and consummation of the Plan is preferable to potential alternatives.

[*Remainder of Page Left Intentionally Blank*]

## VIII.   Certain Risk Factors to Be Considered

AS WITH ANY INVESTMENT, RECOVERIES ON THE NEW BONDS INVOLVE RISKS. YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW REGARDING THE PLAN, AND THE NEW BONDS, AS WELL AS ALL OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT. THE FOLLOWING RISK FACTORS ARE NOT THE ONLY RISKS THE DEBTORS FACE, ARE NOT MEANT TO BE A COMPLETE LIST OF RISKS ASSOCIATED WITH THE PLAN OR THE NEW BONDS, AND DO NOT NECESSARILY REFLECT THE RELATIVE IMPORTANCE OF VARIOUS RISKS. ADDITIONAL RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTORS OR THAT THE DEBTORS DO NOT CURRENTLY CONSIDER TO BE MATERIAL, OR THAT ARE GENERALLY APPLICABLE TO ALL GOVERNMENTAL INSTRUMENTALITIES, ALSO MAY MATERIALLY AND ADVERSELY AFFECT THE DEBTORS AND THE DEBTORS' ABILITY TO CONSUMMATE THE PLAN AND MAKE PAYMENTS ON THE NEW BONDS. YOU ARE ADVISED TO CONSIDER THE FOLLOWING RISK FACTORS, AMONG OTHERS, AND TO REVIEW THE OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT BEFORE MAKING ANY DECISIONS WITH RESPECT TO THE PLAN OR THE NEW BONDS. ANY ONE OR MORE OF THE FACTORS DISCUSSED HEREIN, AND OTHER FACTORS NOT DESCRIBED HEREIN, COULD AFFECT RECOVERIES UNDER THE PLAN OR LEAD TO A DECREASE IN THE MARKET VALUE AND THE LIQUIDITY OF THE NEW BONDS. THERE CAN BE NO ASSURANCE THAT OTHER RISK FACTORS NOT DISCUSSED BELOW WILL NOT BECOME MATERIAL IN THE FUTURE.

NEITHER THE DEBTORS NOR ANY FEDERAL, STATE, OR COMMONWEALTH SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE NEW BONDS AND OTHER SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE STATEMENT.

### A.   Risks Related to the Title III Cases

***The Title III Court may not confirm the Plan.***

PROMESA section 314(b) and Bankruptcy Code section 1129 (in its incorporated parts) set forth the requirements for confirmation of a Title III plan of adjustment, and require the Title III Court to make a series of specified, independent findings. There can be no assurance that the Title III Court will find that the Plan meets all of these requirements and confirm the Plan. If the Plan is not confirmed, it is uncertain what recoveries, if any, holders would receive with respect to their Claims under an alternative plan of adjustment or under other applicable law if the Title III Court dismisses the Title III Cases. For additional information, *see* section VII.C of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment."

***The Title III Court does not find the plan of adjustment is consistent with the applicable certified fiscal plan.***

Under PROMESA section 314(b)(7), the Plan must be consistent with the Commonwealth Fiscal Plan, certified by the Oversight Board. Although the Oversight Board has certified under PROMESA section 104(j)(3) that the Plan is consistent with the Commonwealth Fiscal Plan,[356] PROMESA section 314(b) requires that the Title III Court make an independent determination as to whether the Plan is consistent with the Commonwealth Fiscal Plan. Therefore, there can be no assurance that the Title III Court will find that the Plan is consistent with the Commonwealth Fiscal Plan. To be consistent with the certified fiscal plans, the Plan cannot provide for more debt than the certified fiscal plans' debt sustainability analyses determines should be sustained by each reorganized entity.

***If any claimant is successful in prosecuting and obtaining an allowed (i) administrative expense claim, (ii) priority claim, (iii) secured claim, or (iv) non-dischargeable claim, and any such claim is not contemplated to be paid pursuant to the Plan, the Plan may not be confirmable.***

Various parties have asserted claims against the Debtors that they assert may be administrative expense claims, priority claims, secured claims, or non-dischargeable and that are not contemplated to be paid pursuant to the Plan. If such and other similar claims are ultimately allowed, the Plan may not be confirmable without amendments that may materially change its proposed distributions.

***The Title III Court may not approve the settlements and compromises in the Plan.***

The Debtors believe the significant compromises and settlements reflected in the Plan are fair, equitable, and reasonable. Such compromises and settlements are an integral part of the Plan, and they provide value and certainty for the Debtors and all Creditors by eliminating significant litigation risk and expenses, and providing a framework for the Debtors to emerge from Title III expeditiously.

While parties to the Plan Support Agreements include holders of billions of dollars in Claims against the some of the Debtors, other parties in interest in the Title III Cases may object to those compromises and settlements, as incorporated in the Plan. If the compromises and settlements in the Plan Support Agreements are not approved in the Title III Cases, the Debtors may not be able to confirm the Plan.

The Plan may also be contingent on the approval of other settlements and compromises resolved under the Plan. If the settlements and compromises contained in the Plan require approval, but are not approved, the Debtors may not be able to confirm the Plan.

---

[356] The certification of a new Commonwealth fiscal plan is currently expected on April 30, 2020. Letter from Natalie A. Jaresko to Governor Vázquez Garced, President Rivera Schatz, and Speaker Méndez Núñez, Jan. 30, 2020, https://drive.google.com/file/d/1Y81ivGjzA8kqtIyqtRSIW9gkZs-1k_Ew/view.

***The Effective Date may not occur.***

Article LVIII of the Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date. Many of the conditions are outside of the control of the Debtors. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Title III Court, there can be no assurance that the Plan will be consummated and the adjustment of the Debtors' debts completed. *See* section VI.S. of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date" (description of the conditions to the effectiveness of the Plan). In addition, certain agreements contemplated in the Plan impose conditions that must be satisfied as of the Effective Date. There can be no assurance that such conditions will be timely satisfied or waived.

***If the Plan Support Agreements are terminated, the ability of the Debtor to confirm the Plan may be materially and adversely affected.***

Each of the Plan Support Agreements contains a number of termination events, upon the occurrence of which certain parties to the Plan Support Agreements may terminate or withdraw from such agreement. For instance, creditor parties may terminate their respective Plan Support Agreement if the Debtors withdraw the Plan, the Disclosure Statement, or the motion seeking entry of an order approving the Disclosure Statement, or file any motion or pleading with the Title III Court, in each case, that is inconsistent with the subject Plan Support Agreement in any material respect and such motion or pleading has not been withdrawn within a specified period of time. If the respective Plan Support Agreement is terminated, each of the parties thereto will be released from their obligations in accordance with the terms of the respective Plan Support Agreement. The withdrawal of support by creditors from, or the termination of, a Plan Support Agreement may have a material adverse effect on the Debtor's ability to confirm the Plan.

## B.      Risks Related to the Debtors

***The financial information contained herein is based upon the Debtors' books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.***

The financial information contained herein has not been, and will not be, audited or reviewed by any independent accounting firm or third party and is limited in scope. Although the Debtors believe that they have used their reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained herein is without material inaccuracies or inconsistencies.  As a result, you are cautioned not to place undue reliance on any of the financial information contained herein.

***The Debtors have no duty to update the statements contained in this Disclosure Statement.***

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that

date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Title III Court or as required under the Bankruptcy Code or Bankruptcy Rules.

***No representations outside this Disclosure Statement are authorized.***

No representations concerning or related to the Debtors, the Title III Cases, or the Plan are authorized by the Title III Court, PROMESA, or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Solicitation Materials that accompany this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

***The Oversight Board will terminate before Plan obligations are fully satisfied.***

After five years of balanced budgets, the Oversight Board terminates.  This may occur many years before the obligations under the Plan are fully satisfied.  Then, there will no longer be annual fiscal plans, budgets, and monitoring performed by people who are not politicians.

***When the Oversight Board terminates, the Government can eliminate controls, protections, and transparency the Oversight Board has created.***

Every legislature can change prior laws.  There is no assurance the Oversight Board's protections and systems will be continued by subsequent administrations, and the Government may object to measures the Oversight Board imposes, and may continue to do so once the Oversight Board is no longer present to enforce the reforms it has imposed.  However, covenants and obligations in the Plan, the New GO Bonds Legislation, thee COFINA Junior Lien Bonds Legislation, and the Definitive Documents, inclusive of obligations impacting governmental or political powers pursuant to PROMESA section 305, may be enforced by parties in interest having standing to do so.

***Financial reporting going forward may not be completed on a timely basis.***

The most recent basic audited financial statements prepared by the Commonwealth, ERS, and PBA are for fiscal year 2016.  No guaranty can be made as to the availability of current audited financial statements or the Debtors' ability to provide financial reporting on a timely basis.

### C.  Risks Related to the New GO Bonds

***The New GO Bonds may not trade at par and limited liquidity may make the New GO Bonds less attractive to investors.***

As a result of concerns with the Commonwealth's current financial circumstances, holders of the New GO Bonds may encounter limited market acceptance upon any attempt to sell the New GO Bonds, making sales at or near par potentially difficult. Holders of the New GO Bonds after the Effective Date may not be able to sell such bonds for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of such bonds before a potential purchaser would be willing to purchase the New GO Bonds. There can be no assurance that a

secondary market will exist for any New GO Bonds. The absence of a secondary market for the New GO Bonds or a lack of liquidity in the secondary markets could limit bondholders' ability to resell any New GO Bonds or adversely affect the market value of the New GO Bonds.

The New GO Bonds and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended. The New GO Bonds have not been approved or disapproved by the United States Securities and Exchange Commission, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the forgoing passed upon the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. Therefore, the secondary market for the New GO Bonds may be limited, and bondholders may not be able to sell the New GO Bonds when they want to do so or obtain the price that they wish to receive for the New GO Bonds, and, as a result, could suffer significant losses.

Given the unique nature of the Plan, certain closing conditions and closing deliverables, including legal opinions, with respect to the Plan will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Plan will differ materially from and be more limited than those typical requirements.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the New GO Bonds and limiting bondholders' ability to sell the New GO Bonds. Concerns with the Commonwealth's fiscal crisis may also adversely affect the market value and liquidity of the New GO Bonds.

### *Limited Nature of Remedies.*

Upon any declaration of default under the New GO Bonds Indenture, Reorganized Commonwealth's payment of the New GO Bonds cannot be accelerated. However, the New GO Bonds are secured by a statutory first lien on the Debt Service Reserve Fund and the Debt Service Fund to be held in trust by the New GO Bond Trustee for the benefit of holders of New GO Bonds, and are backed by the Commonwealth's good faith, credit and taxing power in accordance with Article VI, Section 2 of the Commonwealth Constitution and applicable laws of the Commonwealth as of the Effective Date, but not by any further assets of the Commonwealth.

### *Limited Nature of Ratings; Reductions, Suspension, or Withdrawal of a Rating.*

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New GO Bonds, the Government Parties have agreed to use commercially reasonable best efforts to obtain ratings on the New GO Bonds as soon as reasonably practicable as determined solely by the Government Parties following consultation with up to two (2) Initial PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group, each of which shall have executed a confidentiality agreement, in form and substance satisfactory to the Oversight Bond and restricting such Initial PSA Creditors

from trading New GO Bonds and COFINA Junior Lien Bonds, and to subsequently use their commercially reasonable best efforts to obtain the best possible ratings. The New GO Bonds Indenture will not include a covenant by the Government Parties to maintain a specific rating with respect to outstanding New GO Bonds.

Any future rating assigned to the New GO Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the New GO Bonds on their respective maturity dates. Any rating of the New GO Bonds is not a recommendation to purchase, hold or sell such New GO Bonds and such rating will not address the marketability of such New GO Bonds, their market price, or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended, or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for Reorganized Commonwealth or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the New GO Bonds.

***An adverse rating of the New GO Bonds could adversely affect the market price of the New GO Bonds.***

Notwithstanding that the Government Parties may not initially solicit a rating, a rating agency may issue an unsolicited rating on the New GO Bonds, employing quantitative and qualitative factors, including Reorganized Commonwealth's actual or perceived financial strength, the prospects for payment of principal and interest on the New GO Bonds, the impact of the Commonwealth's fiscal crisis, and other macroeconomic conditions in the Commonwealth. Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice. Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of Reorganized Commonwealth's indebtedness or placing Reorganized Commonwealth on negative outlook for possible future downgrading. Such action may be taken at any time and is beyond the Commonwealth's control. The downgrade or withdrawal of any credit rating of Reorganized Commonwealth's indebtedness, including the New GO Bonds, or placing Reorganized Commonwealth on negative outlook for possible future downgrading may have a negative effect on the value of the New GO Bonds.

***The New GO Bonds will not be subject to the Trust Indenture Act***.

The New GO Bonds will not be required to be and will not be issued under an indenture qualified under the Trust Indenture Act of 1939, as amended (the "TIA"). Accordingly, holders of the New GO Bonds will not have the benefit of the protections of the TIA with respect to their investment in the New GO Bonds.

### D. Risks Related to the COFINA Junior Lien Bonds

***The COFINA Junior Lien Bonds are special, limited obligations of COFINA payable solely from, secured solely by, and having recourse solely to, the COFINA Pledged Taxes, subordinate to the statutory lien granted pursuant to the COFINA Senior Lien Bonds Legislation.***

The COFINA Junior Lien Bonds are not indebtedness or liabilities of the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than COFINA. The COFINA Junior Lien Bonds are not secured by the good faith, credit and taxing power of the Commonwealth, nor are they payable or secured by any of the Commonwealth's public instrumentalities or political subdivisions, other than COFINA. The COFINA Junior Bonds represent indebtedness solely of COFINA and will not be insured or guaranteed by the Commonwealth, the Trustee, or any of their respective affiliates, or any other Commonwealth government entity.

***The COFINA Junior Lien Bonds may not trade at par and limited liquidity may make the COFINA Junior Lien Bonds less attractive to investors.***

As a result of concerns with the Commonwealth's current financial circumstances, holders of the New GO Bonds may encounter limited market acceptance upon any attempt to sell the New GO Bonds, making sales at or near par potentially difficult. Holders of the COFINA Junior Lien Bonds after the Effective Date may not be able to sell such bonds for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of such bonds before a potential purchaser would be willing to purchase the New GO Bonds. There can be no assurance that a secondary market will exist for any New GO Bonds. The absence of a secondary market for the New GO Bonds or a lack of liquidity in the secondary markets could limit bondholders' ability to resell any New GO Bonds or adversely affect the market value of the New GO Bonds.

The COFINA Junior Lien Bonds and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended. The COFINA Junior Lien Bonds have not been approved or disapproved by the United States Securities and Exchange Commission, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the forgoing passed upon the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. Therefore, the secondary market for the COFINA Junior Lien Bonds may be limited, and bondholders may not be able to sell the COFINA Junior Lien Bonds when they want to do so or obtain the price that they wish to receive for the COFINA Junior Lien Bonds, and, as a result, could suffer significant losses.

Given the unique nature of the Plan, certain closing conditions and closing deliverables, including legal opinions, with respect to the Plan will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Plan will differ materially from and be more limited than those typical requirements.

389

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the COFINA Junior Lien Bonds and limiting bondholders' ability to sell the COFINA Junior Lien Bonds. Concerns with the Commonwealth's fiscal crisis may also adversely affect the market value and liquidity of the COFINA Junior Lien Bonds.

### *Limited Nature of Remedies.*

Upon any declaration of default under the COFINA Junior Lien Bonds Indenture, COFINA's payment of the COFINA Junior Lien Bonds cannot be accelerated. Moreover, the COFINA Junior Lien Bonds are not secured by a lien on any property of the Commonwealth (other than the Conveyed Commonwealth Share, which will be transferred by the Commonwealth to COFINA).

Repayment of the COFINA Junior Lien Bonds shall be secured by a second lien on the COFINA Pledged Taxes that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies, to the COFINA Senior Lien Bonds. Repayment of the COFINA Junior Lien Bonds shall not be payable from the COFINA Revenues.

### *Limited Nature of Ratings; Reductions, Suspension, or Withdrawal of a Rating.*

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the COFINA Junior Lien Bonds, the Government Parties shall use commercially reasonable best efforts to obtain ratings on the COFINA Junior Lien Bonds as soon as reasonably practicable as determined solely by the Government Parties following consultation with up to two (2) Initial PSA Creditors jointly designated by the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group, each of which shall have executed a confidentiality agreement in form and substance satisfactory to the Oversight Board and restricting such Initial PSA Creditors from trading New GO Bonds and COFINA Junior Lien Bonds, and shall subsequently use their commercially reasonable best efforts to obtain the best possible ratings. The COFINA Junior Lien Bonds Indenture will not include a covenant by the Government Parties to maintain a specific rating with respect to outstanding COFINA Junior Lien Bonds.

Any future rating assigned to the COFINA Junior Lien Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the COFINA Junior Lien Bonds on their respective maturity dates. Any rating of the COFINA Junior Lien Bonds is not a recommendation to purchase, hold or sell such COFINA Junior Lien Bonds and such rating will not address the marketability of such COFINA Junior Lien Bonds, their market price, or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended, or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for COFINA or the Commonwealth's economy. Any

such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the COFINA Junior Lien Bonds.

***An adverse rating of the COFINA Junior Lien Bonds could adversely affect the market price of the COFINA Junior Lien Bonds.***

A rating agency may issue an unsolicited rating on the COFINA Junior Lien Bonds, employing quantitative and qualitative factors, including COFINA's actual or perceived financial strength, the prospects for payment of principal and interest on the COFINA Junior Lien Bonds, the impact of the Commonwealth's fiscal crisis, and other macroeconomic conditions in the Commonwealth relating to the collection of sales tax revenue.  Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice. Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of COFINA's indebtedness or placing COFINA on negative outlook for possible future downgrading. Such action may be taken at any time and is beyond COFINA's control. The downgrade or withdrawal of any credit rating of COFINA's indebtedness, including the COFINA Junior Lien Bonds, or placing COFINA on negative outlook for possible future downgrading may have a negative effect on the value of the COFINA Junior Lien Bonds.

***The COFINA Junior Lien Bonds will not be subject to the Trust Indenture Act***.

The COFINA Junior Lien Bonds will not be required to be and will not be issued under an indenture qualified under the TIA. Accordingly, holders of the COFINA Junior Lien Bonds will not have the benefit of the protections of the TIA with respect to their investment in the COFINA Junior Lien Bonds.

**E.    Risks Related to Projections in Revenues and Expenses in the Commonwealth Fiscal Plan**

The May 2019 Fiscal Plan[357] and its underlying financial projections are the result of several months of working sessions, dialogue, stakeholder engagement, research and in-depth analysis, as well as Oversight Board and the Commonwealth Government collaboration, that created a deep and rich fact base to underpin the presented macroeconomic trends and revenue and expenditure forecasts. However, the aforementioned have been built upon a set of factors that are subject to external and internal risks that could materially impact the expected outcomes. To recognize such risks, the following outlines those that could affect the macroeconomic and 30 year financial projections contained in the May 2019 Fiscal Plan.

---

[357] The Oversight Board may certify a revised fiscal plan at any time.  The certification of a new Commonwealth fiscal plan is currently expected on April 30, 2020.  Letter from Natalie A. Jaresko to Governor Vázquez Garced, President Rivera Schatz, and Speaker Méndez Núñez, Jan. 30, 2020, https://drive.google.com/file/d/1Y81ivGjzA8kqtIyqtRSIW9gkZs-1k_Ew/view.

***The Fiscal Plan model relies on historical data to project GNP and inflation and does not take into account potential external shocks not already experienced.***

The Fiscal Plan model relies on historical data on a key set of economic variables (*e.g.*, oil prices, food prices, output gap, capital growth, net federal transfers) to project GNP and inflation—and layers on the effects of Hurricanes Maria and Irma as well as the resulting disaster relief funding projected to be received by Puerto Rico. It does not take into account potential future external shocks such as unforeseen economic crises, natural disasters, or other changes in global (or local) economic activity that are not currently projected. Because future projections take into account past performance, if economic growth (or inflation) for the United States or Puerto Rico is materially higher or lower than projected, that could significantly affect the accuracy of the subsequent GNP and inflation projections in the Fiscal Plan and thus the accuracy of the revenue and expense projections. Additionally, delayed or ineffective implementation of structural reforms on labor, energy, ease of doing business and education—which are currently assumed to drive a GNP growth uptick of 1.02%—could impact GNP growth and in consequence, overall revenue performance.

***The Fiscal Plan model does not incorporate major demographic shifts not currently apparent.***

Population projections in the Fiscal Plan model are driven by projected future economic growth, as well as several demographic factors—such as projected fertility rates and net outmigration—based on the latest available data. Major demographic shifts not currently apparent (*e.g.*, major changes in fertility rates, age-mix of the population, migration patterns) could significantly change the accuracy of population estimates underlying the Fiscal Plan model. Since population serves as an input for certain revenue and expense estimates (*e.g.*, cigarette tax revenues, healthcare costs, education costs), changes in population projections would impact the accuracy of projected surplus.

***Healthcare projections assume current federal and Puerto Rico healthcare law and policy, as well as the latest projections regarding healthcare costs.***

The Fiscal Plan healthcare estimates are based on the current laws and public policies adopted by both the federal government and Puerto Rico government. As a result, changes to policy could impact the accuracy of current expenditure estimates. For example, if Medicaid eligibility is revised such that a greater number of people are eligible for Medicaid coverage than projected, the Government may bear additional expenses. If federal funding for Medicaid changes significantly, the accuracy of Fiscal Plan projections would also be impacted.

Similarly, projected healthcare expenditures take into account current long-term estimates related to healthcare inflation. If national projections related to healthcare inflation (*e.g.*, due to structural changes to the healthcare market) drastically change, then the accuracy of healthcare expenditure projections would also be affected.

***The Fiscal Plan uses current data and policies to project the magnitude and roll out of federal funds for disaster relief and other major federal programs.***

The projections in the Fiscal Plan rely on the efficient and timely implementation of receipt and disbursement of federal and private disaster relief funds. This assumes both federal and local government processes to apply for and disburse funds will continue on their current pace (with potential to speed up slightly after fiscal year 2019) and that the latest federal estimates in terms of overall magnitude of funding and roll out are accurate. The projections are also built on current legislation and federal policies governing the use of these funds. If overall local or federal government efficiency levels or processes change, or there are changes to the appropriations or governing policies (i.e., changes made by Congress, FEMA, HUD, USDA, or other federal agencies), there could be direct impacts on the accuracy of revenue and expenditure projections given disaster relief funds impact GNP growth estimates (which then impact population projections) as well as estimates regarding local government cost share.

Projected funding levels for standard federal programs and transfers (*e.g.*, TANF, NAP, Title I Funding) are based on the latest federal legislation as well as funding formulas for each program. Similar to disaster relief funds and healthcare federal funds, if the federal formulas or funding levels for other major social programs change, the accuracy of projected revenues and expenditures could materially change.

Moreover, several governmental entities in Puerto Rico are classified as high-risk grantees, imposing additional compliance and controls before federal funds are released. The intent of these additional conditions is to ensure effective implementation of federal programs through appropriate fiscal management and responsibility. This also, however, has the potential to delay implementation of projects funded by federal dollars. The lack of substantial reform process at the local Department of Education, for instance, recently led federal officials to withhold disbursement of federal dollars to the department until substantial reforms are implemented. The inability to access federal funds on a timely basis consistent with projections in the Fiscal Plan could impact the ability to achieve Fiscal Plan targets.

***The Fiscal Plan assumes current Puerto Rico and U.S. tax law and effective revenue measure implementation.***

The Fiscal Plan projections take into account current U.S. and Puerto Rico tax laws and assume timely and effective implementation of revenue measures, including establishment of new revenue streams from taxes and fees and increased tax compliance.

Changes in Puerto Rico and U.S. tax law could therefore impact revenues, as could decisions that large businesses (including multinationals) make regarding their scale of operations in Puerto Rico, and their global tax planning. Further, if revenue measures are not effectively implemented, or if they exceed expected revenue yield, revenues could differ materially from those in the Fiscal Plan projections.

***The Fiscal Plan assumes agency efficiency measures are implemented to achieve savings without adverse impact on economic conditions.***

Expense measures assume that the achievement of savings will generally be achieved through reforms that improve government efficiency while maintaining a level of services commensurate with the needs of the population and facilitate economic growth. However, if such savings are captured via simple attrition or expensive buy-out programs, there would be increased risk that efficiencies are not achieved and that the lower level of expenditures compromise the government's delivery of services, adversely impacting economic sustainability and poverty levels.

***The Fiscal Plan assumes effective and timely implementation of revenue and expense measures.***

The Fiscal Plan projections rely on the effective and timely implementation of various revenue and expense measures.  This assumes that any subsequent policy changes or departures from the Fiscal Plan targets and objectives will adhere to the revenue-neutrality and overall spending limits contemplated by the Fiscal Plan and related certified Budgets.  In order to assure effective implementation and credibility to the Fiscal Plan objective and projections, the Oversight Board requires the Government to provide periodic reports on financial performance and implementation progress.  The Oversight Board has also developed a monitoring mechanism on its website, which can provide further transparency and accountability to the public on the Government's efforts relating to the Fiscal Plan milestones and achievements.  Delays or departures from the revenue and expense measure targets, milestones, and reporting specified in the Fiscal Plan could materially alter the Fiscal Plan projections.

***The Fiscal Plan model is based on historical data reported by the Commonwealth, much of which has not been audited or independently reviewed.***

The Fiscal Plan model is based on the input of historical macroeconomic, revenue and expense data reported by the Commonwealth.  The Government has faced challenges in the past in reporting complete and accurate data, and much of the financial information provided by the Government has not been audited or reviewed by any independent accounting firm or third party.  Any material inaccuracies or inconsistencies in the data could impact the accuracy of projections based on that data.

***The Fiscal Plan model is based on current data and information to project capital improvement program needs and impact.***

The Fiscal Plan projections incorporate capital expenditure based on current and projected future assessment of capital improvement program needs.  The capital expenditure plans may need to be revised periodically due to various factors including, but not limited to, changes in legislative policy, changes in public sector operations, need for acceleration or deferrals of planned improvements, interaction with other governmental agencies, instrumentalities, municipalities, and private investors and financing sources, and other macroeconomic factors.  Needs for quantification or increase in structural reform relating to public infrastructure may also impact the capital expenditure projections in the Fiscal Plan.  Changes in these expenditure projections as well as any deviations from the projected impact of such capital improvements could also impact

394

the timing and achievement of other financial projections that are inter-dependent on effective accomplishment and existence of underlying framework and infrastructure.

***The Fiscal Plan does not assume major changes in the current political climate in Puerto Rico or the United States subsequent to its certification.***

The Fiscal Plan policies and financial projections are driven by the executive commitment and legislative policies in the United States and Puerto Rico political climate which existed at the time of the Fiscal Plan certification. Much of the financial projections are closely tied to federal funding availability and local political commitment. The Fiscal Plan does not take into account future changes in the political environment – such as those from the Puerto Rican administration, Puerto Rican legislative and regulatory direction, federal appropriations and funding policies, federal tax exemptions, or Puerto Rico's statehood or relationship with the federal government.

## F.   Risks Related to the Collection of Revenues Supporting the Payment of New GO Bonds

***The Commonwealth has recently enacted new tax legislation which will have an uncertain impact on future tax revenue.***

In December 2018, the Commonwealth enacted Act 257-2018 which made numerous amendments to the 2011 Code including to modify the SUT and to modify the alternative basic tax ("ABT") and alternative minimum tax ("AMT"). In addition, Act 257-2018 eliminated certain categories of purchases from the SUT base and reduced rates on other categories. Act 257-2018 also legalized certain categories of gambling game machines. Additionally, the Commonwealth enacted Act 60-2019, the Puerto Rico Incentives Tax Code, that made additional changes affecting those persons benefiting from the lower rates, accelerated deductions, grants and tax credits made available under Act 60-2019. The Commonwealth has been unable to certify that that Act 257 is compliant with the fiscal plan. With respect to Act 60, the Commonwealth has certified under section 204 of PROMESA that the act is not "significantly inconsistent" with the fiscal plan. Accordingly, both laws lack certification as to their fiscal plan compliance casting uncertainty on forecasted income tax revenue.

***The Commonwealth may enact future tax legislation, the effect of which is unknown.***

The Commonwealth may enact other legislation that could adversely affect tax revenue. For example, in 2019, the Commonwealth recently enacted three laws that amended the Internal Revenue Code, enacted Act 81-2019 to legalize physical and online sports betting and establish a gaming revenue tax upon such activities, and the aforementioned Act 60-2019. The Commonwealth has not certified fiscal plan compliance with respect to any of these laws. Accordingly, there is uncertainty as to whether these laws could have a negative effect on future tax revenue.

***The Commonwealth generates significant revenue from a small set of non-resident persons through Act 154 excise taxes and non-resident withholdings, the financial impact of which is has been expected to decline.***

In previous years, the Puerto Rico Department of Treasury had expected that from 2017 to 2023, revenue from Act 154 and non-resident withholdings (NRW) would decline 42% and 12%, respectively. It was anticipated that the decline would be the result of pending expirations of pharmaceutical patents, supply chain diversification, and U.S. federal tax. While Act 154 and NRW revenue from 2017 to 2019 have not declined as was expected, the fiscal plan assumes that the revenue will decline due in part from the drivers referenced above. It is uncertain how quickly and to what degree these or other risks will impact the taxes paid by this small group of taxpayers.

***The Internal Revenue Service has to date not challenged the creditability against federal income of the Act 154 excise taxes paid to Puerto Rico, however, the issue of creditability has not been fully resolved.***

Taxpayers that are foreign to Puerto Rico but that are otherwise United States taxpayers have benefited by crediting the Act 154 excise taxes paid to Puerto Rico as taxes in lieu of income taxes against these taxpayers' federal income taxes. The IRS has issued Notice 2011-29 to articulate its view that while the creditability issues need resolution, any resolution against the credit would only be prospective. Such resolution is still pending and it is uncertain how or when the IRS will address creditability and which taxpayers will be materially affected by such a change. An adverse change to the creditability could result in certain taxpayers restructuring their operations in Puerto Rico and impacting the long-term economic outlook of Puerto Rico taxes.

***There is no assurance the Government will be able to replace the loss of Act 154 revenues on a timely or substantive basis.***

In September 2019, U.S. Treasury Secretary Steve Mnuchin asked Governor Wanda Vázquez to present a transition plan to eliminate the temporary credit that has allowed foreign companies to fully deduct the 4 percent tax imposed by Act 154. Following the meeting, Puerto Rico's government announced that a working group consisting of government and private sector individuals would be formed to identify potential alternatives to the tax. There is no assurance these efforts will lead to the successful development and implementation of a reform process that replaces revenues from Act 154 on a timely or substantive basis.

***The recent transaction with one large taxpayer may materially reduce future corporate income, and other, tax collections.***

In July 2019, one of Puerto Rico's largest tax filers completed a one-time corporate transaction, which is contributing to more than $500 million in out-performance of corporate income tax collections, relative to the fiscal plan forecast. The long term implications are still being evaluated by the Department of Treasury.

***Natural disasters may impact the ability of the government to collect revenue.***

It is possible that natural disasters disrupt the ability to collect revenues as forecast and could lead to additional outmigration that would also potentially reduce revenues and economic growth.

## G.    Risk Factors Related to Future Judicial Actions

***The Bonds are being issued in connection with the Plan that is subject to confirmation pursuant to PROMESA Title III, which is newly enacted legislation that has not been previously used for financial restructuring, and substantial uncertainties related to its construction exists, including uncertainties due to the lack of judicial decisions interpreting PROMESA Title III.***

The Plan is effected pursuant to PROMESA Title III. PROMESA is a new federal statute signed into law in 2016, and a plan of adjustment pursuant to Title III thereof has not yet been confirmed by any court or consummated by any party. As a result, there are uncertainties relating to the successful confirmation and consummation of a plan of adjustment pursuant to PROMESA Title III. For example, it is uncertain to what extent an order of the Title III Court confirming the Plan can be appealed or its effectiveness delayed. While courts likely will borrow from existing precedents from chapters 9 and 11 of the Bankruptcy Code, there can be no assurances that courts would do so or consider other factors when interpreting the provisions of PROMESA. Such uncertainties may affect, among other things, market perception and, therefore, the trading value of the Bonds.

In addition, there is uncertainty associated with the consummation of a plan of adjustment pursuant to PROMESA Title III because there is no judicial experience interpreting the provisions of a plan of adjustment confirmed pursuant to PROMESA Title III. Judicial interpretations of a plan of adjustment confirmed pursuant to PROMESA Title III, including those related to the successful consummation of a plan of adjustment, could affect the value of the bonds issued under the Plan.

***PROMESA is subject to challenges regarding its constitutionality.***

For example, certain parties have challenged the constitutionality of PROMESA on the grounds that appointment of the members of the Oversight Board violates the Appointments Clause and the separation-of-powers principles of the United States Constitution because the members were not appointed by the President with the advice and consent of the U.S. Senate. These parties seek to dismiss the Commonwealth Title III Case and seek declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid.  These parties also seek to enjoin the Oversight Board from exercising any authority granted to it by PROMESA.  The Title III Court entered an opinion and order holding that there is no constitutional defect in the method of appointment. The parties challenging PROMESA appealed to the First Circuit, which reversed the Title III Court and held that the method of appointment was defective.  Certiorari was granted by the Supreme Court on this issue, and oral argument took place on October 15, 2019.  For additional information, *see* section V.F of this Disclosure Statement, entitled "Significant Adversary Proceedings and Related Litigation."

***The Debtors may be subject to future claims and legal actions.***

The Debtors may be subject to various claims and legal actions arising in the ordinary course of its activities that arise after the Effective Date. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Debtors after their emergence from Title III.

***The enforcement of rights under the New GO Bonds, New GO Bond Indenture, and New Bond Legislation may be limited to the extent Reorganized Commonwealth is subject to a subsequent case under Title III of PROMESA.***

The holders of New GO Bonds may be unable to enforce rights under the New GO Bonds, New Bond Indenture, and New Bond Legislation to the extent Reorganized Commonwealth are subject to a subsequent case under Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the Title III petition.

***Certain closing conditions and closing deliverables with respect to the Plan may differ in type and scope from those described herein.***

Certain closing conditions and closing deliverables with respect to the Plan may differ in type and scope from those described herein if the Title III Court enters a Confirmation Order that is different than expected.

## H.     Risk Factors Related to Legislative Action

The Plan contemplates legislation will be enacted by the Government on or prior to the Effective Date authorizing the transactions contemplated in the Plan, including the issuance of the New GO Bonds. There is no certainty such legislation will be enacted, and if it is not, the Oversight Board will seek judicial relief in lieu thereof pursuant to PROMESA Section 305, allowing the Title III Court to interfere with governmental and political powers in a plan of adjustment or with the consent of the Oversight Board and to cause the issuance of the New GO Bonds. There is no certainty the Title III court will grant the foregoing judicial relief, or that it would be upheld on appeal.

If the legislation authorizing the transactions contemplated in the Plan is enacted, future action by the Legislature could change the pertinent legislation in ways that affect the New GO Bonds. While the legislation authorizing the New GO Bonds will include, among other things, a non-impairment covenant, any action of the Government to amend the legislation, as well as the litigation that likely would ensue, might adversely affect the value of the New GO Bonds, and the recoveries on the New GO Bonds. Furthermore, the enforcement of any rights against the Commonwealth under the Commonwealth's statutory non-impairment covenant may be subject to the exercise of judicial discretion and limitations on legal remedies against the Commonwealth or the enforcement of the non-impairment covenant.

In addition, other future actions by the Legislature could also materially adversely affect the value of the New GO Bonds and the recoveries on such bonds

**I.     Risk Factors Related to Tax Treatment of New GO Bonds and COFINA Junior Lien Bonds**

*The proportion of New GO Bonds and COFINA Junior Lien Bonds that will be tax-exempt for U.S. federal income tax purposes is uncertain.*

The New GO Bonds and COFINA Junior Lien Bonds will be issued as Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds (as defined in "Certain Material United States Federal Income Tax Considerations") or Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds (as defined in "Certain Material United States Federal Income Tax Considerations"), as applicable. The tax status of the New GO Bonds and COFINA Junior Lien Bonds has not been determined as of the date of this Disclosure Statement, including (i) whether a portion of the interest on the New GO Bonds and/or the COFINA Junior Lien Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) the ratio of the aggregate amount of all Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds to be issued on the Effective Date to the total aggregate amount of all New GO Bonds and all COFINA Junior Lien Bonds. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Taxation of New GO Bonds and COFINA Junior Lien Bonds.*"

*[The manner in which interest accruals should be calculated with respect to the New GO Bonds and COFINA Junior Lien Bonds for U.S. federal income tax purposes is uncertain.*

The Debtors do not intend to treat the New GO Bonds or COFINA Junior Lien Bonds as "contingent payment debt instruments" under the applicable Treasury Regulations (as defined in "Certain Material United States Federal Income Tax Considerations"). However, there is limited authority as to the treatment of the New GO Bonds and COFINA Junior Lien Bonds, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of New GO Bonds and COFINA Junior Lien Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds that may be excluded from gross income for U.S. federal income tax purposes. See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims*

*(Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond
Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond
Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims
(Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—
Taxation of New GO Bonds and COFINA Junior Lien Bonds.*"]

***U.S. Holders may be required to report income in certain years in excess of the amount of cash
received by such holders in those years, resulting in "phantom income" for U.S. federal income
tax purposes.***

If, for U.S. federal income tax purposes, the Taxable New GO Bonds or Taxable COFINA
Junior Lien Bonds, as applicable, (as defined in "Certain Material United States Federal Income
Tax Considerations") are issued with more than a *de minimis* amount of original issue discount,
generally, 0.25% of the stated redemption price at maturity multiplied by the number of complete
years to maturity, then a U.S. Holder of such bonds must include original issue discount in income
as it accrues (regardless of the holder's regular method of tax accounting) using a constant yield
method under the accrual rules for original issue discount. If interest accruals exceed the cash
payments on the Taxable New GO Bonds or Taxable COFINA Junior Lien, as applicable, in any
year, a U.S. Holder will have "phantom income" in that year, *i.e.*, taxable income in excess of the
cash received, which may be substantial.

In the event of a sale or other taxable disposition of a New GO Bond or COFINA Junior
Lien Bond, as applicable, with accrued market discount, a U.S. Holder must recognize ordinary
income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder
previously elected to include the market discount in income as it accrued. See "*Certain Material
United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed
Claims— Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured)
(Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims
(Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class
20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class
24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class
28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32),
2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Taxation
of New GO Bonds and COFINA Junior Lien Bonds.*"

ALL HOLDERS SUBJECT TO UNITED STATES TAXATION SHOULD READ THE
DISCUSSION OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE NEW GO BONDS THAT IS
CONTAINED IN THIS DISCLOSURE STATEMENT UNDER THE HEADING "CERTAIN
MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS."

[*Remainder of Page Left Intentionally Blank*]

## IX.   Certain Material United States Federal Income Tax Considerations

### A.   General

A general description of certain material U.S. federal income tax consequences of the Plan to holders of certain Claims is provided below. This description is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), regulations (including temporary and proposed regulations) promulgated under the IRC (the "Treasury Regulations"), judicial decisions and administrative determinations, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause some, or all, of the U.S. federal income tax consequences of the Plan to differ materially from the consequences described below.

The U.S. federal income tax consequences of the Plan are complex, and may vary based on the Class of Claims held by a holder. As of the date of this Disclosure Statement, no ruling has been requested from the Internal Revenue Service (the "IRS") as to any aspect of the Plan; no opinion has been requested from the Debtors' counsel concerning any tax consequence of the Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of U.S. federal income taxation that may be relevant to holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers (e.g., regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency for tax purposes is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, individuals receiving Social Security or Railroad Retirement benefits, and persons whose claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, the description does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires New GO Bonds or COFINA Junior Lien Bonds in the secondary market. Furthermore, the description does not discuss state, territorial (including Puerto Rico), local or non-U.S. income or other tax consequences (including estate or gift tax consequences). Finally, this discussion does not address the U.S. federal income tax consequences to holders of Claims who are deemed to have rejected the Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the U.S. federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan.

**The Puerto Rico tax consequences of the Plan to holders that are bona fide residents of the Commonwealth, and others who may be subject to tax on a gross or net basis by the Commonwealth are not discussed in this section. Such holders should review the section "Certain Material Puerto Rico Income Tax Considerations" below.**

401

B.    **U.S. Holders**

1.    **Definition of U.S. Holder**

Unless otherwise noted, the discussion below applies only to U.S. Holders. As used herein, the term "U.S. Holder" means a beneficial owner of GO Bonds, ERS Bonds and/or PBA Bonds (together, "Existing Securities") on the Effective Date of the Plan that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Existing Securities, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

The term "U.S. Holder" does not include a Puerto Rico Individual or a Puerto Rico Corporation, each as defined below under "—Puerto Rico Individuals and Puerto Rico Corporations." Puerto Rico Individuals and Puerto Rico Corporations should review the certain U.S. federal income tax consequences of the Plan discussed under "— Puerto Rico Individuals and Puerto Rico Corporations."

In addition, solely for purposes of holders of (i) Active and Retired Employee Benefits Claims (Class 39A – 39E), and (ii) AFSCME Employee Claims (Class 40), the term "U.S. Holder" does not include any individual that was a Puerto Rico Individual and is now a citizen or resident of the United States.

A U.S. Holder who holds Allowed Claims of more than one Class may have different U.S. federal income tax consequences for each Class of Allowed Claims. U.S. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such U.S. Holder holds, and U.S. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the U.S. federal income tax consequences of each Class of Allowed Claims such U.S. Holder holds.

402

Certain U.S. Holders that use the accrual method of accounting for U.S. federal income tax purposes generally will be required to include certain amounts in income with respect to the Allowed Claims no later than the time that such amounts are reflected on certain financial statements of such U.S. Holders. Such U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of the Plan in their individual circumstances.

2.      **Tax Treatment of Allowed Claims**

a)      **Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)**

The Debtors expect that, pursuant to the Plan, each U.S. Holder of any of the following: (i) Vintage CW Bond Claims (Class 11); (ii) Vintage CW Bond Claims (Insured) (Class 13); (iii) Vintage CW Guarantee Bond Claims (Class 15); (iv) Vintage CW Guarantee Bond Claims (Insured) (Class 16); (v) 2011 CW Bond Claims (Class 18); (vi) 2011 CW Bond Claims (Insured) (Class 20); (vii) 2011 CW Guarantee Bond Claims (Class 22); (viii) 2011 CW Series D/E/PIB Bond Claims (Class 24); (ix) 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25); (x) 2012 CW Bond Claims (Class 28); (xi) 2012 CW Bond Claims (Insured) (Class 30); (xii) 2012 CW Guarantee Bond Claims (Class 32); (xiii) 2014 CW Bond Claims (Class 34); and (xiv) 2014 CW Guarantee Bond Claims (Class 37) will be treated as exchanging such U.S. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New GO Bonds, COFINA Junior Lien Bonds and Cash for U.S. federal income tax purposes. The Debtors intend to report the transaction consistently with this treatment to the IRS, and the remainder of this discussion assumes the expected treatment will be followed by each U.S. Holder.

(i)      *Tax Treatment of Exchange*

The tender of the GO Bonds for the New GO Bonds, COFINA Junior Lien Bonds and Cash, as applicable, pursuant to the Plan will be considered an exchange under Section 1001 of the IRC. A U.S. Holder will recognize gain or loss in an amount equal the difference between (i) the sum of any Cash received (other than Cash received attributable to accrued but unpaid interest on the GO Bonds) plus the "issue price" for U.S. federal income tax purposes (determined in the manner described below under "—Issue Price") for any New GO Bonds and COFINA Junior Lien Bonds received and (ii) the U.S. Holder's adjusted tax basis in the GO Bonds that were tendered therefore (such adjusted tax basis calculated as described below). Subject to the discussion under "—Market Discount," any gain or loss that a U.S. Holder recognizes upon the exchange of the GO Bonds for the New GO Bonds, COFINA Junior Lien Bonds and Cash, as applicable, pursuant to the exchange will generally be capital gain or loss and, if the U.S. Holder's holding period of the

GO Bonds surrendered is more than one year, long-term capital gain or loss. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations.

A U.S. Holder's holding period for any New GO Bonds and COFINA Junior Lien Bonds received will begin the day after the exchange. A U.S. Holder's tax basis in the New GO Bonds and COFINA Junior Lien Bonds received in the exchange will generally be equal to the issue price of the New GO Bonds and COFINA Junior Lien Bonds (determined in the manner described below under "—Issue Price").

(ii) *Tax Treatment of Receipt of Cash*

(1) **Cash**

Cash is expected to be treated as a payment on the GO Bonds for U.S. federal income tax purposes, other than Cash received that is attributable to accrued but unpaid interest. The Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (such as any accrued but unpaid interest other than described in the preceding clauses). Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes. Consistent with such allocation under the Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest. While the Debtors intend to report distributions to a U.S. Holder in accordance with the Plan, and the Debtors believe that such reporting is consistent with applicable law and congressional intent, there can be no assurance that the IRS will respect those allocations with respect to payment on the GO Bonds. U.S. Holders should consult their tax advisors to determine the appropriate characterization of payments received.

Subject to the discussion in the previous paragraph, if any of the Cash received is attributable to accrued but unpaid interest on the GO Bonds, the treatment of such Cash paid to a U.S. Holder will depend on whether the accrued but unpaid interest on such U.S. Holder's Claim is, or is not, tax-exempt for U.S. federal income tax purposes. In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be required to include such amount of Cash received as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest. A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be entitled to recognize a deductible loss, to the extent that such interest is not satisfied under the Plan. However, a U.S Holder of a tax-exempt Claim will not be entitled to recognize a deductible loss with respect to any unpaid interest if such U.S. Holder never included such unpaid interest in U.S. gross income. Additionally, a U.S. Holder that receives a distribution of accrued but unpaid interest on a Claim that is tax-exempt will not be

404

required to include such amount as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest. Although U.S. Holders generally will not be required to include the foregoing amounts in computing U.S. taxable income, U.S. Holders will likely have to report such amounts to the IRS.

For tax-exempt GO Bonds that are capital appreciation bonds, where the accrual of the original issue discount is treated as tax exempt interest, the amount of such accrual would have increased the tax basis of a bondholder, thereby increasing a bondholder's investment in such capital appreciation bond. Such increase in tax basis is generally considered an increase in the principal amount of the capital appreciation bond. U.S. Holders of Claims on which such interest has accrued are urged to consult their own tax advisors regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

(2)    <strong>Consummation Costs and PSA Restriction Fee</strong>

The U.S. federal income tax treatment of the Consummation Costs and the PSA Restriction Fee is unclear. The Debtors intend to treat the receipt of the Consummation Costs and PSA Restriction Fee in the same manner as discussed above under "—Cash." It is possible, however, that the Consummation Costs and the PSA Restriction Fee could instead be treated as a separate fee that would be reported as ordinary income, rather than an amount paid under the GO Bonds and such ordinary income generally would not be tax-exempt regardless of whether the underlying GO Bonds were tax-exempt for U.S. federal income tax purposes. These fees may also be treated as additional consideration paid to holders that would be taken into account in calculating a holder's gain or loss. U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the Consummation Costs and the PSA Restriction Fee.

(iii)    <strong><em>Market Discount</em></strong>

If a U.S. Holder acquired the GO Bonds for less than the "adjusted issue price" of the GO Bonds and the difference between the U.S. Holder's cost and the "adjusted issue price" exceeded a *de minimis* threshold (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining complete years to maturity), such difference will generally be treated as "market discount."

Any gain recognized on the exchange will generally be treated as ordinary income to the extent of any accrued market discount not previously included in ordinary income with respect to the GO Bonds. To the extent gain is recognized pursuant to the exchange of GO Bonds for New GO Bonds and COFINA Junior Lien Bonds, a U.S. Holder must include as ordinary income any gain that would have otherwise been treated as capital gain to the extent of the accrued market discount on the GO Bonds, unless the U.S. Holder previously elected to include the market discount in income as it accrued. See below "—Taxation of New GO Bonds and COFINA Junior Lien Bonds—Sale, Retirement or Other Disposition of New GO Bonds and COFINA Junior Lien Bonds" for a further discussion regarding the election to include market discount in income as it accrues. U.S. Holders should consult their own tax advisors regarding the tax treatment of market

405

discount pursuant to the exchange, including the interaction of the market discount, original issue discount ("OID") and acquisition premium rules.

(iv)     ***Taxation of New GO Bonds and COFINA Junior Lien Bonds***

The New GO Bonds and COFINA Junior Lien Bonds will be issued either as bonds the interest on which is excluded from gross income for U.S. federal income tax purposes (the "Tax-Exempt New GO Bonds" and the "Tax-Exempt COFINA Junior Lien Bonds," respectively); or, bonds the interest on which is not excluded from gross income for U.S. federal income tax purposes (the "Taxable New GO Bonds" and the "Taxable COFINA Junior Lien Bonds," respectively). The tax status of the New GO Bonds and COFINA Junior Lien Bonds has not been determined as of the date of this Disclosure Statement, including (i) whether a portion of the New GO Bonds and COFINA Junior Lien Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) the ratio of the aggregate amount of all Taxable New GO Bonds and all Taxable COFINA Junior Lien Bonds to be issued on the Effective Date to the total aggregate amount of all New GO Bonds and all COFINA Junior Lien Bonds.

(1)     **Issue Price**

The Debtors expect that the issue price of the New GO Bonds and COFINA Junior Lien Bonds should equal the fair market value of the New GO Bonds and COFINA Junior Lien Bonds on the date of the exchange. This determination is based on the Debtors' conclusion that the GO Bonds as well as the New GO Bonds and COFINA Junior Lien Bonds should be treated as "publicly traded" within the meaning of the applicable Treasury Regulations. The fair market value of the New GO Bonds and COFINA Junior Lien Bonds will be determined by the "trading price" of such Bonds on or about the date of the exchange. There is no specific guidance on how to determine the trading price as of a specific time; however, related Treasury Regulations suggest that a taxpayer may use any consistently applied, reasonable method to determine fair market value when there is more than one sales price or quoted price. The Debtors' determination that the GO Bonds and the New GO Bonds and COFINA Junior Lien Bonds are "publicly traded" will be binding on all holders, unless a holder discloses its contrary position in the manner required by applicable Treasury Regulations. The rules regarding the determination of issue price are complex, and U.S. Holders should consult their own tax advisors regarding the determination of the issue price of the New GO Bonds and COFINA Junior Lien Bonds for U.S. federal income tax purposes.

(2)     **Interest Including OID**

The U.S. federal income tax rules used to determine what amounts are treated as interest are complex. U.S. Holders are urged to consult their own tax advisors regarding what amounts will be treated as interest for U.S. federal income tax purposes in their individual circumstances.

i.      **Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds**

The IRC imposes certain requirements that must be met subsequent to the issuance and delivery of the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds for interest thereon to be and remain excluded from gross income for U.S. federal income tax purposes

406

pursuant to Section 103 of the IRC. Noncompliance with such requirements could cause the interest on the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds to be included in gross income for U.S. federal income tax purposes retroactive to the date of issue of the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds. When the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds are issued on the Effective Date, Reorganized Commonwealth will, pursuant to the Definitive Documents, including the New GO Bond Legislation and COFINA Junior Lien Bond Legislation, covenant to do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds shall be and remain excludable from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC. However, as noted above, the tax status of the New GO Bonds and COFINA Junior Lien Bonds has not been determined as of the date of this Disclosure Statement.

Amounts allocable to pre-issuance accrued interest on the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds will not be treated as tax-exempt interest under Section 103 of the IRC.

### ii.    Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds

If interest on the New GO Bonds or COFINA Junior Lien Bonds (or a portion of them) is not treated as exempt from gross income for U.S. federal income tax purposes, then payments or accruals of "qualified stated interest" (as defined below) on the New GO Bonds or COFINA Junior Lien Bonds (or the relevant portion of them) will be taxable to such U.S. Holder as ordinary interest income at the time received or accrued, in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the debt instrument at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices. Stated interest payments on the New GO Bonds and COFINA Junior Lien Bonds [generally] are expected to be qualified stated interest for this purpose.

### iii.    OID

The amount of OID on the New GO Bonds and COFINA Junior Lien Bonds, if any, will be equal to the excess of the sum of all principal [and stated interest payments (other than qualified stated interest)] provided by such New GO Bonds or COFINA Junior Lien Bonds (initially taking into account the payment schedule as described below) over the issue price (determined in the manner described above under "—Issue Price") of such New GO Bonds or COFINA Junior Lien Bonds. Furthermore, the Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds would bear OID only if the issue price of the New GO Bonds or COFINA Junior Lien Bonds, as applicable, is less than its principal amount by more than a *de minimis* amount. OID will be considered *de minimis* if it is less than 0.25% of the stated redemption price at maturity multiplied by the number of remaining complete years to maturity of such New GO Bonds or COFINA Junior Lien Bonds. U.S. Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, must include the OID on Taxable New GO Bonds and Taxable COFINA Junior Lien bonds in gross income as ordinary income as it accrues on a constant yield to maturity

basis, regardless of whether cash attributable to such OID is received at such time. However, the New GO Bonds and COFINA Junior Lien Bonds may be subject to the acquisition premium rules (described below under "—Acquisition Premium"), which could reduce the amount of OID includible in gross income.

For Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds, the amount of OID includible in gross income by a U.S. Holder in any taxable year generally is the sum of the daily portions of OID with respect to a Taxable New GO Bond or Taxable COFINA Junior Lien Bond, as applicable, for each day during such taxable year or portion of such taxable year on which the U.S. Holder holds the Taxable New GO Bond or Taxable COFINA Junior Lien Bond. The daily portion is determined by allocating to each day in any accrual period a pro rata portion of the OID allocable to that accrual period. The accrual period for a Taxable New GO Bond and Taxable COFINA Junior Lien Bond may be of any length and may vary in length over the term of the Taxable New GO Bond or Taxable COFINA Junior Lien Bond, as applicable, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on either the first day or the final day of an accrual period. The amount of OID allocable to any accrual period, subject to the possible adjustments described below, will be an amount equal to the product of the Taxable New GO Bond's or Taxable COFINA Junior Lien Bond's adjusted issue price at the beginning of the accrual period and its yield to maturity (less payments of qualified stated interest allocable to that period). The yield to maturity of the Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds is the discount rate that, when used in computing the present value (as of the issue date) of all principal and interest payments to be made on the Taxable New GO Bonds or Taxable COFINA Junior Lien Bonds, as applicable, produces an amount equal to the issue price of such Taxable New GO Bonds or Taxable COFINA Junior Lien Bonds. The amount of OID allocable to the final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price at the beginning of the final accrual period. The adjusted issue price of a Taxable New GO Bond and Taxable COFINA Junior Lien Bond at the beginning of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period and reduced by any payments made on the Taxable New GO Bond or Taxable COFINA Junior Lien Bond, as applicable, during the prior accrual periods (other than payments of qualified stated interest).

For Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds, the amount of OID is excluded from gross income for U.S. federal income tax purposes to the same extent as interest on the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds, as applicable, is so expected to be excluded. The OID accruals are computed in the same manner as described above for Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds, but such accruals will be added to the holder's tax basis for the Tax-Exempt New GO Bonds and COFINA Junior Lien Bonds, as applicable. The accrual of OID may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Tax-Exempt New GO Bonds and COFINA Junior Lien Bonds, as applicable, even though there will not be a corresponding cash payment. Owners of the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds with OID are urged to consult with their own advisors with respect to the tax consequences of owning such Tax-Exempt New GO Bonds or Tax-Exempt COFINA Junior Lien Bonds.

The rules regarding OID are complex and the rules described above may not apply in all cases. If other rules apply instead, U.S. Holders receiving the New GO Bonds and COFINA Junior Lien Bonds could be treated differently than described above. U.S. Holders receiving the New GO Bonds and COFINA Junior Lien Bonds should consult their own tax advisors regarding the potential application of the OID and related U.S. federal income tax rules to the New GO Bonds and COFINA Junior Lien Bonds.

[This disclosure assumes that the New GO Bonds and COFINA Junior Lien Bonds will not be considered contingent payment debt instruments within the meaning of the applicable Treasury Regulations. However, there is limited authority as to the treatment of the New GO Bonds and COFINA Junior Lien Bonds, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of New GO Bonds and COFINA Junior Lien Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the Tax-Exempt New GO Bonds and Tax-Exempt COFINA Junior Lien Bonds that may be excluded from gross income for U.S. federal income tax purposes.]

### (3)    **Acquisition Premium**

A New GO Bond or COFINA Junior Lien Bond would be treated as acquired with acquisition premium if the U.S. Holder's initial basis in the New GO Bond or COFINA Junior Lien Bond is (a) less than or equal to the sum of all amounts payable on the New GO Bond or COFINA Junior Lien Bond (other than payments of qualified stated interest) and (b) greater than such bond's adjusted issue price for U.S. federal income tax purposes. If a Taxable New GO Bond or Taxable COFINA Junior Lien Bond was acquired with acquisition premium, a U.S. Holder generally would reduce the amount of OID that otherwise would be included in income for each accrual period by an amount equal to (i) the amount of OID otherwise includible in income multiplied by (ii) a fraction, the numerator of which is the excess of the adjusted tax basis of the Taxable New GO Bond or Taxable COFINA Junior Lien Bond, as applicable, immediately after its acquisition by the U.S. Holder over the adjusted issue price of the Taxable New GO Bond or Taxable COFINA Junior Lien Bond, as applicable, and the denominator of which is the excess of the sum of all amounts payable on the Taxable New GO Bond or Taxable COFINA Junior Lien Bond, as applicable, after the purchase date, other than payments of qualified stated interest, over the Taxable New GO Bond's or Taxable COFINA Junior Lien Bond's, as applicable, adjusted issue price. If a Tax-Exempt New GO Bond or Tax-Exempt COFINA Junior Lien Bond were acquired with acquisition premium, a U.S. Holder will reduce the Tax-Exempt New GO Bond's or Tax-Exempt COFINA Junior Lien Bond's, as applicable, tax basis during each accrual period using the same method described above for a Taxable New GO Bond and Taxable COFINA Junior Lien Bond.

As an alternative to reducing the amount of OID that otherwise would be included in income during an accrual period or reducing the tax basis of the Tax-Exempt New GO Bond or Tax-Exempt COFINA Junior Lien Bond, the U.S. Holder may elect to compute OID accruals by applying the constant yield method described above; provided, however, that if a U.S. Holder chooses to make such election, the election shall also apply with respect to all other bonds held by such U.S. Holder at the beginning of the taxable year to which the election applies and to any

bonds thereafter acquired, and such election generally may not be revoked. U.S. Holders who acquire New GO Bonds and COFINA Junior Lien Bonds with acquisition premium should consult their own tax advisors as to the consequences of such an election in their individual circumstances.

### (4)   Sale, Retirement or Other Disposition of New GO Bonds and COFINA Junior Lien Bonds

A U.S. Holder will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a New GO Bond or COFINA Junior Lien Bond equal to the difference, if any, between (i) the amount realized upon such disposition (other than cash received attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of such New GO Bond or COFINA Junior Lien Bond. A U.S. Holder's adjusted tax basis in a New GO Bond or COFINA Junior Lien Bond will generally equal such U.S. Holder's tax basis on such New GO Bond or COFINA Junior Lien Bond on the date the U.S. Holder acquired such New GO Bond or COFINA Junior Lien Bond, increased by any OID previously accrued by the U.S. Holder, and decreased by the amount of any Cash payments (other than payments of qualified stated interest) previously received on such New GO Bond or COFINA Junior Lien Bond by the U.S. Holder. U.S. Holders should consult with their own tax advisors as to the tax basis of their New GO Bonds and COFINA Junior Lien Bonds on the date of acquisition.

Subject to the discussion of market discount below, any gain or loss that a U.S. Holder recognizes upon the sale or other taxable disposition of a New GO Bond or COFINA Junior Lien Bond should generally constitute capital gain or loss and will be long-term capital gain or loss if such holder's holding period in the New GO Bond or COFINA Junior Lien Bond is greater than one year. A U.S. Holder's holding period in New GO Bonds and COFINA Junior Lien Bonds received pursuant to the exchange will begin the day after the exchange. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations. Upon a taxable disposition of the New GO Bonds or COFINA Junior Lien Bonds, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued. A U.S. Holder can elect to include market discount in income as it accrues, in which case such income would be treated as ordinary interest income at the time it is recognized and the U.S. Holder would increase its basis in the New GO Bonds or COFINA Junior Lien Bonds, as applicable, by the amount of the market discount recognized. Such election is made by including market discount in income on a timely filed U.S. federal income tax return and attaching a statement to the return providing that such election has been made.

If such election is made, the election applies to all market discount bonds acquired by the U.S. Holder during the year for which the election is made and all subsequent years.

### b)   Holders of Retail Vintage CW Bond Claims (Class 12), Retail 2011 CW Bond Claims (Class 19), Retail 2011 CW Series D/E/PIB Bond

**Claims (Class 26), Retail 2012 CW Bond Claims (Class 29), and Retail
2014 CW Bond Claims (Class 35)**

The Debtors expect that pursuant to the Plan, each U.S. Holder of any of the following: (i)
Retail Vintage CW Bond Claims (Class 12); (ii) Retail 2011 CW Bond Claims (Class 19); (iii)
Retail 2011 CW Series D/E/PIB Bond Claims (Class 26); (iv) Retail 2012 CW Bond Claims (Class
29); and (v) Retail 2014 CW Bond Claims (Class 35) will be treated as exchanging such U.S.
Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New GO Bonds,
COFINA Junior Lien Bonds, and Cash for U.S. federal income tax purposes. The remainder of
this discussion assumes this will be the case.

(i)      *Tax Treatment of Exchange*

Generally, the Debtors expect that the U.S. federal income tax consequences to each of the
above-mentioned U.S. Holders for the exchange of a portion of such U.S. Holder's GO Bonds for
New GO Bonds and COFINA Junior Lien Bonds and Cash should be as described above under
"—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class
13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims
(Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class
20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class
24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class
28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32),
2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax
Treatment of Exchange."

(ii)     *Tax Treatment of Receipt of Cash*

The Debtors expect that, to the extent that any of the above-mentioned U.S. Holders
receives its pro rata share of Cash under the Plan, the U.S. federal income tax consequences to
such U.S. Holder should be as described above under "—Holders of Vintage CW Bond Claims
(Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims
(Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims
(Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class
22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims
(Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class
30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014
CW Guarantee Bond Claims (Class 37)—Tax Treatment of Receipt of Cash." To the extent that
such U.S. Holder voted to accept the Plan and thereby receives its pro rata share of Retail Support
Fees, although, not free from doubt, the Debtors expect that Retail Support Fees generally shall be
treated similarly to the description above of Consummation Costs under "—Tax Treatment of
Receipt of Cash—Consummation Costs and PSA Restriction Fee."

(iii)    *Taxation of New GO Bonds and COFINA Junior Lien Bonds*

The Debtors expect that the New GO Bonds and COFINA Junior Lien Bonds should be
treated for U.S. federal income tax purposes as described above under "—Holders of Vintage CW
Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee

Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Taxation of New GO Bonds and COFINA Junior Lien Bonds."

    c)    **Holders of Vintage CW Bond Claims (Taxable Election) (Class 14), Vintage CW Guarantee Bond Claims (Taxable Election) (Class 17), 2011 CW Bond Claims (Taxable Election) (Class 21), 2011 CW Guarantee Bond Claims (Taxable Election) (Class 23), 2011 CW Series D/E/PIB Bond Claims (Taxable Election) (Class 27), 2012 CW Bond Claims (Taxable Election) (Class 31), 2012 CW Guarantee Bond Claims (Taxable Election) (Class 33), 2014 CW Bond Claims (Taxable Election) (Class 36), and 2014 CW Guarantee Bond Claims (Taxable Election) (Class 38)**

In general, this discussion does not apply to holders of (i) Vintage CW Bond Claims (Taxable Election) (Class 14); (ii) Vintage CW Guarantee Bond Claims (Taxable Election) (Class 17); (iii) 2011 CW Bond Claims (Taxable Election) (Class 21); (iv) 2011 CW Guarantee Bond Claims (Taxable Election) (Class 23); (v) 2011 CW Series D/E/PIB Bond Claims (Taxable Election) (Class 27); (vi) 2012 CW Bond Claims (Taxable Election) (Class 31); (vii) 2012 CW Guarantee Bond Claims (Taxable Election) (Class 33); (viii) 2014 CW Bond Claims (Taxable Election) (Class 36); and (ix) 2014 CW Guarantee Bond Claims (Taxable Election) (Class 38). Any holder of any such Claim that files a U.S. federal income tax return should consult their tax advisor regarding the U.S. federal income tax consequences of holding such Claim and making a taxable bond election. As described above, the term "U.S. Holders" as defined herein does not include Puerto Rico Individuals and Puerto Rico Corporations, each as defined below under "—Puerto Rico Individuals and Puerto Rico Corporations." Puerto Rico Individuals and Puerto Rico Corporations should see the discussion below under "—Puerto Rico Individuals and Puerto Rico Corporations."

    d)    **Holders of ERS Bond Claims (Class 48)**

The Debtors expect that pursuant to the Plan, each U.S. Holder of ERS Bond Claims will be treated as exchanging such U.S. Holder's ERS Bonds that are the subject of this Class of Allowed Claims for Cash, which shall be placed in the ERS Reserve as if such Claim had been an Allowed ERS Bond Claim as of the Effective Date, pending entry of a final, non-appealable order resolving or settling the ERS Litigation. The remainder of this discussion assumes this will be the case.

Any actual or constructive distributions from the ERS Reserve to U.S. Holders of Allowed Claims shall be treated for U.S. federal income tax purposes as if received directly from the Debtors on behalf of the holder's original Claim.

Accordingly, the Debtors expect that the U.S. federal income tax consequences to the U.S. Holders of Allowed ERS Bond Claims for the exchanges of ERS Bonds for ERS Bond Collateral Cash should be as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Receipt of Cash."

e)      **Holders of Settling ERS Bond Claims (Class 49)**

The Debtors expect that pursuant to the Plan, each U.S. Holder of a Settling ERS Bond Claim should be treated as exchanging such U.S. Holder's ERS Bonds that are the subject of this Class of Allowed Claims for Cash for U.S. federal income tax purposes. The remainder of this discussion assumes this will be the case.

The tender of the ERS Bonds in exchange for the ERS Bond Settlement Distribution, which is comprised of ERS Bond Collateral Cash, will be treated as a taxable exchange of the ERS Bonds for Cash for U.S. federal income tax purposes. The Debtors expect that the U.S. federal income tax consequences to the U.S. Holders of Settling ERS Bonds Claims of such exchange should be as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Receipt of Cash."

f)      **Holders of Vintage PBA Bond Claims (Class 1), Vintage PBA Bond Claims (Insured) (Class 2), 2011 PBA Bond Claims (Class 4), and 2012 PBA Bond Claims (Class 6)**

The Debtors expect that pursuant to the Plan, each U.S. Holder of any of the following: (i) Vintage PBA Bond Claims (Class 1); (ii) Vintage PBA Bond Claims (Insured) (Class 2); (iii) 2011 PBA Bond Claims (Class 4); and (iv) 2012 PBA Bond Claims (Class 6) will be treated as exchanging such U.S. Holder's PBA Bonds for Cash, for U.S. federal income tax purposes.

Generally, the Debtors expect that the U.S. federal income tax treatment of receipt of Cash should be as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25),

413

2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Receipt of Cash."

g)      **Holders of Retail Vintage PBA Bond Claims (Class 3), Retail 2011 PBA Bond Claims (Class 5), and Retail 2012 PBA Bond Claims (Class 7)**

The Debtors expect that pursuant to the Plan, each U.S. Holder of any of the following: (i) Retail Vintage PBA Bond Claims (Class 3); (ii) Retail 2011 PBA Bond Claims (Class 5); and (iii) Retail 2012 PBA Bond Claims (Class 7) will be treated as exchanging such U.S. Holder's PBA Bonds for Cash for U.S. federal income tax purposes.

Generally, the Debtors expect that the U.S. federal income tax treatment of receipt of Cash should be as described above under, "—Holders of Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Receipt of Cash." To the extent that such U.S. Holder voted to accept the Plan and thereby receives its pro rata share of Retail Support Fees, although, not the matter is not free from doubt, the Debtors expect that Retail Support Fees generally should be treated similarly to the description above of Consummation Costs under "—Tax Treatment of Receipt of Cash—Consummation Costs and PSA Restriction Fee."

h)      **Holders of PBA General Unsecured Claims (Class 9), CW General Unsecured Claims (Class 41), CW/HTA Claims (Class 42), CW/Convention Center Claims (Class 43), CW/PRIFA Rum Tax Claims (Class 44), CW/MBA Claims (Class 45), ERS General Unsecured Claims (Class 50), Gracia Gracia Claims (Class 51), and Convenience Claims (Class 52)**

The Debtors expect that pursuant to the Plan, each U.S. Holder of any of the following: (i) PBA General Unsecured Claims (Class 9); (ii) CW General Unsecured Claims (Class 41); (iii) CW/HTA Claims (Class 42); (iv) CW/Convention Center Claims (Class 43); (v) CW/PRIFA Rum Tax Claims (Class 44); (vi) CW/MBA Claims (Class 45); (vii) ERS General Unsecured Claims (Class 50); (viii) Gracia Gracia Claims (Class 51); and (ix) Convenience Claims (Class 52) will be treated as receiving a distribution in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims. The consequences of the receipt of such distribution will vary depending on the U.S. Holders individual circumstances. U.S Holders are urged to consult their tax advisors regarding the tax consequences of the receipt of such distribution in their individual circumstances.

414

i)       **Holders of Active and Retired Employee Retirement Benefits Claims
(Class 39A-39E) and AFSCME Employee Claims (Class 40)**

In general, this discussion does not apply to holders of (i) Active and Retired Employee
Retirement Benefits Claims (Class 39A-39E) and (ii) AFSCME Employee Claims (Class 40). Any
holder of any such Claim that files a U.S. federal income tax return should consult their tax advisor
regarding the U.S. federal income tax consequences of holding such Claim.

3.       **Bad Debt and/or Worthless Securities Deduction**

A U.S. Holder who, under the Plan, receives in respect of an Allowed Claim an amount
less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt
(or in an earlier or later year) to a bad debt deduction or a worthless securities deduction. The rules
governing the character, timing and amount of bad debt or worthless securities deductions place
considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the
instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims should
consult their tax advisors with respect to their ability to take such a deduction and as to what
taxable year.

4.       **Medicare Tax**

A U.S. Holder of Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds that
is an individual, estate or trust that does not fall into a special class of trusts that is exempt from
such tax, is subject to a 3.8% Medicare surtax on the lesser of (1) the U.S. Holder's "net investment
income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant
taxable year, which includes, among other items, interest (including original issue discount) on
debt and capital gains from the sale or other taxable disposition of debt, and (2) the excess of the
U.S. Holder's modified adjusted gross income (or adjusted gross income in the case of an estate
or trust) for the taxable year over a certain threshold (which in the case of individuals is between
$125,000 and $250,000, depending on the individual's circumstances). A U.S. Holder that is an
individual, estate or trust should consult its own tax advisors regarding the applicability of the
Medicare surtax to its income and gains in respect of its exchanges and their ownership of the New
GO Bonds and COFINA Junior Lien Bonds.

5.       **Information Reporting and Backup Withholding**

Information reporting will generally apply to (i) payments in respect of the exchange; (ii)
payments of principal and interest and OID, if any, on the New GO Bonds and COFINA Junior
Lien Bonds; and (iii) payments of proceeds of the sale or other disposition of the New GO Bonds
and COFINA Junior Lien Bonds.

Additionally, backup withholding may apply to any payments if such U.S. Holder (a) fails
to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer
identification number, (c) is notified by the IRS that it has failed to report all interest and dividends
required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties
of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the
IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding. The

415

application for exemption is available by providing a properly completed IRS Form W-9 (or suitable substitute).

Backup withholding is not an additional tax. A U.S. Holder generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain U.S. Holders are not subject to information reporting and backup withholding in some cases, provided they properly identify themselves as exempt. U.S. Holders should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

### C.     Puerto Rico Individuals and Puerto Rico Corporations

#### 1.     Definition of Puerto Rico Individuals and Puerto Rico Corporations

As used herein, the term "Puerto Rico Individual" means a beneficial owner of a Bond Claim, a New GO Bond or COFINA Junior Lien Bond that is an individual and a bona fide resident of the Commonwealth within the meaning of Section 937 of the IRC and the Treasury Regulations for the entire taxable year that includes the Effective Date. As used herein, the term "Puerto Rico Corporation" means a beneficial owner of a Bond Claim, a New GO Bond or COFINA Junior Lien Bond that is a corporation organized under the laws of the Commonwealth.

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Puerto Rico Individuals and Puerto Rico Corporations. The discussion does not include any non-U.S. (including Puerto Rico) tax considerations. A Puerto Rico Individual or a Puerto Rico Corporation should review the Section "Certain Material Puerto Rico Income Tax Considerations" below for the Puerto Rico tax consequences of the Plan.

The rules governing the U.S. federal income tax consequences to Puerto Rico Individuals and Puerto Rico Corporations are complex. Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the consummation of the Plan in their own circumstances.

#### 2.     Tax Treatment of Exchange

A Puerto Rico Individual generally will not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan. A Puerto Rico Corporation generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, unless such gain is effectively connected with such Puerto Rico Corporation's conduct of a trade or business in the United States, in which case the gain will be subject to tax in the same manner as effectively connected income as described below under "—Sale, Retirement or Other Disposition of New GO Bonds and COFINA Junior Lien Bonds."

3.    **Taxation of New GO Bonds and COFINA Junior Lien Bonds**

   a)    **Treatment of Interest**

Payments of interest on a New GO Bond and COFINA Junior Lien Bond, including OID, to a Puerto Rico Individual or a Puerto Rico Corporation, generally, would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

   b)    **Sale, Retirement or Other Disposition of New GO Bonds and COFINA Junior Lien Bonds**

Gain realized upon a sale, retirement or other disposition of a New GO Bond or COFINA Junior Lien Bond by a Puerto Rico Individual or a Puerto Rico Corporation generally would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New GO Bond or COFINA Junior Lien Bond by the Puerto Rico Corporation is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

**Certain tax consequences of the Plan to Puerto Rico Individuals and Puerto Rico Corporations are uncertain. Puerto Rico Individuals and Puerto Rico Corporations should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.**

4.    **Information Reporting and Backup Withholding**

Information reporting will generally apply to (i) payments in respect of the exchange, (ii) payments of principal and interest and OID, if any, on the New GO Bonds and COFINA Junior Lien Bonds, and (iii) payments of proceeds of the sale or other disposition of the New GO Bonds and COFINA Junior Lien Bonds.

In general, a Puerto Rico Individual will not be subject to backup withholding with respect to any payments on the New GO Bonds and COFINA Junior Lien Bonds if it provides a validly completed IRS Form W-9 (or suitable substitute) unless such Puerto Rico Individual (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.

A Puerto Rico Corporation, generally, will not be subject to backup withholding with respect to payments in respect of the exchange or payments of principal and interest and OID, if any, on the New GO Bonds and COFINA Junior Lien Bonds, provided that the Puerto Rico Corporation has provided a validly completed IRS Form W-8BEN-E (or other applicable form) establishing that it is not a U.S. person as defined in the IRC (or it satisfies certain documentary evidence requirements for establishing that it is not a U.S. person). Information reporting and, depending on the circumstances, backup withholding will apply to payments of proceeds of the sale or other disposition of the New GO Bonds and COFINA Junior Lien Bonds made within the United States or conducted through certain United States-related financial intermediaries, unless the Puerto Rico Corporation certifies to the payor under penalties of perjury that it is not a U.S. person (and the payor does not have actual knowledge or reason to know that such Puerto Rico Corporation is a U.S. person), or otherwise establishes an exemption.

Backup withholding is not an additional tax. A Puerto Rico Individual or Puerto Rico Corporation, as applicable, generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain Puerto Rico Individuals and Puerto Rico Corporations are not subject to information reporting and backup withholding in specific circumstances, provided they properly identify themselves as exempt. Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

**D.     Non-U.S. Holders**

1.     **Definition of Non-U.S. Holder**

Unless otherwise noted, the discussion below applies only to Non-U.S. Holders. As used herein, the term "<u>Non-U.S. Holder</u>" means a beneficial owner of Existing Securities that is not (i) a U.S. Holder, (ii) a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes or (iii) a Puerto Rico Individual or a Puerto Rico Corporation.

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the Plan in their individual circumstances.

418

2.     **Treatment of Exchange**

A Non-U.S. Holder generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, unless (i) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States), in which case the gain will be subject to tax in the same manner as effectively connected income as described above, for New GO Bonds and COFINA Junior Lien Bonds, under "—Sale, Retirement or Other Disposition of New GO Bonds and COFINA Junior Lien Bonds" or (ii) such Non-U.S. Holder is a nonresident alien individual who holds the New GO Bonds and COFINA Junior Lien Bonds as a capital asset and is present in the United States for 183 days or more in the taxable year of the exchange and such gain is derived from sources within the United States.

3.     **Taxation of New GO Bonds and COFINA Junior Lien Bonds**

a)     *Treatment of Interest*

Payments of interest on a New GO Bond and COFINA Junior Lien Bond, including OID, to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such income is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New GO Bonds and Taxable COFINA Junior Lien Bonds is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

b)     *Sale, Retirement or Other Disposition of New GO Bonds and COFINA Junior Lien Bonds*

Gain realized upon a sale, retirement or other disposition of a New GO Bond or COFINA Junior Lien Bond by a Non-U.S. Holder generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such gain is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New GO Bond or COFINA Junior Lien Bond by the Non-U.S. Holder is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income

tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

The tax consequences of the Plan to the Non-U.S. Holders are uncertain. Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

4.      **FATCA**

Pursuant to FATCA, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities generally must comply with certain new information reporting rules with respect to their U.S. account holders and investors or confront a new withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally would be subject to withholding tax with respect to any "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodic income, profits and income and certain "foreign passthru payments." Withholding under FATCA generally should not apply to payments of interest (including OID) under a New GO Bond and COFINA Junior Lien Bond because such payment generally should be foreign source income. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Holders should consult with their tax advisors as to the application of FATCA in their individual circumstances.

[*Remainder of Page Left Intentionally Blank*]

## X.     Certain Material Puerto Rico Income Tax Considerations

### A.     General

A general description of certain material Puerto Rico income tax consequences of the Plan to holders of certain Claims is provided below. This description is based on the Puerto Rico Internal Revenue Code of 2011, as amended (the "P.R. Code"), regulations promulgated under the P.R. Code, administrative pronouncements and judicial decisions, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect (collectively, "Applicable P.R. Tax Law"). Changes in Applicable P.R. Tax Law or in their interpretation could cause some or all of the Puerto Rico income tax consequences of the Plan to differ materially from the consequences described below.

The Puerto Rico income tax consequences of the Plan are complex. As of the date of this Disclosure Statement, no ruling has been formally requested from the Puerto Rico Treasury Department (the "P.R. Treasury"); no opinion has been requested from the Debtors' counsel concerning any tax consequence of the Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of Puerto Rico income taxation that may be relevant to Holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers (e.g., regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, corporations of individuals, partnerships or other pass-through entities for Puerto Rico income tax purposes, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, the description assumes that a Holder holds Existing Securities and New Bonds only as a "capital asset" within the meaning of Section 1034.01(a)(1) of the P.R. Code. This description does not address Puerto Rico taxes other than Commonwealth income taxes, nor does it apply to any person that acquires New Bonds in the secondary market. Finally, this discussion does not address the Puerto Rico income tax consequences to Holders of Claims who are deemed to have rejected the Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the Puerto Rico tax consequences of the Plan.

### B.     P.R. Holders

#### 1.     Definition of P.R. Holder

Unless otherwise noted, the discussion below applies only to P.R. Holders. As used herein, the term "P.R. Holder" means a beneficial owner of Existing Securities on the Effective Date of the Plan that is, for P.R. income tax purposes:

- An individual who for the entire taxable year is a bona fide resident of Puerto Rico for purposes of Section 933 of the U.S. Internal Revenue Code of 1986, as amended (as determined under Section 937(a) of such Code) and a resident of Puerto Rico for purposes of the P.R. Code;

- a corporation or other entity organized under the laws of Puerto Rico that is treated as a corporation for Puerto Rico income tax purposes, excluding a corporation or any other type of entity subject to pass through tax treatment or any other special tax regime under the P.R. Code;

- an estate, the income of which is subject to Puerto Rico income taxation regardless of its source; or

- a trust (other than a business trust), all of the beneficiaries of which are individual residents of Puerto Rico, as described above.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

A P.R. Holder who holds Allowed Claims of more than one Class may have different Puerto Rico income tax consequences for each Class of Allowed Claims. P.R. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such P.R. Holder holds, and P.R. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the Puerto Rico income tax consequences of each Class of Allowed Claims such P.R. Holder holds.

2. **Tax Treatment of Allowed Claims**

a) **Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) Vintage CW Bond Claims, (ii) Vintage CW Bond Claims (Insured), (iii) Vintage CW Guarantee Bond Claims, (iv) Vintage CW Guarantee Bond Claims (Insured), (v) 2011 CW Bond Claims, (vi) 2011 CW Bond Claims (Insured), (vii) 2011 CW Guarantee Bond Claims, (viii) 2011 CW Series

D/E/PIB Bond Claims, (ix) 2011 CW Series D/E/PIB Bond Claims (Insured), (x) 2012 CW Bond Claims, (xi) 2012 CW Bond Claims (Insured), (xii) 2012 CW Guarantee Bond Claims, (xiii) 2014 CW Bond Claims, and (xiv) 2014 CW Guarantee Bond Claims (Class 37) will be treated as exchanging such P.R. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New Bonds (including New GO Bonds and COFINA Junior Lien Bonds) and Cash.

(i)     *Tax Treatment of Exchange*

The Debtors expect that, and intend to take the position that, the exchange should not qualify as a recapitalization because neither Debtors nor Reorganized Debtors should be classified as a corporation for Puerto Rico income tax purposes. If, consistent with Debtors' expectation, the exchange of a portion of the GO Bonds for the New Bonds pursuant to the Plan does not qualify as a recapitalization, then the exchange will be considered a taxable exchange under the P.R. Code. Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the GO Bonds on the date of the exchange. The amount realized on the exchange of GO Bonds will equal the fair market value of each New Bond plus any Cash received (except for any portion attributable to accrued and unpaid interest). Please refer to the discussion below related to Cash payments for Consummation Costs and the PSA Restriction Fee.

Gain or loss on the exchange of GO Bonds for New Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the GO Bonds is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable). The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the exchange of the GO Bonds for New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

To the extent that any consideration (i.e. New Bonds or portion thereof, plus any Cash payment) received by a P.R. Holder in exchange for GO Bonds is attributable to accrued and unpaid interest on the GO Bonds, that amount of consideration will be considered exempt interest income for Puerto Rico income tax purposes. In that event, the portion allocated to accrued and unpaid interest will reduce the amount realized by the P.R. Holder to compute gain or loss on the exchange.

The Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (such as any accrued but unpaid interest other than described in the preceding clauses).

Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes. Consistent with such allocation under the Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest. There is no specific Applicable P.R. Tax Law that considers how payments must be applied in our situation. While the Debtors intend to report distributions to a P.R. Holder in accordance with the Plan, and the Debtors believe that such reporting is consistent with applicable law and congressional intent, there can be no assurance that the P.R. Treasury will respect those allocations with respect to payment on the GO Bonds.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan.

(ii)    *Taxation of New Bonds*

*Interest*. Interest paid or accrued to P.R. Holders on the New Bonds will not be subject to Puerto Rico income tax, including the alternate basic tax. The excess of the principal amount of the New Bonds due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

Ownership of the New Bonds may result in a portion of the interest paid or accrued by a P.R. Holder and other expenses incurred by the P.R. Holder attributable to interest on the New Bonds being disallowed as deductions for Puerto Rico income tax purposes.

*Sale, Exchange or Retirement of the New Bonds*. Gain or loss on the sale or exchange of New Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the New Bonds is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable). The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the sale or exchange of the New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

**b)    Holders of Retail Vintage CW Bond Claims (Class 12), Retail 2011 CW Bond Claims (Class 25), Retail 2011 CW Series D/E/PIB Bond Claims (Class 26), Retail 2012 CW Bond Claims (Class 29), and Retail 2014 CW Bond Claims (Class 35)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of (i) Retail Vintage CW Bond Claims, (ii) Retail 2011 CW Bond Claims, (iii) Retail 2011 CW Series D/E/PIB Bond Claims, (iv) Retail 2012 CW Bond Claims, and (v) and Retail 2014 CW Bond Claims will be treated as exchanging such P.R. Holder's GO Bonds that are the subject of these Classes of

Allowed Claims for New Bonds (including New GO Bonds and COFINA Junior Lien Bonds) and Cash. These Holders may also receive Cash payments of Retail Support Fee.

(i) ***Tax Treatment of Exchange***

Generally, the Debtors expect that the Puerto Rico income tax consequences to the P.R. Holders of (i) Retail Vintage CW Bond Claims, (ii) Retail 2011 CW Bond Claims, (iii) Retail 2011 CW Series D/E/PIB Bond Claims, (iv) Retail 2012 CW Bond Claims, and (v) and Retail 2014 CW Bond Claims for the exchanges of GO Bonds for New Bonds and Cash should be as described above under "—Holders of  Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Exchange."

Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the GO Bonds on the date of the exchange. The amount realized on the exchange of GO Bonds will equal the fair market value of each New Bond plus any Cash received (except for any portion attributable to accrued and unpaid interest).

(1) **Retail Support Fee**

The Puerto Rico income tax treatment of the Retail Support Fee is unclear. The Debtors intend to treat the receipt of the Retail Support Fee similar to the treatment adopted for U.S. federal income tax purposes, thus, they will be part of your amount realized on the exchange and subject to Puerto Rico income taxes as described above under "—Holders of  Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Exchange." However, P.R. Treasury may not agree and consider such payments (or some of them) as a separate payment taxable as ordinary income.

P.R. Holders of (i) Retail Vintage CW Bond Claims, (ii) Retail 2011 CW Bond Claims, (iii) Retail 2011 CW Series D/E/PIB Bond Claims, (iv) Retail 2012 CW Bond Claims, and (v) and Retail 2014 CW Bond Claims should consult their own tax advisors regarding the Puerto Rico income tax treatment of distributions received under the Plan, including Cash received as Retail Support Fee.

(ii) *Taxation of New Bonds*

The Debtors expect that the New Bonds should be treated for Puerto Rico income tax purposes as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Taxation of New Bonds."

c) **Holders of Vintage CW Bond Claims (Taxable Election) (Class 14), Vintage CW Guarantee Bond Claims (Taxable Election) (Class 17), 2011 CW Bond Claims (Taxable Election) (Class 20), 2011 CW Guarantee Bond Claims (Taxable Election) (Class 22), 2011 CW Series D/E/PIB Bond Claims (Taxable Election) (Class 27), 2012 CW Bond Claims (Taxable Election) (Class 31), 2012 CW Guarantee Bond Claims (Taxable Election) (Class 33), 2014 CW Bond Claims (Taxable Election) (Class 36), and 2014 CW Guarantee Bond Claims (Taxable Election) (Class 38)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) Vintage CW Bond Claims (Taxable Election), (ii) Vintage CW Guarantee Bond Claims (Taxable Election), (iii) 2011 CW Bond Claims (Taxable Election), (iv) 2011 CW Guarantee Bond Claims (Taxable Election), (v) 2011 CW Series D/E/PIB Bond Claims (Taxable Election), (vi) 2012 CW Bond Claims (Taxable Election), (vii) 2012 CW Guarantee Bond Claims (Taxable Election), (viii) 2014 CW Bond Claims (Taxable Election), and (ix) 2014 CW Guarantee Bond Claims (Taxable Election) will be treated as exchanging such P.R. Holder's GO Bonds that are the subject of these Classes of Allowed Claims for New Bonds (including New GO Bonds and COFINA Junior Lien Bonds) and Cash.

(i) *Tax Treatment of Exchange*

Generally, the Debtors expect that the Puerto Rico income tax consequences to the P.R. Holders of (i) Vintage CW Bond Claims (Taxable Election), (ii) Vintage CW Guarantee Bond Claims (Taxable Election), (iii) 2011 CW Bond Claims (Taxable Election), (iv) 2011 CW Guarantee Bond Claims (Taxable Election), (v) 2011 CW Series D/E/PIB Bond Claims (Taxable Election), (vi) 2012 CW Bond Claims (Taxable Election), (vii) 2012 CW Guarantee Bond Claims (Taxable Election), (viii) 2014 CW Bond Claims (Taxable Election), and (ix) 2014 CW Guarantee Bond Claims (Taxable Election) for the exchanges of GO Bonds for New Bonds and Cash  should be as described above under "—Holders of  Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25),

2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Exchange."

P.R. Holders of (i) Vintage CW Bond Claims (Taxable Election), (ii) Vintage CW Guarantee Bond Claims (Taxable Election), (iii) 2011 CW Bond Claims (Taxable Election), (iv) 2011 CW Guarantee Bond Claims (Taxable Election), (v) 2011 CW Series D/E/PIB Bond Claims (Taxable Election), (vi) 2012 CW Bond Claims (Taxable Election), (vii) 2012 CW Guarantee Bond Claims (Taxable Election), (viii) 2014 CW Bond Claims (Taxable Election), and (ix) 2014 CW Guarantee Bond Claims (Taxable Election) that are eligible to make a taxable election should consult their own tax advisors regarding the Puerto Rico income tax consequences of making such election and distributions received under the Plan.

(ii)   *Taxation of New Bonds*

The Debtors expect that the New Bonds should be treated for Puerto Rico income tax purposes as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Taxation of New Bonds."

d)   **Holders of ERS Bond Claim (Class 48)**

Pursuant to the Plan, each P.R. Holder of ERS Bond Claims, shall be entitled to receive such P.R. Holder's pro-rata share of ERS Bond Collateral Cash, which shall be placed in the ERS Reserve as if such Claim had been an Allowed ERS Bond Claim as of the Effective Date, pending entry of a final, non-appealable order resolving or settling the ERS Bonds Claim.

Any actual or constructive distributions from the ERS Reserve to P.R. Holders of Allowed Claims shall be treated for Puerto Rico income tax purposes as if received directly from the Debtors on behalf of the holder's original Claim.

Accordingly, the Debtors expect that the Puerto Rico income tax consequences to the P.R. Holders of ERS Bond Claims for the exchanges of ERS Bonds for ERS Bond Collateral Cash upon any actual or constructive distributions from the ERS Reserve should be as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Exchange." Therefore, a P.R. Holder will recognize gain or loss equal to the

difference between the ERS Bond Cash (except for any portion attributable to accrued and unpaid interest) and the P.R. Holder's adjusted tax basis in the ERS Bonds on the date of the exchange.

e)    **Holders of Settling ERS Bond Claims (Class 49)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of a Settling ERS Bond Claim should be treated as exchanging such P.R. Holder's ERS Bonds that are the subject of this Class of Allowed Claims for Cash for Puerto Rico income tax purposes. The remainder of this discussion assumes this will be the case.

The tender of the ERS Bonds in exchange for the ERS Bond Settlement Distribution, which is comprised of ERS Bond Collateral Cash, will be treated as a taxable exchange of the ERS Bonds for Cash for Puerto Rico income tax purposes. The Debtors expect that the Puerto Rico income tax consequences to the P.R. Holders of Settling ERS Bonds Claims of such exchange for Cash should be as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Exchange."

f)    **Holders of Vintage PBA Bond Claims (Class 1), Vintage PBA Bond Claims (Insured) (Class 2), Retail Vintage PBA Bond Claims (Class 3), 2011 PBA Bond Claims (Class 4), Retail 2011 PBA Bond Claims (Class 5), 2012 PBA Bond Claims (Class 6), and Retail 2012 PBA Bond Claims (Class 7)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) PBA Bond Claims, (ii) PBA Bond Claims (Insured), (iii) Retail Vintage PBA Bond Claims, (iv) 2011 PBA Bond Claims, (v) Retail 2011 PBA Bond Claims, (vi) 2012 PBA Bond Claims, and (vii) and Retail 2012 PBA Bond Claims will be treated as exchanging such P.R. Holder's Allowed Claim for Cash, plus the Retail Support Fee in the case of P.R. Holders of (i) Retail Vintage PBA Bond Claims, (ii) Retail 2011 PBA Bond Claims, and (iii) and Retail 2012 PBA Bond Claims.

Generally, the Debtors expect that the Puerto Rico income tax treatment of the receipt of Cash (see treatment of Retail Support Fee below) should be as described above under "—Holders of Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Exchange."

428

Generally, the Debtors expect that the Puerto Rico income tax treatment of the receipt of the Retail Support Fee should be as described above under "—Holders of Retail Vintage CW Bond Claims (Class 12), Retail 2011 CW Bond Claims (Class 25), Retail 2011 CW Series D/E/PIB Bond Claims (Class 26), Retail 2012 CW Bond Claims (Class 29), and Retail 2014 CW Bond Claims (Class 35)—Tax Treatment of Exchange—Retail Support Fee."

Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized (except for any portion of Cash attributable to accrued and unpaid interest) and the P.R. Holder's adjusted tax basis in the PBA Bonds on the date of the exchange.

> **g)** **Holders of PBA General Unsecured Claims (Class 9), CW General Unsecured Claims (Class 41), CW/HTA Claims (Class 42), CW/Convention Center Claims (Class 43), CW/PRIFA Rum Tax Claims (Class 44), CW/MBA Claims (Class 45), Settling ERS Bond Claims (Class 49), ERS General Unsecured Claims (Class 50), Gracia Gracia Claims (Class 51), Convenience Claims (Class 52)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of any of the following: (i) PBA General Unsecured Claims; (ii) CW General Unsecured Claims; (iii) CW/HTA Claims; (iv) CW/Convention Center Claims; (v) CW/PRIFA Rum Tax Claims; (vi) CW/MBA Claims; (vii) Settling ERS Bond Claims; (viii) ERS General Unsecured Claims; (ix) Gracia Gracia Claims; and (x) Convenience Claims  will be treated as receiving a distribution in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims. The consequences of the receipt of such distribution will vary depending on the P.R. Holders individual circumstances and the nature of assets being distributed. P.R. Holders are urged to consult their tax advisors regarding the tax consequences of the receipt of such distribution based on their individual circumstances.

> **h)** **Active and Retired Employee Benefits Claims (Classes 39A-39E), and AFSCME Employee Claims (Class 40)**

The Debtors expect that pursuant to the Plan, each P.R. Holder of an Active and Retired Employee Benefits Claim, and AFSCME Employee Claim will receive modified monthly payments in accordance with the terms and provisions of the Plan. The reduction on the amounts of the monthly payments in accordance with the Plan does not constitute a taxable event and no gain or loss shall be recognized by the P.R. Holders for Puerto Rico income tax purposes as a result of such reductions.

The Puerto Rico tax treatment of the monthly modified payments will not be affected by the adjustments under the Plan. Any P.R. Holders of i) Active and Retired Employee Benefits Claims, and ii) AFSCME Employee Claims that files a Puerto Rico income tax return should consult their tax advisor regarding the Puerto Rico income tax consequences upon the receipt of any payment from such claims.

3.      **Tax Treatment of Consummation Costs and PSA Restriction Fee**

Certain Holders of Claims may receive Cash payments of Consummation Costs and/or the PSA Restriction Fee. The Puerto Rico income tax treatment of Cash payments of Consummation Costs and the PSA Restriction Fee is unclear. The Debtors intend to treat the receipt of the Consummation Costs and PSA Restriction Fee similar to the treatment adopted for U.S. federal income tax purposes, thus, they will be part of your amount realized on the exchange and subject to Puerto Rico income taxes as described above under "—Holders of  Vintage CW Bond Claims (Class 11), Vintage CW Bond Claims (Insured) (Class 13), Vintage CW Guarantee Bond Claims (Class 15), Vintage CW Guarantee Bond Claims (Insured) (Class 16), 2011 CW Bond Claims (Class 18), 2011 CW Bond Claims (Insured) (Class 20), 2011 CW Guarantee Bond Claims (Class 22), 2011 CW Series D/E/PIB Bond Claims (Class 24), 2011 CW Series D/E/PIB Bond Claims (Insured) (Class 25), 2012 CW Bond Claims (Class 28), 2012 CW Bond Claims (Insured) (Class 30), 2012 CW Guarantee Bond Claims (Class 32), 2014 CW Bond Claims (Class 34), and 2014 CW Guarantee Bond Claims (Class 37)—Tax Treatment of Exchange." However, P.R. Treasury may not agree and consider such payments (or some of them) as a separate payment taxable as ordinary income.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan, including Cash received as Consummation Costs and PSA Restriction Fee.

C.      **Non-P.R. Holders**

1.      **Definition of Non-P.R. Holders**

Unless otherwise noted, the discussion below applies only to Non-P.R. Holders. As used herein, the term "Non-P.R. Holder" means a beneficial owner of Existing Securities, or New Bonds that is not (i) a P.R. Holder or (ii) a partnership or other entity treated as a partnership or other pass-through entity for Puerto Rico income tax purposes.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities, or New Bonds, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership are urged to consult their tax advisors.

The following discussion includes only certain Puerto Rico income tax consequences of the Plan to Non-P.R. Holders. The discussion does not include any non-Puerto Rico tax considerations. Non-P.R. Holders should consult their own tax advisors regarding the Puerto Rico and foreign tax consequences of the Plan under their individual circumstances.

2.      **Tax Treatment of Exchange**

A Non-P.R. Holder that is not engaged in trade or business in Puerto Rico would not be subject to Puerto Rico income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, including any amount allocated to accrued and unpaid interest.  On the

430

other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for income tax purposes will be subject to Puerto Rico income tax as a P.R. Holder on any such gain if it is effectively connected with their Puerto Rico trade or business.

3. **Taxation of New Bonds**

a)      **Treatment of Interest**

Interest paid or accrued on a New Bond to a Non-P.R. Holder will not be subject to Puerto Rico income tax, including the alternate basic tax. The excess of the principal amount of the New Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

The deductions for Puerto Rico income tax purposes of a Non-P.R. Holder engaged in a trade or business in Puerto Rico that are related to interest paid or accrued and other expenses incurred that are attributable to interest on the New Bonds may be disallowed.

b)      **Sale, Retirement or Other Disposition of New Bonds**

Gain realized on the sale, retirement or other disposition of a New Bond by a Non-P.R. Holder that is not engaged in a trade or business in Puerto Rico will not be subject to Puerto Rico income tax, by way of withholding or otherwise. On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if it is effectively connected with their Puerto Rico trade or business in the same manner as a P.R. Holder. In addition, a corporation may be subject to a branch profits tax with respect to such effectively connected income.

*[Remainder of Page Left Intentionally Blank]*

431

## XI.    Applicability of Certain Federal and State Securities Laws

### A.    New GO Bonds

#### 1.    Registration of Securities

In general, securities issued by Reorganized Commonwealth such as the New GO Bonds are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to governmental entities such as Reorganized Commonwealth and government agencies and instrumentalities thereof under the Securities Act, Bankruptcy Code section 1145(a)(1), made applicable to the Title III Cases pursuant to PROMESA section 301, provides an exemption from the registration requirements of the Securities Act and from any requirements arising under state securities laws for the offer or sale under a plan of adjustment of securities of the debtor, an affiliate of the debtor participating in a joint plan of adjustment with the debtor, or a successor of the debtor.  The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell such securities without registration under the Securities Act or pursuant to an exemption therefrom.  Since obligations of the Commonwealth are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized Commonwealth although the provisions of Bankruptcy Code section 1145 which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code.  Creditors of the Debtors who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Like the exemption from registration provided to the Commonwealth under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities.  Therefore, each trust indenture, ordinance, resolution and other written actions of the Commonwealth or Reorganized Commonwealth relating to the New GO Bonds will be exempt from qualification under section 304(a)(4) of the TIA.

#### 2.    Market Disclosure

##### a)    Initial Offer and Sale

Although exempt from registration, securities issued by Reorganized Commonwealth are subject to the anti-fraud provisions of federal securities laws.  Sections 10(b) and 17(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the SEC under the Securities Act generally prohibit fraud in the purchase and sale of securities.  Therefore, each publicly offered sale of Reorganized Commonwealth obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Bankruptcy Code section 1125(d), which has been adopted by PROMESA, provides that the

432

adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principals of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, Bankruptcy Code section 1125(b), which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the Debtors and to hypothetical investors in obligations of the Debtors through a disclosure statement such as this Disclosure Statement.

b)      **Continuing Disclosure**

Publicly offered securities of Reorganized Commonwealth generally are subject to the requirements of Rule 15c2-12 under the Exchange Act (the "Rule"), promulgated by the SEC under the Securities Act, unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as Reorganized Commonwealth.

The delivery of the New GO Bonds pursuant to the Plan is not covered by the Rule because the New GO Bonds are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the New GO Bonds.

**B.      COFINA Junior Lien Bonds.**

**1.      Registration of Securities**

In general, securities issued by Reorganized COFINA such as the COFINA Junior Lien Bonds are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to government agencies and instrumentalities such as Reorganized COFINA under the Securities Act, Bankruptcy Code section 1145(a)(1), made applicable to the Title III Case pursuant to PROMESA section 301, provides an exemption from the registration requirements of the Securities Act and from any requirements arising under state securities laws for the offer or sale under a plan of adjustment of securities of the debtor, an affiliate of the debtor participating in a joint plan of adjustment with the debtor, or a successor of the debtor. The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell such securities without registration under the Securities Act or pursuant to an exemption therefrom. Since obligations of COFINA are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized COFINA, although the provisions of Bankruptcy Code section 1145 which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code. Creditors of COFINA who believe they meet the definition of

"underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Like the exemption from registration provided to COFINA under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities. Therefore, each trust indenture, ordinance, resolution and other written actions of COFINA relating to the COFINA Junior Lien Bonds will be exempt from qualification under section 304(a)(4) of the Trust Indenture Act.

### 2. Market Disclosure

#### (a) Initial Offer and Sale

Although exempt from registration, securities issued by COFINA are subject to the anti-fraud provisions of federal securities laws. Section 10(b) of the Securities Act and Rule 10b-5 promulgated by the SEC under the Exchange Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of COFINA obligations typically is accompanied by an offering document that referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Bankruptcy Code section 1125(d), which has been adopted by PROMESA, provides that the adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principals of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, Bankruptcy Code section 1125(b), which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of COFINA and to hypothetical investors in obligations of COFINA through a disclosure statement such as this Disclosure Statement.

#### (b) Continuing Disclosure

Publicly offered securities of COFINA generally are subject to the requirements of the Rule (that is, Rule 15c2-12 under the Exchange Act (as defined above)), promulgated by the SEC under the Securities Act, unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as COFINA.

The delivery of the COFINA Junior Lien Bonds pursuant to the Plan is not covered by the Rule because the COFINA Junior Lien Bonds are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the COFINA Junior Lien Bonds.

434

# XI.     Financial Information and Projections

## A.     Historical Financial Reporting

### 1.     Commonwealth Financial Statements

The Commonwealth has entered into several continuing disclosure undertakings in accordance with Rule 15c2-12 of the SEC in connection with its bond issuances. In accordance with such Rule, the Commonwealth has covenanted to file with the MSRB through EMMA, within 305 days after the end of each fiscal year, core financial information and operating data for the prior fiscal year, including: (1) audited financial statements and (2) a Financial Information and Operating Data Report (the "Commonwealth Report") which provides financial information and operating data on revenues, expenditures, financial operations, and indebtedness of the type generally found in the Commonwealth's Official Statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by the Commonwealth are for fiscal year 2016. These financial statements were filed by the Commonwealth with the Municipal Securities Rulemaking Board (the "MSRB") through its Electronic Municipal Markets Access System ("EMMA") on May 6, 2019. The latest Commonwealth Report is dated December 18, 2016, and sets forth unaudited financial information as of June 30, 2016.[358]

The financial statements for fiscal year 2016 were audited by KPMG LLP, which did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated May 3, 2019, which report and express qualified and unmodified opinions[359] and include emphasis of matter paragraphs regarding going concern considerations relating to the Commonwealth, the Retirement Systems, GDB, HTA, PREPA, PRASA, and UPR.

According to reports published in April 2019, the Commonwealth expected to finalize its 2017 financial statements by September 30, 2019, and its 2018 financial statements by March 31, 2020.

On June 20, 2019, in connection with a request of information by federal law enforcement agencies, the Government announced the cancellation of certain contracts that the Treasury Department or the OCFO had awarded to the accounting firm BDO Puerto Rico, including a contract related to assisting with the completion of the Commonwealth's 2017 and 2018 financial statements. On June 24, 2019, the Treasury Secretary and Chief Financial Officer, who is the official in charge of preparing the Commonwealth's financial statements, was removed from his

---

[358] The GAO found in its 2019 GAO Report that timely release of audited financial information has long been a problem for Puerto Rico; Puerto Rico's fiscal years 2015 and 2016 financial statements were both released more than 1,000 days after the end of those fiscal years.

[359] A qualified opinion is a statement issued after an audit is completed suggesting that the information being provided is limited in scope; an unmodified opinion is the opinion where auditor expresses an opinion that financial statements are presented, in all material respects, in accordance with applicable financial reporting framework.

position.  These events are likely to cause delays to the Commonwealth's expected completion date of its financial statements.

**Late Filing of Financial Reports.** As mentioned above, the Commonwealth has not filed its 2018 or 2017 financial statements or its 2018 or 2017 Commonwealth Report.  Although the Commonwealth has filed all the financial statements and Commonwealth Reports required to be filed for prior years, some of these filings have been made after the Commonwealth's filing deadline, which is normally May 1.[360]

Below is a brief summary of the reasons that have caused filing delays with respect to the Commonwealth Report or the financial statements for fiscal year 2008 and onward.

*Fiscal year 2018.*  On May 1, 2019, the Commonwealth gave notice that its audited financial statements and the Commonwealth Report for fiscal year 2018 would not be filed by the May 1, 2019 deadline.  According to the notice filed on EMMA, the Commonwealth will file such documents as soon as the information is available.

*Fiscal year 2017.*  On May 1, 2018, the Commonwealth gave notice that its audited financial statements and the Commonwealth Report for fiscal year 2017 would not be filed by the May 1, 2018 deadline.  According to the notice filed on EMMA, the delay was primarily caused by the revisions to the fiscal plans for the Commonwealth and certain instrumentalities requested by the Oversight Board after Hurricanes Irma and Maria devastated the island, which fiscal plans were needed in final form in order to complete the Commonwealth Report.

---

[360] The delay was caused by various reasons.  The audited financial statements and Commonwealth Report for fiscal year 2017 were delayed primarily because of the revisions to the fiscal plans for the Commonwealth and certain instrumentalities requested by the Oversight Board after the island, which fiscal plans were needed in final form in order to complete the Commonwealth Report.  The audited financial statements and Commonwealth Report for fiscal year 2015 were delayed primarily because of: (a) significant delay on engagement of the Commonwealth audit firm due to significant increase in audit risk and liabilities to the audit firm, (b) implementation of GASB 68, GASB 69 and GASB 72, (c) issues of liquidity and going concern considerations of the Commonwealth and its component units, (d) enhanced analysis over the insolvency of the Retirement Systems, (e) impairment analyses of deposits held at GDB and accounts receivable balances of the Primary Government and component units, (f) delays in the issuance of audited financial statements for significant component units, such as GDB, PREPA, HTA, the Puerto Rico Automobile Accident Compensation Administration, Special Communities Trust, the PR National Guard Trust, the Puerto Rico Agricultural Insurance Authority and the Retirement Systems, among others, (g) significant changes in the composition of the Commonwealth reporting unit, through the inclusion of approximately 10 entities as blended component units instead of discretely presented component units, and (h) a delay in the issuance of the PREPA financial statements related to the actuarial reports and financial statements of the utility's retirement system, which in turn delayed the financial statements of the Commonwealth.  The audited financial statements and Commonwealth Report for fiscal year 2014 were delayed primarily because of:  (a) liquidity and going concern considerations of the Commonwealth and its component units, (b) required enhanced and complex analysis over a GDB loan reserve, (c) implementation of GASB 67 in the Retirement Systems, (d) enhanced analysis over the depletion date of the Retirement Systems, (d) delays in the issuance of certain component units, (e) enhanced and extended audit procedures performed by the Commonwealth auditors and (f) significant adjustments and modifications required to the financial statements relating to going concern considerations of the Commonwealth and its instrumentalities.

*Fiscal year 2016.*  On April 27, 2017, the Commonwealth gave notice that its audited financial statements for fiscal year 2016 would not be filed by the May 1, 2018 deadline.

*Fiscal year 2015*. The audited financial statements of the Commonwealth for fiscal year 2015 were filed after the Commonwealth's filing deadline. The delay was primarily caused by: (a) significant delay on engagement of the Commonwealth audit firm due to significant increase in audit risk and liabilities to the audit firm, (b) implementation of GASB 68, GASB 69 and GASB 72, (c) issues of liquidity and going concern considerations of the Commonwealth and its component units, (d) enhanced analysis over the insolvency of the Retirement Systems, (e) impairment analyses of deposits held at GDB and accounts receivable balances of the Primary Government and component units, (f) delays in the issuance of audited financial statements for significant component units, such as GDB, PREPA, HTA, the Puerto Rico Automobile Accident Compensation Administration, Special Communities Trust, the PR National Guard Trust, the Puerto Rico Agricultural Insurance Authority and the Retirement Systems, among others, (g) significant changes in the composition of the Commonwealth reporting unit, through the inclusion of approximately 10 entities as blended component units instead of discretely presented component units, and (h) a delay in the issuance of the PREPA financial statements related to the actuarial reports and financial statements of the utility's retirement system, which in turn delayed the financial statements of the Commonwealth.

*Fiscal year 2014.* The financial statements of the Commonwealth for fiscal year 2014 were filed after the Commonwealth's filing deadline. The delay was primarily caused by: (a) liquidity and going concern considerations of the Commonwealth and its component units, (b) required enhanced and complex analysis over a GDB loan reserve, (c) implementation of GASB 67 in the Retirement Systems, (d) enhanced analysis over the depletion date of the Retirement Systems, (d) delays in the issuance of certain component units, (e) enhanced and extended audit procedures performed by the Commonwealth auditors and (f) significant adjustments and modifications required to the financial statements relating to going concern considerations of the Commonwealth and its instrumentalities.

*Fiscal year 2013.* The financial statements of the Commonwealth for fiscal year 2013 were filed after the Commonwealth's filing deadline. Initially, the delay was primarily caused by (i) a delay in the commencement of the financial close and audit process for fiscal year 2013, which did not commence until the completion of the financial statement for fiscal year 2012 on September 16, 2013 (delays in the audit of the 2012 financial statements were principally caused by the government transition process after the November 2012 elections), (ii) delays related to the change of the Commonwealth's external auditors, and (iii) the implementation of GASB Statement No. 61, *The Financial Reporting Entity*, which changed the Commonwealth's financial reporting entity. Although the Commonwealth addressed these issues by dedicating additional resources to the financial close and audit process for fiscal year 2013, the Commonwealth was unable to finalize the 2013 financial statements due to certain additional unanticipated delays attributable to (i) additional procedures required as part of the audit, (ii) delays in the issuance of the audited financial statements of the three Commonwealth retirement systems resulting from the pension reform legislation enacted in 2013 and the subsequent judicial modification of such reforms, and (iii) delays in the issuance of the audited financial statements of certain other blended and discretely presented component units.

*Fiscal Year 2012.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2012 were filed after the Commonwealth's filing deadline due to delays in the audit of such financial statements as a result of the government transition process, as a new administration entered office in January of 2013, and the failure of certain discretely presented component units to finalize their audited financial statements. The Commonwealth Report for fiscal year 2012 was also filed after the Commonwealth's filing deadline.

*Fiscal year 2009.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 were filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units of the Commonwealth.

*Fiscal year 2008.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2008 (and certain prior years) were filed after the Commonwealth's filing deadline, because various governmental agencies did not submit their audited financial statements to the Central Government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth Report for fiscal year 2008 was also filed after the Commonwealth's filing deadline.

2.　**ERS Financial Statements**

In accordance with Rule 15c2-12 of the SEC and in connection with its bond issuances, ERS has covenanted to file within 305 days after the end of each fiscal year, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including: (1) audited financial statements and (2) an Annual Financial Information and Operating Data Report, which provides financial information and operating data on revenues, expenditures, financial operations, and indebtedness generally found in the Official Statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by ERS are for fiscal year 2016. These financial statements were filed by ERS with the MSRB through EMMA on November 13, 2018. The financial statements of ERS for fiscal year 2017 and fiscal year 2018 have not been finalized.  The most recent Annual Financial Information and Operating Data Report of ERS was published on May 1, 2019 and sets forth unaudited financial information as of June 30, 2018.

The financial statements for fiscal year 2016 were audited by KPMG LLP, whose report includes an emphasis of matter paragraph[361] regarding the uncertainty about the ability of ERS to continue as a going concern.

**Late Filing of Financial Reports.**  As mentioned above, ERS has not filed its 2018 or 2017 financial statements, which have not been finalized.  And although ERS has filed all the

---

[361] An emphasis of matter paragraph is a paragraph directing the attention of users of financial statements to a matter the auditor believes is fundamental to the users' understanding of the financial statements.

reports and financial statements required to be filed for prior fiscal years, some of these filings have been made after ERS's filing deadline, which is normally May 1.

### 3.  PBA Financial Statements

In accordance with Rule 15c2-12 of the SEC and in connection with its bond issuances, PBA has covenanted to file within 305 days after the end of each fiscal year, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including: (1) audited financial statements and (2) an Annual Financial Information and Operating Data Report, which provides financial information and operating data on revenues, expenditures, financial operations, and indebtedness generally found in the Official Statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by PBA are for fiscal year 2016. These financial statements were filed by PBA with the MSRB through EMMA on April 8, 2019. The most recent Annual Financial Information and Operating Data Report of PBA was published on April 28, 2017 and sets forth unaudited financial information as of June 30, 2016.

The financial statements for fiscal year 2016 were audited by BDO Puerto Rico, PSC. The auditors' report expresses a qualified opinion given that PBA has not implemented the requirements of GASB Statement No. 68 – "Accounting and Financial Reporting for Pensions, an amendment to GASB Statement No. 27 (Statement 68)" and the financial statements do not disclose the pension cost information required by GASB Statement No. 68. Therefore, PBA has not been able to determine its proportionate share of net pension liability, deferred inflow of resources and deferred outflow of resources related to pension costs. GAAP require that pension related liability, deferred outflow of resources and deferred inflow of resources, as applicable, be recognized in accordance with the parameters established by Statement No. 68, as well as the effect of current period changes of the such amounts that must be recognized in pension expense during the current period. Recognition of these amounts would increase liabilities, increase deferred outflow of resources, increase deferred inflow of resources, increase the deficit, and change the pension expense.

The report includes an emphasis of matter paragraph regarding the financial deterioration of the Commonwealth and GDB and possible effects therefrom on PBA. The auditor's report also includes another matter paragraph concerning required supplementary information related to the Schedules of PBA's Proportionate Share of Net Pension Liability and Contributions to the Employee's Pension Plan, which is required by GAAP but was omitted.

***PBA Late Filing of Financial Reports.*** PBA has not filed its 2018 or 2017 audited financial statements, which have not been finalized.

### 4.  COFINA Financial Statements

The certified COFINA Fiscal Plan, certified COFINA budget for fiscal year 2020, and the most recent COFINA annual report are attached hereto as Exhibit M, N, and O respectively.

### B.      Commonwealth Fiscal Plan and Projections

Attached to this Disclosure Statement as Exhibit E is a copy of the Commonwealth Fiscal Plan, certified by the Oversight Board on May 9, 2019.  The Commonwealth Fiscal Plan provides details regarding the Commonwealth's and ERS's projected operations under the Plan, subject to the assumptions and qualifications set forth in the certified Commonwealth Fiscal Plan.[362]

It is important to note the projections described in the Commonwealth Fiscal Plan may differ from actual performance and are highly dependent on significant assumptions concerning the future economic and financial condition of the Commonwealth and its instrumentalities, including ERS, which are affected by various legal, financial, social, economic, environmental, governmental and political factors.  These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government, the Oversight Board, and other third-party entities such as the government of the United States.

The financial projections included in the Commonwealth Fiscal Plan assume the successful implementation of the Plan.  The financial projections included in the Commonwealth Fiscal Plan should be reviewed in conjunction with the assumptions, notes, and qualifications included in the Commonwealth Fiscal Plan and the assumptions, qualifications, and explanations set forth in this Disclosure Statement, including in the sections titled "Overview of the Debtors," "The Title III Plan of Adjustment," "Certain Risk Factors to Be Considered," "Certain Material United States Federal Income Tax Considerations," "Certain Material Puerto Rico Income Tax Considerations," and "Applicability of Certain Federal and State Securities Laws."

The Commonwealth Fiscal Plan do not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government or ERS and the information contained herein.

---

[362] The Debt Sustainability Analysis ("DSA") in the Commonwealth Fiscal Plan was intended to provide a framework for assessing the long-term capacity of the Government to pay debt service on its bonded debt.  The DSA included a comparison of existing debt levels between Puerto Rico and U,S. states, finding that Puerto Rico's existing debt levels are far higher than that of peer U.S. States.  The DSA also included a comparison of existing debt levels between Puerto Rico and certain European Union ("EU") sovereigns, again finding that Puerto Rico's existing debt levels are far higher than that of the selected EU sovereigns.  The DSA included a further analysis of key debt ratios of the ten lowest indebted states, ten highest indebted states, and the mean for all U.S. states to determine a range of implied debt capacity based on debt and fixed cost metrics.  The DSA concluded that Puerto Rico must develop and adhere to structurally balanced budgets reflecting ongoing discipline, timely publicize audited financial statements, and restructure its debt load to a sustainable level.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of the assumptions and the reliability of the financial projections and should consult with their own advisors.

*[Remainder of Page Left Intentionally Blank]*

## XII.   **Additional Information**

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. All Exhibits to the Plan will be filed with the Title III Court and available for review, free of charge, on the Document Website at https://cases.primeclerk.com/puertorico prior to the Voting Deadline. Copies of all Exhibits to the Plan also may be obtained, free of charge, by contacting the Solicitation Agent, Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com and reference "Commonwealth Plan of Adjustment Exhibits" in the subject line.  Please note that Prime Clerk LLC is not authorized to provide, and will not provide, legal advice.

## XIII.   **Conclusion**

The Oversight Board and the Debtors believe that the Plan is in the best interests of all creditors and urge the Holders of Impaired Claims entitled to vote on the Plan to vote to accept the Plan and to evidence the acceptance by timely returning their Ballots marked to accept the Plan by the Voting Deadline.